IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CEC ENTERTAINMENT, INC.**, *et al.*, | § | Case No. 20-33163 (MI) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DECLARATION OF JAMES HOWELL IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND RELATED REQUESTS FOR RELIEF

I, James A. Howell, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Financial Officer ("**CFO**") of CEC Entertainment, Inc.

("**CEC**"; together with its direct and indirect subsidiaries, the "**Company**").  The Company is a

leading family entertainment and dining company worldwide, with a global network of family

entertainment and dining centers that it develops, operates, and franchises under the names

"**Chuck E. Cheese**" ("Where A Kid Can Be A Kid") (the "**CEC Venues**") and "**Peter Piper**

**Pizza**" ("Pizza Made Fresh, Families Made Happy") (the "**PPP Venues**").  On June 24, 2020

(the "**Petition Date**"), CEC, its direct parent company Queso Holdings, Inc. ("**Queso**"), and

certain of its direct and indirect subsidiaries (collectively with CEC and Queso, the "**Debtors**")

commenced in this Court voluntary cases under chapter 11 of title 11 of the United States Code

(the "**Bankruptcy Code**").  I am knowledgeable about and familiar with the Company's business

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings, Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company, Inc. (8656); and Texas PP Beverage, Inc. (6895).  The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

and financial affairs.  I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**"). I am authorized to submit this Declaration on behalf of the Debtors.

2. I have served as Executive Vice President – CFO of CEC since September 2018.  Previously, I served as Chief Financial Officer of Billabong International Ltd. (ASX:BBG) from June 2017 through July 2018.  Prior to that, I spent ten years at Nordstrom Inc., most recently as Executive Vice President – Finance and Treasurer.  Prior to Nordstrom Inc., I served as CFO at CAE SimuFlite, Inc.; SVP and Corporate Controller at Blockbuster, Inc.; and spent 11 years at PricewaterhouseCoopers LLP in the audit practice.  I have a Bachelor of Science in Business Administration (*magna cum laude*) from Union University and a Graduate Certificate from the Mid-South School of Banking (*summa cum laude*).  I am a Certified Public Accountant licensed in the State of Tennessee.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, and/or my discussions with the Company's other officers, directors, and restructuring advisors, Weil Gotshal & Manges LLP ("**Weil**"), PJT Partners LP ("**PJT**"), FTI Consulting, Inc. ("**FTI**"), and Hilco Real Estate, LLC ("**Hilco**").

4. This Declaration has five sections.  The first provides an overview of the Company's business.  The second provides background information on the Company's corporate structure, governance, and management.  The third describes the Company's prepetition capital structure.  The fourth describes the events that led to the filing of these cases and the Company's

prepetition restructuring efforts.  Finally, the fifth section summarizes the relief requested in, and the factual bases supporting, the First Day Motions.

## I.

## The Company's Business

5.     Company Overview.  Based in Irving, Texas, the Company, through the CEC Venues and PPP Venues, offers a lively, kid-friendly atmosphere and features a broad array of entertainment offerings including arcade-style and skill-oriented games, rides, and live entertainment shows, with the opportunity for guests to win tickets and redeem prizes such as toys, plush dolls, and branded merchandise.  It combines this memorable entertainment experience with a broad and creative menu that combines kid-friendly classics with a selection of more sophisticated options for adults.  The Company offers families a highly compelling value proposition in which a family can visit Chuck E. Cheese and spend only $39 for a package that includes food, drinks and entertainment, which the Company believes to be significantly lower than comparable offerings at other dining and entertainment alternatives.  The Company believes there is consistent demand for wholesome entertainment and family dining and positions Chuck E. Cheese as the #1 brand for children's birthdays.

6.     As of December 29, 2019, across both the Chuck E. Cheese brand and the Peter Piper Pizza brand, the Company operated 555 venues and had 186 venues operating under franchise arrangements, for a system-wide total of 741 venues across 47 states and 16 foreign countries and territories.  In its fiscal 2019, the Company generated $912.9 million in revenue, $28.9 million of net loss, and $184.1 million in Adjusted EBITDA.  The Company's 2019 sales mix was relatively balanced between entertainment and merchandise, on the one hand, and food and beverage, on the other hand.

7. <u>Chuck E. Cheese</u>. Chuck E. Cheese was founded in 1977 and is a highly recognized brand among families and children. Its primary guest base consists of families with children between 2 and 12 years of age. CEC Venues feature an open and bright setting, designed to create an inviting atmosphere for children and "line of sight" parent supervision. Each CEC Venue includes approximately 75 games, rides, and attractions, including classic skill games, such as arcade basketball, skee-ball, and Whack-a-Mole. CEC Venues serve a menu of fresh, hand-made pizza, boneless and bone-in chicken wings, desserts, and beverages, including beer and wine at most locations. Chuck E. Cheese, the Company's iconic mouse mascot, performs music and dance shows and interacts with guests. In fiscal 2019, reserved birthday packages represented approximately 16% of CEC Venue revenues. As of December 29, 2019, there were 612 CEC Venues in 47 states and 15 foreign countries and territories, of which 515 were operated by the Company and 97 were franchised. The Company recently began operating a new pizza brand, Pasqually's Pizza & Wings ("**Pasqually's**"), out of Chuck E. Cheese locations. Pasqually's focuses on third-party delivery pizza sales in contrast to Chuck E. Cheese, which focuses on in-store dining and entertainment experiences.

8. Prior to February 14, 2014, CEC was a publicly owned company that traded on the New York Stock Exchange (the "**NYSE**") under the ticker symbol "CEC." On February 14, 2014, Queso, an affiliate of Apollo Global Management, LLC ("**Apollo**"), acquired CEC in a leveraged buyout (the "**LBO**"), resulting in the Company's capital structure and equity ownership being largely similar to those that exist today. Following the LBO, although the Company's common stock was delisted from the NYSE, CEC has continued to publicly report its financial and other information pursuant to covenants in its funded debt agreements.

9.      <u>Peter Piper Pizza</u>.  Acquired by the Company in 2014 following the LBO, Peter Piper Pizza serves fresh, high-quality handcrafted food and beverages, including craft beer and wine, and offers state-of-the-art games at PPP Venues.  PPP Venues feature a bold design and contemporary layout with open kitchens and large, open dining areas.  As of December 29, 2019, there were 129 PPP Venues in the United States and Mexico, of which 40 were operated by the Company and 89 were franchised.  All Company-operated PPP Venues are located in the United States.

## II.

## The Company's Corporate Structure and Leadership

10.      <u>Corporate Structure</u>.  The Company comprises Queso, CEC, and 17 direct and indirect subsidiaries of CEC organized under the laws of, as applicable, Texas, Delaware, Kansas, Arkansas, Canada, and Mexico.  All such entities other than the Company's Canadian and Mexican subsidiaries are Debtors.

11.      Queso is the acquisition vehicle through which Apollo acquired CEC in the LBO.  Queso is 98% owned by affiliates of Apollo and 2% owned by employees and directors of the Company.

12.      The Company's Canadian subsidiary, CEC Entertainment Canada, ULC, is the entity through which the Company conducts substantially all of its Canadian business.  The Company's Mexican entity, Peter Piper de Mexico, S. de R.L. de C.V., has no assets, liabilities, or operations.

13.      The Company also operates with a nonprofit affiliate organized under Texas law (the "**International Association**").  The International Association is governed by a board consisting of 50% representation of the Company and 50% representation of its franchisees.  The

International Association's purpose and function is to centralize advertising costs and allocate such costs among the Company and its franchisees, and it is funded by the Company and franchisees accordingly on a nonprofit basis.

14.    A chart depicting the Debtors' organizational structure as of the Petition Date is attached as Exhibit A to this Declaration.

15.    The Company's senior management consists of the following individuals:

| Individual | Title |
|---|---|
| David McKillips | Chief Executive Officer |
| J. Roger Cardinale | President |
| James A. Howell | Executive Vice President and CFO |
| Rodolfo Rodríguez, Jr. | Executive Vice President, Chief Legal Officer and Chief Human Resources Officer |

16.    Restructuring Committee.   On April 7, 2020, the Board established the Restructuring Committee of the Board (the "**Restructuring Committee**").  The Board appointed independent directors Paul Aronzon, Peter C. Brown, and Allen R. Weiss to the Restructuring Committee.   The Board unanimously delegated authority to the Restructuring Committee to, among other things, consider, evaluate and approve strategic alternatives including financings, refinancings, amendments, waivers, forbearances, asset sales, debt issuances, exchanges and purchases, out-of-court or in-court restructurings (including seeking relief under the Bankruptcy Code), non-ordinary-course transactions and/or similar transactions involving the Company.  The Company was governed by the Board and/or the Restructuring Committee, as was appropriate in each case, with respect to its prepetition evaluation of strategic alternatives.

