IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-33163-H1-11 |
| | § | HOUSTON, TEXAS |
| CEC ENTERTAINMENT, INC., | § | MONDAY, |
| ET AL, | § | AUGUST 3, 2020 |
| DEBTORS. | § | 1:29 P.M. TO 2:35 P.M. |

<u>TELEPHONIC HEARING ON CASH COLLATERAL
AND RENT ABATEMENT MOTION</u>

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

(Some audio distortion/glitched noted.  No log notes.)

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

```
FOR THE DEBTOR:                    WEIL GOTSHAL & MANAGES, LLP
                                   Alfredo Perez, Esq.
                                   Paul Genender, Esq.
                                   700 Louisiana, Ste. 1700
                                   Houston, TX  77002
                                   713-546-5040


FOR THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:               KELLEY DRYE & WARREN, LLP
                                   Jason Adams, Esq.
                                   101 Park Avenue
                                   New York, NY  10178
                                   212-808-7612


FOR RIVER OAKS PROPERTIES:         REED SMITH, LLP
                                   Michael P. Cooley, Esq.
                                   2501 N. Harwood, Ste. 1700
                                   Dallas, TX  75201
                                   469-680-4213


FOR WEINGARTEN:                    MALLORY & NATSIS, LLP
                                   Ivan M. Gold, Esq.
                                   3 Embarcadero Center, 12th Fl.
                                   San Francisco, CA  94111-4074
                                   415-837-1515


FOR B SQUARE SC COMPANY,
LTD:                               BRENT A. FRIEDMAN, PA
                                   Brent A. Friedman, Esq.
                                   78 SW 7th St., 5th
                                   Miami, FL  33130
                                   305-579-5111
```

(Please also see electronic appearances.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| CHAD COBEN | | | | | |
| By Exhibits | 10 | . | . | . | . |
| By Mr. Gold | . | 11 | . | 27 | . |
| By Mr. Cooley | . | 16 | . | . | . |
| By Mr. Friedman | . | . | . | 30 | . |
| By the Court | 34 | | | | |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Debtor's Exhibits 2 and 3 (70 and 132-1) | 10 | 10 | 10 |

. . .

1          HOUSTON, TEXAS; MONDAY, AUGUST 3, 2020; 1:29 P.M.

2              THE COURT:  All right.  Good afternoon.  We're here

3      in the CEC Entertainment case.  This is Case Number 20-33163.

4      We've had electronic appearances --

5              (Conference recording started.)

6              THE COURT:  We have electronic appearances that have

7      been made.  I want to go ahead and start by getting an Agenda

8      from the Debtors as to where they want to go.  If the Debtors

9      want to make an opening statement, that's fine.  We'll then

10     allow any other opening statements and then move into the

11     evidentiary record.

12             So if I can ask whoever is going to take the lead

13     for Debtor to go ahead and press five-star, please.

14             Mr. Perez, good afternoon.

15             MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

16     Perez.  Can you hear me, sir?

17             THE COURT:  Yes, sir.

18             MR. PEREZ:  Your Honor, there were two matters on

19     the Agenda for today:  One was the cash collateral hearing,

20     and the other one is the motion on the rent deferral.  Your

21     Honor, last week, we were able to reach agreement with the

22     Committee and with the secured lenders on extending the cash

23     collateral deadline, and so we wanted to adjourn that hearing.

24     We anticipate that we will be filing a motion to obtain DIP

25     financing and we will likely have that hearing at the same

1    time that we have the hearing on the DIP financing.

2           Your Honor, the stipulation which extended both the

3    milestone deadlines to obtain the final cash collateral order,

4    as well as the Committee's challenge period, is at Docket

5    Number 471.

6           THE COURT:  All right.  Is there any party that

7    objects to the Court's execution of the stipulation that was

8    filed at ECF 471?

9           Mr. Genender, I don't think you're objecting, but

10   you raised your hand, so, please, go ahead.

11          MR. GENENDER:  Sure, Your Honor.  I'm not.  That was

12   for earlier.  I apologize.  Paul Genender for the Debtors.

13          THE COURT:  All right.  No problem.

14          Is there anyone that objects to that?  I'd seen it

15   earlier.  I didn't sign it only because I wanted -- we had had

16   a broader array of objections to that; and, if anybody did

17   have an objection, I wanted them to get their opportunity.

18       (No verbal response)

19          THE COURT:  All right.  In the absence of any

20   objections, I'm going to sign the modification to cash

21   collateral.  Let me just get that docketed.

22          MR. PEREZ:  And Your Honor, we had -- we did receive

23   both formal and informal objections to the Form of Order, and

24   we have been working with the various parties to try to

25   resolve some of those issues.  And hopefully, those issues

1    will be resolved by the time of the final hearing.

2                THE COURT:  Okay.  But there is no dispute over the

3    interim order, right; the further interim order?

4                MR. PEREZ:  Correct, Your Honor, there is no dispute

5    over the further interim order.

6            (Pause in proceedings)

7                THE COURT:  All right.  I have signed the further

8    interim order and I have sent that to docketing.

9                All right.  So that takes us then to the rent

10   deferral motion.

11               MR. PEREZ:  Yes, Your Honor.  So just to kind of set

12   the table, Your Honor, this motion was filed probably about

13   45 days ago, or a little bit less than 45 days ago, and the

14   Court entered an Interim Order and allowed parties to file

15   objections.  We have received about 36 objections and

16   joinders.

17               Your Honor, we are assuming that the Court is --

18   that viewing this as if we were here at the first time, and we

19   have a witness prepared in order to meet our evidentiary

20   burden.  But before we did that, Your Honor, I did want to

21   address the objections and evidence and our view of the

22   responses to the objections.

23               Most of it, Your Honor -- I don't know that there is

24   a lot of factual disputes as to what's going on.  I think the

25   arguments, you know, fall into a couple of buckets.  And Your

1    Honor --

2              THE COURT:  So can I just interrupt?  Let me take

3    the liberty of interrupting you just for a minute, Mr. Perez.

4              The one thing that's sort of pervasive -- and I want

5    to just put everybody's mind at ease.  I am not deciding today

6    whether I have the legal authority at the end of this time

7    period, if we do grant anything at all, to further extend it.

8    I am not -- by allowing the Debtors to say they're reserving

9    the right, each of the lenders is also reserving the right to

10   say that that is impermissible and inappropriate.

11             And you're not going to get a decision out of me

12   today on whether, at the end of the time period, there is

13   anything further that might, could, or should be done.  So I'm

14   hoping that puts everybody's mind at ease that them saying

15   they want to reserve something is the same as you saying you

16   want to reserve something.  And I don't need either party to

17   reserve it because I'm not making a decision about it.  So I

18   don't care if it's in there or not.  That is simply not

19   something that is occurring today.

20             Mr. Perez, why don't you go ahead, if you had

21   something else?

