IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | § |
| | §   Chapter 11 |
| CEC ENTERTAINMENT, INC., *et al.*, | § |
| | §   Case No. 20-33163 (MI) |
| Debtors.[1] | § |
| | §   Relates to Docket No. 487 |

**OPPOSITION OF MGP IX PROPERTIES, LLC AND MGP XI CASCADE, LLC
TO DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS
TO ABATE RENT PAYMENTS AT STORES AFFECTED BY
<u>GOVERNMENT REGULATIONS</u>**

MGP IX Properties, LLC and MGP XI Cascade, LLC (collectively, the "MGP Landlords"), who hold the three leases with Debtors for its locations in Roseville, California; Lancaster, California; and Burlington, Washington ("Roseville," "Lancaster" and "Burlington Leases," respectively, or collectively "MGP Leases"),[2] appearing through undersigned counsel, hereby oppose and object to the Debtors' *Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations* [Docket No. 487] (the "Motion").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

[2] Roseville, Ex. A; Lancaster, Ex. B; Burlington, Ex. C.  The three Leases were originally executed by predecessor entities, but for purposes of this motion the parties are referred to as the MGP Landlords and the Debtors.

1

**INTRODUCTION**

1. The Debtors' Motion should be denied as to all of the affected leases, because Section 365(d)(3) specifically and unambiguously provides that the time period in which a debtor can defer making rental payments is limited to 60 days and may not be extended beyond that. The cases and legislative history make clear that this 60-day period was and is a bright-line boundary established as a compromise between a landlord's right to be timely paid and giving the tenant time to come up with the money needed to pay rent and to evaluate whether to continue with the lease or to reject it. Moreover, the Supreme Court has confirmed that bankruptcy courts may not use their equitable power to contravene a specific statute in the Bankruptcy Code. Therefore, Debtors cannot extend the specific 60-day period under any equitable or common law theory, and they cannot reduce the rent owing, which must be paid at the full contractual rate.

2. More specifically, the Motion must be denied as to the three MGP Leases because these leases contain a different force majeure clause than the clause in the "typical" lease cited in Debtors' motion, and the clauses in the MGP Leases do not excuse payment of rent for force majeure events. Similarly, Debtors' invocation of common law principles fails because the common law in California and Washington does not permit tenants simply to cease paying rent when operations are restricted or to unilaterally reduce their rent payments; instead, tenants are required to mitigate their damages and make the best use possible of the premises.

3. Instead of paying rent or rejecting the leases, the Debtors are trying to give themselves a free option, for an indefinite period of time, to keep the premises and all the benefits (including storage, food preparation, and food pick-up and delivery) without paying anything. Then, if things look better months (or years) from now, they take all the benefits, but if not, they have no downside and they put all the cost and risk on the landlords, making them into an

involuntary, long-term lenders with no recourse. Section 365(d)(3) was enacted for the very purpose of preventing exactly this type of gambling at the landlords' expense.

## DISCUSSION

### A. Section 365(d)(3) of the Bankruptcy Code Is Clear on Its Face that No Extensions Are Permitted Beyond 60 Days.

4. As this Court acknowledged at the August 3, 2020 hearing in this case on the Debtors' prior motion to defer paying rent, the plain, unambiguous language of 11 U.S.C. § 365(d)(3) requires that the "trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365. A deviation from the general rule up to 60 days is permitted only upon a showing of cause and only as an interim measure:

> The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period.

11 U.S.C. § 365(d)(3). There is nothing in the Bankruptcy Code that counteracts or supersedes this plain language—that "the time for performance shall not be extended beyond such 60-day period."

