Dana M. Andreoli
California State Bar No. 262068
*Admitted Pro Hac Vice*
STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP
235 Pine Street, Fifteenth Floor
San Francisco, California 94104
Tel.: (415) 421-3400
Email: dandreoli@steyerlaw.com

Attorneys for Creditor San Bruno Towne Center Partnership

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CEC ENTERTAINMENT, INC., et al., | Case No. 20-33163 (MI) |
| Debtors.[1] | (Jointly Administered) |
| | **[RE: DKT NO. 487]** |

## SAN BRUNO TOWNE CENTER PARTNERSHIP'S OBJECTION TO MOTION FOR ORDER AUTHORIZING DEBTORS TO ABATE RENT PAYMENTS AT STORES AFFECTED BY GOVERNMENT REGULATIONS

Creditor San Bruno Towne Center Partnership ("**SBTCP**"), by and through its undersigned

---

[1] The Debtors in the Chapter 11 Cases and the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company, Inc. (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

counsel, hereby objects to the Debtors' Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations [Dkt. No. 487] ("**Motion**"). In support of this Objection, SBTCP respectfully states as follows.

## PRELIMINARY STATEMENT

1.      SBTCP is the owner of that certain real property commonly known as 1270-1271 El Real, San Bruno, California ("**SBTCP's Premises**") listed by the Debtors as Store No. 444, and the landlord under that commercial lease agreement dated December 23, 1992 by and between SBTCP's predecessor in interest BHI-DOVER XVII and debtor CEC Entertainment, Inc.'s predecessor in interest Showbiz Pizza Time, Inc., as amended ("**SBTCP's Lease**"). A copy of the SBTCP Lease is attached hereto as Exhibit A.

2.      The Debtors' request to comprehensively - across 141 locations in 12 states - abate rent that is owed to landlords under unexpired commercial leases based on claimed equitable state law doctrines and purported contract rights due to the varying temporary government regulations in place as a result of COVID-19 is nothing more than an attempt by the Debtors to adjudicate non-core issues of state law in a summary fashion and is not properly before this Court.

3.      Under California law, which governs SBTCP's Lease, the doctrine of frustration of purpose is inapplicable where the alleged frustrating offense restricts the purpose of the business or makes the business less profitable but does not render performance impossible. *See, e.g.*, Lloyd v. Murphy, 25 Cal.2d 48, 53 (1944). The Debtors are admittedly operating their businesses, albeit in a restricted manner, and the California and local regulations governing the Debtors' operations at SBTCP's Premises do not prohibit the Debtors' operations.   The Debtors' attempt to avoid their rent obligations entirely while enjoying the benefits of the leases at their landlords' expense is in bad faith and should be rejected by this Court.

4.      The Debtors misrepresent the effect of their purported "standard" force majeure clause, which would not excuse the Debtors' performance of their lease obligations but merely extend the time for performance of lease obligations to the extent affected by causes not within the Debtors' control. In any event, the force majeure clause in SBTCP's lease specifically excludes the Debtors' obligation to pay rent from the application of a force majeure delay and, otherwise, only delays and does not excuse performance.

5.      The Court's inherent, equitable powers pursuant to 11 U.S.C. Section 105 are limited to the authorities granted to the Court under Title 11. The Debtors cite no authority, and the undersigned is not aware of any, permitting this Court to contravene a debtor's obligations under Section 365(d)(3) to timely perform post-petition obligations, including payment of rent, or summarily reduce a debtor's post-petition obligations under unexpired nonresidential real property leases.

6.      Because the Debtors' Motion cannot be decided in a summary fashion, particularly here where the request seeks prejudicial factual findings and determinations of state law not before this Court and without any admissible evidence, and because in any event the Debtors are not excused from payment of rent under SBTCP's Lease or California law, the Debtors' request for this Court to abate all rent due to landlords during the period the various Government Regulations are in effect should be denied.

## **BACKGROUND**

7.      The Debtors' Motion seeks an order that they "are not required to pay rent at stores subject to Government Regulations based on the extent and duration of the closures and limitations imposed by such Government Regulations . . . from the date such Government Regulations went into effect until such Government Regulations have been lifted" [Dkt. No. 487-2] on three grounds:

(a) the common law doctrine of frustration of purpose recognized by some states, (b) contractual "force majeure" clauses in the leases, and (c) the Court's "inherent, equitable powers" [Dkt. No. 487, pp. 6-9].

8.      The Debtors incorporate in the subject "Government Regulations" all of the governmental regulations, recommendations and orders imposed in California, New York, Michigan, New Jersey, North Carolina, Washington, New Mexico, Colorado, Massachusetts, Connecticut, Delaware and Oregon that "impair economic activity" of the Debtors as a result of COVID-19. Although the terms of the Governmental Regulations are not set forth in the Debtors' Motion, the Motion references by title the orders "in effect" as of the date of the Motion. [Dkt. No. 487, fn. 7.]  Almost all of the orders referenced, including the orders issued by the California Governor and the California Department of Public Health placing restrictions on business operations due to COVID-19, were effective in March 2020.

9.      The Debtors commenced their Chapter 11 cases on June 24, 2020.

## DISCUSSION

### A. THE DEBTORS' MOTION CONCERNS NON-CORE ISSUES NOT PROPERLY BEFORE THIS COURT

10.      Although alleged as a core proceeding under Section 157(b), the Debtors' Motion is not; rather the Debtors' Motion is grounded exclusively in the parties' respective contractual and equitable rights under state law and seeks, in part, relief for pre-petition rent, which this Court may not adjudicate to judgment. See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 71, 82-87 (1982) (distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power . . . from the adjudication of state created private rights" and finding that bankruptcy judges do not have constitutional authority to decide state law contract claims); Beard v. Braunstein, 914 F.2d 434, 443 (3d Cir. 1990) ("It is clear that to the

extent that a claim is for pre-petition contract damages, it is non-core.").

11.     Nor should the Debtors' Motion be decided without the opportunity for a full review of the disputed issues as the Motion (a) lacks any specificity as to the terms of the Government Regulations, (b) lacks any discussion of the effect of each of the Government Regulations on the Debtors' businesses, (c) fails to include the terms of the 141 leases for which abatement is sought, (d) vaguely seeks uncertain relief "based on the extent and duration of the closures and limitations imposed by such Government Regulations", (e) fails to contain any discussion of the applicable laws of each of the 12 states governing the leases, and (f) fails to include any admissible evidence to support its request. The Court may not appropriately consider the Debtors' requests in a summary proceeding. Cf. In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993) (a motion to assume or reject an executory contract is not the forum to conduct prolonged discovery or litigate lengthy disputed issues); In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1232 (7th Cir. 1990) (motions for relief from the automatic stay are intended to be summary proceedings "limited strictly to adequacy of protection, equity, and necessity to an effective reorganization" and should not consider a debtor's unrelated counterclaims); In re The Great Atlantic & Pacific Tea Company, Inc., 544 B.R. 43, 50-51 (S.D.N.Y. 2016) (refusing to determine the landlord, tenant and subtenant's substantive rights under New York's common law to the lease in the context of the debtor's summary motion to reject the lease).

**B.  THE DOCTRINE OF FRUSTRATION OF PURPOSE IS INAPPLICABLE**

12.     Even if the Court could decide the Debtors' Motion, it fails on the merits. Under California law, which governs SBTCP's Lease, the doctrine of frustration of purpose is inapplicable where the alleged frustrating offense restricts the purpose of the business or makes the business less profitable but does not render performance impossible. See, e.g., Lloyd v.

Murphy, 25 Cal.2d 48, 53 (1944).

13.     The Debtors claim that "Government Regulations" (without identifying any specific provisions or prohibitions on the Debtors' operations) have "entirely eliminated" the Debtors' year-over-year revenue. Not so. The California and local San Mateo County regulations applicable to the Debtors' business at the SBTCP's Premises do not prohibit all of the Debtors' operations. The Debtors are permitted to utilize outdoor space for outdoor dining and entertainment, and operate kitchens for takeout and delivery service.[2]

14.     Moreover, as evidenced by the Debtors' Monthly Operating Reports [Dkt. Nos. 474 and 571] and admitted by the Debtors' representative at the August 13, 2020 Meeting of Creditors, the Debtors are in fact operating take-out, delivery, and in some locations on-premises dining and entertainment where allowed, in the various leased premises. Indeed, the Debtors are operating in SBTCP's Premises to support the Debtors' takeout and delivery operations.

15.     The State and local governmental regulations in California (which are temporary) do not render the Debtors' performance of the SBTCP's Lease impossible, and the Debtors are in fact making use of the SBTCP's Premises.  Accordingly, at a minimum, the doctrine of frustration of purpose is inapplicable to SBTCP's Lease and the Debtors are not excused from paying the rent due thereunder.

### C.  SBTCP'S LEASE DOES NOT EXCUSE PAYMENT OF RENT DUE A FORCE MAJEURE

16.     The force majeure clause in SBTCP's Lease specifically ***excludes*** the Debtors'

---

[2]  The July 13, 2020 California Statewide Public Health Officer Order can be found at https://vcportal.ventura.org/covid19/docs/2020-07-13_Statewide_Public_Health_Officer_Order.pdf. The County of San Mateo has issued orders consistent with the State's Order allowing restaurants and family entertainment centers to operate outdoors and to provide take out and delivery services. See https://www.smcgov.org/smc-reopening.

obligation to pay rent from the application of a force majeure delay. (Ex. A, §25 ("The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease (*except for the payment of money*) shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be." (emphasis added)).

17.     Even if the force majeure clause did not exclude payment of rent, however, it would not operate to excuse the Debtors' performance of their lease obligations but merely to extend the time for performance of lease obligations to the extent affected by causes not within the Debtors' control. Moreover, because the Government Regulations cited in the Debtors' Motion do not prohibit or delay the Debtors' payment of rent, the time for payment of rent would not be extended.

### D.  THE COURT'S EQUITABLE POWERS DO NOT EXTEND TO ABATEMENT OF RENT OF UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES

18.     The Court's inherent, equitable powers pursuant to 11 U.S.C. Section 105 are limited to the authorities granted to the Court under Title 11 ("The court may issue any order, process, or judgment that is necessary or appropriate to *carry out the provisions of this title*." (emphasis added)). In re Mirant Corp., 378 F.3d 511, 523 (5th Cir. 2004) ("A court's powers under § 105(a) are not unlimited as that section only 'authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code,' and does not permit those courts to 'act as roving commission[s] to do equity.'" (quoting In re Southmark Corp., 49 F.3d 1111, 1116 (5th Cir. 1995)).

19.     Section 365(d)(3) requires a debtor to timely perform all post-petition obligations, including payment of rent, under executory contracts, including unexpired nonresidential real

property leases. The Court may extend such performance, but only for "cause" and only for sixty days after the order for relief, and no longer. The Debtors cite no authority, and the undersigned is not aware of any, permitting this Court to contravene a debtor's express statutory obligations under Section 365(d)(3) or to summarily reduce a debtor's post-petition obligations under unexpired nonresidential real property leases. Instead, bankruptcy courts have consistently held that, in furtherance of the clear Congressional intent to protect landlords from "holding the bag" while the debtor is in possession rent free pending lease assumption or rejection, Section 365(d)(3) must be strictly construed. See, e.g., In re Pudgie's Dev. of NY, Inc., 292 B.R. 832, 837 (S.D.N.Y. 1996); In re Taynton Freight System Inc., 55 B.R. 668, 670-71 (M.D. Penn. 1985). Accordingly, the Court should not abate the Debtors' rent owed to landlords under unexpired nonresidential real property leases not permitted by Section 365(d)(3).

## JOINDER

20.    In addition to the foregoing, SBTCP joins the objections raised, and adopts the arguments and authorities advanced, by other landlords, including those reflected on the docket at Nos. 597 and 601.

