SUBLEASE


BETWEEN


OPPIDAN INVESTMENT COMPANY,
a Minnesota corporation


AND


CEC ENTERTAINMENT, INC.,
a Kansas corporation


Green Ridge Square
Grand Rapids, Michigan


<div style="border:2px solid black; display:inline-block; padding:10px;">

EXHIBIT

1

</div>

1

Table of Contents

1.  RECITALS .................................................................................................................. 4
2.  PERMITTED USE ....................................................................................................... 4
3.  OPERATIONS OF PREMISES .................................................................................. 5
4.  TERM .......................................................................................................................... 5
5.  RENT .......................................................................................................................... 6
6.  INCORPORATION BY REFERENCE ....................................................................... 6
7.  ASSUMPTION OF OBLIGATIONS .......................................................................... 6
8.  MAINTENANCE AND REPAIR OF THE DEMISED PREMISES ........................... 7
9.  SUBLANDLORD OBLIGATIONS ............................................................................ 7
10. ALTERATIONS .......................................................................................................... 8
11. COMMON AREAS ..................................................................................................... 8
12. ASSIGNMENT; SUBLETTING ................................................................................. 8
13. SUBTENANT'S PERFORMANCE UNDER MASTER LEASE ................................ 9
14. DEFAULT ................................................................................................................... 9
15. SUBLANDLORD DEFAULTS ................................................................................. 11
16. COVENANT OF QUIET ENJOYMENT ................................................................. 12
17. SUBORDINATION ................................................................................................... 12
18. MASTER LEASE ...................................................................................................... 13
19. SUBLANDLORD'S INDEMNITY ........................................................................... 13
20. WAIVER OF SUBROGATION ................................................................................ 14
21. DAMAGE AND DESTRUCTION ............................................................................ 14
22. CONDEMNATION ................................................................................................... 15
23. NOTICES .................................................................................................................. 15
24. REPRESENTAITONS OF SUBLANDLORD .......................................................... 16
25. RADIUS RESTRICTION. ......................................................................................... 17
26. WAIVER OF SUBLANDLORD'S LIEN .................................................................. 17
27. MORTGAGE BY TENANT ..................................................................................... 18
28. SIGNS ....................................................................................................................... 18
29. ESTOPPEL CERTIFICATES ................................................................................... 19
30. CHANGES TO SUBLEASE ..................................................................................... 19
31. DEFINED-TERMS ................................................................................................... 19
32. COUNTERPARTS .................................................................................................... 19
33. HEADINGS ............................................................................................................... 19

34. NO WAIVER ......................................................................................................................... 19

35. EXPENSES OF ENFORCEMENT ......................................................................................... 20

36. REAL ESTATE COMMISSIONS .......................................................................................... 20

37. RELATIONSHIP OF PARTIES ............................................................................................. 20

38. MERCHANT'S ASSOCIATION; PROMOTIONAL ACTIVITIES ................................... 20

39. PURCHASE OF BUILDING .................................................................................................. 20

## **Exhibits**

| Exhibit A | Master Lease |
| Exhibit B | Demised Premises (Cross-Hatched) |
| Exhibit C | Toys R Us Letter |
| Exhibit D | Consent to Sublease |
| Exhibit E | Release of Lien |
| Exhibit F | Third Amendment to OEA |
| Exhibit G | Termination Agreement |

<u>SUBLEASE</u>

This Sublease is made on this 29th day of July, 2002 (the "Effective Date"), between **OPPIDAN INVESTMENT COMPANY,** a Minnesota corporation ("Sublandlord"), whose address is 5125 County Road 101, Minnetonka, Minnesota 55345, and **CEC ENTERTAINMENT, INC.,** a Kansas corporation ("Subtenant"), whose address is 4441 W. Airport Freeway, Irving, Texas 75062, who agree as follows:

1.    <u>RECITALS</u>

This Sublease is made with reference to the following facts and objectives:

A.    **TOYS "R" US-DELAWARE, INC.,** a Delaware corporation, whose address is 461 From Road, Paramus, New Jersey 07652, Attn: Senior Vice President/Real Estate ("Master Landlord") and Sublandlord, as Tenant, entered into a written Lease dated March 19, 1999 ("Master Lease"), covering a portion of Master Landlord's property (the "Demised Premises") for the construction of a building (the "Building") consisting of approximately 19,000 square feet, which Demised Premises is located on Alpine Road in the City of Walker, County of Kent, State of Michigan, within a shopping center commonly known as Green Ridge Square (the "Shopping Center"), all as more particularly set forth in the Master Lease. The Master Lease is attached hereto, incorporated herein and made a part hereof as <u>Exhibit "A"</u>. The Demised Premises is shown by cross-hatching on the Site Plan attached hereto as <u>Exhibit B"</u>.

B.    Subtenant desires to sublet the Demised Premises and purchase the Sublandlord's interest in the Building from Sublandlord and Sublandlord desires to sublet the Demised Premises and sell the Sublandlord's interest in the Building to Subtenant pursuant to the terms and provisions contained in this Sublease.

2.    <u>PERMITTED USE</u>

(a)    Sublandlord hereby subleases to Subtenant and Subtenant hereby subleases from Sublandlord the Demised Premises solely for a children's themed restaurant and entertainment center which may include the sale and serving of beer and wine (in an amount not to exceed five percent (5%) of the gross sales of Subtenant generated at the Demised Premises), the operation of mechanical and electrical rides, games and other amusement devices and a merchandise center and for such other uses as are incidental to the operation thereof and for any other lawful purpose (hereinafter referred to as the "Permitted Use"); provided, however, Subtenant shall not use the Demised Premises for any use in violation of the Master Lease or the OEA (as defined in the Master Lease) or without the prior written consent of Master Landlord as provided in the Master Lease. Subtenant may be open for business at all hours permitted by law in the jurisdiction where the Demised Premises are located, and the Shopping Center shall be open and operating for ingress and egress and parking during all of Subtenant's business hours.

(b)    Sublandlord hereby assigns to Subtenant all rights and benefits under the Master Lease, including without limitation, all of the Sublandlord's rights and remedies under the Master Lease against Master Landlord and the non-exclusive right to use, appurtenant to and for the benefit of the Demised Premises, the Common Areas (as defined in the Master Lease) of the Shopping Center, for all purposes for which such Common Areas are intended, for and during the term of this Sublease.

(c)     Subtenant and Sublandlord hereby agree to comply with the terms and provisions of that certain letter dated April 30, 2002 from Master Landlord to Sublandlord consenting to this Sublease, which is countersigned by Sublandlord on July 23, 2002 and attached hereto as Exhibit "C" and made a part hereof for all purposes.

3.     OPERATIONS OF PREMISES

(a)     Notwithstanding anything contained in this Sublease and the Master Lease to the contrary, and subject to the provisions of Section 3(b) below, no term or provision of this Sublease shall be construed as creating any obligation for Subtenant to open or operate its business in the Demised Premises. Subtenant shall have the right to remove Subtenant's property and cease operations in the Demised Premises at any time and from time to time and at Subtenant's sole discretion, subject to the provisions of Section 3(b) below. However, the right to cease to operate its business shall not affect Subtenant's obligation to pay any amounts due hereunder and to perform all covenants and obligations hereunder. Furthermore, and except as otherwise specifically set forth herein to the contrary, in no event shall Subtenant be liable to Sublandlord for damages as a result of operating other stores in the area surrounding the Demised Premises or any other area, nor shall Subtenant be limited or restricted in any way from opening or operating other stores in the area surrounding the Demised Premises or any other area.

(b)     In the event Subtenant either discontinues operations from the Demised Premises for a period of eighteen (18) consecutive months or consistently fails to remain open to the general public at least six (6) hours per day on each day (excluding Sundays) that the Shopping Center is open for business and Master Landlord exercises its option to terminate the Master Lease as set forth in Section 5.05 of the Master Lease, Sublandlord shall cooperate with Subtenant in delivering to Master Landlord a statement of Subtenant's "Unamortized Costs" (as defined in the Master Lease) and shall immediately upon receipt from Master Landlord remit to Subtenant Subtenant's "Unamortized Costs" and/or "Tenant's Unamortized Costs" (as defined in the Master Lease) if and when received from Master Landlord. If Master Landlord shall elect to terminate the Master Lease in accordance with Section 5.05 of the Master Lease, then this Sublease shall terminate on the Termination Date (as defined in the Master Lease) and Subtenant, on the Termination Date, shall surrender the Demised Premises to Sublandlord and pay to Sublandlord all rents and other sums owing under this Sublease up through the Termination Date.

4.     TERM

(a)     The term of this Sublease shall commence on the date (the "Commencement Date") on which the Closing (hereinafter defined) shall occur but Subtenant's obligations for Fixed Rent, Additional Rent and other charges shall not commence until the earlier of the date Subtenant opens the Demised Premises for business with the public or ninety (90) days after the Commencement Date (the "Rent Commencement Date"), and shall end one (1) minute before the expiration of the term of the Master Lease on June 8, 2020 or any applicable extension thereof if Subtenant elects to exercise its right to extend the term of this Sublease for one or more of the Renewal Terms. Notwithstanding the fact that the Rent Commencement Date may not have occurred, Subtenant shall have full access to the Demised Premises and shall be entitled to exercise all rights granted Subtenant under this Sublease, including, without limitation, the right to commence any demolition or construction activities. From and after the Commencement Date of this Sublease, Subtenant shall provide all insurance and perform all other obligations under this Sublease other than the payment of Fixed Rent (hereinafter defined) and Additional Rent (hereinafter defined), which shall be due and payable on and after the Rent Commencement Date.

(b)     Sublandlord hereby grants to Subtenant the right and the option to extend the term of this Sublease for four (4) five (5) year periods (the "Renewal Terms"). All of the terms,

provisions and covenants of this Sublease shall remain in full force and effect during the Renewal Terms except that Fixed Rent shall be adjusted as set forth in Section 5 below. Subtenant may exercise each such option to renew by delivering to Master Landlord and Sublandlord written notice thereof no later than twelve (12) months prior to the expiration of the term of this Sublease or the then current Renewal Term.

5.   RENT

(a)   Subtenant shall pay to Sublandlord at the address first provided for, without deduction, setoff, prior notice, or demand, Fixed Rent (as defined in the Master Lease) in the amounts and for the rental periods specified in Section 3.02 of the Master Lease. Monthly payments of Fixed Rent shall be due and payable on the first day of each and every calendar month during the term of this Sublease commencing with a first payment due on the Rent Commencement Date. Sublandlord reserves the right to require Subtenant to pay Fixed Rent directly to Master Landlord upon written notice by Sublandlord to Subtenant of such requirement.

(b)   In addition to the Fixed Rent payable by Subtenant as provided in Subsection 5(a) above, Subtenant shall pay its proportionate share of Real Estate Taxes and Tenant's Common Area Expense Contribution and Insurance, as those terms are defined in the Master Lease (collectively, "Additional Rent"), directly to Sublandlord; provided however, in no event shall such amounts exceed $2.00 per square foot of the Demised Premises in the first three (3) Sublease years nor shall Tenant's Common Area Expense Contribution, excluding snow removal, increase by more than three percent (3%) per year thereafter. In no event shall Tenant's Common Area Expense Contribution include any management fee(s) or administration fee(s) in excess of five percent (5%) of Fixed Rent. Sublandlord reserves the right to require Subtenant to pay all Additional Rent directly to Master Landlord upon written notice by Sublandlord to Subtenant of such requirement. The amount of Additional Rent due as of the Rent Commencement Date of this Sublease is $32,000.00 per year, which amount is payable in twelve (12) equal monthly installments to Sublandlord. In the event that the actual amount paid by Subtenant for Additional Rent exceeds the actual amount due for such year, such excess (a) shall be credited against the next monthly installment or installments of Additional Rent due from Subtenant, (b) shall be refunded to Subtenant if such excess relates to the calendar year in which this Sublease expires, or (c) if Subtenant is paying Additional Rent directly to the Master Landlord pursuant to the terms of this Sublease, shall be credited or refunded in accordance with the terms of the Master Lease.

6.   INCORPORATION BY REFERENCE

All terms and conditions of the Master Lease, except as expressly limited in this Sublease, are incorporated into this Sublease as if fully set forth herein. Except as expressly set forth herein, in the event of any conflict between the terms and provisions of the Master Lease and the terms and provisions of this Sublease, the terms and provisions of the Master Lease shall govern and control.

7.   ASSUMPTION OF OBLIGATIONS

(a)   Except for the payment of Fixed Rent and Additional Rent to Master Landlord by Sublandlord (unless Subtenant pays such amounts directly to Master Landlord pursuant to the terms of this Sublease and Master Landlord accepts such payment from Subtenant) and other Sublandlord's obligations specifically set forth under the terms of this Sublease, which obligations shall remain the responsibility of Sublandlord, Subtenant shall assume, perform and be responsible for Sublandlord's obligations as Tenant under the Master Lease, including, but not limited to, the performance of all OEA obligations of Tenant under the Master Lease. Subtenant agrees to indemnify and hold Sublandlord harmless from any and all claims of any kind made by Master Landlord against Sublandlord under the

Master Lease or by any other person or party with respect to any obligation pursuant to the Master Lease (other than the payment of Fixed Rent and Additional Rent) assumed hereunder by Subtenant arising after the Commencement Date of this Sublease and with respect to the payment of Fixed Rent and Additional Rent, arising after the Rent Commencement Date unless Sublandlord fails to pay Fixed Rent and Additional Rent to Master Landlord after receipt thereof from Subtenant. In the event Subtenant fails to keep and perform each and every obligation of the Sublandlord under the Master Lease assumed by Subtenant above, then Sublandlord shall have the right, but not the obligation, in addition to any other remedies that it may have at law or in equity, if the failure of Subtenant continues following twenty (20) days written notice from Sublandlord to Subtenant of such failure (unless a shorter period is required under the Master Lease to prevent a default thereunder), to perform such obligations and all sums so expended to perform such obligations shall be due and payable by Subtenant to Sublandlord on demand as Additional Rent.

(b)     Commencing on the date Subtenant first enters the Demised Premises, Subtenant shall at Subtenant's full cost and expense procure the insurance set forth in Article XI of the Master Lease. Subtenant acknowledges that its insurance is primary and that in addition to those parties listed in the Master Lease, Sublandlord shall be named as additional insureds under such liability policies required to be carried by Subtenant.

## 8.     MAINTENANCE AND REPAIR OF THE DEMISED PREMISES

Subtenant shall comply with the terms and provisions of Article VII of the Master Lease. Sublandlord shall not have the right to require any repairs or maintenance to the Building be performed by Subtenant during the term of this Sublease.

## 9.     SUBLANDLORD OBLIGATIONS

Except as expressly provided herein, Sublandlord does not assume the obligations of the Master Landlord under the provisions of the Master Lease, but shall exercise reasonable efforts in attempting to cause Master Landlord to perform its obligations under the Master Lease for the benefit of Subtenant, provided however, that:

(a)     Whenever notice is received by Sublandlord from Master Landlord regarding the obligations of Subtenant under this Sublease, or the obligations of Subtenant to perform under the Master Lease, Sublandlord shall promptly provide a copy of such notice to Subtenant;

(b)     Sublandlord shall not cause a default to occur under or pursuant to the terms and provisions of the Master Lease, the OEA or the Supplemental Agreement (as defined in the Master Lease).

(c)     Sublandlord shall not modify, amend, cancel or terminate the Master Lease without the prior written consent of Subtenant, which may be withheld in Subtenant's sole discretion;

(d)     Sublandlord shall not waive any provision of the Master Lease or requirement for Master Landlord's performance thereof unless Subtenant agrees in writing, which consent may be withheld in Subtenant's sole discretion;

(e)     If requested in writing by Subtenant, and to the extent Sublandlord is permitted by the Master Lease to so act, Sublandlord shall enforce the terms and provisions of the Master Lease against Master Landlord, including without limitation, compliance with the OEA and the Supplemental

Agreement and Master Landlord's maintenance obligations with respect to the Common Areas in accordance with the terms and provisions of the Master Lease; and

(f)     Sublandlord will not consent to any changes in the "No Change Area" of the Common Areas without the prior written consent of Subtenant.

10.     ALTERATIONS

Subtenant shall comply with the terms and provisions of Article X of the Master Lease. If specifically allowed under the Master Lease, then any alterations made by Subtenant to the Demised Premises and the Building shall belong to Subtenant. Sublandlord shall have no right to approve or disapprove any alterations made by Subtenant to the Demised Premises and the Building during the term of this Sublease.

11.     COMMON AREAS.

The continued existence of the Common Areas for the term of this Sublease are a material consideration for Subtenant entering into this Sublease. Sublandlord hereby agrees that Sublandlord will not approve any change, alteration or addition to the Common Areas or the Site Plan, including, but not limited to, the configuration of the Common Areas, methods of ingress and egress, direction of traffic, lighting, curbing, building heights and stories, the landscaping (which would affect to the Demised Premises), construction of additional buildings and the number of parking spaces and configuration, without the prior written consent of Subtenant, which may be withheld by Subtenant in Subtenant's sole and exclusive discretion. Should any change in the location and arrangement of the Common Areas adversely affect and/or interfere with Subtenant's business operations, Subtenant, in addition to any remedy it may have at law or in equity, shall have the right to terminate this Sublease, or, at its option, shall receive an abatement of rent and any other payment obligations due under this Sublease for the period of the adverse effect or interference.

12.     ASSIGNMENT; SUBLETTING

Subject to the approval of the Master Landlord pursuant to the terms of the Master Lease, Subtenant shall have the right to assign or encumber its interest in this Sublease or in the Demised Premises, or further sublease all or any part of the Demised Premises, or allow any other person or entity to occupy or use all or any part of the Demised Premises. Specifically, and in no way limiting the foregoing, Subtenant may to the extent allowed pursuant to the Master Lease:

(i)     Sublease or license departments or grant concessions in the Demised Premises;

(ii)     assign or sublet to a related corporation or a successor corporation;

(iii)     assign or sublet to an entity spun-out or separated from or formed by Subtenant (or any successor corporation or related corporation of Subtenant) by a distribution to shareholders, sale of assets or stock, reorganization or otherwise; and

(iv)     assign or sublet to any responsible or reputable entity (in Subtenant's reasonable judgment) not otherwise described in the preceding subsections.

In the event of any such assignment or subletting, Subtenant shall remain liable under this Sublease, unless Sublandlord expressly releases Subtenant in writing.

13.    SUBTENANT'S PERFORMANCE UNDER MASTER LEASE

At any time, with at least ten (10) days prior written notice to the other, either Subtenant or Sublandlord may elect to require Subtenant to perform any obligations of Sublandlord under the Master Lease that have been assumed or are to be performed by Subtenant herein directly to Master Landlord, including without limitation, the payment of Fixed Rent and Additional Rent, and Subtenant shall do so upon such election, in which event Subtenant shall send to Sublandlord from time to time copies of all notices and other communications it shall send to and receive directly from Master Landlord.

14.    DEFAULT

(a)    The occurrence of any one or more of the following events set forth in this Section shall constitute a default and breach of this Sublease by Subtenant:

(i)    Failure to Pay Rent or other Amounts Due. The failure by Subtenant to make any payment of Fixed Rent, Additional Rent or any other payment required to be made under the terms of this Sublease by Subtenant, within seven (7) days after receipt of notice that same has not been received by Sublandlord on the date it was payable under this Lease;

(ii)    Failure to Perform and Other Breach. The failure by Subtenant to observe, perform or comply with any terms, covenants, conditions or provisions of this Sublease (other than described in Paragraph 14(a)(i) above) where such failure shall continue for a period of twenty (20) days after written notice from Sublandlord to Subtenant; provided, that in the event such cure reasonably requires more than twenty (20) days to complete, then Subtenant shall not be in default if Subtenant shall, within said twenty (20) days, promptly commence the cure of such default and diligently pursue such cure to completion and does cure the same within the time as may be necessary to cure the same.

(iii)    Insolvency. The making by Subtenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Subtenant of a petition to have Subtenant adjudged bankrupt, or a petition of reorganization or arrangement under any law relating to bankruptcy (unless in the case of a petition filed against Subtenant, the same is dismissed within thirty (30) days of filing); or the appointment of a trustee or a receiver to take possession of substantially all of Subtenant's assets located at the Demised Premises or of Subtenant's interest in this Sublease, where such seizure is not discharged in thirty (30) days after appointment of said trustee or receiver, or the filing for the appointment of the same, whichever shall occur first.

(iv)    Breach Under Master Lease. Any act or omission by Subtenant of an obligation assumed by Subtenant hereunder which would constitute a breach or violation by Sublandlord under the Master Lease and the same is not cured within the cure periods set forth under the Master Lease less three (3) days.

(b)    If Subtenant is in default pursuant to Paragraph 14(a) hereof, after the expiration of all applicable notice and cure periods, Sublandlord shall be entitled to take any action it deems necessary or advisable under one or more of the following provisions of this Paragraph 14(b):

(i)      Sublandlord may give a written termination notice to Subtenant specifying a date on which this Sublease shall terminate, and, on such date, this Sublease shall terminate and all rights, duties and obligations of Subtenant under this Sublease (including without limitation the payment of all amounts hereunder) shall cease. Sublandlord may terminate this Sublease by such notice of termination of Sublease at any time after Subtenant's default and after the expiration of all applicable notice and cure periods whether or not Sublandlord has taken action under one or more of the provisions of this Section.

(ii)     Sublandlord may, at Sublandlord's option, whether or not Sublandlord terminates this Sublease pursuant to this Section, enter into and repossess the Demised Premises or any part thereof by legal process, summary proceedings, ejectment or otherwise, remove Subtenant's signs and other evidences of tenancy, and take and hold possession thereof. If Sublandlord does not terminate this Sublease pursuant to this Section, entry and repossession by Sublandlord shall not terminate this Sublease or release Subtenant, in whole or in part, from any obligations under this Sublease, including Subtenant's obligation to pay Fixed Rent, Additional Rent and all other sums payable by Subtenant hereunder.

(iii)    Sublandlord may, but is not required to, whether or not Sublandlord terminates this Sublease pursuant to this Section, relet the Demised Premises or any part thereof for the account of Subtenant, in the name of Subtenant or Sublandlord or otherwise, without notice to Subtenant, for such rent and such term (which may be greater or less than the period that would otherwise have constituted the balance of the term of the Sublease) and on such conditions (which may include rent concessions or free rent) and for such uses as Sublandlord, in its reasonable discretion, may determine, and may collect and receive the rents therefor. Sublandlord shall not be required to accept any subtenant offered by Subtenant except in accordance with Section 12 hereof or to observe any instructions given by Subtenant about such reletting. In any such case, Sublandlord may make repairs, alterations and additions in or to the Demised Premises, and redecorate the same to the extent Sublandlord deems necessary or desirable, in its sole discretion. If Sublandlord does not terminate this Sublease pursuant to this Section, reletting of the Demised Premises by Sublandlord shall not terminate this Sublease or release Subtenant, in whole or in part, from any obligations under this Sublease, including Subtenant's obligation to pay Fixed Rent, Additional Rent and all other sums payable by Subtenant hereunder. However, in the event the Sublease is not terminated, any sums collected shall be applied first, to the payment of any indebtedness other than rent due hereunder from Subtenant to Sublandlord; second, to the payment of such expenses as Sublandlord may have incurred in connection with reentering, ejecting, removing, dispossessing, reletting (but not repairing, altering, redecorating or adding to) the Demised Premises, including brokerage and reasonable attorneys' fees; and the balance, if any, Sublandlord shall apply to the fulfillment of the terms, covenants and conditions of this Sublease to be performed by Subtenant hereunder and Subtenant hereby waives all claims to the surplus, if any and Subtenant shall be and hereby agrees to be liable for and to pay Sublandlord at Sublandlord's election any deficiency between the rent, additional rents and other charges reserved herein and the net rentals, as aforesaid, of reletting, if any, for each month of the period which otherwise would have constituted the balance of the Sublease term. Subtenant hereby agrees to pay such deficiency in monthly installments on the rent day specified in this Sublease, and any suit or preceding brought to collect the deficiency for any month, either during the Sublease term or after any termination thereof, shall not prejudice or preclude in any way the rights

of Sublandlord to collect the deficiency for any subsequent month by a similar suit or proceeding. Sublandlord shall use its best efforts to mitigate damages.

(iv)    If Sublandlord maintains the Sublease in effect without termination, Subtenant will pay to Sublandlord: (1) the Fixed Rent, Additional Rent and other charges that would be payable under this Sublease by Subtenant until the end of the term of the Sublease in the absence of such default; plus (2) all reasonable costs directly or indirectly incurred by Sublandlord relating to Subtenant's default and Sublandlord's repossession and reletting of the Demised Premises, including, without limitation, brokerage commissions, reasonable attorneys' fees and costs, collection costs, interest at the Default Rate of Interest, less (3) the rent, if any, of such reletting. Subtenant will pay such current damages monthly on the days on which Fixed Rent is payable under this Sublease, and Sublandlord shall be entitled to recover the same from Subtenant on each such day.

(c)    To the extent Subtenant shall be obligated to pay interest at the Interest Rate (as defined in the Master Lease) and pay any late charge imposed under the Master Lease, Subtenant shall pay any such Interest Rate and any such late charge on all amounts due Sublandlord under this Sublease from the date such amount was due until the date of payment. Provided Subtenant makes timely payments required hereunder, in no event shall Subtenant be obligated to pay interest or late charges as a result of Sublandlord's failure to make timely payments under the Master Lease.

