IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CEC ENTERTAINMENT, INC., *et al.*, | § | Case No. 20-33163 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |

## OBJECTION TO MOTION FOR ORDER AUTHORIZING DEBTORS TO ABATE RENT PAYMENTS AT STORES AFFECTED BY GOVERNMENT REGULATIONS

Shore Plaza LLC ("**Shore Plaza**"), the owner of the premises at the West Shore Plaza shopping center commonly known as 1775 - P South Avenue, Staten Island, New York ("**Staten Island Premises**"), objects to the Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations (the "**Motion**") [Dkt. No. 487] filed by Debtors seeking an order abating rent payments of CEC Entertainment, Inc. ("**Debtor**") on the Staten Island Premises until governmental orders allegedly restricting Debtor's use of the Staten Island Premises have been lifted, and in support thereof states as follows:

## PRELIMINARY STATEMENT

1.      The Motion rests on theories of force majeure and frustration of purpose that allegedly excuse the Debtor from its obligation to pay rent to Shore Plaza for the use of the Staten Island Premises by reason of various executive orders issued by New York Governor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895) (collectively, "Debtors"). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

Andrew Cuomo due to the COVID-19 pandemic (hereafter, the "**Executive Orders**") that allegedly limited its use of the Staten Island Premises. The Court should deny the Motion.

2.     The Debtors' Motion is based on sample lease clauses, which do not apply to Shore Plaza, and statements of law from California and other sources not applicable in New York. The Debtors' supposed standard force majeure clause, examples of which are attached to the Motion, are inapplicable to the Staten Island Premises as the force majeure provision in paragraph 24 of the Lease (as hereafter defined) expressly excludes payment of rent from the force majeure provision. Moreover, assertions of frustration of purpose as a result of an alleged reduction in the Debtor's restaurant operations at the Staten Island Premises are not availing because the Debtor has not even used the Staten Island premises to the extent permitted by the Executive Orders and the use clause of the Lease permits the Debtor to use the Staten Island Premises for any lawful retail purpose with the prior consent of Shore Plaza, which consent may not be unreasonably withheld. Consequently, the Staten Island Premises can be used for numerous purposes despite the Executive Orders, and there is no basis to abate the rent.

3.     The Lease constitutes a freely negotiated commercial contract between sophisticated parties, each represented by counsel, and should be enforced according to its terms. Moreover, if the Lease does not suit the Debtor's present purposes, the Debtors' can simply assume and assign it or reject it. By seeking to abate their rent, however, while retaining the right to use the premises in the future, the Debtors are simply seeking a free option for the Premises to which they are not entitled.

4.     Although the Debtors assert that the Motion is a core proceeding, it is a non-core, related proceeding as to which Shore Plaza does not consent to the Bankruptcy Court's exercise

of the judicial power of the United States or to its entry of final orders or judgments with respect to the Motion.

5.    Accordingly, and for the reasons detailed below, the Court should deny the Motion as to Shore Plaza and the Staten Island Premises subject to *de novo* review by the District Court.

## RELEVANT BACKGROUND AND FACTS

### A.    Relevant Lease Provisions

6.    Debtor is the tenant under a long-term commercial lease with Shore Plaza for the Staten Island Premises pursuant to that certain Lease Agreement dated November 25, 1991 (the "**Original Lease**"), as amended by that certain (i) First Amendment of Lease dated the "___day as of July 1992"; (ii) Second Amendment to Lease dated as of April 8, 2002; (iii) Third Amendment of Lease  made as of April 24, 2007, and (iv) Fourth Amendment to Lease Agreement made and entered into effective as of July 26, 2016 (collectively, the "**Lease**").  A copy of the Original Lease is annexed hereto as Exhibit A.  A copy of each of the First through Fourth Amendments are annexed hereto collectively as Exhibit B.

7.    Paragraph 4(b) of the Original Lease provides: "[b] All amounts other than Minimum rent which are payable to Landlord under this Lease shall be deemed to be additional rent.  All payments of rent shall be made by Tenant to Landlord without set-off or deduction, except as specifically provided otherwise in this Lease." Lease, ¶ 4, Exhibit A at 2.

8.    Although the Lease contains a force majeure provision, which was bargained for by the parties to the Lease, it expressly excludes the payment of money from its terms. Paragraph 24 of the Lease expressly provides as follows:

> Force Majeure.  The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease **(except for the payment of money)** shall be deemed extended by time lost due to delays resulting from acts of God, strikes,

unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

Lease ¶ 54, Exhibit A at 11 (emphasis added).

9.    Moreover, pursuant to paragraph 33 of the Original Lease, Debtor covenants that

"no part of the Premises or improvements thereon shall be used in any manner whatsoever in violation of the laws, ordinances, regulations, or orders of the United States or of the state, county, city or other applicable governmental subdivisions where the Premises are located.  Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises . . . are concerned . . . ."

Lease, ¶ 33, Exhibit A at 13.

10.    Lastly, Paragraph 5 of the Lease provides:

Use.  Tenant may use the Premises for the operation of a restaurant and/or related entertainment center serving alcohol beverages and for such other uses as are incidental to the operation thereof **and for any other lawful retail purpose** with the prior consent of Landlord, which shall not be unreasonably withheld.

Lease ¶ 5, Exhibit A at 4 (emphasis added).

## B.    New York Governor Cuomo's Executive Orders

11.    On March 20, 2020, New York Governor Cuomo signed the "New York State on PAUSE" Executive Order 202.6 that became effective at 8:00 PM on Sunday, March 22, 2020. A copy of the Executive Order is Annexed hereto as Exhibit C.  Among the "essential" businesses permitted to remain open by the Executive Order were restaurants/bars, although only for take-out/delivery services.  Other essential businesses included grocery stores, liquor stores and home improvement stores.  In late April, 2020 New York Governor Cuomo announced the "New York Forward" initiative, which included a four-part phased approach to reopening. These guidelines applied to all restaurants and food service establishments and provided that, in regions that reach Phase 2, such establishments may open outdoor spaces with seating for customers in accordance with certain guidelines.  New York City started Phase 2 of its reopening

4

on June 22, 2020, and, accordingly, restaurants, such as the Debtor's, have been free to provide outdoor sit down dining services since that date. Although the Staten Island Premises has remained open and operational during the pandemic by providing take-out/delivery services, it has chosen not to offer outdoor dining services even though legally permitted to do so.

### C.    **Relevant Correspondence**

12.    By letter dated August 3, 2020, the same day Debtors filed their Motion, Colton Pearson, Director of Real Estate for the Debtor, sent a letter, clearly drafted by Debtor's counsel, Weil Gotshal and Manges, to Shore Plaza advising of the filing of this bankruptcy case, and claiming an alleged right to abate or defer rent for the Staten Island Premises because it had allegedly sustained substantial and indefinite restrictions on services at its restaurants as a result of various Executive Orders issued by Governor Cuomo. By letter dated August 10, 2020, Shore Plaza responded and rejected the Debtor's reservation of rights as not in accordance with the terms of the Lease and applicable law.

### ARGUMENT

### I.

### THE FORCE MAJEURE CLAUSE IN THE LEASE DOES NOT FORGIVE, EXCUSE OR EXTEND THE TIME FOR PAYMENT OF RENT BY THE DEBTOR

13.    New York law is crystal clear that when parties set down their agreement in writing, the agreement should be enforced according to its terms. These "considerations are all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern." *W.W.W. Associates, Inc. v. Gianconteri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *see also Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004). Accordingly, New York courts interpret contracts according to their plain and natural meaning. *Mercury Bay Boating*

5

*Club Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 557 N.Y.S.2d 851, 557 N.E.2d 87 (1990).

As stated by the New York State Court of Appeals in *159 MP Corp. v. Redbridge Bedford, LLC*,

> Freedom of contract is a "deeply rooted" public policy of this state (*New England Mut. Life Ins. Co. v Caruso*, 73 NY2d 74, 81 [1989]) and a right of constitutional dimension (US Const, art I, § 10[1]). In keeping with New York's status as the preeminent commercial center in the United States, if not the world, our courts have long deemed the enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law. Thus, "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]).

*159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 104 N.Y.S.3d 1, 128 N.E.3d 128 (2019).

14.     With respect to *force majeure* lease clauses, New York courts have interpreted such clauses narrowly. New York courts have consistently found that a party will be excused from performance under a *force majeure* clause only if the clause expressly includes the event in question and the event actually prevents the party's performance of its obligations under the contract. *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987); *Castor Petroleum, Ltd. v. Petroterminal De Panama, S.A.*, 107 A.D. 3d 497, 968 N.Y.S.2d 435 (1st Dept. 2013); *Duane Reade v. Stoneybrook Realty, LLC*, 30 A.D. 3d 229, 818 N.Y.S.2d 9 (1st Dept. 2006).

15.     "The burden of demonstrating force majeure is on the party seeking to have its performance excused . . . and the non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure." *Rochester Gas And Electric Corporation*, No. 06–CV–6155–CJS–MWP, 2009 WL 368508, at *7 (W.D.N.Y. 2009) (quoting *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985)). "Mere impracticality or unanticipated difficulty is not enough to

excuse performance" under a *force majeure* clause. *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl,* 720 F.Supp. 312, 318 (S.D.N.Y.1989).

16.     Here, paragraph 24 of the Lease[2] provides as follows:

> Force Majeure.  The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease **(except for the payment of money)** shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

Lease, ¶ 24, Exhibit A at 11 (emphasis added).

17.     By virtue of the exception "for the payment of money", paragraph 24 of the Lease does not allow the Debtor to defer, withhold, reduce or otherwise ignore or modify its obligation to pay rent, no matter the circumstances.  No amount of argument can change what is an enforceable commercial lease provision. To do so is to ask this Court to modify a Lease, which is against well-established New York public policy. *159 MP Corp., v. Redbridge Bedford LLC,* 33 N.Y. 3d at 359.

18.     In its Motion, the Debtor cites *In Re Hitz Restaurant Group,* 616 B.R. 374, (Bankr. N.D. Ill.), in which an Illinois Bankruptcy Court considered whether, under Illinois Law, an Illinois' "Stay-at-Home" executive order triggered a lease's *force majeure* provision. The force majeure clause in *Hitz* provided that

> "Landlord and Tenant shall each be excused from performing its obligations or undertakings provided in this Lease, in the event, but only so long as the performance of any of its obligations are prevented or delayed, retarded or

---

[2] In the Motion, the Debtor references what it describes as CEC's standard lease force majeure clause, which provides that

> "The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by any time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, severe and unusual weather conditions, material or labor restrictions by governmental authority and any other cause not within the reasonable control of Landlord or Tenant, as the case may be."

As established above, this purported standard clause is not the force majeure clause contained in the Lease.

hindered by . . . laws, governmental action or inaction, orders of government . . .
Lack of money shall not be grounds for Force Majeure."

*In Re Hitz Restaurant Group*, 616 B.R. at 376-77. The Illinois Bankruptcy Court found that the
force majeure provision of the lease was triggered by the executive order.

19.     The *Hitz* case is clearly distinguishable from the instant case, however. There, the
court concluded that the debtor's inability to pay the rent was caused by governmental action and
therefore covered by the force majeure clause, even though it otherwise might not have been.
Here, in contrast, the payment of money is expressly excluded from the force majeure clause in
the Lease, which does not enforce performance, as in *Hitz*, but merely extends the time for
performance, except for the time to pay money, which is not extended. Moreover, in *Hitz*, the
force majeure clause was expressly based on "governmental action" or "order of government".
Here, in contrast, the only type of governmental action which triggers the force majeure clause
under the Lease is "material or labor restrictions by governmental authority", which have not
occurred here. Thus, the *Hitz* case is not applicable to the facts at bar and, in any event, is not
binding precedent in this case.

20.     Moreover, to the extent *Hitz* is applicable here, Debtor's request for a complete
abatement of rent is not warranted by the very case on which it relies. Because the executive
order in *Hitz* did not prohibit the tenant from offering carry-out, curbside pick-up, and delivery
services, the court there held that "to the extent that Debtor could have continued to perform
those services, its obligation to pay rent is not excused by the force majeure clause," but is
instead "reduced in proportion to its reduced ability to generate revenue due to the executive
order." *Hitz* 616 B.R. at 379, n.2. Consequently, Debtor's reliance on *Hitz* for its requested
complete rent abatement is inapposite.

8

## II.

## THE DEBTOR MAY NOT INVOKE FRUSTRATION OF PURPOSE BOTH BECAUSE THE COVID-19 PANDEMIC WAS FORESEEABLE AND BECAUSE THE LEASE ITSELF ALLOCATES THAT RISK TO THE DEBTOR

### A.    The Frustration Doctrine Defined

21.    In addition to relying on force majeure, the Debtor argues that its obligation to pay rent to Shore Plaza should be excused based on the doctrine of frustration of purpose. To the extent applicable under New York Law, the frustration of purpose doctrine, which is narrowly applied, *Crown It Services v. Koval-Olsen*, 11 A.D.3d 263,782 N.Y.S. 2d 808 (1st Dept. 2004), provides that "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, <u>unless the language or the circumstances indicate the contrary</u>." *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), *aff'd*, 561 Fed. Appx. 48 (2d Cir. 2014).

22.    Frustration of purpose excuses performance when a "virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *U.S. v. Gen. Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir. 1974). If a party could reasonably foresee an event that would destroy the purpose of the contract, and did not provide for the event's occurrence, then such party will be deemed to have assumed that risk. *Sage Realty Corp. v. Jugobanka, D.D.*, 1998 WL 702272 (S.D.N.Y. 1987).

23.    But, "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 244 N.E. 2d 37 (1968). It is not enough that the

transaction has become less profitable for the affected party or even that he/she will sustain a loss in order to apply the doctrine. *Rockland Developmen Associates. v. Richlou Auto Body, Inc.*, 173 A.D.2d 690, 570 N.Y.S. 2d 343 (2d Dep't 1991); *Bank of New York v. Tri 360 Polyta Finance B.V.* 2003 WL 1960587 (S.D.N.Y. 2003). Applying the forgoing principles of New York Law, the Debtor's frustration of purpose argument should be wholly rejected by this Court.

### B.     The Pandemic Was Foreseeable

24.     The events giving rise to the Debtor's frustration claims were reasonably foreseeable and, thus, bar the Debtor from asserting this argument. The Court may take judicial notice of pandemics occurring in the years leading up to the Debtor's signing of the Fourth Amendment in 2016, including the SARS pandemic of 2002 and the H1N1 pandemic of 2009, and, of course, the Flu Pandemic of 1918, and the wide publicity that they received. Thus, the risk of a pandemic was certainly foreseeable when the Fourth Amendment was signed in 2016.

25.     In *Sage Realty Corp. v. Jugobanka*, 1998 WL 702272 (S.D.N.Y. 1987) a Yugoslavian bank was a tenant under a long-term lease in a Manhattan, New York office building. Shortly after signing its lease, President Clinton issued an Executive Order that prevented the bank from accessing assets in the United States, an order that the Treasury Department then implemented by directing the bank to close. As a result, the bank then stopped paying rent. In response to the landlord's suit to recover rent, the bank argued that the purpose of the lease had been frustrated and warranted rescission. In granting summary judgment to the landlord, the court first noted that the closure order was foreseeable because the potential for it was reported in the press in the months leading up to the lease's signing. In addition, the force majeure provision of the lease provided that, "[T]he obligation of Tenant to pay rent hereunder shall in no way be affected, impaired or excused because Landlord is unable to fulfill any of its

10

obligations under this Lease by reason of any order or regulation of any government agency."
*Id.* at *3. Accordingly, the *Sage* Court enforced the Lease provision as written.

26.       In *Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 34 Misc. 3d 1222, 951 N.Y.S.

2d 84 (Sup. Ct. NY. Co. 2009), *aff'd*, 68 A.D. 3d 562, 891 N.Y.S.2d 63 (1st Dept. 2009),  the

tenant claimed that because of the economic downturn of 2008, it was not required to proceed

with a lease that it had signed just before that recession took hold.  The New York Supreme

Court disagreed and held that: "The contract here was entered into by sophisticated commercial

parties who could have anticipated the possibility that future events might result in financial

disadvantage on the part of either party, even if the precise cause or extent of such financial

disadvantage was not foreseen at the time the contract was executed." *Urban Archaeology Ltd.*

*v. 207 E. 57th St. LLC,* 34 Misc. 3d 1222.  On appeal, the Appellate Division, First Department

affirmed, stating:

> The force majeure clause of the parties' lease agreement contemplates either
> party's inability to perform its obligations under the lease due to "any cause
> whatsoever" beyond the party's control—other than financial hardship.  This
> clause conclusively establishes a defense to plaintiff's claim that it is excused
> from performing under the lease by reason of the effect that the downturn in the
> economy has had on it.

*Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 68 A.D. 3d 562 (1st Dep't 2009).

27.       Here, by virtue of paragraphs 24 and 33 of the Lease, the parties anticipated the

consequences of an event that might impact upon the Debtor's use of the Staten Island Premises

and provided that no supervening event would excuse the Debtor from paying its rent.  These

sections control.  Had the Debtor been concerned about allocating risk should a governmental

order require closure during a pandemic, it was incumbent on the Debtor to have raised the issue

at the bargaining table and obtained a provision addressing its lease obligations in those

65301396v.1

circumstances. Indeed, the Debtor apparently did exactly that in the sample lease provisions it attaches as exhibits to the Motion, but it did not do so in the Lease.

28.     Debtors expressly agreed in paragraph 24 of the Lease that any obligation to pay money under the Lease was not subject to a force majeure event and the Executive Orders complained of are likewise not a force majeure event. Indeed, Debtor expressly agreed in paragraph 33 of the Lease to comply with all orders of the "state, county, city or other applicable governmental subdivisions where the Premises are located." Lease, ¶ 33, Exhibit A at 11.

29.     Thus, this Court may not relieve the Debtor of the consequences of its negotiated, arm's-length bargain struck by sophisticated parties, each represented by counsel. *See Maxton Bldrs., Inc. v. LoGalbo*, 68 N.Y.2d 373, 382, 509 N.Y.S.2d 507, 502 N.E.2d 184 (1986) ("[R]eal estate contracts are probably the best examples of arm's length transactions. Except in cases where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of their contract. If the parties are dissatisfied [citation omitted] the time to say so is at the bargaining table."); *Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 68 A. D. 3d at 562.

C.     <u>**The purpose of the Lease Has Not Been Frustrated.**</u>

30.     Moreover, Paragraph 5 of the Lease provides that the Debtor may use the Premises for the operation of a restaurant and/or related entertainment center serving alcoholic beverages and for such other uses as are incidental to the operation thereof and "**for any other lawful retail purpose** with the prior consent of Landlord, which shall not be unreasonably withheld." (emphasis added) Thus, even if the Executive Order issued by Governor Cuomo restricted the Debtor from fully conducting its preferred type of restaurant business at the Staten Island Premises, the Debtor was free to use the Staten Island Premises for any other lawful retail purpose, subject to the use restrictions in Exhibit F to the Lease.

12

31.     Thus, if the Debtor is not satisfied with the results of its restaurant operations and refuses to conduct outdoor dining, the Debtor is free to use the Staten Island Premises for numerous other retail purposes which are allowed to be fully open. All it has to do is ask. The Debtor can hardly argue that the purpose of the Lease has been frustrated when no provision of the Lease provides any promise that the Debtor will be able to operate its specific type of business, but merely permits operation of a "restaurant and/or related entertainment center serving alcoholic beverages, and the use clause specifically permits the Debtor to use the premises for any lawful retail use, many of which uses have been allowed to operate without restriction as essential businesses throughout the pandemic. The Debtor thus had, and will continue to have, the economic benefits of using the Staten Island Premises and must be required to pay the rent due under the Lease.

32.     The Debtor cannot only operate its restaurant, but it is also storing its merchandise and property at the premises while it waits to be able to fully reopen, and it otherwise benefits from the quiet enjoyment of its Lease on the Staten Island Premises. Debtor does not wish to surrender the Premises, which would be the proper course for a tenant claiming it cannot use the Premises, particularly for a Debtor in bankruptcy which can reject the Lease. Rather, the Debtor has, and wants to maintain, the benefits of its long term Lease, including the right to use the Premises fully in the future, but not pay for those benefits. In short, the Debtor wants the Court to award it a free option for the Staten Island Premises. In the meantime, Shore Plaza has to pay its mortgage, taxes, insurance and other expenses for the Staten Island Premises. The Debtor's Motion thus violates the terms of the Lease and is simply unfair and inequitable.

**D.      The Lease Allocates The Risk of Closure to The Debtor.**

33.     Even if, _arguendo_, the Executive Order that allegedly limits the Debtor's use of the Staten Island Premises was not foreseeable, the Lease conclusively disposes of the Debtor's

13

frustration claim.  First, based on the express language of the *force majeure* provision (paragraph 24) of the Lease, the Debtor simply cannot rely upon the common law doctrine of frustration of purpose.  Its obligation to pay the rent is specifically not excused or delayed by the Force Majeure provision of the Lease.

