**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CEC ENTERTAINMENT, INC., *et al.*,[1] | ) | Case No. 20-33163 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

**OBJECTION OF CBL & ASSOCIATES MANAGEMENT, INC. TO MOTION FOR ORDER AUTHORIZING DEBTORS TO ABATE RENT PAYMENTS AT STORES AFFECTED BY GOVERNMENT REGULATIONS**

CBL & Associates Management, Inc. ("CBL"), managing agent for one (1) landlord ("Landlord") hereby files its objection ("Objection") to the *Motion of Debtors For Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations* [Docket No. 487] ("Motion"), and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     The Motion, in direct contravention of the specific mandates of the Bankruptcy Code, seeks to abate the payment of over accruing postpetition rent for at least one CBL location at Friendly Center, Greensboro, North Carolina (the "Premises"). While Debtors' entertainment operations have unquestionably been negatively impacted by the COVID-19 pandemic, Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SHALL BE Hospitality Corporation (4736); SPT Distribution Company, Inc. (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

HB: 4843-5767-5976.1

seek to override both clear lease provisions and the express terms of the Bankruptcy Code, to obtain Court-authorized "equitable" abatement of rent.

2.      Not only do Debtors glaze over and ignore pertinent facts in the Motion (Debtors have been operating curbside in the Premises from the Petition Date forward),  rely on "form" lease provision in the Motion to which CBL is not a party (the Premises is not subject to the "form" *force majeure* provision cited in the Motion), and attempt to lump over one-hundred Debtor locations into the same bucket across states and leases (Landlord is only subject to the North Carolina Executive Order and has an enforceable lease with the Debtor) – Debtors also seek to override the clear mandates of Section 365(d)(3) of the Bankruptcy Code.  Debtors can cite no precedent or Code section that would allow such prejudicial and damages relief as to landlords, moreover on generic non-evidentiary statements.  This Motion is a bald attempt by Debtors to finance this case on the backs of its landlords and should be denied with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

3.      On June 24, 2020, (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On June 25, 2020, this Court entered its order authorizing the joint administration and procedural consolidation of these Chapter 11 cases. [Docket No. 9].

4.      No trustee or examiner has been appointed and Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

HB: 4843-5767-5976.1

5.      Landlords are lessors of Debtors with respect to eleven leases for restaurant and entertainment venues in ten states.[2]  It cannot be seriously questioned that each of Debtors' leases with the Objecting Landlords is a "lease of real property in a shopping center" as that term is used in Section 365(b)(3). *See In re Joshua Slocum, Ltd.,* 922 F.2d 1081, 1086-1087 (3d Cir. 1990).

6.      The Motion lists one CBL lease on its *Exhibit A,* that certain *Lease Agreement* original dated April 24, 1984, as amended, between CBL-Friendly Center CMBS, LLC and Debtor CEC Entertainment, Inc. (the "Lease").

7.      On June 29, 2020, this Court entered its *Interim Order (I) Authorizing The Debtors To Use Cash Collateral, (II) Granting Adequate Protection To The Prepetition Secured Parties, (Iii) Modifying The Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 114] (the "Interim DIP Order"). Debtors' "Initial Budget" contains a 13-week cash flow forecast through the week of September 20, 2020 that provides for the timely payment of $10.5 million per month in rent payments "for the stores [that] are assumed to remain open," commencing with the month of July 2020. [*See* Docket No. 114, Ex. A].

8.      The Court orally authorized a deferral of Debtor's requirement to pay rent pursuant to Section 365(d)(3) through August 24, 2020. [*See* Docket No. 481].

9.      The facts and circumstances supporting this Objection are set forth in the Declaration of Gary Roddy ("Roddy Decl."), which is attached hereto as **Exhibit A**.

## ARGUMENT

I.      **The Bankruptcy Code Directly Contravenes the Relief Requested in the Motion.**

---

[2] Debtor leases the following Premises in which CBL has an interest: Friendly Center in Greensboro, NC.

HB: 4843-5767-5976.1

9.      Contrary to Debtors' suggestion, Debtors find no support for such restriction on landlord remedies in 11 U.S.C. § 105(a). [*See* Docket No. 487, ¶¶ 15–16].   As the Supreme Court instructed in *Law v. Siegel*, 571 U.S. 415, 421 (2014), "[i]t is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" (*citing* 2 COLLIER ON BANKRUPTCY ¶ 105.01[2], p. 105–06 (16th ed. 2013)). Section 105(a) cannot be used to contravene Section 365(d)(3). The Fifth Circuit is in accord. *See In re Mirant Corp.*, 378 F.3d 511, 523 (5th Cir. 2004) ("A court's powers under § 105(a) are not unlimited as that section only 'authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code,' and does not permit those courts to 'act as roving commissions to do equity.'" (*quoting In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995)).

10.     With respect to unexpired leases of nonresidential real property, § 365(d)(3) is unambiguous, directing that the debtor-in-possession "*shall timely perform* all of the obligations of the debtor" after the case is filed "until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3) (emphasis added); *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001) ("The clear and express intent of § 365(d)(3) is to require the trustee to perform the lease in accordance with its terms."); *In re Pac-West TeleComm, Inc.*, 377 B.R. 119, 123 (Bankr. D. Del. 2007) ("In simpler terms, the bankruptcy trustee must fulfill any obligation that arises under a non-residential lease after the filing of the bankruptcy petition[.]"); *In re Appletree Markets, Inc.*, 139 B.R. 417, 421 (Bankr. S.D. Tex. 1992) ("The plain language of the statute is clear. Section 365(d)(3) provides for timely performance of all obligations of the debtor from and after the order for relief.").

HB: 4843-5767-5976.1

8.     As this Court noted in *In re Simbaki Ltd.*, 2015 Bankr. LEXIS 1142 *19 (Bankr. S.D. Tex. 2015), the Bankruptcy Code prohibits a bankruptcy court from extending the time for performance of rent obligations that do not arise within 60 days after the order for relief. *See* 11 U.S.C. § 365(d)(3) ("[T]he time for performance shall not be extended beyond such 60-day period.").

9.     The legislative history of § 365 suggests that the purpose of the 1984 Amendments to § 365 was "to relieve the burden placed on nonresidential real property lessors (or 'landlords') during the period between a tenant's bankruptcy petition and assumption or rejection of a lease." *Omni Partners, L.P. v. Pudgie's Development of NY, Inc. (In re Pudgie's Development of NY, Inc.*), 239 B.R. 688, 692 (S.D.N.Y. 1999) (citing 130 Cong. Rec. S8894-95 (daily ed. June 29, 1994) (statement of Sen. Hatch); *accord*, *In re Appletree Markets, Inc.*, *supra*, 139 B.R. at 419420 (discussing legislative history of 1984 amendments to § 365).

