IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CEC ENTERTAINMENT, INC., *et al.*,[1] | Case No. 20-33163 (MI) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF LANDLORDS YAMAOKA AND ATHENA TO DEBTORS' MOTION
FOR ORDER AUTHORIZING DEBTORS
TO ABATE RENT PAYMENTS AT STORES AFFECTED BY
GOVERNMENT REGULATIONS**
[relates to Docket No. 487]

Portal Plaza LP, by and through its duly-authorized Property Manager, Yamaoka Associates, Inc. ("Yamaoka") and Maria and Anthony Canciamilla, by and through their duly-authorized Property Manager, Athena Property Management ("Athena") (collectively, the "Santa Clara County Landlords"), who hold the leases with Debtors for their respective locations in Cupertino, California and Gilroy, California (the "Cupertino Lease" and "Gilroy Lease" respectively, and collectively the "Santa Clara County Leases"),[2] hereby files their objection (the "Objection") to the Debtors' *Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations* [Docket No. 487] (the "Motion"). In support of the Objection, Yamaoka submits the *Declaration of Russell Schaadt in Support of Objection of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

[2] The Gilroy Lease was executed by a predecessor entity and has been assigned, amended or extended from time to time.

4831-1358-4315.1

*Landlords Yamaoka and Athena to Debtors' Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations* (the "Schaadt Declaration"), which is attached hereto as **Exhibit D**.  The Santa Clara County Landlords respectfully request that the Court deny the Motion and represent as follows:

### INTRODUCTION

1. The Motion should be denied.  The Debtors have sought to deprive landlords of their rights under section 365 of the Bankruptcy Code, all the while retaining the possession and benefits of the leased premises.  This is not only substantively deficient but procedurally defective.  Although the Court granted the Debtors' request to defer payment of rent during the first 60-days of these chapter 11 cases, the Bankruptcy Code makes clear that the obligation to pay post-petition rent to a real property lessor is absolute.  The Debtors may not resort to the equitable powers of section 105(a) where other, more specific provisions of the Bankruptcy Code already provide for the Debtors' duties and obligations (as well as the rights of landlords).  In addition, because the Debtors are attempting to invoke specific lease provisions that vary from lease to lease and are otherwise seeking to apply state law theories of relief, the landlords are entitled to separate adversary proceedings, along with the procedural and substantive protections afforded by to FRBP 7001(2) and (9).

2. The Motion also contains no sunset date by which the requested relief will end.  Landlords are left to wonder when the Debtors will again begin paying rent.  Will rent be paid the first day that state or local shelter-in-place and/or social distancing restrictions have lifted, or on the date that the Debtors decide to reopen, and if so how much rent will be paid at that time?  In fact, even in the presence of local and state ordinances prohibiting indoor dining and social gatherings, many restaurants have continued to operate during various stages of the COVID-19

pandemic through curbside pickup, food delivery and outdoor dining. The Debtors have not identified any single leased location where restaurant activities such as take-out and delivery services are prohibited. The Debtors have made a knowing, business decision not to engage in these options, which would have generated revenues to the Debtors during the pandemic.

3. Like their decision to not engage in any operations during the pandemic, the decision on when and if to reopen specific leased locations rests wholly within the Debtors' discretion. The Motion also makes no distinction between monthly base rent and those expenses for which the Debtors are required on a monthly basis to reimburse the affected landlords. For example, the landlords must continue to pay for real estate taxes, insurance and common area maintenance expenses regardless of whether they are receiving minimum monthly rent. Landlords depend on tenants to provide reimbursement of those expenses in the form of additional rent, as well as rely upon rents to pay underlying mortgages on the real properties. The Debtors are simply wrong that they cannot operate their businesses absent reopening the arcade and 100% capacity indoor dining. If the Motion were granted, the Debtors could indefinitely stop paying rent while still receiving the benefits of the premises that they lease. This is not what section 365 of the Bankruptcy Code provides and is not how chapter 11 works.