# III.

## The Company's Prepetition Capital Structure

17.     <u>First Lien Credit Agreement</u>.  Each of the Debtors is party to that certain *First Lien Credit Agreement*, dated as of August 30, 2019, by and among Queso, as holdings, CEC, as borrower, the lenders party thereto, Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), as administrative agent (together with any successor administrative agent, the "**Administrative Agent**"), and certain other parties specified therein (such agreement, as amended, modified, or supplemented from time to time, and including all related credit documents, the "**Credit Agreement**").  The First Lien Credit Agreement provides for a term loan facility (the "**Term Loan**") in the original aggregate principal amount of approximately $760 million and a revolving loan facility (the "**Revolver**") in the aggregate maximum committed principal amount of approximately $114 million (including any letter-of-credit exposure).  The Debtors borrowed the entire amount of the Term Loan on August 30, 2019; drew down $105 million from the Revolver on March 18, 2020; and drew down the remaining approximately $3 million from the Revolver (less approximately $6 million in issued letters of credit).  As of the Petition Date, the Debtors have approximately $874 million of outstanding principal obligations under the Credit Agreement, in addition to any accrued and unpaid prepetition interest, fees, and other charges.  The obligations under the Credit Agreement are secured pursuant to, among other documents, that certain *Collateral Agreement (First Lien)*, dated as of August 30, 2019, by and among CEC, the other Company subsidiaries party thereto, and Credit Suisse as collateral agent (the "**Collateral Agent**").  All of the Debtors other than CEC are guarantors of CEC's obligations under the Credit Agreement.  Queso, however, guaranteed such obligations only on a limited-recourse basis (limited to Queso's pledge of equity in CEC).

18.     As discussed below, the Collateral Agent's prepetition liens on a substantial portion of the Debtors' cash were first perfected within 90 days before the Petition Date and, in the Debtors' view, are potentially subject to avoidance as preferences.[2]

19.     Unsecured Notes.  Each of the Debtors other than Queso is party to that certain Indenture, dated as of February 19, 2014, by and among CEC, as issuer, the subsidiary guarantors party thereto, and Wilmington Trust, National Association, as trustee, for the issuance of $255 million in aggregate principal amount of 8.000% senior unsecured notes due 2022 (such agreement, as amended, modified, or supplemented from time to time, and including the first through fifth Supplemental Indentures, the "**Indenture**"; such notes, the "**Notes**").  As of the Petition Date, the Debtors have approximately $215.7 million of outstanding principal obligations under the Indenture and the Notes, in addition to any accrued and unpaid prepetition interest, fees, and other charges.

20.     Other Obligations.  The Company has other obligations that do not necessarily constitute part of its capital structure.  Among other things, the Company is party to two sale-leaseback transactions covering dozens of stores with National Retail Properties, LP, currently its largest landlord.  The Company is also party to a financing lease with respect to its Cisco communications systems.  Most notably, the Company has monthly rent obligations under hundreds of store leases with a wide array of landlord counterparties, nearly all of which are owed several months' worth of past-due rent.  Finally, the Company has obligations to trade counterparties, some of which benefit from statutory liens.

---

[2] As of the filing of this Declaration, the Debtors and the prepetition lenders continue to try to consensually resolve this dispute and the consensual use of the lenders' purported cash collateral.

21.     Equity.  As discussed above, affiliates of Apollo Global Management own approximately 98% of the equity interests in Queso.  The remaining approximately 2% is owned by current and former employees and directors.

## IV.

## Key Events Leading to the Commencement of These Chapter 11 Cases

22.     Impact of COVID-19 Pandemic.  In ordinary times, the Company would be financially sound.  Chuck E. Cheese and Peter Piper Pizza operated in their ordinary course of business and remained profitable until the recent impact of the COVID-19 coronavirus pandemic (the "**Pandemic**").  Then, on March 16, 2020, things changed.  The Company, like many others, announced the temporary suspension of on-premise dining, entertainment, and arcade rooms at all Company-operated CEC Venues and PPP Venues as a safety precaution in response to the Pandemic.  At the same time, many states and foreign countries began to restrict the operations of restaurants, arcades, and entertainment venues.  As a protective measure, on March 18, 2020, CEC drew $105 million from the Revolver, which constituted nearly all of its available incremental liquidity.

23.     The Revolver draw, however, could not substitute for ordinary course operations.  The impact of the Company's suspension of on-premise customer business eliminated upwards of 90% of the Company's year-over-year revenue during each week of the suspension.  Although the Company made drastic cuts in expenses, sought concessions from landlords (as discussed below), ramped up (and in some cases, established) its third-party delivery and takeout pizza business, including with the launch of Pasqually's, and began limited operations in certain locations as State's allowed restaurants to re-open, those efforts could not compensate for the impact of the Pandemic.

24.     <u>Restructuring Committee</u>.   In early April, 2020, the Company believed it was prudent to explore restructuring and financing alternatives given the impact of the Pandemic and the corresponding uncertainty surrounding its operations.   First, Paul Aronzon, a former corporate restructuring attorney, was appointed to the Board as an independent director.   Second, the Board established the Restructuring Committee and appointed Messrs. Aronzon, Brown, and Weiss—the Board's three independent directors—as its members.   Third, the Board delegated authority to evaluate, negotiate, and implement (including by way of a chapter 11 case) a value-maximizing transaction for the Company.   At approximately the same time, the Company retained Weil, PJT, FTI, and Hilco as advisors with respect to a potential transaction.

25.     The Restructuring Committee met numerous times a week and I understand engaged informally with the Company's advisors and senior management almost every day.   I was present for many of the Restructuring Committee meetings as the Chief Financial Officer of the Company.   The Restructuring Committee from the outset requested and discussed a substantial amount of detailed analysis from the Company's advisors regarding the Company's potential paths forward, along with financial, legal, strategic, and practical considerations.   At various times, full Board meetings were also conducted, including in connection with the filing for chapter 11.

26.     During this process, the Company's advisors had been engaged in discussions with advisors to three organized constituents in the Company's capital structure: (i) Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") and Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), as advisors to an ad hoc group of Term Loan holders (the "**Term Loan Advisors**"; such group, the "**Term Loan Group**"); (ii) King & Spalding LLP ("**K&S**") and Ducera Partners LLC ("**Ducera**"), as advisors to an ad hoc group of holders of Notes (the "**Notes Advisors**"; such group, the "**Notes Group**"); and (iii) Paul, Weiss, Rifkind, Wharton & Garrison

LLP ("**Paul Weiss**"; collectively with the Term Loan Advisors and the Notes Advisors, the "**Stakeholder Advisors**"), as counsel to Apollo.  The Company remained engaged in discussions with the Stakeholder Advisors approximately weekly at first and then more frequently as the Company's process advanced.  In the days leading up to the Petition Date, the Company (through its various representatives) was in daily communication with each of the Stakeholder Advisors.

27.    <u>Multiple Transaction Proposals and Expressions of Interest</u>.  Through its discussions with its various constituencies to date, the Company has been fortunate to have received transaction proposals from each level of constituency in its capital structure.  The Company has also received unsolicited expressions of interest from third parties interested in doing diligence in connection with a potential transaction.  The proposals and expressions of interest received to date vary in their degrees of specificity.  Although the Term Loan Advisors and Notes Advisors have been engaged in confidential due diligence processes to date, other parties (including the Term Loan Group and the Notes Group) have just entered into nondisclosure agreements with the Company to engage in their own principal-side due diligence process.  As is clear, these chapter 11 cases will involve substantial engagement with a wide range of parties regarding a potential transaction in an effort to maximize the value of the estates and its assets.