22             MR. PEREZ:  Yes.  Your Honor, I really don't, and I

23   think we understood that.  And to the extent that we want

24   further relief, we will obviously file a motion and seek to

25   have -- seek to have it heard.  And the Judge, at that -- and

1    the Court, at that time, will decide, you know, based on the

2    evidence, whether any relief is appropriate or not.

3          And Your Honor, I think we fully understand that the

4    relief that we're seeking today is merely to have the Order

5    that the Court entered initially, on a preliminary basis, have

6    it confirmed and nothing further.  And at that -- I really

7    don't have anything further to say.  But we certainly do

8    anticipate that we will likely file a subsequent motion for

9    additional relief that the Court will have to determine on

10   some basis at the time of the hearing.

11         THE COURT:  All right.  Does anyone wish to make any

12   opening statement?  I know that we have a lot of objections

13   that are out there, and I don't want to impair anybody's

14   ability to make an opening statement, or we can simply do it

15   with the witnesses and then closing statements.

16         If you wish to make an opening statement, please

17   press five-star.

18       (No audible response.)

19         THE COURT:  All right.  It looks like, Mr. Perez,

20   I'm cutting you off a little bit.  Nobody else feels the need

21   to respond.  So we're going to let you go ahead and present

22   your evidentiary case.

23         Is that Mr. Barr or Mr. Genender or you?

24         MR. PEREZ:  It's going to be Mr. Genender, Your

25   Honor.

1          MR. GENENDER:  Your Honor, Paul Genender for the

2     Debtors.  Can you hear me okay?

3          THE COURT:  I can.  Thank you.

4          MR. GENENDER:  Thank you, Your Honor.

5          We will first call Chad Coben of FTI, Your Honor.

6     And he has submitted, on prior occasions, two separate

7     declarations at Docket Entry 70 and Docket Entry 132-1.  Those

8     are Exhibits 2 and 3 on the Exhibit List for this hearing.  I

9     will --

10          THE COURT:  So, Mr. Genender, we're losing about

11     half of every second word.  You might want to pick up of your

12     phone.

13          MR. GENENDER:  Okay, absolutely.

14          Better, Your Honor?

15          THE COURT:  I don't know.  Try it.

16          MR. GENENDER:  Okay.  We would offer Debtors'

17     Exhibits 2 and 3 from our Exhibit List, which are Docket

18     Entries 70 and 132-1, respectively, Mr. Coben's prior

19     declarations, into evidence for purposes of this hearing only,

20     as his direct examination.

21          THE COURT:  All right.  Is there any party that

22     objects to the admission of 70 and of 132-1, as the direct

23     examination of Mr. Coben?  If so, please press five-star on

24     your phone.

25          (No response.)

1           THE COURT:  All right.  70 and 132-1 are admitted as

2     his direct examination.

3           (Debtors' Exhibits 2 and 3 received in evidence as

4     Debtors' Direct Examination.)

5           THE COURT:  Does any party wish to cross-examine

6     Mr. Coben at this point?  If so, please press five-star.

7     Okay.

8           Mr. Gold, you're the first one I'm coming to.

9     There's more than you, but we'll start with you and then we'll

10    move to others.

11          Mr. Coben, would you raise your right hand, sir.

12        (Oath administered)

13          THE COURT:  Mr. Coben, I need to get your line

14    activated.  Sorry.

15          Would you press five-star on your phone, please.

16    All right.

17          CHAD COBEN, WITNESS FOR THE DEBTORS, SWORN.

18          THE WITNESS:  I do.

19          THE COURT:  All right.  Would you state your full

20    name, please, Mr. Coben?

21          THE WITNESS:  Chad Eric Coben.

22          THE COURT:  So, Mr. Coben, the speaker phone is not

23    working very well.  I would suggest you pick up your phone.

24          THE WITNESS:  Okay.

25          THE COURT:  All right.  Mr. Gold, go ahead, please.

1           MR. GOLD:  Thank you and good afternoon, Your Honor.

2           THE COURT:  Good afternoon, Mr. Gold.

3           MR. GOLD:  Can you hear me clearly?

4           THE COURT:  I can.  Thank you.

5           MR. GOLD:  Thank you.  For the Record, Your Honor.

6    Ivan Gold of Allen Matkins.  I represent landlords affiliated

7    with Brookfield Properties, Weingarten Realty, and River Oaks

8    Properties.

9                 CROSS-EXAMINATION OF CHAD COBEN

10   BY MR. GOLD:

11   Q   Mr. Coben, I'd just like to ask you a few brief questions

12   to update some of the factual representations that you made in

13   your original declaration supporting this motion.  As

14   Mr. Perez noted, it's been approximately 45 days since the

15   motion was filed.

16        In your declaration, sir, you said that the Debtor, at

17   that time, had approximately 500 leases in 47 states.  Is that

18   all correct?

19   A   That's correct.

20   Q   What is the current unit count -- I believe the Debtor

21   uses the phrase "venue."  So how many venues does the Debtor

22   currently lease?

23   A   Yeah, so we have 515 Chuck E. Cheese locations.  And

24   there -- there were -- there were some lease rejections that

25   occurred; 54 leases were rejected.  That included 11 Chuck E.

1    -- excuse me -- 11 Peter Piper Pizzas.  And in addition to the

2    550 Chuck E. Cheese locations, we have had 40 -- I believe we

3    had 40 store locations that are -- that are Peter Piper.

4    Q    So, at this point, sir, it's just over 500, about

5    490-ish?

6    A    Yes, so -- approximately.

7    Q    Okay.  How many of those are open?

8    A    There are 300 of them, at the end of the June, there were

9    approximately 300 of them open -- excuse me, at the end of

10   July, there were approximately 300 open.

11   Q    And with respect to the locations that remain closed,

12   where -- in general terms, I don't mean precise towns, but

13   generally speaking, sir, where are those located?

14   A    Apologies.  Are you looking to -- are you looking for me

15   to -- do you know which states each of the --

16   Q    No, no.  No, I'm looking for with respect to the

17   approximately under 200 locations that remain closed.

18   A    Uh-huh.

19   Q    Where are they geographically?  Is there any easy way to

20   describe where they are?

21   A    No.  They're -- they're scattered, although I will say

22   that 73 of them are in the State of California.  All of the

23   locations in that state are -- are closed as a result of state

24   regulations.

25   Q    Okay.  (Glitch in the audio).

CHAD COBEN - CROSS BY MR. GOLD

1    A    Sure.

2    Q    The question are there any closed in the State of Texas?

3    A    Yes, sir.  Yeah.  I think -- yeah, in the State of Texas,

4    I think we have 63 locations.  We -- we closed -- rejected two

5    leases and we closed two stores.  We've got 51 locations that

6    are open for dine-in and some limited arcade.  As you -- as

7    you may recall, in this -- in the case of Texas, the -- there

8    was a staged reopening under state law and local laws, where

9    the regulations where they then allowed us to reopen stores up

10   to, originally 25 percent capacity or actually two levels,

11   which would increase to 50 percent, and then increased to

12   75 percent with respect to -- with respect to the food and

13   beverage.