5. "Given the fact that section 365(d)(3) mandates a departure from the normal priority of claims, it should be strictly construed. . . . [T]he statutory obligation of 'timely' performance is unambiguous with respect to rent . . . ." *In re Pudgie's Dev. of NY, Inc.*, 202 B.R. 832, 837 (Bankr. S.D.N.Y. 1996). In addition to the maximum of 60-days extension that is permitted under section 365(d)(3), the only other exception is that the obligations a tenant must perform does not include the *ipso facto* obligations specified in 365(b)(2). Under the doctrine of "*inclusio unius est exclusio alterius*," the inclusion of specified exceptions is a preclusion of any other implied exceptions. *See, e.g., Law v. Siegel*, 571 U.S. 415, 423-24 (2014) ("The Code's

3

meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."). Here, Congress manifested a clear intent to strike a balance between commercial landlords and tenants, which gives the tenant a maximum of 60 days of occupancy without timely performance of obligations under the lease, and section 365(d) sets out the specific limits of that balance, which cannot be expanded by implication. That balance also helps, among other things, to forestall landlord bankruptcies and chain reactions that would hurt the economy.

6. Section 365(d)(3) is unambiguous, but if there were any doubt, the Congressional intent confirms that the 60-day period that cannot be extended. "The clear intent [behind section 365(d)(3)] is . . . to assure that landlords not be compelled to furnish current services without being compensated on a current basis." *In re Food City, Inc.*, 95 B.R. 451, 455 (Bankr. W.D. Tex. 1988); *see also In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001) ("The clear and express intent of § 365(d)(3) is to require the trustee to perform the lease in accordance with its terms.").

7. Senator Orrin G. Hatch, a key sponsor of the legislation that added subsection 365(d)(3), summarized the intended effect of the 60-day grace period as follows:

> For cause, the court can extend the time for performance of obligations due during the first 60 days after the order for relief, but not beyond the end of such 60-day period. At the end of this period, the amounts due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time. This permissible 60-day grace period is intended to give the trustee time to determine what lease obligations the debtor has and to locate the cash to make the required payments in exceptionally large or complicated cases.

130 Cong. Rec. S8891, S8895 (1984) (statement by Sen. Hatch), *available at* E1 Collier on Bankruptcy, App. Pt. 6(c): H.R. 5174 Floor Statements (16th ed. 2020).

### B. The Debtors Must Pay Rent at the Full Contract Rate.

8. If the Debtors do not reject the MGP Leases, then they must timely pay rent at the full contract rate, and they are not entitled to limit payment to fair market value or to the "benefit of the estate," or otherwise reduce or avoid payment by not making full use of the property. In *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 174-75 (Bankr. D. Del. 2002), the debtors attempted to pay less than the lease rate, arguing instead for a fair rental value, but the court rejected this argument: "[S]ection 365(d)(3) mandates that the Debtors make monthly payments at the contract rate regardless of what the fair rental value actually is. The Debtors do not have the option of paying the fair rental value under section 365(d)(3)."

9. Similarly, in *In re Pacific-Atlantic Trading Co.*, 27 F.3d 401 (9th Cir. 1994), the trustee refused to pay rent because he was not using the property and was removing all of the debtor's possessions from the property. The Ninth Circuit flatly rejected this argument and required that the trustee pay the full amount of rent:

> The plain and unconditional language of the statute demands that a trustee promptly pay the full amount of rent due under a nonresidential real property lease during the 60-day period pending assumption or rejection. . . . [S]ection 365(d)(3) expresses the intent of Congress to secure for lessors the full amount of rent due during the 60-day period while the trustee determines to accept or reject the lease, regardless of any benefit to the estate.

*Id*. at 401-05.

10. In a later case, *In re Cukierman*, 265 F.3d 846 (9th Cir. 2001), the Ninth Circuit confirmed that such rental payments are be timely paid even if they far exceed fair market value:

> We have held that claims arising under § 365(d)(3) are entitled to administrative priority even when they may exceed the reasonable value of the debtor's actual use of the property. *See Pacific-Atlantic,* 27 F.3d at 405. We did so because the "notwithstanding section 503(b)(1)" proviso exempts the amount of lease obligations that a trustee must timely pay under § 365(d)(3) from § 503(b)(1)'s limitation of administrative expenses to the fair value of the debtor's use of the

property. *Id.* When the trustee fails to pay an obligation, the amount accorded administrative priority is similarly not subject to the § 503(b)(1) limitation. *Id.*

> . . . the purpose of § 365(d)(3) is to ensure that landlords continue to receive payment for lease obligations. . . . Interpreting § 365(d)(3) as a bright-line rule, encompassing all obligations contained in a bargained-for agreement, ensures prompt performance of lease obligations by bankruptcy trustees. The simplicity of this rule prevents delays and disputes caused by uncertainty over whether the provision applies to any given lease obligation. If the trustee fails to perform a lease obligation, the plain meaning of § 365(d)(3) serves to eliminate disputes over whether the claim arising from that nonperformance is entitled to administrative priority, and thus advances the interest of resolving bankruptcy cases expeditiously. *See In re Town Country Home Nursing Servs., Inc.,* 963 F.2d 1146, 1155 (9th Cir. 1991).