## RESERVATION OF RIGHTS

21.    This objection raises SBTCP's preliminary opposition to the Debtors' Motion. SBTCP anticipates that it will raise additional objections and seek discovery in any trial or other proceeding concerning this dispute. SBTCP reserves the right to raise further objections to the Debtors' Motion or to any motion or other proceeding seeking similar relief.

## CONCLUSION

22.    For the foregoing reasons, SBTCP respectfully requests that the Court deny the Debtors' Motion with prejudice, and require the Debtors to comply with their Section 365(d)(3)

obligations to SBTCP and the other affected landlords.


Dated: August 20, 2020                    STEYER   LOWENTHAL   BOODROOKAS
                                                     ALVAREZ & SMITH LLP


                                                     */s/ Dana M. Andreoli*
                                          ─────────────────────────────────
                                          Dana M. Andreoli
                                          Attorneys  for  Creditor  San  Bruno  Towne
                                          Center Partnership

# EXHIBIT A

# LEASE AGREEMENT
## TABLE OF CONTENTS

### SAN BRUNO TOWNE CENTER
### SAN BRUNO, CALIFORNIA

EXCLUSIVE TENANT FILE

| **Section** | **Page** |
|---|---|
| 1. | Premises and Term | 1 |
| 2. | Renewal Options | 1 |
| 3. | Construction | 1 |
| 4. | Rent | 2 |
| 5. | Use | 4 |
| 6. | Utility Charges | 4 |
| 7. | Taxes | 5 |
| 8. | Insurance | 6 |
| 9. | Common Areas | 7 |
| 10. | Maintenance, Repairs and Alterations | 8 |
| 11. | Equipment, Fixtures and Signs | 9 |
| 12. | Damage by Fire or Other Casualty | 10 |
| 13. | Condemnation | 11 |
| 14. | Indemnifications | 11 |
| 15. | Assignment and Subletting | 12 |
| 16. | Default by Tenant | 14 |
| 17. | Default by Landlord | 16 |
| 18. | Party's Right to Perform Party's Covenants | 16 |
| 19. | Right of Inspection | 16 |
| 20. | Quiet Enjoyment | 16 |
| 21. | Subordination, Nondisturbance and Attornment | 16 |
| 22. | Holding Over by Tenant | 17 |
| 23. | Notices and Payments | 17 |
| 24. | Expenses of Enforcement | 17 |
| 25. | Force Majeure | 18 |
| 26. | Waiver of Subrogation | 18 |
| 27. | Estoppel Certificate | 18 |
| 28. | Recording | 18 |
| 29. | Conditions | 18 |
| 30. | Commissions | 19 |
| 31. | Exclusive Use | 19 |
| 32. | Visibility and Access | 19 |
| 33. | Hazardous Substances | 19 |
| 34. | Compliance with Laws | 20 |
| 35. | Rules and Regulations | 20 |
| 36. | Accord and Satisfaction | 20 |
| 37. | Waiver | 21 |
| 38. | Cumulative Remedies | 21 |
| 39. | Relationship of Parties | 21 |
| 40. | No Personal Liability of Landlord | 21 |
| 41. | Miscellaneous | 21 |
| 42. | Choice of Law | 22 |
| 43. | No Discrimination | 22 |
| 44. | Disclaimer of Authority | 22 |
| 45. | Landlord's Contribution | 22 |
| 46. | Assignment by Landlord | 23 |

| | |
|---|---|
| Site Plan | Exhibit A |
| Legal Description | Exhibit B |
| Landlord's Work | Exhibit C |
| Tenant's Work | Exhibit D |
| Certificate of Tenant | Exhibit E |
| Landlord's Sign Criteria | Exhibit F |
| Rules and Regulations | Exhibit G |
| Building Exterior and Signage | Exhibit H |



## LEASE AGREEMENT

This Lease Agreement ("Lease") dated as of December 23, 1992, by and between BHI-Dover XVII, a California limited partnership ("Landlord"), and ShowBiz Pizza Time, Inc., a Kansas corporation, ("Tenant").

1.  Premises and Term. In consideration of the obligation of Tenant to pay rent as hereinafter provided and in consideration of the other terms, provisions and covenants hereof, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, those certain premises which are located in the City of San Bruno, County of San Mateo, State of California, and are designated on Exhibit "A" hereto (the "Premises"), TO HAVE AND TO HOLD the same for a primary term of ten (10) years (the "Primary Term") commencing on the Commencement Date (as hereinafter defined) and expiring one hundred twenty (120) months after such date. The "Commencement Date" of this Lease shall be the earlier of: (a) the date on which Tenant opens for business the restaurant to be operated on the Premises or (b) one hundred and twenty (120) days after the later of (i) the Delivery Date as defined in Section 3(b) hereof or (ii) Tenant's receipt of a building permit for Tenant's Work or (iii) the expiration of Tenant's option to terminate under Section 29 hereof. The Premises are approximately 9,000 square feet in area being approximately 100 feet wide by 90 feet deep, and are known as Space R-1 and are situated in and constitute a part of a shopping center known as San Bruno Towne Center (the "Center"). At any time after the Delivery Date, (defined in Section 3(b), Tenant or Landlord may cause the Premises to be measured by a licensed architect and the rent provided in the Lease shall be adjusted accordingly (provided that the adjusted measurement of the Premises shall not exceed 9,500 square feet). A metes and bounds description of the Center is attached hereto as Exhibit "B". Landlord reserves the right to change the name of the Center. ·

2.  Renewal Options. Landlord hereby grants to Tenant the right and option to extend the term of this Lease for two (2) separate consecutive renewal terms of five (5) years each ("Renewal Terms")(the Primary Term and any Renewal Terms which actually occur being referred to together as the "Term,"), the first Renewal Term to begin upon the expiration of the Primary Term and the second Renewal Term to begin upon the expiration of the first Renewal Term. Tenant's right to exercise the renewal options granted to it in this Section 2 is conditioned upon the Lease being in full force and effect at the time of such exercise and that no Events of Default (defined in Section 16 hereof) shall have occurred and be continuing. Except for the options contained in this Section 3, all of the terms, provisions and covenants of this Lease shall apply to each of the Renewal Terms. Tenant may exercise each such option by delivering to Landlord written notice of its election to renew no later than one hundred eighty (180) days prior to the expiration of the Primary Term as to the first Renewal Term and no later than one hundred eighty (180) days prior to the expiration of the first Renewal Term as to the second Renewal Term.

3.  Construction.

   (a)   Within fifteen (15) days from the date hereof, Landlord shall deliver to Tenant all engineering and site plans, environmental reports, utility plans and other information on the Premises and the Center in Landlord's possession (together, "Landlord's Plans") which may facilitate Tenant's preparation of plans and specifications and a recent title report for the Premises and a topographical as-built survey of the Premises from a registered, licensed surveyor in the State of California. Within forty-five (45) days after the satisfaction of the conditions set forth in Section 29, Tenant shall deliver to Landlord detailed plans and specifications ("Tenant's Plans") of the improvements to be constructed on the Premises. Within a period of fifteen (15) days from the date of delivery of Tenant's Plans, Landlord shall either approve the same (which approval shall not be unreasonably withheld and shall be conclusively presumed if Landlord fails to then specify its objections) or specify in detail by written notice to Tenant its objections thereto. In the event Landlord specifies objections to Tenant's Plans as herein provided and Landlord and Tenant are unable to resolve such objections by mutual agreement within a period of thirty (30) days from the date of delivery of written notice thereof, (i) Landlord shall have the right to make the final determination to the extent Tenant's Plans specify structural or exterior aspects of the Premises building or the landscaping adjacent thereto and (ii) Tenant shall have the right to make the final determination of all nonstructural interior matters in Tenant's Plans. Landlord hereby approves and consents (subject to any required government approvals) to the size, color, configuration and other aspects of Tenant's proposed building exterior and signage set forth in Exhibit "H".

1



(b)   Landlord, at its sole cost and expense, shall with all reasonable diligence construct and deliver the Premises to Tenant to the extent and in accordance with the specifications attached hereto as Exhibit "C" (except Items 9, 10 and 11 thereof) ("Landlord's Work") within sixty (60) days after the later of: (i) the final determination of Tenant's Plans pursuant to Section 3(a) or (ii) issuance of the building permit for Landlord's Work, which Landlord shall diligently pursue (the "Delivery Deadline"). If Landlord's Work is not completed, subject to reasonable punch-list items, within one hundred eighty (180) days after the Delivery Deadline, Tenant may at its sole option terminate this lease by written notice to Landlord delivered at any time before Landlord's Work is so completed. If Landlord's Work is not completed on the date Tenant opens for business on the Premises, no Minimum Rent or other amounts hereunder shall be payable for the period commencing on such opening date and ending on the date Landlord actually completes such Landlord's Work.

(c)   Upon the Delivery Date, Tenant shall commence and diligently pursue the Tenant's Work specified in Exhibit "D" ("Tenant's Work") at Tenant's sole cost and expense. Tenant shall open for business to the public as a fully-stocked, staffed and fixturized "Chuck E. Cheese's Pizza" no later than the Commencement Date set forth in Section 1.

(d)   Within sixty (60) days after written notice from Tenant, Landlord shall complete Items 9, 10 and 11 of Exhibit "C" ("Landlord's Final Work"). If Landlord's Final Work is not completed, subject to reasonable punch-list items, within such 6 0 day period, Tenant may deduct from the first payments of Minimum Rent otherwise payable under this Lease one day's Minimum Rent for each day that occurs between the expiration of such 6 0 day period and completion of Landlord's Final Work.

(e)   Selection of a supervising architect and general contractor, as well as all other persons to be employed in connection with Tenant's Work, shall be within the sole discretion of Tenant; provided, however, the supervising architect shall be a member in good standing of the American Institute of Architects or of another organization having comparable accreditation and the general contractor's financial condition and responsibility shall be such as to enable Landlord to obtain a performance bond, if desired; provided further, however, Tenant or any corporate affiliate of Tenant may act as general contractor for purposes of Tenant's Work, in which case the supervising architect may be an appropriately-trained employee of Tenant or one of its corporate affiliates.

(f)   Landlord hereby assigns (to the extent assignable) to Tenant and agrees to reasonably cooperate to provide Tenant with the benefit of all warranties and guarantees pertaining to Improvements and equipment erected or installed upon the Premises as Landlord's Work.

4.   <u>Rent</u>

(a)   Tenant shall pay to Landlord as "Minimum Rent":

(i)   The sum of $13,500 in advance upon the first day of each calendar month of the first through fifth Lease Years inclusive (each "Lease Year" being equal to one calendar year, commencing on the Commencement Date or an anniversary thereof).

(ii)   The sum of $15,187.50 in advance upon the first day of each calendar month of the sixth through tenth Lease Years inclusive.

(iii)   For the first Renewal Term, the sum of $17,465.63 in advance upon the first day of each calendar month of the eleventh through fifteenth Lease Years inclusive.

(iv)   For the second Renewal Term, the sum of $20,085.55 in advance upon the first day of each calendar month of the sixteenth through twentieth Lease Years inclusive.

(b)   All amounts other than Minimum Rent which are payable to Landlord under this Lease shall be deemed to be additional rent. All payments of rent (including Minimum Rent) shall be made by Tenant to Landlord without demand, set-off or deduction, except as specifically provided otherwise in this Lease. Tenant shall pay to Landlord, with each payment of Minimum Rent, the amount of any sales tax imposed thereon by any state or local government authority.



(c)   As additional rent hereunder, Tenant shall pay to Landlord, for each Fiscal Year (as hereinafter defined) during the Term of the Lease, Percentage Rent equal to the amount by which five percent (5%) of the Gross Receipts (hereinafter defined) exceeds the Minimum Rent for such Fiscal Year.