(d)    The termination of this Sublease pursuant to Subparagraph 14(b) hereof, whether by operation of law or otherwise, and the repossession of the Demised Premises or any part thereof, and the reletting of the Demised Premises, shall not relieve Subtenant of its obligations to pay Fixed Rent, Additional Rent or other charges required to be paid under this Sublease, or from any obligations or liabilities, that accrued prior to such termination, all of which shall survive such termination, repossession or reletting.

15.    SUBLANDLORD DEFAULTS.

(a)    The occurrence of any one or more of the following events set forth in this Paragraph shall constitute a default and breach of this Sublease by Subtenant:

(i)    Failure to Pay. The failure by Sublandlord to pay any sum payable to Subtenant under this Sublease as and when the same shall become due and payable and shall not cure such default within seven (7) days after written notice thereof is given by Subtenant to Sublandlord; or

(ii)    Failure to Perform and Other Breach. The failure by Sublandlord to observe, perform or comply with (y) any term, provision or covenant of this Sublease, other than the payment of a monetary amount to Subtenant, or (z) any term, provision or covenant of the Master Lease, the Supplemental Agreement or the OEA, which failure to perform was not caused by Subtenant's actions or inaction and which Sublandlord is required to perform pursuant to this Sublease, and shall not cure such failure within twenty (20) days after written notice thereof is given by Subtenant to Sublandlord; provided that if such default cannot reasonably be cured within twenty (20) days, then Sublandlord shall have an additional reasonable period of time within which to cure such default as long as Sublandlord promptly commences the cure within such twenty (20) day period and diligently pursues such cure; or

(iii)     Default under Other Documents.  Sublandlord shall cause a default under the Master Lease, the Supplemental Agreement or the OEA.

(b)     If Sublandlord is in default pursuant to Paragraph 15(a) hereof, after the expiration of all applicable notice and cure periods, Subtenant shall have the right to pursue any one or more of the following remedies without any further notice or demand whatsoever;

(i)     Remedy any default of Sublandlord under this Sublease, the Master Lease, the Supplemental Agreement or the OEA and in connection with such remedy, Subtenant may pay all expenses and employ counsel, and all reasonable sums so expended or obligations actually incurred by Subtenant in connection therewith shall, at Subtenant's option, be offset by Subtenant against rents and other monetary amounts thereafter coming due by Subtenant under this Sublease or be reimbursed to Subtenant by Sublandlord within fifteen (15) days after Subtenant's written demand therefor;

(ii)     Enforce Subtenant's rights and remedies by suit, action at law or in equity or other appropriate proceeding, whether one or more, sue for damages, and/or bring an action for enforcement or specific performance of any covenant, promise, agreement or condition contained in this Sublease; or

(iii)     Terminate this Sublease by giving written notice thereof to Sublandlord, in which event all obligations of Subtenant to Sublandlord under this Sublease shall immediately terminate.

16.     COVENANT OF QUIET ENJOYMENT

Sublandlord covenants and agrees that, if Subtenant is not in default of any term and condition of this Sublease, after the expiration of all applicable notice and cure periods, Subtenant shall have and enjoy throughout the term of this Sublease the quiet and undisturbed possession of the Demised Premises.

17.     SUBORDINATION

(a)     At all times this Sublease and Subtenant's interest herein shall be subject and subordinate to the Master Lease and the OEA (as defined in the Master Lease), (such Master Lease and OEA being hereinafter referred to as an "Encumbrance").  Any Encumbrance shall be prior and paramount to this Sublease and to the rights of Subtenant hereunder and all persons claiming through or under Subtenant, or otherwise, in the Demised Premises.  Subtenant agrees that, upon the request of any person succeeding to the interest of Sublandlord or Master Landlord as a result of the enforcement of any Encumbrance, whether upon foreclosure sale or otherwise (the successor-in-interest being hereinafter referred to as the "Purchaser"), Subtenant shall automatically become the Subtenant of the Purchaser, without changing the terms or other provisions of this Sublease; provided, however, that the Purchaser shall not (a) be liable to Subtenant for any previous act or omission of the prior Sublandlord or Master Landlord under this Sublease, (b) be subject to any offset which shall theretofore have accrued to Subtenant against the prior Sublandlord or Master Landlord, (c) have any obligation with respect to any security deposited under this Sublease unless such security shall have been physically delivered to the holder of the foreclosed encumbrance, or its successor-in-interest, or (d) be bound by any previous payment of rent for a period greater than one (1) month; unless such prepayment shall have been expressly approved in writing by the holder of the foreclosed Encumbrance or its successor-in-interest. Notwithstanding the foregoing, upon the request of the holder of any Encumbrance, this Sublease shall be prior and superior to the lien of any specified Encumbrance.

(b) Sublandlord shall obtain a Subordination, Non-Disturbance and Attornment Agreement (an "SNDA") in form and substance reasonably acceptable to Subtenant from the holder(s) (each a "Mortgagee") of each existing lessor under any ground lease covering the Premises (each a "Ground Lessor"), if any, and deliver same to Subtenant within thirty (30) days after the Commencement Date, and from any future mortgage, deed of trust or other similar type of encumbrance against the Premises and the (each a "Mortgagee") and/or Ground Lessor within thirty (30) days after the grant of the mortgage to such Mortgagee or the ground lease with such Ground Lessor. The SNDA shall be in form and substance satisfactory to Subtenant, recorded in the Real Property Records of Kent County, Michigan and provide for the following: (i) such Mortgagee and/or Ground Lessor shall be bound by the terms of this Sublease; (ii) such Mortgagee and/or Ground Lessor shall not disturb Subtenant's use or possession of the Demised Premises pursuant to this Sublease in the event of a foreclosure of such lien or encumbrance so long as Subtenant is not in default in the performance of any terms and conditions on Subtenant's part to be kept and performed under this Sublease, after the expiration of all applicable notice and cure periods; (iii) such Mortgagee and/or Ground Lessor shall not join Subtenant as a party defendant in any such foreclosure proceeding taken by it; and (iv) such Mortgagee and/or Ground Lessor shall permit application of all insurance and condemnation proceeds to the restoration and repair of the Demised Premises pursuant to the provisions of this Sublease. The delivery of a fully executed SNDA from each Mortgagee and/or Ground Lessor shall be a condition precedent to the effectiveness of this Sublease and if and so long as the SNDA(s) required herein is not so delivered, Subtenant may at its option terminate this Sublease by written notice to Sublandlord. Subtenant shall join in the execution and delivery of each SNDA upon the request of the Mortgagee and/or Ground Lessor which is a party to such SNDA.

(c) In no event shall any of Subtenant's personal property, inventory, trade fixtures, trademarked items, signs, furniture or furnishings, equipment, books or records, accounts or other property or assets be or become subject or subordinate to any Mortgage or other lien or encumbrance in favor of Sublandlord or granted by Sublandlord to any Mortgagee or other person.

18.    MASTER LEASE

(a) This Sublease shall be construed in accordance with, and its validity and effect shall be governed by, the laws of the State of Michigan.

(b) If the Master Lease terminates, Subtenant's possession shall terminate and the parties shall be relieved from all liabilities and obligations under this Sublease except for (i) those obligations of Subtenant and Sublandlord which by their terms shall survive the termination of this Sublease and (ii) damages incurred by a party as a result of a default of one of the parties under this Sublease.

19.    SUBLANDLORD'S INDEMNITY

Sublandlord hereby agrees to indemnify and defend Subtenant and to hold Subtenant harmless from any and all claims, liabilities, damages, penalties, losses, costs and expenses incurred by Subtenant (including attorneys fees) incident to, resulting from or any way arising out of the Master Lease, the Building or the operation of the Building prior to Commencement Date, including (but not limited to) any and all claims, liabilities, damages, penalties, losses or expenses incurred, resulting from, or any way arising out a default under the Master Lease or any injury to persons or damage to property happening or occuring, in, on or about the Demised Premises prior to the Commencement Date; Sublandlord further agrees, upon notice and request of Subtenant to contest any demand, claim, suit or action against Sublandlord as hereinabove agreed to indemnify and hold Subtenant harmless, Sublandlord shall defend any action that may be brought in connection with any such demand, claim, suit or action, or with respect

to any manner against which Sublandlord has hereinabove agreed to indemnify and hold Subtenant harmless, Sublandlord shall bear all costs and expenses of such contest and defense; it being further understood, acknowledged and agreed by Sublandlord that any tenant, subtenant or any employees or independent contractors retained by Sublandlord or any tenant or subtenant engaged in the operation of the Building prior to the Commencement Date are and shall be construed to be, for all purposes of this Article the employess of Sublandlord and the acts and omissions of said employess or independent contractors prior to the Commencement Date shall not be attributed to Subtenant for the purposes of this Article. The terms and provisions and agreements of this Article shall survive any termination or expiration of this Sublease.

### 20.  WAIVER OF SUBROGATION

Sublandlord, for itself and for parties claiming by, through or under Sublandlord, hereby releases and discharges Subtenant from any liability or claim for damage or destruction to the Demised Premises, whether or not caused by acts or omissions of Subtenant, and Sublandlord hereby waives any and all claims against Subtenant for damage, loss or injury caused by or resulting from fire and/or other perils, to the extent that any such claims for damages, losses or injuries are or would be covered by fire and extended insurance coverage policies which Sublandlord does or is required to maintain hereunder. Subtenant, for itself and for parties claiming by, through or under Subtenant, hereby releases and discharges Sublandlord from any liability or claim for damage or destruction to Subtenant's property or the Demised Premises (provided that nothing herein is intended to release Sublandlord from any obligation of Sublandlord to replace, repair or maintain such Demised Premises in accordance with this Sublease), whether or not caused by acts or omissions of Sublandlord, and Subtenant hereby waives any and all claims against Sublandlord for damage, loss or injury caused by or resulting from fire and/or other perils, to the extent that any such claim for damages, losses or injuries are covered by fire and extended insurance coverage policies payable to Subtenant. Sublandlord and Subtenant shall look to their respective insurance coverage for recovery of any insured casualty damage to the Demised Premises. Each of Sublandlord and Subtenant shall cause any fire insurance and extended coverage policies which it maintains in respect of the Demised Premises to contain a provision whereby the insurer waives any rights of subrogation against the other party. Both Sublandlord and Subtenant agree to immediately give each insurance company which has issued to it policies of fire and extended coverage insurance written notice of the terms of said mutual waivers and to cause said insurance policies to be properly endorsed, if necessary, to prevent the invalidation thereof by reason of said waivers and shall furnish to the other party written evidence of such endorsement or that such endorsement is not required.

### 21.  DAMAGE AND DESTRUCTION

Subtenant shall comply with, and Sublandlord hereby assigns all of its rights with respect to, Article XII of the Master Lease, including without limitation, any rights to terminate the Master Lease or abate rent pursuant to Article XII. In no event shall Sublandlord have any rights to terminate the Master Lease pursuant to Article XII of the Master Lease. In the event either Master Landlord or Subtenant elect to terminate the Master Lease in accordance with Article XII of the Master Lease, this Sublease shall terminate. Sublandlord hereby acknowledges that all right, title and interest in and to any of the insurance proceeds payable under said Master Lease or this Sublease pertaining to the Demised Premises and/or the Building, (including, but not limited to, Subtenant's furniture, fixtures, signage, trade equipment and fixtures, equipment or other personal property) vest solely in Subtenant and Subtenant agrees to apply such proceeds in accordance with the terms of said Master Lease.

22.    CONDEMNATION

Subtenant shall comply with, and Sublandlord hereby assigns all of its rights with respect to, Article XIII of the Master Lease, including without limitation, any rights to terminate the Master Lease or abate rent pursuant to Article XIII of the Master Lease. In no event shall Sublandlord have any rights to terminate the Master Lease. In the event either Master Landlord or Subtenant elect to terminate the Master Lease in accordance with Article XIII of the Master Lease, this Sublease shall terminate. Sublandlord shall promptly notify Subtenant in the event that it has knowledge or receives notice of any pending or proposed condemnation affecting all or any portion of the Demised Premises or the Shopping Center. In the event of a taking which does not result in a termination of this Sublease, the rent and any other charges provided herein shall be equitably adjusted and Subtenant shall be entitled to the entire condemnation award. Sublandlord hereby assigns all of Sublandlord's right, title and interest, if any, in and to the condemnation proceeds payable under said Master Lease to Subtenant and Subtenant agrees to apply such proceeds in accordance with the terms of said Master Lease.

23.    NOTICES

Any notices, consent, approvals, elections, submissions, requests or demands required or permitted to be given under this Sublease or pursuant to any law or governmental regulation by Sublandlord to Subtenant or by Subtenant to Sublandlord shall be in writing (whether or not expressly so provided) and shall be deemed received and effective: (i) three (3) business days after being deposited in the United States mail, registered or certified mail, return receipt requested, postage prepaid or (ii) one (1) business day after being sent by overnight express mail or nationally recognized courier service (e.g., Federal Express) to Sublandlord or Subtenant, at the respective addresses set forth herein or such other addresses as either party may designate by notice to the other from time to time. In lieu of registered or certified mail, and in any event during any period of postal strike or other interference with the mails, any notice may be given by personal delivery with a receipt signed by the person served or by any person authorized by law to serve process in the jurisdiction where such service is accomplished and shall be effective when received. Addresses for notice are as follows:

|  |  |
|---|---|
| If to Sublandlord: | Oppidan Investment Company<br>5125 County Road 101<br>Suite 100<br>Minnetonka, Minnesota 55345<br>Attn: Mr. Paul J. Tucci |
| And a copy under separate cover to: | Morrison, Fenske & Sund, P.A.<br>5125 County Road 101<br>Suite 102<br>Minnetonka, Minnesota 55345<br>Attn: James F. Morrison, Esq. |
| If to Subtenant: | CEC Entertainment, Inc.<br>4441 W. Airport Freeway<br>Irving, Texas 75062<br>Attn: General Counsel |

And a copy under separate
cover to:                    Piper Rudnick LLP
                            1717 Main Street, Suite 4600
                            Dallas, Texas 75201
                            Attn: Laurie A. Carroll, Esq.

24.    REPRESENTATIONS OF SUBLANDLORD

As a material inducement to Subtenant for entering into this Sublease, Sublandlord hereby represents and warrants to Subtenant that each of the following is true and correct in all respects:

(a)    There are no actions, suits, claims, assessments or proceedings pending or, to the knowledge of Sublandlord, threatened that could materially and adversely affect the Building, the Master Lease, Sublandlord's leasehold interest or the ownership, operation or maintenance of the Building or the Demised Premises or Sublandlord's ability to perform hereunder;

(b)    Sublandlord has no actual knowledge of any fact or condition existing which would result or could result in the termination or reduction of the current access from the Demised Premises to existing highways, streets or roads, or to sewer or other utility services, if any, presently serving the Building or the Demised Premises;

(c)    To the actual knowledge actual of Sublandlord, no portion of the Demised Premises is or has been subjected to a special valuation pursuant to any state, local or other governmental statute, ordinance or regulation;

(d)    Sublandlord nor, to the best knowledge of Sublandlord, any of its agents, employees or contractors have not caused or permitted any hazardous materials to be placed, held, located or disposed of on, under or at the Building or the Demised Premises or any part thereof. No part of the Building or the Demised Premises is being used for the disposal, storage, treatment, processing, manufacturing or other handling of hazardous materials. To the best knowledge of Sublandlord, no investigation, administrative order, consent order or agreement, litigation or settlement with respect to hazardous materials or hazardous materials contamination is proposed, threatened, anticipated or in existence with respect to the Building or the Demised Premises. The Demised Premises is not currently on and, to the best knowledge of Sublandlord, has never been on any federal or state "superfund" or "superlien" list;

(e)    Sublandlord is the holder of the leasehold interest in the Demised Premises, and Sublandlord, with the approval of Master Landlord, has the full right to sublease the Demised Premises to Subtenant for the term. Sublandlord is the sole owner of the Building and has the full right to sell the Building to Subtenant;

(f)    The Master Lease attached hereto as Exhibit "A" is a true and correct copy of the Master Lease. The Master Lease is in full force and effect and has not been amended, modified, cancelled or terminated as of the date hereof. There are currently no defaults by Master Landlord or Sublandlord under the terms and provisions of the Master Lease;

(g)    Sublandlord has received no notice of any default, and is not aware of any condition which would give rise to a default, under the OEA and/or the Supplemental Agreement;

(h)    As of the Commencement Date, there will be no parties in possession of any portion of the Demised Premises, as lessees, tenants, licenses, subtenants, trespassers or otherwise; and

(i)     Sublandlord has the full right, power and authority to enter into this Sublease and to carry out Sublandlord's obligations hereunder, and all requisite action necessary to authorize Sublandlord to enter into this Sublease and to carry out Sublandlord's obligations hereunder has been taken; and

(j)     All representations and warranties of Sublandlord contained in this Section shall survive the expiration or earlier termination of this Sublease;

25.     RADIUS RESTRICTION.

As a material inducement for Subtenant to enter into this Sublease, Sublandlord acknowledges and agrees that throughout the term of the Sublease, Sublandlord shall not and Sublandlord shall not allow Sublandlord's affiliates, shareholders, directors or officers, directly or indirectly, to use, sell or lease for the intended use, permit others to use, or permit any tenant or occupant to use, any parcel or tract of land that is located within a two (2) mile radius of the Demised Premises and is owned or controlled by Sublandlord or any of Sublandlord's affiliates, shareholders, directors or officers for: (i) a restaurant or other business primarily serving pizza; (ii) an arcade or game room; (iii) a business primarily providing physical play activities for children (including, but not limited to, Discovery Zone, Leaps and Bounds, Peter Piper, Pistol Pete's or similar concept); or (iv) the use of kiddie rides or games (including, but not limited to, electronic, computer-controlled and pin-ball games) (collectively, a "Competing Business"). However, other restaurants having pin-ball machines or electronic or computer games shall not be considered a Competing Business by virtue of games unless such use generates more than ten percent (10%) of the total revenue of such operation. Sublandlord shall deliver to Subtenant on or prior to the Commencement Date binding documentation, in recordable form, containing such restriction on all property presently owned, leased or controlled by Sublandlord or any of Sublandlord's affiliates, shareholders, director or officers and shall be subject to a continuing obligation to deliver similar documentation in recordable form to bind property subsequently acquired, leased or controlled by Sublandlord which falls within said two (2) mile restriction area. In the event of a breach by Sublandlord or any of Sublandlord's affiliates, shareholders, directors or officers under the terms of this Section, Subtenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity, Sublandlord acknowledging and agreeing that Subtenant does not have an adequate remedy at law for breach of this provision.

26.     WAIVER OF SUBLANDLORD'S LIEN.

The Building and any personal property, fixtures, equipment, furniture, inventory, trademarked items, electrical rides, redemption games, amusement devices, trade fixtures and equipment, signs, decorative soffits, counters, shelving, showcases, mirrors and other trade fixtures installed in or on the Demised Premises by Subtenant, including, but not limited to, walk-in coolers, exhaust hoods, sinks and preparation areas ("Subtenant's Property"), shall remain the property of Subtenant. Sublandlord agrees that Subtenant shall have the right, at any time or from time to time, to remove any and all of Subtenant's Property (other than the Building). Subtenant, at its expense, shall immediately repair any damage occasioned by the removal of Subtenant's Property upon expiration of the term or earlier termination of this Sublease. Sublandlord hereby waives all of Sublandlord's rights to any contractual, statutory, constitutional or other lien or security interest on any of Subtenant's Property or the property of any assignee or Subtenant that may now or at any time hereafter be situated on the Demised Premises. From time to time, some or all of Subtenant's Property may be financed or owned by someone other than Subtenant. To the extent that any of Subtenant's Property is financed or owned by someone other than Subtenant, Sublandlord agrees that such Subtenant's Property is not Sublandlord's property no matter how the same is affixed to the Demised Premises or used by Subtenant and agrees to recognize the rights

of the lender or owner of Subtenant's Property. Sublandlord agrees to sign and deliver to any lender or secured creditor or lessor a waiver of any lien Sublandlord may have on Subtenant's Property if required by such lender, secured creditor or lessor. Sublandlord also agrees that all of Subtenant's Property that is not subject to a security interest or leased from another shall be the property and remain the property of Subtenant or Subtenant's assignee or transferee no matter how the same is affixed to the Demised Premises.

27.    MORTGAGE BY SUBTENANT.

Subtenant shall have no right, power or authority to place a mortgage or deed of trust lien upon Sublandlord's leasehold interest or Master Landlord's fee simple title to the Demised Premises. Subtenant shall have the right, however, to place a mortgage or deed of trust lien upon, collaterally assign or otherwise encumber the Building and/or Subtenant's subleasehold interest in the Demised Premises (a "Mortgage") as security for an indebtedness ("Debt"), but such Mortgage shall cover and affect only the Building and/or Subtenant's subleasehold interest in the Demised Premises and not the primary leasehold or fee simple title to the Demised Premises. Sublandlord shall make such changes or modifications to this Sublease, with the exception of those provisions of this Sublease concerning the rent and the length of the term as are reasonably requested by any potential Mortgagee to facilitate the mortgaging of Subtenant's subleasehold estate. Sublandlord shall execute such instruments as may be required by each mortgagee, trustee or collateral assignee ("Mortgagee") in order to subordinate the rights and interest of Sublandlord to the lien of each Mortgage. If a Mortgagee notifies Sublandlord of the execution of a Mortgage and names the place for service of notice upon Mortgagee, then:

(a)    Sublandlord shall give to any Mortgagee, simultaneously with service on Subtenant, notices of all demands made by Sublandlord on Subtenant and no such notice to Subtenant shall be effective unless a copy is so served upon Mortgagee.

(b)    Mortgagee shall have the privilege of performing any of Subtenant's covenants, curing any defaults by Subtenant, and exercising any election, option or privilege conferred upon Subtenant by the terms of this Sublease.

(c)    Sublandlord shall not terminate this Sublease or Subtenant's right of possession for any default of Subtenant if, within the period of time within which Subtenant might cure such default, such default is cured or caused to be cured by Mortgagee.

(d)    No liability for the payment of rent or the performance of any of Subtenant's covenants and obligations of this Sublease shall attach to or be imposed upon any Mortgagee, while not in possession of the Demised Premises, all such liability being hereby expressly waived by Sublandlord.

28.    SIGNS.

Subject to Master Landlord's approval as provided in the Master Lease, Tenant may, at Tenant's expense, erect, maintain and replace Tenant's signage, canopies, awnings and/or flags from time to time upon or around the Premises including, at Tenant's election, the front, side and back walls of the Premises, provided the same do not violate any of the OEA; provided further, however, that neither the OEA nor any other provisions herein shall restrict Tenant's right to erect and maintain Tenant's standard signage package. In addition, Tenant may from time to time hang or display banners or other temporary signage on or about the exterior of the Premises or on the interior or exterior glass surfaces of the windows and doors thereof. Tenant shall also be entitled to place a panel on Master Landlord's pylon sign in accordance with Section 20.02 of the Master Lease.

29.     ESTOPPEL CERTIFICATES.

Upon the reasonable request of either party, at any time or from time to time (but no more often than twice in any year without the consent of the other party), each of Sublandlord and Subtenant agree to execute, acknowledge and deliver to the other within thirty (30) days after request a written instrument in a form reasonably satisfactory to both parties duly executed and acknowledged (a) certifying that this Sublease has not been modified except as set forth in such certificate and is in full force and effect as modified, (b) specifying the dates to which the Fixed Rent and other charges hereunder have been paid and the amounts thereof, (c) stating whether or not, to the knowledge of the party executing such instrument, it or the other party thereto is in default hereunder and, if so, stating the nature of such default, (d) stating the Rent Commencement Date, (e) stating which options to extend the term have been exercised, if any, (f) stating whether or not the Subtenant has a claim against Sublandlord which might be offset against accruing rent, and (g) stating such other factually accurate matters pertaining to the terms or subject matter of this Sublease as may be reasonably requested.

30.     CHANGES TO SUBLEASE

All prior conversations or writings between the parties or their representatives are merged herein and extinguished.  This Sublease shall not be modified except by a writing signed by the parties.

31.     DEFINED-TERMS

All terms capitalized herein, unless otherwise specifically defined herein, shall have the same meaning as provided for in the Master Lease.

32.     COUNTERPARTS

This Sublease may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

33.     HEADINGS

The headings, captions and arrangements used in this Sublease are for convenience only and shall not affect the interpretation of this Sublease.

34.     NO WAIVER.

No delay or omission in the exercise of any right or remedy accruing to either party upon any breach by the other party under this Sublease shall impair such right or remedy or be construed as a waiver of any such breach theretofore or thereafter occurring.  No waiver by either party at any time, express or implied, of any breach of any provision of this Sublease shall be deemed a waiver of a breach of any other provision of this Sublease or a consent to any subsequent breach of the same or any other provision.  If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.

35.     EXPENSES OF ENFORCEMENT.

Should any legal action be commenced and a final inapplicable judgment rendered in connection with this Sublease, the prevailing party in such action shall be entitled to recover, in addition to court costs, such amount as the court may adjudge as reasonable attorneys' fees.

36.     REAL ESTATE COMMISSIONS

Both Sublandlord and Subtenant represent to the other that they have dealt with no broker in connection with the negotiation, execution and delivery of this Sublease. If any person shall assert a claim to a finder's fee, brokerage commission or other compensation on account of alleged employment as finder or broker or performance of services as a finder or broker in connection with this transaction, the party against whom the finder or broker is claiming shall indemnify, defend and hold the other party harmless from and against any such claim and all costs, expenses and liabilities incurred in connection with such claim or any action or proceeding brought thereon including, but not limited, to attorneys' fees and court costs in defending such claim.