34.     Further, paragraph 33 of the Lease provides that

> Tenant covenants that, during the Term, no part of the Premises of improvements thereon shall be used in any manner whatsoever in violation of the laws, laws, ordinances, regulations, or orders of the United States or of the State, county, city or other applicable governmental subdivisions where the Premises are located. Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises . . ."

Lease, ¶ 33, Exhibit A at 33.

35.     Thus, paragraph 33 places the onus on the Debtor to comply, at its own cost and expense, with governmental orders affecting its occupancy of the Staten Island Premises, and the Debtor cannot use the Executive Order issued by New York Governor Cuomo, with which it contractually agreed to comply, as a legal excuse for its non-payment of rent.

36.     Further, Paragraph 4(b) of the Original Lease provides that all payments of rent shall be made by Tenant to Landlord without set-off or deduction, except as specifically provided otherwise in this Lease."  Lease, ¶ 4(b), Exhibit A at 2.  There is no provision of the Lease that specifically grants a set-off or deduction that is applicable here.

37.     Thus, the Debtor is not entitled to any rent abatement and the Debtor must continue to pay its rent. *See LIDC I v. Sunrise Mall, LLC*, 46 Misc.3d 885, 996 N.Y.S.2d 875 (Sup. Ct., Nassau Co. 2014) ("[R]ent is excepted under the leases' force majeure clause, and non-payment of rent is the stated default. It [rent] thus had to be paid.").

## III.

## THE COURT HAS NO INHERENT AUTHORITY
## TO ABATE RENTAL OBLIGATIONS

### A.   The Debtor Fails To Establish The Court's "Inherent" Authority

38.     The Debtor also asks the Court to abate the Debtor's obligation to pay rent based

on what it asserts is the Court's "inherent" authority, yet the Court has no such inherent authority

and the Debtor's reliance on *Marrama v. Citzens Bank*, 549 U.S. 365, 172 S. Ct. 1105, 166 L.

Ed. 2d 956 (2007), is misplaced.[3]

39.     In *Marrama*, the Chapter 7 debtor had made misleading or inaccurate statements

in his verified schedules in an attempt to hide his transfer of a valuable property to a trust for no

consideration seven months before filing his Chapter 7 petition.  After the Chapter 7 Trustee

advised the debtor that the trustee intended to recover the transferred property, the debtor sought

to convert his case to a case under Chapter 13.  *Marrama*, 547 U.S. at 368-369, 127 S. Ct. at

1108.  The bankruptcy court denied the debtor's request to convert his case, which was upheld

on appeal, on grounds that because the debtor had acted in bad faith, its Chapter 13 case would

simply be dismissed or converted back to Chapter 7, and therefore the conversion of the debtor's

case to Chapter 13 should not be permitted.  *Marrama*, 549 U.S. at 370, 127 S. Ct. at 1109.

40.     The Supreme Court upheld the denial of the conversion based on the text of

section 706(d), reasoning that because the debtor's Chapter 13 case would be dismissed based on

a showing of bad faith, the debtor could not be a debtor under Chapter 13 and conversion could

be denied under section 706(d), which provides that "a case may not be converted to a case under

---

[3] To the extent the Debtor seeks equitable relief, it may only do so in an adversary proceeding, not by motion in a contested matter, Fed. R. Bankr. P. 7001(7).

another chapter of this type unless the debtor may be a debtor under such chapter." *Marrama*, 549 U.S. at 372-374, 127 S. Ct. at 1110-1111.

41.     The Supreme Court also noted that Section 105(a) of the Bankruptcy Code, which grants bankruptcy judges broad authority "to take action that is necessary or appropriate 'to prevent an abuse of process'", was adequate to deny the motion to convert rather than allow it and postpose the inevitable reconversion to Chapter 7 or dismissal. *Marrama*, 549 U.S. at 375, 127 S. Ct. at 1112.

42.     Finally, the Supreme Court noted that, as the Solicitor General argued in his amicus brief, "even if § 105(a) had not been enacted, the inherent power of every federal court to sanction 'abusive litigation practice' . . . might well provide adequate justification for a prompt, rather than a delayed ruling on an unmeritorious attempt to qualify as a debtor under Chapter 13." *Marrama*, 549 U.S. at 375-376, 127 S. Ct. at 1112.  From this argument in an amicus brief based on a power to sanction abusive litigation  that "*might*" have provided a justification for denial of a conversion motion "*if*" Section 105(a) did not exist, all of which is dicta, the Debtor argues here that the Court has inherent authority to allow the Debtor to ignore its contractual obligations to Shore Plaza under the Lease and not pay the rent due to Shore Plaza.  That is hardly the law.  Rather, it is a blatant attempt to avoid the explicit requirement of Section 365(d)(3) of the Bankruptcy Code which obligates the Debtor to begin paying rent shortly.

**B.     The Court May Not Contravene Section 365(d)(3) of the Bankruptcy Code**

43.     Section 365(d)(3) of the Bankruptcy Code provides that the

> trustee shall timely perform all of the obligations of the debtor . . .
> arising from or after the order for relief under any unexpired lease
> of nonresidential real property, until such lease is assumed or
> rejected . . . The court may extend, for cause, the time for
> performance of any such obligation that arises within 60 days after
> the date of the order for relief, **but the time for performance
> shall not be extended beyond such 60-day period**.

16

11 U.S.C. § 365(d)(3). (Emphasis Added.) Thus, 11 U.S.C § 365(d)(3) specifically prohibits the Court from extending the Debtor's time for performance of its obligations to pay rent for more than 60 days after the Petition Date.

44.    Section 365(d)(3), which was "added to this section [of] the Code ... to improve the position of lessors of nonresidential real property", was "intended to protect real property lessors during the period between the petition date and the date when debtor/lessees choose to assume or reject a lease." *In re Microvideo Learning Sys., Inc.*, 232 B.R. 602, 604 (Bankr. S.D.N.Y.), *aff'd sub nom. In re Microvideo Learning Sys.*, 254 B.R. 90 (S.D.N.Y. 1999), *aff'd sub nom. In re Microvideo Learning Sys., Inc.*, 227 F.3d 474 (2d Cir. 2000). "Lessors are provided with this extra protection because they are one of the few creditors who, unlike trade creditors or utilities, are required to continue to do business with debtors post petition." *In re Microvideo Learning Sys., Inc.*, 232 B.R. at 604; *see also In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 529 (Bankr. N.D. Ill. 1992) ("Because such a lessor, unlike utilities, trade creditors, or post-petition employees, cannot utilize the self-help remedy of terminating their relationship with the debtor if prompt payment is not assured, the lessor becomes, in effect, an 'involuntary extender of unsecured credit.'").

45.    "The relevant legislative history indicates that Section 365(d)(3) was enacted in order to protect landlords by requiring timely payment of lease obligations in the pre-rejection period." *In re Valley Media, Inc.,* 290 B.R. 73, 75 (Bankr. D. Del. 2003).

46.    To "level[] the playing field" and "to assure commercial landlords timely receipt of post-petition rent from debtors in Chapter 11 proceedings," Congress amended Section 365 of the Bankruptcy Code in 1984 to include Section 365(d)(3). *In re Stone Barn Manhattan LLC*, 398 B.R. at 361-62 (Bankr. S.D. N.Y. 2008) ("Congress enacted the statute to ameliorate the

17

perceived inequities that lessors of nonresidential real property had faced during the period after a Chapter 11 filing but before assumption or rejection") (citing Cong. Rec. S8894-95 (daily ed. June 29, 1984)); *In re Microvideo Learning Sys., Inc.,* 232 B.R. 602, 604 (Bankr. S.D.N.Y.), *aff'd sub nom. In re Microvideo Learning Sys.,* 254 B.R. 90 (S.D. N.Y. 1999), *aff'd sub nom. In re Microvideo Learning Sys. Inc.,* 227 F. 3d 474 (2d Cir. 2000). "The addition of section 365(d)(3) to the Code, in 1984, addressed those concerns." *In re Montgomery Ward Holding Corp.,* 268 F.3d at 210–11 (3d Cir. 2001). "Its purpose was explained by Senator Hatch." *In re Montgomery Ward Holding Corp.,* 268 F.3d at 210–11 (3d Cir. 2001).

47.    "As Senator Orrin Hatch, a conferee on the originating act, put it":

> This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code . . . A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments under the lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

*In re Montgomery Ward Holding Corp.,* 268 F.3d at 210–11 (3d Cir. 2001) (citing H.R. Rep. No. 882, 95th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 576; *In re Valley Media, Inc.,* 290 B.R. 73, 75 (Bankr. D. Del. 2003) (*citing* H.R. Rep. No. 882, 95th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 576.

48.     "Virtually all courts have agreed that [section 365(d)(3)] was intended to alleviate the above described burdens of landlords by requiring timely compliance with the terms of the lease." *In re Montgomery Ward Holding Corp.*, 268 F.3d at 210-12; *In re Valley Media, Inc.*, 290 B.R. 73, 74 (Bankr. D. Del. 2003)("[t]he purpose of § 365(d)(3) is to protect landlords by requiring debtors to timely perform their obligations arising under the lease.").

49.     In its unanimous decision in *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188 (2014), the Supreme Court specifically held that although a Bankruptcy Court "may also possess 'inherent power . . . to sanction abusive litigation practices'" . . . "in exercising those statutory and inherent powers, "a bankruptcy court may not contravene specific statutory provisions." *Law v. Siegel* 571 U.S. at 421, 134 S.Ct. at, 1194. As the Supreme Court noted, "it is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" Id. Rather, "a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." Id. In this case, that specific provision is 11 U.S.C. § 365(d)(3), which specifically provides that The Debtor "shall timely perform all the obligations . . . under any unexpired lease of non-residential real property." 11 U.S.C. § 365 (d)(3). Consequently, the Supreme Court's mandate in *Law v. Siegel* prohibits the Bankruptcy Court from employing any inherent authority it may have to enable the Debtor to avoid its obligations under the Lease.

## IV.

## THE BANKRUPTCY COURT MAY NOT ENTER A FINAL ORDER OR JUDGMENT ON THE MOTION

### A.     Shore Plaza Does Not Consent To Entry Of Final Orders Or Judgments

50.     Although the Debtor asserts that the Motion "is a core proceeding pursuant to 28 U.S.C. § 157(b)", Motion ¶8, the Motion is, at best, a non-core related proceeding and, as

both a statutory and constitutional matter, the Court may not enter a final order or judgment in connection with the Motion absent Shore Plaza's consent. Shore Plaza does not consent to the Court's exercise of the judicial power of the United States or to its entry of final orders or judgments with respect to the Motion.

**B.**   **The Court's Related To Jurisdiction**

51.     "Section 1334 grants the federal district courts jurisdiction over four types of bankruptcy matters: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings "arising in" a case under title 11, and (4) proceedings "related to" a case under title 11." *In re Lorax Corp.*, 295 B.R. 83, 88 (Bankr. N.D. Tex. 2003).

52.     "Civil proceedings that arise under title 11 or arise in cases under title 11 are deemed 'core' matters; while civil proceedings that are related to a title 11 case are deemed 'non-core' matters." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 704 (Bankr. W.D. Tex. 2011). A proceeding is "related to" a bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Lorax Corp.*, 295 B.R. 83, 88 (Bankr. N.D. Tex. 2003) (internal quotations and citations omitted)).

53.     As the Fifth Circuit observed in *In re Zale Corp.*:

> [Section 1334's] reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*In re Legal Xtranet, Inc.*, 453 B.R. 699, 706 (Bankr. W.D. Tex. 2011)(citing *In re Zale Corp.*, 62 F.3d 746, 752 (5th Cir.1995)).

54.     In this case, "the claims . . . relating to the parties' contractual relationship fall within the subject matter jurisdiction of federal courts under section 1334(b)'s 'related to'

20

prong." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 706 (Bankr. W.D. Tex. 2011). First, Debtor is

the tenant under a long-term commercial, pre-petition lease with Shore Plaza for the Staten

Island Premises pursuant to the Lease. Second, in its Motion, Debtor seeks an Order abating its

rent payments as a result of governmental orders or restrictions imposed by New York State

until such restrictions or orders have been lifted. In support of such relief, Debtor relies on the

state law doctrines of force majeure and frustration of purpose, which the Debtor asserts excuse

it from fulfilling its obligation to pay rent to its landlords, including Shore Plaza. The

determination of the Debtor's obligations under the Lease is unquestionably a matter of New

York law, which governs the Lease. Lease ¶38, Exhibit A at 14.

55.     Thus, the Court has "related to" jurisdiction over the contract-related state law

claims asserted by the Debtor in the Debtor's Motion.

C.     **Debtor's Motion Concerning The Lease is "Non-Core"**

56.     Debtor's motion concerning its Lease with Shore Plaza is a non-core matter for

several reasons. Although Debtor does not reference any particular subsection of 28 U.S.C.

§ 157(b), "A proceeding is not 'core' simply because it 'arguably fits within the literal wording'

of one of the listed proceedings under § 157(b)(2)." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 711

(Bankr. W.D. Tex. 2011) (citing *Hoffmeyer v. Loewen Group Int'l, Inc. (In re Loewen Group*

*Int'l, Inc.), 279 B.R. 471, 475 (Bankr. D.Del.2002)).

57.     Debtor's claims do not "arise under" a case under title 11. *See e.g.*, *In re Legal*

*Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "Arising under' jurisdiction involves

causes of action created or determined by a statutory provision of title 11." *In re Legal Xtranet,*

*Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "State law claims do not fall within

bankruptcy court's 'arising under' jurisdiction because they do not invoke substantive rights

21

provided by Title 11." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011)(internal quotations omitted)).

58.    Likewise, Debtor's state law claims against Shore Plaza do not "arise in" Debtor's bankruptcy "because they could (and in fact did) exist absent [Debtor's] bankruptcy filing." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "Claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *In re Legal Xtranet, Inc.*, 453 B.R. at 709.

59.    Moreover, many courts have rejected the "attempt to incorporate . . . pre-petition causes of action, premised on state law, into the catchall provisions of 28 U.S.C. § 157(b)(2). *In re Legal Xtranet, Inc.*, 453 B.R. at 711 (citing *Peterson v. 610 West Owners Corp. (In re 610 West Owners Corp.)*, 219 B.R. 363, 372 (Bankr.S.D. N.Y.1998)). "Such an argument runs counter to Congress' intent in distinguishing core and non-core claims." *In re Legal Xtranet, Inc.*, 453 B.R. at 711 (*In re 610 West Owners Corp.*, 219 B.R. at 372)).

60.    Accordingly, the Motion is not a core proceeding but is otherwise related to a case under Title 11.[4] Consequently, the Court must submit proposed findings of fact and conclusions of law to the District Court for *de novo* review. 28 U.S.C. § 157(c)(1).

---

[4] In the instant case, Shore Plaza has not filed a proof of claim, although the filing of a proof of claim would not necessarily constitute Shore Plaza's consent to entry by this Court of final orders and judgments with respect to the Motion.  Even if Shore Plaza "would have to eventually file a proof of claim to preserve its rights in the bankruptcy court, that eventuality is insufficient to deem [Shore Plaza's] . . . claims core at this time." *In re Legal Xtranet, Inc.*, 453 B.R. at 712 (citing *Lennar Corp. v. Briarwood Capital LLC*, 430 B.R. 253, 265 (Bankr.S.D.Fla.2010) ("In looking at the core versus non-core nature of the removed case, the Court must look solely to the present record, not what may or may not happen in the Bankruptcy Cases."); *In re Asousa Partnership*, 264 B.R. 376, 387 (Bankr.E.D.Pa.2001) (holding that "when no proof of claim is filed, claims (or counterclaims) asserted against the debtor prepetition are not transformed into core proceedings simply because the debtor files for bankruptcy and removes them")).

**D.    As A Constitutional Matter, The Bankruptcy Court May Not Enter a Final Order Or Judgment With Respect To The Motion**

61.    Because, as described above, the rights of the Debtor and Shore Plaza under the Lease arise entirely under state law and owe no existence to Congress or any federal statute, the issues of rent abatement under the Lease raised in the Motion is entirely one of private rights. *Stern v. Marshall*, 564 U.S. 462, 493, 131 S. Ct. 2594, 2614 (2011).  Consequently, the Court lacks the constitutional authority to enter a final order or judgment with respect to the Motion. *Id.*, 564 U.S. at 502-503, 131 S. Ct. at 2620.

## JOINDER

62.    Shore Plaza joins in the other objections filed in opposition to the Motion to the extent not inconsistent herewith.

## CONCLUSION

63.    In view of all of the forgoing, this Court must deny the Debtor's Motion.  The Debtor should be held to the terms of its bargained for Lease and, accordingly, this Court should deny the Debtor's motion and grant Shore Plaza such other and different relief as the Court deems just or proper, subject to de novo review in the District Court.

## CERTIFICATION PURSUANT TO LOCAL RULE 9013-1(G)(1)

64.    On Tuesday, August 18, 2020, Edward M. Fox and Nascine Howell of Seyfarth Shaw LLP, counsel to Shore Plaza, and Paul Genender and Amanda Pennington Prough of Weil Gotshal & Manges LLP, counsel to Debtors, engaged in a telephonic conference call to discuss

possible consensual resolution of the Motion.  The parties were unable to reach an agreement.

Dated: New York, New York
         August 20, 2020

SEYFARTH SHAW LLP

By:  */s/ Emma Mata*
      Emma Mata

700 Milam Street, Suite 1400
Houston, Texas  77002-2797
Direct Dial:  (713) 238-1820

and

Edward M. Fox

620 Eighth Avenue
32nd Floor
New York, NY 10018
Direct Dial:  (212) 218-4646
Direct Fax:  (917) 344-1339
Email:  emfox@seyfarth.com

*Attorneys for* Shore Plaza LLC

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2020 a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing System ("ECF") upon all parties registered to receive electronic notice.

/s/ Emma Mata
Emma Mata

65301396v.1

# EXHIBIT A

#40

# CHUCK E. CHEESE
# (SHOWBIZ PIZZA TIME, INC.)





PROFILED
CONVENIENCE COPY
DISCARD AFTER USE
Strategic Resources Corporation

LEASE AGREEMENT
TABLE OF CONTENTS

CHUCK E. CHEESE'S
WEST SHORE PLAZA
STATEN ISLAND, NEW YORK

| Section | | Page |
|---|---|---|
| 1. | Premises and Term | 1 |
| 2. | Renewal Options | 1 |
| 3. | Construction | 1 |
| 4. | Rent | 1 |
| 5. | Use | 2 |
| 6. | Utility Charges | 4 |
| 7. | Taxes | 4 |
| 8. | Insurance | 4 |
| 9. | Common Areas | 5 |
| 10. | Maintenance, Repairs and Alterations | 6 |
| 11. | Equipment, Fixtures and Signs | 6 |
| 12. | Damage by Fire or Other Casualty | 7 |
| 13. | Condemnation | 7 |
| 14. | Indemnifications | 7 |
| 15. | Assignment and Subletting | 8 |
| 16. | Default by Tenant | 8 |
| 17. | Default by Landlord | 9 |
| 18. | Party's Right to Perform Party's Covenants | 10 |
| 19. | Right of Inspection | 10 |
| 20. | Title Matters | 10 |
| 21. | Holding Over by Tenant | 10 |
| 22. | Notices and Payments | 11 |
| 23. | Expenses of Enforcement | 11 |
| 24. | Force Majeure | 11 |
| 25. | Waiver of Subrogation | 11 |
| 26. | Estoppel Certificate | 12 |
| 27. | Recording | 12 |
| 28. | Contingency Period | 12 |
| 29. | Commissions | 12 |
| 30. | Exclusive Use | 12 |
| 31. | Visibility and Access | 13 |
| 32. | Hazardous Substances | 13 |
| 33. | Compliance with Laws | 13 |
| 34. | Rules and Regulations | 13 |
| 35. | Accord and Satisfaction | 13 |
| 36. | Waiver | 14 |
| 37. | Miscellaneous | 14 |
| 38. | Choice of Law | 14 |
| 39. | Exculpation of Landlord | 14 |

| Site Plan | Exhibit A |
|---|---|
| Legal Description | Exhibit B |
| Landlord's Work | Exhibit C |
| Tenant's Work | Exhibit D |
| Proposed Building Exterior and Signage | Exhibit E |
| Prohibited Uses | Exhibit F |

<u>LEASE AGREEMENT</u>

This Lease Agreement ("Lease") dated as of _____, 1991, by and between Meredith Avenue Associates, a New York limited partnership ("Landlord"), and ShowBiz Pizza Time, Inc., a Kansas corporation, ("Tenant").