11.     The legislative history of the 1984 amendments to § 365(d)(3) has been described as "display[ing] empathy for the plight of a lessor who, unlike most postpetition creditors, is *forced to extend credit* to the bankruptcy estate for at least a limited period." *In re Brennick*, 178 B.R. 305, 307 (Bankr. D. Mass. 1995); *see also In re Best Products Co., Inc.*, 206 B.R. 404, 407 (Bankr. E.D. Va. 1997) ("Congress enacted § 365(d)(3) to guarantee that landlords would not be placed at a disadvantage for providing postpetition services to the debtor."); *In re Warehouse Club, Inc.*, 184 B.R. 316, 317 (Bankr. N.D. Ill. 1995) ("The purpose of § 365(d)(3) is to prevent landlords from becoming involuntary postpetition creditors of the bankruptcy estate.").

12.     Section 365(d)(3) is clear—prior to rejection, Debtors must pay post-petition rent of a non-residential lease.  The Supreme Court and has made clear that this Court cannot use

Section 105(a) to override such a mandate as Debtors suggest. *See Law v. Siegel,* 571 U.S. at

421.  As such, Debtors' Motion should be denied with prejudice.

## II.     The Debtors Have Been Operating in the Premises Continually Since the Petition Date.

13.     Despite statements to the contrary, the State of North Carolina has permitted carry-

out orders and interior dining (50% capacity) from the Petition Date forward. *See North Carolina*

*Executive Order No. 141* (the "Executive Order") attached hereto as **Exhibit B**.  Pursuant to the

Executive Order, Debtors have continuously operated a carryout restaurant in the Premises since

the Petition Date without interruption. *See* Roddy Decl., ¶ 8.

14.     Because Debtors have avoided paying rent for five (5) months at the Premises,

while continuing to operate in some capacity without interruption, there can be no argument that

this location has not generated revenue for Debtors. *See* Roddy Decl., ¶¶ 7–8.  Debtors have used

and continue to use the Premises for their intended benefits, including, but not limited to, storage,

food preparation, and food pick-up and delivery. *See* Roddy Decl., ¶ 11.

15.     On the other hand, Landlord has been forced to: pay its mortgagor, pay for the

Debtors' utilities, provide common area maintenance and security, among other things, at the

Premises for the direct benefit of Debtors' continuing operations. *See* Roddy Decl., ¶ 9.

16.      Despite these facts that are notably absent from the Motion, Debtors still request

complete abatement of all rent and charges, while continuing to operate in the Premises.  Debtors

have failed to offer adequate evidentiary support for the proposition that the relief requested in

the Motion is equitable, and thus the Motion should be denied.

## III.    The Lease Does Not Permit the Requested Relief, and Debtors Cite No Evidence to Support the Argument that the Lease Provides the Requested Relief.

HB: 4843-5767-5976.1

17.     In the Motion, Debtors fail to cite any evidence regarding the Lease at issue.  In fact, Debtors only cite a form *force majeure* provision with no application to the rights and obligations between Debtors and Landlord.

18.     Debtor cannot fulfil its evidentiary burden by citing a form lease provision—a provision that is not in the Lease.

19.     In part, Debtors' arguments rest on the fact that certain of the Debtors form leases contain a *force majeure* clause (the "Form Clause") that purportedly allow Debtors to avoid paying rent due to government shutdowns. [*See* Docket No. 487, ¶ 12].

20.     Although the Lease contains a force majeure provision, the Lease does not contain the language found in the Form Clause.  *See* Roddy Decl., ¶ 6.

21.     If Debtors want this Court to abate rent based on a lease provision, at the very least, Debtors must present evidence relating to the Lease. Debtors fail to do this, instead only stating in a footnote that "[a]lthough CEC's leases are too numerous to attach and cite individually, many of CEC's leases contain this exact language." [*See* Docket No. 487, ¶ 12, n. 11].

22.     Because Debtors fail to demonstrate that the Lease contains language similar to the Form Clause, Debtors fail to meet their evidentiary burden, and as such, the Motion should be denied as to the Lease.

IV.     **No Common Law Doctrine Supports the Debtors' Request for Rent Abatement and Debtors Fail to Make Any Specific Argument Regarding the Lease.**

22.     Debtors boldly assert that "common law doctrines" support rent abatement.  [*See* Docket No. 487, ¶¶ 9–11].  Debtors fail to cite a single North Carolina case indicating a common law doctrine of frustration of purpose exists in North Carolina or applies to the Lease.[3]

---

[3] The Lease contains a provision indicating that North Carolina law governs the validity, construction, and effect of the Lease. *See* Roddy Decl., ¶ 5.

23.     Moreover, even if a common law doctrine of frustration of purposes did apply—the agreed upon Lease must first be examined to determine whether the situation was contemplated. *See Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 210 (N.C. 1981). Specifically, the North Carolina Supreme Court has noted that, among other things, a tenant would be required to prove that (i) frustration of purpose under North Carolina law actually exists, and (ii) the parties have not contracted in reference to the allocation of the risk involved in the allegedly frustrating event.  *See id*.; *Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011) (stating that a party wishing to assert a frustration defense must prove that, among other things, there was an implied condition in the contract that a changed condition would excuse performance and that the changed condition was not reasonably foreseeable). Further, applicable state law requires enforcement of a contractual provision which specifies the allocation of risk over common law principles of impossibility and/or frustration of purpose. *See Brenner*, 302 N.C. at 210.

24.     Debtors attempts to paint a broad brush on what must be Lease-specific relief once again fails to meet the required evidentiary burden to support such dramatic relief.  Debtors' Motion simply ignores the Lease language negotiated at arms' length between the parties. The Motion also ignores the magnitude and impact of rent abatement on landlords, who must continue to pay the operating costs and debt service associated with their properties. As such, Debtors motion should be denied.

### V.     The Motion is not Properly Brought under the Federal Rules of Bankruptcy Procedure.

25.     Federal Rule of Bankruptcy Procedure 7001(7) requires that a "proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief" be brought as an adversary proceeding.  Further,

8

Federal Rule of Bankruptcy Procedure 7001(9) requires "a proceeding to obtain a declaratory judgment relating to any of the foregoing."

26.    The Motion requests equitable relief as to the Lease.  Debtor only cites generic "common law" principles and Section 105(a) in support of its motion. The Lease is only referenced in an exhibit to the Motion, and no specific evidence is presented as to the Lease or the applicable language in the Lease.