## OBJECTION

**I. The Debtors Have Not Demonstrated that They Are Entitled to the Desired Rent Abatements.**

4. As a general principle, since the Santa Clara Leases concern real property located within the state of California, California law applies in interpreting the leases and the rights of the

parties thereunder.[3] California Civil Code §1511(2) provides that force majeure clauses are recognized subject to the limitations imposed by the parties: "[t]he want of performance of an obligation . . . is excused [w]hen it is prevented or delayed by an irresistible, superhuman cause . . . *unless the parties have expressly agreed to the contrary*." California Civil Code §1511(2) (emphasis added). California courts have, however, limited the application of force majeure, particularly where the contract has a different provision. As discussed in greater detail below, the Cupertino Lease contains a substantially different force majeure clause than that contained in the Gilroy Lease. The Santa Clara County Landlords submit that this Court cannot, on a wholesale basis, make a determination that force majeure and other similar theories apply to relieve the Debtors of their duty to pay post-petition rent without examining the requirements of each specific lease and the provisions of applicable state law.

5. The Debtors also cannot prevail on the related legal theory of commercial frustration of purpose. The leading case is *Lloyd v. Murphy*, 25 Cal. 2d 48 (1944), in which a car dealer in Beverley Hills entered into a five year lease beginning in August 1941. The use provision under the lease allowed for (i) the sale of new cars, (ii) the repair of cars, and (iii) the sale of gasoline. In December 1941, Pearl Harbor was bombed, causing the United States to enter World War II. The First War Powers Act was passed two weeks later, followed by a Second War Powers Act in March 1942. As a result, restrictions were imposed on the sale of new cars since no new cars were being manufactured in the United States as factories were converted to the war effort.[4] In March 1942, the tenant repudiated the lease, claiming his performance should be excused due

---

[3] See Gilroy Lease at Section 33(h) ("The laws of the State of in which the Premises are located shall govern the validity, performance and enforcement of this Lease" and the Cupertino Lease at Section 48 ("The lease shall be governed by the laws of the State in which the premises are located, " which is California).

[4] See generally: https://teachinghistory.org/history-content/ask-a-historian/24088

4831-1358-4315.1

to frustration of purpose. In upholding a decision for the landlord, the California Supreme Court noted that the event must have been unforeseeable when the lease was made. In this case, there were already news agencies reporting on the war that had broken out in other parts of the world by August 1941. The Court further noted the use under the lease must be virtually destroyed, not just unprofitable, for commercial frustration of purpose to apply. The tenant confirmed that he was still able to repair cars and sell gasoline even if selling new cars, which had accounted for 90% of his business, could no longer occur after the start of the war.

6.  This is analogous to the Debtors' ability to operate its restaurants for pizza take-out, delivery and outdoor dining even if the Debtors are unable to allow patrons to use the indoor dining and arcade facilities due to the pandemic restrictions. The Santa Clara Leases do not contain restrictive use provisions that prohibit the Debtors from such restaurant operations. Moreover, take out, delivery and outdoor dining are permitted under local shelter-in-place and California emergency orders.[5] Rather, the decision not to engage in these permitted restaurant activities has been a business decision made by the Debtors, who admit they did not do so due to profitability concerns.

## II. Specific Provisions in the Cupertino Lease prevent the Court from Granting the Debtors' Motion.

7.  The Cupertino Lease commenced on May 2, 2006 and is set to expire on April 30, 2021. A true and correct copy of the excerpted portions of the Cupertino Lease[6] are attached hereto as **Exhibit A** and are incorporated herein by reference.

---

[5] For a summary of the Santa Clara County and State of California restrictions on dining, see generally https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-outdoor-dining.aspx#:~:text=On%20July%2013%2C%202020%2C%20the,they%20are%20offering%20sit%2Ddown%2C.

[6] The Cupertino Lease, including all exhibits, exceeds 50 pages in length and for that reason, only the excerpted provisions cited are attached as **Exhibit A**. The complete Cupertino Lease is attached to the Santa Clara County Landlord's exhibit and witness list, which is being filed contemporaneously herewith.