28.    As noted above, at the direction of the Restructuring Committee, the Debtors and its advisors sought rent abatements and/or concessions from a number of its landlords to provide relief during these unprecedented times.  At first, the Debtors either obtained interim relief from landlords or chose not to make lease payments in an effort to preserve liquidity.  As time extended and landlords were no longer willing to provide interim relief or negotiate with the Debtors, a number of landlords began to commence lawsuits for missed lease payments or, worse, take self-help remedies and terminate leases or lock the Debtors out of premises.  As of the Petition

Date, over 50 lawsuits had been filed by landlords against the Debtors. The Debtors could not risk losing any additional stores and believed filing these chapter 11 cases was necessary to, among other reasons, stop these actions.

29.     In addition, as mentioned above, the Debtors believe that certain liens of the Collateral Agent on cash became perfected on March 27, 2020. As a result, the Debtors determined that filing before the lookback period under section 547(b) of the Bankruptcy Code was important to maximize the value of their estates for the benefit of all parties in interest. The Debtors are attempting to consensually resolve litigable issues surrounding potential preference claims with the Term Loan Group by way of a consensual cash collateral order.

## V.

### The First Day Motions

30.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions. Below is an overview of each of the First Day Motions.

31.     **Joint Administration Motion**. Pursuant to the *Emergency Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 for an Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint Administration Motion**"), the Debtors

request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only. There are seventeen (17) Debtors, and I have been informed that there are approximately 1,500 potential creditors and other parties in interest in these cases. I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the Southern District of Texas and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

32. I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

33. **Request for Emergency Consideration**. Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* (the "**Request for Emergency Consideration**"), the Debtors request emergency consideration of the following motions: (i) the Joint Administration Motion; (ii) the Notice Motion; (iii) the Cash Management Motion; (iv) the Customer Programs Motion; (v) the Vendors Motion; (vi) the Utilities Motion; (vii) the Insurance and Surety Bond Motion; (viii) the Taxes Motion; (ix) the Wages Motion; (xi) the Claims and Noticing Agent Retention Application; and (xii) the Schedules and Statements Extension Motion. I believe that, based on the complexity of these chapter 11 cases (as explained to me by the

Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

34.     **Claims and Noticing Agent Retention Application**.   Pursuant to the *Emergency Application of Debtors Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. §§ 105(a) and 327 for an Order (I) Appointing Prime Clerk LLC as Claims, Noticing, and Solicitation Agent, and (II) Granting Related Relief* (the "**Claims and Noticing Agent Retention Application**"), the Debtors request entry of an order approving the retention and appointment of Prime Clerk LLC ("**Prime Clerk**") as claims, noticing, and solicitation agent ("**Claims and Noticing Agent**") in the Debtors' chapter 11 cases.

35.     I believe that the appointment of Prime Clerk as the Claims and Noticing Agent is appropriate under the circumstances and is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest.  The Debtors selected Prime Clerk as the Claims and Noticing Agent after determining, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

36.     As more fully described in the Claims and Noticing Agent Retention Application, the Claims and Noticing Agent will, among other things, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' chapter 11 cases, pursuant to the provisions of the Engagement Agreement.  I believe that, by appointing Prime Clerk as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices will be expedited and the Office of the

Clerk of the Bankruptcy Court will be relieved of the administrative burden of, among other things, noticing, administering claims, and soliciting and tabulating votes. Accordingly, I believe the Claims and Noticing Agent Retention Application should be granted in all respects.

37.     **Cash Management Motion**. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transaction; (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims; (III) Waiving the Requirements of 11 U.S.C. § 345(b); and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtors request authority to (i) continue participating in the Debtors' existing cash management system (the "**Cash Management System**"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms; (ii) implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in or control of the Cash Management System, including, without limitation, opening new or closing existing bank accounts owned by the Debtors; (iii) continue to perform under and honor intercompany transactions between the Debtors and certain of their non-Debtor affiliates in the ordinary course of business, transfer, and make certain payments on behalf of their non-Debtor affiliates; (iv) provide administrative expense priority for postpetition intercompany transactions which generate intercompany accounts receivables and accounts payables against the Debtors; and (v) honor and pay all prepetition and postpetition fees in connection with the maintenance of the Cash Management System payable by the Debtors. The Debtors further request waiver of the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' bank accounts or investments.

38.     To facilitate the efficient operation of their businesses, the Debtors utilize the Cash Management System; an integrated, centralized cash management system used to collect, transfer, and disburse funds generated by their operations.  The Cash Management System (which includes both Debtors and Non-Debtor Affiliates) facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately 588 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") owned by the Debtors and maintained with multiple banks (each a "**Bank**" and collectively, the "**Cash Management Banks**" or "**Banks**") reflected on the diagram of the Cash Management System attached as Exhibit C to the Cash Management Motion.  The Debtors' treasury department, located primarily in Irving, Texas, maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  I believe that any disruption of the Cash Management System would be materially detrimental and disruptive to the Debtors' operations, as their businesses require prompt and reliable access to cash and accurate cash tracking.

39.     The Cash Management System is tailored to meet the Debtors' operating needs – enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

40.     The Debtors' and Non-Debtor Affiliates' Bank Accounts are as follows: (i) 16 Bank Accounts held by CEC Entertainment Canada, Inc.; (ii) 1 Bank Account held by CEC Entertainment Concepts, L.P.; (iii) 1 Bank Account held by CEC Entertainment Leasing Company; (iv) 525 Bank Accounts held by CEC Entertainment, Inc.; (v) 1 Bank Account held by International Association of CEC Entertainment, Inc.; (vi) 41 Bank Accounts held by Peter Piper,

Inc.; (vii) 1 Bank Account held by Queso Holdings, Inc.; (viii) 1 Bank Account held by SB Hospitality Corporation; and (ix) 1 Bank Account held by SPT Distribution Company, Inc.

41.     The Debtors' primary Cash Management Bank is JP Morgan Chase Bank, N.A. ("**JPMorgan**"), where the Debtors maintain 224 of the Bank Accounts noted above, including the Master Concentration Account.  The Debtors also maintain Bank Accounts with 14 other Cash Management Banks as listed on Appendix 1 to the Cash Management Motion.

42.     As of the Petition Date, the Debtors have an aggregate amount of approximately $89,211,026 in the Bank Accounts.  The bulk of the Debtors' cash on-hand consists of proceeds from (i) draws on the Revolver and (ii) the Debtors' ongoing business operations.

43.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (the "**Bank Fees**").  The Bank Fees are paid monthly and automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Cash Management Banks.

44.     A general overview of the movement of cash through the Cash Management System is illustrated by the flow of funds diagram attached as **Exhibit C** hereto.  As more fully set forth in the Cash Management Motion, cash generally moves through the Cash Management System as follows:

- *Receipts*: All receipts of the Debtors are deposited, swept, or otherwise transferred into the CEC Master Concentration Account or PPP Master Concentration Account either directly via electronic wires and credit card payments, or indirectly via deposits into Deposit Accounts or Venue Concentration Accounts, which are swept periodically into the corresponding Master Concentration Account.  Funds from the PPP Master Concentration Account are transferred to and from the CEC Master Concentration Account on an as needed basis including to satisfy obligations under the intercompany payables or otherwise settle intercompany balances. The CEC Master Concentration Account also receives miscellaneous funds from royalties and franchise assessments and non-trade receipts from third-

party vendors and service providers; typically, these miscellaneous receipts are in the form of a check, wire transfer or automated clearing house receipt.

- ***Disbursements***: With respect to zero-balance Disbursement Accounts tied to the CEC Master Concentration Account and PPP Master Concentration Account, such accounts are funded, as needed, by the CEC Master Concentration Account or PPP Master Concentration Account with cash sufficient to satisfy the Debtors' obligations on a given day. Other, non-zero-balance disbursing accounts, of which there are three, are funded from the CEC Master Concentration Account or PPP Master Concentration Account via the Disbursement Accounts on an as needed basis, but are nonetheless utilized to pay the Debtors' obligations and certain obligations of Non-Debtor Affiliates via transfers of funds into the Non-Debtor Cash Management Systems.

45.     The Debtors use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "**Business Forms**"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "**Books and Records**"). I believe that granting the Debtors authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records, would avoid a significant disruption to the Debtors' business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense,

46.     In the ordinary course of business, the Debtors engage in intercompany transactions with Non-Debtor Affiliates in the ordinary course of their business, which generate intercompany accounts receivables and accounts payables (the "**Intercompany Claims**"). For

instance, in the ordinary course of business, CEC Entertainment, Inc. ("**CEC Entertainment**"), a Debtor, pays amounts owed by CEC Entertainment Canada, ULC ("**CEC ULC**"), a Non-Debtor Affiliate organized under the laws of Canada, resulting in CEC Entertainment recording an intercompany accounts receivable. This intercompany accounts receivable is paid to CEC Entertainment by CEC ULC at the end of each month. CEC ULC's intercompany accounts payable as of the date of petition is approximately $75,000 (USD). CEC ULC also owes a balance of approximately $15.2 million (USD) to CEC Entertainment pursuant to a non-interest bearing intercompany promissory note which does not require regular principal payments and does not allow for incremental borrowings thereunder.