14        And then the -- as a result of the increase in COVID

15   activity, we were forced to roll that back and it's now

16   limited to a 50 percent occupancy level in the stores.

17   Q    Operating under those restrictions in Texas and some

18   others in some other states, and given your California

19   closures, where is the Debtor on its projections, in terms of

20   it as you've got it as what you described at the first-days as

21   conservative projections going forward, where does the Debtor

22   sit?  Are you operating at about projection, below or above?

23   A    We are operating below the original projections that were

24   -- that were, you know, provided to various parties at the

25   outset of the case, and in connection with the original budget

1    under the cash collateral order.  Since that time, we've

2    revised both that budget and the operating projections to a

3    slightly refined view of our expected performance over the

4    (glitch in the audio) the circumstances that we're operating

5    under.

6    Q    In the lease extension motion that brings us here today,

7    the -- there's a representation that the post-petition cash

8    flow forecast presently projects the Debtors will have

9    sufficient liquidity to pay for operating costs for and after

10    the extension period.  Are you familiar with that statement?

11    A    Is that the truth of it?

12    Q    Is that still a true statement as of today?

13    A    Yes, sir, it is.

14    Q    So, if Judge Isgur decided today to terminate the

15    extension of time to perform under the leases and ordered the

16    Debtor, say in the next week, to pay the deferred rent for the

17    months of July and August, does the Debtor have the liquidity

18    to do so?

19    A    We have the cash available to do so; however, I don't

20    believe that it's in the Debtors' interest to -- to make that

21    payment.  I think it's in the Debtors' interest to preserve as

22    much flexibility as possible and as much availability as

23    possible, in -- in those assets, in cash on hand.  As -- as

24    we've seen over the -- you know, since the time of the initial

25    filing, we had states back up and reverse what was originally

1    some relaxation of (indiscernible) back to open these

2    locations.  And I don't know what the future holds with

3    respect to that.  So, over the course of the next several

4    weeks, between now and 24th, I believe that it's in the

5    Debtors' interest to preserve as much flexibility and maintain

6    as much cash on hand as possible.  But if the Judge ordered

7    that, yes, we have the cash on hand to do the -- make that

8    payment.

9    Q    And do you have -- apart from the Debtors' desire to

10   preserve liquidity, you have the cash to pay on the 24th of

11   August.  Is that correct?

12   A    That is correct, yeah.

13   Q    And having paid that on the 24th of August, would the

14   Debtor have sufficient resources to timely pay September rent,

15   which would be coming due a week later?

16   A    Yes.  On the cash flow forecast that we're currently

17   operating under, those are all true statements.

18   Q    And approximately how many of the Debtors' locations are

19   operating without any governmental restrictions at all?

20   A    None.

21   Q    Not a single state?

22   A    That's my understanding, that's correct.

23   Q    Okay.  And with the -- just to make sure that, again, the

24   numbers synch up, with the -- the motion referred to

25   10.4 million as the rent roll.  Is that number, after the

1    lease rejections, still an accurate figure, or is it --

2    A    No, sir.  No, sir.  That's the current figure, yes.

3    Q    Okay.

4    A    Approximately 10.4.

5         MR. GOLD:  Thank you.  That's all I have, Your

6    Honor, for now.

7         THE COURT:  Thank you.  Who else has questions?

8         MR. GOLD:  I'll pass the witness.

9         THE COURT:  Who else has questions for Mr. Coben?

10   If so, please press five-star on your line.

11        All right.  Hold on.

12        From (214)497-9584, who do we have?

13        MR. COOLEY:  Good afternoon, Your Honor.  This is

14   Michael Cooley from Reed Smith.

15        THE COURT:  Mr. Cooley, good afternoon.

16        MR. COOLEY:  I have a few questions.

17        THE COURT:  Go ahead, please.

18        MR. COOLEY:  Thank you, Your Honor.

19              CROSS-EXAMINATION OF CHAD COBEN

20   BY MR. COOLEY:

21   Q    Mr. Coben, good afternoon.  Can you hear me okay?

22   A    I can.  Good afternoon, Mr. Cooley.

23   Q    Very good.

24        In addition to serving as local counsel for various

25   landlords, I also represent National Retail Properties for

1 their landlord locations, Lynwood Public Facilities District,

2 River Chase Shopping Center, and an individual person --

3 husband and wife, who are a landlord themselves.  And I just

4 have a couple of questions for you, following on what Mr. Gold

5 asked, and hopefully not overlap anything.

6   I wanted to ask you about the budget that was attached to

7 the cash collateral order at Docket Entry 114.  It's one of

8 the Debtors' exhibits.  I'm happy to share my screen and put

9 it up on the screen, but I think, from my questions, you will

10 probably be able to answer them from memory.  If not, then I'm

11 happy to go otherwise.

12   My first question is:  Have -- am I correct that the

13 Debtors' cash flow budget that was attached to the cash

14 collateral order assumed that the landlord rent would be paid

15 in Weeks 2 and 6, at its regularly scheduled times?

16 A That's -- that's correct, it was -- it was scheduled to

17 be paid on the date preceding the beginning of July and the

18 beginning of August.  That's correct.

19 Q And the deferral was, obviously, in accordance with the

20 Court's order entered a few weeks ago.

21 A Correct.

22 Q And so am I correct then that, over the last 45 days, by

23 not paying the rent from -- indicated in the budget, that has

24 given some added liquidity to the Debtors, to the tune of

25 $10.5 million in each of those two months.

1    A    That's correct.

2    Q    Nevertheless, unless the Court extends the deferral

3    period beyond August 24th, the Debtors do plan to pay the

4    August and July rent on July 24 [sic], correct?

5    A    If that's the order by the Judge, then absolutely.

6    Q    And so any liquidity benefit that the Debtors had enjoyed

7    from having that extra cash today and yesterday and tomorrow

8    will be eliminated at the time the rent is paid.  Is that a

9    fair statement?

10   A    It may -- it may be a fair statement.  It -- if, in fact,

11   that's what -- what we're ordered to do, then, yes, that would

12   be true.  But what I had mentioned earlier, there were

13   material changes to the operating environment at the time that

14   this initial motion was filed, and -- and I don't know what

15   will happen between now and the 24th, and whether or not we'll

16   be in a position to have to seek additional relief.  In the

17   event that -- that we don't and we -- we are ordered to make

18   that payment, then certainly we -- we anticipate having the

19   cash on hand and being in a position to make the payments.

20   Q    Thank you.

21        Aside from that temporary increase in liquidity, can you

22   identify for me any other economic benefit that the Debtors

23   have received from the deferral of rent?

24   A    Well, I think the -- the benefit to the estate is -- is

25   clearly related to flexibility and -- and ensuring that it has

1    the liquidity to pivot as the regulatory environment changes

2    and as the -- as the business is forced to react to -- to the

3    operating circumstances that we find ourselves in, in lieu of

4    the global pandemic, so ... does that answer your question?