265 F.3d at 850-52.

11. In fact, the *Cukierman* court required payment of substantial amounts arising from a lease which was not related to use of the property that was the subject of the lease. *See id.* If even that is covered by section 365(d)(3), there can be no doubt that actual, contract rate rent for the lease premises themselves must be paid, regardless of whether the Debtors are using the property or not.

12. This Court has followed this same interpretation, that the full rent is owed irrespective of the debtor's claim of lost use or lesser value. *See In re Simbaki, Ltd.*, No. 13-36878, 2015 Bankr. LEXIS 1142, at *9 (Bankr. S.D. Tex. Apr. 6, 2015) (Judge Isgur) (agreeing with the Fourth Circuit that a "landlord need not show that the rent provided a reasonable benefit to the estate"). This is true even where the property was vacant. *See In re MEP R&H, Inc.*, 2015 Bankr. LEXIS 4132, at *5-6 (Bankr. S.D. Tex. Dec. 7, 2015) (debtor required to pay postpetition pre-rejection rent (other than stub rent); "The debtor's obligations must be performed at the time required in the lease."). In another case, *In re SRT Sols., LLC*, No. 15-35572-H3-11, 2016 Bankr. LEXIS 1657, at *7 (Bankr. S.D. Tex. Apr. 13, 2016), the property was vacated by debtor shortly after petition date but the lease was not rejected until almost four months later. The court followed

the same logic as in the *MEP R&H* case, and ordered that the landlord had an administrative expense claim for rent at the contract rate from the petition date until rejection date, except for stub rent.

### C. This Court Has No Inherent Equitable Power to Contravene the Clear and Express Terms of Section 365(d)(3).

13. The Debtors try to evade section 365(d)(3)'s mandate by asserting that "this Court has broad authority to take necessary and appropriate actions in light of, among other things, the global pandemic." Motion, ¶ 15. *Law v. Siegel*, 571 U.S. 415 (2014) disposes of this argument:

> A bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U. S. C. § 105(a). And it may also possess "inherent power . . . to sanction 'abusive litigation practices.'" *Marrama* v. *Citizens Bank of Mass.*, 549 U. S. 365, 375-376, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007). But in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.
>
> It is hornbook law that §105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶105.01[2], p. 105-6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere. See *Morton* v. *Mancari*, 417 U. S. 535, 550-551, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974); *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U. S. 204, 206-208, 52 S. Ct. 322, 76 L. Ed. 704 (1932). Courts' inherent sanctioning powers are likewise subordinate to valid statutory directives and prohibitions. *Degen* v. *United States*, 517 U. S. 820, 823, 116 S. Ct. 1777, 135 L. Ed. 2d 102 (1996); *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 47, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). We have long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code. *Norwest Bank Worthington* v. *Ahlers*, 485 U. S. 197, 206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988); see, *e.g.*, *Raleigh* v. *Illinois Dept. of Revenue*, 530 U. S. 15, 24-25, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000); *United States* v. *Noland*, 517 U. S. 535, 543, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996); *SEC* v. *United States Realty & Improvement Co.*, 310 U. S. 434, 455, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940).

571 U.S. at 420-21.

14. The Fifth Circuit is in accord. *See In re Mirant Corp.*, 378 F.3d 511, 523 (5th Cir. 2004) ("A court's powers under § 105(a) are not unlimited as that section only 'authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code,' and does not permit those courts to 'act as roving commissions to do equity.'" (quoting *In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995)).