(i)   The term "Fiscal Year" as used in this Subsection (c), shall mean the fiscal year of Tenant used for financial reporting purposes (such fiscal year being a period of 52 or 53 weeks ending on the Friday nearest December 31). If the Commencement Date is a date which is not the first day of a Fiscal Year, then the first Fiscal Year shall be for a period of less than twelve (12) months commencing on the Commencement Date and ending on the last day of such fiscal year in which the Commencement Date falls. If this Lease terminates on a day which does not coincide with the end of a Fiscal Year, then the last Fiscal Year shall be for a period of less than twelve (12) months commencing on the first day of such Fiscal Year and ending on the termination date of this Lease.

(ii)   The term "Gross Receipts" shall mean the aggregate amount of all sales (whether for cash, on credit or otherwise) of food, beverages (both alcoholic and non alcoholic), goods, articles and any other merchandise, and entertainment and the aggregate of all charges for services performed (whether for cash, on credit or otherwise) made and rendered in about or in connection with the Premises (whether or not through a private club) by Tenant and its assignees, sublessees and licenses, including off Premises sales and monies derived at or away from the Premises so long as they are in connection with the restaurant operations conducted on the Premises, plus the aggregate amount of all receipts by Tenant with respect to all sales made or performed by means of mechanical and other vending devices, but shall not include any Federal, State, municipal or other sales, value added or retailer's excise taxes paid or accrued by Tenant, irrespective of whether such taxes are collected from customers or absorbed by Tenant, receipts from discount sales to employees not to exceed two percent (2%) of Gross Receipts per Fiscal Year, , the actual net amount of refunds or allowances to customers in accordance with Tenant's reasonable business practices, proceeds of insurance policies received by Tenant, bulk and/or intercompany transfers of food and/or inventory, proceeds from the sale of used restaurant equipment, private club membership fees required or permitted by applicable alcoholic beverage regulations, if any, or receipts from  cigarette vending machines or pay telephones.

(iii)   Within sixty (60) days from the end of each fiscal quarter within a Fiscal Year, Tenant shall deliver to Landlord a written statement setting forth the amount of Tenant's Gross Receipts for the preceding fiscal quarter certified to be correct by a corporate officer of Tenant. Simultaneously with the delivery of such statement, Tenant shall pay to Landlord an amount equal to the estimated Percentage Rent, pro rated for the applicable fiscal quarter. Within sixty (60) days after the end of each Fiscal Year, Tenant shall deliver to Landlord a written statement setting forth the Gross Receipts for the Fiscal Year certified to be correct by a corporate officer of Tenant and the amount of estimated Percentage Rent paid for the Fiscal Year. If such statement indicates that the actual Percentage Rent for the Fiscal Year exceeds the estimated payments made, Tenant shall simultaneously pay to Landlord the excess amount. If such statement indicates that the estimated payments exceeded the actual Percentage Rent for the Fiscal Year, Landlord shall pay to Tenant within thirty (30) days the excess amount.

(iv)   Tenant shall maintain and preserve, or cause to be maintained and preserved at the principal office of Tenant in accordance with generally accepted accounting practices for the type of business conducted by Tenant on the Premises, full, complete, accurate and detailed books, records and accounts of its daily Gross Receipts, both for cash and on credit from on the Premises; provided, however, Tenant shall not be required to preserve any detailed books, records and accounts as aforesaid for more than ninety (90) days following delivery of the written statement provided for hereinabove, or other books, records and accounts for a period of more than two (2) years after the end of each Fiscal Year covered thereby. Landlord or its agents may inspect any and all records in Tenant's possession which relate to Gross Receipts from the Premises, at any time during normal business hours and normal working days. Such examination shall be conducted in a manner which will not interfere unreasonably with

3



the business conducted at Tenant's principal office. Landlord may once in any Fiscal Year cause an audit of the Gross Receipts from the Premises for the immediately preceding two (2) Fiscal Years to be made by a certified public accountant of Landlord's selection, and if the written statement of Gross Receipts previously delivered to Landlord shall be found to be inaccurate, Landlord and Tenant shall make appropriate adjustments so that Landlord shall receive the full Percentage Rent to which it is entitled, and only such amount. Landlord shall pay for the cost of such audit unless the audit shall disclose Gross Receipts of three percent (3%) or more in excess of the Gross Receipts theretofore reported by Tenant for that particular Fiscal Year, in which case Tenant shall promptly pay to Landlord the cost of said audit in addition to the deficiency in Percentage Rent.

(v)    Tenant shall refrain from operating, managing, opening or having any interest, directly or indirectly, in any other similar or competing business within a radius of two (2) miles from the outside boundary of the Center. Landlord, for breach of this covenant and in addition to any other remedy otherwise available, may require that all sales made from any such other store be included in the computation of the Percentage Rent herein provided, as though said sales had actually been made from the Premises and the provisions of Article 4(c) shall automatically apply to any such locations.

5.    Use.

(a)    Tenant shall use the Premises for the operation of a Chuck E. Cheese's Pizza restaurant and entertainment center which may include the serving of alcoholic beverages and the operation of mechanical and electrical rides and games and other amusement devices and a merchandise center and for such other uses as are incidental to the operation thereof provided a majority of Chuck E. Cheese's Pizza restaurants in Southern California include such incidental uses, and for no other purposes.    Landlord hereby grants to Tenant and Tenant's employees, invitees and customers for the Term of this Lease a non-exclusive easement to use (i) Common Areas (hereinafter defined) of the Center to the same extent the Common Areas maybe used by the employees, invitees and customers of other tenants of the Center and (ii) the Common Areas established on certain parcels adjacent to the Center pursuant to the Declaration of Restrictions and Grant of Easements dated March 11, 1987 and recorded on March 19, 1987 in the official records of San Mateo County, California as Instrument No. 87040323, as amended from time to time (the "CCR"), subject to all terms and conditions set forth in the CCR.

(b)    Landlord represents and warrants to Tenant that Tenant's permitted use set forth in Section 5(a) does not violate any existing use restrictions (except the restriction of Round Table Pizza, for which Landlord has delivered to Tenant a waiver).

(c)    Tenant shall (i) continuously operate its business on the Premises during the entire term of this Lease, except for temporary closings for repairs or alterations not to exceed thirty (30) continuous days, and (ii) conduct its business on the Premises during the same days and hours of Tenant's other restaurants in the same metropolitan area.

(d)    All references in the Lease to a "Chuck E. Cheese's Pizza" restaurant shall be deemed to include any other trade name which is then utilized by the majority of Tenant's restaurants in Southern California.

6.    Utility Charges.  Tenant shall pay all charges incurred for the use of utility services at the Premises including, without limitation, gas, electricity, water, sewer and telephone and all fees related to the physical connection of utilities. If any such charges are not paid when due and such nonpayment continues for thirty (30) days after written notice by Landlord to Tenant, Landlord may pay the same, and any amount so paid by Landlord shall thereupon become due to Landlord from Tenant as additional rent, together with interest thereon. Landlord shall not be in default hereunder nor be liable in damages or otherwise for any failure or interruption of any utility service being furnished to the Premises (unless the same is caused by the gross negligence or intentional misconduct of Landlord or its agents or employees), and no such failure or interruption shall entitle Tenant to terminate this Lease or to abate payment of any portion of the rent due hereunder.



7.  <u>Taxes.</u>

(a)  Landlord shall pay before delinquency all general real property and improvement taxes, assessments, impositions, levies, charges, reassessments, license fees, license taxes, business license taxes, commercial rental taxes, in lieu taxes, penalties or similar impositions whatsoever or at all, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvements or special assessment district thereof, or any agency or public body ("Taxes") by any government authority assessed against any legal or equitable interest of Landlord in the Center, including the Common Areas, including but not limited to the Premises but excluding any portion of the Center which is separately assessed by the taxing authority.  Such Taxes include, but shall not be limited to:

(i)  any tax on Landlord's rent, right to rent or other income from the Premises or as against Landlord's business of leasing the Premises;

(ii)  any assessment, tax, fee, levy or charge in addition to, or in partial or total substitution of any assessment, tax, fee, levy or charge previously included within the definition of real property tax.  Tenant and Landlord acknowledge that Proposition 13 was adopted by the people of the State of California in June 1978 and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges and all similar assessments, taxes, fees, levies and charges be included within the definition of real property taxes for the purposes of this Lease;

(iii)  any assessment, tax, fee, levy or charge allocable to or measured by the area of the Premises or the rent payable hereunder including, but not limited to, any gross income tax with respect to the receipt of such rent, or upon or concerning the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of the Premises, or any portion thereof, by Tenant;

(iv)  any assessment, tax, fee, levy, or charge upon this Lease transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises; and

(v)  any assessment or reassessment related to any change of ownership of any interest in the Center or portion thereof by Landlord, or any addition or improvement to the Center or a portion thereof.

(b)  As additional rent, Tenant shall pay to Landlord its Proportionate Share (as hereinafter defined) of Taxes assessed against the Center for each tax year during the Term of the Lease.  As used in this Section 7, Tenant's "Proportionate Share of Taxes" shall equal a fraction, of which the numerator is the area of the Premises and the denominator is the total rentable area of the Center (including the Premises and all floors of any other tenant's space) on the applicable date less any rentable area which is separately assessed.  The amount to be paid by Tenant to Landlord pursuant to this Section 7(b) with respect to the tax years during which the Term begins and ends shall be further adjusted pro-rata on the basis of the number of days of the Term occurring within said tax year.

(c)  Tenant shall pay its Proportionate Share of Taxes as estimated by Landlord, monthly, in advance, on the first day of each month during the Term of this Lease.  If the aggregate of monthly amounts paid by Tenant in any year is in excess of its Proportionate Share of Taxes actually assessed, such excess shall be credited against the next succeeding payments due to Landlord from Tenant.  If such aggregate of monthly amounts is less than Tenant's Proportionate Share of Taxes actually assessed, the difference shall be payable by Tenant to Landlord within thirty (30) days after notice thereof.  Tenant's monthly payments shall be adjusted annually on the basis of the previous year's actual Taxes.  Within one hundred twenty (120) days after the end of each calendar year during the Term of this Lease, Landlord shall furnish to Tenant a statement of the past year's Taxes and a computation of Tenant's Proportionate Share of Taxes.  Upon Tenant's reasonable request, Landlord shall provide Tenant with copies of applicable tax bills and receipts.

(d)  Notwithstanding anything herein to the contrary, if any Taxes are separately assessed against the Premises or a portion thereof, Tenant shall pay before delinquency the full amount of such Taxes (subject to proration for any partial tax year) to Landlord or the taxing authority, as directed by Landlord.



(e)    Notwithstanding anything herein to the contrary, if at any time during the Term of this Lease any assessment (general or special) is assessed against the Premises, the Center or any part thereof, Tenant's obligation under this Section 7 to pay such assessment or its Proportionate Share shall apply only to that portion of the Taxes that would be due if Landlord elected to pay the same over the maximum period of time (by installments or otherwise) permitted by the taxing authority.

(f)    Tenant shall pay before delinquency all Taxes assessed during the Term of the Lease against the leasehold granted herein or any personal property of Tenant located on the Premises.

8.    Insurance.

(a)    Tenant shall insure Tenant's leasehold improvements, alterations or additions permitted pursuant to this Lease, trade fixtures, merchandise and all personal property located on the Premises against loss or damage by fire and other casualties included in the so-called "Extended Coverage Endorsement" in an amount not less than one hundred percent (100%) of the full replacement value thereof. Any insurance proceeds shall be used for the repair or replacement of the property damaged or destroyed unless this Lease shall be terminated pursuant to the terms of Section 12, whereupon any proceeds shall be paid to the policyholder.

(b)    Tenant shall insure against comprehensive general liability arising by reason of occurrences on or about the Premises in the amount of not less than $500,000 in respect of loss or damage to property, in the amount of not less than $1,000,000 in respect of injury to or death of any one person, and in the amount of not less than $1,000,000 in respect of any one accident or disaster. Tenant shall cause the general contractor and subcontractors performing Tenant's Work to maintain insurance in compliance with the immediately preceding sentence.