37.     RELATIONSHIP OF PARTIES

Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Sublandlord and Subtenant.

38.     MERCHANT'S ASSOCIATION; PROMOTIONAL ACTIVITIES

Subtenant shall not be required to join, participate in or contribute to a merchants' association or promotional fund throughout the term of this Sublease.

39.     PURCHASE OF BUILDING

(a)     On or before the Effective Date, Subtenant shall deposit in escrow (i) the sum of Five Hundred and Seven Thousand Dollars ($507,000.00) (the "Purchase Price") in cash and (ii) an executed counterpart of this Sublease with Republic Title of Texas, Inc. Attn: Peter Graf (the "Escrow Company") located at 2626 Howell Street, 10th Floor Dallas, Texas 75204. Concurrently therewith, Sublandlord shall deposit in escrow with the Escrow Company (x) a bill of sale executed by Sublandlord, conveying all of right, title and interest in and to the Building and all fixtures, improvements, equipment, furnishings and other personalty attached or related thereto, (y) an executed counterpart of this Sublease and (z) a certificate stating that Sublandlord is not a "foreign person" as required by Section 1445 of the Internal Revenue Code of 1986 as amended. Upon confirmation in writing from Sublandlord and Subtenant that all conditions (hereinafter defined) have been satisfied and the Escrow Company is prepared to record all releases of any liens encumbering the leasehold interest in the Demised Premises, the consent from Master Landlord, the third amendment to the OEA and a short form memorandum of this Sublease, Escrow Company shall disburse the Purchase Price and at least one original of the Sublease to Sublandlord and deliver to Subtenant at least one original of the Sublease and the original bill of sale. This Sublease and the purchase of the Building are contingent upon satisfaction of the following conditions (the "Conditions"):

(i)     Subtenant shall have received in form and content acceptable to Subtenant all consents and approvals from the Master Landlord necessary to permit this

Sublease, Subtenant's use and Subtenant's construction of its proposed improvements and signage, which consent shall also contain non-disturbance language in form and content satisfactory to Subtenant, a copy of which is set forth on <u>Exhibit D</u>.

       (ii)     Subtenant shall have received a fully executed releases of any liens encumbering the leasehold interest in the Demised Premises in form and content satisfactory to Subtenant from all Mortgagees, if any, a copy of which is set forth on <u>Exhibit E</u>.

       (iii)    Subtenant shall have received in form and content satisfactory to Subtenant a fully executed third amendment to the OEA, a copy of which is set forth on <u>Exhibit F</u>.

       (iv)    Subtenant shall have received evidence satisfactory to Subtenant that Sublandlord's leasehold interest in the Demised Premises is subject to no exception to title that is unacceptable to Subtenant.

       (v)     Subtenant shall have received a fully executed termination agreement between Sublandlord and Golf Galaxy, Inc., terminating the Sublease dated April 1999 executed by and between Sublandlord and Golf Galaxy, Inc, a copy of which is set forth on <u>Exhibit G</u>.

       (vi)    Subtenant shall have received in recordable form and content satisfactory to Subtenant a Memorandum of Sublease executed by Sublandlord.

       (b)     Sublandlord's shall deliver possession to Subtenant on the Commencement Date, in a broom clean condition with all of the furniture, fixtures, equipment and other improvements of Golf Galaxy, Inc. removed from the Building and any damages caused by such removal repaired to Subtenant's satisfaction. Subtenant agrees to accept the Demised Premises in its "as-is" condition. Sublandlord shall have no obligation to make any alterations or improvements to the Demised Premises. Notwithstanding anything contained in above, Sublandlord warrants and guarantees that on the Commencement Date, the interior and exterior of the Demsied Premises shall comply with all applicable laws, codes, ordinances and regulations of governing authorities, including, without limitation, the Americans With Disabilities Act.

IN WITNESS WHEREOF, the parties have executed this Sublease effective as of the date first above written.

**SUBLANDLORD:**

**OPPIDAN INVESTMENT COMPANY,**
**a Minnesota corporation**

By: _____
Name: _Joseph H. Ryan_
Title: _President_

**SUBTENANT:**

**CEC ENTERTAINMENT, INC.,**
**a Kansas corporation**

By: _____
Name: _Roger Cardinale_
Title: _Exet UP Development_

EXHIBIT A

MASTER LEASE

RRD:bd
090198
110998
123198
020399
030299
031299

Walker, Michigan

# L E A S E

between

## TOYS "R" US - DELAWARE, INC.

Landlord

and

## OPPIDAN INVESTMENT COMPANY

Tenant

Date:    March 19th, 1999

Premises:   Green Ridge Square
Walker, Michigan

[::ODMA\PCDOCS\NEWARK\70717\7]
[March 12, 1999; RDIVITA]

## TABLE OF CONTENTS

| Article | Page |
|---|---|

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE I.  DEMISE OF PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Demise of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Condition of Demised Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II.  TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Initial Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Intentionally Omitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Renewal Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE III.  Rent
    Rent Payment Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Fixed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Real Estate Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Tenant's Common Area Expense Contribution . . . . . . . . . . . . . . . . . . . . . . . . 6
    Late Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV.  INITIAL CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE V.  USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE VI.  ASSIGNMENT/SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VII.  REPAIRS AND MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE VIII.  COMPLIANCE WITH LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE IX.  UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE X.  ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE XI.  INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE XII  DAMAGE AND DESTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE XIII  EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE XIV.  LANDLORD'S COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE XV.  INSOLVENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE XVI.  DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE XVII.  UNAVOIDABLE DELAYS, FORCE MAJEURE . . . . . . . . . . . . . . . . . . 28

ARTICLE XVIII.  NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XIX.  ACCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE XX.  SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE XXI.  IMPROVEMENTS AND FIXTURES . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE XXII.  END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE XXIII.  HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE XXIV.  INDEMNITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE XXV.  MORTGAGES  ............................................. 32

ARTICLE XXVI.  OPERATION AND EASEMENT AGREEMENT  ..................... 33

ARTICLE XXVII.  COMMON AREAS  ........................................ 34

ARTICLE XXVIII.  CERTIFICATES  ....................................... 34

ARTICLE XXIX. LEASEHOLD LIENS.  ...................................... 35
    Definitions.  ..................................................... 35
    Encumbrance by Tenant.  ........................................... 35
    Leasehold Lender Protection Provisions.  .......................... 36
    Foreclosure.  ..................................................... 37

ARTICLE XXX.  INTENTIONALLY OMITTED  ............................... 37-A

ARTICLE XXXI.  MISCELLANEOUS  ........................................ 38
    Waiver of Redemption  ............................................ 38
    No Waiver ........................................................ 38
    Relationship of Parties  ......................................... 38
    Recording  ....................................................... 38
    Captions  ........................................................ 38
    Applicable Law  .................................................. 38
    Addenda  ......................................................... 39
    Survival  ........................................................ 39
    Mechanics Liens  ................................................. 39
    Floor Area  ...................................................... 39
    Brokerage  ....................................................... 39
    Limitation of Landlord's Liability  .............................. 40
    Attorneys' Fees  ................................................. 40
    Waiver of Trial by Jury  ......................................... 40
    Interest Rate  ................................................... 40
    Excavations on Adjoining Property  ............................... 41

ARTICLE XXXII.  ENTIRE AGREEMENT/BINDING EFFECT  ..................... 41

[::ODMA\PCDOCS\NEWARK\707171\7]
[March 12, 1999; RDIVITA]

INDEX OF DEFINITIONS

|  | SECTION |
|---|---|
| ADDITIONAL RENT | 3.01 |
| ALTERATION(S) | 10.01 |
| APPROVAL DATE | 3.01 |
| COMMON AREAS | 27.01(a) |
| COMMON AREA EXPENSE | 3.04(c) |
| CONSENTS | 3.01 |
| DEMISED PREMISES | Prelim. State. B. |
| DEPOSITORY | 12.05(b) |
| EVENT OF DEFAULT | 16.01 |
| EXECUTION DATE | 2.01(a) |
| FIXED RENT | 3.02(a) |
| FLOOR AREA | 31.10 |
| GOVERNMENTAL AUTHORITIES | 8.01 |
| HAZARDOUS MATERIALS | 8.02 |
| INTEREST RATE | 31.15 |
| INSTITUTIONAL LENDER | 29.01 |
| LAND | Prelim. State. A. |
| LANDLORD'S AWARD | 13.04(a) |
| LANDLORD'S IMPROVEMENTS | Prelim. State. A. |
| LANDLORD'S RECONSTRUCTION WORK | 13.04(a) |
| LANDLORD'S RESTORATION WORK | 12.04 |
| LANDLORD'S TRACT | Prelim. State. B. |
| LEASEHOLD LENDER | 29.01 |
| LEASEHOLD LIEN | 29.01 |
| LEASE TERM | 2.01(a) |
| LEASE YEAR | 2.01(c) |
| LEGAL REQUIREMENTS | 8.01 |
| MORTGAGE | 25.01(a) |
| MORTGAGEE | 25.01(b) |
| OEA | 3.01 |
| PERMITS | 3.01 |
| PYLON | 20.02(a) |
| REAL ESTATE TAXES | 3.03(b) |
| TENANT'S RECONSTRUCTION WORK | 13.03(a) |
| RENT | 3.01 |
| RENT COMMENCEMENT DATE | 3.01 |
| REPAIRS | 7.02 |
| SHOPPING CENTER | Prelim. State. A. |
| SITE PLAN | Exhibit B. |
| TAKING | 13.01(a) |
| TENANT'S AWARD | 13.03(a) |
| TENANT'S BUILDING | Prelim. State. B. |
| TENANT'S COMMON AREA EXPENSE CONTRIBUTION | 3.04(a) |
| TENANT'S FRACTION | 3.03(c) |
| TENANT'S RECONSTRUCTION WORK | 13.03(a) |
| TENANT'S RESTORATION WORK | 12.03(a) |
| TENANT'S PANEL | 20.02(a) |
| TENANT'S PARCEL | Prelim. State. B. |
| TENANT'S PLANS | 4.01(b) |
| TENANT'S TAX SHARE | 3.03(a) |
| TENANT'S WORK | 4.01(b) |

UNAVOIDABLE DELAYS                                      17.01
VESTING DATE                                            13.01(a)

[::ODMA\PCDOCS\NEWARK\707174]
[March 8, 1999; RDIVITA]

<u>LEASE</u>

THIS LEASE made and entered into as of this _19 TH_ day of March, 1999, by and between TOYS "R" US-DELAWARE, INC., a Delaware corporation, having an office at 461 From Road, Paramus, New Jersey 07652 ("Landlord") and OPPIDAN INVESTMENT COMPANY, a __Minnesota corporation__ , having an address at 420 International Centre, 900 Second Avenue South, Minneapolis, Minnesota 55402 ("Tenant").

<u>W I T N E S S E T H</u>:

<u>Preliminary Statement</u>

A. Landlord is the owner of certain real property consisting of approximately six (6) acres of land, which real property is more particularly described on Exhibit A annexed hereto (the "Land"), together with improvements constructed thereon ("Landlord's Improvements"), located on Alpine Road in the City of Walker, County of Kent, State of Michigan, within a shopping center commonly known as Green Ridge Square (the "Shopping Center").

B. Tenant desires to lease from Landlord a portion of the Land ("Tenant's Parcel") for the construction of a building thereon containing approximately 19,000 square feet of "Floor Area" ("Tenant's Building"), which portion is shown crosshatched on the "Site Plan" annexed hereto as Exhibit B, and Landlord desires to lease Tenant's Parcel to Tenant upon and subject to the terms and conditions hereinafter set forth. (Tenant's Parcel and Tenant's Building are herein collectively called the "Demised Premises". The Land, including Tenant's Parcel, Landlord's Improvements and Tenant's Building are herein collectively called "Landlord's Tract".)

NOW, THEREFORE, in consideration of the terms, covenants and conditions herein set forth, Landlord and Tenant hereby covenant and agree as follows:

<u>ARTICLE I. DEMISE OF PREMISES</u>

Section I.01. <u>Demise of Premises</u>.   Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, subject to all liens, encumbrances, easements, restrictions, covenants, zoning laws and regulations affecting and governing the Shopping Center, for the term hereinafter provided, the Demised Premises together with the nonexclusive right to use the "Common Areas" (as such term is defined in the "OEA") in common with other tenants and occupants of the Shopping Center.

Section 1.02.   <u>Condition of Demised Premises</u>.   Tenant accepts the Demised Premises in its "as is" condition, including, without limitation, as regards the title thereto, the

nature, condition and usability thereof, and the use or uses to which the Demised Premises may be put, and shall be deemed to have assumed all risk, if any, resulting from any present latent or patent defects and from the failure of the Demised Premises to comply with all Legal Requirements applicable thereto. Tenant acknowledges that Landlord has made no representations, covenants or warranties as to the physical condition of the Demised Premises, the availability, capacity, flow or pressures of utilities or the ability to conduct or continue to conduct its business within or upon the Demised Premises. Landlord shall not be required to perform any work to prepare the Demised Premises for Tenant's intended use.

## ARTICLE II. TERM

Section 2.01. Initial Term.    (a) Tenant shall have and hold the Demised Premises, together with any and all appurtenances thereto, and the easements, rights and privileges herein granted to Tenant, for and during the Lease Term. The "Lease Term" shall commence as of the date of execution and delivery hereof by both parties (the "Execution Date"), and shall end on the later of (i) the last day of the twentieth (20th) "Lease Year", or (ii) the date of the expiration of the latest renewal period for which Tenant has exercised its option to extend the term of this Lease pursuant to Section 2.03 hereof. Landlord and Tenant covenant and agree that, from and after the Execution Date, Landlord and Tenant shall be bound by the terms and provisions of this Lease, provided however, Tenant shall have no obligation for the payment of "Rent" until the "Rent Commencement Date".

(b)    The first Lease Year shall be the period commencing on the Execution Date and ending twelve (12) calendar months following the Rent Commencement Date, provided, however, that if the Rent Commencement Date is not the first day of a month, the first Lease Year shall end twelve (12) calendar months from the last day of the month in which the Rent Commencement Date occurs. Thereafter, the term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months.

(c)    Upon the determination of the Rent Commencement Date, Landlord and Tenant shall execute, acknowledge and exchange duplicate originals of a recordable agreement in the form of Exhibit E annexed hereto.

Section 2.02.  Intentionally Omitted

Section 2.03.  Renewal Periods.    Provided Tenant is not in default hereunder after receipt of notice and expiration of any applicable cure period at the time any notice is given under this Section 2.03 nor on the expiration date of the then existing Lease Term, Tenant shall have four (4) successive options to extend the Lease Term for four (4) separate renewal periods of five (5) years each, each commencing at the expiration of the then current Lease Term. In the event that Tenant shall desire to exercise one or more of the options herein granted, Tenant shall so advise Landlord by notice no later than twelve (12) months prior to the expiration of the then current Lease Term, time being deemed of the essence. If Tenant exercises any one or more of said options, the Lease Term shall be automatically extended for

2

the renewal period or periods covered by such option or options upon the same terms and conditions as are in effect immediately preceding the commencement of such renewal period, except that (x) Tenant shall not have any further options to extend the Lease Term beyond the expiration of the fourth (4th) renewal period, and (y) "Fixed Rent" shall be as set forth in Section 3.02 hereof, without execution of any extension or renewal lease.  Any cancellation or termination of this Lease shall terminate any unexercised options to extend the Lease Term pursuant hereto.

## ARTICLE III.  RENT

Section 3.01.  Rent Payment Obligation.  (a)  From and after the date which is the earlier of (x) the date which is one (1) year after the Approval Date, or (y) the date on which Tenant opens for business to the public in and from the Demised Premises (the "Rent Commencement Date") and throughout the Lease Term, Tenant shall pay to Landlord the sums set forth in this Article as rent or additional rent, without prior demand therefor.  The term "Rent" shall be deemed to include "Fixed Rent" and all additional sums payable by Tenant to Landlord pursuant to this Lease ("Additional Rent").  All payments of Rent shall be paid to Landlord in lawful money of the United States which shall be legal tender for payment of public and private debts, without demand or notice and without abatement, deduction or set-off, delivered to P.O. Box 23109, Newark, New Jersey 07189, Attention: Real Estate Accounting, or to any other place designated by Landlord.

(b)      Approval Date.  As used herein, the term "Approval Date" shall mean the date on which:

    1.      Tenant shall have obtained all consents or approvals required under that certain Operation and Easement Agreement among Dayton Hudson Corporation, Green Ridge Limited Partnership, Toys "R" Us, Inc. and Kmart Corporation dated on or about July 7, 1988 and recorded on July 13, 1988 in Liber 2570, at page 173, Kent County Records, as amended by First Amendment to Operation and Easement Agreement dated as of December 1, 1989 and Second Amendment to Operation and easement Agreement dated as of March 18, 1993 (collectively, the "OEA") to permit the construction of Tenant's Building (the "Consents"); and

    2.      Tenant shall have obtained permits and approvals required by "Legal Requirements" to permit development of Tenant's Parcel and the construction of Tenant's Building ("Permits").

(c)      In the event Consents and Permits have not been obtained on or before the date which is one hundred eighty (180) days after the Execution Date, Landlord or Tenant may, upon notice to the other, given at any time after said date and prior to Consents and Permits being obtained, elect to terminate this Lease.

Section 3.02.  Fixed Rent.  (a) Tenant shall pay an annual fixed rental to Landlord, as follows:

    1.      commencing on the Rent Commencement Date and ending on the last day of the fifth (5th) Lease Year, at an annual rate of Eighty-Six Thousand ($86,000.00) Dollars;

3

2.      commencing on the first day of the sixth (6th) Lease Year and ending on the last day of the tenth (10th) Lease Year, at an annual rate of Ninety-Four Thousand Six Hundred ($94,600.00) Dollars;

3.      commencing on the first day of the eleventh (11th) Lease Year and ending on the last day of the fifteenth (15th) Lease Year, at an annual rate of One Hundred Four Thousand Sixty ($104,060.00) Dollars;

4.      commencing on the first day of the sixteenth (16th) Lease Year and ending on the last day of the twentieth (20th) Lease Year, at an annual rate of One Hundred Fourteen Thousand Four Hundred Sixty-Six ($114,466.00) Dollars;

5.      during the first renewal period, at an annual rate of One Hundred Twenty-Five Thousand Nine Hundred Twelve and 60/100 ($125,912.60) Dollars;

6.      during the second renewal period, at an annual rate of One Hundred Thirty-Eight Thousand Five Hundred Three and 86/100 ($138,503.86) Dollars;

7.      during the third renewal period, at an annual rate of One Hundred Fifty-Two Thousand Three Hundred Fifty-Four and 24/100 ($152,354.24) Dollars; and

8.      during the fourth renewal period, at an annual rate of One Hundred Sixty-Seven Thousand Five Hundred Eighty-Nine and 66/100 ($167,589.66) Dollars,

(herein called "Fixed Rent"), in equal monthly installments in advance on or before the first day of each month during the Lease Term. If the Rent Commencement Date is not the first day of a calendar month, Fixed Rent for the period from the Rent Commencement Date to the last day of the month in which the Rent Commencement Date occurs shall be apportioned on the basis of a 30-day month and paid on the first day of the following month.

Section 3.03.  Real Estate Taxes.  (a)  Commencing on the Rent Commencement Date and throughout the Lease Term, Tenant shall pay to Landlord, as Additional Rent, a portion of all "Real Estate Taxes" affecting and imposed upon Landlord's Tract which accrue during the Lease Term, as hereinafter provided ("Tenant's Tax Share").

(b)  (i)  The term "Real Estate Taxes" shall mean all ad valorem real estate taxes and general, special and betterment assessments, ordinary and extraordinary, foreseen and unforseen, which are imposed by "Governmental Authorities" and assessed against Landlord's Tract, or any portion thereof, or assessed against Landlord as owner of Landlord's Tract, including, without limitation, taxes, fees and charges imposed in respect of the ownership, operation, management, use, leasing or alteration of Landlord's Tract, or any portion thereof; the improvements constructed upon Landlord's Tract; the various estates in and to Landlord's Tract, or any portion thereof; the Rent payable to Landlord pursuant to this Lease; all water and sewer charges which constitute a lien on Landlord's Tract and/or the Demised Premises measured or imposed by a method other than by volume of consumption; and any taxes, fees and charges imposed in lieu of or in addition to the foregoing due to a future change in the method of taxation.

(ii)  Nothing contained in this Lease shall require Tenant to pay any estate, inheritance, succession, corporate franchise or income tax of Landlord, nor shall any of same be deemed Real Estate Taxes, except to the extent same are substituted in lieu of Real Estate Taxes.

(c)      (i)  If Tenant's Building is separately assessed, or Real Estate Taxes attributable thereto are ascertainable with reasonable certainty, Tenant's Tax Share shall be equal to the sum of

4

(x) Real Estate Taxes assessed against or attributable to Tenant's Building, and (y) the product of (xx) Real Estate Taxes assesses against the Land, and (yy) a fraction, the numerator of which shall be the aggregate number of square feet of Floor Area within Tenant's Building, and the denominator of which shall be the aggregate number of square feet of Floor Area within all buildings constructed upon Landlord's Tract (such fraction herein called "Tenant's Fraction").

(ii) If Tenant's Building is not separately assessed, or Real Estate Taxes attributable thereto are not ascertainable with reasonable certainty, Tenant's Tax Share shall be equal to the product of (x) Real Estate Taxes assessed against Landlord's Tract, and (y) a fraction, the numerator of which shall be the aggregate number of square feet of Floor Area within Tenant's Building, and the denominator of which shall be the aggregate number of square feet of Floor Area within all buildings constructed upon Landlord's Tract.

(iii) Tenant's Tax Share shall be paid to Landlord in equal monthly installments, together with and in the manner prescribed for the payment of Fixed Rent, in an amount reasonably estimated by Landlord to be equal to 1/12th of Tenant's Tax Share for the current or ensuing real estate fiscal tax year, as the case may be. Landlord shall, within ninety (90) days after the end of each calendar year, furnish to Tenant a statement (which statement shall include a copy of the relevant Real Estate Tax bill or bills) of the actual amount of Tenant's Tax Share for the preceding calendar year. If the amount paid by Tenant hereunder is less than the actual amount of Tenant's Tax Share for said calendar year, Tenant shall, within ten (10) days after receipt of Landlord's statement, pay to Landlord the deficiency. If the amount paid by Tenant hereunder exceeds the actual amount of Tenant's Tax Share for said calendar year, such excess shall be credited against the next monthly installment or installments of Tenant's Tax Share due from Tenant to Landlord hereunder, or shall be refunded to Tenant if such excess relates to the calendar year in which the Lease Term expires. Prior to delivery of Landlord's first statement of Real Estate Taxes hereunder, Tenant's Tax Share shall be payable at the rate of $1,560.00 per month, subject to adjustment as provided for in this Section. Landlord shall, upon request from Tenant, provide to Tenant a copy of a receipted tax bill for the previous payment period, if any when provided by the taxing authority.

(d) Any Real Estate Taxes for a real estate fiscal tax year, only a part of which is included within the Lease Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date of the expiration or sooner termination of the Lease Term, as the case may be, for the purpose of computing Tenant's Tax Share.

(e) (i) Landlord may elect to contest the amount or validity of assessed valuation or Real Estate Taxes for any real estate fiscal tax year, in which event Real Estate Taxes shall be deemed to include any reasonable fees and/or expenses, not exceeding the Real Estate Tax savings realized, incurred by Landlord in contesting or appealing Real Estate Taxes and Tenant shall pay Tenant's Tax Share thereof in accordance with Subsection (c) hereof.

(ii) Tenant shall cooperate with Landlord, execute any and all documents required in connection therewith and, if required by Legal Requirements, shall join with Landlord in the prosecution thereof. Landlord shall reimburse Tenant for any out-of-pocket expenses reasonably incurred by Tenant in cooperating with Landlord.

(f) In addition to Tenant's Tax Share, Tenant shall pay (to Landlord if billed to Landlord, or directly to the taxing authority), before delinquent, any sales taxes assessed against the Rent

5

payable hereunder, and any and all taxes and assessments levied against fixtures, equipment, signs and personal property located or installed in, about or upon the Demised Premises; any rent, income or other payments received by Tenant or anyone claiming by, through or under Tenant; the use or occupancy of the Demised Premises; and this transaction, or any document to which Tenant is a party creating or transferring an interest or estate in the Demised Premises.

Section 3.04. Tenant's Common Area Expense Contribution.

(a)  Tenant shall pay to Landlord, as Additional Rent, "Tenant's Common Area Expense Contribution".  "Tenant's Common Area Expense Contribution" shall be equal to the product of (x) "Common Area Expenses", and (y) Tenant's Fraction.

(b)(i)  Tenant's Common Area Expense Contribution shall be paid to Landlord in equal monthly installments, together with and in the manner prescribed for the payment of Fixed Rent.  Prior to delivery of Landlord's first statement of Common Area Expense hereunder, Tenant's Common Area Expense Contribution shall be payable at the rate of $1,050.00 per month, subject to adjustment as provided for in this Section.