1.    <u>Premises and Term.</u> In consideration of the obligation of Tenant to pay rent as hereinafter provided and in consideration of the other terms, provisions and covenants hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby takes from Landlord, that certain tract or parcel of land located at South Avenue and Meredith Avenue, in the City of New York, County of Richmond, State of New York, the same being more particularly described in Exhibit "A" hereto (the "Land"), together with all rights, privileges, and easements and appurtenances belonging or in any way pertaining thereto, and together with any building and other improvements erected and/or to be erected thereon in accordance with Section 3 hereof (the "Improvements" and, together with the Land, hereinafter called the "Premises"), TO HAVE AND TO HOLD the same for a primary term of ten (10) years (the "Primary Term") commencing on the Commencement Date (as hereinafter defined) and expiring one hundred twenty (120) months after such date. The "Commencement Date" of this Lease shall be the earlier of: (a) the date on which Tenant opens for business the restaurant to be conducted by Tenant on the Premises or (b) one hundred and twenty (120) days after the later of (i) the Delivery Date as defined in Section 3(b) hereof or (ii) the expiration of Tenant's option to terminate under Section 28 hereof. The Premises consist of approximately 11,000 square feet in area and are situated in and constitute a part of a shopping center known as West Shore Plaza (the "Center"). A metes and bounds description of the Center is attached hereto as Exhibit "B". Landlord reserves the right to change the name of the Center. At any time after the Delivery Date, (defined in Section 3(b), Tenant or Landlord may cease the Premises to be measured by a licensed architect and the rent provided in the Lease shall be adjusted accordingly (provided that the adjusted measurement of the Premises shall not exceed 12,000 square feet).

2.    <u>Renewal Options.</u> Landlord hereby grants to Tenant the right and option to extend the term of this Lease for two (2) separate consecutive renewal terms of five (5) years each ("Renewal Terms") (the Primary Term and any Renewal Terms which actually occur being referred to together as the "Term,"), the first Renewal Term to begin upon the expiration of the Primary Term and the second Renewal Term to begin upon the expiration of the first Renewal Term. Tenant's right to exercise the renewal options granted to it in this Section 2 is conditioned upon the Lease being in full force and effect at the time of such exercise and that no Events of Default (defined in Section 16 hereof) shall have occurred and be continuing. Except for the options contained in this Section 3, all of the terms, provisions and covenants of this Lease shall apply to each of the Renewal Terms. Tenant may exercise each such option by delivering to Landlord written notice of its election to renew no later than two hundred ten (210) days prior to the expiration of the Primary Term as to the first Renewal Term and no later than two hundred ten (210) days prior to the expiration of the first Renewal Term as to the second Renewal Term.

3.    <u>Construction.</u>

(a) Within fifteen (15) days from the date hereof, Landlord shall deliver to Tenant all engineering and site plans, soil boring reports, environmental reports, utility plans and other information on the Premises and the Center in Landlord's possession (together, "Landlord's Plans") which may facilitate Tenant's preparation of plans and specifications. Within forty-five (45) days from the date Tenant receives Landlord's Plans, Tenant shall deliver to Landlord detailed plans and specifications ("Tenant's Plans") of the Improvements to be constructed on the Premises. Within a period of fifteen (15) days from the date of delivery of Tenant's Plans, Landlord shall either approve the same (which approval shall not be unreasonably withheld and shall be conclusively presumed if Landlord fails to then specify its objections) or specify in detail by written notice to Tenant its objections thereto. In the event Landlord specifies objections to Tenant's Plans as herein provided and Landlord and Tenant are unable to resolve such objections by mutual agreement within a period of thirty (30) days from the date of delivery of written notice thereof; (i) Landlord shall have the right to make the final determination to the extent Tenant's Plans specify structural changes to the building, the elevation of signs and other exterior improvements, and the landscaping to be located on the Premises and (ii) Tenant shall have the right to make the final determination of all other matters in Tenant's Plans. Landlord hereby approves and consents to the size, color, configuration and other aspects of Tenant's proposed building exterior and signage set forth in Exhibit "E".

1

(b)   Landlord, at its sole cost and expense, shall upon approval of Tenant's Plans, with all reasonable diligence construct and deliver a building to Tenant within thirty (30) days from the date hereof in accordance with the specifications attached hereto as Exhibit "C" ("Landlord's Work"), upon which delivery Tenant shall commence construction of Tenant's Work (as hereinafter defined). "Delivery Date" shall be the date Landlord actually delivers the Premises to Tenant in accordance with Landlord's Work. In the event Landlord does not deliver the Premises to Tenant within thirty (30) days of the date hereof and Tenant at any time before the Delivery Date gives Landlord written notice under this Section 3 (b), Landlord shall so deliver the Premises to Tenant within thirty (30) days after such notice. In the event Landlord fails to deliver the Premises to Tenant within such thirty (30) day period, Tenant may at its sole option terminate this Lease by written notice to Landlord at any time before the Delivery Date.

(c)   The Tenant's Work specified in Exhibit "D" ("Tenant's Work") shall be performed by Tenant at its own cost and expense.

(d)   Selection of a supervising architect and general contractor, as well as all other persons to be employed in connection with Tenant's Work, shall be within the sole discretion of Tenant; provided, however, the supervising architect shall be a member in good standing of the American Institute of Architects or of another organization having comparable accreditation and the general contractor's financial condition and responsibility shall be such as to enable Landlord to obtain a performance bond, if desired; provided further, however, Tenant or any corporate affiliate of Tenant may act as general contractor for purposes of Tenant's Work, in which case the supervising architect may be an employee of Tenant or one of its corporate affiliates.

(e)   Landlord hereby assigns to Tenant and agrees to cooperate to provide Tenant with the benefit of all warranties and guarantees pertaining to improvements and equipment erected or installed upon the Premises as Landlord's Work.

4.   Rent

(a)   Tenant shall pay to Landlord as "Minimum Rent":

(i)   The sum of $16,820.83 in advance upon the first day of each calendar month of the first through third Lease Years inclusive (each "Lease Year" being equal to one calendar year, commencing on the Commencement Date or an anniversary thereof) (equivalent to $18.35 per square foot per year).

(ii)   The sum of $18,498.33 in advance upon the first day of each calendar month of the fourth through sixth Lease Years inclusive (equivalent to $20.18 per square foot per year).

(iii)   The sum of $20,350.00 in advance upon the first day of each calendar month of the seventh through tenth Lease Years inclusive (equivalent to $22.20 per square foot per year).

(iv)   The sum of $22,174.17 in advance upon the first day of each calendar month of the eleventh through thirteenth Lease Years inclusive (equivalent to $24.19 per square foot per year).

(v)   The sum of $24,172.50 in advance upon the first day of each calendar month of the fourteen through seventeenth Lease Years inclusive (equivalent to $26.37 per square foot per year).

(vi)   The sum of $26,326.67 in advance upon the first day of each calendar month of the eighteenth through twentieth Lease Years inclusive (equivalent to $28.72 per square foot per year).

(b)   All amounts other than Minimum Rent which are payable to Landlord under this Lease shall be deemed to be additional rent. All payments of rent shall be made by Tenant to Landlord without set-off or deduction, except as specifically provided otherwise in this Lease. Tenant shall pay to Landlord, with each payment of Minimum Rent, the amount of any sales tax imposed thereon by any state or local government authority.

(c)   As additional rent hereunder, Tenant shall pay to Landlord, for each Fiscal Year (as hereinafter defined) during of the Term of the Lease, Percentage Rent

2

equal to the amount by which four percent (4%) of the Gross Receipts (hereinafter defined) during each Lease Year exceeds the Minimum Rent payable for such Lease Year.

(i)    The term "Fiscal Year" as used in this Subsection (c), shall mean the fiscal year of Tenant used for financial reporting purposes. If the Commencement Date is a date which is not the first day of a Fiscal Year, then the first Fiscal Year shall be for a period of less than twelve (12) months commencing on the Commencement Date and ending on the last day of such fiscal year in which the Commencement Date falls. If this Lease terminates on a day which does not coincide with the end of a Fiscal Year, then the last Fiscal Year shall be for a period of less than twelve (12) months commencing on the first day of such Fiscal Year and ending on the termination date of this Lease. In computing the Percentage Rent for the first Fiscal Year or the last Fiscal Year, as the case may be, if such Fiscal Year contains less than twelve (12) months, the dollar amount of Tenant's Gross Receipts governing Tenant's liability for Percentage Rent hereunder shall be multiplied by a fraction, the numerator of which shall be the number of days in such shorter Fiscal Year, and the denominator of which shall be three hundred sixty-five (365).

(ii)    The term "Gross Receipts" shall mean the aggregate amount of all sales (whether for cash, on credit or otherwise) of food, beverages (both alcoholic and non alcoholic), goods, articles and any other merchandise, and entertainment and the aggregate of all charges for services performed (whether for cash, on credit or otherwise) made and rendered in about or in connection with the Premises (whether or not through a private club) by Tenant and its assignees, sublessees and licensees, including off Premises sales and monies derived at or away from the Premises so long as they are in connection with the restaurant operations conducted on the Premises, plus the aggregate amount of all receipts by Tenant with respect to all sales made or performed by means of mechanical and other vending devices, but shall not include any Federal, State, municipal or other sales, value added or retailer's excise taxes paid or accrued by Tenant, irrespective of whether such taxes are collected from customers or absorbed by Tenant, receipts from sales to employees or complimentary sales, proceeds of insurance policies received by Tenant, bulk and/or intercompany transfers of food and/or inventory, proceeds from the sale of used restaurant equipment, private club membership fees required or permitted by applicable alcoholic beverage regulations, if any, or receipts from cigarette vending machines or pay telephones.

(iii)    Within sixty (60) days from the end of each fiscal quarter within a Fiscal Year, Tenant shall deliver to Landlord a written statement certified by an officer of Tenant setting forth the amount of Tenant's Gross Receipts for the preceding fiscal quarter. Simultaneously with the delivery of such statement, Tenant shall pay to Landlord an amount equal to the estimated Percentage Rent, pro rated for the applicable fiscal quarter. Within sixty (60) days after the end of each Fiscal Year, Tenant shall deliver to Landlord a written statement certified by an officer of Tenant setting forth the Gross Receipts for the Fiscal Year and the amount of estimated Percentage Rent paid for the Fiscal Year. If such statement indicates that the actual Percentage Rent for the Fiscal Year exceeds the estimated payments made, Tenant shall simultaneously pay to Landlord the excess amount. If such statement indicates that the estimated payments exceeded the actual Percentage Rent for the Fiscal Year, Landlord shall pay to Tenant within thirty (30) days the excess amount.

(iv)    Tenant shall maintain and preserve, or cause to be maintained and preserved at the principal office of Tenant in accordance with generally accepted accounting practices for the type of business conducted by Tenant on the Premises, full, complete, accurate and detailed books, records and accounts of its daily Gross Receipts, both for cash and on credit from on the Premises; provided, however, Tenant shall not be required to preserve any detailed books, records and accounts as aforesaid for more than one hundred eighty (180)

3

days following delivery of the written statement provided for hereinabove, or other books, records and accounts for a period of more than two (2) years after the end of each Fiscal Year covered thereby. Landlord or its agents may inspect any and all records in Tenant's possession which relate to Gross Receipts from the Premises, at any time during normal business hours and normal working days. Such examination shall be conducted in a manner which will not interfere unreasonably with the business conducted at Tenant's principal office. Landlord may once in any Fiscal Year cause an audit of the Gross Receipts from the Premises for the immediately preceding Fiscal Year to be made by a certified public accountant of Landlord's selection; and if the written statement of Gross Receipts previously delivered to Landlord shall be found to be inaccurate, Landlord and Tenant shall make appropriate adjustments so that Landlord shall receive the full Percentage Rent to which it is entitled, and only such amount. Landlord shall pay for the cost of such audit unless the audit shall disclose Gross Receipts of three percent (3%) or more in excess of the Gross Receipts theretofore reported by Tenant for that particular Fiscal Year, in which case Tenant shall promptly pay to Landlord the cost of said audit in addition to the deficiency in Percentage Rent.

5.  **Use.** Tenant may use the Premises for the operation of a restaurant and/or related entertainment center serving alcoholic beverages and for such other uses as are incidental to the operation thereof and for any other lawful retail purpose with the prior consent of Landlord, which shall not be unreasonably withheld. Landlord hereby grants to Tenant and Tenant's employees, invitees and customers for the Term of this Lease a non-exclusive easement to use Common Areas (hereinafter defined) of the Center to the same extent the Common Areas maybe used by the employees, invitees and customers of other tenants of the Center. Tenant shall use the Premises to offer goods and services at retail only (as opposed to wholesale, manufacturing or other industrial classifications). Tenant shall not use the Premises for any of of the purposes described on Exhibit "F". Tenant shall open the Premises for business on the Commencement Date and shall continuously operate its business on the Premises during the entire term of this Lease, except for temporary closings for repairs or alterations not to exceed ninety (90) continuous days. In the event that Tenant does not operate its business for one hundred eighty (180) consecutive days during the term hereof, in addition to any other remedies provided in this Lease, Landlord may terminate the Lease and Tenant will peacefully surrender possession.

6.  **Utility Charges.** Tenant shall pay all charges incurred for the use of utility services at the Premises including, without limitation, gas, electricity, water, sewer and telephone.

7.  **Taxes.**

(a)  Landlord shall pay before delinquency all taxes, assessments, impositions, levies and charges ("Taxes") by any government authority assessed against the Center, including but not limited to the Premises but excluding any portion of the Center which is separately assessed by the taxing authority.

(b)  As additional rent, Tenant shall reimburse Landlord for its Proportionate Share (as hereinafter defined) of Taxes assessed against the Center for each tax year during the Term of the Lease. As used in this Lease, Tenant's "Proportionate Share" shall equal a fraction, of which the numerator is the area of the Premises and the denominator is the total rentable area of the Center (including the Premises and all floors of any other tenant's space) on the applicable date. The amount to be paid by Tenant to Landlord pursuant to this Section 7(b) with respect to the tax years during which the Term begins and ends shall be further adjusted pro-rata on the basis of the number of days of the Term occurring within said tax year.

(c)  Tenant shall pay its Proportionate Share of Taxes as estimated by Landlord, monthly, in advance, on the first day of each month during the Term of this Lease. If the aggregate of monthly amounts paid by Tenant in any year is in excess of its Proportionate Share of Taxes actually assessed, such excess shall be credited against the next succeeding payments due to Landlord from Tenant. If such aggregate of monthly amounts is less than Tenant's Proportionate Share of Taxes actually assessed, the difference shall be payable by Tenant to Landlord within thirty (30) days after notice thereof. Tenant's monthly payments shall be adjusted annually on the basis of the previous year's actual Taxes. Within sixty (60) days after

the end of each calendar year during the Term of this Lease, Landlord shall furnish to Tenant a statement of the past year's Taxes and a computation of Tenant's Proportionate Share. Upon Tenant's reasonable request, Landlord shall provide Tenant with copies of applicable tax bills and receipts

(d)   Notwithstanding anything herein to the contrary, if any Taxes are separately assessed against the Premises or a portion thereof, Tenant shall pay before delinquency the full amount of such Taxes (subject to proration for any partial tax year) to Landlord or the taxing authority, as directed by Landlord.

(e)   Notwithstanding anything herein to the contrary, if at any time during the Term of this Lease any assessment (general or special) is assessed against the Premises, the Center or any part thereof, Tenant's obligation under this Section 7 to pay such assessment or its Proportionate Share shall apply only to that portion of the Taxes that would be due if Landlord elected to pay the same over the maximum period of time (by installments or otherwise) permitted by the taxing authority.

(f)   Tenant shall pay before delinquency all Taxes assessed during the Term of the Lease against the leasehold granted herein or any personal property of Tenant located on the Premises.

(g)   Notwithstanding anything to the contrary contained herein, if at any time during the term of this Lease, the present method of taxation or assessment shall be changed so that the taxes now levied, assessed or imposed on real estate and buildings and improvements thereon shall, in lieu thereof, be imposed, assessed or levied wholly or partly as a capital levy or otherwise upon the fixed annual rent reserved herein or as a tax, corporation franchise tax, assessment, levy or charge, measured or based, in whole upon the Center or on the rents derived therefrom and imposed upon Landlord, then Tenant shall pay all such taxes so measured or based to the extent that any such change in the present method of taxation or assessment relieves Tenant from the payment of such taxes on real estate as they are now known and to the extent that such taxes would be payable if the Center were the only property of Landlord subject to such taxes.

8.   Insurance.

(a)   Tenant shall insure Tenant's personal property located on the Premises against loss or damage by fire and other casualties included in the so-called "Extended Coverage Endorsement" in an amount not less than eighty percent (80%) of the replacement value thereof.

(b)   Tenant shall insure against comprehensive general liability arising by reason of occurrences on or about the Premises in the amount of not less than $500,000 in respect of loss or damage to property, in the amount of not less than $3,000,000 in respect of injury to or death of any one person, and in the amount of not less than $3,000,000 in respect of any one accident or disaster.

(c)   The insurance coverages provided for herein may be maintained pursuant to master policies of insurance covering other restaurant locations of Tenant and its corporate affiliates. All insurance policies required to be maintained by Tenant hereunder shall be with responsible insurance companies, authorized to do business in the state where the Premises are located if required by law, shall name Landlord as a loss payee or an additional insured, as appropriate, and shall provide for cancellation only upon ten (10) days prior written notice to Landlord. Tenant shall evidence such insurance coverage by delivering to Landlord, if requested, certificates issued by the insurance companies underwriting such risks.

(d)   Landlord shall insure the Premises against loss or damage by fire and other casualties included in the so-called "Extended Coverage Endorsement" in an amount not less than eighty percent (80%) of the replacement value thereof, less the cost of excavations, foundations, footings and underground items.

(e)   Tenant shall reimburse Landlord for the full cost of insurance maintained separately for the Premises (if any) and shall pay to Landlord Tenant's Proportionate Share of the cost of insurance on the Center (including the Premises). The insurance to which this Section 8 (e) applies shall include the property insurance required under Section 8 (d) and rental value insurance (if any) which Landlord elects to obtain.

(f)   Tenant shall maintain Worker's compensation insurance covering all persons employed, directly or indirectly, in connection with Tenant's business on the

5

Premises, as well as in connection with any of Tenant's Work or any Tenant repair or alteration authorized by this Lease or consented to by Landlord, and as required by applicable law.

9. Common Areas.

(a) Landlord shall maintain, in good condition and repair, the Common Areas (hereinafter defined). As used in the Lease, "Common Areas" means all areas, space, equipment and special services provided by Landlord for the common or joint use and benefit of the occupants of the Center, their employees, agents, servants, customers and other invitees, including without limitation, parking areas, access roads, driveways, retaining walls, joint areas, landscaped areas, truck service ways or tunnels, loading docks, pedestrian malls, courts, stairs, ramps and sidewalks, comfort and first aid stations, washrooms and parcel pick-up stations.

(b) Commencing upon the Commencement Date, Tenant shall pay to Landlord as additional rent, subject to the limitation hereinafter set forth, its Proportionate Share of the Center's Operating Cost (hereinafter defined). As used in the Lease, the "Center's Operating Cost" means the total of all items of cost and expense incurred in operating, managing, equipping, protecting, policing, lighting, repairing, replacing, maintaining the Common Areas (hereinafter defined) actually used or available for use by Tenant and the employees, agents, servants, customers and other invitees of Tenant, but specifically including, without limitation, all costs and expenses for or pertaining to gardening and landscaping, the cost of public liability and property damage and fire extended coverage insurance, repairs, line painting, lighting (including the cost of light bulbs and electric current, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, the cost of equipment used to provide such services, parking lot repair, resurfacing and the cost of purchasing and maintaining the common Center signs, if any, supplies, the cost of personnel to implement such services, to direct parking, and to police the common facilities and up to ten percent (10%) of all the foregoing costs to cover the Landlord's administrative and overhead costs.

(c) Tenant shall pay its Proportionate Share of one-twelfth of the Center's anticipated total annual Operating Cost monthly, in advance, on the first day of each month during the term of this Lease, and any extensions or renewals thereof. Within sixty (60) days after the end of each calendar year during the term of this Lease, Landlord shall furnish to Tenant a statement of the Center's Operating Costs for the past year and a computation of Tenant's Proportionate Share. Upon Tenant's reasonable request, Landlord shall allow Tenant to review the records regarding the Center's Operating Costs. Upon the issuance of an annual statement of the Center's Operating Cost, if the total of Tenant's monthly payments for such year are less than Tenant's Proportionate Share of the Center's actual Operating Costs, Tenant shall pay such difference to Landlord within thirty (30) days after Tenant's receipt of such statement, and if the total of Tenant's payments are greater than Tenant's Proportionate Share of the actual Operating Costs such excess shall be credited against the next succeeding payments due to Landlord from Tenant. Tenant's monthly payments shall be adjusted on the basis of the previous year's total for the Center's Operating Cost.