27.    Calling this a contested matter under Rule 9014, is not sufficient – when the relief requested is equitable and declaratory as to the Lease.   For example, in *In re Tucker*, the Court held that the relief requested by a Debtor as to a lease to controvert Section 362(b)(22) was procedurally defective, just as the Debtors are attempting to controvert Section 365(d)(3) here. *See In re Tucker*, 2005 WL 5607595, at *1 (Bankr. N.D. Ga. Nov. 18, 2005).  A Debtor requesting injunctive relief must bring such request as in an adversary proceeding. *See id.*; *see also Matter of Zale Corp.,* 62 F.3d 746, 764 (5th Cir.1995); *In re Conxus Communications, Inc.,* 262 B.R. 893 (D. Del. 2001) (reversing bankruptcy court's entry of injunction, noting that the movant's failure "to file the required adversary proceeding was alone sufficient reason for the Bankruptcy Court to deny [Movant's] request for an injunction").

28.    If Debtors desire equitable relief as to the Lease, the Debtors are required to file an adversary proceeding.

29.    As such, the Motion should be denied on procedural grounds, in addition to the substantive grounds listed herein.

## **RESERVATION OF RIGHTS**

30.    CBL reserves its respective rights to further object to the relief sought by the Motion based upon any new information provided by Debtors or upon any different relief requested by Debtors.

## JOINDER

31.     To the extent consistent with the foregoing, CBL joins in the objections of Debtors' other landlords to the Motion.

## CONCLUSION

32.     The Motion, in direct contravention of the specific mandates of the Bankruptcy Code, seeks to abate the payment of postpetition rent for the Premises. While Debtors' dining and entertainment operations have unquestionably been negatively impacted by the COVID-19 pandemic, Debtors seek to override both clear lease provisions and the express terms of the Bankruptcy Code without authority to obtain Court-sanctioned rent abatement.  The Court should deny the Motion with prejudice and require Debtors to timely pay rent and charges to CBL pursuant to Section 365(d)(3).

Dated: August 21, 2020.                    Respectfully Submitted,

*/s/ Buffey E. Klein*
Buffey E. Klein
State Bar No. 24032515
Buffey.Klein@huschblackwell.com
HUSCH BLACKWELL LLP
1900 N Pearl Street, Suite 1800
Dallas, Texas 75201
(214) 999-6100
(214) 999-6170 Facsimile

ATTORNEYS FOR CBL & ASSOCIATES
MANAGEMENT, INC.

HB: 4843-5767-5976.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2020 a true and correct copy of the foregoing was served by CM/ECF to those participating in the Court's ECF notification system.

<div align="center" style="margin-left:40%">

*/s/ Buffey E. Klein*
Buffey E. Klein

</div>

HB: 4843-5767-5976.1

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CEC ENTERTAINMENT, INC., *et al.*,[1] | ) | Case No. 20-33163 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF GARY RODDY IN SUPPORT OF OBJECTION OF CBL & ASSOCIATES MANAGEMENT, INC. TO MOTION FOR ORDER AUTHORIZING DEBTORS TO ABATE RENT PAYMENTS AT STORES AFFECTED BY GOVERNMENT REGULATIONS

I, Gary Roddy, declare as follows:

1.      I am an adult, over the age of eighteen (18) years, and of sound mind.  I make the following Declaration from my own personal knowledge.  If called to testify hereabout, I could and would do so competently.

2.      I am currently the Vice President of Legal Collections for CBL & Associates Management, Inc. ("CBL").  I am personally familiar with CBL's business operations and its business records including, but not limited to, those operations and records that pertain to this bankruptcy case.

3.      CBL is the managing agent for CBL-Friendly Center CMBS, LLC ("Landlord").

4.      Landlord entered into that certain *Lease Agreement* original dated April 24, 1984, as amended (the "Lease"), with Debtor CEC Entertainment, Inc. ("Debtor") for certain premises

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SHALL BE Hospitality Corporation (4736); SPT Distribution Company, Inc. (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

HB: 4828-8298-6952.1

located at Friendly Center, Greensboro, North Carolina (the "Premises").

5.      The Lease contains a provision stating that North Carolina law governs the validity, construction, and effect of the Lease.

6.      The Lease contains a force majeure provision with language that differs from the language provided in paragraph 12 of the Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations.

7.      Debtor has failed to pay rent due and owing pursuant to the Lease since April 2020.

8.      Since June 24, 2020, Debtor has continued business operations in the Premises in some capacity without interruption.

9.      Since June 24, 2020, Landlord's obligations to pay its mortgage, utilities, common area maintenance and security for the Premises have continued.

10.     Landlord's payment of these obligations directly benefits Debtor.

11.     Specifically, Debtor continues to use the Premises for its intended benefits including, but not limited to, storage, food preparation, and food pick-up and delivery.

I declare under penalty of perjury under the laws of Tennessee and the United States that the foregoing is true and correct and that this Declaration was executed as of the date shown below at Chattanooga, Hamilton County, Tennessee.

DATE:   ___8|20|2020___

_____
GARY RODDY
Vice President – Legal Collections
CBL & Associates Management, Inc.

HB: 4828-8298-6952.1

# EXHIBIT B



# State of North Carolina

## ROY COOPER
GOVERNOR

May 20, 2020

EXECUTIVE ORDER NO. 141

EASING RESTRICTIONS ON TRAVEL, BUSINESS OPERATIONS,
AND MASS GATHERINGS:  PHASE 2

**WHEREAS**, on March 10, 2020, the undersigned issued Executive Order No. 116 which declared a State of Emergency to coordinate the State's response and protective actions to address the Coronavirus Disease 2019 ("COVID-19") public health emergency and provide for the health, safety, and welfare of residents and visitors located in North Carolina; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic; and

**WHEREAS**, on March 13, 2020, the President of the United States issued an emergency declaration for all states, tribes, territories, and the District of Columbia, retroactive to March 1, 2020, and the President declared that the COVID-19 pandemic in the United States constitutes a national emergency; and

**WHEREAS**, on March 25, 2020, the President approved a Major Disaster Declaration, FEMA-4487-DR, for the State of North Carolina; and

**WHEREAS**, in responding to the COVID-19 pandemic, and for the purpose of protecting the health, safety, and welfare of the people of North Carolina, the undersigned has issued Executive Order Nos. 116-122, 124-125, 129-131, 133-136, and 138-140; and

**WHEREAS**, more than twenty thousand people in North Carolina have had laboratory-confirmed cases of COVID-19, and hundreds of people in North Carolina have died from the disease; and

**WHEREAS**, hospital administrators and health care providers have expressed concerns that unless the spread of COVID-19 is limited, existing health care facilities may be insufficient to care for those who become sick; and

**WHEREAS,** the undersigned and the Secretary of Health and Human Services have directed hospitals, physicians' practices, and other health care entities to undertake significant actions as part of North Carolina's emergency response to address the COVID-19 pandemic; and