5

8.  The Cupertino Lease contains the following pertinent language. First, as to the use of the premises, Section 5.1 of the Cupertino Lease provides:

> Permitted Use. Tenant may use and occupy the Premises for any lawful retail or restaurant purpose, including, without limitation, the operation of a restaurant and entertainment center which may include the serving of beer and wine, the operation of mechanical and electrical rides, redemption games and other amusement devices and a merchandise center and for such other uses as are incidental to the operation thereof( collectively, "Tenant's Primary Business"). However, Tenant shall not use the Premises primarily for any of the "Exclusive Uses" or "Prohibited Uses" set forth in Exhibit "F" attached hereto. At the time of any use change, Tenant agrees not to violate any then-existing exclusive uses that have been granted by Landlord to another tenant in the Shopping Center. Tenant may be open for business at all hours permitted by law in the jurisdiction where the Premises are located, and the Common Areas shall be open and operating for ingress, egress and parking during all of Tenant's business hours.

An examination of Exhibit "F" to the Cupertino Lease (also included in **Exhibit A**) states the restrictions on usage due to other tenants in the shopping center and general prohibited uses. Notably, none of these restrictions or prohibited uses impair the Debtors' ability to operate its pizza restaurant for purposes of curbside delivery, take-out service, or even outdoor dining. In fact, the City of Cupertino has provided restaurant owners with the ability to quickly obtain a permit at no cost to allow for outdoor dining.[7] The Debtors, however, have chosen not to pursue these allowed uses. Moreover, the Debtors removed the arcade machines from the premises in or around July 2020. As a result, the Debtors' inability to operate its arcade business is not a basis to abate rent and grant the Motion.

9.  Section 24 of the Cupertino Lease contains the following force majeure provision:

> Force Majeure. Subject to the casualty and condemnation provisions of this Lease, if either party shall be prevented or delayed from punctually performing any obligations or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, unusual governmental restriction, regulation or control, enemy or hostile

---

[7] See City of Cupertino website regarding temporary outdoor dining at: https://www.cupertino.org/businesses/economic-development/temporary-outdoor-dining

4831-1358-4315.1

governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, or caused by the other party, then the time to perform such obligation to satisfy such condition shall be extended on a day-for-day basis for the period of the delay caused by such event; provided, however, that the party claiming the benefit of this Section shall, as a condition thereto, give notice to the other party in writing within ten (I 0) days of the incident specifying with particularity the nature thereof, the reason therefor, the date and time incurred and the reasonable length said incident will delay the fulfillment of obligation contained herein. Failure to give such notice within the specified time shall render such delay invalid in extending the time for performing the obligations hereunder. This Section shall not apply to the (i) inability to pay any sum of money due hereunder or the failure to perform any other obligation due to the lack of money or inability to raise capital or borrow for any purpose.; (ii) the term of the Feasibility Period; (iii) Tenant's application for entitlements as to the commencement of lease term (iv) Rent Commencement Date or (v) the renewal period exercise.

Section 24 of the Cupertino Lease is included as part of **Exhibit A** attached hereto and incorporated herein by reference.

10. The Debtors' attempt to abate rent owing under the Cupertino Lease is a violation of the lease's terms, which provide that the payment of rent may be "extended on a day-to-day basis" for the period of the delay caused by the required event. However, to trigger such provision, the Debtor must have given a notice to Yamaoka within 10 days of the start of the incident. The notice received from the Debtors by Yamaoka is insufficient because it requested that Yamaoka grant the Debtor 90 days of rent relief from April through June (i.e. rent forgiveness), which Yamaoka declined to do as rent forgiveness is not provided in the Cupertino Lease. A true and correct copy of the letter received by Yamaoka dated March 16, 2020 is attached hereto as **Exhibit B** and is incorporated herein by reference.

11. Finally, the Cupertino Lease contains three separate options to extend the term of the Cupertino Lease. The Cupertino Lease provides in Section 3 for the manner of execution of the options to extend as follows:

>Renewal Options. Landlord hereby grants to Tenant the right and option to extend the Primary Term of this Lease for each of the Renewal Terms set forth in Section 1.10(b). The first Renewal Term shall begin upon the expiration of the Primary Term, and the second and any succeeding Renewal Terms begin upon the expiration of the preceding Renewal Term. Except as otherwise set forth herein to the contrary (including, without limitation, the sums constituting Minimum Rent during the Renewal Terms), all of the other terms, provisions and covenants of this Lease shall apply to each of the Renewal Terms. Tenant may exercise each such option to renew by delivering to Landlord written notice thereof no later than one hundred eighty (180) days prior to the expiration of the Primary Term or the then current Renewal Term. Such Renewal Options may only be exercised by Tenant or its Related Corporation (hereinafter defined).