47.       Additionally, International Association, a Non-Debtor Affiliate, pursuant to certain franchise agreements and association membership requirements, assesses each company-owned and franchise-owned Chuck E. Cheese venue on a monthly basis. These assessments are used to fund national media, develop advertisements and commercials, develop/create in-store media played in all the venues, placement of ads on television, radio, and digital outlets, etc., and as such, benefit both the Debtors, Non-Debtor Affiliates, and Chuck E. Cheese franchisees. However, International Association is currently operating at a deficit (in part due to the COVID-19 pandemic) and will need to borrow additional monies from CEC Entertainment to sustain itself in order to provide liquidity for Chuck E. Cheese's marketing and media for the remainder of 2020. As of the Petition Date, International Association owes CEC Entertainment approximately $11.7 million.

48.       At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or Non-Debtor Affiliate, and vice versa. For example in the operation of the Cash Management System, the Debtors transfer funds out of the

CEC Master Concentration Account into various Disbursement Accounts and create intercompany balances among the Debtors (or Non-Debtor Affiliates). The Debtors intend to continue undertaking such transactions on account of obligations arising on a postpetition basis as between Debtors and both other Debtors and their Non-Debtor Affiliates (each, a "**Postpetition Intercompany Transaction**"), in the ordinary course. The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis, and can ascertain, trace, and account for the Intercompany Transactions on demand.

49.     To minimize business disruption and preserve estate value, on the one hand, and provide an appropriate level of supervision and oversight, on the other hand, with respect to Postpetition Intercompany Transactions occurring in the ordinary course (including with respect to netting or setoffs), the Debtors seek authority, but not direction, to continue such practices in the ordinary course.

50.     In the ordinary course of business, the Debtors maintain company-paid credit cards (the "**Credit Cards**"), which are paid for directly by the Debtors. The Debtor earns a rebate on payments made via the Credit Cards from the Credit Card Provider (defined below). The Credit Cards are issued by JP Morgan (the "**Credit Card Provider**") through three credit card programs: (i) a travel and expenses card program; (ii) a purchase card program for licensing, and (iii) a purchase card program for all other departments (the "**Plastic Credit Card Programs**"). Additionally, the Debtors maintain a credit card account to pay vendors who accept card payments (in lieu of a payment via check, wire or automated clearing house) sometimes referred to as a *single-use account program* (the "**Vendor Credit Card Program**" and, together with the Plastic Credit Card Programs, the "**Credit Card Programs**"). The Debtors were recently required to cash collateralize the Plastic Credit Card Programs by depositing $50,000 in cash in the Plastic Credit

Card Cash Collateral Account.  The Debtors have also cash collateralized the Vendor Credit Card Program by depositing $800,000 in cash in the Vendor Credit Card Cash Collateral Account.

51.     The Debtors could incur liabilities of as much as approximately $400,000 per month on account of the Plastic Credit Card Programs.  The Debtors request authority to continue to make all payments in connection with the Credit Cards in the ordinary course of business and consistent with the Debtors' past practices.

52.     I understand that the Debtors' cash management system is tailored to meet the Debtors' operating needs, thereby enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

53.     I believe the Debtors' cash management system constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors.  The Debtors' cash management system has historically reduced the Debtors' expenses by enabling them to use funds in an optimal and efficient manner.  Accordingly, I believe the Debtors' continued use of their cash management system without interruption is vital to the Debtors' business operations and the success of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, and should be granted.

54.     **Wages Motion**.  Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs, and (B) Continue Compensation and Benefits Programs; and (II) Grant Related Relief* (the "**Wages Motion**"), the

Debtors request (i) authority to (a) pay Employee Compensation Obligations, Employee Benefit Obligations, and Contractor Obligations, related expenses, and fees and costs incident to the foregoing, including amounts owed to third-party service providers, administrators and taxing authorities, and (b) maintain, continue to honor, and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business and (ii) related relief.  The monetary relief sought in the Wages Motion with respect to prepetition obligations, is summarized in the following chart:

| Prepetition Obligations | Total Relief Requested |
|---|---|
| Employee Compensation Obligations | $8,500,431 |
| Employee Benefit Obligations | $994,278 |
| Contractor Obligations | $9,700 |
| Total Prepetition Obligations | $9,504,409 |

55.     As described more fully in the Wages Motion, the Debtors' workforce is comprised of approximately 14,929 Employees in the operation of the Company-operated venues and approximately 276 Employees in the Debtors' corporate offices.  Each CEC Venue and PPP Venue typically employs a general manager, senior assistant manager, one or more assistant managers, an electronics specialist who is responsible for repair and maintenance of the show, games and rides, and approximately 25 to 45 food preparation and service employees, many of whom work part-time.  The Debtors' Employees perform a wide variety of functions that are critical to the Debtors' operations and cannot be easily replaced without investing in training and on-the-job experience.  During these times of turbulent shifts in the labor market, failure to maintain the continued, uninterrupted services of their workforce could upend the Debtors' reorganization efforts and jeopardize the value of their businesses as a going concern.

56.     The Debtors believe that, as of the Petition Date, the aggregate amount of outstanding prepetition obligations related to compensation of Employees (collectively, the "**Employee Compensation Obligations**") is approximately $8,500,431.  The Employee Compensation Obligations are summarized in the following chart and described in further detail in the Wages Motion:

| Prepetition Obligations | Total Relief Requested |
| --- | --- |
| Wages and Salaries | $5,585,798 |
| Withholding and Deduction Obligations | $2,519,833 |
| Incentive Programs | $392,000 |
| Wage and Benefit Services | $2,800 |
| Total | $8,500,431 |

57.     Additionally, as described in the Wages Motion, in the ordinary course of business, the Debtors make various benefit plans available to their Employees.  I understand that these benefit plans fall within the following categories: (i) paid time off, including vacation and other leave (together, the "**Employee Leave Benefits**"); (ii) medical, prescription drug, dental, and vision benefits ("**Medical Benefits**"); and (iii) life insurance, accidental death and dismemberment ("**AD&D**") insurance, supplemental insurance, short-term disability, and long-term disability benefits (the "**Insurance Benefits**" and, together with the Medical Benefits, the "**Health and Welfare Benefits**"); (iv) 401(k) plan benefits (the "**Retirement Benefits**"); and (v) certain other miscellaneous benefits (the "**Other Benefits**") (each of (i)–(v), an "**Employee Benefit Program,**" and its corresponding obligations, the "**Employee Benefit Obligations**").  While many Employees do participate in the Employee Benefit Programs (such Employees, with respect to each plan, the "**Plan Participants**"), in certain cases, Employees may elect to opt-out of a particular program.

58.     The Debtors also utilize the services of an independent contractor to provide (the "**Contractor**"), whom manages and oversees the Debtors' international franchising program.

The Contractor's responsibilities include identifying and negotiating with potential third party franchisees, interfacing with the Debtors' international franchisees to ensure compliance with the Debtors' franchise agreement, including reviewing and assisting with restaurant locations, operations set-up, recruiting and training, marketing, and financial matters.  As of the Petition Date, the Debtors estimate they owe approximately $9,700 for prepetition services (the "**Contractor Obligations**").

59.     As stated in the Wages Motion, the relief requested represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Absent authorization to pay prepetition wages, employee benefits, and similar obligations, the Debtors are at the risk of significant Employee attrition, as the Debtors' Employees may seek alternative opportunities.  Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.  Additionally, the loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their obligations and likely diminishing the Debtors' ability to carry out their chapter 11 strategy and successfully reorganize.

60.     In addition to Employee attrition, failure to satisfy prepetition Employee Obligations will likely jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  I understand that the majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Similarly, if the Court does not authorize the

Debtors to honor their various obligations under the Employee Benefit Programs, many Employees will lose access to health coverage at a time when the Debtors need their Employees to perform their jobs at peak efficiency. I believe the loss in morale and potential distraction of Employees worrying about paying their bills and their healthcare costs will harm the Debtors' ability to operate and serve customers at their standard high levels, causing an erosion in the Debtors' value.