5    Q   If that is your answer to my question, then yes.

6    A   Okay.

7           MR. COOLEY:  That's all for me.  Nothing further,

8    Your Honor.  Thank you.

9           THE COURT:  Thank you.

10          Are there any other cross-examination questions for

11    Mr. Coben?  If so, please press five-star on your phone.

12      (No audible response.)

13          THE COURT:  Mr. Genender, do you have any followup

14    questions?

15          MR. GENENDER:  Yes, Your Honor, briefly.  Can you

16    hear me okay?

17          THE COURT:  Yes, sir.

18          MR. GENENDER:  Thank you, Your Honor.  Great.

19            REDIRECT EXAMINATION OF CHAD COBEN

20    BY MR. GENENDER:

21    Q   Mr. Coben, I just want to clarify something that you were

22    asked.  How many of the Debtors' venues are open consistent

23    with pre-pandemic levels right now?

24    A   There are -- there are none that implicate pre-pandemic

25    levels.

1    Q    You were asked --

2    A    (Indiscernible).

3    Q    -- by Mr. Gold -- go ahead.

4    A    My apologies.  No, we have -- we're unable to operate in

5    the same way in which we were operate prior to the pandemic.

6    Q    And how is it that the operation of the Debtors'

7    businesses is different than a typical restaurant, Mr. Coben?

8    A    Well, we're -- we're not a typical restaurant.  We're --

9    we're -- as you know, we have both restaurant facilities, but

10   we also have arcades and family entertainment facilities.  And

11   so we're neither an arcade or a gaming environment, nor are we

12   a restaurant, but we're a hybrid of the two.

13        Approximately 55 to 60 percent of our -- of our revenues,

14   historically, have come from the arcade side and the

15   entertainment side of the business, and 45 percent of the --

16   of the venue-related revenue has been tied to food and

17   beverage, so it's a hybrid.

18        In lieu of this whole pandemic and the pending

19   regulations imposed by -- by the states and local governments,

20   the way that you've been able to operate is that, very widely,

21   as referenced earlier, that there have been staged reopenings,

22   allowing us to -- to reopen from the dine-in perspective,

23   allowing our customers to come into some of the venues.

24        As I said, there's at least 300 that are open now, many

25   of which are still -- we still don't have the ability to get

1      into.  Some of them are at -- they're all at -- at reduced

2      capacity level.  So we've got -- of the 300 venues, I think

3      only 90 of them have greater than 50 percent occupancy

4      allowed.  So we're -- we're limited in the number of customers

5      that we can allow into our dine-in facilities.  And in some

6      cases, the arcade is closed or the arcade site is even more

7      restricted, so that may be limited to 50 people, rather than

8      50 percent or some other -- some other metric (glitch in the

9      audio) we're not able to -- to open fully due to the pandemic,

10     as I said.

11             Three -- of our 300 venues, only 90 of them have

12     greater than 50 percent occupancies allowed -- even allowed.

13     So, as -- as you might anticipate, our -- our revenue -- our

14     ability to conduct business at the same level that we did is

15     -- you know, is materially impaired or (glitch in the audio) a

16     fraction of what we did in 2019 (glitch in the audio).

17     Q    Mr. Coben, if you're allowed, in a particular venue, to

18     have 50 percent occupancy and no arcade, does that mean that

19     the restaurant can enjoy 50 percent revenue pre-pandemic --

20     compared to pre-pandemic?

21     A    Well, we could, but that has not been our experience so

22     far.  So, in -- I will tell you that, at -- of the restaurants

23     that we have open or at the locations that we've had open

24     during the month of July -- and this was measured on -- on

25     those locations available for -- for a full week during the

1    month of July.  I think there were 286 stores that were open

2    for a full -- for a full week during the month of July.  And

3    our sales and receipts were pacing at 77 percent of -- down

4    77 percent from 2019.  So, in some instances, we -- as I

5    mentioned, we had -- had the ability to have slightly higher

6    occupancies, and in some cases, slightly lower, and in some

7    cases, 50 percent.  Our experience, so far, is that it's been

8    ticking down off of 2019 by 77 percent.

9    Q   Mr. Coben, that 77 percent figure that you just

10    referenced does not take into account the 200-some-odd stores

11    that are completely closed.  Is that right?

12    A   That's correct.

13    Q   All right.  So that would make the -- if you factor those

14    in, the impact on revenue would be -- it would be more than

15    77 percent lower, month over month, right?

16    A   Correct.  (Glitch in the audio), if you will.

17    Q   Thank you.

18    You referenced, in answering some of the questions on

19    cross, additional government regulations that have come into

20    effect since the emergency motion was filed in late June.

21    What impact has that had on the Debtors' business, those

22    regulations?

23    A   Well, at one point, just by way of example, in the State

24    of California, we had opened up a number of stores, and on

25    July 13th, I believe it was, the State of California rolled

1    back the loosening -- the loosening of the regulations back,

2    forcing us to shutter all of our locations once again.  So in

3    that event, you know, where we had some locations open,

4    they're now closed.

5         And similarly, in New Mexico and in Arizona and in

6    New Jersey and elsewhere -- Michigan, we've experienced some

7    tightening of restrictions after they had been loosened at

8    some level, as a result of increased COVID activity in those

9    states.

10   Q    Mr. Coben, at the time that you issued your prior

11   declarations on -- in late June, did you anticipate that those

12   additional regulations that were reversed, reopenings, would

13   come to bear?

14   A    No.  It's a -- it's a very unique situation, and we're --

15   we're reacting to it on a daily basis.  Just like everyone on

16   this -- in this hearing, we wake up in the morning and hear

17   what the day's news holds, and -- and it's different every day

18   and every week.  And it -- I just -- we had no idea that was

19   going to happen, you know, that they were going to be walking

20   back the -- the loosened restrictions, nor California, nor

21   anyplace.

22        So, no, we -- we had -- we had hopes that the summer

23   months, if you recall, back in the April/May time frame, that

24   -- the prevailing thought that the heat in the summer months

25   was going to dampen the impact of and the spread of COVID-19,

1    and we were all hopeful that we would return to some degree of

2    normalcy.  But instead, what happened is that we've had

3    increased COVID activity in many states and various regions

4    across the country, and those spikes have resulted in

5    increased regulations and rolling back of -- of whatever

6    loosening of regulations we were experiencing.  So, no, it's a

7    very uncertain environment.

8    Q    When you refer to wanting flexibility over the next three

9    weeks, Mr. Coben, does that in any way relate in any way to

10   being able to react to additional uncertainties that may come

11   to bear over the next three weeks?

12   A    A hundred percent.  It is -- it is imperative that we

13   maintain as much flexibility as possible.  I think the

14   examples that we've been talking about are -- are -- are

15   directly on point.  We have no idea about what's coming.  Yet,

16   we find ourselves in the situation of -- of having to deal

17   with it.