15. The Debtors cite just two cases, neither of which supports using section 105(a) to contravene section 365(d)(3). Motion, ¶ 15. The Debtors cite *Marrama v. Citizens Bank of Mass*, where the Supreme Court sanctioned "the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code . . . ." *Marrama v. Citizens Bank of Mass*, 549 U.S. 365, 375 (2007). Nowhere in *Marrama*, however, did the Supreme Court even consider, much less authorize, the use of section 105(a) of the Bankruptcy Code to contravene an express, unambiguous provision of the Bankruptcy Code, and *Law v. Siegel*, in fact, distinguished *Marrama* on that very basis. *See* 571 U.S. at 420-21. The Debtors citation to *In re Greene*, 103 B.R. 83, 89 (S.D.N.Y. 1989), involving the extension of the deadline to file a non-dischargeability complaint, is even more far afield. In short, the Debtors have no argument around section 365(d)(3) as written.

D. **The Motion Is Procedurally Improper Because Debtors Must First Pay the Full Rent and, to the Extent They Have a Valid Legal Argument, Only Then Seek a Refund.**

16. While the MGP Landlords submit that the Debtors' claimed state law defenses to the payment of rent are preempted by the clear and unambiguous federal law mandate within section 365(d)(3) to timely pay the full amount of rent, in the event that the Debtors' defenses are not preempted, to meet the requirements of the Bankruptcy Code and Bankruptcy Rules the Debtors must first timely pay the full amount of rent and only then commence an adversary proceeding against the MGP Landlords for a refund. *See* Bankruptcy Rule 7001(1) and (9). The

Debtors should not be permitted to seek an advance declaration by motion that rent already paid or to be paid in the future should be refunded. The Bankruptcy Rules are clear that when debtors seek to recover money or seek a declaration concerning their right to recover money that the additional procedural safeguards provided by an adversary proceeding are required. *Id.*

### E. The Force Majeure Clauses in the MGP Leases Require Payment of Rent.

17. Putting aside that the Motion is not the appropriate procedural vehicle for determining whether there is a force majeure defense to the payment of rent under the MGP Leases, the Debtors would still lose on the merits based on the plain language of the MGP Leases, because those Leases are different from the so-called "standard" one on which Debtors rely in their Motion:

> The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by any time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, severe and unusual weather conditions, material or labor restrictions by governmental authority and any other cause not within the reasonable control of Landlord or Tenant, as the case may be.

Motion, ¶ 12.

18. But the three MGP Leases at issue in this opposition contain different provisions, which specifically do not excuse payment of rent:

Lancaster Lease, Ex. B

> 24. Force Majeure. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease (**except for the payment of money** or the length of the Term) shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

Roseville Lease, Ex. A

9

24. FORCE MAJEURE

Subject to the casualty and condemnation provisions of this Lease, if either party shall be prevented or delayed from punctually performing any obligations or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, governmental restriction, delay (including, without limitation, any delay in permitting or needed governmental approval, but only to the extent not caused or contributed to by the party seeking to rely on this provision of the Lease), regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, or caused by the other party, then the time to perform such obligation to satisfy such condition shall be extended on a day-for-day basis for the period of the delay caused by such event; provided, however, that the party claiming the benefit of this Section shall, as a condition thereto, give notice to the other party in writing within fifteen (15) days of the incident specifying with particularity the nature thereof, the reason therefor, the date and time incurred and the estimated length said incident will delay the fulfillment of obligation contained herein. Failure to give such notice within the specified time shall render such delay invalid in extending the time for performing the obligations hereunder, but only to the extent that the other party suffers actual prejudice as a result thereof. **This Section shall not apply to the inability to pay any sum of money due hereunder or the failure to perform any other obligation due to the lack of money or inability to raise capital or borrow for any purpose.**

<u>Burlington Lease, Ex. C</u>

27.12. Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other Casualty, in each case if due to a cause beyond the reasonable control of the party obligated to perform, and other causes beyond the reasonable control of the party obligated to perform, **except with respect to the obligations imposed with regard to Rent payable by Tenant pursuant to this Lease** and with respect to the terms of Section 10.6 of this Lease (collectively, "Force Majeure"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