(c)    The insurance coverages provided for herein may be maintained pursuant to master policies of insurance covering other restaurant locations of Tenant and its corporate affiliates provided coverage afforded will not be diminished by reason of a so-called blanket policy. All insurance policies required to be maintained by Tenant hereunder shall be with responsible insurance companies, authorized to do business in the state where the Premises are located shall name Landlord as a loss payee or an additional insured, as appropriate, shall provide for cancellation only upon ten (10) days prior written notice to Landlord and shall have a financial rating of at least an A,IX status as rated in the most recent edition of Best's Insurance Reports. Tenant shall evidence such insurance coverage by delivering to Landlord, if requested, certificates issued by the insurance companies underwriting such risks.

(d)    Landlord shall insure the building in which the Premises are located against loss or damage by fire and other casualties included in the so-called "Extended Coverage Endorsement" in an amount not less than one hundred percent (100%) of the full replacement value thereof, less the cost of excavations, foundations, footings and underground items. Landlord shall insure against comprehensive general liability arising by reason of occurrences on or about the Shopping Center in the amount of not less than $1,000,000 in respect of any one occurrence and such further insurance as Landlord or Landlord's lender reasonably deems necessary. Landlord shall cause the general contractor and subcontractors performing Landlord's Work to maintain insurance in compliance with the immediately preceding sentence. Landlord's obligation to carry the insurance provided herein may be brought within the coverage of a so-called blanket policy maintained by Landlord provided the coverage afforded will not be diminished thereby.

(e)    Tenant shall pay to Landlord the full cost of insurance maintained for the Premises and shall pay to Landlord Tenant's Proportionate Share of the cost of insurance on the Center (including the Premises). As used in Sections 8 and 9 of this Lease, Tenant's "Proportionate Share" shall equal a fraction of which the numerator is the area of the Premises and the denominator is the total rentable area of the Center (including the Premises and all floors of any other tenant's space). The insurance to which this Section 8 (e) applies shall include the property insurance required under Section 8 (d) and rental value insurance (if any) which Landlord elects to obtain. Tenant shall pay its proportionate share of insurance maintained for the Common Areas of the Center as "Center's Operating Expense" pursuant to Section 9. Tenant shall pay its Proportionate Share of such insurance as estimated by Landlord, monthly, in advance, without demand, setoff or deduction, on the first day of each month during the Term of this Lease. If the aggregate of monthly amounts paid by Tenant in any year is in excess of its Proportionate Share of such insurance actually incurred, such excess shall be credited against the next succeeding payments due to Landlord from Tenant. If such aggregate of monthly amounts is less than Tenant's Proportionate



Share of such insurance actually incurred, the difference shall be payable by Tenant to Landlord within thirty (30) days after notice thereof. Tenant's monthly payments shall be adjusted annually.  Within one hundred twenty (120) days after the end of each calendar year during the Term of this Lease, Landlord shall furnish to Tenant a statement of the past year's insurance cost and a computation of Tenant's  Proportionate Share of the cost of insurance.  Upon Tenant's reasonable written request, Landlord shall provide Tenant with copies of applicable insurance bills and receipts.

(f)  Tenant shall maintain Worker's compensation insurance covering all persons employed, directly or indirectly, in connection with Tenant's business on the Premises, as well as in connection with any of Tenant's Work or any Tenant repair or alteration authorized by this Lease or consented to by Landlord, and as required by applicable law.

(g)  Tenant agrees that it will not keep, use, sell or offer for sale on the Premises any article which is prohibited by the standard form of fire and extended risk insurance policy.  Tenant agrees to pay any increase in premiums for fire and extended coverage insurance that may be charged during the Term of this Lease on the amount of such insurance which may be carried by Landlord on said Premises or the building of which they are a part, resulting from the type of merchandise sold by Tenant in the Premises, whether or not Landlord has consented to the same.  In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule issued by the organization making the insurance rate on the Premises, showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the insurance rate on the Premises.  Tenant agrees to promptly make, at Tenant's cost, any repairs, alterations, changes and/or improvements to equipment in the Premises reasonably required by the company issuing Landlord's fire insurance so as to avoid the cancellation of said insurance.

9.  Common Areas.

(a)  Landlord shall maintain, in good condition and repair, the Common Areas (hereinafter defined) and shall use reasonable efforts to cause adjacent parcels to be so maintained under the CCR. As used in the Lease, "Common Areas" means all areas, space, equipment and special services provided by Landlord for the common or joint use and benefit of the occupants of the Center, their employees, agents, servants, customers and other invitees, including without limitation, parking areas, access roads, driveways, retaining walls, joint areas, landscaped areas, truck service ways or tunnels, loading docks, pedestrian malls, courts, stairs, ramps and sidewalks, comfort and first aid stations, washrooms and parcel pick-up stations.

(b)  Commencing upon the Commencement Date, Tenant shall pay to Landlord as additional rent, subject to the limitation hereinafter set forth, its Proportionate Share of the Center's Operating Cost (hereinafter defined).  As used in the Lease, the "Center's Operating Cost" means the total of all items of cost and expense incurred in operating, managing, equipping, protecting, policing, lighting, repairing, replacing, and maintaining the Common Areas actually used or available for use by Tenant and the employees, agents, servants, customers and other invitees of Tenant, but specifically including, without limitation, all costs and expenses for or pertaining to gardening and landscaping, the cost of public liability and property damage and fire extended coverage insurance, repairs, line painting, lighting (including the cost of light bulbs and electric current, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, the cost of equipment used to provide such services, parking lot repair, resurfacing and the cost of purchasing and maintaining the common Center signs, if any, supplies, the cost of personnel to implement such services, to direct parking, and to police the common facilities and up to ten percent (10%) of all the foregoing costs to cover the Landlord's administrative and overhead costs.

(c)  Tenant shall pay its Proportionate Share of one-twelfth of the Center's anticipated total annual Operating Cost monthly, in advance, without demand, setoff or deduction (except as provided in Section 17) on the first day of each month during the term of this Lease, and any extensions or renewals thereof.  Within one hundred twenty (120) days after the end of each calendar year during the term of this Lease, Landlord shall furnish to Tenant a statement of the Center's Operating Costs for the past year and a computation of Tenant's Proportionate Share.  Upon Tenant's reasonable request, Landlord shall allow Tenant to review the records regarding the Center's Operating Costs.  Upon the issuance of an annual statement of the Center's Operating Cost, if the total of Tenant's monthly payments for such year are less than Tenant's Proportionate Share of the Center's actual Operating Costs, Tenant shall pay such difference to Landlord within thirty (30) days after Tenant's receipt of such statement, and  if the total of Tenant's payments are greater than Tenant's Proportionate Share of the actual Operating Costs such excess shall be credited against the next succeeding payments due to Landlord from Tenant.  Tenant's monthly payments shall be adjusted on the basis of the previous year's total for the Center's Operating Cost.



(d)     During the first Lease Year, Tenant's Proportionate Share of the Center's Operating Cost will not exceed $2.05 per square foot.  During the second Lease Year and thereafter during the Term of this Lease, Tenant's Proportionate Share of the Center's Operating Cost (less the costs of public liability and property damage and fire extended coverage insurance, utilities, and taxes on the Common Areas) will not exceed one hundred five percent (105%) of the applicable amount during the immediately preceding Lease Year.

(e)     Landlord shall have the right, at least once in each calendar year to erect temporary barriers for the purpose of blocking access to the Common Areas or to close temporarily in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein or to discourage non-customer use. Such barriers shall be erected for such purposes, if possible, at a time or upon a day, when the parties' respective premises are not open for business. Landlord shall also have the right to temporarily restrict the use of Common Areas as necessary for maintenance, repair and other work to the Common Area or the Center, provided that Landlord shall use its best efforts to give Tenant advance notice and to avoid or minimize interference with Tenant's business.

(f)     Subject to the terms of Section 32, the Common Areas shall be subject to the exclusive control and management of Landlord or such other persons or nominees as Landlord may have delegated or assigned to exercise such management or control, in whole or in part, in Landlord's place and stead. Landlord shall have the right to increase the size of the Common Areas, including the expansion thereof to adjacent property, to reduce the Common Areas, to rearrange the parking spaces and improvements on the Common Areas and to make such changes therein and thereto from time to time, which, in Landlord's opinion, are deemed to be desirable and for the best interest of all occupants and persons using the Common Areas, subject to the terms of Section 32. Landlord shall have the right to do and perform such other acts in, to and with respect to the Common Areas as in the use of good business judgment, Landlord shall determine to be appropriate for the Center. In no event shall Tenant have the right to sell or solicit in any manner in any of the Common Areas. Tenant acknowledges and agrees that the employees of Tenant and the other tenants of Landlord within the Center shall not be permitted to park their automobiles in the automobile parking areas which may from time to time be designated for patrons of the Center. Landlord shall have the right to designate space for employee parking, either with the Center parking area or in an area reasonably close thereto. Upon written request of Landlord, Tenant shall furnish Landlord with Tenant's employees' automobile license numbers. If Tenant's employees fail to park their automobiles in designated parking areas, Landlord may charge Tenant Twenty-Five Dollars ($25.00) per day for each day or partial day per automobile parked in any area other than those so designated, which Tenant shall pay upon demand.

10.    Maintenance, Repairs and Alterations.

(a)     Landlord shall, at its own cost, maintain and keep in good repair the exterior of the Premises, the load-bearing members, the roof, the foundations and the exterior electrical, sewer, water, telephone and other utility lines to the exterior walls of the Premises.

(b)     Tenant shall at its own cost, maintain the Premises, other than the parts thereof to be maintained by Landlord under paragraph (a) above, in good condition and repair (including replacements, when necessary), including but not limited to the heating, ventilating and air conditioning equipment, exterior entrances, interior utility lines, and all door and window glass. All maintenance and repair work undertaken by Tenant shall be done in a good and workmanlike manner, leaving the Premises free of liens for labor or materials. Tenant shall make any repairs required by any governmental agency by reason of Tenant's use and occupancy of the Premises.

(c)     Tenant shall have the right to make non-structural interior alterations, additions or improvements to the Premises deemed necessary or appropriate in connection with the requirements of its business, without the necessity of obtaining the prior written consent of Landlord and without the payment of any additional rent; provided, however, that any such alterations, additions or improvements shall not reduce or impair the value of the Premises and shall be in conformity with all local codes and ordinances. Tenant shall not make any structural or exterior alterations to the Premises without the prior written consent of Landlord, which shall not be unreasonably withheld. Upon the expiration or termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, broom-clean, in good order and condition, ordinary wear and tear excepted, and shall surrender to Landlord all keys to or for the Premises.

8



(d)   The interest of Landlord in the Center shall not be subject to liens for improvements made by or on behalf of or at the direction of Tenant. Tenant shall discharge any lien filed against the Center, and any part thereof, for work done or materials or labor furnished with respect to the Premises by or for the benefit of Tenant or at its request within thirty (30) days after Tenant receives written notice that such lien has been filed. If Tenant shall contest any claim of lien, it shall (within said 30-day period) furnish Landlord adequate security of the value or in the amount of the claim, plus estimated costs and interests, or a bond of a responsible corporate surety in such amount as is necessary to release the lien. If a final judgment establishing the validity or existence of a lien for any amount is entered, Tenant shall pay and satisfy the same at once. Should Tenant be in default in paying any charge for which a lien claim and suit to foreclose the lien has been filed, and shall not have given Landlord's security to protect the Premises (within said 30-day period), then Landlord may, but shall not be obligated to, pay the same and any cost therefor, and the amount shall be paid together with reasonable attorney's fees incurred in connection therewith, shall be immediately due and owing from Tenant to Landlord.

(e)   If Tenant refuses or neglects to make repairs to and/or maintain the Premises, or any part thereof, as required by this Lease, and the same continues for thirty (30) days after written notice thereof by Landlord to Tenant, Landlord shall have the right, but shall not be obligated, to make such repairs or perform as additional rent promptly upon demand, together with interest thereon.