(ii)  Within one hundred twenty (120) days after the end of each calendar year, Landlord shall furnish to Tenant a statement of "Common Area Expense" for such calendar year. Within fifteen (15) days after receipt of Landlord's statement, Tenant, shall pay to Landlord any deficiency between the amount of Tenant's Common Area Expense Contribution as paid during such calendar year and the amount thereof as shown on Landlord's statement.  If the amount paid by Tenant hereunder exceeds the actual amount of Tenant's Common Area Expense Contribution for said calendar year, such excess shall be credited against the next monthly installment or installments of Tenant's Common Area Expense Contribution due from Tenant to Landlord hereunder, or shall be refunded to Tenant if such excess relates to the calendar year in which the Lease Term expires.  After receipt of Landlord's statement, Tenant's Common Area Expense Contribution shall be paid based on Landlord's estimate of Common Area Expense anticipated during the then current calendar year, and Tenant shall, without demand, pay to Landlord 1/12th of the amount thereof, in advance, on or before the first day of each calendar month until the next statement of Common Area Expense is received from Landlord.

(c)  The term "Common Area Expense" shall mean all amounts payable by Landlord pursuant to that certain Supplemental Agreement between Landlord and Green Ridge Limited Partnership, dated as of July 7, 1988, or otherwise actually incurred by Landlord to operate, maintain and repair the Common Areas of Landlord's Tract, including, without limitation (and to the extent not duplicative of amounts paid under the Supplemental Agreement) the costs and expenses of cleaning; snow removal and treatment of ice; maintaining, repairing, repaving and restriping the parking area; replanting and replacing landscaping; maintaining, repairing and replacing common utility lines; water and sewerage charges; electricity charges; premiums for Common Area liability insurance policies Landlord is required to maintain pursuant to the OEA; wages, salaries and worker's compensation (including employee benefits and unemployment and social security taxes and insurance) of staff performing services in connection with the Common Areas; fees (not exceeding 12% of Common Area Expenses) paid to a third party management company for supervision, management and operation of the Common Areas; security services; traffic control; rental or depreciation on equipment used in

6

connection with operation and maintenance of the Common Areas; the cost of compliance with the terms of the OEA relating to the Common Areas; the cost of compliance with and/or contesting Legal Requirements relating to the Common Areas; license and permit fees; personal property, sales, service and/or use taxes on material, equipment, supplies and services; and other similar direct costs chargeable to the operation and maintenance of the Common Areas. In lieu of the third party management fees referred to above Common Area Expenses may include an administrative fee equal to twelve percent (12%) of the foregoing includable costs.

Section 3.05.  Late Charge.  In the event more than one (1) time during any consecutive twelve month period, Rent or any installment thereof is not paid to Landlord on or before the due date thereof, the amount of such payment shall bear interest at the Interest Rate from the date payment was due until paid in full.  In the event more than one (1) time during any consecutive twelve (12) month period Rent, or any installment thereof, is not paid to Landlord within five (5) business days after written notice thereof from Landlord to Tenant that said Rent (or installment) has not been received by Landlord when due, a late charge equal to ten (10%) percent of the then late payment shall be automatically due from Tenant to Landlord to cover Landlord's administrative costs and expenses and not as a penalty

Section 3.06.  (a) It is the purpose and intention of Landlord and Tenant, and the parties hereto agree, that the Fixed Rent and Additional Rent shall be absolutely net to Landlord without any abatement, deduction, counterclaim, set-off or offset whatsoever and that Landlord shall not be required to provide any services or do any act in connection with the Demised Premises, except as specifically provided herein.

(b) Except as expressly and specifically provided to the contrary elsewhere in this Lease, no abatement, diminution or reduction of Rent shall be claimed by or allowed to Tenant, or any persons claiming under it, under any circumstances, whether for inconvenience, discomfort, interruption of business, or otherwise, arising from the making of alterations, changes, additions, improvements or repairs to the Demised Premises, the Common Areas or any building or buildings now on or which may hereafter be erected within Landlord's Tract or the Shopping Center; by virtue or because of any present or future governmental laws, or regulations; by virtue or arising from, and during, the restoration of the Demised Premises, the Common Areas or any other portion of Landlord's Tract or the Shopping Center after the destruction or damage thereof by fire or other casualty or the taking or condemnation of a portion thereof; or arising from any other cause or reason.

Section 3.07.  This Lease shall not be affected by any laws, ordinances or regulations, whether federal, state, county, city, municipal or otherwise, which may be enacted or become effective from and after the date of this Lease affecting or regulating or attempting to affect or regulate the Rent herein reserved.

7

## ARTICLE IV. INITIAL CONSTRUCTION

Section 4.01. (a)   Landlord shall, within ten (10) days after the Execution Date, deliver to Tenant a copy of any surveys, site development plans and environmental site assessments (if any) which may be in Landlord's possession and control.

(b)   Tenant shall, within sixty (60) days after the Execution Date, cause its architect or engineer to prepare complete, detailed civil engineering, site, architectural, plumbing, electrical, mechanical and sign plans and specifications, conforming to the requirements of the engineering group of the Factory Mutual Insurance Companies, for development of Tenant's Parcel and construction of Tenant's Building.  (The work required to develop and construct the Demised Premises is herein called "Tenant's Work".)  Landlord shall review said plans and specifications and either approve them, which approval shall not be unreasonably withheld, or state what reasonable changes Landlord requires.  If Landlord shall not have approved a submission, or stated what changes Landlord requires thereto, on or before the thirtieth (30th) day after receipt of such submission, the submission shall be deemed approved.  If Landlord requires any reasonable changes, Tenant shall cause its architect or engineer to modify said plans and specifications in accordance with Landlord's requirements and resubmit them to Landlord.  The modifications and resubmissions shall continue until the plans and specifications have been approved by Landlord (such approved plans and specifications herein called "Tenant's Plans").

(c)  Within five (5) days after Tenant's Plans have been approved, Tenant shall apply for and thereafter diligently pursue the issuance of all Consents and Permits.  Landlord shall, without cost, expense or liability to Landlord, assist Tenant in obtaining the Consents and Permits, including, without limitation, executing applications and other documents (reasonably approved by Landlord) requiring Landlord's execution in connection therewith.

(d) After Consents and Permits have been obtained or are available Tenant shall commence Tenant's Work and thereafter diligently proceed therewith to completion.

(e)  Tenant's Work shall be performed at Tenant's sole cost and expense and shall be completed in a good and workmanlike manner, in accordance with Tenant's Plans and in compliance with all applicable Legal Requirements and the OEA.

(f)     (i)  During performance of Tenant's Work, Tenant shall comply with rules and regulations promulgated by Landlord concerning performance of Tenant's Work, including, without limitation, utilization of traffic entrance and exit points to and from the Shopping Center and construction staging and storage areas designated by Landlord and compliance with safety and security procedures.  Tenant shall keep its construction site reasonably free of debris.

(ii)  In performing Tenant's Work, Tenant shall use its best efforts to prevent any interference with the operation of the Shopping Center and the business of Landlord or any owner, tenant or occupant of the Shopping Center.

(iii)  Tenant shall, upon request of Landlord, at Tenant's sole cost and expense, erect a temporary screening or security fence surrounding Tenant's Parcel during the period of Tenant's Work.

(g)  Tenant shall, at Tenant's cost and expense, promptly repair any damage to adjacent buildings and structures and/or the Common Areas directly or indirectly resulting from the performance of Tenant's Work.

8

<u>ARTICLE V.  USE</u>

<u>Section 5.01</u>.  Tenant shall, on or before the Rent Commencement Date, open for business in the Demised Premises as a retail store selling golf equipment, apparel and related accessories, and, except during Temporary Closings, shall, for a period of one (1) year, continuously operate the Demised Premises during normal business hours for such purpose.  Thereafter Tenant shall have no obligation to continuously operate or conduct any business at the Demised Premises.  The Demised Premises may be used for the display and retail sale of golf-related products and services, including golf supplies, golf equipment, golf shoes, golf apparel and other golf-related items, and including, but not limited to, golf-related travel and demonstrations of golf-related products and supplies, together with office and warehouse uses in connection therewith and incidental thereto, and, except as prohibited or restricted in accordance with Sections 5.02 and 5.03 hereof, for any other lawful retail use operated by a national or region chain of retail stores operating not less than twenty (20) stores under a common tradename.

<u>Section 5.02</u>.  (a)    Notwithstanding anything contained in Section 5.01 above to the contrary, Tenant and its successors and assigns agree not to use, sublease or permit the use of any portion of the Demised Premises:

1.    as a restaurant serving meals primarily for on premises consumption or a fast food restaurant incorporating a coin or token operated amusement room, provided however, the foregoing shall not prohibit the operation of a "café", "coffee bar" or "juice bar" as an incidental part the operation of a golf equipment, apparel and accessories retail store;

2.    as an establishment serving alcoholic beverages for on premises consumption;

3.    as a massage parlor or a discotheque;

4.    as a health spa or similar type business;

5.    as an offtrack betting establishment;

6.    for any industrial or residential purposes; or

7.    for any use or activity which violates the terms, covenants and provisions of the OEA.

(b)    Neither Landlord,  Tenant, nor their respective successors or assigns, shall use Landlord's Tract, or any part thereof (including the Demised Premises), for:

1.    any operation, activity or business that is a public or private nuisance;

2.    any operation, activity or business that emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; or

3.    any operation, activity or business that creates unusual fire, explosive or other hazards.

(c)    For so long as the Demised Premises is being operated as a retail store selling golf equipment, apparel and related accessories, Landlord shall not use, lease or permit any portion of Landlord's Tract (other than the Demised Premises) for the sale of golf-related products (including, without limitation, golf supplies, golf equipment, golf shoes, golf apparel and other golf-related items)

9

or golf-related services (including, but not limited to, golf-related travel and demonstrations of golf-related products). Notwithstanding the foregoing, the restrictions set forth herein shall not apply to the "incidental" sale of said items. For purposes hereof, "incidental" shall mean the sale of such items, individually or in the aggregate, in an area of not greater than fifteen percent (15%) of the sales and/or display area of the applicable premises.

Section 5.03. (a)    Notwithstanding anything contained in Section 5.01 above to the contrary, Tenant and its successors and assigns agree not to use, sublease or permit the use of any portion of the Demised Premises for the sale of items customarily carried by a children's specialty store or a modern toy store, including, without limitation, toys; outdoor play equipment; wheel goods (as such term is commonly used in the toy industry); layettes; pre-natal, infant and juvenile food;  pre-natal, infant and juvenile health and beauty aids; children's books or records; infant, juvenile and children's clothing, apparel, shoes or accessories;  infant, juvenile and children's furnishings, furniture, bedding or recreational equipment; family and adult games; computers and accompanying software; video and electronic games and equipment; candy; infant, juvenile and children's sporting goods; children's hair salon; children's photo studio; or children's entertainment facility, provided however, the foregoing shall not be deemed to prohibit the sale of any of the foregoing items to the extent incidental to the operation of a golf equipment, apparel and accessories retail store.

(b)    The foregoing restriction shall not be applicable if Landlord, its successors, assigns and subtenants discontinue the operation of a modern toy store and all other children's specialty store formats on Landlord's Tract for a period in excess of twelve (12) consecutive months, not including any period of "Temporary Closing" (as hereinafter defined), but said restrictions shall be reinstated if Landlord, its successor, assign or subtenant resumes the operation of a modern toy store or children's specialty store on Landlord's Tract, except with respect to any use commenced (or permitted in a sublease executed) during a period when the restrictions did not apply.

(c)    For the purposes of this Section 5.03, the term "Temporary Closing" shall mean discontinuance of operation of a modern toy store and all other children's specialty store formats  for periods during which Landlord's Improvements are being altered, renovated or remodeled; for any period after a casualty or a Taking and prior to repair and/or restoration of Landlord's Improvements required as a result thereof; by reason of an Act of God or other Unavoidable Delays; by reason of future governmental restrictions, regulations or controls; or by reason of insurrection, sabotage or war.

Section 5.04. (a)    In its use of the Demised Premises and Common Areas, Tenant shall comply with, and cause its employees, contractors, subtenants, licensees and business invitees to comply with, the rules and regulations annexed hereto as Exhibit C.

(b)    Tenant shall, at Tenant's cost and expense, obtain and maintain, or cause to be obtained and maintained, in full force and effect, all applicable governmental permits, licenses, certificates and approvals required for use and occupancy of the Demised Premises and the conduct of Tenant's business and the business of its subtenants, licensees and concessionaires. Tenant shall at all times comply with the terms and conditions of each such license or permit.

10

Section 5.05. (a) If Tenant discontinues the conduct of its business in and from all or substantially all of the Demised Premises for any period in excess of eighteen (18) months, except for a "Temporary Closing" (as hereinafter defined), or consistently fails to remain open to the general public for at least six (6) hours per day on each day (excluding Sundays) that the Shopping Center is open for business, Landlord shall have the right, in addition to any other rights or remedies available to Landlord pursuant to this Lease, to terminate this Lease on not less than 30-days' notice to Tenant. Tenant shall, within ten (10) days after request therefor from landlord, deliver to Landlord a statement of Tenant's "Unamortized Costs" at the end of its most recent fiscal quarter. In the event Landlord exercises its option to terminate this Lease as provided herein, then this Lease shall terminate on the thirtieth (30th) day following the date on which Landlord sends such notice to Tenant (the "Termination Date"), whereupon, provided Tenant has delivered to Landlord a statement of Tenant's Unamortized Costs, Landlord shall pay to Tenant the unamortized costs of Tenant's leasehold improvements and fixtures ("Tenant's Unamortized Costs"). Tenant's Unamortized Costs shall be the then current amount of Tenant's unamortized leasehold improvements and fixtures constructed or installed within the Demised Premises by Tenant (excluding furnishings, trade fixtures and equipment), as carried on Tenant's financial books and records, amortized on a straight line basis over not more than a 20-year useful life. Upon the Termination Date, Tenant shall surrender possession of the Demised Premises to Landlord and neither party shall thereafter have any further obligation to the other by virtue of this Lease.

(b) For the purposes of this Section 5.05, the term "Temporary Closing" shall mean discontinuance of business for a period not in excess of thirty (30) days during which the Demised Premises is being altered, renovated or remodeled; for any period after a casualty or a Taking and prior to repair and/or restoration of the Demised Premises required as a result thereof; by reason of an Act of God; by reason of future governmental restrictions, regulations or controls; or by reason of insurrection, sabotage or war.

## ARTICLE VI. ASSIGNMENT/SUBLETTING

Section 6.01. (a) Tenant shall not assign this Lease or sublet the Demised Premises, or any part or parts thereof, without the prior consent of Landlord, which consent shall not be unreasonably withheld.

(b) Notwithstanding the provisions of Subsection (a) hereof, Tenant shall have the right, without Landlord's consent, to:

(i) assign this Lease, or sublet the entire Demised Premises, to Golf Galaxy, Inc., a Minnesota corporation, for the operation of a "Golf Galaxy" retail store; and/or

(ii) to grant to an Institutional Lender (as defined in Section 29.01) on the terms and conditions set forth in Article XXIX of this Lease, a Leasehold Lien (as defined in Section 29.01) in Tenant's leasehold estate under this Lease and in Tenant's Building and other improvements constructed by Tenant on Tenant's Parcel and to refinance such Leasehold Lien, but no such Leasehold Lien shall encumber Landlord's fee estate in Landlord's Tract.

Section 6.02. If the sale, assignment, transfer or other disposition of any of the issued and outstanding capital stock of Tenant (or of any permitted successor or permitted assignee of Tenant

11

which is a corporation), or of the interest of any general partner in a partnership constituting Tenant hereunder, or of the interest of any member of a joint venture, limited liability company, syndicate or other group which may collectively constitute Tenant hereunder, shall result in changing the control of Tenant or such other corporation or such partnership, joint venture, limited liability company, syndicate or other group, such sale, assignment, transfer or other disposition shall be deemed an assignment of this Lease. For the purposes of this Section 6.02, "control" of any corporation shall be deemed to have changed if any person or group of persons purchases or otherwise succeeds to more than 50% of the voting power for the election of the Board of Directors of such corporation and "control" of a partnership, joint venture, limited liability company, syndicate or other group shall be deemed to have changed if any person or group of persons purchases or otherwise succeeds to more than 50% of the general partners' or other active interest in such joint venture, syndicate or other group.

Section 6.03   Notwithstanding anything in Sections 6.01 and 6.02 to the contrary, Tenant shall have the right, without the consent of Landlord, to (i) assign this Lease or sublet all or any portion of the Demised Premises to any corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Tenant, (ii) assign Tenant's interest in this Lease to any entity which purchases all or substantially all of the assets of Tenant, Tenant's parent company and all affiliates of Tenant, or (iii) assign Tenant's interest in this Lease in conjunction with any merger or consolidation involving Tenant and Tenant's parent company; provided in each such event of assignment, the assignee has a net worth and net current assets not less than the net worth and net current assets, in "Constant Dollars", of Tenant hereunder as of the Execution Date. "Constant Dollars" shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the "Current Index Number" and the denominator of which is the "Base Index Number". The "Base Index Number" shall be the level of the "Index" for the month during which the Execution Date occurs and the "Current Index Number" shall be the level of the Index for the month in which the proposed assignment shall become effective. The "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average, All items published by the United States Department of Commerce, Bureau of Labor Statistics (base year 1982-84=100), or any successor or replacement index.

Section 6.04.   (a)   In the event Tenant subleases all or substantially all of the Demised Premises for substantially all of the then remaining term of this Lease to a subtenant (x) having a then net worth of at least thirty million ($30,000,000) dollars, (y) which is part of a national or regional chain of retail stores operating not less than twenty-five (25) stores under a common tradename with the business to be operated in the Demised Premises, and (z) which shall not violate the provisions of Sections 5.01, 5.02 or 5.03 hereof, then in the event of a termination of this Lease as a result of Tenant's default, Landlord shall provide the sublessee with written notice that this Lease has been terminated ("Termination Notice"), together with a statement of all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, then known to Landlord. Provided a Leasehold Lender has not elected to enter into a "New Lease" in accordance with Section 29.03 hereof, Landlord agrees to enter into a new lease ("Substitute Lease") of the Demised Premises with such sublessee for the remainder of the Lease Term at the Fixed Rent and Additional Rent, and upon the terms, covenants and conditions (but excluding requirements which are not applicable or which have already been fulfilled) of this Lease, and re-vest title to Tenant's Building and all improvements and Alterations to the Demised Premises in the sublessee, effective as of the date of

12

termination, provided:

(i).    such sublessee shall make written request upon Landlord for such Substitute Lease within fifteen (15) days (thirty-one (31) days if there is a Leasehold Lien encumbering Tenant's leasehold estate and/or Tenant's Building) after the date such sublessee receives Landlord's Termination Notice (which request may be conditioned on the Leasehold Lender's failure to exercise its right to enter into a "New Lease" in accordance with Section 29.03 hereof);

(ii)    such sublessee shall pay or cause to be paid to Landlord at the time of the execution and delivery of such Substitute Lease, any and all sums which would at the time of execution and delivery thereof be due pursuant to this Lease but for such termination and, in addition thereto, all reasonable out-of-pocket expenses, including reasonable attorney's fees, which Landlord shall have incurred at such time or during such 31-day period by reason of such termination and the execution and delivery of the Substitute Lease and which have not otherwise been received by Landlord from Tenant. Upon execution of such Substitute Lease, Landlord shall allow to the sublessee as an offset against the sums otherwise due under this paragraph (ii) or under the Substitute Lease, an amount equal to the net income derived by Landlord from the Demised Premises during the period from the date of termination of this Lease to the date of the beginning of the term of such Substitute Lease; and

(iii)    such sublessee shall, within thirty (30) days after execution and delivery of the Substitute Lease, remedy any of Tenant's defaults of which said sublessee was notified by Landlord's Termination Notice and which are reasonably susceptible of being so cured by the sublessee (provided however, if such default is not susceptible of being cured with due diligence within said 30-day period, the time within which to cure shall be extended for such time as may be necessary to cure the same with all due diligence, provided the sublessee commences promptly and proceeds diligently to cure the same).

It shall be the intention and agreement of the parties that any Substitute Lease made pursuant to this Section 6.04 shall have the same priority and rights in relation to any mortgage or other lien, charge or encumbrance on the fee of Landlord's Tract and the tenant under such Substitute Lease shall have the same right, title and interest in and to Tenant's Parcel and the buildings and improvements thereon as Tenant had under this Lease.

(b)    In the event a Substitute Lease of the Demised Premises is entered into between Landlord and such sublessee pursuant to this Section 6.04, insurance proceeds and condemnation proceeds that would otherwise be retained by Landlord pursuant to Sections 12.03(b) and/or 13.03(b), respectively, shall be redeposited with the Depository and made available to such sublessee for the purposes of paying the costs of Clearing Work, Tenant's Restoration Work or Tenant's Reconstruction work, as applicable, on the terms and conditions set forth in this Lease.

Section 6.05.  If this Lease shall be assigned or transferred in any manner whatsoever, such assignment or transfer shall be upon and subject to all of the terms, covenants, provisions and conditions contained in this Lease and, notwithstanding any consent by Landlord to any such assignment or transfer or any subletting by Tenant, Tenant shall continue to be and remain liable hereunder. Any consent by Landlord to any such assignment, transfer or subletting shall in no event be construed to relieve Tenant from obtaining the prior consent of Landlord to any other or further such assignment, transfer or subletting.

Section 6.06.  If this Lease be assigned, or if the Demised Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed an acceptance

of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of the terms, covenants and conditions of this Lease on the part of Tenant to be performed. Any violation of any provision of this Lease, whether by act or omission, by any assignee, subtenant or similar occupant, shall be deemed a violation of such provision by Tenant, it being the intention and meaning of the parties hereto that Tenant shall assume and be liable to the Landlord for any and all acts and omissions of any and all assignees, subtenants and similar occupants.

## ARTICLE VII.   REPAIRS AND MAINTENANCE

Section 7.01.   (a)  Throughout the Lease Term, Tenant shall, at Tenant's cost and expense, keep and maintain in good order and condition, and make all Repairs to the interior and exterior, structural and non-structural portions of the Demised Premises; the equipment, fixtures and facilities appurtenant thereto; the heating, ventilating and air conditioning system therein; the electrical and plumbing systems; and the utility lines exclusively serving the Demised Premises; except to the extent being maintained pursuant to the Supplemental Agreement, the sidewalks and curbs adjacent to the Demised Premises (including keeping said sidewalks and curbs clean and free from dirt, rubbish, ice and snow); and, except to the extent the cost thereof is covered under the policies of insurance being maintained by Landlord in accordance with this Lease and/or the OEA, any such maintenance or Repair to Landlord's Tract and/or the Common Areas arising out of any act or negligence of Tenant, its agents, employees or invitees.

(b)  Tenant shall cause all Repairs required to be made by Tenant to be made in a good and workmanlike manner and without interference with or disruption to the operation of the Shopping Center or to the business of Landlord or any tenant, concessionaire or licensee of Landlord.

Section 7.02.  As used in this Article VII, the term "Repairs" shall mean all maintenance, repairs, replacements, alterations, additions and betterments, whether structural or non-structural, foreseen or unforeseen, ordinary or extraordinary, required to maintain the Demised Premises to the standard to which first class retail establishments are maintained in the Grand Rapids, Michigan greater metropolitan area.

Section 7.03.  Tenant covenants that, except to the extent caused by Landlord's negligence, Landlord shall not be responsible or liable to Tenant, or any person, firm or corporation claiming by, through or under Tenant for, or by reason of, any defect in the Demised Premises, or in any heating, ventilation or air conditioning equipment, machinery, electric wiring or fixtures, or other equipment or apparatus or appliances in the Demised Premises, or for any failure or defect of water, heat, ventilation, air conditioning, electric light or power supply, or of any apparatus or appliance in connection therewith, or from any injury or loss or damage to person or property resulting therefrom. Tenant further covenants that, except to the extent caused by Landlord's negligence, Landlord shall not be responsible or liable to Tenant, or any person, firm or corporation claiming by, through or under Tenant, for any injury, loss or damage to any persons or to the Demised Premises, or to any property of Tenant, or of any other person, contained in or upon the Demised Premises, caused by or arising or

13

resulting from the electric wiring, or plumbing, water, sewerage, or other pipes, or by or from any machinery or apparatus, or by or from any defect in or leakage, running or overflow of water or sewerage in any part of the Demised Premises, or by or from any other defect whatsoever, or by or from any injury or damage caused by, arising or resulting from lightning, wind, tempest, water, snow or ice, in, upon or coming through or falling from the roof, awnings or party walls or by or from other actions of the elements, or from any injury or damage caused by or arising, or resulting from acts or negligence of any occupant or user of the Building.

## ARTICLE VIII.  COMPLIANCE WITH LAW

Section 8.01.  (a)      Tenant shall, throughout the Lease Term and at no expense whatsoever to Landlord, promptly comply, or cause compliance, with all laws and ordinances and the orders, rules, regulations and requirements (individually and collectively "Legal Requirements") of all federal, state, county and municipal governments and appropriate departments, commissions, boards and officers thereof (individually and collectively "Governmental Authorities"), foreseen or unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto or shall involve any change of governmental policy or require structural or extraordinary repairs, alterations or additions and irrespective of the cost thereof, which may be applicable to the Demised Premises or the use or manner of use thereof.