10. Maintenance, Repairs and Alterations.

(a) Landlord shall, at its own cost, maintain and keep in good repair the load-bearing members, the roof, the foundations and the exterior electrical service, sewer, plumbing and other utility lines to the exterior space of the Premises, provided that Landlord shall not be required to repair damage to the Premises caused by the negligence or intentional misconduct of Tenant or its agents or employees. In the event that Tenant makes any structural alterations to the Premises, as permitted under Section 10 (c). Tenant (and not Landlord) shall at its own cost maintain and keep in good repair such structural alterations.

(b) Tenant shall at its own cost and expense to maintain the Premises, other than the parts thereof to be maintained by Landlord under paragraph (a) above, in good condition and repair, including but not limited to exterior entrances, exterior walls, the HVAC system, all door and window glass and interior lighting, ordinary wear and tear excepted. All maintenance and repair work undertaken by Tenant shall be done in a good and workmanlike manner, leaving the Premises free of liens for labor or materials.

(c) Tenant shall have the right to make non-structural alterations, additions or improvements to the Premises deemed necessary or appropriate in connection with the requirements of its business, without the necessity of obtaining

6

the prior written consent of Landlord and without the payment of any additional rent; provided, however, that any such alterations, additions or improvements shall not reduce or impair the value of the Premises and shall be in conformity with all local codes and ordinances  Tenant shall not make any structural alterations to the Premises without the prior written consent of Landlord, which shall not be unreasonably withheld. Upon the expiration or termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, broom-clean, in good order and condition, ordinary wear and tear excepted, and shall surrender to Landlord all keys to or for the Premises

(d)   The interest of Landlord shall not be subject to liens for improvements made by or on behalf of or at the direction of Tenant.  Tenant shall discharge any lien filed against the Center, and any part thereof, for work done or materials or labor furnished with respect to the Premises by or for the benefit of Tenant or at its request within ten (10) days after Tenant receives notice that such lien is filed.

11.   Equipment, Fixtures and Signs.

(a)   Tenant shall have the right to erect, install, maintain and operate on the Premises such equipment, trade and business fixtures, signs and other personal property as Tenant may deem necessary or appropriate within the limitation of local zoning laws and ordinances, and such shall not be deemed to be part of the Premises but shall remain the property of Tenant.  Any such installations shall not materially injure or deface the Improvements.  At any time during the term of this Lease Agreement and within thirty (30) days after termination hereof, Tenant shall have the right to remove its equipment, fixtures, signs and other personal property from the Premises.  Tenant shall not install any flashing or exposed neon signs on the outside of the Premises building.

(b)   Landlord agrees to allow Tenant the right to utilize the front and back exterior of the building for signage as set forth on Exhibit "F".

12.   Damage by Fire or Other Casualty.

(a)   If the Premises, or any material part thereof, are destroyed or damaged by fire or other casualty, Tenant shall immediately deliver written notice thereof to Landlord.

(b)   If the Premises or the Center is totally destroyed by fire or other casualty, or if either is so damaged that rebuilding or repairs cannot be completed within two hundred seventy (270) days after the date of such damage, Tenant or Landlord, by written notice to the other party, may terminate this Lease effective as of the date of such damage.

(c)   If the Premises or the Center is damaged by fire or other casualty but not to such an extent that rebuilding or repairs cannot be completed within two hundred seventy (270) days after the date of such damage, or if to such extent and neither party has elected to terminate this Lease pursuant to paragraph (b) hereof, this Lease shall not terminate, but Landlord shall proceed with all reasonable diligence to rebuild and repair the Center or the Premises respectively to substantially the condition in which it existed prior to such damage.  If the Premises are untenantable in whole or in part following such damage, the rent payable hereunder during the period in which they are untenantable shall be adjusted to such extent as may be fair and reasonable under all of the circumstances.

(d)   All insurance proceeds payable under insurance policies maintained by Tenant and Landlord by reason of the occurrence of such fire or other casualty shall be paid to the policyholder.

13.   Condemnation.

(a)   If all of the Premises or the parking area cross-hatched on Exhibit "A" (or if less than all, but Tenant reasonably determines that the remaining portion cannot be operated as a restaurant and/or related entertainment center serving alcoholic beverages, having sufficient parking therefor), shall be acquired by the right of condemnation or eminent domain for any public or quasipublic use or purpose, or sold to a condemning authority under threat of condemnation, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding (or sale) and all rentals shall be paid up to that date.

7

(b)   In the event of a partial taking or condemnation which takes less than a substantial portion of the Premises or the parking area cross-hatched on Exhibit "A" and Tenant determines that the remaining portion can be operated as a restaurant and/or related entertainment center serving alcoholic beverages, having parking sufficient therefore, then Landlord, at Landlord's sole cost and expense, shall promptly restore the Premises or said parking area to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking, and this Lease shall continue in full force and effect but with an equitable reduction or abatement of rent.

(c)   In the event of such a condemnation, taking or sale, Landlord shall be entitled to receive any award attributable to the value of the real estate (including the fee, the leasehold and the Improvements) and Tenant shall be entitled to receive any award attributable to Tenant's trade fixtures and personal property or interruption or relocation of Tenant's business.  Landlord and Tenant shall each execute documents reasonably requested by the other party to carry out the intent of this Section 13 (c)

14.   Indemnifications.

(a)   Tenant shall indemnify, hold harmless and defend Landlord and its agents and employees from and against any and all loss, liability and expense (including but not limited to reasonable attorneys' fees) arising from or in connection with: (i) the use or occupancy of the Premises or any occurrence on the Premises during the Term hereof; (ii) any negligent or intentionally wrongful act or omission of Tenant or its agents or employees during the Term hereof; or (iii) any failure of Tenant to perform its obligations under this Lease.  The provisions of this Section 14(a) shall not apply to any loss, liability and expense arising from or in connection with the gross negligence or intentional misconduct of Landlord or its agents or employees.

(b)   Landlord shall indemnify, hold harmless and defend Tenant and its agents and employees from and against any and all loss, liability and expense (including reasonable attorneys' fees) arising from or in connection with: (i) the use of the Common Areas or any occurrence on the Common Areas during the Term hereof; (ii) any negligent or intentionally wrongful act or omission of Landlord or its agents or employees; or (iii) any failure of Landlord to perform its obligations under this Lease.  The provisions of this Section 14(b) shall not apply to any loss, liability or expense arising from or in connection with the gross negligence or intentional misconduct of Tenant or its agents or employees.

15.   Assignment and Subletting.

(a)   Tenant shall not assign this Lease or sublet the whole or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, provided (i) no Event of Default has occurred and is continuing at the time of the request for consent to the assignment or sublease, (ii) the use to be made of the Premises by the assignee or subtenant shall be permitted by Section 5 hereof and shall not conflict with the business of any other then-existing tenant in the Center, (iii) the assignee or subtenant shall assume in writing the performance of all of the terms, provisions and covenants of this Lease on the part of Tenant to be kept and performed and (iv) Tenant shall deliver to Landlord within fifteen (15) days after the assignment or subletting an executed duplicate of such agreement, together with a duly executed assumption agreement; provided, however, anything herein to the contrary notwithstanding, Tenant, without Landlord's prior written consent but otherwise subject to the foregoing conditions, may assign this Lease or sublet the whole of the Premises to a legal entity which is either (x) the successor, by merger or otherwise, to all or substantially all of Tenant's assets and liabilities or (y) controls or is controlled by or is under common control with Tenant, and Tenant may sublet a portion of the Premises to a legal entity under common control with Tenant solely for the purpose of such entity obtaining a liquor license for the Premises, if Tenant delivers to Landlord the name of the said assignee or subtenant and the names and addresses of its officers, directors and stockholders.  Any such assignment or subletting shall be subject to and upon all of the terms, provisions and covenants of this Lease.

(b)   No assignment or subletting or collection of rent from the assignee or subtenant shall be deemed to constitute a novation or in any way release Tenant from further performance of its obligations under this Lease,  and Tenant shall continue to be liable under this Lease for the balance of the Term with the same force and effect as if no such assignment has been made.

8

(c)   In the event Tenant requests Landlord's consent to an assignment or sublease under Section 15(a), Landlord may elect instead to terminate this Lease by written notice to Tenant within thirty (30) days after Landlord's receipt of such request, such termination to be effective on the date of the proposed assignment or sublease. However, if Tenant withdraws such request by written notice to Landlord within fifteen (15) days after Tenant's receipt of Landlord's election to terminate this Lease, Landlord's election shall be of no force or effect.

16.   Default by Tenant.

(a)   The following events shall be "Events of Default" under this Lease:

(i)   Tenant fails to pay any installment of rent hereby reserved as and when the same becomes due and does not cure such default within ten (10) days after written notice of such default is given by Landlord to Tenant;

(ii)   Tenant fails to comply with any term, provision or covenant of this Lease, other than the payment of rent, and shall not cure such failure within thirty (30) days after written notice of such default is given by Landlord to Tenant (provided that if such default cannot reasonably be cured within thirty (30) days, the Tenant shall have an additional reasonable period of time to cure such default as long as Tenant diligently pursues same to completion); or

(iii)   Tenant files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future federal, state or other bankruptcy or insolvency statute or law, or seeks or consents to or acquiesces in the appointment of any bankruptcy or insolvency trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties or of the Premises, and such condition continues for a period of thirty (30) days after notice from Landlord specifying the matter involved.

(b)   Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever:

(i)   Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails so to do, Landlord may, without prejudice to any remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises, or any part thereof, by force if necessary, without being liable to prosecution or for any claim for damages; and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise;

(ii)   Landlord may enter upon and take possession of the Premises and expel or remove Tenant and other persons who may be occupying the Premises, or any part thereof, by force if necessary, without being liable to prosecution or for any claim for damages, and relet the Premises, as Tenant's agent, and receive the rent therefore; and Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of such reletting;

(iii)   Landlord may enter upon the Premises, without being liable to prosecution or for any claim for damages, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations hereunder.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the

9

violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of an Event of Default shall not be deemed or construed to constitute a waiver of such default.

17.  **Default by Landlord.**  If the Landlord fails to perform or observe any requirement of this Lease, and such failure shall continue for ten (10) days (in the case of a default consisting of the failure to pay money due) or thirty (30) days (in other cases) after written notice of such default to Landlord from Tenant specifying the nature of such default, then Tenant may, at its option (a) deduct the amount of any such payment to Tenant in default from Minimum Rent otherwise payable by Tenant to Landlord ,provided that no monthly payment of Minimum Rent shall be reduced by more than 25%, and (b) pursue any other remedies as may be permitted by law or equity.  If any default (other than nonpayment) cannot reasonably be cured within thirty (30) days, Landlord shall have an additional reasonable period of time to cure such default as long as Landlord diligently pursues same to completion.

18.  **Party's Right to Perform Defaulting Party's Covenants.**  If either party hereto shall default in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed and shall not cure such default within any applicable time period provided herein after notice from the other party specifying the default (or if such default cannot reasonably be cured within such time period, and the defaulting party shall not within such time period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), the first party may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the defaulting party, and any amount paid or any contractual liability incurred by the first party in so doing shall be deemed paid or incurred for the account of the defaulting party, and the defaulting party agrees to reimburse the first party therefor upon demand: provided that the first party may cure any such default as aforesaid prior to the expiration of said time period but after written notice to the defaulting party, if the curing of such default prior to the expiration of said time period is reasonably necessary to protect the Premises or the first party's interest therein, or to prevent injury or damage to persons or property.

19.  **Right of Inspection and Repair.**  Landlord and its agents and representatives shall be entitled to inspect or make repairs to the Premises at any time during normal business hours, provided only that such inspection shall not unreasonably interfere with Tenant's business.

20.  **Title Matters.**

(a)  Landlord represents and warrants that it is the owner in fee simple of the Land hereto, and that it alone has full right to lease the Premises for the Term set out herein. Landlord further represents and warrants that Tenant, on paying the rent and performing its obligations hereunder, shall peaceably and quietly hold and enjoy the Premises for the Term of this Lease without any hindrance, molestation or ejection by Landlord, its successors or assigns, or those claiming through them.

(b)  Landlord and Tenant agree that this Lease, automatically and without the necessity of any further documentation (subject to the provisions of Section 20(d) of this Lease), is and shall be subject and subordinate at all times to all mortgages (in any amounts and all advances thereon) which may now or hereafter affect the real property of which the Premises form a part, and to all renewals, modifications, consolidations, participation, replacements and extensions thereof. In confirmation of the foregoing, Tenant shall promptly upon request therefor by Landlord, and without charge therefor, execute an agreement in recordable form.

(c)  Notwithstanding any contrary provision in the Lease (subject to the provisions of Section 20(d) of this Lease), no notice by Tenant to Landlord of any default by Landlord under any obligation of the Lease, which default is of such a nature as to give Tenant a right to terminate the Lease or to reduce the rent payable under the Lease or to any credit or offset against future rents, shall be effective unless and until such notice is also given to such lender and unless and until the time period otherwise provided for herein shall have elapsed following receipt of such notice by such lender (of which Tenant has been given written notice), during which period any lender of which Tenant has notice shall have the right (but not the obligation) to remedy or cure such default.

(d)  So long as Tenant is not in default of any of the terms, covenants or conditions of the Lease, no lender or holder of a mortgage on the Premises shall, by reason of foreclosure of its mortgage or other proceedings brought to enforce the

rights of the holder thereof, disturb Tenant in Tenant's occupancy of the Premises or Tenant's other rights arising out of the Lease during the Term of the Lease. In confirmation of the foregoing and as a condition to Tenant's agreement to subordinate its interest under the Lease to such mortgage, to provide notice of default to such lender, and to attorn to such lender (set forth in subsections (b), (c) and (e) of this Section 20), Landlord shall cause each such lender or holder of a mortgage to execute without charge to Tenant an agreement in recordable form acceptable to Landlord and Tenant.

(e)   If the interest of Landlord shall be acquired by Landlord's lender by reasons of foreclosure of such lender's mortgage or other proceedings brought to enforce the rights of the holder thereof, by deed in lieu of foreclosure or by any other method, and if such lender succeeds to the interest of Landlord under the Lease, then the Lease and the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the terms of the Lease, and Tenant shall be bound to such lender under all of the terms, covenants and conditions of the Lease for the balance of the Term of the Lease, with the same force and effect as if such lender were the Landlord under the Lease. Tenant does hereby attorn to such lender as Tenant's Landlord, said attornment to be effective and self operative without the execution of any other instruments on the part of any party hereto (subject to provisions of Section 20(d) of this Lease).

21.   Holding Over by Tenant.  Should Tenant or any assignee, sublessee or licensee of Tenant hold-over the Premises or any part thereof after the expiration of the Term hereof, unless otherwise agreed in writing, such hold-over shall constitute and be construed as a tenancy at sufferance only, but otherwise upon the same terms and conditions except minimum rent shall be in an amount equal to one and one-half (1- 1/2) times the minimum rent payable in the last applicable year of the Lease Agreement.

22.   Notices and Payments.  Any notice, document or payment required or permitted to be delivered or remitted hereunder or by law shall be deemed to be delivered or remitted either when actually received or, whether actually received or not, when deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed to the party hereto at its respective address set out below, or at such other address as it shall have theretofore specified by written notice delivered in accordance herewith:

Landlord

Meredith Avenue Associates
1430 Richmond Avenue
Staten Island, New York  10304

With a copy to (for notice pursuant
to Section 17 only):

Mark H. Goldberg, Esq.
Goldberg & Pines
50 East 42nd Street
New York, New York 10047

Tenant

ShowBiz Pizza Time, Inc.
4441 West Airport Freeway
P. O. Box 152077
Irving, Texas 75015
Attention: Real Estate Department

If and when included within the term "Landlord" there is more than one person or legal entity, all shall jointly arrange among themselves for one (1) among their numbers to receive at one (1) specified address all such notices and payments, all parties included within the term "Landlord" shall be bound by notices delivered by Tenant in accordance with the provisions of this paragraph as if each had received such notice.

23.   Expenses of Enforcement. In the event either party to this Lease files a lawsuit to enforce any of the obligations of the other party under the Lease and obtains a judgment in its favor, the other party shall pay all costs and expenses, including reasonable attorney fees at all trial and appellate levels, incurred by the first party in enforcing such obligations.

24.   Force Majeure. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease (except for the payment of money) shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

11

25. <u>Waiver of Subrogation</u>   Landlord and Tenant severally waive any and every claim which arises or may arise in its favor and against the other during the Term of this Lease for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Premises, which loss or damage is covered by valid and collectible fire and extended coverage insurance policies, to the extent that such loss or damage is recoverable thereunder. Inasmuch as the above mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company (or any other person), Landlord and Tenant severally agree immediately to give to each insurance company which has issued to it policies of insurance, written notice of the terms of said mutual waivers, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

26. <u>Estoppel Certificate</u>.   Tenant or Landlord shall promptly and without charge or cost to the other party, certify by written instrument, which written instrument shall be duly executed and delivered to the other party: (i) that this Lease is unmodified and in full force and effect (or if there has been a modification, that the same is in full force and effect as modified, and stating the modification); (ii) the dates, if any, to which the Rent due under this Lease has been paid; (iii) whether the other party has failed to perform, any covenant, term or condition under this Lease, and the nature of such party's failure, if any; and (iv) such other relevant information as either party may request.

27. <u>Recording</u>.   A short-form memorandum of this Lease, setting forth the term hereof, the renewal options, and such other provisions hereof as Landlord or Tenant shall reasonably deem to be pertinent, which Landlord or Tenant, promptly upon request of the other party, shall execute, acknowledge and deliver to the requesting party in recordable form, may be recorded at Landlord's or Tenant's option. The requesting party agrees to provide the other party with an executed duplicate of such short-form memorandum upon written request.

28. <u>Contingency Period</u>.

(a)   During the one hundred twenty (120) days immediately following complete execution of this Lease by both parties (the "Initial Contingency Period"), Tenant shall promptly commence and diligently pursue, at its sole expense, procedures to obtain the appropriate zoning, licenses and permits and to complete any other requirements imposed by local and state government authorities for the construction and operation of Tenant's business on the Premises, including but not limited to requirements regarding alcoholic beverages, games and rides, signs, sewerage and parking (collectively, the "Permits"). If Tenant determines, in its sole judgment, that it will not obtain all the Permits before the expiration of the Initial Contingency Period, Tenant may extend the Initial Contingency Period by one period of thirty (30) days (the Initial Contingency Period and any such extension period which actually occurs being called the "Contingency Period"), by written notice to Landlord before the expiration of the Contingency Period to date.   If Tenant determines, in its sole judgment, that it will not be able to obtain all the Permits, Tenant may terminate this Lease upon written notice to Landlord before the expiration of the Contingency Period.  If Tenant does not give Landlord notice as provided in this Section 28, Tenant's right to extend the Contingency Period or terminate this Lease shall be deemed to have been waived. Tenant shall advise Landlord of its progress in obtaining the Permits, including the dates of public hearings and the results thereof. Tenant shall give Landlord written notice promptly after all Permits have been obtained and the Contingency Period shall expire on the date of such notice.

(b)   Landlord shall use its best efforts to cause each current lender or holder of a mortgage on the Premises to execute and deliver to Tenant a nondisturbance agreement in form and substance satisfactory to Tenant, promptly after complete execution of this Lease.  If such nondisturbance agreement is not received by Tenant before expiration of the Contingency Period, Tenant may terminate this Lease pursuant to Section 28(a).

29. <u>Commissions</u>.  Landlord agrees to pay the brokers' commissions payable to Welco Realty by reason of this Lease (part of which commission is being paid by Welco Realty to The Anz Company as co-broker).  Landlord and Tenant shall each indemnify, hold harmless and defend the other party from and against any and all claims or demands by any other broker or similar entity alleging that the indemnifying party engaged its services.

12

30    Exclusive Use  Landlord will not use, knowingly sell for the intended use, permit others to use, or permit any tenant or the assignee or subtenant of any tenant to use, any land or structure owned or controlled by Landlord (or any partner or shareholder of Landlord) within the Center for a restaurant serving pizza, a food stand primarily serving pizza, or an arcade or game room, and will not use or permit the use of kiddie rides or games (including but not limited to electronic, computer-controlled and pin-ball games) on any of such land; provided that (a) other tenants in the Center may operate up to four such games or rides, (b) this section shall not prohibit a restaurant which is less than 3,000 square feet and whose primary business is Italian specialities (not pizza), (c) this section shall not prohibit a local pizzeria (not part of a national chain) which is less than 3,000 square feet, and (d) any business in operation on the date hereof will be excluded from the effect of this section.