**WHEREAS**, slowing and controlling community spread of COVID-19 is critical to ensuring that the state's healthcare facilities remain able to accommodate those who require medical assistance; and

**WHEREAS**, the continued community spread of COVID-19 within North Carolina requires the state to continue some measures to slow the spread of this virus during the pandemic; and

**WHEREAS**, since the issuance of executive orders to slow the spread of COVID-19, North Carolina has "flattened the curve" and prevented a surge or spike in cases across the state, and North Carolina has also increased its capacity for testing, tracing and the availability of personal protective equipment ("PPE"); and

**WHEREAS**, despite the overall stability in key metrics, North Carolina's daily case counts of COVID-19 continue to increase slightly in the context of increased testing, demonstrating the state must remain vigilant in its work to slow the spread of the virus; and

**WHEREAS**, should there be an increase in the percentage of emergency department visits that are due to COVID-19 like illness, an increase in the number of laboratory-confirmed cases, an increase in the positive tests as a percent of total tests, an increase in COVID-19-related hospitalizations that threaten the ability of the health care system to properly respond, or should the State's ability to conduct testing and tracing be compromised, it may be necessary to reinstate certain restrictions eased by this Executive Order so as to protect the health, safety, and welfare of North Carolinians; and

**WHEREAS**, the risk of contracting and transmitting COVID-19 is higher in settings that are indoors, where air does not circulate freely and where people are less likely to maintain social distancing by staying six (6) feet apart; and

**WHEREAS**, the risk of contracting and transmitting COVID-19 is higher in settings where people are stationary and in close contact for long periods of time; and

**WHEREAS**, the risk of contracting and transmitting COVID-19 is higher in gatherings of larger groups of people because these gatherings offer more opportunity for person-to-person contact with someone infected with COVID-19; and

**WHEREAS**, to lower the risk of contracting and transmitting COVID-19, this Executive Order imposes restrictions on businesses that limit the number of contacts between people, particularly in settings that are indoors, involve people being stationary and in close contact for long periods of time, or are part of mass gatherings; and

**WHEREAS,** certain types of businesses by their very nature present greater risks of the spread of COVID-19 because of the nature of the activity, the way that people have traditionally acted and interacted with each other in that space, and the duration that patrons stay in the establishment; and

**WHEREAS**, people in North Carolina are encouraged to use a cloth face covering to reduce the spread of COVID-19, but some populations may experience increased anxiety and fear of bias and being profiled if wearing face coverings in public spaces; and

**WHEREAS**, if someone is the target of ethnic or racial intimidation as the result of adhering to the mask provision or as a result of the pandemic, they are encouraged to report the matter to law enforcement or another government entity; and

**WHEREAS,** people in North Carolina must remain flexible to account for the evolving nature and scope of the public health emergency posed by COVID-19, and also return to—in a safe, strategic, and incremental manner—their normal personal and professional activities, to the extent public health circumstances permit; and

**WHEREAS,** people in North Carolina are encouraged to take on the challenges of living in a community beset by a global pandemic, while also returning to school, work, and social activities in a safe, strategic and incremental manner to help reduce the risk of COVID-19 transmission; and

**WHEREAS,** businesses that are open during the duration of this Executive Order are encouraged to follow the Guidelines for Businesses published by the North Carolina Department of Health and Human Services ("NCDHHS"), available electronically on its website; and

**WHEREAS,** food service and food availability remain an important component of North Carolina's response to the COVID-19 pandemic, such that food service providers, including restaurants and other dine-in facilities are encouraged to open to the extent practicable to safely provide food and nutrition to people in North Carolina; and

**WHEREAS,** it is in the interest of the State of North Carolina to provide as many viable avenues as practicable for North Carolina agricultural products to be consumed in-state in order to avoid unnecessary waste in the production of food; and

**WHEREAS,** the closure of on-premises dining in restaurants has significantly curtailed demand for food sold by restaurants and, therefore, disproportionately harmed workers, farms, and businesses involved in the sale of food through the restaurant supply chain and led to the waste of food produced by such workers, farms, and businesses; and

**WHEREAS,** because restaurants and grocery stores are served by different supply chains that cannot always be rapidly adjusted, the closure of on-premises dining in restaurants has shifted food demand to grocery stores, taxing the supply chain for grocery stores and leading to higher grocery prices for consumers; and

**WHEREAS,** reopening restaurants for on-premises dining in a safe, strategic manner should ameliorate the adverse economic effects on workers, farms, and businesses involved in the sale of food through the restaurant supply chain, prevent the waste of food, and reduce stress on the supply chain for grocery stores, thereby lowering grocery prices for consumers; and

**WHEREAS,** despite the unprecedented nature of the COVID-19 pandemic, people in North Carolina should have the opportunity to enjoy performing arts and competitive sporting events broadcast into their homes; and

**WHEREAS,** as long as progress continues to be met on the COVID-19 metrics, and as long as health care systems continue to be projected to have sufficient capacity for patient care, commerce that does not raise unreasonable risks of COVID-19 spread may be reopened; and

**WHEREAS,** with public health requirements in place and face coverings more readily available, personal care, grooming, and tattoo businesses may be reopened in a safe, strategic manner without raising unreasonable risk of COVID-19 spread; and

**WHEREAS,** Executive Order No. 116 invoked the Emergency Management Act, and authorizes the undersigned to exercise the powers and duties set forth therein to direct and aid in the response to, recovery from, and mitigation against emergencies; and

**WHEREAS,** pursuant to N.C. Gen. Stat. § 166A-19.10(b)(2), the undersigned may make, amend, or rescind necessary orders, rules, and regulations within the limits of the authority conferred upon the Governor in the Emergency Management Act; and

**WHEREAS,** N.C. Gen. Stat. § 166A-19.10(b)(3) authorizes and empowers the undersigned to delegate Gubernatorial vested authority under the Emergency Management Act and to provide for the sub-delegation of that authority; and

**WHEREAS,** N.C. Gen. Stat. § 166A-19.10(b)(4) gives the undersigned the authority to "cooperate and coordinate" with the President of the United States; and

**WHEREAS,** pursuant to N.C. Gen. Stat. § 166A-19.12(3)(e), the Division of Emergency Management must coordinate with the State Health Director to revise the North Carolina Emergency Operations Plan as conditions change, including making revisions to set "the appropriate conditions for quarantine and isolation in order to prevent the further transmission of disease," and following this coordination, the Emergency Management Director and the State