In light of the fact that the Cupertino Lease otherwise expires by its terms on April 30, 2021, the Debtors are currently within the option exercise period which will expire on October 31, 2020. Pursuant to the terms of the last sentence of the force majeure clause in the Cupertino Lease, the force majeure clause shall not apply during the option exercise period. Accordingly, the Debtors are not entitled to any relief under the force majeure provision contained in the Cupertino Lease by its very terms.

### III. The Debtors' Have Misconstrued the Force Majeure Provision in the Gilroy Lease and Do Not Meet the Requirements for Requested Relief under California Law.

12.     In the Motion, the Debtors cited as an exemplar the force majeure provision appearing at Section 24 of the Gilroy Lease, which provides as follows:

>Force Majeure. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by any time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, severe and unusual weather conditions, material or labor restrictions by governmental authority and any other cause not within the reasonable control of Landlord or Tenant, as the case may be.

True and correct copies of the excerpts cited from the Gilroy Lease are attached hereto as **Exhibit C** and are incorporated herein by reference.[8]

13. However, the Debtors did not provide the Court with the use provision and pertinent restrictions for the Gilroy Lease. These are found in the Basic Provisions of the Gilroy Lease at paragraph F, and provide as follows:

> Permitted Use: a restaurant and entertainment center which may include the serving of beer and wine, the operation of indoor mechanical and electrical rides, games and other amusement devices and a merchandise center and for such other uses as are incidental to the operation thereof and for any other lawful retail purpose, subject to the prohibited uses attached hereto as Exhibit "H".

14. As discussed above, the Debtors have made the business decision to _not_ operate their restaurants, including the Gilroy location, to the extent permitted by applicable local and state ordinances at this time. That is a business decision and is not the result of acts of God, strikes, unavailable building materials, material or labor restrictions by governmental authority that fall within the scope of the force majeure provision contained in the Gilroy Lease. The City of Gilroy has even encouraged outdoor dining during the pandemic through local ordinances and by donating outdoor dining tables and chairs to local restaurants.[9] The Debtors, however, have made an affirmative choice not to engage in these business activities which are permitted under the terms of the Gilroy Lease.

15. Finally, Yamaoka and Athena incorporate by reference the additional arguments and legal authorities raised by other landlords filed in opposition in these cases, including the

---

[8] A complete copy of the Gilroy Lease exceeds 65 pages, and for that reason, only the excerpted provisions are included in **Exhibit C**. The complete Gilroy Lease is attached to the Santa Clara County Landlords' exhibit and witness list, which is being filed contemporaneously herewith

[9] See the City of Gilroy online application for free outdoor dining furniture found at: https://ca-gilroy.civicplus.com/FormCenter/Community-Development-8/Outdoor-Dining-Furniture-Application-96

opposition of MGP IX Properties, LLC and MGP XI Cascade, LLC in their opposition brief found at Docket No. 597.

**WHEREFORE**, the Santa Clara County Landlords pray that this Court deny all relief to the Debtors.

Respectfully submitted this 21st day of August 2020.

**GRAY REED & McGRAW LLP**

By: /s/ Paul D. Moak
    Paul D. Moak
    Texas Bar No. 200794316
    Lydia R. Webb
    Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:    pmoak@grayreed.com
           lwebb@grayreed.com

-and-

**BINDER & MALTER LLP**

    Julie H. Rome-Banks (*pro hac vice* pending*)*
2775 Park Avenue
Santa Clara, CA 95050
Telephone:  (408) 295-1700
Facsimile:  (408) 295-1531
Email:    julie@bindermalter.com

**COUNSEL TO THE SANTA CLARA COUNTY LANDLORDS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21st day of August, 2020, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

    /s/ Paul D. Moak
    Paul D. Moak

4831-1358-4315.1