61.     Further, I am advised that, as priority claims, the Employee Obligations are entitled to payment in full before any general unsecured claims asserted against the Debtors can be satisfied. Thus, the relief requested largely affects only the timing of payment of the priority prepetition Employee Obligations and should not prejudice the rights of general unsecured creditors and other parties in interest.

62.     For the foregoing reasons, I believe the payment of the prepetition Employee Obligations and continuation of the Employee Benefit Programs is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.

63.     **Vendors Motion**. Pursuant to the *Emergency of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Obligations to (A) Critical Vendors, (B) Lien Claimants, (C) 503(b)(9) Claimants, and (D) PACA/PASA Claimants; and (II) Granting Related Relief* (the "**Vendors Motion**"), the Debtor are requesting authority to timely and fully pay, in the ordinary course of business and consistent with their historical practices, (i) third party service providers (collectively, the "**Lien Claimants**"), that may be able to assert and perfect liens against the property of the Debtors, (ii) certain vendors whose prepetition claims are entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, (iii) vendors (the "**PACA Vendors**") that supply fresh fruits and vegetables to the Debtors' venues

25

under the Perishable Agricultural Commodities Act of 1930, and (iv) vendors (the "**PASA**" Vendors) that supply livestock and poultry to the Debtors' venues under the Packers and Stockyards Act of 1921.

64.     The Debtors contract with certain service providers to perform repairs and make improvements related to refrigeration equipment, electrical systems, plumbing, and various types of food service equipment.  I have been advised that the Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens (the "**Miscellaneous Lien Claims**") against the Debtors' property for amounts the Debtors owe to those third parties.  It is my understanding that, if the Debtors are unable to pay the Miscellaneous Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of the Debtors' venues.  In addition, prior to the Petition Date, in the ordinary course of business, the Debtors ordered goods and supplies necessary to operate their business, the delivery of which occurred within 20 days of the Petition Date (the "**503(b)(9) Orders**").  In order to prevent any disruption to the Debtors' operations, the Debtors seek an order (i) confirming administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to the 503(b)(9) Orders and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

65.     Further, it is my understanding that the fruits, fresh vegetables, livestock and poultry purchased by certain of the Debtors from the PACA Vendors and PASA Vendors are a critical component of the Debtors' business.  I believe, without uninterrupted access to these perishable agricultural commodities, the Debtors would not be able to meet the demands of their venues and consumer products customers.  In order to avoid disruption to the Debtors' businesses, and because it is my understanding that PACA Vendors and PASA Vendors adhere to certain

statutory notice requirements and are entitled to prompt payment from the Debtors as beneficiaries of trust assets, it is essential that the Debtors be able to continue to pay these claims in the ordinary course of business, as required by PACA and PASA.

66.     The Debtors are requesting authority to pay the prepetition claims of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to maintaining the going concern value of the Debtors' business (the "**Critical Vendors**").

67.     The Debtors operate approximately 555 venues and had 186 venues operating under franchise arrangements, for a total of approximately 741 venues across 47 states and 16 foreign counties and territories.  To operate these venues, the Debtors rely on continuing access to and relationships with certain of their vendors.  It is my understanding that any disruption in the Debtors' access to critical goods and services would have a far-reaching and adverse economic and operational impact on their business.

68.     In narrowing the Debtors' list of vendors to only those that are critical, the Debtors and their advisors have engaged in a comprehensive process reviewing and analyzing the Debtors' books and records, consulting with the Debtors' management and personnel responsible for operations, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and past practices to identify business relationships which, if lost, could materially harm the Debtors' businesses or impair their restructuring process.

69.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Vendors Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and should be granted.

70.     **Customer Programs Motion**.  Pursuant to *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Customer Programs in Ordinary*

*Course of Business and Pay Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "**Customer Programs Motion**"), the Debtors request (i) authority, but not direction, to (a) pay, perform, and honor their prepetition obligations related to their Customer Programs (as defined below) as they deem appropriate and (b) continue, renew, replace, implement, or terminate the Customer Programs as they deem appropriate, in each case in the ordinary course of business, and (ii) related relief.

73. The Debtors' businesses depend upon the loyalty of their customers. To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, the practices and programs described herein and others (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' restaurants. Customer programs, like those administered by the Debtors, are standard in the restaurant and entertainment industries.

72. I believe that the Debtors' ability to continue their Customer Programs and honor obligations related thereto is necessary to keep the reputation of the Debtors intact, meet competitive market pressures, ensure customer satisfaction, and, ultimately, maximize value for the Debtors' estates and their stakeholders.

73. The Customer Programs include: Party Deposits, Coupons, Sale Promotions, the Loyalty Program, Promotional Contests, the Gift Certificate Program, the Guest Pass program, the PlayPass program and the redemption of Tokens and Prize Tickets. A summary of each Customer Program is set forth below.

74. I understand that the Debtors require customers to make a deposit ($50 at CEC Venues and $30 at PPP Venues) to reserve a table for a party at a future date and time (the "**Party Deposits**"). The customer's final bill for food, games and other items is reduced by the

amount of the previously collected Party Deposit.  Sales associated with such pre-booked parties comprise a large part of the Debtors' revenue and such parties are an important source of word-of-mouth advertising.  Based on advise of counsel I believe that any customer deposits held by the Debtors as of the Petition Date are entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code up to the statutory amount.  Moreover, the Party Deposits likely do not even constitute property of the Debtors' estates.  Therefore, the Debtors seek authority to honor all customer Party Deposits in the ordinary course of business, including any Party Deposits that were made prior to the Petition Date.

75.     Second, the Debtors maintain a coupon redemption program pursuant to which they distribute coupons online, in advertising circulars, electronic mailings, or in the Debtors' stores (collectively, the "**Coupons**").  Purchases in connection with Sales Promotions account for over 20% of revenue at the Company's stores.  To preserve the goodwill of the Debtors' customer base, the Debtors seek authorization to honor the Coupons issued prior to the Petition Date and to continue issuing coupons in a manner consistent with their ordinary business practices.

76.     From time to time, the Debtors also conduct sales promotions at their stores (the "**Sales Promotions**").  The Debtors typically advertise their Sales Promotions by sending out mass flyers and electronic mailings notifying their customers of current deals available for redemption at the Debtors' stores.  Examples of the Debtors' current Sales Promotions include discounted prices for certain food items or discounts on multiple items purchased as a "meal."  Accordingly, the Debtors seek authority to honor current Sales Promotions and continue such promotions in the ordinary business of business.

77. The Debtors currently administer a loyalty discount program (the "**Loyalty Program**") for guests who opt in to receive special rewards and offers by providing their email, phone number and birthday information for ongoing promotional communication. Rewards include free food and PlayPass Minutes in connection with the customer's sign-up and birthday, as well as rewards for multiple visits and customer referrals. Members of the Loyalty Program are also offered coupons and promotions that are not offered to non-members. The Debtors also offer some of their other customers an opportunity to receive certain benefits and discounts. For example, the Debtors maintain a discount program for students and service members. The Debtors do not typically accrue a liability on account of these programs, rather, they deduct any customer savings provided through these programs from revenue otherwise generated at the point of sale. Therefore, the Debtors seek to honor their commitments under the Loyalty Program and their other discount programs.

78. From time to time, the Debtors conduct promotional contests for marketing and customer awareness purposes (the "**Promotional Contests**") pursuant to which various prizes are awarded, including without limitation, Giveaway Gift Cards (as defined below), toys, merchandise, tickets and trips (the "**Giveaway Prizes**"). Accordingly, the Debtors seek authority to maintain the ongoing Promotional Contests and continue awarding the Giveaway Prizes as provided for therein.

79. Additionally, the Debtors maintain a program by which their customers can purchase gift cards for redemption at the Debtors' or their franchised Chuck E. Cheese and Peter Piper stores from the Debtors' stores, certain third-party retail stores, and online that can be redeemed for use at any of the respective Chuck E. Cheese or Peter Piper store locations at a later date (the "**Purchased Gift Cards**"). The Debtors also conduct promotional contests pursuant to

which gift cards redeemable at any of the Debtors' store locations are given away as prizes (the "**Giveaway Gift Cards**" and collectively with the Purchased Gift Cards, the "**Gift Certificate Program**").  As of the Petition Date, the Debtors estimate that the aggregate amount outstanding for issued gift cards is approximately $19.5 million.  I am advised that any customer claims arising under the Gift Certificate Program are entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code up to $3,025 per individual.  Accordingly, the Court should authorize the Debtors to maintain the Gift Certificate Program and to honor all gift cards purchased or given away to customers, including any gift cards that were issued prior to the Petition Date.