18        We had anticipated and originally projected that our --

19   that our -- that our -- our receipts and recovery in some of

20   those locations that we had -- were reopening, we were

21   anticipating that -- that our clientele would resume, that

22   their spending would resume, and their comfort level in being

23   in the store with their families and having birthday parties

24   would resume.

25        And instead, what's happening is, you know, when the --

1    when the news comes out that the incidents of COVID is

2    spiking, that -- that dampens consumer confidence and their

3    willingness to go into stores.  And our experience with

4    respect to revenue goes down accordingly.

5    Q    Unlike, perhaps, a retailer, what online presence does

6    Chuck E. Cheese or Peter Piper Pizza have, in terms of their

7    overall business?

8    A    Yeah.  So, as -- as you may recall from Mr. Howell's

9    first-day declaration, there was no material amount of takeout

10   business.  That wasn't something that -- that was part of the

11   business model for a family entertainment center.  While they

12   had some, you know, dine-in activities and some food and

13   beverage offerings at the restaurants, there wasn't a material

14   amount of takeout business or delivery business.

15        You know, it wasn't until COVID hit and -- and the

16   Debtors were forced to adapt and find some way to generate

17   revenue that they began to have a material offering of -- of

18   takeout and delivery food.

19   Q    Thank you.  Just a couple of questions -- more questions,

20   Mr. Coben.

21        What efforts has the Debtor -- have the Debtors

22   undertaken to address variable costs since this case has been

23   filed?

24   A    Well, as you can imagine, we're -- we're very sensitive

25   to preserving liquidity and -- and have taken dramatic steps

1    to -- to preserve liquidity, including furloughing most of our

2    -- of our -- of our hourly wage employees and 65 percent of

3    our -- of our corporate employees, including our -- our call

4    center employees.  So we've -- we've cut back on our

5    headcount.

6         We're taking steps to -- to renegotiate and, you know,

7    attempt to work with landlords to -- to amend and modify

8    leases where we can, in order to -- to make the business

9    economically viable.  And we've taken all steps that we can to

10   -- to reduce our -- our variable operating expenses in -- in

11   every instance that we -- that we can, so across the board.

12   Q    Mr. Coben, what -- an additional three weeks of rent

13   deferral from today forward, what -- would that allow -- what

14   impact would that have on the Debtors' ability to continue

15   negotiating with landlords?

16   A    Well, it's critical that we -- you know, with -- as I

17   said and we talked about earlier, there's 500 stores and --

18   and leases that are out there with approximately 400

19   landlords.  So there's -- there's a -- it's a -- it's a heavy

20   lift to reach out and have a productive discussion with each

21   of them and try to talk through what the best outcome is for

22   both the Debtors and the landlords.

23        So we've -- as everyone knows, we've retained Hilco,

24   who's been working with the company and with the landlords to

25   try to renegotiate leases and -- and -- where we could and

1     where we -- where we've been able to so in the locations where
2     we haven't been successful in arriving at a mutually
3     beneficial renegotiated lease, but we're certainly in those --
4     trying to have those discussions and having those discussions
5     across the board.  It's -- it's a -- it's an important
6     component of a successful reorganization for the Debtors.
7     Q    Thank you, Mr. Coben.
8              MR. GENENDER:  Your Honor, I have no more questions.
9     Thank you, Judge.
10             THE COURT:  Thank you.
11             Mr. Gold?
12             MR. GOLD:  Yes.  Thank you, Your Honor.  I just have
13    some discrete Recross, if I may?
14                  RECROSS-EXAMINATION OF CHAD COBEN
15    BY MR. GOLD:
16    Q    Mr. Coben, Mr. Genender asked you about flexibility, and
17    you -- you made the point of preservation of liquidity.  If
18    10 percent more of your locations were forced to close because
19    of changes in the COVID environment, what would you spend all
20    that money on?  You've referred to flexibility.  But what
21    other uses are you putting it to, other than a large rainy day
22    fund?
23    A    Well, we're not in the business of trying to close
24    locations, right?  What we're trying to do is keep our
25    locations open and -- and that's really how we preserve value,

1    and that's how we're going to return.  Once -- once we're

2    successful and once the environment opens up enough for us to

3    return to some sort of normalcy, where kids are having

4    birthday parties and families are returning to Chuck E. Cheese

5    for food and beverage and entertainment, you know, we want to

6    keep as many of the stores as we can.

7         So I think that the preservation of liquidity in the

8    meantime is intended only to -- to help the business for

9    success as we reorganize.  And keeping -- maintaining some --

10   some access for liquidity and some flexibility gives us the

11   ability to reopen those stores and -- and fund the operating

12   losses for some period of time, as we -- as we are able get

13   back into profitability.

14   Q    But if you have to pay the rent later this month, you

15   won't have those benefits going forward, in terms of your so-

16   called "path to profitability."  If the Debtor's Day 61 or 62

17   pays the deferred rent, none of those things exist anymore.

18   You'll have as many stores as you have open, and you just

19   won't have the cash.  Is that correct?

20   A    It -- assuming that there's no change in rent amounts and

21   no settlements with any of those landlords, that -- for some

22   amount that's lower than the 10.3 per month, that would be

23   correct.

24   Q    Well, you keep referring to the lower amount.  I mean, to

25   put it in the bluntest terms -- and I believe the motion

1    refers to it this way -- part of your strategy to maintain

2    liquidity is to withhold rent to leverage your lease

3    renegotiation discussions.  Is that correct?

4    A    I -- I think -- yes, we are negotiating with landlords,

5    and yes, we are also -- we -- as you know, through this

6    discussion, we've -- we've sought relief from the deferment of

7    the July and August rent payments, both to preserve liquidity

8    and to -- and to enable us to evaluate, you know, the leases,

9    the stores that we want to keep open versus closed.

10         As you know, we've already rejected 54 leases and -- and

11   closed some stores, and so that's an evaluation and an

12   assessment that we're going through in real time.  And as

13   well, we're -- we're going through the -- the discussion and

14   dialogue with -- with many landlords, as many landlords as we

15   can, to see if there's any kind of a mutually beneficial,

16   consensual resolution or -- or negotiation of that -- of -- of

17   some of those individual leases.

18   Q    What has withholding rent to do with the evaluation of an

19   open store?

20   A    It preserves liquidity in the meantime, and gives us the

21   flexibility to continue to operate and react to things like

22   rolled-back regulations in markets like California and Texas

23   and others that I referenced earlier.

24   Q    So -- but in the event of additional surprise closures,

25   while you would have less revenue, you would also have less

1    expenses.  Is that correct?

2    A    That could be correct, yes.

3    Q    I'm just wondering -- my question is:  What does this

4    liquidity go to under the circumstances you've described,

5    other than a rainy day fund?

6             MR. GENENDER:  Your Honor, I'm going to object.  I

7    think -- Your Honor, I'm going to object.  I think that was

8    asked and answered.