19.     Debtors' Motion to abate rent must be denied as to the MGP Leases because they specifically exclude the payment of money from the coverage of the force majeure clause.  In other words, Debtors as Tenants specifically contracted to continue paying rent during acts of God and

10

other events which would otherwise qualify as force majeure.[3] Significantly, each of the three Leases was later amended, but the Debtors never amended the force majeure provision. The Debtors cannot now disregard these express, negotiated, and controlling contractual provisions.[4]

**F. Debtors' Common Law Claims Are Barred by California and Washington Law.**

**1. California Law Requires Tenants To Pay Rent and Mitigate Damages.**

20. There is a line of California lease cases which holds that governmental limitations on certain activities do not constitute grounds for frustration of purpose or impossibility, where the tenant could still make some use of the premises. Indeed, the tenant has an affirmative duty to mitigate its alleged losses and the failure to do so bars any claim for relief from the lease. *See, e.g.*, *Grace v. Croninger*, 56 Cal.App. 659 (1922) (lease for saloon and cigar store and portion for bootblack purposes was not destroyed by Prohibition because premises could still be used for cigar store and bootblack purposes, so tenant was not excused from paying rent); *Lloyd v. Murphy*, 25 Cal. 2d 48 (1944) (lease of premises for sale of mostly new automobiles was not made impossible by restriction of new automobile sales during war because sale of automobiles was not made impossible or illegal but merely restricted by the governmental regulation, making performance less profitable, but not impossible); *Davidson v. Goldstein*, 58 Cal. App. 2d Supp. 909, 911 (1943) (performance under lease for tire and battery business was not made impossible

---

[3] To give an example of how these three clauses work: if the Lease required the tenant to stay open 7 days a week but the government ordered the tenant to close on weekends, then the obligation to stay open on weekends would be abated – but not the obligation "to pay any sum of money due hereunder" – *i.e.*, the rent due for this same period.

[4] Debtors did not address these three specific lease provisions in their Motion. To be fair to Debtors' counsel, they may not have had the opportunity to focus on these three leases, but nevertheless the contracts are specific and binding, and the Motion must be denied as to these three specific leases. Again, this underscores the need for focused, individualized discovery and proper motion practice, not a scatter-shot "one size fits all" motion.

11

by WWII limitations on tire sales, which "did not affect at all the battery business or the fixing of flat tires, nor did they prohibit the selling of new or used tires or the retreading of tires altogether").

21. Here, like the temporary limitations on tire sales which did prevent all automotive uses of the premises in the *Davidson* case, the temporary and limited COVID-19 restrictions on inside dining do not bar Debtors from selling the exact same pizza outside or by food pick-up or delivery, using the same kitchen and personnel as before – just like many other restaurants are now doing. Indeed, it is well known that pizza delivery has been booming during the pandemic.[5] Moreover, a quick check on Google shows that both the Lancaster and Roseville locations have enormous parking lots and plenty of outside areas to conduct these operations.[6]

### 2. Washington Law Requires Tenants To Pay Rent and Mitigate Damages.

22. Like California law, Washington law requires tenants to make diligent efforts to utilize the premises and does not permit the indefinite abatement of all rent when the premises can still be used for some purposes. "It does not appear that an act of God by itself excuses performance unless the act of God results in impossibility." 25 Wash. Prac. Contract Law and Practice § 10:15

---

[5] Debtors cite *Baird v. Wendt Enters., Inc.*, 248 Cal. App. 2d 52, 54–55 (1967), for the proposition that governmental regulations can constitute impossibility or frustration of purpose with respect to a lease, but that case had no such holding. First, the court dismissed the appeal as late, so its other remarks are dicta, but in any event the case involved a change in the building code which rendered impossible the construction of the planned hotel. There was never any holding that a temporary restriction on tenant operations could constitute grounds for impossibility or indefinite abatement of all rent.