(f)   Tenant agrees to permit Landlord and its authorized representatives to enter the Premises at all times for the purpose of making emergency repairs and during the usual business hours for the purpose of inspecting the same. Tenant further agrees that Landlord may go upon the Premises and make any necessary repairs thereto and perform any work therein which may be necessary to comply with any laws, ordinances, rules or regulations of any public authority, any fire rating bureau, or of any similar body, or to prevent waste or deterioration in connection with the Premises if Tenant does not make or cause such repairs to be made or performed or cause such work to be performed promptly after receipt of written demand from Landlord. Nothing herein contained shall imply any duty on the part of the Landlord to do any such work which, under provisions of this Lease, Tenant may be required to do, nor shall Landlord's failure to elect to perform such work constitute a waiver of Tenant's default. No exercise by Landlord of any rights herein reserved shall entitle Tenant to damage for any injury or inconvenience occasioned thereby, to any abatement of rent, or to terminate this Lease. Landlord shall use reasonable efforts to give Tenant advance notice and to avoid or minimize interruption of Tenant's business.

(g)   Tenant hereby grants to Landlord such licenses and/or easements in, over, and under the Premises or any portion thereof as shall be reasonably required for the installation or maintenance of mains, conduits, shafts, pipes or other facilities to serve any other portion of the Center including, but not by way of limitation, the premises of any other occupant of the Center; provided, however, that Landlord shall pay for any alteration required on or to the Premises as a result of any such exercise, occupancy under or enjoyment of any such license or easement and provided, further, that no exercise, occupancy under or enjoyment of such license or easement shall result in any unreasonable interference with Tenant's use, occupancy or enjoyment of the Premises as contemplated by this Lease.

11.   Equipment, Fixtures and Signs.

(a)   Tenant shall have the right to erect, install, maintain and operate in the interior of the Premises, and to remove from the Premises, such equipment, trade and business fixtures, and other personal property as Tenant may deem necessary or appropriate within the limitation of local zoning laws and ordinances, and such shall not be deemed to be part of the Premises but shall remain the property of Tenant provided such is not affixed to the Premises and can be removed without material damage to the Premises. Tenant shall at all times maintain enough equipment, fixtures and personal property on the Premises so as to operate a first-class business therein. Tenant shall promptly repair any damage to the Premises which results from the removal of Tenant's equipment, fixtures or personal property therefrom. Tenant shall remove all equipment, fixtures or personal property from the Premises prior to the expiration of the term of earlier termination of the Lease and shall surrender to Landlord the Premises in a broom-clean condition and in good order, repair and condition (except for ordinary wear and tear). In the event Tenant fails to do so, Landlord may elect to retain or dispose of, in any manner, any such equipment, fixtures and personal property without liability to Tenant. Title to such equipment, fixtures and personal property that Landlord chooses to retain shall automatically vest in Landlord. Tenant shall be liable to Landlord for Landlord's cost of storing, removing and disposing of any equipment, fixtures or personal property and shall indemnify and hold Landlord harmless from the claim of any third party to an interest in such equipment, fixtures or personal property.

9



(b)   Landlord agrees to allow Tenant the right to install the maximum number of building signs of maximum size allowed per local code and a panel measuring approximately 16 feet x 2 feet on both sides of the bottom panel on the existing pylon sign on Sneath Lane and a panel on one side (visible to traffic traveling northward) of the bottom panel of the existing pylon sign on El Camino Real. All signs shall be fabricated and installed in conformity to Exhibit"F" (except as to size and other aspects specified in Exhibit "11"). All signs shall comply with applicable government regulations. Tenant shall, at Tenant's sole cost and expense, install and maintain in good condition and repair Tenant's sign panel. Tenant shall pay a pro-rata share of the maintenance of the pylon signs based on a fraction, the numerator of which is square feet of Tenant's sign panel, and the denominator of which shall be the aggregate number of square feet of sign panels installed on each pylon.

(c)   Tenant may affix and maintain upon the windows and the exterior walls of the Premises only such signs, advertising placards, name, insignia, trademarks and descriptive material as shall have first received the written approval of Landlord as to type, size, color, location, number, and other aspects thereof. Any such window and wall signs and advertising medium shall at all times comply with applicable governmental authority and the CC&R's and other matters of record.

(d)   No exterior displays, merchandise or any other material may be stored or remain outside the exterior walls and permanent doorways of the Premises. Tenant further agrees not to install any exterior lighting, amplifiers, radio or television antennas or similar devices or use any advertising medium which may be heard or seen outside the Premises, such as flashing lights, searchlights and loudspeakers.

12.   Damage by Fire or Other Casualty.

(a)   If the Premises, or any material part thereof, are destroyed or damaged by fire or other casualty, Tenant shall promptly deliver written notice thereof to Landlord.

(b)   If the Premises or the Center is totally destroyed by fire or other casualty required to be insured pursuant to this Lease, or if either is so damaged by casualty that rebuilding or repairs cannot be completed within three hundred sixty-five (365) days after the date of such damage, Landlord or Tenant, by written notice to the other party, may terminate this Lease effective as of the date of such damage.

(c)   If the Premises or the Center is damaged by fire or other casualty but not to such an extent that rebuilding or repairs cannot be completed within three hundred sixty-five (365) days after the date of such damage, or if to such extent and neither Landlord or Tenant have elected to terminate this Lease pursuant to paragraph (b) hereof, this Lease shall not terminate, but Landlord shall proceed with all reasonable diligence to the extent of insurance proceeds received by Landlord to rebuild and repair the Center or the Premises respectively to substantially the condition in which it existed prior to such damage subject to then-existing laws and regulations. If the Premises are untenantable in whole or in part following such damage, from a standpoint of reasonable business judgment, the rent payable hereunder during the period in which they are untenantable shall be equitably adjusted to such extent as may be fair and reasonable under all of the circumstances.

(d)   All insurance proceeds payable under insurance policies maintained by Tenant and Landlord by reason of the occurrence of such fire or other casualty shall be paid to the policyholder.

(e)   If the Premises of the Center are materially damaged during the last two (2) years of the Primary Term or the first Renewal Term, Landlord may terminate the Lease by written notice to Tenant within thirty (30) days after the date of such damage. However if, within thirty (30) days after Tenant's receipt of such notice from Landlord, Tenant gives written notice to Landlord of Tenant's exercise of its option to renew the term of this Lease, Landlord's election to terminate the Lease shall be of no force or effect.

(f)   In the event of a reconstruction of the Premises, Tenant, at its sole cost and expense, shall be responsible for the repair and restoration of all items not required to be constructed by Landlord and for the replacement of its stock in trade, trade fixtures, furniture, furnishings and equipment. Tenant shall commence such repair and restoration of its installation of fixtures, equipment and merchandise promptly upon delivery to it of possession of the Premises and shall diligently prosecute such work and installation to completion. With respect to any damage or destruction which Landlord is obligated to repair or may elect to repair under the terms of this Article, Tenant hereby waives the provision of Section 1932(ii) and 1933 (iv) of the Civil Code of the State of California and any amendments thereto where the law which may hereafter be passed by the State during the term of this Lease authorizing the termination of the Lease upon complete or partial destruction of the Premises.



(g)   Unless this Lease is terminated as provided above, such destruction shall in no way null or void this Lease, and Tenant shall continue the operation of its business during any such period to the extent reasonably practicable from the standpoint of prudent business management.

13.   Condemnation.

(a)   If all of the Premises or the parking area cross-hatched on Exhibit "A" (or if less than all of the Premises, but Tenant reasonably determines that the remaining portion of the Premises cannot be operated as a restaurant and/or related entertainment center serving alcoholic beverages, having sufficient parking therefor), shall be acquired by the right of condemnation or eminent domain for any public or quasipublic use or purpose, or sold to a condemning authority under threat of condemnation, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding (or sale) and all rentals shall be paid up to that date.

(b)   In the event of a partial taking or condemnation which takes less than a material portion of the Premises or the parking area cross-hatched on Exhibit "A" and Tenant reasonably determines that the remaining portion can be operated as a restaurant and/or related entertainment center serving alcoholic beverages, having parking sufficient therefore, then Landlord, to the extent of proceeds received, shall promptly restore the Premises or said parking area subject to then-existing laws and regulations to a condition substantially comparable to its condition at the time of such condemnation less the portion lost in the taking, and this Lease shall continue in full force and effect but with an equitable reduction or abatement of rent. Upon Landlord's completion of Landlord's restoration work for the Premises, Tenant shall promptly and diligently restore Tenant's fixtures, furniture and equipment within the Premises to substantially comparable condition as existed immediately prior to the time of such condemnation.

(c)   In the event of such a condemnation, taking or sale, Landlord shall be entitled to receive any award attributable to the value of the real estate (including the fee, the leasehold and the improvements) and Tenant shall be entitled to receive any award attributable to Tenant's trade fixtures and personal property or interruption or relocation of Tenant's business.  Landlord and Tenant shall each execute documents reasonably requested by the other party to carry out the intent of this Section 13 (c).

(d)   Notwithstanding any contrary provision of this Section 13, in the event there shall be a total or partial taking of the Premises during the last two years of the term hereof (subject to Tenant's exercise of any renewal terms remaining), or in the event there shall be a taking of not less than thirty-three and one-third percent (33-1/3%) of the Premises at any time during the term of this Lease, Landlord may elect to terminate this Lease by giving notice to Tenant of such termination within ninety (90) days after the occurrence of such taking.

14.   Indemnifications.

(a)   Tenant shall indemnify, hold harmless and defend Landlord and its agents and employees from and against any and all claims, loss, liability and expense (including but not limited to reasonable attorneys' fees) arising from or in connection with: (i) the use or occupancy of the Premises or any occurrence on the Premises during the Term hereof; (ii) any negligent or intentionally wrongful act or omission of Tenant or its agents or employees during the Term hereof; (iii) the performance of Tenant's Work and any other work done by Tenant; or (iv) any failure of Tenant to perform its obligations under this Lease.  The provisions of this Section 14(a) shall not apply to any loss, liability and expense arising from or in connection with the gross negligence or intentional misconduct of Landlord or its agents or employees.

(b)   Landlord shall indemnify, hold harmless and defend Tenant and its agents and employees from and against any and all loss, liability and expense (including reasonable attorneys' fees) arising from or in connection with: (i) Landlord's use of the Common Areas or any occurrence on the Common Areas during the Term hereof arising from Landlord's activity in the Common Area; (ii) any negligent or intentionally wrongful act or omission of Landlord or its agents or employees; (iii) the performance of Landlord's Work; or (iv) any failure of Landlord to perform its obligations under this Lease.  The provisions of this Section 14(b) shall not apply to any loss, liability or expense arising from or in connection with the gross negligence or intentional misconduct of Tenant or its agents or employees.



15.   Assignment and Subletting.

(a)   Landlord and Tenant agree that the Center consists of an interdependent group of retail enterprises and that the realization of the benefits of this Lease, both to Landlord and Tenant, is dependent upon Tenant's creating and maintaining a successful and profitable retail operation in the Premises.  Landlord and Tenant further agree that the "tenant mix" of the Center is also vital to the realization of the benefits of this Lease, both to Landlord and Tenant.  Accordingly, Tenant shall not transfer, assign, sublet, mortgage or otherwise hypothecate or encumber this Lease, or Tenant's interest in and to the Premises, nor enter into any license or concession agreements with respect to the Premises, without in each instance procuring the prior written consent of Landlord.  Any such attempt (hereinafter collectively a "Transfer") without Landlord's prior written consent shall be void and of no force and effect, shall not confer any interest or estate in the purported transferee, and shall at Landlord's sole, exclusive, and absolute discretion entitle Landlord to terminate this Lease upon written notice to Tenant.