(b)      Notwithstanding anything contained in Section 8.01(a) hereof to the contrary, if a change in applicable Legal Requirements occurs which is applicable to retail operations generally (as opposed to Tenant's specific use of the Demised Premises) then, if such Legal Requirement is first in effect during the last two (2) years of the Lease Term and the cost of compliance therewith, by reference to not less than two (2) bona fide bids, requires an expenditure of more than Seventy-Five Thousand Dollars ($75,000.00), Tenant may give notice to Landlord of the reasonable and necessary costs of compliance.  Landlord may, by notice to Tenant given within thirty (30) days after receipt of Tenant's notice, either (x) require Tenant to comply with such Legal Requirement, in which event Tenant's responsibility for such expenditure shall be limited to Seventy-Five Thousand Dollars ($75,000.00) and Landlord shall be responsible for all costs in excess thereof, or (y) terminate this Lease.  If Tenant fails to give notice to Landlord within thirty (30) days after learning of the application of such Legal Requirement to Tenant or the Demised Premises Tenant shall be deemed to have elected to comply with such Legal Requirement without contribution from Landlord.

Section 8.02.  Tenant agrees to defend and indemnify Landlord, and hold Landlord harmless from and against any and all claims, losses, damages, expenses (including, reasonable attorneys' fees), liabilities, demands and environmental damage arising from the presence of any chemical substance (a) the presence of which requires investigation or remediation under any federal, state, or local statute, regulation, ordinance, order, action, policy, or common law; (b) which is or becomes defined as a "hazardous waste" or "hazardous substance" under any federal, state, or local statute, regulation, or ordinance or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. SS 9601, et seq.) and/or the Resource Conservation and Recovery Act (42 U.S.C. SS 6901, et seq.); (c) which is toxic, explosive,

14

corrosive, carcinogenic, mutagenic, or otherwise hazardous and is or becomes regulated by any governmental authority, agency, department, commission, board, agency, or instrumentality of the United States, the State of Michigan, or any political subdivision thereof; (d) the presence of which on the Demised Premises causes or threatens to cause a nuisance within the Shopping Center or to adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about the Shopping Center; (e) the presence of which on adjacent properties could constitute a trespass; (f) without limitation, which contains gasoline, diesel fuel, or other petroleum hydrocarbons; or (g) without limitation, which contains polychlorinated bipheynols (PCB's), or asbestos, or urea formaldehyde foam insulation (individually and collectively "Hazardous Materials") "Released" as a result of the acts or omissions of Tenant, its agents, contractors or employees. The term "Release(d)" shall mean and refer to any spilling, leaking, pumping, pouring, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment, including the abandonment or discarding of barrels, drums, containers, tanks, or other receptacles containing or previously containing any Hazardous Material.

Section 8.03. (a)   Landlord represents to Tenant that, to the best of Landlord's knowledge, neither Landlord nor its agents, employees or contractors have Released any Hazardous Materials in, on, about or under Landlord's Tract, and, during the period of Landlord's ownership thereof Landlord has received no notice of a Release of Hazardous Materials on or about Landlord's Tract.

(b)   Landlord agrees to defend and indemnify Tenant, and hold Tenant harmless from and against any and all claims, losses, damages, expenses (including, reasonable attorneys' fees), liabilities, demands and environmental damage arising from the presence of any Hazardous Materials Released as a result of the acts or omissions of Landlord, its agents, contractors or employees.

## ARTICLE IX.  UTILITIES

Section 9.01.  Tenant shall, at Tenant's cost and expense, arrange for gas, electric, telephone, water, sewer and other utilities necessary to meet Tenant's requirements and thereafter Tenant shall pay or cause to be paid all charges for gas, water, sewer, electricity, light, heat, power, telephone or other communication service or other utility or kind of service used, rendered or supplied to, upon or in connection with the Demised Premises throughout the Lease Term, and Tenant agrees to defend and indemnify Landlord and save it harmless against any liability or damages on such account. Tenant expressly agrees that Landlord is not, nor shall it be, under this Lease required to furnish to Tenant or any other occupant of the Demised Premises, during the Lease Term, any water, sewer, gas, heat, electricity, light, power or any other facilities, equipment, labor, materials or services of any kind whatsoever. If a separate meter shall be required to be installed on common utility lines to measure Tenant's consumption of the utility, such meter shall be installed by Tenant at its expense.

Section 9.02. Tenant covenants and agrees that its use of utility services (including, without limitation, electric, gas, water and sewer) will not exceed either the capacity or maximum load of the utility lines serving the Demised Premises and other portions of Landlord's Tract or the Shopping

Center or which may from time to time be prescribed by applicable Governmental Authorities.

Section 9.03. Landlord shall in no event be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur if either the quantity or character of utility services is changed or is no longer available or suitable for Tenant's purposes.

## ARTICLE X. ALTERATIONS

Section 10.01. During the Lease Term, Tenant shall have the right to make interior, non-structural changes, alterations, or additions ("Alteration(s)") to the Demised Premises, provided no Alterations shall be made without Landlord's prior approval, which, after completion, would decrease the cubic content, or reduce the value, of the Demised Premises, or increase or conflict with governmental requirements applicable to the Demised Premises or the Shopping Center. Except as hereinabove provided, Tenant shall not make any Alterations to the Demised Premises without the prior consent of Landlord, which consent shall not be unreasonably withheld.

Section 10.02. Any Alterations that Tenant has a right to make, and any Alterations that Landlord has approved, shall be made at Tenant's sole cost and expense, and in making any such Alterations Tenant shall comply with the following conditions:

(i) no Alterations shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required, all necessary permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction. Landlord shall join in the application for such permits or authorizations upon request of Tenant if necessary provided Landlord is promptly reimbursed for any filing or other costs, fees or expenses incurred;

(ii) before commencing any Alterations requiring Landlord's consent, Tenant shall provide to Landlord, for Landlord's approval, plans and specifications, and, with respect to any Alterations which Tenant has a right to make without Landlord's approval, Tenant shall provide to Landlord a copy of plans and specifications therefor for informational purposes;

(iii) before commencing any Alteration, Tenant shall provide any necessary and appropriate riders for fire and extended coverage and comprehensive general public liability and property damage insurance, covering the risks during the course of such Alteration;

(iv) any Alterations shall be made with reasonable diligence (Unavoidable Delays excepted), in a good and workmanlike manner and in compliance with all applicable permits, authorizations, building codes, zoning laws, and all other laws, ordinances, orders, rules, regulations and requirements of all governmental departments having jurisdiction;

(v) all Alterations shall be made in accordance with the terms, covenants and provisions of the OEA;

(vi) upon completion of any Alteration requiring Landlord's consent, Tenant shall deliver to Landlord a set of plans marked to show "as built" conditions;

(vii) if required or issued by applicable Governmental Authorities, Tenant shall deliver to Landlord an amended or updated certificate of occupancy or certificate of completion; and

(viii) the cost of any Alterations shall be promptly paid so that Landlord's Tract at all

times shall be free of liens for labor and materials supplied or claimed to have been supplied to Tenant or the Demised Premises. If any lien shall be filed with respect to the Demised Premises or Shopping Center as a result of work performed by or on behalf of Tenant, Tenant shall cause such lien to be removed or bonded within thirty (30) days of notice by Landlord.

Section 10.03. Tenant's Building and all such Alterations made by Tenant, and any trade fixtures, trade equipment or personal property of Tenant, shall remain the property of Tenant during the Lease Term, and upon the expiration or earlier termination of the Lease Term, Tenant's Building and all such Alterations shall immediately be and become part of the realty and shall remain upon and be surrendered with the Demised Premises at the expiration or other termination of this Lease.

## ARTICLE XI.  INSURANCE

Section 11.01.  Commencing with Tenant entering into possession of the Demised Premises and throughout the Lease Term, Tenant shall, at Tenant's cost and expense, provide and cause to be maintained:

(i)      comprehensive general public liability insurance (including contractual liability coverage) insuring against claims for bodily injury, death or property damage that may arise from or be occasioned by the condition, use or occupancy of the Demised Premises and the sidewalks and curbs adjacent thereto, in the amount required under the OEA, but in no event less than Five Million Dollars ($5,000,000) combined single limit with respect to bodily injury or death to all persons and for property damage. The liability insurance requirements hereunder may be reviewed by Landlord every five (5) years for the purpose of increasing the minimum limits of such insurance from time to time to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards;

(ii)      Property insurance against loss or damage by fire, lightning, windstorm, hail, explosion, vandalism and malicious mischief, riot and civil commotion, smoke and all other perils now or hereafter included in standard extended coverage endorsements, insuring Tenant's Building and Tenant's trade fixtures, furnishings, equipment, leasehold improvements and all other items of personal property of Tenant located on, in or about the Demised Premises, and the plate glass of the Demised Premises, in an amount equal to the actual replacement cost thereof or such greater amount required to prevent Tenant from being treated as a co-insurer within the terms of applicable policies, (with provisions for a deductible as shall be reasonable in comparison with similar properties);

(iii)      If at any time a steam boiler or similar equipment is located in, on or about the Demised Premises, a policy insuring against loss or damage due to explosion, rupture or other failure of any boiler, pipes, turbines, engines or other similar types of equipment;

(iv)      During performance of any Alteration, Tenant shall maintain Worker's Compensation, public liability and builder's risk form of casualty insurance in amounts required under the OEA, naming Landlord, Tenant, any "Mortgagee" and the parties to the OEA as additional insureds;

(v)      In addition to the insurance required to be maintained hereunder, Tenant shall maintain such other or additional insurance required under the OEA with respect to the Demised Premises.

Section 11.02.  Landlord shall maintain, or cause to be maintained, with respect to the Common Areas, comprehensive general public liability insurance (including contractual liability) in an

amount required under the OEA, but in no event not less than Five Million Dollars ($5,000,000) combined single limit for personal and bodily injury to all persons and for property damage.

Section 11.03. All insurance provided for in this Article shall be effected under policies of insurance complying with the requirements of the OEA, issued by insurers reasonably approved by Landlord which are licensed to do business in the State of Michigan and rated "A" or better by A.M. Best Company, or any successor thereto. Landlord and Tenant shall on request provide to the other, to any Mortgagee and the parties under the OEA certificates of the policies required to be maintained pursuant hereto. Each such policy shall contain a provision that no unintentional act or omission of the insured shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained and an agreement by the insurer that such policy shall not be canceled without at least 30-days' prior notice to any party named as an additional insured.

Section 11.04. All policies of liability insurance required to be maintained by Tenant under this Article shall name Tenant as the insured and Landlord, any Mortgagee and the parties under the OEA as additional insureds. All policies of liability insurance required to be maintained by Landlord under this Article shall name Landlord as the insured and Tenant as an additional insured. Al policies of casualty insurance required under this Article shall name Tenant as the insured and Landlord as additional loss payee, and shall be payable in the event of loss, jointly to Tenant and Landlord, as their interests may appear, and shall name any Mortgagee pursuant to a standard first mortgagee clause, subject in all respects to the terms of this Lease.

Section 11.05. Any insurance provided for in this Article XI may be effected by a blanket policy or policies of insurance, or under so-called "all risk" or "multi-peril" insurance policies, provided that the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and provided further that in other respects, any such policy or policies shall comply with the provisions of this Article XI. An increased coverage or "umbrella policy" may be provided and utilized to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate liabilities provided by all such policies shall be satisfactory provided they otherwise comply with the provisions of this Article XI.

Section 11.06. Every insurance policy carried by either party shall (if it can be so written and either does not result in a material additional premium or the other party agrees to pay on demand any additional premium) include provisions denying to the insurer subrogation rights against the other party, against the parties under the OEA and against any Mortgagee to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Each party hereby waives any rights of recovery against the other party for any direct damage or consequential loss covered by said policies against which such party is protected by insurance or (by the inclusion of deductible provisions therein or otherwise) has elected to be self-insured, to the extent of the proceeds paid under such policies and the amount of any such self-insurance, whether or not such damage or loss shall have been caused by any acts or omissions of the other party.

18

Section 11.07. (a) Landlord and Tenant shall cooperate fully with each other to obtain the largest possible recovery and execute any and all consents and other instruments and take all other actions necessary or desirable to effectuate the same and to cause such proceeds to be paid as hereinbefore provided.

(b) Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other.

Section 11.08. Notwithstanding anything in this Lease to the contrary, Landlord may elect to self-insure against any or all of the risks, or any portion thereof, against which Landlord is required to insure pursuant to this Lease, provided Landlord, together with all subsidiaries, affiliates, parent, controlled or controlling entities, complies with the self insurance requirements of the OEA. If Landlord elects to self-insure any risk(s) required to be insured by Landlord hereunder, Tenant shall reimburse Landlord, as part of Tenant's Common Area Expense Contribution, Tenant's Fraction of the imputed value of premiums which reasonably would have been payable for policies of insurance to be maintained by Landlord hereunder.

## ARTICLE XII  DAMAGE AND DESTRUCTION

Section 12.01. If the Demised Premises, or any portion thereof, shall be damaged by fire or other casualty, Tenant shall immediately give notice thereof to Landlord.

Section 12.02. (a) In the event more than fifty percent (50%) of the Floor Area of Tenant's Building is damaged, destroyed or rendered untenantable by fire or other casualty, Tenant shall have the right to terminate this Lease by giving notice of such election to Landlord within ninety (90) days after such damage or destruction shall have occurred. If Tenant shall give such notice, Tenant immediately cause the razing of Tenant's Building and improvements appurtenant thereto, the filling of any excavations, the grading and landscaping of the Demised Premises in a sufficient manner so as to prevent the blowing of dirt and sand and to prevent erosion, and performance of any other work necessary to put the Demised Premises in a clean, sightly and safe condition.

(b). In the event Tenant's Building shall be damaged or destroyed during the last two (2) years of the Lease Term, Tenant shall have the right to terminate this Lease by giving notice of such election to the other within ninety (90) days after such damage or destruction shall have occurred.

(c) If Tenant shall give a notice of termination of this Lease in accordance with this Section 12.02, this Lease shall terminate as of the last day of the calendar month immediately following the month in which such notice shall have been given. In the event of such termination, neither Landlord nor Tenant shall be required to restore or rebuild the Shopping Center or the Demised Premises, or any portion thereof. If this Lease shall terminate pursuant to this Section 12.02, Tenant shall pay to Landlord the least of (x) the insurance proceeds (or the amount of insurance proceeds which would have been payable under policies of insurance Tenant is required to maintain pursuant to this Lease if Tenant fails to carry the insurance coverages required hereunder) payable on account of such damage or destruction, or (y) an amount equal to Fixed Rent which would have been

payable by Tenant during the succeeding five (5) Lease Years, or (z) an amount equal to Fixed Rent which would have been payable by Tenant during the then remaining Lease Term.

Section 12.03. (a) In the event the whole or any part of the Demised Premises shall, during the Lease Term, be damaged or destroyed by fire or other casualty, and this Lease is not terminated pursuant to the terms of Section 12.02 hereof, Tenant shall:

      (i)     commence and proceed with due diligence to repair, restore and/or rebuild Tenant's Building, or damaged portions thereof, substantially to their condition and character immediately prior to such damage ("Tenant's Restoration Work"), or

      (ii)    cause the razing of Tenant's Building and improvements appurtenant thereto, the filling of any excavations, the grading and landscaping of the Demised Premises in a sufficient manner so as to prevent dirt and sand and to prevent erosion, and performance of any other work necessary to put the Demised Premises in a clean, sightly and safe condition ("Clearing Work").

Tenant shall give notice to Landlord within ninety (90) days from the date of such fire or other casualty of which alternative Tenant elects. If Tenant does not repair, rebuild and restore Tenant's Building, Tenant shall, upon expiration or sooner termination of this Lease, pay to Landlord the actual cash value of Tenant's Building on the date of the fire or other casualty.

(b)    (i)    If Tenant has elected to perform the Clearing Work but has not commenced the Clearing Work within ninety (90) days after the fire or other casualty or fails to diligently proceed therewith with due diligence, Landlord may, in addition to its other rights and remedies provided in this Lease, or which may be available at law or in equity, elect to (x) perform the Clearing Work on Tenant's behalf, in which event Tenant shall reimburse Landlord on demand for any cost and expense incurred by Landlord in performing the Clearing Work, plus interest at the Interest Rate, (y) seek an injunction requiring Tenant to promptly commence, and continue with reasonable dispatch, the Clearing Work, or (z) terminate this Lease, in which event all insurance proceeds payable on account of such damage or destruction of the Demised Premises may be retained by Landlord.

(ii)    If Tenant has elected to perform Tenant's Restoration Work but has not commenced Tenant's Restoration Work within ninety (90) days after the fire or other casualty, or fails to diligently proceed therewith with due diligence, or fails to complete Tenant's Restoration Work within twelve (12) months after the fire or other casualty, Landlord may, in addition to its other rights and remedies provided in this Lease, or which may be available at law or in equity, elect to (x) perform Tenant's Restoration Work, or any portion thereof, on Tenant's behalf, in which event all insurance proceeds with respect to the Demised Premises shall be made available to Landlord in accordance with Section 12.04 hereof, and in addition thereto Tenant shall reimburse Landlord on demand for any cost and expense incurred by Landlord in performing Tenant's Restoration Work in excess of such insurance proceeds, plus interest at the Interest Rate, (y) seek an injunction requiring Tenant to promptly commence, and continue with reasonable dispatch, Tenant's Restoration Work, or seek damages, or both, or (z) terminate this Lease, in which event all insurance proceeds payable on account of such damage or destruction of the Demised Premises may be retained by Landlord.

Section 12.04. (a)    In the event the whole of, or any portion of, the Common Areas within Landlord's Tract shall, during the Lease Term, be damaged or destroyed by fire or other casualty, and this Lease is not terminated pursuant to the provisions of Section 12.02 hereof, Landlord shall commence and proceed with due diligence to repair, restore and/or rebuild the Common Areas within Landlord's Tract to substantially their condition and character immediately prior to such damage ("Landlord's Restoration Work").

(b)    In no event shall Landlord be required to repair or replace Tenant's Building, or any other portion of the Demised Premises, nor any of Tenant's merchandise, trade fixtures, furnishings, equipment, leasehold improvements or other items of personal property of Tenant.

Section 12.05. (a) As used herein, the phrase "party performing Tenant's Restoration Work" shall mean Tenant, or Landlord in the event Landlord elects to perform Tenant's Restoration Work pursuant to Section 12.03(b).

(b) All insurance proceeds payable to Tenant as a result of casualty to the Demised Premises, or any portion thereof, shall be deposited with a financial institution holding a first mortgage on Tenant's Building, or if none then with Landlord's Fee Mortgagee, if there is a Fee Mortgage, or if there is no Mortgage, then to the joint account of Tenant and Landlord in a bank doing business in the Grand Rapids, Michigan area having assets of at least $150,000,000, selected by Tenant, subject to the reasonable approval of Landlord (the "Depository"), in trust for purposes of reimbursement for the cost of Tenant's Restoration Work, or payment to Landlord in accordance with Section 12.03. Insurance proceeds deposited with the Depository hereunder shall be advanced from time to time to the party performing Tenant's Restoration Work for such purposes as the work progresses, upon certification by the architect (licensed in the State of Michigan) in charge of Tenant's Restoration Work that the amounts requested either shall have been paid in connection with Tenant's Restoration Work or shall be due to contractors, subcontractors, materialmen, architects or other persons who have rendered services or furnished materials for Tenant's Restoration Work, and upon completion of Tenant's Restoration Work, the remaining balance (in excess of the cash value of Tenant's Building if Tenant has elected not to restore Tenant's Building), if any, shall be paid to Tenant.

(c) If Tenant elects to restore Tenant's Building but the insurance proceeds payable to Tenant as a result of damage or destruction of the Demised Premises are not sufficient to cover the costs and expenses of Tenant's Restoration Work, Tenant shall immediately deposit with the Depository the difference between said insurance proceeds and such costs and expenses.

Section 12.06. (a) Except to the extent specifically provided in this Lease, no damage or destruction of the Demised Premises by fire or other casualty, nor the untenantability of the Demised Premises or Common Areas, shall permit Tenant to terminate this Lease or surrender the Demised Premises, nor shall relieve Tenant from its obligation to pay Rent or perform any of Tenant's other obligations under this Lease.

(b) Tenant hereby expressly waives any rights now or hereafter conferred by any law or statute to terminate this Lease or surrender the Demised Premises, or any portion thereof, or to suspend, diminish, abate or reduce Rent on account of any such damage or destruction.

(c) Tenant shall not be entitled to and hereby waives any and all claims against

21

Landlord for any compensation or damage for loss of use of the Demised Premises, the Common Areas or any portion thereof, and/or for any inconvenience or annoyance resulting from any damage, destruction, repair or restoration.

## ARTICLE XIII  EMINENT DOMAIN

Section 13.01.  (a)  In the event of a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right (herein called "Taking") of all or substantially all of the Demised Premises, then this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier (the "Vesting Date").

(b)  In the event of a Taking of any part of the Demised Premises or of any part of the Common Area, then this Lease shall terminate with respect to the portion so taken on the Vesting Date.

Section 13.02.  (a)  In the event of a Taking of less than substantially all of the Demised Premises, Landlord or Tenant may elect to terminate this Lease if, by reason of the Taking (i) the number of parking spaces within Landlord's Tract shall be reduced below the number required by the OEA or municipal requirements and cannot reasonably be replaced by Landlord; or (ii)  there is any Taking of the Demised Premises occurring during the last two (2) years of the Lease Term.

(b)  In addition to the foregoing, in the event of a Taking of less than substantially all of the Demised Premises, Tenant may elect to terminate this Lease if, by reason of the Taking there is a material restriction on Tenant's ability to operate the Demised Premises for the use operating therein immediately prior to the Taking.

(c)  In the event this Lease is terminated pursuant to Subsection (a) or (b) hereof, Landlord or Tenant shall, within one hundred twenty (120) days of the Taking, give notice to the other, and the Lease Term shall expire and come to an end as of the last day of the calendar month in which such notice is given.

(d)  Notwithstanding the foregoing, Landlord's election to terminate this Lease pursuant to clause (ii) of Subsection (a) shall become void if, within twenty (20) days after receipt of Landlord's notice of termination, Tenant exercises an option to extend the Lease Term for the renewal period next following the Taking.

Section 13.03.  (a)  If this Lease is not terminated pursuant to Section 13.01 or 13.02 hereof, Tenant shall:

(i)  commence and proceed with due diligence to repair, restore and/or rebuild the remaining portions of Tenant's Building to a complete architectural unit of substantially the same condition and tenantability as existed immediately preceding the Taking ("Tenant's Reconstruction Work"), or

(ii)  cause the razing of Tenant's Building and improvements appurtenant thereto, the filling of any excavations, the grading and landscaping of the Demised Premises in a sufficient manner so as to prevent dirt and sand and to prevent erosion, and performance of any other work necessary to put the Demised Premises in a clean, sightly and safe condition ("Clearing Work").

22

Tenant shall give notice to Landlord within ninety (90) days after the Vesting Date of which alternative Tenant elects. If Tenant elects to restore Tenant's Building, "Tenant's Award" (as defined in Section 13.07) shall be made available to Tenant in accordance with Section 13.05 hereof, for purposes of paying the cost of Tenant's Reconstruction Work.

(b) (i) If Tenant has elected to perform the Clearing Work but has not commenced the Clearing Work within ninety (90) days after the Vesting Date or fails to diligently proceed therewith with due diligence, Landlord may, in addition to its other rights and remedies provided in this Lease, or which may be available at law or in equity, elect to (x) perform the Clearing Work on Tenant's behalf, in which event Tenant shall reimburse Landlord on demand for any cost and expense incurred by Landlord in performing the Clearing Work, plus interest at the Interest Rate, (y) seek an injunction requiring Tenant to promptly commence, and continue with reasonable dispatch, the Clearing Work, or (z) terminate this Lease, in which event Tenant's Award may be retained by Landlord.

(ii) If Tenant has elected to perform Tenant's Reconstruction Work but has not commenced Tenant's Reconstruction Work within ninety (90) days after the Vesting Date, or fails to diligently proceed therewith with due diligence, or fails to complete Tenant's Reconstruction Work within twelve (12) months after the Vesting Date, Landlord may, in addition to its other rights and remedies provided in this Lease, or which may be available at law or in equity, elect to (x) perform Tenant's Reconstruction Work, or any portion thereof, on Tenant's behalf, in which event Tenant's Award shall be made available to Landlord in accordance with Section 13.05 hereof, and in addition thereto Tenant shall reimburse Landlord on demand for any cost and expense incurred by Landlord in performing Tenant's Reconstruction Work in excess of Tenant's Award, plus interest at the Interest Rate, (y) seek an injunction requiring Tenant to promptly commence, and continue with reasonable dispatch, Tenant's Reconstruction Work, or seek damages, or both, or (z) terminate this Lease, in which event Tenant's Award shall be retained by Landlord.

Section 13.04. (a) If this Lease is not terminated pursuant to Section 13.01 or 13.02 hereof, the award or payment for a taking allocable to the Common Areas of Landlord's Tract (herein called "Landlord's Award") shall be used by Landlord to restore the remaining portions of the Common Areas of Landlord's Tract to substantially their condition and tenantability immediately prior to such Taking ("Landlord's Restoration Work").

(b) In no event shall Landlord be required to repair or replace Tenant's Building or any other portion of the Demised Premises, nor any of Tenant's merchandise, trade fixtures, furnishings, equipment, leasehold improvements or other items of personal property of Tenant.

Section 13.05. (a) As used herein, the phrase "party performing Tenant's Reconstruction Work" shall mean Tenant, or Landlord, in the event Landlord elects to perform Tenant's Reconstruction Work pursuant to Section 13.03 hereof.