31.   Visibility and Access.  Landlord agrees not to erect, construct or install any subsequent signage, building, or other improvements in the Center which would obstruct or diminish the visibility of or access to the Premises from nearby public thorough-fares, intersections, and parking and common areas, except those already shown on the existing site plan attached hereto as Exhibit "A".  Landlord shall not reduce the parking available in the portion of the Common Areas cross-hatched in Exhibit "A".

32.   Hazardous Substances.

(a)    If (i) Tenant causes a study to be conducted to determine whether any radon, asbestos, asbestos-containing material, or "Hazardous Substances" (as that term is defined in the Comprehensive Environment Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq., as amended) are present in the Premises and (ii) the report resulting from such study states that Hazardous Substances are present in the premises and (iii) such report is delivered to Landlord within forty-five (45) days after the mutual execution of this Lease, then Landlord shall reimburse Tenant for the cost of such study (not to exceed $3,000).  If the report, resulting from a study caused by Tenant pursuant to the immediately preceding sentence or a study caused by Landlord, states that Hazardous Substances are present in the premises, Landlord shall remove all such Hazardous Substances identified in such report as part of Landlord's Work under Exhibit "C" to this Lease.

(b)    Tenant shall not cause or allow the generation, treatment, storage, or disposal of Hazardous Substances on the Premises.  In the event Tenant uses any Hazardous Substances, Tenant shall dispose of such substances in accordance with all applicable Federal, state and local laws, regulations and ordinances.

(c)    Tenant agrees to indemnify and hold harmless Landlord, its employees, agents, successors, and assigns, from and against any and all damage, claim, liability or loss, including reasonable attorneys' fees, arising out of or in any way connected to the generation, treatment, storage or disposal of Hazardous Substances by Tenant, its employees or agents, on the Premises

(d)    Landlord agrees to indemnify and hold harmless Tenant, its employees, agents, successors and assigns, from and against any and all damages, claims, liability or loss, including reasonable attorney's fees, arising out of or in anyway connected to Hazardous Substances which were on the Premises before the Delivery Date.

33.   Compliance with Laws.  Tenant covenants that, during the Term, no part of the Premises or improvements thereon shall be used in any manner whatsoever in violation of the laws, ordinances, regulations, or orders of the United States or of the State, county, city or other applicable governmental subdivisions where the Premises are located.  Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises and any signs of the Tenant are concerned including, but not limited to, zoning ordinances, building codes and fire codes.

34.   Rules and Regulations.    Tenant's use of the Premises and the Common Areas shall be subject at all times during the Term to those reasonable rules and regulations adopted by Landlord, not in conflict with any of the express provisions hereof, governing the use of the common areas, signs, exteriors of buildings, lighting and other matters affecting other tenants in and the general management and appearance of the Center.  Tenant agrees to comply with all such rules and regulations.

35.  Accord and Satisfaction    No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying the check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in the Lease or by law.

36.  Waiver   No waiver by either party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.   If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.

37.  Miscellaneous.

(a)   In the event this Lease is terminated pursuant to a right to do so herein contained, neither party hereto shall thereafter have any further obligation or liability one to the other, and this Lease shall be of no further force or effect.

(b)   The captions used in this Lease are for convenience only and shall not be deemed to amplify, modify or limit the provisions hereof.

(c)   Words of any gender used in this Lease shall be construed to include any other gender, and words in the singular shall include the plural and vice versa, unless the context otherwise requires.

(d)   This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representative, successors and assigns.

(e)   This Lease contains the entire agreement of the parties hereto with respect to the subject matter hereof and can be altered, amended or modified only by written instrument executed by all such parties.

(f)   This Lease may be executed in multiple copies, each of which shall be deemed an original, and all of such copies shall together constitute one and the same instrument.

(g)   Time is of the essence in the performance of each obligation, covenant and condition under this Lease.

38.  Choice of Law.  This Lease shall be governed by the laws of the State of New York.

39.  Exculpation of Landlord.   Anything contained in this Lease, at law or in equity to the contrary notwithstanding, Tenant expressly acknowledges and agrees that there shall at no time be or be construed as being any personal liability by or on the part of Landlord under or in respect of this Lease or in any way related thereto or the Premises; it being further acknowledged and agreed that Tenant is accepting this Lease and the estate created hereby upon and subject to the understanding that it shall not enforce or seek to enforce any claim or judgment or any other matter, for money or otherwise, personally or directly against any officer, director, stockholder, partner, principal (disclosed or undisclosed), representative or agent of Landlord, but will look solely to the Landlord's interest in the Center for the satisfaction of any and all claims, remedies or judgments (or other judicial process) in favor of Tenant requiring the payment of money by Landlord in the event of any breach by Landlord of any of the terms, covenants or agreements to be performed by Landlord under this Lease or otherwise, subject, however, to the prior rights of any ground or underlying lessors or the holders of the mortgages covering the Center, and no other assets of Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claims; such exculpation of personal liability as herein set forth to be absolute, unconditional and without exception of any kind.

14

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the day and year first written.

Landlord:                                                    Tenant:

MEREDITH AVENUE ASSOCIATES,                                  SHOWBIZ PIZZA TIME, INC.
   a New York limited partnership

By: _____                               By: _____
    Name:                                                       Richard M. Frank
    Title:                                                      Chairman and
                                                                Chief Executive Officer


WEST SHORE PLAZA LIMITED PARTNERSHIP


By:   West Shore Plaza Corporation,
      a Delaware corporation,
      General Partner

By: _____
    Name:
    Title:

15

STATE OF TEXAS }
} §
COUNTY OF DALLAS }

On this _____ day of _____, 1991, before me, a Notary Public in and for the county and state aforesaid, came Richard M. Frank, Chairman and Chief Executive Officer of ShowBiz Pizza Time, Inc., and such person acknowledged the execution of the foregoing instrument as the act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal, the day and year above written.

_____
Notary

My appointment expires:

(seal)                                              _____

STATE OF }
} §
COUNTY OF }

On this _____ day of _____, 1991, before me, a Notary Public in and for the county and state aforesaid, came _____ of _____ and such person duly acknowledged the execution of the foregoing instrument as the act and deed of said _____.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal, the day and year above written.

_____
Notary

My appointment expires:

(seal)                                              _____

16

EXHIBIT "E"  (P..y< l)

DESCRIPTION

        ALL that certain plot, piece or parcel of land, with the
buildings and improvements thereon erected, situate, lying and
being in the Village of Chelsea, Town of Northfield, Richmond County,
New York State, being lots numbered Thirty-four (34), Thirty-Five
(35), Thirty-six (36), Thirty-seven (37) and Thirty-eight (38),
on map entitled "Map of 162 Valuable Lots at Chelsea, Staten
Island filed in Richmond County Clerks Office on October 26th, 1836
as Map #15", bounded and described as follows:

        Beginning at a point on the Southerly side of Chelsea Road
(33 feet wide) distant 898.72 feet Easterly from the corner formed
by the intersection of the Southerly side of Chelsea Road and the
Easterly side of Meredith Ave. (50 feet wide), said point of
beginning having the co-ordinate values of South 20440.240
West 41464.494;

        running thence South 37 degrees 03 minutes 06 seconds
East 154.00 feet;

        thence North 52 degrees 56 minutes 54 seconds East 100.00 feet;

        thence North 37 degrees 03 minutes 06 seconds West 125.64 feet
to the Southerly side of Chelsea Road;

        thence South 68 degrees 46 minutes 48 seconds West along
the Southerly side of Chelsea Road 103.94 feet to the point or
place of beginning.

EXHIBIT "C" (Page 2)

## SCHEDULE A — Description

TITLE NO

### PARCEL II

All that certain plot, piece or parcel of land, situate, lying, and being in the Borough of Staten Island, City and State of New York, bounded and described as follows:

Beginning at the corner intersection of the southeasterly side of Chelsea Road (33 feet wide) and the northeasterly side of Meredith Avenue (50 feet wide) the Coordinates of which said point of beginning are south 20858.707 west 42253.916; running thence south 37 degrees 58 minutes 35 seconds east along the northeasterly side of Meredith Avenue 493.69 feet;
thence north 52 degrees 01 minutes 25 seconds east 30 feet to the northeasterly side of Meredith Avenue (80 feet wide);
thence south 37 degrees 58 minutes 35 seconds west along the northeasterly side of Meredith Avenue (80 feet wide) 409.65 feet;
thence north 38 degrees 10 minutes 14 seconds east 969.96 feet;
thence north 37 degrees 03 minutes 06 seconds west 1.75 feet;
thence northerly on a curve deflecting to the left, with a radius of 2814.93 feet and a central angle of 9 degrees 29 minutes 18 seconds, an arc distance of 466.16 feet;
thence north 36 degrees 46 minutes 32 seconds west 55.28 feet to the southeasterly side of Chelsea Road;
thence south 70 degrees 44 minutes 36 seconds west along the southeasterly side of Chelsea Road 356 feet;
thence south 37 degrees 03 minutes 06 seconds east 125.64 feet;
thence north 52 degrees 56 minutes 54 seconds west 100 feet;
thence south 37 degrees 03 minutes 06 seconds west 154 feet to the southeasterly side of Chelsea Road;
thence south 68 degrees 46 minutes 48 seconds west along the southeasterly side of Chelsea Road 295.05 feet;
thence south 62 degrees 45 minutes 05 seconds west still along the southeasterly side of Chelsea Road 366.38 feet;
thence south 52 degrees 39 minutes 35 seconds west still along the southeasterly side of Chelsea Road 53.32 feet;
thence south 37 degrees 35 minutes 20 seconds east 99.68 feet;
thence south 52 degrees 16 minutes 28 seconds west 130 feet;
thence north 37 degrees 35 minutes 22 seconds west 100.06 feet to the southeasterly side of Chelsea Road;
thence south 52 degrees 39 minutes 35 seconds west along the southeasterly side of Chelsea Road 53.97 feet to the corner the point or place of Beginning.

Query

(see revised sched A)

DESCRIPTION

EXHIBIT "A"



EXHIBIT "C"

LANDLORD'S WORK

This Exhibit "C" is hereby attached to Lease Agreement dated _____, 1991. All work other than that which is specifically provided for hereunder to be performed by Landlord and as per Tenant's Plans and Specifications (as defined in the Lease), is to be performed by Tenant, at Tenant's expense, and shall be hereinafter referred to as "Tenant's Work".

1.  WORKING DRAWINGS:  Landlord will provide to Tenant at Landlord's cost, scale drawings of the premises including the location of all structural posts, electrical service, water service, gas service, rear doors, toilet rooms, sprinkler system, all roof penetrations and floor penetrations.  After receipt of Landlord's plans, Tenant will provide to Landlord at Tenant's cost, scale drawings of all interior finish work and fixturization.

2.  (INTENTIONALLY OMITTED)

3.  [INTENTIONALLY OMITTED]

4.  STOREFRONT CONSTRUCTION:  The storefront construction will be "AS IS".

5.  DEMISING WALL:  The demising walls shall be constructed using 3 5/8" wide USG (or equal) metal studs spaced on 16" centers or as required for compliance with pertinent regulation, provides required backing and other support for items mounted on the finished covering.  Provide thermal batt insulation such as manufactured by The Manville Corporation or equal. Gypsum wallboard to be 5/8" thick complying to Federal Spec SS-L-30D or fire retardant wallboard Type III, Grade X, Class 1 and water-resistant wall board Type VII, Grade W, Class 2, where shown on Tenant's drawings.  All joints to be taped and bedded.  Provide noise abatement such as necessary to satisfy requirements of location governing authorities and adjacent Tenant.

6.  DELIVERY AND EXIT DOOR   As is.

7.  ACOUSTICAL CEILINGS:  Provide an allowance of $16,500 in lieu of retail drop ceiling.

8.  CONCRETE FLOOR SLAB:  Provide concrete floor slab in all lease areas.  Slab to be a minimum of 4" thick with proper structural reinforcement, designed with sufficient structural support (grade beams) as designed by Registered Structural Engineer.

9.  HVAC.  Provide thirty (30) total tons of roof top air conditioning and an allowance in lieu of retail ducting.  Heating medium to be natural gas with inside temperature of minimum of 65 F.

10.  ELECTRICAL SERVICE:  Provide 400 Amp 120/203/3 phase/4 wire electrical metered service with a fused disconnect.

11.  WATER SERVICE:  Provide a minimum 2-1/2" metered domestic water service inside of lease space.  Water line pressure to be a minimum of 30 P.S.I.

12  GAS SERVICE:  Provide a minimum of 2" gas metered service inside of lease space.  If gas line is more than 30 LF from space, line size to increase to 3". Provide a minimum of 2000 CFM at 12 oz.

13. SANITARY SERVICE: Provide 4" sanitary service inside of lease space at an invert that will allow a grease trap adequate flow.

14. [INTENTIONALLY OMITTED]

15. SPRINKLER: Provide an allowance of $6,300 in lieu of retail sprinkler system. Landlord shall be responsible for FACP, if required by code.

16. ROOF: Pursuant to Landlord's specifications.

17. TOILET ROOMS: None.

18. DUMPSTER PAD: Provide Asphalt dumpster pad convenient to service door

19. PARKING: Provide site development plan to Tenant showing adequate parking, handicap parking locations and total available parking. Handicap ramp.

20. HANDICAP RAMP: Handicapped parking pursuant to New York City Code.

21. Landlord shall obtain all necessary permits for Landlord's work.

22. Landlord and/or its contractors and/or subcontractors are responsible for temporary utilities for their work including payment of utility bills.

By: (Landlord)

MEREDITH AVENUE ASSOCIATES,
a New York limited partnership

By: _____
Name:
Title:

By: (Tenant)

SHOWBIZ PIZZA TIME, INC.

By: _____
Richard M. Frank
Chairman and
Chief Executive Officer

EXHIBIT "D"

TENANT'S WORK

This Exhibit D is hereby attached to Lease dated _____, 1991. Except for Landlord's Work specified in Exhibit C of the Lease, Tenant shall at its own cost and expense construct and equip its demised premises. Tenant's Work, which shall conform to all applicable governing codes, shall include but not be limited to the following:

1.  KNEE WALL: Masonry knee wall approximately 36 inches high across front of Premises. Plus all store front construction.

2.  DELIVERY DOOR: Per Tenant's plans and specifications.

3.  HVAC: If additional service is required, pursuant to Tenant's plans and specifications.

4.  ELECTRIC: If additional service is required, pursuant to Tenant's plans and specifications.

5.  CEILINGS: Per Tenant's plans and specifications.

6.  TOILET ROOMS: Per Tenant's plans and specifications.

7.  FLOORING: Floor coverings including materials and installation.

8.  WALLS: All interior partitions and walls within the premises.

9.  UTILITIES DISTRIBUTION: All water, sewer, electrical (from the distribution panel), gas and telephone lines and equipment within the demised premises.

10. TRADE FIXTURES: All store fixtures, cases, paneling, cornices, etc.

11. Tenant shall obtain all necessary permits for Tenant's work.

12. PLUMBING: Any drinking fountains, water coolers, or other plumbing fixtures.

13. SIGN: Building, pylon facade and signage in accordance with Tenant's sign requirements and approved by Landlord and local governmental agencies.

14. Tenant and/or its contractor and/or subcontractors to obtain and pay for all permits.

15. Exterior: All exterior color selections shall be approved by Landlord.

By: (Landlord)                              By: (Tenant)

MEREDITH AVENUE ASSOCIATES,                 SHOWBIZ PIZZA TIME, INC.
a New York limited partnership

By: _____              By: _____
    Name:                                      Richard M. Frank
    Title:                                     Chairman and
                                               Chief Executive Officer



EXHIBIT "E"

EXHIBIT F

USE RESTRICTIONS

Health club or fitness center, reducing, diet, dance or physical culture facility.

Primary use of the sale of women's wear apparel.

Primary use of the sale of party goods, greeting cards or costumes.

Primary use of the sale of health or beauty aids.

Prescription pharmacy.

Primary use of the sale of computers.

Primary use of the large size women's wear store.

Office space.

Sale of prescription eyewear.

An establishment selling or exhibiting pornographic materials.

An ice skating rink.

A massage parlor

A roller skating rink.

A billiard parlor.

A theatre of any type.

An automobile showroom.

An off-tract betting parlor.

An automobile service center and/or filling station.

A car wash

A dance hall.

A discoteque.

## LIENHOLDER'S ACKNOWLEDGMENT

STATE OF ___ ___ ___        )
                            )      ss.
COUNTY OF ___ ___ ___       )

    On this ___ day of ___ ___ ___, 2007, before me. ___ ___ ___ ___ ___ ___ ___, personally appeared ___ ___ ___ ___ ___ ___ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or entity upon behalf of which the person acted, executed the instrument.

WITNESS MY HAND AND OFFICIAL SEAL.

                                                   (seal)
___ ___ ___ ___ ___ ___ ___
Signature

## LIENHOLDER'S ACKNOWLEDGMENT

STATE OF ___ ___ ___        )
                            )      ss.
COUNTY OF ___ ___          )

    On this ___ day of ___ ___ ___, 2007, before me. ___ ___ ___ ___ ___ ___ ___, personally appeared ___ ___ ___ ___ ___ ___ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or entity upon behalf of which the person acted, executed the instrument.

WITNESS MY HAND AND OFFICIAL SEAL.

                                                   (seal)
___ ___ ___ ___ ___ ___ ___
Signature

## LESSEE'S ACKNOWLEDGMENT

STATE OF TEXAS       )
)    SS.
COUNTY OF DALLAS    )

      On this \_\_ \_\_ day of _____, 2007, before me, \_\_ \_\_\_\_\_ \_\_ \_\_\_\_, personally appeared **MARSHALL R. FISCO, JR.** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or entity upon behalf of which the person acted, executed the instrument.

WITNESS MY HAND AND OFFICIAL SEAL.

(seal)

\_\_ \_\_\_\_ \_\_ \_\_\_ \_\_\_\_\_ \_\_\_
Signature

## LESSOR'S ACKNOWLEDGMENT

STATE OF \_\_\_ \_\_ \_\_    )
)    SS.
COUNTY OF \_\_\_ \_\_\_ \_\_    )

      On this \_\_ \_\_ day of _____, 2007, before me, \_\_ \_\_ \_\_ \_\_\_ \_\_\_\_ \_\_\_ \_\_, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or entity upon behalf of which the person acted, executed the instrument.

WITNESS MY HAND AND OFFICIAL SEAL.

(seal)

\_\_\_\_ \_\_\_\_ \_\_\_ \_\_\_\_ \_\_\_\_\_
Signature





Proposed Front Elevation

Staten Island, NY

March 28, 2007   **Carter≡Burgess**





Proposed Front Elevation

Staten Island, NY                                    March 28, 2007   **Carter≡Burgess**





Proposed Front Elevation

Staten Island, NY

March 28, 2007   **Carter≡Burgess**

# EXHIBIT B

# FIRST AMENDMENT OF LEASE

AGREEMENT dated as of this _____ day of July 1992 by and between Meredith Avenue Associates, a New York limited partnership having an office at 1430 Richmond Avenue, Staten Island ("Landlord") and ShowBiz Pizza Time, Inc., a Kansas corporation having an office at 4441 West Airport Freeway, Irving, Texas 75015 ("Tenant"). Landlord and Tenant entered into an agreement of Lease made November 25, 1991 (the "Lease"). All words and phrases that are defined in the Lease shall have the same meaning in this Amendment.

WHEREAS, Landlord and Tenant desire to amend the Lease to provide for the establishment of the Rent Commencement Date and in addition thereto desire to amend the Lease in other respects all as more particularly set forth herein.

NOW, THEREFORE, in consideration of the sum of TEN ($10.00) DOLLARS and other good and valuable consideration by each of the parties paid to the other and the premises herein contained Landlord and Tenant agree as follows:

1. Tenant shall commence to pay to Landlord the Fixed Minimum Rent and Additional Rent on the date which is the earlier of (a) the date which Tenant opens for business the restaurant to be conducted by Tenant on the Premises or (b) August 25, 1992.

2. Upon the execution of this First Amendment of Lease Tenant shall pay to Landlord the sum of $18,996.55 representing the first month's rent ($17,146.55), Real Estate Taxes ($350.00) and Common Area charges ($1,500.00).

3. Provided that Tenant (i) is not in default beyond any cure period granted in the Lease and (ii) is unable to operate the Leased Premises in substantial conformance to its methods used in its systems of such restaurants, Tenant shall have the right at any time prior to March 1, 1993 to terminate the Lease upon ninety (90) days prior notice to Landlord on the following terms and conditions.