Health Director have recommended that the Governor develop and order the plan and actions identified in this Executive Order; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.23 in conjunction with N.C. Gen. Stat. §§ 75-37 and 75-38, the undersigned may issue a declaration that shall trigger the prohibitions against excessive pricing during states of disaster, states of emergency or abnormal market disruptions; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(1), the undersigned may utilize all available state resources as reasonably necessary to cope with an emergency, including the transfer and direction of personnel or functions of state agencies or units thereof for the purpose of performing or facilitating emergency services; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the undersigned may take such action and give such directions to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of the Emergency Management Act and with the orders, rules, and regulations made thereunder; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(i), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because not all local authorities have enacted such appropriate ordinances or issued such appropriate declarations restricting the operation of businesses and limiting person-to-person contact, thus needed control cannot be imposed locally; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(ii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because some but not all local authorities have taken implementing steps under such ordinances or declarations, if enacted or declared, in order to effectuate control over the emergency that has arisen; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because the area in which the emergency exists spreads across local jurisdictional boundaries and the legal control measures of the jurisdictions are conflicting or uncoordinated to the extent that efforts to protect life and property are, or unquestionably will be, severely hampered; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iv), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection of lives and property of North Carolinians because the scale of the emergency is so great that it exceeds the capability of local authorities to cope with it; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(1) authorizes the undersigned to prohibit and restrict the movement of people in public places; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(2) authorizes the undersigned to prohibit and restrict the operation of offices, business establishments, and other places to and from which people may travel or at which they may congregate; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(5) authorizes the undersigned to prohibit and restrict other activities or conditions, the control of which may be reasonably necessary to maintain order and protect lives or property during a state of emergency; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(1), when the undersigned imposes the prohibitions and restrictions enumerated in N.C. Gen. Stat. § 166A-19.31(b), the

undersigned may amend or rescind the prohibitions and restrictions imposed by local authorities; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), during a Gubernatorially declared State of Emergency, the undersigned has the power to "give such directions to State and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this Article."

**NOW, THEREFORE**, by the authority vested in me as Governor by the Constitution and the laws of the State of North Carolina, **IT IS ORDERED**:

**Section 1. Definitions**.  In this Executive Order:

1.  "Bars" means establishments that are not eating establishments or restaurants as defined in N.C. Gen. Stat. §§ 18B-1000(2) and 18B-1000(6), that have a permit to sell alcoholic beverages for onsite consumption under N.C. Gen. Stat. § 18B-1001, and that are principally engaged in the business of selling alcoholic beverages for onsite consumption.

2.  "Core Signage, Screening, and Sanitation Requirements" are the following actions which establishments open to the public under the terms of this Executive Order must follow, namely:

    a.  Post the Emergency Maximum Occupancy in a noticeable place.

    b.  Post signage reminding attendees, customers, and workers about social distancing (staying at least six (6) feet away from others) and requesting that people who have been symptomatic with fever and/or cough not enter.

    c.  Conduct daily symptom screening of workers, using a standard interview questionnaire of symptoms, before workers enter the workplace.

    d.  Immediately isolate and remove sick workers.

    e.  Perform frequent and routine environmental cleaning and disinfection of high-touch areas with an EPA-approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19).

    NCDHHS has prepared sample signs and a sample screening checklist questionnaire, available at https://covid19.ncdhhs.gov/guidance, that may be used to meet some of the requirements above.  Businesses or operations do not need to use the NCDHHS sample signs and questionnaires to meet the requirements of this Executive Order.

3.  "Emergency Maximum Occupancy" is defined in Section 6.

4.  "Face Covering" means a covering of the nose and mouth by wearing a covering or mask for the purpose of ensuring the physical health or safety of the wearer or others as defined in Session Law 2020-3 s. 4.3(a).  In the context of the COVID-19 emergency, the Face Covering works to protect other people more than the wearer.

5.  "Personal Care, Grooming, and Tattoo Businesses" means businesses that (a) do not provide health care services; and (b) either (i) have workers directly touch customers or (ii) have a piece of equipment (other than a touchscreen) repeatedly come into contact directly with customers' skin.  This includes, but is not limited to, barber shops, beauty salons (including but not limited to waxing and hair removal centers), hair salons, nail salons, manicure or pedicure providers, tattoo parlors, tanning salons, and massage therapists.

6.  "Recommendations to Promote Social Distancing and Reduce Transmission" are defined in Section 3(B) below.

7. "<u>Restaurants</u>" means permitted food establishments, under N.C. Gen. Stat. § 130A-248, and other establishments that both prepare and serve food. This includes, but is not limited to, restaurants, cafeterias, food halls, dining halls, food courts, and food kiosks. This includes not only free-standing locations but also locations within other businesses or facilities, including, but not limited to airports, shopping centers, educational institutions, or private or members-only clubs where food and beverages are permitted to be consumed on premises.

8. "<u>Retail Business</u>" means any business in which customers enter a space to purchase goods or services, including but not limited to grocery stores, convenience stores, large-format retail stores, pharmacies, banks, and ABC stores. This also includes, but is not limited to, (i) retail establishments operated by the state, its political subdivisions, or agencies thereof, and (ii) state agencies under the jurisdiction of the undersigned which have a public-facing component offering a service, such as the Division of Motor Vehicles, the Department of Revenue, and shops in Department of Natural and Cultural Resources facilities.

**Section 2.  High-Risk Individuals Encouraged to Stay at Home.**

People who are at high risk of severe illness from COVID-19 are very strongly encouraged to stay home and travel only for absolutely essential purposes. The Centers for Disease Control and Prevention ("CDC") defines high-risk individuals as people 65 years or older **and people of any age who have serious underlying medical conditions**, including people who are immunocompromised or who have chronic lung disease, moderate-to-severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, or liver disease.

**Section 3.  Activities Outside the Home.**

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Stay at Home Order Lifted**. The Stay at Home Order in Executive Order No. 138 is lifted. Individuals are strongly encouraged to telework to the greatest extent permissible by their employer.

B. **Follow the Recommendations to Promote Social Distancing and Reduce Transmission**. When people are outside their homes, they are strongly encouraged to take the following Recommendations to Promote Social Distancing and Reduce Transmission:

1. Maintain at least six (6) feet social distancing from other individuals, with the exception of family or household members.

2. Wear a cloth Face Covering when leaving home and wear it inside all public settings such as grocery stores, pharmacies, or other retail or public-serving businesses. A Face Covering should also be worn outdoors when you cannot maintain at least six (6) feet distancing from other people with the exception of family or household members. These coverings function to protect other people more than the wearer.

3. Carry hand sanitizer with you when leaving home, and use it frequently.

4. Wash hands using soap and water for at least twenty (20) seconds as frequently as possible.

5. Regularly clean high-touch surfaces such as steering wheels, wallets, and phones.

6. Stay at home if sick.

**Section 4.  Exemptions from This Executive Order.**

Worship, religious, and spiritual gatherings, funeral ceremonies, wedding ceremonies, and other activities constituting the exercise of First Amendment rights are exempt from all the

requirements of this Executive Order and Executive Order Nos. 121 and 138, notwithstanding any other provision of this Executive Order or of Executive Order Nos. 121 and 138.