80.     The Debtors also maintain a program by which they offer "guest pass" coupons ("**Guest Passes**") to guests when they have had a bad experience or for other promotional purposes.  For example, employees are given Guest Passes on their birthdays.  Each Guest Pass entitles the holder to a large one-topping pizza, four drinks and 40 tokens/plays via the Debtors' PlayPass program.  As of the Petition Date, the Debtors estimate that the aggregate amount outstanding for issued Guest Passes is approximately $100,000.  I am advised that any customer claims arising under the Guest Pass program are entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code up to $3,025  per individual. Therefore, the Court should authorize the Debtors to maintain the Guest Pass program and to honor all Guest Passes given away to customers and employees, including any Guest Passes issued prior to the Petition Date.

81.     Beginning in 2015, Debtors began converting the games and rides at their stores to use "Chuck E's PlayPass" ("**PlayPass**"), a Radio Frequency Identification ("**RFID**") technology, replacing the previous Token-based system.  As described in the Customer Programs

Motion, using the PlayPass system, guests can purchase PlayPass cards with either (i) a fixed quantity of credits ("**PlayPass Credits**") for use on games and rides, or (ii) a fixed amount of time ("**PlayPass Minutes**") during which the customer may use unlimited games and rides.  The Debtors request authority to continue to accept and redeem PlayPass Credits, whether issued before or after the Petition Date, and to continue to offer, accept and redeem PlayPass Credits and PlayPass Minutes post-petition, consistent with historical practice to preserve customer loyalty and sustain a positive reputation with our guests and in the marketplace.

82.     Prior to the conversion to PlayPass, all rides and games at Debtors' stores were activated by tokens purchased by or provided to customers (the "**Tokens**").  Many customers still hold Tokens that were purchased or provided either prior to conversion or from franchised stores that have not yet converted to the PlayPass system.  To preserve customer loyalty, the Debtors have continued to allow Tokens for use of in those of its games that still configured to accept Tokens.  The Debtors therefore request authority to continue to accept and redeem Tokens issued pre-petition and to continue to offer, accept and redeem Tokens post-petition, consistent with historical practice to preserve customer loyalty and sustain a positive reputation with our guests and in the marketplace.

83.     Skill-based games at the Debtors' stores dispense prize tickets which can be traded in at the store for various merchandise (the "**Prize Tickets**").  Guests may also receive and store Prize Tickets on their PlayPass cards. Guests often save Prize Tickets for later visits to Debtors' stores to trade for a larger prize.  As a result, numerous guests and loyal customers have unredeemed prize tickets.  The Debtors also request authority to continue to accept and redeem Prize Tickets issued to customers, include those issued prior to the Petition Date, and to continue to offer, accept and redeem Prize Tickets post-petition, in the ordinary course of business.

84.  **Taxes Motion**.  Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments; and (II) Granting Related Relief* (the "**Taxes Motion**"), the Debtors request authority to (i) pay, in the Debtors' sole discretion and in the ordinary course of business, all Taxes and Assessments due and owing to the various local, state, federal, and foreign taxing authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, including all Taxes and Assessments subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date and (ii) related relief.

85.  I understand that, in the ordinary course of their business, the Debtors are obligated to pay certain taxes and assessments, which generally fall into the following categories, each of which is discussed in more detail below: (i) sales and use taxes, (ii) franchise and income taxes, (iii) property taxes, (iv) unclaimed property, (v) foreign taxes, and (vi) regulatory and compliance obligations (collectively, the "**Taxes and Assessments**").  I further understand that approximately $3.184 million in Taxes and Assessments have accrued as of the Petition Date.  The following table describes the various categories of Taxes and assessments incurred by the Debtors in the ordinary course of their business, and includes the Debtors' estimates of such Taxes and Assessments that have accrued as of the Petition Date:

| Category | Description | Approx. Amount as of Petition Date |
|---|---|---|
| Sales and Use Taxes | Taxes on goods and services that are used/consumed or sold and assessed based on the value of those goods and services. | $1,616,000 |
| Franchise and Income Taxes | Taxes incurred in connection with profits generation and taxes required to conduct business within certain states in which the Debtors operate. | $0[3] |

---

[3] Prepetition amounts of Franchise and Income Taxes exist, but are being offset by prior period overpayments and/or estimated taxes previously paid.

| Category | Description | Approx. Amount as of Petition Date |
|---|---|---|
| Property Taxes | Taxes and obligations related to real and personal property holdings. | $975,000 |
| Unclaimed Property | Unclaimed property resulting from uncashed payroll checks, uncashed vendor checks, and similar property to be remitted to state authorities after the dormancy period. | $150,000 |
| Foreign Taxes | Income taxes, withholding taxes, customs taxes, value-added taxes, and other business taxes incurred in connection with foreign operations | $100,000 |
| Regulatory and Compliance Fees | Business licenses, permits, fees, and annual reports. | $343,000 |
| **Total** | | **$3,184,000** |

86.     Further, I understand and am advised that failure to pay the Taxes and Assessments could adversely affect the Debtors' business operations because certain governmental authorities may assert liens on the Debtors' property, assert penalties, or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the Taxes and Assessments, thus distracting the Debtors' management and employees from their important reorganization efforts, and potentially causing immediate and irreparable harm to the Debtors.   Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties-in-interest and should be granted in all respects.

87.     **Utilities Motion**.  Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility*

*Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief*
(the "**Utilities Motion**"), the Debtors seek approval of their proposed form of adequate assurance
of payment to utility providers, approval of certain procedures for determining adequate assurance
of payment for future utility services (the "**Adequate Assurance Procedures**"), and a prohibition
on utility providers from altering, refusing, or discontinuing utility service on account of the
commencement of these chapter 11 cases or outstanding prepetition invoices.

88.     As more fully described in the Utilities Motion, in the ordinary course of
business, the Debtors incur expenses, for among other things, natural gas, water, sewage,
telecommunications, information technology, electricity, waste services, and other utility services.
The Debtors make utility payments in one of three ways, (i) by direct payment to a utility provider,
(ii) through a Payment Processor, or (iii) via a landlord through rent payments.  I believe that
preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.
The Debtors serve customers nation-wide, and any interruption in utility services—even for a brief
period—could severely disrupt the Debtors' ability to continue operations and jeopardize the
Debtors' restructuring efforts and, ultimately, creditor recoveries.

89.     Based on a monthly average for the twelve months prior to the Petition Date,
the Debtors estimate that their aggregate cost of Utility Services for the next thirty (30) days will
be approximately $2.6 million.  To provide additional assurance of payment, the Debtors propose
to deposit, within twenty (20) days after the Petition Date, approximately $1.3 million
(the "**Adequate Assurance Deposit**") into a newly created, segregated account owned by the
Debtors for the benefit of the Utility Companies (the "**Utility Deposit Account**").  The Adequate
Assurance Deposit represents an amount equal to two weeks' cost of Utility Services, calculated
using the historical average for such payments during the past twelve (12) months.

90.     Furthermore, I believe and am advised that the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services.  If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their businesses.  I understand that the Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether.  Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

91.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, and should be granted.

92.     **Insurance and Surety Bond Motion**.  Pursuant to the *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Honor All Insurance Obligations and Surety Bond Obligations, and (II) Granting Related Relief* (the "**Insurance and Surety Bond Motion**"), the Debtors request interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue to maintain their Insurance Policies and Programs and their Surety Bond Programs, (b) honor their Insurance Obligations and Surety Bond Obligations in the ordinary course of business during the administration of these chapter 11 cases, including paying any prepetition Insurance Obligations, including amounts owed to the Insurance Service Providers, and (c) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program, and (ii) granting related relief.