9             THE COURT:  Sustained.

10             MR. GOLD:  That's all I have, Your Honor.  Thank

11    you.

12             THE COURT:  Thank you.

13             Does any other party have any additional cross-

14    examination questions for Mr. Coben?

15             We do have someone, let me get your line activated.

16    From (305)562-6800, who do we have?

17             MR. FRIEDMAN:  Okay, Judge.  My name is Brent

18    Friedman, Brent A. Friedman, PA, I represent B Square SC

19    Limited, the landlord in Boca Raton, Florida.

20             THE COURT:  Good afternoon, Mr. Friedman.  I can see

21    you fine on the screen and hear you on the phone.

22             MR. FRIEDMAN:  Thank you, Judge.

23                  RECROSS-EXAMINATION OF CHAD COBEN

24    BY MR. FRIEDMAN:

25    Q    Mr. Coben, just a few questions.  Are the Debtors

1    accruing any additional post-petition trade claims or vendor

2    debt, aside from that pertaining to the landlords?

3    A    No.  All of the post-petition claims are being paid in

4    the ordinary course from trade operations, if that's the

5    question that you're asking.

6    Q    Yes.  I mean, so there's no mass deferrals with any other

7    group of creditors or vendors, aside from simply the

8    landlords.  Is that correct?

9    A    Well, I think that's -- that's partially true.  But the

10   -- the biggest group that's impacted are our employees.  I

11   guess -- as I mentioned, there's -- there's a large number of

12   employees, most of our -- you know, most of the hourly

13   employees have been furloughed and are -- are not coming back

14   to work, and that's really only a result of the reduced

15   operations.  So -- so I think they've probably been the most

16   impacted of any of the -- of the parties-in-interest.

17   Q    The -- have the Debtors determined (glitch in the audio)

18   determining how many leases it intends to retain post-

19   confirmation?

20            MR. GENENDER:  Your Honor, I'm going to object.

21   That's outside the scope of my Redirect.

22            MR. FRIEDMAN:  I think -- Judge, I think it's

23   pertinent to having some sort of an understanding, in terms of

24   how many leases would be assumed and what the debt associated

25   with those leases may be, both pre- and post-petition.  The

1      landlords have been asked to defer significant sums of money

2      and they have a right to know just where the Debtors stand, in

3      terms of that analysis.

4              THE COURT:  I'm overruling the objection.  I don't

5      think it's beyond the scope because of the testimony that

6      Mr. Coben gave about the extreme need for flexibility, and

7      part of that is determining which leases to keep.  So I think

8      it is consistent with it, and I'm going to overrule the

9      objection.

10             Go ahead and answer, Mr. Coben, if you know.  Have

11     you determined -- I think the question was how many leases

12     you're going to assume or reject at this point.

13             THE WITNESS:  Yeah.  The -- the Debtors haven't made

14     a final determination of that yet.

15     BY MR. FRIEDMAN:

16     Q    Mr. Coben, do you have any idea, in terms of what the

17     total dollar amount of pre-petition debt is owed to the

18     landlords?

19     A    Approximately 20.4 million, if memory serves me

20     correctly.

21     Q    And is confirmation of a plan dependent upon the

22     obtaining of Debtor-in-possession financing?

23             MR. GENENDER:  Your Honor, again, I thought that is

24     -- Judge, again, that's outside of the scope of my -- of my

25     Redirect.

1       THE COURT:  That does seem pretty far outside the

2  scope.  Why don't you tell me how that's within the scope of

3  his Redirect, Mr. Friedman?

4       MR. FRIEDMAN:  Well, Judge, the Debtors argued the

5  need for flexibility necessary to have funds for a rainy day.

6  So, if those funds are used for other purposes, for a rainy

7  day, but I'm not quite sure how it is that the landlords are

8  going to be able to be paid on either pre-petition or post-

9  petition funds, especially the pre -- or the post-petition,

10  which is at issue here.  And so, if they don't have Debtor-in-

11  Possession financing, or aren't substantially along the way in

12  terms of obtaining it, and if the revenue keeps being reduced,

13  as the testimony has been, I'm not sure where the funds are

14  coming from in order to pay the landlords post-petition.

15       THE COURT:  I sustain the objection.  You're

16  stretching, I think, beyond the reason of what's within the

17  scope.

18       MR. FRIEDMAN:  No further questions.

19       THE COURT:  Thank you.

20       Any further cross-examination?

21   (No verbal response)

22       THE COURT:  Any redirect, Mr. Genender, within the

23  scope?

24       MR. GENENDER:  No, sir.  Thank you, Your Honor.

25                 EXAMINATION OF CHAD COBEN

1          BY THE COURT:  Mr. Coben, one of the things in the

2    motion, when you talked about regulatory issues, the motion

3    mentions potential statutory rent deferments, something I'm

4    unfamiliar with in the commercial world.  Is that any part of

5    the flexibility or not?  Because it was news to me, and I

6    didn't know if that was anything you're prepared to testify

7    about.

8          THE WITNESS:  Apologies, Your Honor.  I'm not sure I

9    understand what your question is.

10         BY THE COURT:  The motion --

11         THE WITNESS:  -- is my --

12         BY THE COURT:  The motion implies that, at the end

13   of the -- or states that, at the end of the 60 days, it may be

14   that the rent won't have to be paid because of some regulatory

15   or statutory -- statutorily imposed forbearances of -- against

16   landlords.  I am unfamiliar with any of those in the non-

17   bankruptcy context for commercial leases.

18         Is any of that part of the flexibility that you're

19   looking for, or is that not part of the flexibility you're

20   looking for?

21         THE WITNESS:  I -- I would defer to counsel on -- on

22   answering that question.  I --

23         BY THE COURT:  If it's not part of what you're

24   testifying about, that's fine with me.  I just wanted to

25   clarify what your flexibility need was.  So it sounds like it

1          does not include that.

2                    THE WITNESS:  Correct, Your Honor.

3                    BY THE COURT:  All right.  Thank you.

4                    THE WITNESS:  Thank you.

5               (Witness excused)

6                    THE COURT:  All right.  Mr. Genender, do you have

7          any more witnesses today?

8                    MR. GENENDER:  We do not, Your Honor.

9                    THE COURT:  Thank you.

10                    Are there any parties that are opposed to the relief

11          that have any evidence they wish to introduce today in the

12          form of witnesses or exhibits?

13               (No verbal response)

14                    THE COURT:  All right.  Do all parties rest?

15                    MR. GENENDER:  The Debtors do, Your Honor.

16                    THE COURT:  Thank you.

17                    UNIDENTIFIED:  Yes, sir.

18                    THE COURT:  All right.  Does anyone want to make any

19          closing argument?