[6] Roseville: https://earth.google.com/web/search/chuck+e.+cheese+near+Roseville,+CA,+USA/@38.78340978,-121.27221785,69.52990421a,155.5496323d,35y,-133.38635078h,44.99589064t,0.00000146r/data=CpIBGmgSYgolMHg4MDliMjFlNzhlZDgzMmU5OjB4ZTU5MzU1MGJkNjFmZDAzNxm4AZ8fRmRDQCGYwAh1bFFewConY2h1Y2sgZS4gY2hlZXNlIG5lYXIgUm9zZXZpbGxlLCBDQSwgVVNBGAIgASImCiQJjK-c3itYQUARv9QQC2VWQUAZGZ-9cvyJXcAh8TQPCFeLXcA. Lancaster: https://earth.google.com/web/search/chuck+e.+cheese+near+Lancaster,+CA,+USA/@34.69025742,-118.17111678,715.80044417a,196.89639516d,35y,102.39712239h,44.99584628t,0.00000001r/data=CpIBGmgSYgolMHg4MGMyNWIzMDIxNDk2ZDQ5OjB4YTlmMDFiNDA5NzFiN2I4NhkNvP80WlhBQCFIZwUr84pdwConY2h1Y2sgZS4gY2hlZXNlIG5lYXIgTGFuY2FzdGVyLCBDQSwgVVNBGAIgASImCiQJAPmGVWJkQ0ARtG_LuOhjQ0AZeH-eEFtRXsAhg0zOeahRXsA

(3rd ed). Although performance may be excused due to impossibility, "the mere fact that a contract becomes more difficult or expensive than originally anticipated does not justify setting it aside." *Pub. Util. Dist. No. 1 of Lewis Cty v. Wash. Pub. Power Supply Sys.,* 104 Wash. 2d 353, 364 (1985).

23. In cases where the tenant claims impossibility, the courts require a showing that performance of the primary object of the contract is truly impossible. The fact that the lessee is unwilling to incur potentially unforeseen expenses to comply with government regulations does not amount to impossibility. *See Stevedoring Servs. of Am. v. Marvin Furniture Mfg.*, 54 Wash. App. 424 (1989). There, lessee leased a warehouse for the purpose of manufacturing mattresses and furniture. The lease provided that lessee's "use of the premises would be in conformity with all municipal, county, state, and federal ordinances, statutes, and regulations currently in force, or subsequently applicable." *Id.* at 425. The fire department subsequently inspected the property and found several violations of the fire code relating to lessee's storage of flammable foam rubber and required lessee to install an automatic sprinkler system. *Id.* Lessee claimed that the cost of compliance was prohibitive and that the fire department's assessment was incorrect and the lessee stopped paying the rent. The court found in favor of lessor:

> [Lessee] apparently chose for its own reasons to vacate the leased property, rather than take the necessary steps to preserve its right to use the property within the limits of the fire code . . . . [We] hold that [Lessee] had a duty to attempt to resolve the problem concerning enforcement of the fire code. Only after such an attempt had failed could [Lessee] claim that its principal purpose was frustrated. In the absence of evidence of an attempt to correct the matter through administrative appeal or legal action, there was no factual issue to be resolved and summary judgment was proper.

*Id.* at 433-34.[7]

24.     The case cited by Debtors, *Stratford v. Seattle Brewing*, 94 Wash. 125, 126 (1916), proves this distinction. *Stratford* concerned a lease which expressly stated that "lessees should not use said premises for any other purpose than that of a saloon." In 1914, the voters approved a prohibition statute making the sale of liquor entirely and permanently illegal. Lessor argued that "the right of the lessee was not totally destroyed" because lessee could sell non-alcoholic products, such as cigars and food, but the court emphasized the strict language of the lease and the highly regulated nature of the liquor industry in finding that the lease was dissolved by the enactment of the prohibition statute, which permanently barred liquor sales. *Id.* at 127-29.[8]

25.     Here, in contrast, the permitted use of "the operation of a prototypical Chuck E. Cheese's restaurant" (Burlington Lease § 1.11 Permitted Use) certainly includes and contemplates the sale of substantial amounts of pizza, which Debtors are still free to do. In the State of Washington, although indoor arcades are temporarily closed, restaurants are not.[9] Skagit County, where the Burlington Lease is located, is currently in Phase 2, where restaurants and taverns can operate dine-in service at less than 50% capacity in addition to takeout service.[10]

---

[7] It is only when the object of the entire contract becomes truly impossible that a lease can be terminated. *See Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.* 96 Wash. 2d 558, 564-65 (1981) (public opposition to proposed mining would have prevented mine from obtaining required permits and it would be "inequitable to cast upon [lessee] the entire risk of the commercial frustration of its purpose").