(b)   The consent of Landlord required hereunder shall not be unreasonably withheld, provided, however, that Landlord and Tenant agree that it shall not be commercially unreasonable for Landlord to withhold its consent to any proposed Transfer for any commercially-reasonable reason, including but not limited to:

(i)   A conflict between the contemplated use of the Premises by the proposed transferee, assignee, or sublessee following the proposed Transfer (hereinafter referred to as the "Transferee") with the "Use of Premises" clause contained in Exhibit "B" hereof;

(ii)   The financial worth and/or financial stability of the Transferee is less than that of the Tenant hereunder at the commencement of the Lease Term or not reasonably suitable to Landlord in Landlord's sole discretion so as to insure the ability of the Transferee to perform Tenant's obligations under the Lease for the full Lease Term;

(iii)   A Transferee whose reputation or proposed use of the Premises would have an adverse effect upon the reputation of the Center and/or the other business located therein;

(iv)   Percentage Rent following the proposed Transfer that could be reasonably anticipated from Transferee's net sales, could be reasonably expected to be less than that of Tenant hereunder;

(v)   A Transferee which would breach any covenant of or affecting Landlord concerning radius, location, use or exclusivity in any other lease, financing agreement, or other agreement relating to the Center;

(vi)   The proposed Transfer would, in Landlord's sole and exclusive discretion, require an amendment to any material term of the Lease.

(c)   Should Tenant desire to make a Transfer hereunder, Tenant shall, in each instance, give written notice of its intention to do so to Landlord not less than sixty (60) days prior to the effective date of such proposed Transfer, specifying in such notice whether Tenant proposes to assign or sublet, or enter into a license or concession agreement, the proposed date thereof, and specifically identifying the proposed Transferee.  Such notice shall be accompanied, in the case of a sublease, license or concession agreement, by a copy of the proposed sublease, license or concession agreement, or if same is not available, a letter of commitment or a letter of intent.  Landlord shall, within twenty (20) days after its receipt of such notice of a proposed Transfer from Tenant, by mailing written notice to Tenant of its intention to do so (i) withhold consent to the Transfer pursuant to Section 15(b); or (ii) consent to such transfer; or (iii) terminate this Lease, such termination to be effective thirty (30) days after receipt of such notice by Tenant (provided that such termination shall be of no force or effect if Tenant withdraws its request for Landlord's consent by written notice within thirty (30) days after receipt of Landlord's notice of termination).  No Transfer of this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of this Lease from liability under this Lease.  Landlord hereby reserves the right to condition Landlord's consent to any assignment, sublease or other transfer of all or any portion of Tenant's interest in this Lease or the Premises upon Landlord's receipt from Tenant of a written agreement, in form and substance acceptable to Landlord, pursuant to which Tenant shall pay over to Landlord all rent or other consideration received by Tenant from any such assignee, sublessee, or transferee either initially or over the term of the assignment, sublease or transfer, in excess of the rent called for hereunder.  If Landlord elects to terminate this Lease pursuant to Section 15(c)(iii) hereinabove, Landlord may, if it elects, enter into a new lease covering the Premises with the intended Transferee on such terms as Landlord and such person may agree, or enter into a new lease covering the Premises with any other

12



person; in such event Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such termination and reletting.

BY PLACING THEIR INITIALS AT THE END OF THIS SENTENCE, LANDLORD AND TENANT HEREBY CERTIFY THAT THIS SECTION 15 (c) HAS BEEN FREELY NEGOTIATED.

"LANDLORD"          "TENANT"

(d)    In the event Tenant shall make a permitted Transfer hereunder, then the Minimum Rent specified in Section 4 shall be increased, effective as of the date of such Transfer, to the highest of (i) the total rental payable by the Transferee pursuant to such transfer; or (ii) an amount equal to the total of the Minimum Rent, plus Percentage Rent, required to be paid by Tenant hereunder during the twelve (12) month period immediately preceding such Transfer, whichever is higher.  In no event shall the Minimum Rent, after the Transfer, be less than the Minimum Rent specified in Section 4.

(e)    Each Transfer to which Landlord has consented shall be evidenced by a written instrument, the form and content of which is satisfactory to Landlord, executed by Tenant and Transferee under which the Transferee shall agree in writing for the benefit of Landlord to perform and to abide by all of the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord and the obligation to use the Premises only for the purpose specified in Section 5 thereof.  Tenant agrees to reimburse Landlord for Landlord's reasonable attorneys' and administrative fees incurred in conjunction with the processing of any documentation for each proposed Transfer, whether or not the Transfer is consummated, which in any event shall not be less than seven hundred fifty ($750) per transfer.

(f)    If Tenant is a corporation which, under the current laws, rules or guidelines promulgated by the governmental body or agency having jurisdiction and authority to promulgate the same, is not deemed a public corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation, in the aggregate of more than twenty-five (25%) of the total outstanding stock or interest in such corporation, association or partnership, shall be deemed a Transfer within the meaning and provisions of this Section 15 and shall require Landlord's prior written consent.  A corporation shall be deemed a public corporation if its stock is traded on an exchange or over the counter.

(g)    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Section 101 et. seq. (the "Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord, and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code.  Any and all monies or other considerations constituting Landlord's property under this Section 15(g) not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord.

(h)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment, including the obligation to operate the business which Tenant is required to operate pursuant to Section 5.

(i)    Anything herein to the contrary notwithstanding, Tenant may assign this Lease or sublet the whole of the Premises to a legal entity which is either (x) the successor, by merger or otherwise, to all or substantially all of Tenant's assets and liabilities or (y) controls or is controlled by or is under common control with Tenant, and Tenant may sublet a portion of the Premises to a legal entity under common control with Tenant solely for the purpose of such entity obtaining a liquor license for the Premises, if Tenant delivers to Landlord the name of the said assignee or subtenant and the names and addresses of its officers, directors and stockholders.  Any such assignment or subletting shall be subject to and upon all of the terms, provisions and covenants of this Lease (except the requirement of Landlord's consent, Landlord's right to terminate the Lease or increase the rent or the payment of Landlord's attorneys' and administrative fees).



(j)    In the event of any sale or other transfer of the Premises or the Center by Landlord, Landlord shall be relieved of any and all liability for its obligations in this Lease arising out of any act, occurrence or omission occurring after the consummation of such sale; and the purchaser or other transferee, shall be deemed, without any further agreement between the parties or their successors-in-interest, to have assumed and agreed to carry out any and all of the covenants and obligations of Landlord under this Lease.

16.    Default by Tenant.

(a)    The following events shall be "Events of Default" under this Lease:

(i)    Tenant fails to pay any installment of rent hereby reserved as and when the same becomes due and does not cure such default within ten (10) days after written notice of such default is given by Landlord to Tenant;

(ii)    Tenant fails to comply with any term, provision or covenant of this Lease, other than the payment of rent, and shall not cure such failure within thirty (30) days after written notice of such default is given by Landlord to Tenant (provided that if such default cannot reasonably be cured within thirty (30) days, the Tenant shall have an additional reasonable period of time to cure such default as long as Tenant diligently pursues same to completion);

(iii)    Tenant files a voluntary petition in bankruptcy or is voluntarily or involuntarily adjudicated a bankrupt or insolvent, or files any general assignment for the benefit of creditors or files or has any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future federal, state or other bankruptcy or insolvency statute or law, or seeks or consents to or acquiesces in the appointment of any bankruptcy or insolvency trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties or of the Premises, and such condition continues for a period of thirty (30) days after notice from Landlord specifying the matter involved;or

(iv)    Tenant abandons or vacates the Premises (five (5) or more days of continual absence).

(b)    Upon the occurrence of any Event of Default, in addition to any other remedies available to Landlord at law or equity, Landlord shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever:

(i)    Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails so to do, Landlord may, without prejudice to any remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises, or any part thereof, by force if necessary, without being liable to prosecution or for any claim for damages; and if Landlord shall so elect to terminate this Lease, Landlord may recover from Tenant:

A.    The worth at the time of award of any unpaid rent which had been earned at the time of such termination; plus

B.    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Tenant proves could have been reasonably avoided; plus

C.    The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided;

D.    Any amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease of which in the ordinary course of things would be likely to result therefrom; and

14

E.    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "rent" as used herein shall be deemed to include the Minimum Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease.   All such sums, other than the Minimum Rent, specifically including Percentage Rent, shall be computed on the basis of the average monthly amount thereof accruing during the thirty (30) day period immediately preceding the default, except that if it becomes necessary to compute such sums before such a thirty (30) day period has occurred, then on the basis of the average monthly amount accruing during such shorter period.

As used in subparagraphs A and B above, the "worth at the time of award" is computed by allowing interest at the prime commercial rate being charged by the Bank of America N.T. & S.A. plus two percent (2%) per annum, but not to exceed the then legal maximum rate of interest.  As used in subparagraph C above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

In the event of any such Event of Default by Tenant, Landlord shall also have the right, with or without terminating this Lease, to reenter the Demised Premises and remove all persons and property therefrom by summary proceedings or otherwise.  Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant.

(ii)    Landlord may without terminating this Lease, enter upon and take possession of the Premises and expel or remove Tenant and other persons who may be occupying the Premises, or any part thereof, by force if necessary, without being liable  to prosecution or for any claim for damages, and recover all rent as it becomes due or relet the Premises or any part thereof for the account of Tenant on such term or terms and at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, with the right to make alterations and repairs to the Premises.  In the event that Landlord shall elect to relet, then rentals received by Landlord from such reletting shall be applied first, to the payment of any indebtedness, other than rent due hereunder, owed by Tenant to Landlord; second, to the payment of any cost of such reletting; third, to the payment of the cost of any alterations and repairs to the Premises; fourth, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. Should that portion of such rentals received from such reletting during any month, which is applied to the payment of rent hereunder, be less than the rent payable during the month by Tenant hereunder, then Tenant shall pay such deficiency to Landlord upon demand.    Such deficiency shall be calculated and paid monthly.  Tenant shall also pay to Landlord, as soon as ascertained, any costs and expenses incurred by Landlord in such reletting or in making such alterations and repairs not covered by the rentals received from such reletting;

(iii)    Landlord, at Landlord's option, may enter upon the Premises, without being liable to prosecution or for any claim for damages, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations hereunder.

(iv)    No reentry or taking possession of the Premises by Landlord pursuant to this Section 16 shall be construed as an election to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Landlord may at any time after such reletting elect to terminate this Lease for any such default by Tenant.



(c)   Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which is extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any mortgage or deed of trust covering the Premises.  Accordingly, if any installment of rent or any other sum due from tenant shall not be received by Landlord or landlord's designee when due, then Tenant shall pay to Landlord a late charge equal to Two Hundred Fifty and 00/100 Dollars ($250.00) or ten percent (10%) of the amount due, whichever is lower, provided that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant.  Acceptance of such late charge by landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.  Tenant hereby agrees that if Tenant is subject to a late charge for two (2) consecutive months, Minimum Rent for the following twelve (12) months shall automatically be adjusted to be payable quarterly, in advance, commencing upon the first day of the month following such consecutive late month and continuing for the next twelve (12) months on a quarterly basis in advance.

"LANDLORD"          "TENANT"

17.   Default by Landlord.  If Landlord fails to perform any of its obligations under Section 9(a) or Section 10(a) of the Lease and such failure has a material adverse effect on the business or property of Tenant on the Premises and such failure continues after thirty (30) days written notice by Tenant to Landlord, then Tenant may perform such obligation for Landlord and Tenant may deduct the reasonable cost of such performance from amounts that would otherwise be payable by Tenant to Landlord thereafter under Section 9(b) of this Lease, such deductions not to exceed $5,000 in any calendar year.

18.   [Intentionally Omitted]

19.   Right of Inspection.  Landlord and its agents and representatives shall be entitled to enter upon and inspect the Premises and to display the same to prospective purchasers or tenants and to post and maintain any notice necessary to protect Landlord's interest in the Premises at any time during normal business hours, provided only that such inspection shall not unreasonably interfere with Tenant's business.