(b) Tenant's Award shall be deposited with the Depository, in trust for purposes of reimbursement for the cost of Tenant's Reconstruction Work. Tenant's Award deposited with the Depository hereunder shall be advanced from time to time to the party performing Tenant's Reconstruction Work for such purposes as the work progresses, upon certification by the architect

(licensed in the State of Michigan) in charge of Tenant's Reconstruction Work that the amounts requested either shall have been paid in connection with the Reconstruction Work or shall be due to contractors, subcontractors, materialmen, architects or other persons who have rendered services or furnished materials for Tenant's Reconstruction Work, and upon completion of Tenant's Reconstruction Work, the remaining balance of Tenant's Award shall be paid to Tenant.

(c)  If Tenant elects to restore Tenant's Building but Tenant's Award is not sufficient to cover the costs and expenses of Tenant's Reconstruction Work, Tenant shall immediately deposit with the Depository the difference between Tenant's Award and such costs and expenses.

Section 13.06.        If there is a Taking, then commencing on the Vesting Date, Fixed Rent shall be the product of (i) Fixed Rent immediately preceding the Taking, and (ii) a fraction, the numerator of which shall be the Floor Area of the Demised Premises remaining after the Taking, and the denominator of which shall be the Floor Area of the Demised Premises immediately preceding the Taking.

Section 13.07.  (a)       If there is a Taking, the proceeds of any award or settlement shall be divided between Landlord and Tenant as follows and in the following order of priority:

> (i)      if and only if (x) the Leasehold Lien providing construction financing, or (y) the first so-called "permanent" Leasehold Lien encumbering Tenant's interest under this Lease and/or Tenant's Building, continues to encumber the Demised Premises at the time of the Taking, the holder of such Leasehold Lien shall be entitled to that portion of the award or settlement equal to the outstanding unpaid principal balance under the Leasehold Lien at the time of the Taking, but in no event exceeding One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00);

> (ii)      Landlord shall be entitled to receive that portion of the award or settlement equal to the value of Landlord's fee estate in the Land taken;

> (iii)      Tenant shall be entitled to receive that portion of the award or settlement allocable to the improvements constructed by Tenant upon the Demised Premises, less any amount payable to the holder of a Leasehold Lien in accordance with paragraph (i) above; and

> (iv)      all other compensation awarded or paid in respect of a total or partial Taking of the Land and/or improvements constructed thereon, or for loss of easements rights or property interests under the OEA, shall belong to and be the property of Landlord without any participation by Tenant.

(The portion of the award or settlement set forth in paragraph (i) or (iii) above, as applicable, is herein called "Tenant's Award".)  Nothing herein shall be construed to preclude Tenant from prosecuting any claim directly against the condemning authority in such condemnation proceeding for loss of business, depreciation and damage to, cost of removal and value of, stock, trade fixtures, furniture and other personal property belonging to Tenant, provided that no such claim shall diminish or otherwise adversely affect Landlord's award or the award of any Mortgagees.

## ARTICLE XIV.  LANDLORD'S COVENANTS

Section 14.01.  (a)  Tenant, upon paying the Rent and performing and observing all of Tenant's other obligations under this Lease, shall have and enjoy, during the Lease Term, quiet and undisturbed possession and use of the Demised Premises and all appurtenances thereto, as

contemplated in this Lease."

(b) This covenant shall be construed as running with Landlord's fee interest in the Demised Premises and is not, nor shall it operate or be construed as, a personal covenant of Landlord, except to the extent of Landlord's said interest in the Demised Premises and only so long as such interest shall continue; and thereafter this covenant shall be binding only upon such subsequent owners and successors in interest, to the extent of their respective interests, as and when they shall acquire the same, and only so long as they shall retain such interest.

Section 14.02.   Landlord shall, upon request of Landlord or Golf Galaxy, Inc., execute acknowledge and deliver a Waiver and Consent in the form annexed hereto as Exhibit G.

## ARTICLE XV.   INSOLVENCY

Section 15.01.   If proceedings in bankruptcy shall be instituted by or against Tenant, or if Tenant shall file, or any creditor or other person shall file, any petition in bankruptcy under any law, rule or regulation of the United States of America or of any State, or if a receiver of the business or assets of Tenant shall be appointed, or if a general assignment is made by Tenant for the benefit of creditors, or any sheriff, marshall, constable or other duly constituted public official takes possession of the Demised Premises by authority of any attachment or execution proceedings, and offers same for sale publicly, and if any such action is not vacated or withdrawn, within thirty (30) days thereafter, any of such event shall constitute and "Event of Default" hereunder and Landlord may, at its option, subject to Tenant's rights under the Bankruptcy Act, in addition to its other rights and remedies provided in this Lease, or which may be available at law or in equity, immediately take possession of the Demised Premises and terminate this Lease.  On any such termination, all installments of Rent owing to the date of termination shall become at once due and payable.

## ARTICLE XVI.   DEFAULT

Section 16.01.   Each of the following shall be deemed an "Event of Default":

(i) Any failure by Tenant to pay any Rent or other sum of money within ten (10) days after receipt of notice that same has not been received by Landlord on the date it was payable under this Lease;

(ii) Any failure by Tenant to perform any of the other terms, conditions or covenants of this Lease to be observed or performed by Tenant for more than thirty (30) days after notice of such default shall have been given to Tenant, provided however, if such failure is not susceptible of being cured with due diligence within said 30-day period, the time within which to cure shall be extended for such time as may be necessary to cure the same with all due diligence, provided Tenant commences promptly and proceeds diligently to cure the same;

(iii) Any interest of Tenant hereunder shall pass to another except as expressly permitted in this Lease;

(iv) Any act or omission by Tenant which would constitute a breach or violation by Landlord of any of the terms, covenants, conditions or provisions of the "OEA" after receipt of notice thereof and expiration of a period equal to the cure period provided for such default under the OEA, less five (5) days if the default relates to the payment of money, and less ten (10) days if the default relates to the performance of any obligation, or violation or attempted violation of the covenants and restrictions, contained in the OEA; or

(v) An Event of Default under Section 15.01 hereof.

25

**Section 16.02.** If an Event of Default shall occur, in addition to any other right or remedy available at law or in equity, Landlord shall have the right to:

(i) bring suit for the collection of the Fixed Rent, Additional Rent and/or other amounts for which Tenant may be in default, or for the performance of any other covenant or agreement devolving upon Tenant, all without entering into possession or terminating this Lease;

(ii) without terminating this Lease, re-enter the Demised Premises and dispossess Tenant and any other occupants thereof, by legal process, and remove their effects not previously removed by them and hold the Demised Premises free of this Lease; or

(iii) terminate this Lease, notwithstanding any prior reletting without termination, whereupon Landlord, its agents or representatives, may re-enter the Demised Premises and dispossess Tenant and any other occupants thereof, by legal process, and remove their effects not previously removed by them and hold the Demised Premises free of this Lease, and this Lease shall terminate as if such date were the date fixed herein for the expiration of the Lease Term, but Tenant shall continue to remain liable as hereinafter provided.

After such a dispossession or removal, (x) the Fixed Rent and Additional Rent hereunder shall be paid up to the date thereof, (y) Landlord may relet the Demised Premises or any part or parts thereof either in the name of Landlord or otherwise, for a term or terms which may, at the option of Landlord, be less than or exceed the period which would otherwise have constituted the balance of the Lease Term, (z) Tenant shall pay to Landlord any deficiency between the sum of the Fixed Rent and Additional Rent due hereunder and the amount of rents and other charges collected on account of the new lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the Lease Term, and (xx) Tenant shall pay to Landlord the reasonable costs and expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Demised Premises and in securing possession thereof, as well as the expenses of reletting the Demised Premises, including, without limitation, repairing the Demised Premises, making commercially reasonable alterations thereto which do not change the general character of Tenant's Building, and preparing the Demised Premises for new tenants; reasonable brokers' commissions; reasonable legal fees; and other reasonable expenses and concessions. Such deficiency shall be paid by Tenant in monthly installments on the dates specified in this Lease for payment of Fixed Rent, and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. On each reletting, all rent received by Landlord from such reletting shall be applied first to the payment of any indebtedness (other than Rent due hereunder) of Tenant to Landlord, second, to the payment of any costs and expenses of such reletting, including brokerage fees, attorneys' fees and costs of such alterations and repairs, third, to the payment of Rent due and unpaid hereunder, and the balance, if any, shall be held by Landlord and applied in payment of future Rent as it may come due and payable hereunder. In the alternative to the sums due to Landlord pursuant to clause (z) above, following any such dispossession or removal, Landlord may claim as damages no more than the difference discounted to present value at a rate equal to that of a ten (10) year Treasury Note (as published in the most recent Federal Reserve Statistical Release H-15, Selected Interest Rates, 10-year Treasury Constant Maturities, or if no longer published, in the Wall Street Journal or other national periodical covering financial markets) between the balance of Fixed Rent payable over the remainder of the Lease Term and the fair market rental value of the Premises over the same period. No such re-entry or taking possession of the Demised Premises by Landlord shall be construed as election on its part to terminate this Lease unless a written notice of such intention be given to Tenant or unless such termination be decreed by a court of competent jurisdiction. Notwithstanding any other provision

hereof to the contrary, Landlord shall use commercially reasonable efforts to mitigate its damages in the event of any breach or default by Tenant. In no event shall Landlord seek, nor shall Tenant be held liable for, any consequential damages.

Section 16.03. If Tenant shall fail to comply with all of its duties and obligations as set forth in this Lease for a period of thirty (30) days (or such other period as may be provided elsewhere in this Lease) after notice thereof from Landlord to Tenant, in addition to such other rights and remedies as may be available to Landlord under the this Lease, or at law or in equity, Landlord shall have the right, but not the obligation, to cure such failure. Notwithstanding the foregoing, if, in Landlord's reasonable judgment, an emergency shall exist, Landlord may cure such default without any prior notice to Tenant, provided however, Landlord will thereafter give notice to Tenant as promptly as practical of the reason for and time of entry and of all actions taken by Landlord. Any performance by Landlord of an obligation of Tenant shall not be construed as a modification or waiver of any provision of this Lease, and said obligation shall remain the obligation of Tenant. Tenant shall immediately upon demand, reimburse Landlord, as Additional Rent, the costs incurred by Landlord in performing Tenant's obligations under this Lease, together with interest at the Interest Rate.

Section 16.04. In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right to appropriate injunctive and declaratory relief.

Section 16.05. The rights and remedies provided in this Lease shall be cumulative, and the exercise of any one or more shall not preclude the exercise, or act as a waiver, of any other right or remedy of Landlord hereunder, or which may exist at law, in equity or by statute. The words "re-enter" and "re-entry" as used herein are not restricted to their technical legal meaning.

Section 16.06. (a) If Landlord shall fail to observe, perform or comply with any of its duties and obligations as set forth in this Lease for a period of thirty (30) days after notice thereof from Tenant to Landlord (provided however, said 30-day period shall be extended if such failure is of such a nature that it cannot with reasonable diligence be completely remedied within said period of thirty (30) days, provided Landlord shall promptly commence to remedy such failure and thereafter diligently proceeds therewith to completion):

> (i)      Tenant shall have the right to seek a court order or judgment to compel Landlord to observe, comply with or perform such duties and obligations or cure such failure, or

> (ii)     Tenant shall have the right, but not the obligation, to cure such failure, in which event Landlord shall immediately reimburse Tenant for the reasonable and necessary costs incurred by Tenant in performing any of Landlord's obligations hereunder.

In no event whatsoever, however, shall Tenant seek nor shall Landlord be held liable for any monetary damages, whether consequential, incidental or otherwise, in connection with or as a result of any such legal action by Tenant.

(b) Notwithstanding that certain additional rights or remedies may now or hereafter be available to Tenant at law or in equity, by statute or otherwise, the rights and remedies as, when and

27

to the extent specifically provided Tenant in Subsection (a) hereof shall be Tenant's sole and exclusive rights and remedies under this Lease in the event of Landlord's failure to observe, perform or comply with any of its duties and obligations of this Lease on its part to be observed, performed or complied within the time periods provided in this Lease.

## ARTICLE XVII.  UNAVOIDABLE DELAYS, FORCE MAJEURE

Section 17.01.  If either party shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor, materials or reasonable substitutes therefor, Act of God, weather, soil conditions, site conditions, present or future governmental restrictions, regulation or control, insurrection, sabotage, fire or other casualty,  or any other condition beyond the control of the party, other than unavailability of funds or financing (individually and collectively "Unavoidable Delays"), then the time to perform such obligation or satisfy such condition shall be extended by the delay caused by such event.  If either party shall as a result of an Unavoidable Delay be unable to exercise any right or options within any time limit provided therefor in this Lease, such time limit shall be deemed extended for a period equal to the duration of such Unavoidable Delay.

## ARTICLE XVIII.  NOTICES

Section 18.01.  (a)  Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication shall or may be given to either of the parties by the other, it shall be in writing and, any law or statute to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given or served by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier (public or private) addressed as follows:

(i) If to Landlord:

TOYS "R" US - DELAWARE, INC.
461 From Road
Paramus, New Jersey 07652
Attention: Senior Vice President-
    Real Estate

and a copy under
separate cover to:

TOYS "R" US - DELAWARE, INC.
461 From Road
Paramus, New Jersey  07652
Attention:  Real Estate Counsel

and to any Mortgagee at the address
provided by such Mortgagee; and

(ii) If to Tenant:

OPPIDAN INVESTMENT COMPANY
420 International Centre
900 Second Avenue South
Minneapolis, Minnesota 55402

28

and a copy under
separate cover to:

Golf Galaxy, Inc.
9961 Valley View Road
Eden Prairie, Minnesota 55344
Attention: Greg Maanum

Morrison & Fenske, P.A.
465 Southdale Office Centre
6600 France Avenue South
Edina, Minnesota 55435
Attention: James F. Morrison, Esq.

Winthrop & Weinstine, P.A.
3200 Minnesota World Trade Center
30 East Seventh Street
St. Paul, Minnesota 55101
Attention: James W. Dierking, Esq.

Tenant's leasehold mortgagee in accordance
with Section 29.03 hereof

or at such other address as either party may from time to time designate by notice to the other as
herein provided.

(b) Any notice hereunder shall be deemed to have been given or served on the date on
which such notice is deposited with the United States Postal Service or such overnight carrier, and
shall be deemed to have been received on the third business day following the time same was
deposited with the United States Postal Service, or upon receipt or rejection if sent by overnight
carrier.

(c) Anything herein to the contrary notwithstanding, neither party may designate an
address for delivery of notices which does not indicate a street address, which shall include a building
name and/or number, street designation, city, state and zip code.


## ARTICLE XIX. ACCESS

Section 19.01. Landlord and its designees shall have the right, during regular business hours,
upon prior notice to Tenant, to enter upon the Demised Premises to inspect the Demised Premises, to
make Repairs and perform other obligations of Tenant pursuant to Section 16.02 hereof, and, during
the period commencing one hundred eighty (180) days prior to the end of the Lease Term, for the
purpose of exhibiting same to prospective tenants. Landlord's employees, agents and contractors
shall identify themselves to store management upon entering the Demised Premises. Notwithstanding
anything herein to the contrary, Landlord and its designees shall have the right to enter upon the
Demised Premises at any time without prior notice to respond to emergency situations.


## ARTICLE XX. SIGNS

Section 20.01. Tenant may install and maintain, at its own cost and expense, a storefront sign,
on the exterior wall of the Demised Premises of the color, content, design and dimensions shown on
Exhibit F annexed hereto. Except as herein provided, Tenant shall not place or install any sign on the
roof or exterior wall of the Demised Premises without the approval of Landlord as to the dimensions,
content, material, location and design.

Section 20.02.  (a) Tenant may, subject to obtaining approval by the parties to the OEA (if such approval is required), place and maintain an identification sign ("Tenant's Panel") on the pylon sign structure identified as "TRU Sign Area" in the OEA (the "Pylon").  Tenant's Panel shall not exceed the dimension of any identification panel identifying Landlord or other occupants of Landlord's Tract, shall be installed below the identification panels of Landlord and the other occupants of Landlord's Tract, and shall otherwise be of such design and content as shall be approved by Landlord, which approval shall not be unreasonably withheld.

(b)  If Tenant installs Tenant's Panel on the Pylon, Tenant shall, within fifteen (15) days after installation thereof, pay to Landlord the sum of Five Thousand Dollars ($5,000.00) for Tenant's contribution to the original cost of construction.  Tenant shall, at Tenant's cost and expense, make such modifications to the Pylon as shall be required to accommodate and/or support Tenant's Panel in accordance with plans and specifications approved by Landlord, which approval shall not be unreasonably withheld.  Landlord shall maintain the Pylon, or cause the Pylon to be maintained, in good order and repair.  Tenant shall pay to Landlord a portion of cost of operation and maintenance of the Pylon which portion shall be equal to the product of (x) such costs, and (y) a fraction, the numerator of which shall be the number of square feet of surface area of Tenant's Panel, and the denominator of which shall be the number of square feet of surface area of all identification sign panels maintained thereon (excluding the Shopping Center name panel).

Section 20.03.  No sign shall be installed by Tenant until all governmental approvals and permits required therefor are first obtained and all fees pertaining thereto have been paid.  Tenant shall comply with all laws and ordinances of applicable Governmental Authorities, and the terms, covenants and provisions of the OEA, with respect to the installation and maintenance of all signs.

Section 20.04.  (a)  Landlord hereby reserves for the benefit of Landlord, its successor and/or assigns, an easement for the installation, use, maintenance, repair, removal and replacement of an exterior, illuminated sign ("Landlord's Additional Sign"), three (3) feet in height and twenty-four (24) feet in length, upon the southerly exterior wall of Tenant's Building, in a location thereon approved by Tenant (which approval shall not be unreasonably withheld), together with an easement for the installation, use, maintenance, repair and replacement of electrical lines upon, over, under and through Tenant's Building necessary to provide electricity for the illumination of Landlord's Additional Sign, and also together with rights of access for the purposes hereinabove provided.

(b)  Landlord shall, prior to installation of Landlord's Additional Sign, obtain approval of Landlord's Additional Sign from the parties to the OEA (if such approval is required) and all governmental approvals and permits required therefor.

(c)  Landlord shall promptly repair all damage to the Demised Premises caused by installation or removal of Landlord's Additional Sign.  Landlord shall, at Landlord's cost and expense, maintain Landlord's Additional Sign (unless the need for repairs result from the negligence of Tenant, its employees, contractors, agents, subtenants or other occupants of the Demised Premises).

(d)  Landlord shall defend, indemnify and save Tenant harmless from and against any loss, expense (including reasonable attorneys' fees) or damage incurred or suffered by Tenant by

reason of the Installation, removal, maintenance or operation of Landlord's Additional Sign on the Demised Premises.

## ARTICLE XXI.  IMPROVEMENTS AND FIXTURES

Section 21.01.  Tenant's Building and all Improvements or Alterations to the Demised Premises and equipment therein, together with any replacements thereof, shall be and remain the property of Tenant during the Lease Term, and upon the expiration or earlier termination of the Lease Term, Tenant's Building and all Improvements and Alterations shall immediately be and become part of the realty and shall remain upon and be surrendered with the Demised Premises.  Upon the expiration or sooner termination of this Lease Tenant shall remove Tenant's trade fixtures, inventory, personal property and debris from the Demised Premises. Any of Tenant's trade fixtures, inventory and personal property remaining on the Demised Premises after the expiration or sooner termination of this Lease shall be deemed abandoned by Tenant or its subtenants or licensees and shall become the property of  Landlord without payment therefor and may be retained by Landlord as its sole property, or may be disposed of or stored by Landlord, at Tenant's cost and expense, in such manner as Landlord may see fit, without accountability therefor.  Tenant agrees to repair any damage done to the Demised Premises resulting from the removal of such Tenant's trade fixtures, inventory and personal property.

## ARTICLE XXII.  END OF TERM

Section 22.01.  Upon the expiration or other termination of the Lease Term, Tenant shall peaceably and quietly quit and surrender the Demised Premises, together with all Improvements and Alterations which are then part of the realty, broom clean, in good order and condition, reasonable wear and tear and the provisions of Articles XII and XIII excepted.

Section 22.02.  (a)  Upon the expiration of the Lease Term or other earlier termination of this Lease, (i) any Rent paid for a period after the date of the expiration of the Lease Term or earlier termination of this Lease shall be refunded to Tenant upon demand, and (ii) any item of Rent which is payable to the date of the expiration of the Lease Term or earlier termination of this Lease which is not then ascertainable shall be paid to Landlord when the same is determined.

(b)  The provisions of this Section 22.02 shall survive the expiration of the Lease Term or other earlier termination of this Lease for a period of four hundred eighty (480) days.

## ARTICLE XXIII.  HOLDING OVER

Section 23.01.  Should Tenant hold over in possession after the expiration date, such holding over shall not be deemed to extend the Lease Term or renew this Lease; but the tenancy thereafter shall continue as a month to month tenancy upon the terms and conditions herein contained, except that Fixed Rent shall be equal to 110% of the Fixed Rent immediately preceding the expiration date.

### ARTICLE XXIV. INDEMNITIES

**Section 24.01.** Tenant covenants to defend Landlord by counsel reasonably satisfactory to Landlord and Tenant, and to indemnify Landlord and hold Landlord harmless (except for loss or damage resulting from the acts or omissions of Landlord, or its agents, contractors, or employees) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon, within or about the Demised Premises, or any part thereof, or upon the sidewalks and curbs immediately adjacent thereto, or (y) occasioned by any act or omission of Tenant, its agents, contractors, employees, servants, subtenants or licensees.

### ARTICLE XXV. MORTGAGES

**Section 25.01.** (a) Landlord shall have the right at any time during the Lease Term to subject its interest in Landlord's Tract and/or this Lease, but not Tenant's Building or other property of Tenant, to any one or more mortgages on Landlord's interest therein ("Mortgage") and to renew, modify, consolidate, replace, extend and/or refinance any such Mortgage.

(b) Landlord shall be entitled to all of the proceeds from any such Mortgage at any time effected pursuant hereto. The owner or holder of any such Mortgage shall be referred to as a "Mortgagee".

**Section 25.02.** (a) This Lease and all subleases hereunder shall become subject and subordinate to any Mortgage if and when Landlord obtains from the Mortgagee, for the benefit of Tenant, a subordination, non-disturbance and attornment agreement in the form annexed hereto as Exhibit E. Tenant agrees that, within ten (10) days after request therefor, Tenant shall execute and deliver to Landlord a subordination, non-disturbance and attornment agreement in the form annexed hereto as Exhibit E.

(b) Notwithstanding the provisions of Subsection (a) hereof, should any Mortgagee require that this Lease be prior rather than subordinate to any such Mortgage, Tenant shall, promptly on request therefor by Landlord or such Mortgagee, and without charge therefor, execute a document effecting or acknowledging such priority, which document shall contain, at the option of such requesting party, an attornment obligation to the Mortgagee as landlord in the event of foreclosure, or to any party acquiring title through such Mortgagee in such event.

**Section 25.03.** Tenant shall not have a right to encumber Landlord's fee title in the Demised Premises or Landlord's Tract, or in any manner act in any way to subject any such estate to any lien, encumbrance or charge of any kind or nature. Nothing contained in this Lease shall be deemed to authorize or empower or permit Tenant to derogate from or diminish Landlord's fee title in the Demised Premises or Landlord's Tract.

ARTICLE XXVI. OPERATION AND EASEMENT AGREEMENT

Section 26.01. (a)  This Lease and all rights of Tenant hereunder are in all respects subject and subordinate to the OEA.  The foregoing provision shall be self-operative and no further instrument of subordination shall be necessary, unless required by Landlord, in which event Tenant agrees, on demand, at any time or times, to execute, acknowledge and deliver to Landlord any and all instruments that may be necessary or proper to confirm the subordination of this Lease, and all rights of Tenant hereunder, to the OEA.

(b)  Tenant shall, with respect to the Demised Premises duly and promptly keep, observe and perform, each and every, term, covenant, condition and provisions of the OEA on the part of Landlord to be kept, observed and performed and, except to the extent that they are inapplicable to (i) the Demised Premises and its appurtenances, (ii) this transaction or (iii) this Lease, or inconsistent with or modified by the provisions of this Lease, each and every covenant, agreement, provision and obligation under the OEA, accruing during the Lease Term, is made a covenant, agreement, provision and obligation under this Lease, with the same force and effect as if herein set forth at length.

(c)  Tenant agrees that it, its agents, employees or anyone claiming from, through or under Tenant, will not do, permit or suffer any act or omission which would constitute a breach or violation by Landlord of any of the terms, covenants, conditions or provisions of the OEA.

(d)  In the event of any conflict between the terms of the OEA and the terms of this Lease, the terms of the OEA shall control.

(e)  Tenant hereby agrees to indemnify and hold Landlord and its successors and assigns harmless from and against any and all losses, liabilities, actions, suits, proceedings, costs (including attorneys' fees and expenses), damages, claims and demands whatsoever resulting from any failure by Tenant, after receipt of notice thereof and expiration of the applicable cure period under the OEA,  to perform any of the obligations of Landlord, as a party under the OEA, which Tenant has hereinabove in this Section 26.01 assumed and agreed to perform.

Section 26.02 (a)  Landlord shall not, without the prior consent of Tenant (which consent shall not be unreasonably withheld),  further amend, waive the benefit of or terminate the OEA in any manner which is inconsistent with, or materially adversely affects, the rights of Tenant under this Lease.  Landlord shall promptly forward to Tenant a copy of any amendments to the OEA not requiring Tenant's consent hereunder.