(A) At the end of the ninety (90) day period, Tenant shall (i) vacate the Leased Premises in the condition set forth in the Lease (Tenant shall remove only furniture and moveable equipment from the Leased Premises and Landlord shall retain other Tenant improvements and fixtures of a permanent nature); and (ii) pay to Landlord a sum equal to (a) nine (9) months Fixed Minimum Rent, Real Estate Taxes and Common Areas Changes and (b) any deficiency due Landlord for the preceeding ninety (90) days for Fixed Minimum Rent, Real Estate Taxes and Common Area Charges;

(B) Landlord shall have reasonable access to the Leased Premises for the purpose of exhibiting the same to prospective tenants and to post any "To Lease" signs upon the Leased Premsies, during said ninety (90) day period; and

(C) Execute a cancellation and surrender agreement terminating the Lease.

4. Tenant covenants and agrees to open the Leased Premsies for business to the public on or before November 25, 1992.

PROFILED

5. Provided that Tenant is not in default beyond any applicable cure period. Tenant shall receive a rent credit equal $34,293.66 as set forth below. In the event Tenant exercises its option to cancel the Lease as set forth in Paragraph 3, then said rent credit shall be deducted from Tenant's termination payment due Landlord.  In the event Tenant elects not to cancel the Lease then Tenant shall receive a rent credit of $17,146.55 for the fixed minimum rent due on March 1, 1993 and $17,146.55 for the fixed minimum rent due on March 1, 1994.

6. Except as specifically modified herein all of the terms covenants and conditions in the Lease contained are and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereunto caused this agreement to be executed as of the day and year first above written.

MEREDITH AVENUE ASSOCIATES

By: _____

WEST SHORE PLAZA
LIMITED PARTNERSHIP

By: West Shore Plaza Corporation,
    a Delaware Corporation
    General Partner

By: _____

SHOWBIZ PIZZA TIME, INC.

By: _____

DATED:                    , 1992

APPROVED AND CONSENTED TO:

THE BANK OF TOKYO TRUST COMPANY

BY: _____

SEP-02-2003  14:51          MANDEL PESNIK & FAISEP PC

212 573 0067   P.02 04

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** made as of the ✗ day of AMAL 2002, between WSP Capital, LLC, a Delaware limited liability company, having an office at 152 West 57th Street, 44th Floor, New York, NY 10019 ("Landlord"), and CEC ENTERTAINMENT, INC. (f/k/a ShowBiz Pizza Time, Inc.), a Kansas corporation, having an office at 4441 W. Airport Freeway, Irving, TX 75062 ("Tenant"):

### WITNESSETH:

**WHEREAS,** by that certain Lease dated November 25, 1991, as amended by a certain First Amendment of Lease dated July 1992 (as amended, the "Lease"), Meredith Avenue Associates, a New York limited partnership, leased to Tenant certain premises (the "Demised Premises") located in the shopping center known as West Shore Plaza, located at South Avenue and Meredith Avenue, Staten Island, New York;

**WHEREAS,** Landlord has succeeded to the interests of Meredith Avenue Associates under the Lease; and

**WHEREAS,** Landlord and Tenant are mutually desirous of further amending the Lease as hereinafter provided.

**NOW THEREFORE,** in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration paid by each party to the other, the receipt and sufficiency of which are hereby acknowledged by both parties, Landlord and Tenant do hereby covenant and agree as follows:

1.     The recital clauses set forth above shall be deemed a part of this Second Amendment to Lease as though set forth verbatim and at length herein.

2.     Except as otherwise expressly set forth herein, all capitalized terms in this Second Amendment to Lease shall have the meanings set forth for such terms in the Lease.

3.     Landlord and Tenant hereby acknowledge that Tenant has exercised the option for the first Renewal Term and that the Lease is therefor extended for a further term of five years from September 1, 2002.

4.     Section 4(a) of the Lease is hereby amended by (a) deleting clauses (iv) and (v) and substituting therefor the following:

   "(iv)   The sum of $12,833.33 in advance upon the first day of each calendar month commencing September 1, 2002 through to February 28, 2005 (equivalent to $14.00 per square foot per year);

   (v)    The sum of $14,666.66 in advance upon the first day of each calendar month commencing March 1, 2005 through August 31, 2007 (equivalent to $16.00 per square foot per year);

   (vi)   The sum of $24,172.50 in advance upon the first day of each calendar month

SEP-02-2003  14:52          MANDEL RESNIK & KAISER PC                    212 573 0067    P.03-04

of the sixteenth and seventeenth Lease Years (equivalent to $26.37 per square foot per year);" and (b)  renumbering the existing clause (vi) as clause (vii).

5.      Section 4(c) of the Lease is hereby amended, for the first Renewal Term only, so that Percentage Rent shall equal four (4%) percent of Gross Sales in excess of $1,400,000.00 per annum (or a proportionate part thereof for periods less than a full year) for the period from September 1, 2002 and ending February 28, 2005, or in excess of $1,600,000.00 per annum (or a proportionate part thereof for periods less than a full year) for the balance of the first Renewal Term.

6.      Section 22 of the Lease is hereby amended by (i) deleting the words "ShowBiz Pizza Time, Inc." and substituting therefor the words "CEC Entertainment, Inc., and (ii) by deleting the Landlord's notice address as set forth therein and substituting therefor the following:

Landlord's Notice Address:
                Carnegie Hall Tower,
                152 West 57th Street,
                44th Floor,
                New York, New York 10019
                Attention: General Counsel

Landlord's Notice Copy Address:
                Carnegie Hall Tower,
                152 West 57th Street,
                44th Floor,
                New York, New York 10019
                Attention: Managing Director of Asset Management

7.      Section 30 of the Lease is hereby amended by adding to the end thereof a new sentence as follows "Nothing in this Section 30 shall prevent the use by an occupant (which occupant may a local, regional or national chain) of up to one thousand square feet of floor area (exclusive of seating) as a pizzeria which is part of a food court, which food court is an incidental part of a flea market, or multi-department retail store located in the Shopping Center."

8.      Provided Tenant is not in default under the terms and conditions of this Lease beyond any applicable cure period, if Tenant's total Gross Receipts for the twelve month period ending June 30, 2004 are less than $1,800,000.00, Tenant shall have the one time right to terminate this Lease (hereinafter called "Tenant's Gross Sales Termination Right"). Tenant shall exercise Tenant's Gross Sales Termination Right by sending on or before August 31, 2004, six (6) months notice thereof to Landlord (the "Termination Notice"). The Termination Notice shall be accompanied by proof in the form of Tenant's typical statement of Gross Receipts signed by an authorized representative of Tenant, showing that the annual Gross Receipts for said period were less than $1,800,000.00. Tenant shall vacate the Premises on or before February 28, 2005 and deliver possession to Landlord in the condition required herein, and thereupon neither party shall have any further obligation to the other.

9.      (a)      Except as expressly modified by this Amendment, the Lease and all the terms, covenants, conditions, provisions and agreements thereof, are hereby in all respects, ratified, confirmed and approved.

        (b)      Tenant hereby affirms that, as of the date hereof, no breach or default by Landlord has occurred, and that the Lease and all of its terms, covenants, conditions, provisions and

agreements, except as modified by this Amendment, are in full force and effect.

     (c)    Landlord hereby affirms that, as of the date hereof, no breach or default by Tenant has occurred, and that the Lease and all of its terms, covenants, conditions, provisions and agreements, except as modified by this Amendment, are in full force and effect, with no defenses or offsets thereto.

9.    This Second Amendment to Lease may be executed on one or more counterparts each of which when so executed and delivered shall be deemed an original, but all of which when taken together shall constitute but one and the same instrument.

    **IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals as of the day and year first above written.

WSP CAPITAL, LLC.
BY: WSP ACQUISITION, LLC, MANAGING MEMBER

By _____
JORDAN J. METZGER
VICE PRESIDENT

CEC ENTERTAINMENT, INC.

By: _____
Don McKechnie
Real Estate Counsel/Director of Real Estate

TOTAL P.04

THIRD AMENDMENT OF LEASE

This THIRD AMENDMENT OF LEASE ("Third Amendment") made as of April 24, 2007 by and between SHORE PLAZA LLC, having an address c/o ACHS Management Corp., 1412 Broadway, 3rd Floor, New York, New York 10018 ("Landlord") and CEC ENTERTAINMENT, INC., D/B/A Chuck E. Cheese's having an address at 4441 West Airport Freeway, Irving Texas 75062 ("Tenant").

WITNESSETH

WHEREAS, Landlord's and Tenant's respective predecessor in interest are parties to that certain Lease Agreement dated November 25, 1991, as amended by a certain First Amendment of Lease dated as of July, 1992 and a certain Second Amendment to Lease dated as of April 8, 2002 (collectively, the "Lease") demising a portion shown on Exhibit A-1 to this Third Amendment (the "Premises") of the West Shore Plaza shopping center, known by the street address of 1775 South Avenue, Staten Island, New York (the "Center") to Tenant. (Capitalized terms not defined herein are defined in the Lease.)

WHEREAS, Landlord and Tenant desire to enlarge the Premises by approximately 5,375 square feet adjacent to the Premises as shown on Exhibit A-1 to this Third Amendment (the "Expansion Space"), to state the size of Tenant's Proportionate Share, to extend the term of the Lease following the addition of the Expansion Space to the Premises, to increase the Minimum Rent following the addition of the Expansion Space to the Premises, and to amend the Lease with respect to other matters.

NOW, THEREFORE in consideration of the mutual premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1. Tenant shall, within one hundred twenty (120) days from the date of this Third Amendment ("Tenant's Diligence Period"), engage registered architects, engineers and other consultants and otherwise act diligently, including, without limitation, prepare detailed plans and specifications in form reasonably satisfactory to Landlord, prepared and certified by a registered architect or licensed engineer, and suitable for filing with the applicable governmental authority, if filing is required by any applicable laws ("Tenant's Plans") for its use of the Expansion Space for its operation of Chuck E. Cheese's in sufficient detail to submit to the applicable governmental authorities for the issuance of the necessary permits and approvals. Tenant shall promptly submit Tenant's Plans to Landlord for Landlord's review and approval. Landlord shall review and comment on Tenant's Plans, and any revisions to them, within ten (10) business days after Landlord receives them. Tenant shall, within Tenant's Diligence Period, after Landlord's review, comment and re-review (if any) and approval, submit Tenant's Plans to the governmental authorities. Tenant shall give Landlord periodic verbal reports of Tenant's efforts. If Tenant determines that it is unlikely to obtain from the appropriate governmental

authorities all permits and licenses necessary for the construction and operation of the improvements and installations to be constructed or installed by Tenant within the Expansion Space, it shall promptly so notify Landlord ("Tenant's Expansion Termination Notice") as soon as it makes such determination, but not later than the last day of Tenant's Diligence Period. If Landlord has not received Tenant's Expansion Termination Notice on or before the last day of Tenant's Diligence Period, Tenant shall be deemed to have waived its right to so notify Landlord. Tenant may, but is not obligated to, notify Landlord prior to the expiration of Tenant's Diligence Period that Tenant waives its right to give Tenant's Expansion Termination Notice.

2. Tenant acknowledges that on the date of this Third Amendment, the Expansion Space is leased to another lessee. Provided that Landlord has not timely received Tenant's Expansion Termination Notice, within ten (10) days after the earlier to occur of (a) the end of Tenant's Diligence Period and (b) Tenant's notification to Landlord that Tenant waives its right to send Tenant's Expansion Termination Notice, Landlord shall make good faith efforts to negotiate with the lessee so that Landlord will be able to deliver the Expansion Space, free of other occupants, to Tenant on or before one hundred twenty (120) days after the expiration of Tenant's Diligence Period (the "Outside Expansion Space Delivery Date") in broom clean, "current" condition, with all shelving, furniture and debris removed, and free of hazardous materials (excluding methane gas). Landlord shall be entitled to extend the Outside Expansion Space Delivery Date by a maximum of ninety (90) days, by notice to Tenant. Landlord shall have no liability to any third parties if Landlord cannot deliver the Expansion Space to Tenant. Landlord shall have no obligation to deliver the Expansion Space to Tenant if any Events of Default are in existence on the Expansion Space Delivery Date (hereinafter defined) and Landlord shall so notify Tenant ("Landlord's Expansion Termination Notice").

Landlord shall have no obligation to do any work to the Expansion Space to prepare it for Tenant, unless otherwise stated. Tenant shall accept the Expansion Space on the date that Landlord notifies Tenant that the Expansion Space is vacant and broom clean (the "Expansion Space Delivery Date") and the Expansion Space shall be deemed to be part of the Premises from the Expansion Space Delivery Date. Landlord and Tenant shall execute an agreement in the form attached to this Third Amendment to set forth the Expansion Space Delivery Date.

3. Concurrent with either (a) Landlord's receipt of Tenant's Expansion Termination Notice, or (b) Tenant's receipt of Landlord's Expansion Termination Notice, whichever shall occur, if any, then the Expansion Space shall not become part of the Premises, Tenant shall have no further right to lease the Expansion Space, and the following sections of this Third Amendment shall be deemed deleted, null and void ab initio: the second sentence of section 5, sections 6, 7 and 9 in their entirety, and the second sentence of section 10.

4. Until the Expansion Space Delivery Date, the provisions of the Lease that do not relate to the Expansion Space, including, without limitation, the provisions relating to the payment of rent under Article 4 (a) of the Lease, and the term of the Lease, shall remain in full force and effect. If the Expansion Space does not become part of the

2

Premises, the provisions of the Lease that do not relate to the Expansion Space shall not be effected and shall remain in full force an effect.

5. The rentable square feet of the Premises is, on the date of this Third Amendment, approximately 11,213. From and after the Expansion Space Delivery Date, the Premises will be approximately 16,588 square feet.

6. Commencing on the Expansion Space Delivery Date, section 1 of the Lease shall be deleted in its entirety, and the following shall be substituted in its place:

1. Premises and Term

In consideration of Tenant's obligations under the Lease, from and after the Expansion Space Delivery Date, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord, the Premises (including the Expansion Space), for a term ("Term") of ten (10) years, ending on the last day of the tenth Lease Year.

7. After the Expansion Space Delivery Date, section 2 of the Lease is deleted in its entirety and the following is substituted in its place:

2. Renewal Options.

(a) After the Expansion Space Delivery Date, provided that Tenant is not in default in the performance of its obligations under the Lease at the time that Tenant gives notice to Landlord that it would like to extend the Term of the Lease and at the time of the expiration of the Term of the Lease, Tenant shall have the option to extend the Term of the Lease for two (2) consecutive five (5) year periods (the "Renewal Term(s)"). Tenant shall not have the option to extend the Term of the Lease for the second Renewal Term if the first Renewal Term is not in effect. Tenant shall exercise its options to extend the Term of the Lease by the Renewal Term(s) by so notifying Landlord on a date that is not earlier than thirteen (13) months, nor later than one (1) year, prior to the expiration of the Term, (including the Term as extended by the first Renewal Term, if applicable), time of the essence.

(b) The annual Minimum Rent for the first Renewal Term shall be equal to the greater of (i) $328,442.40, payable in equal monthly installments of $27,370.20 or (ii) the fair market rental value. The annual Minimum Rent for the second Renewal Term shall be equal to the greater of (iii) one hundred ten percent (110%) the annual Minimum Rent in effect in the last year of the first Renewal Term and (iv) fair market rental value.

(c ) After Landlord receives Tenant's notification of its exercise of its option for each Renewal Term, Landlord shall notify Tenant of Landlord's determination of fair market rental value and the annual Minimum Rent for the respective Renewal Term. The determination of fair market rental value (i) shall assume that the Premises are in its then-current condition, with no need for any Tenant's Work, and that there is no "free rent" or rent abatement and (ii) shall otherwise take into account all applicable provisions of this

Lease. Tenant may, within fifteen (15) days after receiving such determination, notify Landlord that it disputes the determination. Tenant's failure to so notify Landlord shall be deemed to mean that Tenant shall be bound to extend the Term at the annual Minimum Rent stated in Landlord's notice to Tenant. Landlord and Tenant shall try for fifteen (15) days after Landlord receives notice of Tenant's dispute, to agree on the annual Minimum Rent for the Renewal Term. At the expiration of such fifteen (15) day period, if Landlord and Tenant are still unable to agree, each shall, within twenty (20) days thereafter, select an appraiser and the two appraisers shall agree on the fair market rental value. If only one appraiser is selected, that appraiser shall determine the fair market rental value. If there are two (2) appraisers, and if they are unable to agree on the fair market rental value, they shall mutually select a third appraiser whose decision as to the fair market rental value shall be binding and conclusive. Each appraiser's fees and costs shall be borne and paid by the party who selected the appraiser but the fees of the third appraiser, if any, shall be paid equally by Landlord and Tenant.

(d) Tenant shall promptly execute an amendment to the Lease to reflect the extension of the Term.

8. Section 3 of the Lease is hereby deleted in its entirety and the following text is substituted in its place:

3. Tenant's Work

(a) Tenant shall not paint or decorate any part of the exterior of the Premises without first obtaining Landlord's approval. Landlord hereby approves Tenant's exterior photo simulation that is Schedule A to this Third Amendment. Tenant's replacement of fixtures, changes, improvements and alterations (collectively, "Tenant's Work") shall be performed, at Tenant's expense, in a good and workerlike manner using new or like-new materials in compliance with this Lease, all applicable laws (including ordinances, codes and administrative or judicial decisions) and Tenant's Plans.

(b) Prior to performing any Tenant's Work which requires Landlord's consent, Tenant shall, at Tenant's expense (i) deliver to Landlord Tenant's Plans for such Tenant's Work, (ii) obtain Landlord's approval of Tenant's Plans, (iii) obtain (and deliver to Landlord copies of) all required permits and authorizations of any governmental authority, and (iv) deliver to Landlord certificates, in form and content reasonably acceptable to Landlord, evidencing that Tenant's general contractor has insurance coverage acceptable to Landlord in carrier, type and amount, and with contractual liability coverage naming Landlord, Landlord's managing agent, if any, and Landlord's mortgagee(s) as additional insureds. Following the completion of Tenant's Work, Tenant shall, at Tenant's expense, obtain and deliver to Landlord copies of all authorizations and certificates of any governmental authority required upon the completion of Tenant's Work (including any required amendments to the certificate of occupancy for the Premises and/or Center) and "as-built" plans and specifications for Tenant's Work prepared as reasonably required by Landlord.

4

( c) If, in connection with Tenant's Work or any other act or omission of Tenant or Tenant's employees, agents or contractors, a mechanic's lien, financing statement or other lien or violation is filed against Landlord or all or any part of the Center or the Center, Tenant shall, at Tenant's expense, have such lien removed by bonding or otherwise within fifteen (15 ) days after Tenant receives notice of the filing.

(d) All contractors and subcontractors performing work for which a license is required by laws, shall be licensed by all appropriate governmental authorities. Promptly following substantial completion of Tenant's Work, Tenant shall furnish to Landlord lien waivers and releases from all contractors, subcontractors, and materialmen furnishing work, services or materials in connection with Tenant's Work. Notwithstanding the preceding sentence, with respect to Tenant's Work performed on behalf of CEC Entertainment, Inc., Landlord shall require only a lien waiver and release from Tenant's general contractor covering Tenant's Work.

(e) At Tenant's request, Landlord shall join in any applications for any authorizations required from any applicable governmental authority in connection with Tenant's Work to which Landlord has consented, and otherwise cooperate with Tenant in connection with Tenant's Work, but Landlord shall not be obligated to incur any expense or obligation in connection with any such applications or cooperation.

(f) Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which is allowed by any applicable laws.

(g) If Tenant performs with Landlord's approval any work on the roof of the Center (for example, in connection with repair, maintenance, or installation of any air conditioning system), Tenant shall not do or cause anything to be done which would invalidate Landlord's then effective roof guaranty for the Center. Tenant shall also be responsible for promptly repairing any damage to the roof or Center caused by such work.

(h) On or before the last day of the Term, Tenant shall, at Tenant's expense, remove from the Premises Tenant's trade fixtures, equipment and personal property which are removable without material damage to the Premises or the building in which the Premises is located ("Tenant's Property"). Tenant shall repair any damage to the Premises, and the Center caused by the removal of Tenant's Property or signs. Except as expressly provided in this section, Tenant's Work shall not be removed and shall, on the expiration of the Term (or such sooner date that this Lease may terminate) become the property of Landlord. Any Tenant's Property (which Tenant was required to remove) which is not removed by Tenant by the expiration of the Term shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's expense.

9. From and after the Expansion Space Delivery Date, Section 4 (a) of the Lease shall be amended to delete:

(w) the first parenthetical in clause (i) "("Lease Year" being equal to one calendar year, commencing on the Commencement Date or an anniversary thereof)" and to substitute in its place "("Lease Year" being equal to one calendar year, commencing on the Expansion Space Delivery Date or an anniversary thereof, provided that if the Expansion Space Delivery Date is not the first day of a month, the first Lease Year shall commence on the first day of the month following the Expansion Space Delivery Date )" ; and

(x) clauses (v), (vi) and (vii) in their entirety and the Minimum Rent shall be as follows:
(v) The sum of $20,735.00 in advance upon the first day of each calendar month commencing on the date that is thirty (30) days after the Expansion Space Delivery Date, through the second Lease Year;
(vi) The sum of $22,808.50 in advance upon the first day of each calendar month commencing on the first day of the third Lease Year through the fifth Lease Year;
(vii) The sum of $22,882.00 in advance upon the first day of each calendar month commencing on the first day of the sixth Lease Year through the tenth Lease Year.