The undersigned strongly urges that entities and individuals engaging in these exempted activities follow the Recommendations to Promote Social Distancing and Reduce Transmission, avoid exceeding Emergency Maximum Occupancy in the places where they meet, and avoid holding Mass Gatherings.

**Section 5.  Structure of This Executive Order.**

The restrictions in this Executive Order are tailored for particular situations where COVID-19 can spread.  As a result, the restrictions in this Executive Order fall into three categories:

- Section 6 establishes restrictions for certain listed kinds of businesses and operations.  The restrictions in this Section ensure that there is not overcrowding and spread people out in each space to reduce the risk from COVID-19.

- Section 7 establishes a Mass Gathering limit.  This limit controls the risk of COVID-19 spread in events or convenings that are not covered by the specific restrictions in Section 6.

- Section 8 keeps closed certain kinds of businesses and operations because those types of businesses, by their very nature, present greater risks of the spread of COVID-19.  These greater risks are due to factors such as people traditionally interacting in that space in a way that would spread COVID-19, shared equipment that is repeatedly touched by customers or attendees, or a business model that involves customers or attendees remaining in a confined indoor space over a sustained period.

**Section 6.  Restrictions on Certain Businesses and Operations**.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Prohibition.** To control the spread of COVID-19 and protect lives during the State of Emergency, this Section lists restrictions on the operations of business establishments and other places to or from which people may travel or at which they may congregate.  Businesses or operations within the scope of this Section are prohibited from operating unless they follow the restrictions stated in this Section.

B. **Retail Businesses**.

1. **Requirements for Retail Businesses**.  While this Executive Order is in effect, all open Retail Businesses must do all of the following.

   a. Limit customers inside the store to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a Retail Business is the <u>lowest</u> number produced by applying the following two tests:

      i. Limit the number of customers in the store to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

      ii. Limit the number of people in the store so that everyone can stay six (6) feet apart.

   b. Mark six (6) feet of spacing in lines at point of sale and in other high-traffic areas for customers, such as at deli counters and near high-demand products.

   c. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

C. **Restaurants**.

1. **Restaurants May Open for On-Premises Service.** During the effective period of this Executive Order, restaurants may allow on-premises consumption of food and beverages. Restaurants must meet the sanitation requirements of this Section even if they are open only for take-out or delivery service.

2. **Requirements**. While this Executive Order is in effect, all open restaurants must do all of the following:

   a. Limit customers in indoor and outdoor seating areas to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a restaurant is the <u>lowest</u> number produced by applying the following three tests:

      i. Limit the number of customers in the restaurant to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

      ii. Limit the number of people in the space so that groups can stay six (6) feet apart.

      iii. Arrange the restaurant so that customers sitting at a table are not within six (6) feet of any customers sitting at another table. Moreover, each group of customers sitting at a counter should be separated from other groups by six (6) feet.

   b. Limit customers at tables so that no more than ten (10) people shall be seated together at the same table. However, more than ten (10) people may sit together at the same table if they are members of the same household.

   c. Workers in Restaurants are strongly encouraged to wear Face Coverings when they are within six (6) feet of another person. Notwithstanding this general rule, people whose religious beliefs prevent them from wearing a Face Covering, people who cannot wear a Face Covering due to a medical or behavioral health condition, and people who are under twelve (12) years of age are excepted from the requirement to wear a Face Covering. Children under two (2) years of age shall not wear a Face Covering so that their breathing may not be inhibited.

   d. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order, along with the following additional requirements:

      i. Increase disinfection during peak times or high customer density times, and disinfect all shared objects (e.g., dining tables, booths, counters, payment terminals, tables, countertops/bars, receipt trays, condiment holders, and reusable menus) between each use.

      ii. Promote frequent use of hand-washing and hand sanitizer for wait staff and food service staff throughout the shift and upon reporting to work. Hand washing must at least meet the requirements specified in the North Carolina Food Code Manual.

   e. Mark six (6) feet of spacing in lines at high-traffic areas for customers, such as a cash register or place where customers wait to be seated at their table.

3. **Clarifications**. People sitting at a table need not be members of the same household and do not need to stay six (6) feet apart. Moreover, this Executive Order does not require servers and wait staff to stay six (6) feet away from customers.

4. **Miscellaneous.** A restaurant that operates consistent with the terms of this Subsection of this Executive Order shall continue to be considered an "Essential Business" for the purpose of N.C. Sess. L. 2020-03, Sec. 4.14(a) to the extent that COVID-19-related claims are made against the restaurant.

D. **Personal Care, Grooming, and Tattoo Businesses**.

1. **Personal Care, Grooming, and Tattoo Businesses May Open.** During the effective period of this Executive Order, Personal Care, Grooming, and Tattoo Businesses may operate, but must be in compliance with this Section.

2. **Requirements**. While this Executive Order is in effect, all open Personal Care, Grooming, and Tattoo Businesses must do all of the following:

   a. Limit customers inside the store to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a Personal Care, Grooming, and Tattoo Business is the <u>lowest</u> number produced by applying the following two tests:

      i. Limit the number of customers in the store to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

      ii. Limit the number of people in the store so that patrons can stay six (6) feet apart.

   b. Arrange seating so that groups of customers are separated from one another by six (6) feet.

   c. Workers in Personal Care, Grooming, and Tattoo Businesses shall wear Face Coverings when they are within six (6) feet of another person. Notwithstanding this general requirement, people whose religious beliefs prevent them from wearing a Face Covering, people who cannot wear a Face Covering due to a medical or behavioral condition, and people who are under twelve (12) years of age are excepted from the requirement to wear a Face Covering. Children under two (2) years of age shall not wear a Face Covering so that their breathing may not be inhibited.

   d. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order, except for the requirement to have signage remind people about staying six (6) feet apart.

   e. Ensure that all equipment that comes into direct personal contact with customers and all furniture in service areas (such as chairs, capes, and the shampooing area in a barber shop or salon) is completely cleaned and disinfected between each customer.

   f. Mark six (6) feet of spacing in lines at point of sale and in other high-traffic areas for customers, such as at cash registers and waiting areas.

3. **Recommendation**. Patrons in Personal Care, Grooming, and Tattoo Businesses are strongly encouraged to wear Face Coverings when they are within six (6) feet of another person, unless they cannot wear Face Coverings due to religious beliefs, age, or a medical or behavioral health condition.

E. **Pools**.

1. **Indoor and Outdoor Pools May Open.** During the effective period of this Executive Order, indoor or outdoor pool facilities (whether stand-alone or part of other facilities) may operate, but must be in compliance with this Subsection.