93.     In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies and workers' compensation programs (collectively, the "**Insurance Policies and Programs**" and all premiums and other obligations related thereto, including any broker or advisor fees, assessments, or other fees, collectively, the "**Insurance Obligations**") through several different insurance carriers (the "**Insurers**").   Specifically, the Debtors maintain various liability, property and other insurance policies, which provide the Debtors with insurance related to, among other things, general liability, liquor liability, products liability, excess liability, lead umbrella, directors' and officers' liability, foreign liability, cyber liability, workers compensation, employment practices liability earthquake, flood, special crime, property, foreign property and automobile coverage (collectively, the "**Insurance Policies**").

94.     Pursuant to the Insurance Policies, the Debtors pay premiums based upon a fixed rate established and billed by each Insurer (collectively, the "**Insurance Premiums**").   The Debtors pay approximately $6.1 million in Insurance Premiums each year.   I understand that no Insurance Premiums on account of recently renewed Insurance Policies and Programs for the period beginning March 1, 2020 and ending March 1, 2021 are expected to become due and payable within the first twenty-one (21) days of these chapter 11 cases.   Approximately $500,000 in Insurance Premiums will become due and owing on or around July 31, 2020.

95.     I understand that the Debtors maintain the Insurance Policies to help manage and limit the various risks associated with operating their businesses, which is essential to the preservation of the value of the Debtors' businesses and assets and that some of the Insurance Policies are required by certain regulations, laws, and contracts that govern the Debtors' commercial activities.   Further, I have been advised that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to

the public," is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to be pay their Insurance Premiums, as they come due, in the ordinary course of business, whether arising from the prepetition or postpetition period, throughout these chapter 11 cases.

96.    Additionally, the Debtors maintain workers' compensation insurance as required by statute in each of the states and territories in which they operate or participate in a fund operated and administered by certain monopolistic states (Ohio and Washington) (collectively, the "**Workers' Compensation Programs**").  The Debtors' Workers' Compensation Programs are self-insured up to $500,000 per claim.  I also understand that the Debtors maintain several excess workers' compensation Insurance Policies with certain third-party Insurers, which are maintained to cover workers' compensation claims in excess of $500,000 (the "**Excess Policies**").  Accordingly, on a per claim basis, the Debtors' maximum exposure under their Workers' Compensation Programs is $500,000.

97.    The Debtors estimate that they pay, on average, based on 2019 data, approximately $230,000 per month on account of workers' compensation claims.  During 2019, the Debtors paid $2,732,082.63 with respect to all workers' compensation claims.  As of the Petition Date, there are approximately ninety-two (92) pending claims under the Workers' Compensation Programs, which the Debtors estimate aggregate to a total liability of approximately $2 million.  Of this amount, approximately $75,000 may become due and payable within the first twenty-one (21) days of these chapter 11 cases.

98.    I understand that, to secure payment of the Debtors' obligations under the Workers' Compensation Programs, the Debtors posted collateral in the form of letters of credit,

cash, a loss fund, or other security in various amounts based upon the size of the Debtors' operations in a particular state and the Debtors' loss experience in that state (collectively, the "**Collateral**"). As of the Petition Date, the aggregate amount of outstanding Collateral posted by the Debtors in support of their Workers' Compensation Programs is approximately $6 million. I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to be permitted to maintain their Workers' Compensation Programs in the ordinary course of business, and to pay any obligations arising under or in connection with the Workers' Compensation Programs, including prepetition workers' compensation claims, assessments, and other obligations, and including maintenance of the Excess Policies with the related Insurers and the posting of any collateral in connection therewith.

9. As described in detail in the Insurance and Surety Bond Motion, to avoid paying certain on their Insurance Premiums on a lump-sum basis, the Debtors financed certain of their Insurance Premiums pursuant to that certain Commercial Insurance Premium Finance and Security Agreement, dated as of June 23, 2020 (the "**Premium Financing Agreement**"), by and between CEC Entertainment, Inc., and Aon Premium Finance, LLC (the "**Premium Financier**"). Under the Premium Financing Agreement, the Premium Financier agreed to finance certain annual Insurance Premiums totaling approximately $3.65 million. In exchange therefor, and on June 24, 2020, the Debtors paid the Premium Financier a down payment of approximately $2.4 million. Additionally, the Debtors agreed to pay monthly installments of approximately $320,000 per month. These monthly installments are due on the first of each month, beginning on August 1, 2020. The amount financed under the Premium Financing Agreement accrues interest at an annual rate of approximately 4.15%.

99.     Pursuant to the Premium Financing Agreement, the Debtors granted the Premium Financier a security interest in, among other things, any and all unearned premiums and dividends which may become payable for any reason under the financed Insurance Policies.  It is my understanding and I am advised that, if the Debtors do not satisfy their obligations under the Premium Financing Agreement, the Premium Financier has the right, subject to the automatic stay, to, among other things, terminate any covered Insurance Policies.  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to be permitted to continue honoring their obligations to the Premium Financier in the ordinary course of business.

100.     The Debtors utilize Aon Risk Services Southwest, Inc. (the "**Broker**") as their insurance broker to assist with the procurement and negotiation of certain Insurance Policies and, in certain circumstances, to remit payment to the Insurers on behalf of the Debtors.  In exchange for these services, the Broker assesses an annual fee of approximately $135,000 (the "**Broker's Fees**").  The Debtors also employ the Third-Party Administrators (together with the Broker, the "**Insurance Service Providers**") to advise them on insurance related matters and to process claims arising under the Insurance Policies and Programs.  The Debtors pay the Third-Party Administrators' fees for their management services in connection with the Workers' Compensation Policies on a monthly basis in arrears and for their general liability claims on a quarterly basis in advance (the "**Administrative Fees**" and, together with the Broker's Fees, the "**Service Providers' Fees**").  The Administrative Fees are calculated based on the number of claims processed per period.  The Debtors estimate that, on average, they pay approximately $370,000 on an annual basis on account of Administrative Fees.

101.     Considering the importance of the Insurance Service Providers' role in maintaining the Debtors' Insurance Programs, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to be permitted to continue making payments to the Service Providers for any applicable Service Provider Fees incurred postpetition.

102.     Finally, pursuant to their surety bond program (the "**Surety Bond Program**"), in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties (the "**Obligees**"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with utility deposits, tax permits, and various business licenses (the "**Surety Bonds**").  Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate established and billed by each Obligee (collectively, the "**Surety Premiums**").  The Surety Premiums are generally determined on an annual basis (on some occasions every two (2) to four (4) years) and total in the aggregate approximately $875,000 per year (the "**Surety Bond Obligations**").  I understand that, typically, the Debtors remit premium payments when the bonds are issued or upon renewal.  The Debtors estimate that no Surety Premiums are outstanding as of the Petition Date.

103.     As a condition to issuing the bonds, the Surety requires that the Debtors enter into indemnity agreements (collectively, the "**Indemnity Agreements**"), pursuant to which the Surety is indemnified from any loss, cost, or expense that the Surety may incur on account of the issuance of any bonds on behalf of the Debtors.  The Debtors directly indemnify the Surety for their own policies.  Under the terms of the Indemnity Agreements, the Surety may demand cash collateral or letters of credit to secure the obligations under surety bonds at any point during the time the Surety Bonds remain outstanding.  As of the Petition Date, the Debtors have posted approximately $700,000 in cash collateral in connection with the Indemnity Agreements.

104.    To continue their business operations during these chapter 11 cases, the Debtors must be able to continue to provide financial and other assurances to Obligees in the form of Surety Bonds.  This requires the Debtors to maintain their existing Surety Bond Program, including the payment of Surety Bond Obligations as and when they come due, providing the Surety and any additional sureties with collateral, if required, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business, and executing other indemnity agreements, as needed, in connection with the Surety Bond Program.  Accordingly, I believe the Debtors should be permitted to continue their Surety Bond Program and pay their Surety Bond Obligations, as they come due, in the ordinary course of business, whether arising from the prepetition or postpetition period, throughout these chapter 11 cases.

105.    Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties-in-interest and should be granted in all respects.

106.    **Omnibus Lease Rejection**.  Pursuant to the *Omnibus Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property and (B) Abandon De Minimis Property in Connection Therewith and (II) Granting Related Relief* (the "**Omnibus Lease Rejection**"), the Debtors seek (i) authority to (a) reject certain venue leases (the "**Venue Leases**"), each effective *nunc pro tunc* to the Petition Date and (b) abandon any Remaining Property and (ii) granting related relief.