20               (No verbal response)

21                    THE COURT:  Okay.  I'm going to grant the Debtors'

22          motion.  The evidence is just how bad of a situation we are

23          in, frankly.  And the function of the statutory extension of

24          60 days, as a possible extension, I think is designed for

25          situations much less than what we are facing, in terms of

1    uncertainty.  To ask the Debtor to be making final decisions

2    when it, under the statute, can get 21 more days, as things

3    are moving rapidly against the Debtor, and maybe for the

4    Debtor in some situations, it's sort of the definition of why

5    we should be giving people this flexibility.

6         Mr. Cooley -- I'm sorry, not Mr. Cooley -- Mr. Coben

7    -- sorry, your picture is right under his, Mr. Cooley.

8    Mr. Coben testified that, every day, he wakes up with new

9    information, new challenges, and it sounds like new nightmares

10   that have to be dealt with.

11        The testimony is that the Debtor hasn't even decided

12   which leases to keep and which leases not to keep.  That's a

13   decision that, in my view, is going to get accelerated over

14   the next 21 days.  And given the Debtors that flexibility to

15   decide which leases are important, which ones aren't, which

16   ones can be renegotiated and which ones can't be is

17   appropriate under the statute.

18        I combine that need for flexibility with the absence

19   of any evidentiary showing of any additional harm from the

20   21 days.  So, on the one hand, I'm giving the Debtors a

21   tremendous amount of flexibility only for three more weeks, in

22   a world where I do understand that this hurts landlords, but

23   there isn't any unique harm on the 21 days that is different

24   from just the generic harm that's incorporated into the

25   statute, that people are going to wait for their money and

1     maybe wait for a decision.

2              I combine all of this with some uncertainty as to

3     what the law requires at the end of 60 days, with respect to a

4     rejected lease.  The Debtors' performance may be abated for

5     that 60 days, and it may be due at the end of 60 days.  What

6     does mean, though, the remedies are at the end of the 60 days

7     for a lease that is rejected?  It's a question I don't know

8     the answer to and I'm not prepared to confront today.

9              And so it seems to me that, based on the evidence

10    and the uncertainty in the law, that the motion fits under the

11    statute and should be granted.  I'm going to grant it.  I'm

12    doing all this without prejudice to what the result is at the

13    end of the 60 days, and to exactly what that means, in terms

14    of required performance.

15             Mr. Gold, go ahead, please.

16             MR. GOLD:  Yes, Your Honor.  Thank you.

17             Obviously, Your Honor has ruled.  I just wanted to

18    highlight a comment Your Honor made at the interim hearing on

19    this motion.  And that related to exactly the scenario that

20    was just outlined, and that is we need to be careful in that

21    situation, where the Debtor has been open and operating at

22    certain locations, and then decides, on Day 57 or 58, to

23    reject.

24             THE COURT:  Correct.

25             MR. GOLD:  You're not adjudicating that now.  I

1  would just urge the Court -- and I believe you're doing this

2  -- we have to have our eyes wide open, Your Honor.  These are

3  unique and challenging times.  But we may get to Day 62 and go

4  off the grid.  And I think that's the slippery slope that some

5  unfortunate cases have traveled down.  Landlords are still

6  waiting for their deferred rent from April and May in the

7  *Pier One* case.  That case is administratively insolvent.  The

8  Debtors cited (glitch in the audio) and it is nothing to model

9  ourselves after.

10       I hope the three weeks goes quickly and safely, but

11  I believe the Debtor has fired so many warning shots across

12  our bow with the motion and with their presentation today,

13  Your Honor, that you -- we should not be naïve to think that

14  we may find ourselves back in front of you a little sooner

15  than we might otherwise think with respect to the rent that

16  you're ordering deferred.

17       Thank you for the opportunity, Your Honor.

18       THE COURT:  No, I -- and Mr. Gold, I -- you are

19  correct.  I don't know where we're going to be.  I think that,

20  if I knew where I was going to be in 21 days, I think if

21  Mr. Coben knew where he was going to be in 21 days, I think if

22  you knew where Mr. Coben was going to be in 21 days, might

23  have gotten a different ruling.

24       Largely, my ruling is based on uncertainty;

25  uncertainty, both factually, which is, by far, the dominant

1    feature, but also uncertainty legally.  And the example that

2    you've given of a store not closed, but opened, you know,

3    there is a difference between an administrative claim and a

4    present payment.  It may be that present payment is required

5    on the administrative claim.  That's an issue I'm not

6    addressing.  All I'm saying is I've got really tough legal

7    questions that I'm going to have to confront, tougher on

8    closed stores, I think, than on open stores, and we'll just

9    need to see where we are.

10            But you're correct.  I am not making any decision

11    today about what that means.

12            MR. PEREZ:  And Your Honor, this is Alfredo Perez.

13    Can I ask a question?

14            THE COURT:  Go ahead, please.

15            MR. PEREZ:  In terms of the Form of Order, the Form

16    of Order that the Court entered granting the relief, would you

17    like a subsequent Order, or is that Form of Order sufficient?

18            THE COURT:  I don't know that I need any further

19    Order, other than the oral Order that I'm deferring the rent

20    for another 21 days.  If the parties think --

21            MR. PEREZ:  Thank you, Your Honor.  That --

22            THE COURT:  Yeah, if the parties think it's going to

23    helpful that another order -- we could, but I mean, I --

24    you've got the ruling.  And I don't know what good the written

25    Order is going to do at this point because, with the previous

1    Interim Order and now this Final Oral Order, it's, I think,

2    now an appealable Order, if somebody wants to appeal it.

3        I will say that, if somebody wants something in

4    writing because you think it's going to help your ability to

5    get an appeal done, I'll do that.  But I don't see that it

6    helps the Debtors at all.  And if the opposing parties want

7    something in writing, I will get that done.

8        Mr. Adams, though, has raised his hand and has some

9    -- a comment or a question.  Mr. Adams, go ahead.

10       MR. ADAMS:  Yes.  Yes.  Thank you, Your Honor.  And

11   for the record, Jason Adams, Kelley, Drye & Warren, proposed

12   counsel for the Official Committee of Unsecured Creditors.

13       Your Honor, I was actually expecting that others

14   would jump in at the closing argument point, so I was just --

15   I was just kind of waiting until the end, but Your Honor --

16       (Laughter)

17       MR. ADAMS:  I -- Your Honor, I understand Your

18   Honor's ruling, and certainly -- I feel some of the concerns

19   that Mr. Gold raised with respect to where we're going to be

20   in 21 days.  And clearly, the Debtors have indicated that

21   they're intending to file something apparently within that

22   21 days for potential additional referrals.  I think Your

23   Honor raised questions during cross-examination with respect

24   to state law or statutory deferrals or other types of things.