[8] It appears that no Washington court has cited to *Stratford* since 1918, so the case should be limited to its facts based on prohibition law. *Stratford* is distinguishable from prior and subsequent cases in which the tenant could still make some use of the premises. *See, e.g.*, *Hayton v. Seattle Brewing & Malting Co.*, 66 Wash. 248, 249 (1911) (rejecting lessee's impossibility defense where clause describing purpose of saloon lease "only permissive . . . and clearly does not prevent appellant from using the premises for any lawful purposes"); *Yesler Estate, Inc. v. Cont'l Distrib. Co.*, 99 Wash. 480, 482 (1918) ( "controlling clause [in saloon lease] . . . identical in meaning with . . . the language of the *Hayton* lease"); *Aronson v. Sweeney*, 94 Wash. 698, 698 (1916) (finding language of saloon lease permissive for the reasons stated in *Stratford*).

[9] OFFICE OF THE GOVERNOR, PROCLAMATION BY THE GOVERNOR AMENDING PROCLAMATION 20-05, STAY HOME – STAY HEALTHY, Mar. 23, 2020, as updated July 28, 2020.

[10] *See* https://www.skagitcounty.net/Departments/HealthDiseases/coronavirus.htm.

14

### G. The Proposed Relief Is Overbroad.

26. Even if the Court concludes that the Debtors are entitled to some relief, the Motion goes too far. According to their Motion, Debtors are asking this Court to "enter an order abating rent payments for stores closed or otherwise limited in operations as a result of any governmental order or restriction until such restriction or order has been lifted and to reflect the extent and duration of such forced governmental closures or limitations." Motion, at 2; *see also* Proposed Order, ¶ 1. In other words, the existence of "any" COVID-19-related governmental order or restriction (no matter how minor) would abate all rent indefinitely, even if that governmental order or restriction has no negative or only a limited negative effect on the Debtors. Under a literal interpretation of the relief that the Debtors are requesting and the language of their proposed order, the Debtors effectively could be asking this Court never to have to pay rent ever again. There is no basis for granting the Debtors such sweeping relief.

27. Even if the Court were to entertain any form of relief, it would have to be specific to the affected leases, in the specific states and counties where the affected locations are, based on the operations that the Debtors are or could be conducting at those locations, and based on the specific governmental order or restriction in place for the relevant time period. This would require, at a minimum, proper discovery, motion practice and hearings focused on these specific factual inquiries. There is a proper procedure, but Debtors have not followed it.

### H. The MGP Landlords Join in Other Landlord Oppositions.

28. Finally, in addition to the substantive and procedural arguments set forth above, the MGP Landlords hereby respectfully join in and incorporate by reference the argument, evidence and citations offered in the oppositions to the Motion filed by the Debtors' other landlords.

## CONCLUSION

15

WHEREFORE, the MGP Landlords respectfully request that the Court deny the Motion.

Dated: August 17, 2020

By: **GREENBERG TRAURIG, LLP**

*/s/ Joshua A. Lesser*
Joshua A. Lesser
Texas State Bar No. 24116663
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
(713) 374-3575
Email: lesserj@gtlaw.com

-and-

David M. Guess (*pro hac vice*)
California State Bar No. 238241
18565 Jamboree Road, Suite 500
Irvine, California 92612
(949) 732-6500
Email: guessd@gtlaw.com

- *and* –

Adam Siegler (*pro hac vice*)
California State Bar No. 116233
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
(310) 586-6536
Email: sieglera@gtlaw.com

*Counsel for MGP IX Properties, LLC, and MGP XI Cascade, LLC*

**CERTIFICATE OF SERVICE**

I certify that on August 17, 2020 a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing (ECF) system on all parties registered to receive electronic service in these cases.

<i>/s/ Joshua A. Lesser</i><br>
Joshua A. Lesser