20.   Quiet Enjoyment.  Landlord represents and warrants that it is the owner in fee simple of the Premises, and that it alone has full right to lease the Premises for the Term set out herein.  Landlord further represents and warrants that Tenant, on paying the rent and performing its obligations hereunder, shall peaceably and quietly hold and enjoy the Premises for the Term of this Lease.

21.   Subordination, Nondisturbance and Attornment.

(a)   Landlord and Tenant agree that this Lease, automatically and without the necessity of any further documentation (subject to the provisions of Section 21(c) of this Lease), is and shall be subject and subordinate at all times to all ground or underlying leases and to all mortgages or deeds of trust ("Mortgages") in any amounts and all advances thereon which may now or hereafter affect the real property of which the Premises form a part, and to all renewals, modifications, consolidations, participation, replacements and extensions thereof.  In confirmation of the foregoing, Tenant shall promptly upon request by Landlord, and without charge therefor, execute an agreement in recordable form on Landlord's lender's standard form therefor.

(b)   Notwithstanding any contrary provision in the Lease (subject to the provisions of Section 21(c) of this Lease), no notice by Tenant to Landlord of any default by Landlord under any obligation of the Lease, which default is of such a nature as to give Tenant a right to terminate the Lease, to be relieved of Tenant's obligations hereunder or to reduce the rent payable under the Lease or to any credit or offset against future rents (except as specifically provided in Section 17 hereof, shall be effective unless and until such notice is also given to the holder of a Mortgage ("Mortgagee") and a "reasonable time" shall have elapsed following receipt of such notice by such Mortgagee (of which Tenant has been given written notice), during which period the Mortgagee shall have the right (but not the obligation) to remedy or cure such default.  "Reasonable time" shall be deemed to mean and include a reasonable time to obtain possession of the mortgaged premises if the mortgagee elects to do so, and a reasonable time to correct or cure the condition if such condition is determined to exist.



(c)   So long as Tenant is not in default of any of the terms, covenants or conditions of the Lease, no Mortgagee shall, by reason of foreclosure of its Mortgage or other proceedings brought to enforce the rights of Mortgagee, disturb Tenant in Tenant's occupancy of the Premises or Tenant's other rights arising out of the Lease during the Term of the Lease.  In confirmation of the foregoing and as a condition to Tenant's agreement to subordinate its interest under the Lease to such Mortgage, to provide notice of default to such Mortgagee, and to attorn to such Mortgagee (set forth in subsections (a), (b) and (d) of this Section 21), Landlord shall cause each such Mortgagee to execute without charge to Tenant an agreement in recordable form on such Mortgagee's standard form for such agreement.

(d)   If the interest of Landlord shall be acquired by a Mortgagee by reason of foreclosure of a Mortgage or other proceedings brought to enforce the rights of Mortgagee, by deed in lieu of foreclosure or by any other method, and if such Mortgagee succeeds to the interest of Landlord under the Lease, then the Lease and the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the terms of the Lease, and Tenant shall be bound to such Mortgagee under all of the terms, covenants and conditions of the Lease for the balance of the Term of the Lease, with the same force and effect as if such Mortgagee were the Landlord under the Lease.  Tenant does hereby attorn to such Mortgagee as Tenant's Landlord, said attornment to be effective and self operative without the execution of any other instruments on the part of any party hereto (subject to provisions of Section 21(c) of this Lease).

(e)   Tenant agrees that as to its leasehold interest in the Premises, Tenant and all persons in possession or holding under Tenant will conform to and will not violate the terms of the CCR and any other matter of record and that this Lease shall be subordinate to the CCR and other matters of record and any amendments or modifications thereto.  Notwithstanding the immediately preceding sentence, none of such CCR or other matters of record shall prohibit or materially interfere with Tenant's use of the Premises as provided in Section 5(a).

22.   Holding Over by Tenant.  Should Tenant or any assignee, sublessee or licensee of Tenant hold-over the Premises or any part thereof after the expiration of the Term hereof, unless otherwise agreed in writing, such hold-over shall constitute and be construed as a tenancy at sufferance only, but otherwise upon the same terms and conditions except minimum rent shall be in an amount equal to one and one-half (1- 1/2) times the minimum rent payable in the last applicable year of the Lease Agreement.

23.   Notices and Payments.  Any demand, notice, document or payment required or permitted to be delivered or remitted hereunder or by law shall be deemed to be delivered or remitted either when actually received or rejected or when deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed to the party hereto at its respective address set out below, or at such other address as it shall have theretofore specified by written notice delivered in accordance herewith:

| Landlord | Tenant |
|---|---|
| BII-Dover XVII | ShowBiz Pizza Time, Inc. |
| c/o Interstar Management, Inc. | 4441 West Airport Freeway |
| 200 East Sandpointe Avenue | P. O. Box 152077 |
| Suite 750 | Irving, Texas 75015 |
| Santa Ana, California  92707 | Attention: Real Estate Department |

If and when included within the term "Landlord" or "Tenant" there is more than one person or legal entity, all shall jointly arrange among themselves for one (1) among their numbers to receive at one (1) specified address all such notices and payments; all parties included within the term "Landlord" or "Tenant" shall be bound by notices delivered in accordance with the provisions of this paragraph as if each had received such notice.

24.   Expenses of Enforcement.  In the event either party to this Lease files a lawsuit to enforce any of the obligations of the other party under the Lease and obtains a judgment in its favor, the other party shall pay all costs and expenses, including reasonable attorney fees at all trial and appellate levels, incurred by the first party in enforcing such obligations.

17

25.  Force Majeure. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease (except for the payment of money) shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

26.  Waiver of Subrogation. Landlord and Tenant severally waive any and every claim which arises or may arise in its favor and against the other during the Term of this Lease for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Premises, which loss or damage is required to be covered by valid and collectible fire and extended coverage insurance policies or any other insurance policy required to be carried hereunder, to the extent that such loss or damage is recoverable thereunder or should have been recoverable thereunder (if not procured as set forth herein). Inasmuch as the above mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company (or any other person), Landlord and Tenant severally agree immediately to give to each insurance company which has issued to it policies of insurance, written notice of the terms of said mutual waivers, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

27.  Estoppel Certificate.

(a)  Tenant or Landlord shall promptly and without charge or cost to the other party, certify by written instrument, which written instrument shall be duly executed and delivered to the other party: (i) that this Lease is unmodified and in full force and effect (or if there has been a modification, that the same is in full force and effect as modified, and stating the modification); (ii) the dates, if any, to which the Rent due under this Lease has been paid; (iii) whether the other party has failed to perform, any covenant, term or condition under this Lease, and the nature of such party's failure, if any; and (iv) such other information customarily set forth in an estoppel certificate as either party may reasonably request.

(b)  Within ten (10) days after the Commencement Date, and at any other time during the Term, within ten (10) days following request in writing by Landlord, Tenant will execute and deliver to Landlord a certificate substantially in the form attached hereto as Exhibit "E" indicating therein any exceptions thereto which may exist at that time. The failure of Tenant to execute and deliver such certificate within ten (10) days after second written request of Landlord shall constitute an automatic acceptance of the Premises and an express acknowledgement by Tenant that the statements included in Exhibit "E" are true and correct, without exception.

28.  Recording. A short-form memorandum of this Lease, setting forth the term hereof, the renewal options, and such other provisions hereof as Landlord or Tenant shall reasonably deem to be pertinent, which Landlord or Tenant, promptly upon request of the other party, shall execute, acknowledge and deliver to the requesting party in recordable form, may be recorded at Landlord's or Tenant's option at the recording party's expense. The requesting party agrees to provide the other party with an executed duplicate of such short-form memorandum upon written request.

29.  Conditions. Anything herein to the contrary notwithstanding, it is expressly understood and agreed that Tenant shall be entitled to terminate this Lease, without further obligation or liability, by written notice delivered to Landlord on or prior to the expiration of ninety (90) days from the date hereof, in the event any of the following conditions shall remain unsatisfied:

(a)  Tenant shall have received evidence reasonably satisfactory to it that the Land is or will be zoned for use as a restaurant, with related entertainment center serving alcoholic beverages;

(b)  Tenant shall be reasonably satisfied with the plans and other information provided by Landlord under Section 3(a) hereof;

(c)  Tenant shall have obtained, or received evidence reasonably satisfactory to it that it will be able to obtain, from the appropriate governmental authorities all permits and licenses necessary for the construction and operation of the Improvements, including the erection of Tenant's signage and the operation of electronic games;

(d)   Tenant shall have obtained, or received evidence reasonably satisfactory to it that it will be able to obtain, from the appropriate governmental authorities all permits and licenses necessary for the sale and on Premises consumption of wine, beer, cocktails and other alcoholic beverages, and;

(e)   Tenant shall have received evidence reasonably satisfactory to it of the condition of title to the Land, and such condition of title shall be satisfactory to Tenant, including but not limited to Tenant's receipt of a non-disturbance agreement executed by the holder of any mortgage as of the date of this Lease pursuant to Section 21(c).

Tenant shall at all times act in good faith, use its best efforts, proceed with due diligence and cooperate with Landlord in its efforts to satisfy the conditions set forth in Section 29. Should Tenant not act in good faith, use its best efforts, proceed with due diligence or cooperate with Landlord, Tenant shall have no right to terminate the Lease pursuant to this Section 29.

If Tenant determines that it will not be able to satisfy all the conditions under this Section 29 before the expiration of the 90 day period, Tenant may extend such Period by three (3) periods of 30 days each, by written notice to Landlord before the expiration of the immediately preceding period.  Upon the expiration of such 90 day period (as the same may have been extended under the immediately preceding sentence) without Tenant providing notice to Landlord as provided in this Section 29, Tenant's option to terminate shall be deemed to have been waived.  Tenant shall advise Landlord of its progress in satisfying the conditions hereunder, including the dates of public hearings and the results thereof.  Tenant shall give Landlord written notice promptly after all conditions have been satisfied.

30.   Commissions.  Landlord agrees to pay the brokers' commissions payable to The Anz Company by reason of this Lease.  Landlord and Tenant shall each indemnify, hold harmless and defend the other party from and against any and all claims or demands by any other broker or similar entity alleging that the indemnifying party engaged its services.

31.   Exclusive Use.  Provided that Tenant is not in default, Tenant has not transferred this Lease in any way (except under Section 15(i) hereof), Tenant has not changed its use, and Tenant continues to operate the Premises as a restaurant with an arcade/gameroom providing physical play activities for children or kiddie rides or games, Landlord will not, from the date of Lease execution, use, sell for the intended use, permit others to use, or permit any tenant or the assignee or subtenant of any tenant to use, any land or structure owned or controlled by Landlord (or any partner or shareholder of Landlord) within the Center for:  a business primarily providing an arcade or game room, physical play activities for children, or the use of kiddie rides or games (including but not limited to electronic, computer-controlled and pin-ball games).  However, each of the other tenants in the Center may operate up to four (4) such games or rides and any business in operation on the date hereof will be excluded from the effect of this section.  The premises occupied by Costco, Lucky and Downey Savings and Loan are not owned by Landlord and shall not be subject to this section.  Further, this Section shall not apply to any lease for premises in the Center entered into prior to the date of this Lease (including any existing tenant's successors and assigns) or any new lease, or extension of a lease, entered into with an existing tenant. Tenant agrees to indemnify, defend and save Landlord and its employees and agents harmless from and against any and all claims, demands, costs and expenses, including attorneys' fees, arising out of the exclusive use provisions set forth herein or arising out of the enforcement of such restrictions.  Landlord represents and warrants to Tenant that prior to the date of this Lease, Landlord has not entered into a lease for premises in the Center which would violate this Section 31 if such lease were executed after this Lease.

32.   Visibility and Access.  Landlord shall not make any changes to the Center and shall not agree to any amendment or waiver of the CCR  which in either case would permanently, materially and adversely diminish the visibility, access or parking for the Premises.