(b)  Landlord shall have no duty to perform any obligations of any party to the OEA (other than the obligations of Landlord under this Lease) and shall under no circumstances be responsible or liable to Tenant for any default, failure or delay on the part of any party to the OEA in the performance of any obligations under the OEA, nor shall such default affect this Lease, or waive or defer the performance of any of Tenant's obligations hereunder; provided, nevertheless, that in the event of any such default or failure of performance by another party to the OEA, Landlord agrees, on notice from Tenant, to make demand on such party to perform its obligations under the OEA.

(c)  Any consent or approval given by Landlord hereunder shall constitute approval by Landlord as an "Approving Party" under the OEA.

33

## ARTICLE XXVII.  COMMON AREAS

Section 27.01.  (a)  The term "Common Areas" shall mean those portions of the Shopping Center defined as Common Area under the OEA.

(b) (i)  Landlord hereby grants to Tenant, its successors and assigns, a non-exclusive right of use, appurtenant to and for the benefit of the Demised Premises, of the Common Areas of the Shopping Center, for all the purposes for which such Common Areas are intended, for and during the Lease Term.

(ii)  Landlord hereby reserves unto itself, its successors and assigns, a non-exclusive right of use of the Common Areas for all the purposes for which such Common Areas are intended.

(iii)  It is agreed that the rights of use granted and reserved hereby are not intended nor shall it be construed as creating any right in or for the benefit of the general public.

Section 27.02.  (a) (i)  Except as hereinafter provided, Landlord may, to the extent permitted under the OEA, at any time and from time to time, increase, reduce or change the Common Areas of Landlord's Tract, or any portion thereof, and/or erect additional buildings thereon, and Tenant shall not be entitled to any compensation as a result thereof, nor shall same be deemed an actual or constructive eviction.

(ii)   Except for immaterial changes, Landlord shall not, without the prior consent of Tenant (which consent shall not be unreasonably withheld), change the Common Areas within that portion of Landlord's Tract shown and designated as "No Change Area" on Exhibit B-1 annexed hereto.

(b)  Landlord may temporarily close any part of the Common Areas of Landlord's Tract for such time as may be required to prevent a dedication thereof or an accrual of any rights in any person or in the public generally therein, or when necessary for the maintenance or repair thereof, or for such other reason as Landlord, in its judgment, may deem necessary or advisable.

Section 27.03.  Tenant shall not use or permit the use of the Common Areas for retail sales or promotional purposes.  Tenant shall use reasonable efforts to cause its employees to park their cars only in such areas as Landlord may designate.  Upon request, Tenant shall supply a list by name and license plate number of automobiles belonging to persons employed at the Demised Premises.

Section 27.04.  Landlord shall operate and maintain, or cause to be operated and maintained, the Common Areas of Landlord's Tract as required by the OEA.

## ARTICLE XXVIII.  CERTIFICATES

Section 28.01.  On the reasonable request of either party, at any time or from time to time, Landlord and Tenant shall execute, acknowledge and deliver to each other, within fifteen (15) days after request, a written instrument, duly executed and acknowledged, (i) certifying that this Lease has not been modified and is in full force and effect or, if there has been a modification, that this Lease is

in full force and effect as modified, stating such modification, (ii) specifying the dates to which Fixed Rent and Additional Rent have been paid, (iii) stating whether or not, to the knowledge of the party executing such instrument, the other party hereto is in default and, if so, stating the nature of such default, (iv) stating the Execution Date, the Rent Commencement Date and the date of expiration of the then current Lease Term, and (v) stating which options to extend the Lease Term have been exercised, if any.

## ARTICLE XXIX. LEASEHOLD LIENS

**Section 29.01. Definitions.**

(a)　The term "Institutional Lender" as used in this Lease shall refer to a savings bank, savings and loan association, commercial bank, trust company, credit union, investment bank, insurance company, college, university, real estate investment trust or pension fund, investment banker or mortgage banker. The term "Institutional Lender" shall also include business entities regularly engaged in the placing and making of mortgage loans such as mortgage brokers and "conduit lenders". The term "Institutional Lender" shall expressly exclude any person or business entity controlled by, under common control with or otherwise affiliated with Tenant or any subtenant of the Demised Premises.

(b)　The term "Leasehold Lien" as used in this Lease shall include a mortgage, a deed of trust, a deed to secure debt, or other security instrument by which Tenant's leasehold estate, Tenant's Building and improvements on the Demised Premises are mortgaged or otherwise transferred, to secure a bona fide debt.

(c)　The term "Leasehold Lender" as used in this Lease shall refer to the holder of a Leasehold Lien of which notice has been given and received in accordance with Section 29.03(a) hereof.

**Section 29.02. Encumbrance by Tenant.**

(a)　So long as Tenant shall not be in default under the terms of this Lease at the time of the granting, and subject to the terms hereof, Tenant shall have the right to grant to an Institutional Lender, a Leasehold Lien. Any Leasehold Lien shall not be for a period exceeding the Lease Term existing at the time of the granting thereof. In no event shall Landlord's fee title or reversionary interest be encumbered by or be subject to the Leasehold Lien. Tenant shall make payment when due and before delinquency, of all principal, interest, and other charges for which Tenant may be or become obligated under any obligations secured by or contained in a Leasehold Lien. In the event Tenant grants such Leasehold Lien, the Leasehold Lender Protection Provisions set forth in Section 29.02 below shall apply. No more than one (1) Leasehold Lien shall encumber Tenant's interest in this Lease and/or Tenant's Building at any time, and the amount of the Leasehold Lien shall not, at any time, exceed eighty percent (80%) of the then current appraised value of Tenant's Building and improvements (existing or to be constructed with the proceeds of the Leasehold Lien) on Tenant's Parcel (the "Aggregate Principal Amount").

(b)　The making of a Leasehold Lien shall not be deemed to constitute an assignment or transfer of this Lease or of the leasehold estate hereby created, nor shall any

35

Leasehold Lender, as such, be deemed to be an assignee or transferee of this Lease or of the leasehold estate hereby created so as to require such Leasehold Lender, as such, to assume the performance of any of the terms, covenants or conditions on the part of Tenant to be performed hereunder, unless and until such Leasehold Lender elects to enter into a "New Lease" between landlord and such Leasehold Lender, as tenant, in accordance with Section 29.03(c) below.

Section 29.03.   Leasehold Lender Protection Provisions.   In the event that Tenant shall grant a Leasehold Lien to an Institutional Lender as contemplated pursuant to Section 29.02 above, the following provisions shall apply for the benefit of such Leasehold Lender, its successors and assigns (including any purchaser at a foreclosure sale or deed in lieu thereof) notwithstanding any contrary provisions in this Lease:

(a)   If Tenant shall, on one or more occasions, grant a Leasehold Lien to an Institutional Lender and if the holder of such Leasehold Lien shall provide Landlord with notice of such Leasehold Lien together with a true copy of such Leasehold Lien and the name and address of such Leasehold Lender, Landlord and Tenant agree that, following receipt of such notice by Landlord the provisions of this Section 29.03 shall apply in respect to such Leasehold Lien. In the event of any assignment of a Leasehold Lien or in the event of a change of address of a Leasehold Lender or of an assignee of such Leasehold Lien, notice of the new name and address shall be provided to Landlord.

(b)   Landlord, upon providing Tenant any notice of: (i) default under this Lease, or (ii) a termination of this Lease, shall at the same time provide a copy of such notice to Leasehold Lender. From and after such notice has been given to a Leasehold Lender, such Leasehold Lender shall have the same period, after receipt of such notice, to remedy any default or acts or omissions which are the subject matter of such notice or causing the same to be remedied, as is given Tenant after the giving of such notice to Tenant to remedy the defaults or acts or omissions which are the subject matter of such notice specified in any such notice. Landlord shall accept such performance by or at the instigation of such Leasehold Lender as if the same had been done by Tenant. Tenant authorizes each Leasehold Lender to take any such action at such Leasehold Lender's option and does hereby authorize entry upon the premises by the Leasehold Lender for such purpose. Any notice to be given by Landlord to a Leasehold Lender pursuant to any provisions of this Section 29.03 shall be deemed property addressed if sent to the address provided by the Leasehold Lender in accordance with Section 29.03(a) above.

(c)   In the event of a termination of this Lease as a result of Tenant's default, Landlord shall, in addition to providing the notices of default and termination as required by Section 29.02(b) above, provide Leasehold Lender with written notice that this Lease has been terminated ("Notice of Termination"), together with a statement of all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, then known to Landlord. Landlord agrees to enter into a new lease ("New Lease") of the Demised Premises with such Leasehold Lender or its designee for the remainder of the Lease Term at the Fixed Rent and Additional Rent, and upon the terms, covenants and conditions (but excluding requirements which are not applicable or which have already been fulfilled) of this Lease, and re-vest title to Tenant's Building and all Improvements and Alterations to the Demised Premises in the Leasehold Lender, effective as of the date of termination, provided:

36

(i)     such Leasehold Lender shall make written request upon Landlord for such New Lease within thirty (30) days after the date such Leasehold Lender receives Landlord's Notice of Termination;

(ii)    such Leasehold Lender or its designee shall pay or cause to be paid to Landlord at the time of the execution and deliver of such New Lease, any and all sums which would at the time of execution and delivery thereof be due pursuant to this Lease but for such termination and, in addition thereto, all reasonable out-of-pocket expenses, including reasonable attorney's fees, which Landlord shall have incurred at such time or during such 30-day period by reason of such termination and the execution and delivery of the New Lease and which have not otherwise been received by Landlord from Tenant or other party in interest under Tenant. Upon execution of such New Lease, Landlord shall allow to the tenant named therein as an offset against the sums otherwise due under this paragraph (ii) or under the New Lease, an amount equal to the net income derived by Landlord from the Demised Premises during the period from the date of termination of this Lease to the date of the beginning of the term of such New Lease;

(iii)   such Leasehold Lender or its designee shall, within thirty (30) days after execution and delivery of the New Lease, remedy any of Tenant's defaults of which said Leasehold Lender was notified by Landlord's Notice of Termination and which are reasonably susceptible of being so cured by Leasehold Lender or its designee (provided however, if such default is not susceptible of being cured with due diligence within said 30-day period, the time within which to cure shall be extended for such time as may be necessary to cure the same with all due diligence, provided Leasehold lender or its designee commences promptly and proceeds diligently to cure the same);

(iv)    such Leasehold Lender (but not its designee or assignee) under any such New Lease shall be liable to perform the obligations imposed on the tenant by such New Lease only during the period such Leasehold Lender has ownership of such leasehold estate.

It shall be the intention and agreement of the parties that any New Lease made pursuant to this Section 29.03 shall have the same priority and rights in relation to any mortgage or other lien, charge or encumbrance on the fee of Landlord's Tract and the tenant under such New Lease shall have the same right, title and interest in and to Tenant's Parcel and the buildings and improvements thereon as Tenant had under this Lease.

(d)     In the event a New Lease of the Demised Premises is entered into between Landlord and such Leasehold Lender or its designee pursuant to this Section 29.03, insurance proceeds and condemnation proceeds that would otherwise be retained by Landlord pursuant to Sections 12.03(b) and/or 13.03(b), respectively, shall be redeposited with the Depository and made available to such Leasehold Lender or its designee for the purposes of paying the costs of Clearing Work, Tenant's Restoration Work or Tenant's Reconstruction work, as applicable, on the terms and conditions set forth in this Lease.

Section 29.04.      Foreclosure.   Notwithstanding any other provisions of this Lease, any sale of this Lease and of the leasehold estate hereby created in any proceedings for the foreclosure of any Leasehold Lien to the Leasehold Lender, or to a third party acquirer for occupancy and operation (directly or by sublease) by a national or regional chain of retail stores operating not less than twenty (20) stores under a common tradename with the business to operated in the Demised Premises (a "Recognized Retailer"), or the assignment or transfer of this Lease and of the leasehold estate hereby created in lieu of the foreclosure of any Leasehold Lien to the Leasehold Lender, or to a third party for occupancy and operation (directly or by sublease) by a Recognized Retailer, shall be

deemed to be a permitted sale, transfer or assignment of Tenant's interest in this Lease and of the leasehold estate hereby created.  Such Leasehold Lender or third party acquirer of the leasehold estate of Tenant pursuant to foreclosure, assignment in lieu of foreclosure or other proceedings may, upon acquiring Tenant's leasehold estate, without further consent of Landlord, assign the leasehold estate or sublease the Demised Premises to a Recognized Retailer on such terms and to such persons and organizations as are acceptable to such Leasehold Lender or third party acquirer.

## ARTICLE XXX.  INTENTIONALLY OMITTED

[Here ends Page 37-A]

37-A

## ARTICLE XXXI.  MISCELLANEOUS

**Section 31.01.  WAIVER OF REDEMPTION.**  Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being dispossessed or removed from the Demised Premises upon the termination of this Lease because of an Event of Default by Tenant hereunder.

**Section 31.02.  NO WAIVER.**  The failure of Landlord, Tenant or any Leasehold Mortgagee to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies that party or any other such party may have and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.

**Section 31.03.  RELATIONSHIP OF PARTIES.**  Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the parties hereto other than the relationship of Landlord and Tenant.  Nothing contained herein shall in any way impose any liability upon the stockholders, officers or directors of Landlord or stockholders, officers, directors or trustees of Tenant should such parties be corporate entities.

**Section 31.04.  RECORDING.**  Neither Landlord nor Tenant shall record this Lease; however, upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" of lease for the purposes of recordation.  Said memorandum or short form of lease shall describe the parties, the Demised Premises, the Lease Term, any subordination, any special provisions other than those pertaining to Rent, and shall contain such additional information as may be required for recordation in the jurisdiction in which the Demised Premises is located and shall incorporate this Lease by reference.  Any transfer tax payable to any governmental taxing authority, by reason of the execution of this Lease shall be borne by Landlord, and the cost of recordation of a memorandum hereof shall be borne by the party requesting recordation.

**Section 31.05.  CAPTIONS.**  The captions, section numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles nor in any way affect this Lease.

**Section 31.06.  APPLICABLE LAW.**  This Lease shall be governed by, and construed in accordance with the laws of the State of Michigan.  If any provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each provision of the Lease shall be valid and enforceable to the fullest extent permitted by the law.

38

Section 31.07. ADDENDA. The following exhibits have been agreed to by the parties and annexed hereto or initialed by the parties prior to the execution hereof, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

Exhibit A - Description of the Land
Exhibit B - Site Plan
Exhibit C - Rules and Regulations
Exhibit D - Rent Commencement Agreement
Exhibit E - Subordination, Non-Disturbance and Attornment Agreement
Exhibit F - Sign Plans
Exhibit G - Waiver and Consent

Section 31.08. SURVIVAL. All obligations and indemnities accruing prior to the expiration or earlier termination of this Lease or shall survive such expiration or earlier termination.

Section 31.09. MECHANICS LIENS. (a) Throughout the Lease Term, Tenant shall not suffer or permit any liens to stand against the Demised Premises, nor any part thereof, by reason of any work, labor, services or materials done for, or supplied, or claimed to have been done for, or supplied to, Tenant or anyone holding the Demised Premises or any part thereof through or under Tenant. If any such lien shall at any time be filed against the Demised Premises, Tenant shall cause the same to be discharged of record within thirty (30) days after the date of filing the same, by either payment, deposit or bond. If Tenant shall fail to discharge any such lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, procure the discharge of the same either by paying the amount claimed to be due or by deposit in court or bonding. Any amount paid or deposited by Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of Landlord, including reasonable counsel fees, in defending any such action or in or about procuring the discharge of such lien, with all necessary disbursements in connection therewith, together with interest thereon at the Interest Rate from the date of payment or deposit, shall become due and payable forthwith by Tenant to Landlord, or, at the option of Landlord, shall be payable by Tenant to Landlord as Additional Rent.

(b)     Nothing herein shall prevent Tenant from contesting the validity or amount of any such lien, provided such contest is pursued with reasonable diligence and Tenant has posted such bonds or other security required to prevent enforcement of such lien against the Demised Premises and/or Landlord's Tract.

(c)     Nothing in this Lease shall be deemed to be, or construed in any way as constituting, the consent or request of Landlord, expressed or implied, by inference or otherwise, to any person, firm or corporation for the performance of any labor or the furnishing of any materials for any construction, rebuilding, alteration or repair of or to the Demised Premises or any part thereof, or as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials, which might in any way give rise to the right to file any lien against or Landlord's interest in the Demised Premises. Landlord shall have the right to post and keep posted at all reasonable times upon the Demised Premises any notices which Landlord shall be required so to post for the protection of Landlord and/or the Demised Premises from any such lien.

Section 31.10. FLOOR AREA. As used herein "Floor Area" shall have the same meaning ascribed to such term in the OEA.

Section 31.11. BROKERAGE. Landlord and Tenant each represent that it dealt with no broker or brokers or other person in connection with the negotiation, execution and delivery of this Lease other than The Woodmont Companies. Landlord shall pay all commissions, fees and other payable to said broker pursuant to separate agreement. Each party shall defend, indemnify and hold the other harmless from and against any claims or demands for any brokerage commissions, finder's fees and/or other compensation resulting from a breach by it of the foregoing representation.

Section 31.12. LIMITATION OF LANDLORD'S LIABILITY. (a) The term "Landlord" as used in this Lease means only the owner or the mortgagee in possession, for the time being, of Landlord's Tract, so that in the event of any sale of Landlord's Tract, or Landlord's interest in this Lease, Landlord shall be and hereby is entirely freed and relieved of all obligations of Landlord hereunder and it shall be deemed without further agreement between the parties and such purchaser(s) or assignee(s) that the purchaser or assignee has assumed and agreed to observe and perform all obligations of Landlord hereunder.

(b) It is specifically understood and agreed that there shall be no personal liability on Landlord in respect to any of the covenants, conditions, or provisions of this Lease; in the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of Landlord in Landlord's Tract for the satisfaction of Tenant's claims.

Section 31.13. ATTORNEYS' FEES. Should either party hereto institute any action or proceeding in court to enforce any provision hereof or for damages or for declaratory or other relief hereunder, the prevailing party shall be entitled to receive from the losing party, in addition to court costs, such amount as the court may adjudge to be reasonable as attorneys' fees for services rendered to said prevailing party, and said amount may be made a part of the judgment against the losing party.

Section 31.14 WAIVER OF TRIAL BY JURY. Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Demised Premises, and/or any claim of injury or damage.

Section 31.15 INTEREST RATE. (a) Wherever this Lease refers to "Interest Rate", same shall be computed at a rate equal to the "Prime Rate" (hereinafter defined) plus one (1%) percent for the time period when any interest is due as provided in this Lease, and, if no time period is designated, the period shall be from the date of the occurrence in question to the date of payment. If, however, payment of interest at such rate by Tenant (or by the tenant then in possession having succeeded to Tenant's interest in accordance with the terms of this Lease) should be unlawful, i.e., violative of usury statutes or otherwise, then "Interest Rate" shall, as against such party, be computed at the maximum lawful rate payable by such party.

(b) "Prime Rate" shall mean the rate being charged at the time in question by Citibank, N.A., for short term (90-day) unsecured loans made to its preferred customers.

40

Section 31.16.  EXCAVATIONS ON ADJOINING PROPERTY.  If any excavation or other building operation shall be about to be made or shall be made upon any adjoining premises or streets, Tenant shall permit any third persons obligated by law to protect the Demised Premises, and their respective representatives, to enter upon the Demised Premises and shore the foundations and walls thereof and to do any other act or thing necessary for the safety or preservation of the Demised Premises.

## ARTICLE XXXII.  ENTIRE AGREEMENT/BINDING EFFECT

Section 32.01.  This Lease and the exhibits attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the subject matter hereof and there are no covenants, promises, agreements, conditions or understandings heretofore made, either oral or written, between the parties other than as herein set forth.  No modification, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

Section 32.02.  The covenants and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives, successors and assigns.

Section 32.03.  Each of the covenants contained in this Lease which meet the criteria of covenants running with the land in the State of Michigan, shall be deemed to run with the land and shall bind each and every person having any leasehold or other interest in any part of the Demised Premises at any time and from time to time.

IN WITNESS WHEREOF, the parties have this day set their hands and seals.

OPPIDAN INVESTMENT COMPANY
a Minnesota corporation

By: _____
Name: _____ Joseph H. Ryan
Title: President

TOYS "R" US - DELAWARE, INC.

By: _____
Name: _____ DAVID P. PICOT
Title: _____ VICE PRESIDENT-REAL ESTATE

41

## EXHIBIT A

### Description of the Land

A PARCEL OF LAND BEING A PART OF THE WEST 1/2 OF SECTION 1, T7N, R12W, CITY OF WALKER, KENT COUNTY, MICHIGAN, DESCRIBED AS:  COMMENCING AT THE WEST 1/4 CORNER OF SAID SECTION 1; THENCE S1°12'25"E ALONG THE WEST LINE OF SAID SECTION 1 A DISTANCE OF 560.72 FEET; THENCE S87°29'18"E 59.94 FEET TO THE EAST RIGHT OF WAY OF ALPINE AVENUE (M-37) TO THE PLACE OF BEGINNING; THENCE N1°12'36"W 35.96 FEET; THENCE N88°47'24"E 36.14 FEET; THENCE N43°47'24"E 80.62 FEET; THENCE N88°47'24"E 706.45 FEET; THENCE S1°12'52"E 339.99 FEET; THENCE S88°47'08"W 799.46 FEET; THENCE N1°12'25"W 247.06 FEET ALONG THE EAST RIGHT-OF-WAY LINE OF ALPINE AVENUE; THENCE N87°29'18"W 0.19 FEET TO THE PLACE OF BEGINNING.

## EXHIBIT B

### Site Plan

Neither the depiction of any building, structure or improvement, nor the identification of any owner, tenant or occupant, shall be deemed a representation that such improvement shall be constructed or remain in its present location, size or dimensions, or that such owner, tenant or occupant will operate at any time.



Green
Ridge
Square
Planned

## EXHIBIT C

### Rules and Regulations

Tenant agrees to comply with, abide and be bound by the following Rules and Regulations:

1. Tenant shall keep the Demised Premises, including all vestibules, entrances and returns located therein, all improvements thereon, and all windows, doors and glass or plate glass fixtures in a safe, neat and clean condition at all times.

2. Tenant shall store or stock in the Demised Premises only such goods, wares, merchandise, or other property as shall be reasonably required in connection with Tenant's business conducted in and from the Demised Premises, and not to use any portion of the Demised Premises for storage or warehouse purposes beyond such needs.

3. Tenant shall use for office, clerical or other non-selling purposes only such space in Tenant's Building as is from time to time reasonably required for Tenant's business therein.

4. Tenant shall store within the Demised Premises, all trash and garbage in adequate containers, which shall be maintained in a neat and clean condition. All trash and garbage shall be located in the area shown therefor on the Site Plan and in such manner so as not to create or permit any health hazard or fire hazard. Tenant shall arrange for regular removal of said trash and garbage at Tenant's expense.

5. Tenant shall not burn any papers, trash or garbage of any kind in or about the Demised Premises or Common Areas.

6. Tenant shall not use any portion of the Demised Premises as living quarters, sleeping apartments or lodging rooms.

7. Tenant shall not conduct any going-out-of-business, fire, bankruptcy, auction or other distress sale in or from the Demised Premises, unless and until satisfactory proof has been supplied to Landlord that the person intending to conduct such sale has complied meticulously with all Legal Requirements including, without limitation, the rules and regulations of the Federal Trade Commission.

8. Tenant shall not install on or about the Demised Premises any exterior amplifiers or similar devices and shall not use in, on or about the Demised Premises any advertising medium which may be heard or experienced outside Tenant's Area, such as, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, television or radio broadcasts.

9. Tenant shall give Landlord prompt notice of any accident, fire or damage occurring on or to the Demised Premises or the Common Areas.

10. Tenant shall keep the sidewalks immediately adjoining Tenant's Area clean and free from ice and snow and shall not place and/or permit any rubbish, obstructions or merchandise in such areas.

1 of 2

11.    Tenant shall keep the Demised Premises clean, orderly, sanitary and free from objectionable odors and from insects, vermin and other pests, and shall not keep any live animals of any kind about or upon the Demised Premises.

12.    Neither Tenant nor any person claiming by or through Tenant, shall, in or on any part of the Common Areas:

(a) Vend, peddle or solicit orders.

(b) Exhibit any sign, placard, banner, notice, or other written material, except as otherwise permitted pursuant to Article XX of this Lease.

(c) Solicit signatures on any petition or for any other purpose, disseminate any information in connection therewith, or distribute any circular, booklet, handbill, placard, or other material.

(d) Solicit membership in any organization, group, or association, or solicit contributions for any purpose.

(e) Parade, rally, patrol, picket, demonstrate, or engage in any conduct that might tend to interface with or impede the use of any of the Common Areas by any customer, business invitee, employee, or tenant of the Shopping Center, create a disturbance, attract attention, or harass, annoy, disparage, or be detrimental to the interest of any of the retail establishments within the Shopping Center.

EXHIBIT D
Rent Commencement Agreement

Agreement made and entered into as of this _____ day of _____, 199__, between OPPIDAN INVESTMENT COMPANY, a _____, having an address at 420 International Centre, 900 Second Avenue South, Minneapolis, Minnesota 55402 ("Tenant") and TOYS "R" US - DELAWARE, INC., a Delaware corporation, having an office at 461 From Road, Paramus, New Jersey 07652 ("Landlord").

RECITALS

A. Pursuant to a certain instrument entered into between Landlord and Tenant dated as of _____ (hereinafter, together with the amendments thereto, if any, described in Paragraph B of this Recital, called the "Lease"), Landlord leased to Tenant a portion of the premises described on Exhibit 1 annexed hereto ("Landlord's Tract"); to wit, the premises shown crosshatched on Exhibit 2 annexed hereto.