10. Tenant's Proportionate Share is 4.39% on the date of this Third Amendment. From and after the Expansion Space Delivery Date, Tenant's Proportionate Share will be 6.5%, subject to adjustment pursuant to the terms of the second sentence of Section 7 (b) of this Lease.

11. Section 8 (b) of the Lease is hereby amended by adding the following at the end of the section: "If Tenant sells alcoholic beverages for in Premises consumption, Tenant shall maintain dram shop liability insurance. Notwithstanding anything to the contrary contained in this section, Tenant's direct insurance obligations may be met if Tenant maintains excess liability insurance in the amount of at least $5,000,000 throughout the Term of this Lease."

12. Intentionally deleted.

13. Article 10 is hereby amended by adding the following sections:

(e) Tenant shall, at its expense: (i) keep the inside and outside of all glass in the doors and windows of the premises clean and keep all exterior store surfaces of the Premises clean; and (ii) replace promptly any cracked or broken glass of the Premises with glass of like color, grade, and quality, and (iii) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests and shall arrange for extermination at regular intervals, as necessary; and (iv) keep any garbage, trash, rubbish or other refuse in clean, sanitary containers until removed.

(f) Tenant shall not (i) place or maintain any merchandise, show cases, trash, refuse or other items on the sidewalks or elsewhere outside the Premises; (ii) obstruct, or permits its employees, or invitees to obstruct, any sidewalk, or common areas of the Center; (iii) set up tables for service on the sidewalk abutting the Building.

6

14. Section 22 of the Lease is hereby amended to delete the address for notice to Landlord in its entirety and to substitute the following in its place and stead:

Shore Plaza LLC
c/o ACHS Management Corp.
1412 Broadway, 3rd Floor
New York, New York 10018

15. Intentionally deleted.

16. Sections 27 and 28 of the Lease are hereby deleted in their entirety.

17. Exhibits C and D to the Lease, respectively Landlord's Work and Tenant's Work, are hereby deleted in their entirety.

18. Tenant and Landlord represent to each other that no broker, including without limitation, the brokers referenced in Section 29 of the Lease, brought about the transaction reflected in this Third Amendment and no one is entitled to any commission or finder's fee related to this Third Amendment. Tenant shall indemnify and hold Landlord harmless from the claims, costs and expenses incurred by Landlord arising from a breach of Tenant's representation, including without limitation, attorneys' fees and expenses.

The balance of this page is intentionally blank.

19. As modified hereby, Landlord and Tenant hereby reaffirm, ratify and confirm the terms, covenants and conditions of the Lease.

IN WITNESS WHEREOF, the parties have executed this THIRD AMENDMENT OF LEASE as of the date above written.

<u>Landlord</u>

SHORE PLAZA LLC

By: Shore Plaza Manager Corp.

By: _____
Name:
Title:

<u>Tenant</u>

CEC ENTERTAINMENT, INC.

By: _____
Name:
Title:





Staten Island, NY

Proposed Front Elevation

March 28, 2007   **Carter≡Burgess**

## FOURTH AMENDMENT TO LEASE AGREEMENT

This Fourth Amendment to Lease Agreement ("**Agreement**") is made and entered into effective as of July 26, 2016 ("**Effective Date**"), by and between Shore Plaza LLC, a New York limited liability company ("**Landlord**"), and CEC Entertainment, Inc., a Kansas corporation ("**Tenant**"), collectively referred to herein as the "**Parties**" and, each, a "**Party**," with reference to the following facts:

**WHEREAS**, Landlord and Tenant (or their respective predecessors in interest, as applicable) entered into that certain Lease Agreement, effective as of November 25, 1991 (as it may have been amended from time to time prior to the Effective Date, the "**Lease**"), related to the property located at 1775-P South Ave., Staten Island, NY 10314 (as further described in the Lease, the "**Premises**"); and

**WHEREAS**, the Parties wish to amend the Lease in accordance with the terms set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord and Tenant hereby agree as follows:

1.  Definitions: Capitalized terms used, but not defined, herein shall have the meanings ascribed to such terms in the Lease.

2.  Extension Term: The Term is hereby extended to expire on July 31, 2027 on the terms and conditions as provided below ("**Extension Term**").

3.  Extension Term Rent:

| Extension Term | Monthly Rent | Annual Rent |
|---|---|---|
| 8/1/2017 – 7/31/2022 | $20,735.00 | $248,820.00 |
| 8/1/2022 – 7/31/2027 | $22,808.50 | $273,702.00 |

4.  Renewal Terms: All "Renewal Term(s)" and/or "Option Term(s)" defined in the Lease and commencing after the Effective Date are hereby deleted in their entirety. The parties acknowledge and agree the currently active term expires on July 31, 2017 (upon which event, the Extension Term, above, shall commence).

5.  [Intentionally deleted]

6.  [Intentionally deleted]

7.  Broker: Each Party hereby represents and warrants to the other Party that (a) it has not contracted or entered into any agreement with any real estate broker, agent, finder, or any other person or entity in connection with the transaction contemplated herein, other than Swearingen Realty Group L.L.C. ("Swearingen") and (b) it has not taken any action that would result in any



real estate broker's, agent's, finder's, or other fees or commissions being due to any person or entity in connection with the transaction contemplated herein, other than Swearingen.

Each Party ("**Indemnitor**") hereby agrees to indemnify, protect, defend, and hold harmless the other Party ("**Indemnitee**") from and against any and all losses, claims, demands, damages, liabilities, costs or expenses (including reasonable attorneys' fees) suffered or incurred by the Indemnitee as a result of the foregoing representation and warranty made by the Indemnitor being untrue in any respect.

Tenant agrees to pay Swearingen any commission due Swearingen in connection with this Agreement in accordance with a separate agreement; and Tenant further agrees to indemnify, protect, defend and hold harmless, Landlord, from and against any and all losses, claims, demands, damages, liabilities, costs or expenses (including, without limitation, reasonable attorneys' fees) suffered or incurred by the Landlord as a result of the claims made by Swearingen for any commission or fee in connection with this Agreement.

8.     Notice:  The Parties' notice addresses set forth in the Lease are hereby deleted in their entirety and replaced in their entirety as follows:

Landlord:

> c/o Achs Management Corp.
> 1412 Broadway
> New York, New York 10018

Tenant:

> CEC Entertainment, Inc.
> 1707 Market Place Blvd.
> Suite 200
> Irving, TX 75063
> Attn: Real Estate Department
> Phone: 972-258-8507
> Fax: 972-258-5498

With a copy to:

> CEC Entertainment, Inc.
> 1707 Market Place Blvd.
> Suite 200
> Irving, TX 75063
> Attn: Legal Department
> Phone: 972-258-8507
> Fax: 972-258-5527

9.     Terms Confidential:  Landlord and Tenant each covenant and agree to (i) keep and hold in strict confidence the terms of this Agreement, and (ii) not disclose the terms of this Agreement to any third party except for lenders, accountants, legal counsel, and such other agents and advisors with a need to know in connection with such Party's business, or when required by a court of competent jurisdiction.



10. <u>Landlord's Representations and Warranties</u>: Landlord represents, warrants, covenants, and agrees that, as of the Effective Date:

    a. Landlord has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

    b. Landlord is the owner of fee simple title to the Premises, subject only to the easements, mortgages and other encumbrances and exceptions set forth in the Lease (if any);

    c. The execution and delivery of this Agreement and the performance by Landlord of its obligations hereunder are not prohibited by, and shall not cause a breach of, any other agreement, mortgage, contract, restrictive covenant or other instrument or document to which Landlord is a party or by which it is bound; and, without limiting the foregoing and for the avoidance of doubt, Landlord represents, warrants, covenants and agrees that no consent of any lender is required for Landlord to enter into this Agreement or, if required, has been obtained; and

    d. Landlord is the only party entitled to Tenant's rent payments pursuant to the terms of the Lease, as amended by this Agreement.

(collectively, "**Landlord's Representations**").

11. <u>Indemnity</u>: Landlord shall indemnify, protect, defend, and hold harmless the Tenant from and against any and all losses, claims, demands, damages, liabilities, costs or expenses (including reasonable attorneys' fees) suffered or incurred by Tenant as a result of Landlord's Representations being untrue in any respect.

12. <u>Financial Reporting</u>. The Parties acknowledge that certain Tenant financials are publicly reported and available. Accordingly, except as provided on <u>Exhibit A</u> hereto, all Tenant obligations set forth in the Lease (if any) to report to Landlord any Tenant financials (of any kind or nature whatsoever) are hereby null and void, so long as such financials are publicly reported and available.

13. <u>Conflicts</u>. In the event of a conflict or ambiguity between the Lease and this Agreement, the terms of this Agreement shall control.

14. <u>Counterparts</u>. This Agreement may be (i) executed in several counterparts, each of which when executed and delivered shall be deemed an original and all of which together shall constitute one instrument; and (ii) delivered by original, facsimile, email, or other electronic means and any Party delivering in such a manner shall be legally bound.

Except as expressly modified by this Agreement, all of the terms set forth in the Lease are hereby ratified and confirmed. This Agreement shall be binding upon and shall inure to the benefit of the Parties' respective successors and assigns.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective as of the Effective Date.

**LANDLORD:**

**TENANT:**

**Shore Plaza LLC,**
**a New York limited liability company**

**CEC Entertainment, Inc.,**
**a Kansas corporation**

Name: Alex Hymi

Name: Mark Kellinger

Title: Authorized Signatory

Title: Vice President, Development

## **EXHIBIT A**

## TENANT'S FINANCIAL REPORTING OBLIGATIONS

1. [NONE]

# EXHIBIT C



**MARCH 20, 2020** Albany, NY

# Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order

Earlier today, Governor Andrew M. Cuomo announced he is signing the "New York State on PAUSE" executive order, a 10-point policy to assure uniform safety for everyone. It includes a new directive that all non-essential businesses statewide must close in-office personnel functions effective at 8PM on Sunday, March 22. Guidance on essential services under the executive order is as follows:

**ESSENTIAL BUSINESSES OR ENTITIES,** including any for profit or non-profit, regardless of the nature of the service, the function they perform, or its corporate or entity structure, are not subject to the in-person restriction.

(Essential Businesses must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the Department of Health).

This guidance is issued by the New York State Department of Economic Development d/b/a Empire State Development and applies to each business location individually and is intended to assist businesses in determining whether they are an essential business and steps to request such designation. With respect to business or entities that operate or provide both essential and non-essential services, supplies or support, only those lines and/or business operations that are necessary to support the essential services, supplies, or support are exempt from the restrictions.

For purposes of Executive Order 202.6, "Essential Business," means:

**1. Essential Health Care Operations, Including:**

- research and laboratory services
- hospitals
- walk-in-care health facilities
- emergency veterinary and livestock services
- elder care
- medical wholesale and distribution
- home health care workers or aides for the elderly
- doctor and emergency dental
- nursing homes, or residential health care facilities or congregate care facilities
- medical supplies and equipment manufacturers and providers

## 2. Essential Infrastructure, Including:

- utilities including power generation, fuel supply and transmission
- public water and wastewater
- telecommunications and data centers
- airports/airlines
- transportation infrastructure such as bus, rail, or for-hire vehicles, garages
- hotels, and places of accommodation

## 3. Essential Manufacturing, Including:

- food processing, manufacturing agents, including all foods and beverages
- chemicals
- medical equipment/instruments
- pharmaceuticals
- sanitary products
- telecommunications
- microelectronics/semi-conductor
- agriculture/farms
- household paper products

## 4. Essential Retail, Including:

- grocery stores including all food and beverage stores
- pharmacies
- convenience stores

- farmer's markets
- gas stations
- restaurants/bars (but only for take-out/delivery)
- hardware and building material stores

## 5. Essential Services, Including:

- trash and recycling collection, processing and disposal
- mail and shipping services
- laundromats
- building cleaning and maintenance
- child care services
- auto repair
- warehouse/distribution and fulfillment
- funeral homes, crematoriums and cemeteries
- storage for essential businesses
- animal shelters

## 6. News Media

## 7. Financial Institutions, Including:

- banks
- insurance
- payroll
- accounting
- services related to financial markets

## 8. Providers of Basic Necessities to Economically Disadvantaged Populations, Including:

- homeless shelters and congregate care facilities
- food banks
- human services providers whose function includes the direct care of patients in state-licensed or funded voluntary programs; the care, protection, custody and oversight of individuals both in the community and in state-licensed residential facilities; those operating community shelters and other critical human services agencies providing direct care or support

## 9. Construction, Including:

- skilled trades such as electricians, plumbers
- other related construction firms and professionals for essential infrastructure or for emergency repair and safety purposes

## 10. Defense

- defense and national security-related operations supporting the U.S. Government or a contractor to the US government

## 11. Essential Services Necessary to Maintain the Safety, Sanitation and Essential Operations of Residences or Other Essential Businesses, Including:

- law enforcement
- fire prevention and response
- building code enforcement
- security
- emergency management and response
- building cleaners or janitors
- general maintenance whether employed by the entity directly or a vendor
- automotive repair
- disinfection

## 12. Vendors that Provide Essential Services or Products, Including Logistics and Technology Support, Child Care and Services:

- logistics
- technology support for online services
- child care programs and services
- government owned or leased buildings
- essential government services

If the function of your business is not listed above, but you believe that it is essential or it is an entity providing essential services or functions, you may request designation as an essential business.

Houses of worship are not ordered closed however it is strongly recommended no congregate services be held and social distance maintained.

8/13/2020          Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order | Governor Andrew M. …

Businesses and entities that provide other essential services must implement rules that help facilitate social distancing of at least six feet.

Requests by businesses to be designated an essential function as described above, should only be made if they are NOT covered by the guidance.

**To request designation as an essential business, please <u>click here</u>.**

**Restrictions on requesting designation as an essential business:**

- Any business that only has a single occupant/employee (i.e. gas station) has been deemed exempt and need not submit a request to be designated as an essential business.
- Businesses ordered to close on Monday, March 15, 2020 under the restrictions on any gathering with 50 or more participants, including but not limited to, bars, restaurants, gyms, movie theaters, casinos, auditoriums, concerts, conferences, worship services, sporting events, and physical fitness centers, are presumed to be compliant with NYS issued restrictions and must remain closed and are not eligible for designation as an essential business for purposes of this guidance.

For Guidance on cleaning and disinfection of facilities, refer to the New York State Department of Health Interim Guidance for Cleaning and Disinfection of Public and Private Facilities for COVID -19 at:

<u>http://www.health.ny.gov/diseases/communicable/coronavirus/docs/cleaning_guidance _general_building.pdf</u>.

For further information: New York State Department of Health's COVID-19 Webpage <u>https://coronavirus.health.ny.gov/home</u>

Center for Disease Control and Prevention Webpage:

<u>https://www.cdc.gov/coronavirus/2019-ncov/</u>

Local health department contact information can be found at: <u>https://www.health.ny.gov/contact/contact_information/index.htm</u>

# Contact the Governor's Press Office

 **Contact us by phone:**

Albany:  (518) 474 - 8418

New York City:  (212) 681 - 4640

**Contact us
by email:**        Press.Office@exec.ny.gov

# PROPOSED ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re:

CEC ENTERTAINMENT, INC. *et al.*,

Debtors[1].

Chapter 11

Case No. 20-33163 (MI)

(Jointly Administered)

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO ABATE RENT PAYMENTS AT STORES AFFECTED BY GOVERNMENT REGULATIONS (DOCKET 487)

Upon the Motion for Order Authorizing Debtors to Abate Rent Payments at Stores

Affected by Government Regulations, dated August 3, 2020 (the "Motion") [Dkt. No. 487], filed

by CEC Entertainment, Inc. ("CEC") and its affiliated debtors, as debtors and debtors-in-

possession (collectively, the "Debtors"), for an order authorizing the Debtors to abate rent

payments for stores closed or otherwise limited in operations as a result of any governmental

order or restriction, until such restriction or order has been lifted, as more fully set forth in the

Motion; and the Court having considered the Motion and the relief requested therein; and the

Court having considered the Objection to the Motion for Order Authorizing Debtors to Abate

Rent Payments at Stores Affected by Government Regulations filed by Shore Plaza LLC ("Shore

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

Plaza"); and upon the record of the hearing on the Motion held on August 24, 2020; ; and after due deliberation and for good cause shown,

## THE COURT HEREBY MAKES THE FOLLOWING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1.    Debtors filed voluntary petitions for relief under Chapter 11 of title 11, U.S.C. on June 24, 2020.

### A.    <u>The Lease</u>

2.    Shore Plaza is the owner of the premises at the West Shore Plaza shopping center commonly known as 1775 - P South Avenue, Staten Island, New York ("<u>Staten Island Premises</u>").

3.    Debtor is the tenant under a long-term commercial lease with Shore Plaza for the Staten Island Premises pursuant to that certain Lease Agreement dated November 25, 1991 (the "<u>Original Lease</u>"), as amended by that certain (i) First Amendment of Lease dated the "___day as of July 1992"; (ii) Second Amendment to Lease dated as of April 8, 2002; (iii) Third Amendment of Lease  made as of April 24, 2007, and (iv) Fourth Amendment to Lease Agreement made and entered into effective as of July 26, 2016 (collectively, the "<u>Lease</u>").

4.    Although the Lease contains a force majeure provision, which was bargained for by the parties to the Lease, it expressly excludes the payment of money from its terms. Paragraph 24 of the Lease expressly provides as follows:

> <u>Force Majeure</u>. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease **(except for the payment of money)** shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

Lease ¶ 54. (Emphasis added).

2

5.      Moreover, pursuant to paragraph 33 of the Original Lease, Debtor covenants that

"no part of the Premises or improvements thereon shall be used in any manner whatsoever in violation of the laws, ordinances, regulations, or orders of the United States or of the state, county, city or other applicable governmental subdivisions where the Premises are located.  Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises . . . are concerned . . . ."

Lease, ¶ 33.

6.      Lastly, Paragraph 5 of the Lease provides:

Use.  Tenant may use the Premises for the operation of a restaurant and/or related entertainment center serving alcohol beverages and for such other uses as are incidental to the operation thereof **and for any other lawful retail purpose** with the prior consent of Landlord, which shall not be unreasonably withheld.

Lease ¶ 5. (Emphasis added).

B.      **New York Governor Cuomo's Executive Orders**

7.      On March 20, 2020, New York Governor Cuomo signed the "New York State on

PAUSE" Executive Order 202.6 that became effective at 8:00 PM on Sunday, March 22, 2020.

Among the "essential" businesses permitted to remain open by the Executive Order were

restaurants/bars, although only for take-out/delivery services.  Other essential businesses

included grocery stores, liquor stores and home improvement stores.  In late April, 2020, New

York Governor Cuomo announced the "New York Forward" initiative, which included a four-

part phased approach to reopening.  These guidelines applied to all restaurants and food service

establishments and provided that, in regions that reach Phase 2, such establishments may open

outdoor spaces with seating for customers in accordance with certain guidelines.  New York City

started Phase 2 of its reopening on June 22, 2020, and, accordingly, restaurants, such as the

Debtor's, have been free to provide outdoor sit down dining services since that date.  Although

the Staten Island Premises has remained open and operational during the pandemic by providing

3

take-out/delivery services, it has chosen not to offer outdoor dining services even though legally permitted to do so.

## I.

### THE FORCE MAJEURE CLAUSE IN THE LEASE DOES NOT FORGIVE, EXCUSE OR EXTEND THE TIME FOR PAYMENT OF RENT BY THE DEBTOR

8.       New York law is clear that when parties set down their agreement in writing, the agreement should be enforced according to its terms. These "considerations are all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern." *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *see also Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004). Accordingly, New York courts interpret contracts according to their plain and natural meaning. *Mercury Bay Boating Club Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 557 N.Y.S.2d 851, 557 N.E.2d 87 (1990). As stated by the New York State Court of Appeals in *159 MP Corp. v. Redbridge Bedford, LLC*,

> Freedom of contract is a "deeply rooted" public policy of this state (*New England Mut. Life Ins. Co. v Caruso*, 73 NY2d 74, 81 [1989]) and a right of constitutional dimension (US Const, art I, § 10[1]). In keeping with New York's status as the preeminent commercial center in the United States, if not the world, our courts have long deemed the enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law. Thus, "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]).

*159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 104 N.Y.S.3d 1, 128 N.E.3d 128 (2019).