2. **Requirements**. While this Executive Order is in effect, all open pool facilities must do all of the following:

   a. Limit the user capacity in the pool to no more than 50% of maximum occupancy as determined by fire code (or, when fire code number is not known, thirty-three (33) people per one thousand (1000) square feet in deck areas, wading pools and splash pads), and a maximum occupancy in the water of ten (10) people per one thousand (1000) square feet. This user capacity is the Emergency Maximum Occupancy for the pool facility.

   b. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

3. This Subsection applies only to shared pools in commercial settings or at residential complexes. It does not apply to family pools at people's homes.

F. **Child Care Facilities**.

1. **Child Care Facilities May Open and May Serve All Children.** Child care facilities may open or reopen, and they may serve all children in North Carolina. All references to "covered children" in Executive Order Nos. 130 and 138 shall refer to all children.

2. **Requirements**. Child care facilities that are open or reopened consistent with the Executive Order must abide by the following requirements:

   a. Follow all applicable NCDHHS guidelines.

   b. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

   c. Conduct a daily health screening on all individuals who are entering the building.

   d. Immediately isolate sick workers and children from the rest of the facility and send them home.

   e. Have a plan to work with local health departments to identify close contacts of confirmed cases in the child care setting.

   f. Before reopening, child care facilities shall submit to NCDHHS the Emergency Child Care Provider Application. NCDHHS must approve the Emergency Child Care Provider Application before the child care facility can reopen.

3. **Relationship to Previous Executive Orders**. Subdivisions 1 and 2(a) of this Subsection completely replace Subsections (C) and (D) of Section 2 of Executive Order No. 130. Otherwise, Section 2 of Executive Order No. 130 and Section 3 of Executive Order No. 139 shall remain in effect through 5:00 pm on June 26, 2020. The effective date provisions of those Executive Orders are amended accordingly.

G. **Day Camps and Overnight Camps**.

1. **Requirements for Day Camps**.

   a. Follow all applicable NCDHHS guidelines.

b.  Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

c.  Conduct a daily health screening on all individuals who are entering the building.

d.  Immediately isolate sick workers and children from the rest of the facility and send them home.

e.  Public schools operating day camps and programs may open for the purpose of the day camp or program, but must otherwise remain closed to the general public.

f.  Have a plan to work with local health departments to identify close contacts of confirmed cases in the camp setting.

2.  **Requirements for Overnight Camps.**

a.  Follow all applicable NCDHHS guidelines.

b.  Conduct daily symptom screening of workers.

c.  Immediately isolate sick campers and staff away from others.

d.  If a camper or staff member has been diagnosed with COVID-19 or is presumed positive by a medical professional due to symptoms, the camper or staff member should be isolated away from other campers and staff until they meet the CDC criteria for release from isolation:

i.  No fever for at least 72 hours since recovery (without the use of fever-reducing medicine); and
ii. Other symptoms have improved (e.g., coughing, shortness of breath); and
iii. At least ten (10) days have passed since first symptoms.

e.  Have a plan to work with local health departments to identify close contacts of confirmed cases in a camp setting

f.  Perform ongoing and routine environmental cleaning and disinfection of high-touch areas (e.g., doors, doorknobs, rails) with an EPA approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19), increasing disinfection during peak times or high camper density times.

3.  Programs and camps for adults are not covered by this Section.

**Section 7.  Mass Gatherings.**

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A.  **Prohibition on Mass Gatherings.**

1.  **Prohibition**.  Mass Gatherings are prohibited.  "Mass Gathering" means an event or convening that brings together more than ten (10) people indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space, such as an auditorium, stadium, arena, or meeting hall.  This includes parades, fairs, and festivals.  In publicly accessible indoor facilities, the Mass Gathering limit applies per room of the facility.  A household where more than ten (10) people reside is not a Mass Gathering.

The outdoor Mass Gathering limit of twenty-five (25) people applies to groups of people that may gather together in a park, and on a beach or trail.

2. **Exceptions from Prohibition on Mass Gatherings.** Notwithstanding Subsection (A)(1) above:

   a. The prohibition on Mass Gatherings does not apply to any of the restricted businesses and operations identified in Section 6 of this Executive Order, because in those situations, transmission of COVID-19 will be controlled through the measures specifically tailored for each situation that are listed in those Sections. The prohibition on Mass Gatherings also does not apply to educational institutions or government operations.

   b. The prohibition on Mass Gatherings does not include gatherings for health and safety, to look for and obtain goods and services, for work, or for receiving governmental services. A Mass Gathering does not include normal operations at airports, bus and train stations or stops, medical facilities, libraries, shopping malls, and shopping centers. However, in those settings, people must follow the Recommendations to Promote Social Distancing and Reduce Transmission as much as possible, and they should circulate within the space so that there is no sustained contact between people.

B. **Parks, Trails, and Beaches**.

   1. Each group of people within a park, trail, or beach must be limited so that the group, counted on its own, does not exceed the Mass Gathering limit.

   2. All operators of open public or private parks must meet the following requirements:

      a. Post signage reminding attendees, customers, and workers about social distancing (staying at least six (6) feet away from others) and requesting that people who have been symptomatic with fever and/or cough not enter.

      b. Conduct daily symptom screening of workers, using a standard interview questionnaire of symptoms, before workers enter the workplace.

      c. Immediately isolate and remove sick workers.

      d. Perform frequent and routine environmental cleaning and disinfection of high-touch areas with an EPA-approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19).

   3. **Public Playgrounds Remain Closed**. Because public playground equipment may increase spread of COVID-19, public playgrounds will remain closed during the effective phase of this Executive Order, including public playground equipment located in parks.

C. **Drive-ins**. Events are not prohibited Mass Gatherings if the participants all stay within their cars, such as at a drive-in movie theater.

D. **Households**. A household where more than ten (10) people reside is not a Mass Gathering.

**Section 8.  Orders of Closure**.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Entertainment and Fitness Facilities**.

   1. In addition to the restrictions on Mass Gatherings identified in Section 7 of this Executive Order, the following entertainment and fitness facilities that operate within a confined indoor or outdoor space and do not offer a retail or dining component are ordered to close. Any retail or dining component within the following entertainment and fitness facilities may operate solely for retail or dining, but those components must comply with the restrictions set out in Section 6 of this Executive Order.