107.    Prior to commencing these chapter 11 cases, and as part of the Debtors' ongoing efforts to stabilize their business following the closure of several of the Debtors' venues (the "**COVID Closures**"), the Debtors initiated a comprehensive review and analysis of their venue lease portfolio.  As a result of the initial phase of this analysis, the Debtors, in their

reasonable business judgment, have decided to permanently abandon forty-five (45) closed or underperforming venues (the "**Underperforming Venues**") and seek to reject the associated real property leases (the "**Venue Leases**").  All of the Underperforming Venues were closed prior to the Petition Date and are currently vacant.[4]  The Debtors seek authority to reject the Venue Leases *nunc pro tunc* to the Petition Date.

108.    After evaluating a number of factors, the Debtors concluded that the Underperforming Venues do not meet the requisite performance criteria to rationalize their continued operation.  In addition, the leases associated with the Previously Closed Venues have no go-forward value to the Debtors.  Given the overall losses that the Debtors have been incurring on the Underperforming Venues and Previously Closed Venues, and their lack of strategic value in the Debtors' go-forward business plan, I concluded, in consultation with the Debtors' advisors, that the Venue Leases are unlikely to generate significant value for the Debtors' estates.  As such, the Debtors have determined, in the exercise of their business judgment, that it is in the best interests of their estates to seek authority to reject the Venue Leases.  Rejecting the Venue Leases will allow the Debtors to avoid the accrual of unnecessary administrative expenses with no foreseeable benefits to the Debtors' estates.

109.    During the ordinary course of business, the Debtors accumulated certain miscellaneous assets at the Underperforming Venues, including certain fixtures and equipment. The Debtors generally will remove such assets from the Underperforming Venues and transport the assets to the Debtors' remaining venue locations.  The Debtors have determined, in the exercise of their business judgment, that certain of these assets will be exceedingly difficult or expensive to remove or store (the "**Remaining Property**").  The Debtors estimate that the Remaining

---

[4]    Approximately 27 of the venues were closed due to COVID 19, 4 venues were closed due to lock outs, 3 venues were closed due to expiring leases, and 11 venues that were permanently closed prior to COVID Closures.

Property is of *de minimis* value; therefore, the Debtors will not realize any economic benefit by retaining the Remaining Property. Accordingly, the Debtors request authority to abandon any Remaining Property at the Underperforming Venues.

110.    **Schedules and Statements Extension Motion**. Pursuant to the *Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* (the "**Schedules and Statements Extension Motion**"), the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by thirty (30) days, for a total of forty-four (44) days from the Petition Date, through and including August 7, 2020, without prejudice to the Debtors' ability to request additional extensions.

111.    To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to a substantial number of claims, assets, leases, and contracts from each Debtor entity. This information is voluminous and located in numerous places throughout the Debtors' organization. Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to improve the Debtors' business operations. Additionally, numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system and, thus, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

112.     Although the Debtors have commenced the task of gathering the information necessary for preparing and finalizing the Schedules and Statements, given the sheer volume of such information, coupled with the size and complexity of the Debtors' operations and competing demands on the Debtors, their employees, and their professional advisors during the initial postpetition period, the Debtors anticipate that they will require at least thirty (30) additional days to properly and accurately complete the Schedules and Statements.  Accordingly, I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest, and should be granted in all respects.

113.     **Notice Motion**.  Pursuant to the Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors, and (B) Redact Certain Personal Identification Information; and (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information (the "**Notice Motion**"), the Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**") and a consolidated list of the Debtors' thirty (30) largest unsecured creditors (the "**Consolidated Top 30 Creditors List**"), and (b) redact certain personal identification information, and (ii) approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information

114.     I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H . . . ."  Fed. R. Bankr. P. 1007(a)(1).  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in complex chapter 11 cases involving more than one debtor, the

debtors may file a consolidated creditor matrix. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors.

115. In addition, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor shall file "a list containing the name, address and claim of the creditors that hold the twenty (20) largest unsecured claims, excluding insiders . . . .". Fed. R. Bankr. P. 1007(d). Because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor. I understand that the Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service.

116. Further, I am advised that section 107(c)(1)(A) of the Bankruptcy Code provides that the Court, "for cause, may protect an individual with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft . . . [a]ny means of identification . . . contained in a paper filed, or to be filed, in a case under [the Bankruptcy Code]." 11 U.S.C. § 107(c)(1)(A). Here, I believe cause exists to authorize the Debtors to redact address information of the Debtors' current and former employees, the Debtors' current and former directors, and the Debtors' individual creditors, to the extent applicable, from the Consolidated Creditor Matrix because such information could be used to perpetrate identity theft. Further the Debtors propose to provide upon request an unredacted version of the Consolidated Creditor Matrix to the Court, the Office of the United States Trustee for the Southern District of Texas, and counsel to the official committee of unsecured creditors should one be appointed in these chapter 11 cases.

117.     Finally, I am advised that Bankruptcy Rule 2002(a) states that "the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of: (1) the meeting of creditors under § 341 or § 1104(b) of the [Bankruptcy] Code . . . ." Fed. R. Bankr. P. 2002(a). Bankruptcy Rule 2002(f) provides that such notice of the order for relief shall be sent by mail to all creditors. See Fed. R. Bankr. P. 2002(f).  Here, the Debtors, through Prime Clerk, their proposed claims and noticing agent, propose to serve the Notice of Commencement on all parties entitled to notice of commencement of these chapter 11 cases, to advise them of the section 341 meeting of creditors.

118.     I believe service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but will also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

119.     Based on the foregoing, I believe that the relief requested in the Notice Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## Conclusion

120.     The above describes the Company's businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, and the critical need for the Debtors to restructure their financial affairs and operations.  The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization, help stabilize their operations, strengthen their balance sheet and position them as a healthy economic enterprise able

to effectively compete in their industry for the benefit of their economic stakeholders and employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 26, 2020
    Irving, Texas

/s/ James A. Howell
James A. Howell
Executive Vice President and
Chief Financial Officer
CEC Entertainment, Inc.

## **Exhibit A**

Corporate Organizational Chart

# CEC Entertainment, Inc.



**<u>Exhibit B</u>**

Cash Management Diagram



CEC Entertainment, Inc.
Cash Management System
Master Account AmSouth Bank(1) xxxxx0341
4 Local Depository Accounts
Master Account Compass Bank (BBVA)(2) xxxxx7253
13 Local Depository Accounts
Master Account First National Bank Texas(3) xxxxx6800
1 Local Depository Account
Master Account NBT Bank(4) xxxxx9657
2 Local Depository Accounts
Master Account People's Bank(5) xxxxx9631
1 Local Depository Account
Master Concentration Account (CEC) JP Morgan Chase Bank xxxxx1652
Master Account Summit Community Bank(6) xxxxx6462
1 Local Depository Accounts
Master Account US Bank(7) xxxxx7736
22 Local Depository Accounts
Master Account Bank of America(8) xxxxx0741
111 Local Depository Accounts
Master Account Wells Fargo xxxxx5568
88 Local Depository Accounts
Master Account PNC Bank xxxxx0835
25 Local Depository Account
Master Account JP Morgan Chase Bank xxxxx3266
205 Local Depository Accounts
Master Account Fifth Third Bank(9) xxxxx2655
13 Local Depository Accounts
Operating Account First National Bank xxxxx2302
5 Local Depository Accounts
Master Account Regions Bank xxxxx3517
13 Local Depository Account
Payroll Account (ZBA) JP Morgan Chase Bank xxxxx6258
Distribution Account (ZBA) (Expense & Payroll Tax) JP Morgan Chase Bank xxxxx8070
Operating Account (ZBA) (Franchise Fees, Royalties) JP Morgan Chase Bank xxxxx1242
Operating Account (ZBA) (Leasing and Rent) JP Morgan Chase Bank xxxxx7633
Distribution Account (General Liability) JP Morgan Chase Bank xxxxx1678
Payables Account (ZBA) JP Morgan Chase Bank xxxxx4923
SPT Distribution (ZBA) JP Morgan Chase Bank xxxxx0700
Fast Pay Account (ZBA) JP Morgan Chase Bank xxxxx9901
Pre-Fund Account JP Morgan Chase Bank xxxxx7087

**CEC Entertainment, Inc.**
**Cash Management System**







**Footnotes:**
(1) to (9): AmSouth Bank, Compass Bank (BBVA), Fifth Third Bank, First National Bank Texas, NBT Bank, People's Bank, Summit Community Bank, US Bank and Bank of America are not included in the list of approved depositories for the Southern District of Texas.