25       I guess the point here -- and maybe some of this

1    will get alleviated by deferral of the cash collateral issue

2    -- is the Committee is always of the concern that, you know,

3    we're going to find ourselves in a significant administrative

4    (glitch in the audio) here.  And the Court did not have to

5    deal with the 506(c) waiver issue today or similar relief that

6    was requested in the interim cash collateral order and

7    proposed final cash collateral order.  Maybe these are all

8    issues we're going to have to deal with at that time, if the

9    Debtors -- conditions condition to worsen, if the Debtors are

10   unable to find DIP financing to fund the emergence from

11   bankruptcy, you know, all concerns that I guess we will deal

12   with at another time.  And probably, in 21 days, we're going

13   to -- we're going to have to deal with these issues again.

14           But that's where the Committee's concern comes from

15   here, is we don't want to find ourselves in the *Pier One* hole,

16   where we are in administratively solvent state and I don't

17   think that would be in anyone's best interest; the landlords,

18   the Debtors, creditors, or anyone.  So that was the basis of

19   our objection.

20           I certainly understand Your Honor's ruling.  And

21   hopefully, with the next 21 days, the parties will be able to

22   get together and figure out a solution here.  The landlord

23   community is obviously an extremely critical component of this

24   company's emergence from bankruptcy, and we want to make sure

25   that all of the parties here come to a commercial resolution

1        that addresses all parties' interests.

2                   THE COURT:  Mr. Adams, thank you for that comment.

3                   MR. ADAMS:  Thank you, Your Honor.

4                   THE COURT:  I will say that a large number of folks;

5        the Committee, in particular, but a number of landlords,

6        filed, I think, well-taken objections.  And it's not like this

7        is an easy call.  But you all are all in a very tough

8        position, making for a very tough call, I think, by the Court.

9        But the call is not one made without some sympathy for the

10       plight of the landlords.

11                  I don't think a precipitous decline helps the

12       landlords.  So I'm hoping that folks can come to a way that

13       there can be some stability for the landlords and some

14       stability for the Debtors.  And I'm perfectly prepared to

15       entertain various interim compromises with various interim

16       payment arrangements, if the parties believe that will provide

17       stability to their particular retail location and to the

18       Debtor.  But if not, then it may be there aren't interim

19       arrangements that can be done, and we just have to decide, you

20       know, everything in one fell swoop, and see where we go.

21                  I have a difficult time thinking that, in September

22       of 2020, an empty Chuck E. Cheese is going to get re-leased.

23       So finding a way to keep the landlords getting a stream of

24       income, I think, is better than not finding a way for them to

25       keep the stream of income.  And I'll just tell the Debtors I

1    don't think it's reasonable to expect the landlords, come

2    September, to get no rent.  I mean, there's a point at which

3    the statute takes over.  And so, if there isn't a way to get

4    stability, you all better start making some hard choices.

5          I don't know whether the statute -- and I just

6    haven't looked at it.  As I said, I'm going to wait and rule

7    on that when the time comes.  Does the statute allow me any

8    flexibility to say less than full rent?  You know, not on the

9    face of it.  Maybe, below the face of it, there's case law or

10   some Fifth Circuit case that allows for less than full rent.

11   I don't know.  The economics are what need to drive this, I

12   think, more than the statute.

13         And I do hope, Mr. Adams, that -- I know the

14   Committee has landlords on it, from reading your components.

15   But I think, in terms of service to your overall constituency,

16   including the landlords, for the Committee to work pretty hard

17   on an interim solution that can bring people together, where

18   you're the middle man, I think you know I'm a pretty big

19   believer in having Committees do hard lifting in cases, and

20   you've got hard lifting to do.

21         But I am not going to preordain what the conclusion

22   is.  What I am going to tell you is I want to have some

23   flexibility, economically, so that you all can come to a

24   conclusion.  It may not work.

25         Anybody else need to make --

1           MR. ADAMS:  Under --

2           THE COURT:  -- any comments?

3           MR. ADAMS:  Understood.

4           THE COURT:  Let me just ask this because, if any of

5      the opposing parties want a written order because it will help

6      you with an appeal, I can just do a one-sentence order, we can

7      go through, you know, renewing the earlier order, or I can

8      just do it orally.  I don't think it makes a difference.  And

9      what I really don't want to do is to go off and do something

10     that sort of takes sides in an appeal, one way or the other.

11     So, if anybody wants a written order, would you please speak

12     up and tell me?  And I'll get something done that is as

13     neutral as I can.  But if you all are okay with just the oral

14     ruling, my mistakes and all built in, that may be better.

15          Mr. Adams, you were the last one to speak.  Do you

16     see any reason for anything other than the oral ruling, or

17     you're okay with that?

18          MR. ADAMS:  From the Committee's perspective, Your

19     Honor, we're okay with that.  Obviously, I don't want to speak

20     for the landlord community as a whole.

21          And Your Honor, we will take Your Honor's statements

22     to heart here.  We are going to take an active role in trying

23     to play middle man between (glitch in the audio), Your Honor,

24     but we'll accept the challenge and see if we can play the

25     middle ground between the Debtors and the landlord community

1    to get to a commercial solution here that makes sense for this

2    company.

3              THE COURT:  Thank you.

4              MR. PEREZ:  And Your Honor, this is Alfredo Perez.

5              THE COURT:  Yeah.

6              MR. PEREZ:  We, obviously, will work with the

7    Committee to try to come up with a commercial solution.  But I

8    certainly don't want, you know, to mislead the Court that -- I

9    mean, we, obviously, will do what we think is in the best

10   interest of the estate to maximize value, and we'll do those

11   things simultaneously and do the things we need to do to

12   protect the estate.  And obviously, the Court can also make a

13   determination if we can't have an -- if we don't reach any

14   sort of a --

15             THE COURT:  Yeah.

16             MR. PEREZ:  -- commercial resolution.

17             THE COURT:  I know that you will, and that's what I

18   expect.

19             Okay.  Well, I'm just going to leave it at this.  I

20   am leaving it at an oral order.  Any party that wants a

21   written order, please just file a request for additional

22   findings of fact and conclusions of law, file it as an

23   emergency, so that I can get it done in writing if you think

24   that will help you for the appeal.

25             But I intended to make my rulings orally under

1    Rule 7052.  They are the Court's order.  The minute entry will
2    reflect they were made orally under 7052, and that will be the
3    oral order from which you can file an appeal.
4            All right.  We are -- I think we have nothing else
5    on the Agenda today and we're going to adjourn.  Am I missing
6    anything that we needed to take up?
7            MR. PEREZ:  No, Your Honor.  May we be excused?
8            THE COURT:  Yes, sir.  Thank you.  We're in
9    adjournment.
10         (The parties thank the Court.)
11           THE COURT:  Thank you.
12         (Proceedings concluded at 2:34 p.m.)
13                        * * * * *
14         *I certify that the foregoing is a correct transcript*
15   *to the best of my ability produced from the electronic sound*
16   *recording of the telephonic proceedings in the above-entitled*
17   *matter.*
18        */S./  MARY D. HENRY*
19   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
20   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
21   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
22   *JTT TRANSCRIPT #62463*
23   *DATE FILED:  AUGUST 7, 2020*
24
25

1