33.   Hazardous Materials.

(a)   Tenant represents and warrants that it and its agents, servants, employees, contractors and anyone else acting on Tenant's behalf will not, either with or without negligence, store, dispose, produce, use, permit the escape or release of, transport or manufacture any biologically or chemically active, or toxic or hazardous waste or materials as defined or regulated by local, state or federal law on the Premises or any portion of the Center ("Hazardous Materials").  Without limitation, Hazardous Materials shall include those described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et. seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq.; any applicable state or local laws,



and the regulations adapted under these Acts. Tenant shall give Landlord prompt written notice of the existence of, and/or Tenant's discovery of, the presence of or contamination of the Premises or the Center with Hazardous Materials. In the event or any of its agents, servants, employees, contractors or anyone else acting on Tenant's behalf violates the foregoing provision by storing, disposing, producing, using, permitting the escape or release of, transporting or manufacturing any Hazardous Materials in, on or about the Premises of the Center, Tenant shall indemnify, defend and hold Landlord, its employees, agents, successors and assigns, harmless from and against any damage, claim, injury, cost or liability arising therefrom or related thereto, including all costs of clean up , attorneys' fees and court costs. The clean up and disposal of such Hazardous Materials shall be performed by Tenant at Tenant's sole cost and expense and shall be performed in accordance with all applicable laws, rules, regulations and ordinances. The foregoing notwithstanding, Landlord in Landlord's sole and absolute discretion may elect, by written notice to Tenant, to perform the clean up and disposal of such Hazardous Materials from the Premises and/or the Center. In such event, Tenant shall pay to Landlord the actual cost of same upon receipt from Landlord of Landlord's written invoice therefor. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of Hazardous Materials, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional charges if such requirement applies to the premises and results from any violation of this Section 33. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Premises. In all events, Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of Hazardous Materials on the Premises occurring while Tenant is in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The terms of the indemnifications set forth in this Section 33 shall survive the expiration or termination of this Lease.

(b) Landlord agrees to indemnify and hold harmless Tenant, its employees, agents, successors and assigns, from and against any and all damages, claims, liability or loss, including reasonable attorney's fees, arising out of or in anyway connected to Hazardous Materials which were on the Premises before the Delivery Date.

Notwithstanding any other term of provision of the Lease, Tenant shall permit Landlord or Landlord's agents or employees to enter the Premises at any time, to inspect, monitor and/or take emergency or long-term remedial action with respect to Hazardous Materials on or affecting the Premises. Landlord shall use reasonable efforts to give Tenant advance notice and to avoid or minimize interruption of Tenant's business.

34.  Compliance with Laws. Tenant covenants that, during the Term, no part of the Premises or improvements thereon shall be used in any manner whatsoever in violation of the laws, ordinances, regulations, or orders of the United States or of the State, county, city or other applicable governmental subdivisions where the Premises are located. Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises and any signs of the Tenant are concerned including, but not limited to, zoning ordinances, building codes and fire codes.

35.  Rules and Regulations. Tenant's use of the Premises and the Common Areas shall be subject at all times during the Term to those reasonable rules and regulations adopted by Landlord, not in conflict with any of the express provisions hereof, governing the use of the common areas, signs, exteriors of buildings, lighting and other matters affecting other tenants in and the general management and appearance of the Center. Tenant agrees to comply with all such rules and regulations.

36.  Accord and Satisfaction.    No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying the check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in the Lease or by law.

37.  Waiver.    No delay or omission in the exercise of any right or remedy accruing to either party upon any breach by the other party under this Lease shall impair such right or remedy or be construed as a waiver of any such breach theretofore or thereafter occurring. No waiver by either party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision. If any action by either party shall require the consent or approval of the other party, the other



party's consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.

38. <u>Cumulative Remedies</u>. Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach by the other party, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised by said party or not, shall be deemed to be in exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.

39. <u>Relationship of Parties</u>. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

40. <u>No Personal Liability of Landlord</u>. The obligations of Landlord under this Lease do not constitute obligations of the general or limited partners of the Landlord, and Tenant shall look solely to the Center that is the subject of this Lease and to no other assets of Landlord for satisfaction of any liability in respect of this Lease and will not seek recourse against the general or limited partners of the partnership, which is Landlord herein, nor against any of their personal assets, for such satisfaction.

41. <u>Miscellaneous</u>.

(a) [Intentionally Omitted].

(b) The captions used in this Lease are for convenience only and shall not be deemed to amplify, modify or limit the provisions hereof.

(c) Words of any gender used in this Lease shall be construed to include any other gender, and words in the singular shall include the plural and vice versa, unless the context otherwise requires.

(d) This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representative, successors and assigns.

(e) This Lease contains the entire agreement of the parties hereto with respect to the subject matter hereof and can be altered, amended or modified only by written instrument executed by all such parties.

(f) This Lease may be executed in multiple copies, each of which shall be deemed an original, and all of such copies shall together constitute one and the same instrument.

(g) Time is of the essence in the performance of each obligation, covenant and condition under this Lease.

(h) If any provision of this Lease is determined to be in violation of the laws of any applicable jurisdiction or is determined to be unenforceable by law, such provision shall be deemed null and void but this Lease shall remain in full force and effect in all other respects.

(i) It is understood that there are no oral agreements or representations between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements or representations and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. There are no other representations, or warranties between the parities and all reliance with respect to representations is solely upon the representations and agreements contained in this document.



(j)    In the event Tenant hereunder shall be a corporation, Tenant does hereby covenant and warrant that Tenant is a duly qualified corporation and all steps have been taken prior to the date hereof to qualify Tenant to do business in the state wherein the Center is situated and all franchise and corporate taxes have been paid to date; and all future forms, reports, fees and other documents necessary to comply with applicable law will be filed when due.  Tenant represents and warrants that each individual executing this Lease is duly authorized to execute and deliver this Lease on behalf of said corporation in accordance with the bylaws of said corporation, and that this Lease is binding upon said corporation in accordance with its terms.

(l)    The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises; and this document shall become effective and binding only upon execution and delivery hereof by Tenant and by Landlord (or, when duly authorized, by Landlord's agent or employee).  No act or omission of any agent of Landlord or of Landlord's broker shall alter, change or modify any of the provisions hereof.

42.   Choice of Law.  This Lease shall be governed by the laws of the State in which the Premises are located.

43.   No Discrimination.  Tenant herein covenants by and for itself, its successors and assigns, and all persons claiming under or through them, and this Lease is made and accepted upon and subject to the following conditions:  That there shall be no discrimination against or segregation of any person or group of persons, on account of sex, sexual preference, marital status, race, color, creed, religion, national origin, or ancestry, in the leasing, subleasing, renting, transferring, use, occupancy, tenure or enjoyment of the Premises herein leased, nor shall Tenant itself, or any person claiming under or through it, establish or permit such practice or practices of discrimination or segregation with reference to the selection, location, number, use of occupancy of tenants, lessees, sublessees, or vendees in the Premises herein leased.

44.   Disclaimer of Authority.  Interstar Management, Inc. and The Anz Company have acted as the real estate broker for Landlord in negotiating this Lease.  By signing this Lease, Tenant acknowledges and agrees that no promise, representations or assurances made by such broker that is not expressly set forth in this Lease will be binding upon or enforceable against Landlord.

45.   Landlord's Contribution.  Provided that Tenant is not in default of this Lease, Landlord shall reimburse Tenant the amount of Five Hundred Thousand Dollars ($500,000.00) ("Landlord's Contribution') incurred by Tenant in performing Tenant's Work. Landlord's Contribution shall be payable on a customary construction draw basis in one (1) or two (2) draws, at the option of Tenant, as set forth in this Section 45.  At any time after the commencement of Tenant's Work, Tenant may request payment of up to one-half (1/2) of the Landlord's Contribution, provided that such request is accompanied by copies of invoices indicating payments by Tenant equal to or exceeding the amount requested, partial releases of liens executed by the applicable contractors, subcontractors, and suppliers, and a certificate by Tenant that the work performed and materials supplied for which payment is requested has been completed in accordance with the amount requested.  Provided that Tenant is not in default of this Lease, Landlord shall pay to Tenant the amount requested within thirty (30) days after Landlord's receipt of such request.  At any time after completion of Tenant's Work, Tenant may request payment of Landlord's Contribution, minus the amount paid pursuant to any prior requests, provided that such request is accompanied by copies of invoices indicating payments by Tenant equal to or exceeding the amount requested, complete unconditional releases of liens executed by all applicable contractors, subcontractors and suppliers (or the expiration of the applicable statutory period for filing such liens), and a certificate of Tenant that the Tenant's Work has been completed and a Certificate of Occupancy.  Provided that Tenant is not in default of this Lease, Landlord shall pay to Tenant the amount requested within thirty (30) days after Tenant has opened for business in the Premises and Landlord receives such request (which Tenant shall submit within 120 days after opening).  If any amount payable by Landlord to Tenant under this Section 45 is not paid when due, Tenant may deduct such amount, together with interest at the rate of ten percent (10%) per annum, (or the maximum rate permitted by applicable law, if less), from rent and other charges otherwise payable thereafter by Tenant to Landlord under this Lease.



46.   Assignment by Landlord.  Notwithstanding anything contained herein to the contrary, Landlord may assign, in whole or in part, Landlord's interest in this Lease, and may sell all or part of the Center.  In the event of any sale or exchange of the Premises by Landlord and/or an assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises or to this Lease occurring after the consummation of such sale or exchange and or assignment.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the day and year first written.

Landlord:                                Tenant:

BHI-DOVER XVII; a California             SHOWBIZ PIZZA TIME, INC.
   Limited Partnership

By:   Interstar Management, Inc.,
      Authorized Agent

By: _____          By: _____
                                   Richard M. Frank
Its: _DIRECTOR_ of _LEASING_       Chairman and
                                   Chief Executive Officer



STATE OF TEXAS        }
                      } §
COUNTY OF DALLAS      }

On this 21st day of _December_, 1992, before me, a Notary Public in and for the county and state aforesaid, came Richard M. Frank, Chairman and Chief Executive Officer of ShowBiz Pizza Time, Inc., and such person acknowledged the execution of the foregoing instrument as the act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal, the day and year above written.

_Kathy S. Shields_
Notary

My appointment expires: 6/23/94

(seal) KATHY S. SHIELDS
Notary Public, State of Texas
My Commission Expires 06-23-1994


STATE OF CALIFORNIA }
                    } §
COUNTY OF ORANGE    }

On this 28th day of _December_, 1992, before me, a Notary Public in and for the county and state aforesaid, came _ED WOODLAND_     _DIRECTOR_ of _LEASING_, and such person duly acknowledged the execution of the foregoing instrument as the act and deed of said _CORPORATION_.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal, the day and year above written.

_Joan Sladek_
Notary

My appointment expires: 3/20/95

(seal)

OFFICIAL SEAL
JOAN SLADEK
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Exp. Mar. 20, 1995



| BUILDING DATA | | |
|---|---|---|
| M1 | 56,266 | |
| M2 | 106,854 | |
| M3 | 24,556 | |
| M4 | 27,000 | |
| subtotal | | 214,677 s.f. |
| S1 | 12,479 | |
| S2 | 11,171 | |
| S4 | 17,390 | |
| S5 | 4,375 | |
| S6 | 11,890 | |
| subtotal | | 57,305 s.f. |
| P1 | 7,000 | |
| P2 | 6,068 | |
| P3 | 6,000 | |
| P4 | 7,275 | |
| R1 | 10,300 | |
| R2 | 6,500 | |
| R3 | 2,596 | |
| R4 | 6,675 | |
| subtotal | | 56,414 s.f. |
| TOTAL BUILDING AREA | | 328,396 s.f. |



INITIAL

EXHIBIT "A"

SAN BRUNO
TOWNE CENTER

A1