B. The Lease has not been amended, except by:

_____

_____

C. Pursuant to Section 2.01(b) of the Lease, Landlord and Tenant agreed to execute, acknowledge and deliver to each other duplicate originals of an agreement setting forth, among other things, the date on which the term of the Lease commenced (hereinafter called, and in the Lease defined as, "Rent Commencement Date") and the expiration date of the Lease Term (as such term is defined in the Lease).

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The Rent Commencement Date of the Lease and the expiration date of the Lease Term thereof are as follows:

A. Initial Term:
    (i) Rent Commencement Date:
    (ii) Expiration Date:

B. First Renewal Period
    (i) Commencement Date:
    (ii) Expiration Date:

C. Second Renewal Period:
    (i) Commencement Date:
    (ii) Expiration Date:

D. Third Renewal Period:
    (i) Commencement Date:
    (ii) Expiration Date:

E. Fourth Renewal Period:
    (i) Commencement Date:
    (ii) Expiration Date:

2. Nothing in this Agreement is intended to change or modify the rights of the parties under the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Agreement to be executed as of the date first above written.

OPPIDAN INVESTMENT COMPANY,
a _____

By: _____
    Name: _____
    Title: _____

TOYS "R" US - DELAWARE, INC.

By: _____
    Name: _____
    Title: _____

**EXHIBIT E**
Subordination, Non-Disturbance and Attornment Agreement

THIS AGREEMENT, made as of the _____ day of _____ , _____ ,
among _____ , a _____ , having an
office at _____ (hereinafter called "Mortgagee"), OPPIDAN
INVESTMENT COMPANY, a _____ , having an office at 420 International
Centre, 900 Second Avenue South, Minneapolis, Minnesota 55402 (hereinafter called "Tenant") and
TOYS "R" US - DELAWARE, INC., a Delaware corporation, having an office at 461 From Road,
Paramus, New Jersey 07652, ("Landlord").

## WITNESSETH

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the "Mortgage")
covering a parcel of land owned by Landlord together with certain improvements erected thereon [said
parcel of land and said improvements, expressly omitting Tenant's Building (as defined in the Lease)
and any improvements erected or to be erected on the Demised Premises (as defined below) by
Tenant, being hereinafter called "Landlord's Tract"].  Landlord's Tract is more particularly described on
Exhibit 1 annexed hereto and made a part hereof]; and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as
of _____ (hereinafter called the "Lease"), Landlord leased to Tenant a portion of the
land within Landlord's Tract, to-wit, the land shown crosshatched on Exhibit 2 annexed hereto and
made a part hereof (said land being hereinafter called the "Demised Premises"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is
hereby acknowledged; and

WHEREAS, the Lease provides that the Lease shall become subject and subordinate to a
mortgage encumbering the fee interest of Landlord in and to Landlord's Tract if and when a non-
disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage
and to provide for the non-disturbance of Tenant by Mortgagee.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and
agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as
follows:

1.      Mortgagee hereby consents to and approves the execution of the Lease by Landlord.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall
continue hereafter to be subject and subordinate to the lien of the Mortgage and  the terms thereof,
and to all modifications, amendments, consolidations, increases, supplements, spreaders,
restatements and extensions,  subject, however, to the provisions of this Agreement.

3.      Tenant certifies that:

(a)     the Lease is presently in full force and effect and unmodified and Tenant as of
this date has no knowledge of any charge, lien or claim of offset under the Lease.

(b)     there is no security deposit paid or payable to Landlord under the Lease; and

(c)     Tenant has no right or option of any nature whatsoever, whether pursuant to the
Lease or otherwise, to purchase Landlord's Tract, the Demised Premises or any portion
thereof or any interest therein.

4.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and so
long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or
proceeding for the foreclosure of the Mortgage or to enforce any rights under the
Mortgage or the bond or note or other obligation secured thereby, unless under
applicable law Tenant is a necessary party or the failure to join Tenant would be
prejudicial to the prosecution of the remedy or judgment being sought by Mortgagee

against Landlord;

(b)     The possession by Tenant of the Demised Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Demised Premises or Landlord's Tract, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Demised Premises shall be applied and paid in the manner set forth in the Lease, and

(d)     Tenant's Building and other improvements erected or to be erected on the Demised Premises by Tenant shall remain the property of Tenant during the term of the Lease, and shall not be subject to the lien of the Mortgage.

5.     If Mortgagee or any future holder of the Mortgage shall become the owner of Landlord's Tract by reason of foreclosure of the Mortgage or otherwise, or if Landlord's Tract shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of Landlord's Tract, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the renewal periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the renewal periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform; provided, however, that such new owner shall not:

(i)     be bound by any fixed rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord);

(ii)     be bound by any amendment or modification of the Lease made without its consent;

(iii)     be liable for any previous act or omission of any prior landlord (including without limitation Landlord) under the Lease;

(iv)     be subject to any claims, counterclaims, offsets or defenses which Tenant might have against any prior landlord;

(v)     be liable for any misrepresentation by Landlord under the Lease; or

(vi)     be liable under any indemnity provision of whatever nature contained in the Lease in respect of any act or omission of Landlord prior to the date on which the new owner becomes the owner of Landlord's Tract, including, but not limited to, any environmental indemnification.

6.     Tenant agrees that if a default by Landlord shall occur, written notice of such default shall be sent by Tenant to Mortgagee and Tenant shall take no action to terminate the Lease or abate or off-set from rent by reason of such default, provided that:

(a)     Mortgagee shall remedy such default not later than thirty (30) days after the giving of such notice (or if such default is not a monetary default and is not susceptible of being cured within such 30-day period, Mortgagee commences to cure such default within said 30-day period and thereafter continues therewith with due diligence to completion); and

(b) Upon compliance by Mortgagee with the foregoing, any notice given by Tenant advising of any such default or any action of Tenant to terminate the Lease by reason thereof shall be deemed rescinded and the Lease shall continue in full force and effect.

7. Tenant hereby covenants and agrees that:

(a) except as otherwise provided under the terms of the Lease, Tenant shall not pay any installment of rent or additional rent under the Lease more than one month in advance of its due date;

(b) Tenant shall have no right to appear in any foreclosure action under the Mortgage, unless Tenant's failure to so appear would either violate applicable law or prejudice Tenant with respect to its rights under the Lease or otherwise;

(c) except to the extent that Tenant is granted the right or option to terminate the Lease pursuant to the terms thereof, Tenant shall not cancel or terminate the Lease without Mortgagee's prior written consent, and any attempted cancellation or termination of the Lease in violation of this subparagraph (c) without such consent shall be of no force or effect as to Mortgagee;

(d) Tenant shall not voluntarily subordinate the Lease to any lien or encumbrance (other than the Mortgage) without Mortgagee's prior written consent, provided however, nothing herein shall be deemed or construed to prohibit a "Leasehold Lien" (as such term is defined in the Lease);

(e) Tenant shall deliver to Mortgagee, from time to time and within fifteen (15) business days from the date of request a written statement in form and substance reasonably satisfactory to Mortgagee certifying to certain matters relating to the Lease, as may be reasonably requested by Mortgagee; and

(f) except to the extent Tenant is expressly permitted in the Lease to assign the Lease, or sublet the Demised Premises without the consent or approval of Landlord, Tenant shall not assign the Lease, or sublet the Demised Premises, or any portion thereof, without the prior written consent of Mortgagee.

8. Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. So long as the Mortgage is in effect, no notice of default under the Lease shall be effective with respect to Mortgagee until and unless Mortgagee has received a copy thereof.

9. This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns (including, without limitation, any holder of a Leasehold Lien under Article XXIX of the Lease); provided, however, that in the event of the assignment or transfer of the interest of Mortgagee, all obligations and liabilities of Mortgagee thereafter accruing under this Agreement shall terminate and thereupon all such obligations and liabilities shall be the responsibility of the party to whom Mortgagee's interest is assigned or transferred.

10. This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

11.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

Attest:                                    [MORTGAGEE]

By:_____      By:_____
         Name:_____               Name:_____
         Title:_____               Title:_____


Attest:                                    OPPIDAN INVESTMENT COMPANY

By:_____      By:_____
         Name:_____               Name:_____
         Title:_____               Title:_____


Attest:                                    TOYS "R" US - DELAWARE, INC.

By:_____      By:_____
         Name:_____               Name:_____
         Title:_____               Title:_____



EXHIBIT F
Building Signs

Page 1 of 3
Front Elevation



EXHIBIT F
Building Signs

Page 2 of 3
East Elevation



EXHIBIT F
Building Signs

Page 3 of 3
(Elevations)

EXHIBIT G
Waiver and Consent

THIS LANDLORD'S WAIVER AND CONSENT ("Waiver and Consent") is made and entered into as of this _____ day of _____, 1999 by and among TOYS "R" US-DELAWARE, INC., a Delaware corporation ("Owner"), and OPPIDAN INVESTMENT COMPANY, a _____ ("Landlord") and GENERAL ELECTRIC CAPITAL CORPORATION, a New York corporation ("Lender").

A.    Owner is the owner of the real property more particularly described on Exhibit 1 annexed hereto  (the "Property").

B.    Owner has entered into that certain Lease dated _____, 1999 (together with all amendments and modifications thereto and waivers thereof, the "Lease") with Landlord, with respect to a portion of the Property (such portion herein called the "Premises").

C.    Landlord has entered into that certain sublease dated _____, 1999 (together with all amendments and modifications thereto and waivers thereof, the "Sublease") with Golf Galaxy, Inc., a Minnesota corporation (the "Company"), with respect to the Premises.

D.    Lender has previously entered or is about to enter into a Credit Agreement with Company, and to secure the obligations arising under such Credit Agreement, Company has granted to Lender a security interest in and lien upon certain assets of Company, including, without limitation, all of Company's cash, cash equivalents, goods (excluding machinery, equipment, furniture, leaseholds and trade fixtures) and inventory, together with proceeds of the foregoing (collectively, the "Collateral").

NOW THEREFORE, in consideration of any financial accommodation extended by Lender to Company at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Owner and Landlord acknowledges that (a) the Lease is in full force and effect,  and (b) Owner is not aware of any existing default under the Lease.

2.    Owner will provide Lender with written notice of any default by Landlord under the Lease which could result in termination of the Lease (a "Default Notice").  Lender shall have at least fifteen (15) days following receipt of such Default Notice to cure such default, but Lender shall not be under any obligation to cure any default by Landlord under the Lease.  No action by Lender pursuant to this Waiver and Consent shall be deemed to be an assumption by Lender of any obligation under the Lease, and, except as provided in paragraphs 6 and 7 below, Lender shall not have any obligation to Owner.

3.    Owner acknowledges the validity of Lender's lien on the Collateral and, until such time as the obligations of Company to Lender is indefeasibly paid in full, Owner waives any interest in the Collateral and agrees not to distrain or levy upon any Collateral or to assert any landlord lien, right of distraint or other claim against the Collateral for any reason.

4.    Owner agrees that the Collateral consisting of removable trade fixtures such as equipment bolted to the floor shall not be deemed a fixture or part of the real estate but shall at all times be considered personal property.

5.    Prior to a termination of the Lease, Lender or its representatives or invitees may enter upon the Premises at any time without any interference by Owner to inspect or remove any or all of the Collateral.

6.    Upon a termination of the Lease prior to expiration of the stated term thereof, Owner will provide Lender with written notice thereof (a "Termination Notice") and permit Lender and its representatives and invitees to occupy and remain on the Premises for a period of not more than thirty (30) days (the "Disposition Period") following receipt by Lender of a Termination Notice.  For the actual period of occupancy by Lender, Lender will pay to Landlord the basic rent and additional rent due under the Lease pro-rated on a per diem basis determined on a 30-day month, and shall provide and retain liability and property insurance coverage, electricity and heat to the extent required by the Lease.  Such amounts payable by Lender to Owner during the Disposition Period shall not include any rent adjustments, indemnity payments or similar amounts payable by reason of default or holdover, for

which Landlord shall remain liable in accordance with the Lease. If any injunction or stay is issued that prohibits Lender from removing the Collateral, the commencement of the Disposition Period will be deferred until such injunction or stay is lifted or removed.

7. During any Disposition Period, (a) Lender and its representatives and invitees may, without interference by Owner or liability of Lender to Owner, repossess and remove the Collateral, or conduct a private sale of the Collateral at the Premises provided Lender has supplied to Landlord satisfactory proof that Lender has complied meticulously with all legal requirements, including, without limitation, the rules and regulations of the Federal Trade Commission, and (b) Lender shall make the Premises available for inspection by Owner and prospective tenants and shall cooperate in Owner's reasonable efforts to re-lease the Premises.

8. Lender covenants to defend and indemnify Owner, and hold Owner harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises during the period expiring on the earlier of (x) removal of the Collateral by Lender, or (y) expiration of the Disposition Period (except to the extent arising out of the negligent or wrongful acts or omissions of Owner, its agents, contractors or employees), or occasioned wholly or in part by any act or omission of Lender or its representatives or invitees.

9. Lender shall promptly repair, at Lender's expense, or reimburse Owner for any physical damage to the Premises actually caused by the removal of Collateral by or through Lender (ordinary wear and tear excluded). Lender shall not be liable for any diminution in value of the Premises caused by the absence of Collateral removed, and Lender shall have no duty or obligation to remove or dispose of any Collateral or any other property left on the Premises by Company. Any Collateral remaining on the Premises after expiration of the Disposition Period shall be deemed abandoned by Landlord, the Company and Lender and shall become the property of Owner without payment therefor and may be retained by Owner as its sole property, or may be disposed of or stored by Owner in such manner as Landlord may see fit, without accountability therefor.

10. All notices hereunder shall be in writing, sent by certified mail, return receipt requested or by telecopy, to the respective parties and the addresses set forth on the signature page or at such other address as the receiving party shall designate in writing.

11. This Waiver and Consent may be executed in any number of several counterparts, shall be governed and controlled by, and interpreted under, the laws of the State of Michigan, and shall inure to the benefit of, and be binding upon, Lender, Owner and Landlord and their respective successors and assigns (including any transferees of the Premises).

12.   Landlord consents to the actions to be taken by Owner, and the rights granted by Owner to Lender, pursuant to and in accordance with this Waiver and Consent.

IN WITNESS WHEREOF, this Waiver and Consent is entered into as of the date first set forth above.

"OWNER"
TOYS "R" US - DELAWARE, INC.

461 From Road
Paramus, New Jersey 07652
Attention: Senior Vice President-
    Real Estate
Telephone: (201) 599-7850
Facsimile: (201) 262-9097

By:_____
    Name:_____
    Title:_____

and a copy under separate cover to:
TOYS "R" US - DELAWARE, INC.
461 From Road
Paramus, New Jersey 07652
Attention: Real Estate Counsel
Telephone: (201) 599-7880
Facsimile: (201) 262-9097

"LANDLORD"
OPPIDAN INVESTMENT COMPANY

420 International Centre
900 Second Avenue South
Minneapolis, Minnesota 55402
Attention: Paul J. Tucci
Telephone: (612) 338-8485
Facsimile: (612) 338-8495

By:_____
    Name:_____
    Title _____

"LENDER"
GENERAL ELECTRIC CAPITAL CORPORATION

10 South LaSalle Street
Suite 2800
Chicago, Illinois 60603
Attention: Golf Galaxy Account Manager
Telephone: (312) 419-5992
Facsimile: (312) 419-0985

By:_____
    Name:_____
    Its:   Duly Authorized Signatory

## EXHIBIT B

### DEMISED PREMISES (CROSS-HATCHED)

(See attached Site Plan)

5/4/99



DEMISED PREMISES

Green Ridge Square

Planned

EXHIBIT B

Site Plan

## EXHIBIT C

### SUBTENANT'S INSURANCE OBLIGATIONS

Commencing with Subtenant's entering into possession of the Demised Premises and throughout the term of the Sublease, Subtenant shall, at Subtenant's sole cost and expense, provide and cause to be maintained:

1.  Comprehensive general public liability insurance (including contractual liability coverage) insuring against claims for bodily injury, death or property damage that may arise from or be occasioned by the condition, use or occupancy of the Demised Premises and the sidewalks and curbs adjacent thereto, in the amount required under the OEA (as defined in the Master Lease), but in no event less than Five Million Dollars ($5,000,000), on a per occurrence basis, combined single limit with respect of bodily injury or death to all persons and for property damage. The liability insurance requirements hereunder may be reviewed by Sublandlord every five (5) years for the purpose of increasing the minimum limits of such insurance from time to time to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards;

2.  Special Perils ("All Risk") property insurance insuring Subtenant's trade fixtures, furnishings, equipment, leasehold improvements and all other items of personal property of Subtenant located on, in or about the Demised Premises, the plate glass of the Demised Premises, and Tenant's signage (whether or not attached to the Demised Premises), in an amount equal to the actual replacement cost thereof or such greater amount required to prevent Subtenant from being treated as a co-insurer within the terms of applicable policies (with provisions for a deductible as shall be reasonable in comparison with similar properties);

3.  During the performance of any construction or alteration work in the Demised Premises by Subtenant, Subtenant shall maintain Worker's Compensation, public liability and builder's risk form of casualty insurance in amounts required under the OEA (as defined in the Master Lease), naming Master Landlord, Sublandlord, any mortgagee and the parties to the OEA as additional insureds;

4.  In addition to the insurance required to be maintained hereunder, Tenant shall maintain such other or additional insurance required under the OEA with respect to the Demised Premises.

All insurance provided in this Exhibit C shall be effected under policies of insurance complying with the requirements of the OEA, issued by insurers reasonably approved by Master Landlord and Sublandlord which are licensed to do business in the State of Michigan and rated "A-" or better by A.M. Best Company, or any successor thereto. Sublandlord and Subtenant shall, on request, provide to the other, to any mortgagee and the parties under the OEA certificates of the policies required to be maintained by Subtenant pursuant hereto. Each such policy shall contain a provision that no unintentional act or omission of the insured shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained and an agreement by the insurer that such policy shall not be canceled without at least 30 days' prior notice to any party named as an additional insured.

All policies of liability insurance required to be maintained by Subtenant under this Exhibit C shall name Subtenant as the insured and Master Landlord, Sublandlord, any mortgagee and the parties under the OEA as additional insureds. All policies of casualty insurance required above shall name Subtenant as the insured and Sublandlord as additional loss payee, and shall be payable in the event of loss, jointly to Subtenant and Sublandlord, as their interests may appear, and shall name any mortgagee pursuant to a standard first mortgage clause, subject in all respects to the terms of the Master Lease and the Sublease.

Any insurance provided for in this Exhibit C may be effected by a blanket policy or policies of insurance, or under so-called "all risk" or "multi-peril" insurance policies, provided that the amount of the total insurance available shall be at least the protection equivalent to separate

5/4/99

policies in the amounts herein required, and provided further that in other respects, any such policy or policies shall comply with the provisions of this Exhibit C. An increased coverage or "umbrella policy" may be provided and utilized to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate liabilities provided by all such policies shall be satisfactory provided they otherwise comply with the provisions of this Exhibit C. If a blanket policy applies, Subtenant shall obtain its general liability insurance on a per location basis.

Every insurance policy carried by Subtenant (if it can be so written and either does not result in a material additional premium or the other party agrees to pay on demand any additional premium) include provisions denying to the insurer subrogation rights against Sublandlord or Master Landlord, against the parties under the OEA and against any mortgagee to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Subtenant hereby waives any rights of recovery against Master Landlord or Sublandlord for any direct damage or consequential loss covered by said policies against which Subtenant is protected by insurance or (by the inclusion of deductible provisions therein or otherwise) has elected to be self-insured, to the extent of the proceeds paid under such policies and the amount of any such self-insurance, whether or not such damage or loss shall have been caused by any acts or omissions of Sublandlord or Master Landlord.

Sublandlord and Subtenant shall cooperate fully with each other to obtain the largest possible recovery and execute any and all consents and other instruments and take all other actions necessary or desirable to effectuate the same and to cause such proceeds to be paid as hereinbefore provided. Each policy carried by Subtenant shall be written as a primary policy not contributing with, and not in excess of, the coverage carried by the Master Landlord or Sublandlord.

In addition to any other insurance required to be carried by Sublandlord under this Sublease or as otherwise required under the Master Lease, OEA or by Sublandlord's mortgagee, Sublandlord will procure, at Subtenant's sole cost and expense, the following insurance:

A.   Special Perils Form building insurance with Ordinance of Law coverage (including demolition cost, loss to undamaged portions of any buildings and increased cost of construction ) with a replacement cost endorsement, an inflation guard endorsement, agreed value endorsement insuring the Demised Premises in an amount not less than $1,350,000.00 and waiver of subrogation endorsement;

B.   Comprehensive Boiler and Machinery insurance to include coverage for mechanical and electrical systems breakdown providing for full repair and replacement coverage;

C.   Special Perils Form rent loss insurance for a one year's loss of full occupancy rental income, plus real estate taxes, insurance premiums and common area maintenance expenses payable by the Subtenant under the Sublease;

D.   Such other forms of insurance coverage deemed appropriate to the Demised Premises such as earthquake and flood insurance, environmental impairment insurance, and condemnation/eminent domain insurance; and

E.   Commercial general public liability insurance (including product liability, completed operations, contractual liability, host liquor liability, broad form property damage, and personal injuries, including death resulting therefrom) and with single limit coverage for personal and bodily injury and property damage of at least $5,000,000.00 for each occurrence as Sublandlord's interest may appear.

While any improvements are in the process of construction on the Demised Premises, Sublandlord or Sublandlord's general contractor shall also procure and maintain the following insurance at no additional cost or expense to Subtenant:

(i)   Builder's Risk Insurance written on a completed value basis in an amount equal to the full replacement cost of the Improvements at the date of completion with coverage available on the so-called non-reporting "all risk" form of policy, including coverage

-17-                                                              5/4/99

against collapse and water damage, with standard non-contributing mortgagee clauses, such insurance to be in such amounts and form and written by such companies as shall be approved by Sublandlord's mortgagee, and the originals of such policies (together with appropriate endorsement thereto, evidence of payment of premiums thereon and written agreements by the insurer or insurers therein to give Mortgagee ten (10) days' prior written notice of any intention to cancel);

(ii)     Contractor's Comprehensive General Liability Insurance (including operations, product liability, contingent liability operations, operations of subcontractors, completed operations, contractual liability insurance and comprehensive automobile liability insurance (including hired and non-owned liability) and with single limit coverage for personal and bodily injury and property damage of at least $2,000,000.00 for each occurrence; and

(iii)    Statutory workmen's compensation coverage in the required amounts.

In addition to the foregoing, Sublandlord may also elect to purchase insurance on pylon signage, light standards, fencing and retaining walls to the extent such coverage is available and such exposures are present and not insured by the Subtenant.

5/4/99

## EXHIBIT D

### SUBLANDLORD'S WORK

Sublandlord shall cause to constructed a new Golf Galaxy Building Shell located at Alpine Avenue and I96 in Walker, MI per plans and specification prepared by KKE Architects pursuant to structural plans prepared by Erickson Roed & Associates and mechanical and electrical plans prepared by Michaud-Colley-Erickson Consulting Engineers consisting of the following drawings:

| Sheet No. | Sheet Name | Date | Revised |
|---|---|---|---|
| CS1 | Cover Sheet | 10/30/98 | |
| SP1 | Site Plan | 10/30/98 | 11/19/98 |
| AS1 | Floor Plan | 10/30/98 | |
| AS2 | Exterior Elevations | 10/30/98 | 1/26/99 |
| AS3 | Wall Sections | 10/30/98 | 1/26/99 |
| AS3.1 | Wall Sections | 10/30/98 | 1/26/99 |
| AS4 | Roof Plan & Details, Door & Frame Types | 10/30/98 | |
| AS5 | Enlarged Plans & Details, Finish & Material Schedule, Door & Frame Schedules | 10/30/98 | |
| S1 | General Structural Notes & Typical Details | 10/30/98 | |
| S2 | Foundation Plan | 10/30/98 | |
| S3 | Foundation Details | 10/30/98 | |
| S4 | Roof Framing Plan | 10/30/98 | |
| S5 | Roof Details | 10/30/98 | |
| S6 | Sections & Details | 10/30/98 | |
| MO.1 | Mechanical Plan | 10/30/98 | |
| MO.2 | Mechanical Schedules & Risers | 10/30/98 | |
| EO.1 | Electrical Plan | 10/30/98 | |
| EO.2 | Schedules & Riser | 10/30/98 | |
| | Specification Book | 10/30/98 | |
| | Bulletin #1 | | |
| | B1-S1 | 1/27/99 (8 1/2" X 11") | |
| | EO-2A | 1/27/99 (8 1/2" X 11") | |
| | AS2 | 1/26/99 (24" X 36") | |
| | AS3 | 1/26/99 (24" X 36") | |
| | AS3.1 | 1/26/99 (24" X 36") | |

The above is hereby defined as "Sublandlord's Work" subject to the following revisions:

1.    Sublandlord reserves the right to make any changes to Sublandlord's Work that Sublandlord deems reasonable in its sole discretion subject only to not changing the size of the Tenant's Building by 1,000 square feet.

2.    Sublandlord's Work does not include:

    a.    outside irrigation system;

    b.    pylon signs; and

    c.    light fixtures on outside (exterior of building) and additional site lighting to that which currently exists is not included .

EXHIBIT B

DEMISED PREMISES (CROSS-HATCHED)



EXHIBIT C

TOYS R US LETTER