9.       With respect to *force majeure* lease clauses, New York courts have interpreted such clauses narrowly. New York courts have consistently found that a party will be excused

4

from performance under a *force majeure* clause only if the clause expressly includes the event in question and the event actually prevents the party's performance of its obligations under the contract. *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987); *Castor Petroleum, Ltd. v. Petroterminal De Panama, S.A.*, 107 A.D. 3d 497, 968 N.Y.S.2d 435 (1st Dept. 2013); *Duane Reade v. Stoneybrook Realty, LLC*, 30 A.D. 3d 229, 818 N.Y.S.2d 9 (1st Dept. 2006).

10.    "The burden of demonstrating force majeure is on the party seeking to have its performance excused . . . and the non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure." *Rochester Gas And Electric Corporation*, No. 06–CV–6155–CJS–MWP, 2009 WL 368508, at *7 (W.D.N.Y. 2009) (quoting *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985)). "Mere impracticality or unanticipated difficulty is not enough to excuse performance" under a *force majeure* clause. *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F.Supp. 312, 318 (S.D.N.Y.1989).

11.    Here, paragraph 24 of the Lease[2] provides as follows:

> Force Majeure.  The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease **(except for the payment of money)** shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building material, civil riots, floods, material or labor restrictions by governmental authority and any other cause not within the control of Landlord or Tenant, as the case may be.

---

[2] In the Motion, the Debtor references what it describes as CEC's standard lease force majeure clause, which provides that

> "The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by any time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, severe and unusual weather conditions, material or labor restrictions by governmental authority and any other cause not within the reasonable control of Landlord or Tenant, as the case may be."

As established above, this purported standard clause is not the force majeure clause contained in the Lease.

Lease, ¶ 24. (Emphasis added).

12.     By virtue of the exception "for the payment of money", paragraph 24 of the Lease does not allow the Debtor to defer, withhold, reduce or otherwise ignore or modify its obligation to pay rent, no matter the circumstances.  No amount of argument can change what is an enforceable commercial lease provision. To do so is to ask this Court to modify a Lease, which is against well-established New York public policy. *159 MP Corp., v. Redbridge Bedford LLC,* 33 N.Y. 3d at 359.

13.     In its Motion, the Debtor cites *In Re Hitz Restaurant Group*, 616 B.R. 374, (Bankr. N.D. Ill.), in which an Illinois Bankruptcy Court considered whether, under Illinois Law, an Illinois' "Stay-at-Home" executive order triggered a lease's *force majeure* provision. The force majeure clause in *Hitz* provided that

> "Landlord and Tenant shall each be excused from performing its obligations or undertakings provided in this Lease, in the event, but only so long as the performance of any of its obligations are prevented or delayed, retarded or hindered by . . . laws, governmental action or inaction, orders of government . . . Lack of money shall not be grounds for Force Majeure."

*In Re Hitz Restaurant Group*, 616 B.R. at 376-77.  The Illinois Bankruptcy Court found that the force majeure provision of the lease was triggered by the executive order.

14.     The *Hitz* case is clearly distinguishable from the instant case, however.  There, the court concluded that the debtor's inability to pay the rent was caused by governmental action and therefore covered by the force majeure clause, even though it otherwise might not have been. Here, in contrast, the payment of money is expressly excluded from the force majeure clause in the Lease, which does not enforce performance, as in *Hitz*, but merely extends the time for performance, except for the time to pay money, which is not extended.  Moreover, in *Hitz*, the force majeure clause was expressly based on "governmental action" or "order of government". Here, in contrast, the only type of governmental action which triggers the force majeure clause

6

under the Lease is "material or labor restrictions by governmental authority", which have not occurred here.  Thus, the *Hitz* case is not applicable to the facts at bar and, in any event, is not binding precedent in this case.

## II.

### THE DEBTOR MAY NOT INVOKE FRUSTRATION OF PURPOSE BOTH BECAUSE THE COVID-19 PANDEMIC WAS FORESEEABLE AND BECAUSE THE LEASE ITSELF ALLOCATES THAT RISK TO THE DEBTOR

#### A.     The Frustration Doctrine Defined

15.     In addition to relying on force majeure, the Debtor argues that its obligation to pay rent to Shore Plaza should be excused based on the doctrine of frustration of purpose.  To the extent applicable under New York Law, the frustration of purpose doctrine, which is narrowly applied, *Crown It Services v. Koval-Olsen*, 11 A.D.3d 263,782 N.Y.S. 2d 808 (1st Dept. 2004), provides that "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, <u>unless the language or the circumstances indicate the contrary</u>." *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), *aff'd*, 561 Fed. Appx. 48 (2d Cir. 2014).

16.     Frustration of purpose excuses performance when a "virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *U.S. v. Gen. Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir. 1974).  If a party could reasonably foresee an event that would destroy the purpose of the contract, and did not provide for the event's occurrence, then such party will be deemed to have assumed that risk.  *Sage Realty Corp. v. Jugobanka, D.D.*, 1998 WL 702272 (S.D.N.Y. 1987).

17.     But, "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 244 N.E. 2d 37 (1968).  It is not enough that the transaction has become less profitable for the affected party or even that he/she will sustain a loss in order to apply the doctrine. *Rockland Developmen Associates. v. Richlou Auto Body, Inc.*, 173 A.D.2d 690, 570 N.Y.S. 2d 343 (2d Dep't 1991); *Bank of New York v. Tri 360 Polyta Finance B.V.* 2003 WL 1960587 (S.D.N.Y. 2003).  Applying the forgoing principles of New York Law, the Debtor's frustration of purpose argument must be wholly rejected by this Court.

### B.     The Pandemic Was Foreseeable

18.     The events giving rise to the Debtor's frustration claims were reasonably foreseeable and, thus, bar the Debtor from asserting this argument.  The Court takes judicial notice of pandemics occurring in the years leading up to the Debtor's signing of the Fourth Amendment in 2016, including the SARS pandemic of 2002 and the H1N1 pandemic of 2009, and, of course, the Flu Pandemic of 1918, and the wide publicity that they received.  Thus, the risk of a pandemic was certainly foreseeable when the Fourth Amendment was signed in 2016.

19.     Here, by virtue of paragraphs 24 and 33 of the Lease, the parties anticipated the consequences of an event that might impact upon the Debtor's use of the Staten Island Premises and provided that no supervening event would excuse the Debtor from paying its rent.  These sections control.  Had the Debtor been concerned about allocating risk should a governmental order require closure during a pandemic, it was incumbent on the Debtor to have raised the issue at the bargaining table and obtained a provision addressing its lease obligations in those circumstances.  Indeed, the Debtor did exactly that in the sample lease provisions it attaches as exhibits to the Motion, but it did not do so in the Lease.

8

20.     Debtors expressly agreed in paragraph 24 of the Lease that any obligation to pay money under the Lease was not subject to a force majeure event and the Executive Orders complained of are likewise not a force majeure event.  Indeed, Debtor expressly agreed in paragraph 33 of the Lease to comply with all orders of the "state, county, city or other applicable governmental subdivisions where the Premises are located."  Lease, ¶ 33.

21.     Thus, this Court may not relieve the Debtor of the consequences of its negotiated, arm's-length bargain struck by sophisticated parties, each represented by counsel.  *See Maxton Bldrs., Inc. v. LoGalbo*, 68 N.Y.2d 373, 382, 509 N.Y.S.2d 507, 502 N.E.2d 184 (1986) ("[R]eal estate contracts are probably the best examples of arm's length transactions.  Except in cases where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of their contract.  If the parties are dissatisfied [citation omitted] the time to say so is at the bargaining table."); *Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 68 A. D. 3d at 562, 891 N.Y.S.2d 63 (1st Dept. 2009).

## C.     The purpose of the Lease Has Not Been Frustrated.

22.     Moreover, Paragraph 5 of the Lease provides that the Debtor may use the Premises for the operation of a restaurant and/or related entertainment center serving alcoholic beverages and for such other uses as are incidental to the operation thereof and "**for any other lawful retail purpose** with the prior consent of Landlord, which shall not be unreasonably withheld." (emphasis added)  Thus, even if the Executive Order issued by Governor Cuomo restricted the Debtor from fully conducting its preferred type of restaurant business at the Staten Island Premises, the Debtor was free to use the Staten Island Premises for any other lawful retail purpose, subject to the use restrictions in Exhibit F to the Lease.

23.     Thus, if the Debtor is not satisfied with the results of its restaurant operations and refuses to conduct outdoor dining, the Debtor is free to use the Staten Island Premises for

9

numerous other retail purposes which are allowed to be fully open, subject to Shore Plaza's consent, which may not be unreasonably withheld. All the Debtor had to do is ask. The Debtor can hardly argue that the purpose of the Lease has been frustrated when no provision of the Lease provides any promise that the Debtor will be able to operate its specific type of business, but merely permits operation of a "restaurant and/or related entertainment center serving alcoholic beverages, and the use clause specifically permits the Debtor to use the premises for any lawful retail use, many of which uses have been allowed to operate without restriction as essential businesses throughout the pandemic. The Debtor thus had, and will continue to have, the economic benefits of using the Staten Island Premises and must be required to pay the rent due under the Lease.

24.     The Debtor cannot only operate its restaurant, but it is also storing its merchandise and property at the premises while it waits to be able to fully reopen, and it otherwise benefits from the quiet enjoyment of its Lease on the Staten Island Premises. Debtor does not wish to surrender the Premises, which would be the proper course for a tenant claiming it cannot use the Premises, particularly for a Debtor in bankruptcy which can reject the Lease. Rather, the Debtor has, and wants to maintain, the benefits of its long term Lease, including the right to use the Premises fully in the future, but not pay for those benefits. In short, the Debtor wants the Court to award it a free option for the Staten Island Premises. In the meantime, Shore Plaza has to pay its mortgage, taxes, insurance and other expenses for the Staten Island Premises. The Debtor's Motion thus violates the terms of the Lease and is simply unfair and inequitable.

**D.      The Lease Allocates The Risk of Closure to The Debtor.**

25.     Even if, <u>arguendo</u>, the Executive Order that allegedly limits the Debtor's use of the Staten Island Premises was not foreseeable, the Lease conclusively disposes of the Debtor's frustration claim. Based on the express language of the *force majeure* provision (paragraph 24)

of the Lease, the Debtor cannot rely upon the common law doctrine of frustration of purpose. Its obligation to pay the rent is specifically not excused or delayed by the Force Majeure provision of the Lease.

26.    Further, paragraph 33 of the Lease provides that

> Tenant covenants that, during the Term, no part of the Premises of improvements thereon shall be used in any manner whatsoever in violation of the laws, ordinances, regulations, or orders of the United States or of the State, county, city or other applicable governmental subdivisions where the Premises are located. Tenant shall comply with all such laws, ordinances, regulations and orders now in effect or hereafter enacted during the Term insofar as the Premises . . ."

Lease, ¶ 33.

27.    Thus, paragraph 33 of the Lease places the onus on the Debtor to comply, at its own cost and expense, with governmental orders affecting its occupancy of the Staten Island Premises, and the Debtor cannot use the Executive Order, with which it contractually agreed to comply, as a legal excuse for its non-payment of rent.

28.    Further, Paragraph 4(b) of the Original Lease provides that all payments of rent shall be made by Tenant to Landlord without set-off or deduction, except as specifically provided otherwise in this Lease." Lease, ¶ 4(b), Exhibit A at 2. There is no provision of the Lease that specifically grants a set-off or deduction that is applicable here.

29.    Thus, the Debtor is not entitled to any rent abatement and the Debtor must continue to pay its rent. *See LIDC I v. Sunrise Mall, LLC,* 46 Misc.3d 885, 996 N.Y.S.2d 875 (Sup. Ct., Nassau Co. 2014) ("[R]ent is excepted under the leases' force majeure clause, and non-payment of rent is the stated default. It [rent] thus had to be paid.").

### E.    The Debtor Fails To Establish The Court's "Inherent" Authority To Abate The Rent

30.    The Debtor also asks the Court to abate the Debtor's obligation to pay rent based on what it asserts is the Court's "inherent" authority, yet the Court has no such inherent authority

and the Debtor's reliance on *Marrama v. Citzens Bank,* 549 U.S. 365, 172 S. Ct. 1105, 166 L. Ed. 2d 956 (2007), is misplaced.[3]

31.     The Supreme Court noted in *Marrama* that, as the Solicitor General argued in his amicus brief, "even if § 105(a) had not been enacted, the inherent power of every federal court to sanction 'abusive litigation practice' . . . might well provide adequate justification for a prompt, rather than a delayed ruling on an unmeritorious attempt to qualify as a debtor under Chapter 13." *Marrama,* 549 U.S. at 375-376, 127 S. Ct. at 1112.  From this argument in an amicus brief based on a power to sanction abusive litigation  that "*might*" have provided a justification for denial of a conversion motion "*if*" Section 105(a) did not exist, all of which is dicta, the Debtor argues here that the Court has inherent authority to allow the Debtor to ignore its contractual obligations to Shore Plaza under the Lease and not pay the rent due to Shore Plaza.

32.     In its unanimous decision in *Law v. Siegel,* 571 U.S. 415, 134 S.Ct. 1188 (2014), however, the Supreme Court specifically held that although a Bankruptcy Court "may also possess 'inherent power . . . to sanction abusive litigation practices'" . . . "in exercising those statutory and inherent powers, "a bankruptcy court may not contravene specific statutory provisions." *Law v. Siegel* 571 U.S. at 421, 134 S.Ct. at, 1194.  As the Supreme Court noted, "it is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" *Id.*  Rather, "a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." *Id.*  In this case, that specific provision is 11 U.S.C. § 365(d)(3), which specifically provides that The Debtor "shall timely perform all the obligations . . . under any unexpired lease of non-residential real property." 11 U.S.C. § 365 (d)(3).  Consequently, the Supreme Court's mandate in *Law v. Siegel*

---

[3] To the extent the Debtor seeks equitable relief, it may only do so in an adversary proceeding, not by motion in a contested matter, Fed. R. Bankr. P. 7001(7).

prohibits the Bankruptcy Court from employing any inherent authority it may have to enable the Debtor to avoid its obligation to pay rent due under the Lease.

**F.     Shore Plaza Does Not Consent To Entry Of Final Orders Or Judgments**

33.    Although the Debtor asserts that the Motion "is a core proceeding pursuant to 28 U.S.C. § 157(b)", Motion ¶8, the Motion is, at best, a non-core related proceeding and, as both a statutory and constitutional matter, the Court may not enter a final order or judgment in connection with the Motion absent Shore Plaza's consent.  Shore Plaza does not consent to the Court's exercise of the judicial power of the United States or to its entry of final orders or judgments with respect to the Motion.

**G.     The Court's Related To Jurisdiction**

34.    "Section 1334 grants the federal district courts jurisdiction over four types of bankruptcy matters: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings "arising in" a case under title 11, and (4) proceedings "related to" a case under title 11." *In re Lorax Corp.*, 295 B.R. 83, 88 (Bankr. N.D. Tex. 2003).

35.    "Civil proceedings that arise under title 11 or arise in cases under title 11 are deemed 'core' matters; while civil proceedings that are related to a title 11 case are deemed 'non-core' matters." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 704 (Bankr. W.D. Tex. 2011).  A proceeding is "related to" a bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Lorax Corp.*, 295 B.R. 83, 88 (Bankr. N.D. Tex. 2003) (internal quotations and citations omitted)).

36.    As the Fifth Circuit observed in *In re Zale Corp.*:

> [Section 1334's] reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be

13

forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*In re Legal Xtranet, Inc.*, 453 B.R. 699, 706 (Bankr. W.D. Tex. 2011)(citing *In re Zale Corp.*, 62

F.3d 746, 752 (5th Cir.1995)).

37.     In this case, "the claims . . . relating to the parties' contractual relationship fall

within the subject matter jurisdiction of federal courts under section 1334(b)'s 'related to'

prong." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 706 (Bankr. W.D. Tex. 2011).  First, Debtor is

the tenant under a long-term commercial, pre-petition lease with Shore Plaza for the Staten

Island Premises pursuant to the Lease.  Second, in its Motion, Debtor seeks an Order abating its

rent payments as a result of governmental orders or restrictions imposed by New York  State

until such restrictions or orders have been lifted.  In support of such relief, Debtor relies on the

state common law doctrines of force majeure and frustration of purpose, which the Debtor

asserts excuse it from fulfilling its obligation to pay rent to its landlords, including Shore Plaza.

The determination of the Debtor's obligations under the Lease is unquestionably a matter of New

York law, which governs the Lease.  Lease ¶38, Exhibit A at 14.

38.     Thus, the Court has "related to" jurisdiction over the contract-related state law

claims asserted by the Debtor in the Debtor's Motion.

### H.     Debtor's Motion Concerning The Lease is "Non-Core"

39.     Debtor's motion concerning its Lease with Shore Plaza is a non-core matter for

several reasons.  Although Debtor does not reference any particular subsection of 28 U.S.C.

§ 157(b), "A proceeding is not 'core' simply because it 'arguably fits within the literal wording'

of one of the listed proceedings under § 157(b)(2)." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 711

(Bankr. W.D. Tex. 2011) (citing *Hoffmeyer v. Loewen Group Int'l, Inc. (In re Loewen Group*

*Int'l, Inc.)*, 279 B.R. 471, 475 (Bankr. D.Del.2002)).

14

40.     Debtor's claims do not "arise under" a case under title 11. *See e.g.*, *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "Arising under' jurisdiction involves causes of action created or determined by a statutory provision of title 11." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "State law claims do not fall within bankruptcy court's 'arising under' jurisdiction because they do not invoke substantive rights provided by Title 11." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011)(internal quotations omitted)).

41.     Likewise, Debtor's state law claims against Shore Plaza do not "arise in" Debtor's bankruptcy "because they could (and in fact did) exist absent [Debtor's] bankruptcy filing." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 709 (Bankr. W.D. Tex. 2011). "Claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *In re Legal Xtranet, Inc.*, 453 B.R. at 709.

42.     Moreover, many courts have rejected the "attempt to incorporate . . . pre-petition causes of action, premised on state law, into the catchall provisions of 28 U.S.C. § 157(b)(2). *In re Legal Xtranet, Inc.*, 453 B.R. at 711 (citing *Peterson v. 610 West Owners Corp. (In re 610 West Owners Corp.)*, 219 B.R. 363, 372 (Bankr.S.D. N.Y.1998)). "Such an argument runs counter to Congress' intent in distinguishing core and non-core claims." *In re Legal Xtranet, Inc.*, 453 B.R. at 711 (*In re 610 West Owners Corp.*, 219 B.R. at 372)).

43.     Accordingly, the Motion is not a core proceeding but is otherwise related to a case under Title 11.[4] Consequently, the Bankruptcy Court submits these proposed findings of fact and conclusions of law to the District Court for *de novo* review. 28 U.S.C. § 157(c)(1).

---

[4] In the instant case, Shore Plaza has not filed a proof of claim, although the filing of a proof of claim would not necessarily constitute Shore Plaza's consent to entry by this Court of final orders and judgments with respect to the Motion. Even if Shore Plaza "would have to eventually file a proof of claim to preserve its rights in the bankruptcy court, that eventuality is insufficient to deem [Shore Plaza's] . . . claims core at this time." *In re Legal Xtranet, Inc.*,

I.     **As A Constitutional Matter, The Bankruptcy Court May Not Enter a Final Order Or Judgment With Respect To The Motion**

44.     Because, as described above, the rights of the Debtor and Shore Plaza under the Lease arise entirely under state law and owe no existence to Congress or any federal statute, the issues of rent abatement under the Lease raised in the Motion is entirely one of private rights. *Stern v. Marshall*, 564 U.S. 462, 493, 131 S. Ct. 2594, 2614 (2011).  Consequently, the Court lacks the constitutional authority to enter a final order or judgment with respect to the Motion. *Id.*, 564 U.S. at 502-503, 131 S. Ct. at 2620.

45.     For all the foregoing reasons, the Debtors' Motion and the relief requested therein should be **denied** as to Shore Plaza LLC, and as to the Lease between Debtor and Shore Plaza LLC concerning the property located at 1775-P South Avenue, Staten Island, New York 10314.

Dated: _____, 2020
       Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

---

453 B.R. at 712 (citing *Lennar Corp. v. Briarwood Capital LLC*, 430 B.R. 253, 265 (Bankr.S.D.Fla.2010) ("In looking at the core versus non-core nature of the removed case, the Court must look solely to the present record, not what may or may not happen in the Bankruptcy Cases."); *In re Asousa Partnership*, 264 B.R. 376, 387 (Bankr.E.D.Pa.2001) (holding that "when no proof of claim is filed, claims (or counterclaims) asserted against the debtor prepetition are not transformed into core proceedings simply because the debtor files for bankruptcy and removes them")).

16