2. Entertainment and fitness facilities restricted by this Subsection include, but are not limited to, the following types of business:

- Bingo Parlors, including bingo sites operated by charitable organizations
- Bowling Alleys
- Indoor Exercise Facilities (e.g., yoga studios, dance studios, martial arts facilities, indoor trampoline and rock climbing facilities)
- Gyms
- Indoor Fitness Facilities, including but not limited to indoor basketball courts, volleyball courts, racquetball courts, squash courts, and tennis courts
- Health Clubs and Fitness Centers
- Movie Theaters
- Skating Rinks
- Gaming and business establishments which allow gaming activities (e.g., video poker, gaming, sweepstakes, video games, arcade games, pinball machines or other computer, electronic or mechanical devices played for amusement)
- Venues for Receptions or Parties
- Museums
- Amusement Parks
- Bars
- Night Clubs, Dance Halls, or Music Halls where patrons are not seated.

B. **Limitations of this Executive Order**. This Executive Order solely directs that bars are not to serve alcoholic beverages for onsite consumption, and this Executive Order does not direct the closure of retail beverage venues that provide for the sale of beer, wine, and liquor for off-site consumption only. It also does not require the closure of production operations at breweries, wineries, or distilleries.

C. **Training of Professional and Collegiate Athletes**. Professional athletes and athletes performing on an agreement with an educational institution to receive a scholarship or other benefit may train within indoor fitness facilities that otherwise would be closed under Subsection A above, provided they do not exceed the Mass Gathering limit.

D. **ABC Commission**. If the Alcoholic Beverage Control Commission (the "ABC Commission") identifies other state laws, regulations, and policies that may affect bars, restaurants, and other dining establishments identified in this Executive Order, it is directed to inform the Office of the Governor in writing. Upon written authorization from the Office of the Governor, the ABC Commission may interpret flexibly, modify, or waive those state laws, regulations and policies, as appropriate, and to the maximum extent permitted under applicable state and federal law, to effectuate the purposes of this Executive Order.

**Section 9. Entertainment and Sporting Events in Large Venues.**

A. **Intent**. The intent of this Section is to permit venues to hold sporting or entertainment events, for the recording of and broadcast to the public, if the venue is of sufficient size to allow people to flow in and out of the venue in a way that would avoid creating a risk of spreading COVID-19.

B. **Exception**. Therefore, as an exception to the closure of entertainment and fitness facilities in Section 8 above, an entertainment or sporting venue with at least two entrances and exits and a stated fire capacity of at least five hundred (500) may hold a performance by entertainers, performers, or athletes. The venue must control the flow of people through lobbies and other common spaces to allow social distancing and avoid the spread of COVID-19.

C. **Treatment under Mass Gathering Limit**. In this situation, and only in this situation: (1) entertainers, performers, and athletes, along with coaches, training, support, and broadcast staff, shall not count toward the Mass Gathering limit and (2) employees and other workers at facilities where entertainment and sporting events occur also shall not count toward the Mass Gathering limit.

D. **Restrictions on Spectators**.  Spectators or other attendees at any sporting or entertainment events allowed under this Section must be no more than the Mass Gathering limit of ten (10) people indoors or more than twenty-five (25) people outdoors.  Moreover, any entertainers or athletes must stay six (6) feet away from spectators.

E. **Requirements for Large Venue Operators**.  Any venue operator subject to this Section allowing an event permitted by this Section shall:

1. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

2. Increase disinfection during peak times or high customer density times, and disinfect all shared objects (e.g., payment terminals, tables, countertops/bars, receipt trays, condiment holders) between use.

3. Immediately isolate and remove sick workers.

4. Any food service at sporting or entertainment events must comply with the restrictions set out in Section 6 of this Executive Order.  Bars at sporting or entertainment events must remain closed.

## Section 10.  Provisions from Previous Executive Orders.

A. The provisions on schools contained in Section 4(E) of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full.

B. The Long Term Care provisions contained in Section 7 of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full.

C. The Local Order provisions contained in Section 8 of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full.  The references to maximum occupancy standards for Retail Businesses in Section 8 of Executive Order No. 138 shall instead refer to the equivalent provisions in this Executive Order.

D. Otherwise, all previous travel restrictions, orders to stay at home, and prohibitions of mass gatherings in Executive Orders Nos. 121 and 138 are no longer in effect and are replaced by this Executive Order.

## Section 11.  Extension of Price Gouging Period.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

Pursuant to N.C. Gen. Stat. § 166A-19.23, the undersigned extends the prohibition against excessive pricing, as provided in N.C. Gen. Stat. §§ 75-37 and 75-38, from the issuance of Executive Order No. 116 through 5:00 pm on June 26, 2020.

The undersigned further hereby encourages the North Carolina Attorney General to use all resources available to monitor reports of abusive trade practices towards consumers and make readily available opportunities to report to the public any price gouging and unfair or deceptive trade practices under Chapter 75 of the North Carolina General Statutes.

## Section 12.  No Private Right of Action.

This Executive Order is not intended to create, and does not create, any individual right, privilege, or benefit, whether substantive or procedural, enforceable at law or in equity by any party against the State of North Carolina, its agencies, departments, political subdivisions, or other entities, or any officers, employees, or agents thereof, or any emergency management worker (as defined in N.C. Gen. Stat. § 166A-19.60) or any other person.

**Section 13.  Savings Clause.**

If any provision of this Executive Order or its application to any person or circumstances is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application.  To achieve this purpose, the provisions of this Executive Order are declared to be severable.

**Section 14.  Distribution.**

I hereby order that this Executive Order be: (1) distributed to the news media and other organizations calculated to bring its contents to the attention of the general public; (2) promptly filed with the Secretary of the North Carolina Department of Public Safety, the Secretary of State, and the superior court clerks in the counties to which it applies, unless the circumstances of the State of Emergency would prevent or impede such filing; and (3) distributed to others as necessary to ensure proper implementation of this Executive Order.

**Section 15.  Enforcement.**

A.  Pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the provisions of this Executive Order shall be enforced by state and local law enforcement officers.

B.  A violation of this Executive Order may be subject to prosecution pursuant to N.C. Gen. Stat. § 166A-19.30(d), and is punishable as a Class 2 misdemeanor in accordance with N.C. Gen. Stat. § 14-288.20A.

C.  Nothing in this Executive Order shall be construed to preempt or overrule a court order regarding an individual's conduct (e.g., a Domestic Violence Protection Order or similar orders limiting an individual's access to a particular place).

**Section 16.  Effective Date.**

This Executive Order is effective at 5:00 pm on May 22, 2020.  This Executive Order shall remain in effect through 5:00 pm on June 26, 2020 unless repealed, replaced, or rescinded by another applicable Executive Order.  An Executive Order rescinding the Declaration of the State of Emergency will automatically rescind this Executive Order.

**IN WITNESS WHEREOF,** I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 20th day of May in the year of our Lord two thousand and twenty.

Roy Cooper
Governor

**ATTEST:**

Elaine F. Marshall
Secretary of State