IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CEC ENTERTAINMENT, INC., *et al.*, | § | Case No. 20-33163 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | (Emergency Hearing Requested) |

**EMERGENCY MOTION OF DEBTORS FOR ORDER
(I) APPROVING BIDDING PROCEDURES ESTABLISHING A SALE PROCESS
FOR THE DEBTORS' REORGANIZED EQUITY OR ASSETS, (II) SCHEDULING
AUCTION, (III) APPROVING CURE NOTICE PROCEDURES FOR EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. A hearing will be conducted on this matter on September 29, 2020 at 3:00 pm (CST). You may participate in the hearing by audio/ video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Isgur conference room number is 954554.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeIsgur" in the GoToMeeting app or click the link on Judge Isgur's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Isgur. Under "Electronic Appearance" select "Click here to submit Electronic**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings, Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

> **Appearance".  Select the case name, complete the required fields and click "Submit" to complete your appearance.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than September 29, 2020.**

CEC Entertainment, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), respectfully represent as follows in support of this motion (this "**Motion**" or this "**Bidding Procedures Motion**"):

<u>**Preliminary Statement**</u>

1.      Since the outset of these cases, the Debtors have been diligently working to formulate a strategy for a successful restructuring of their businesses in the face of unprecedented uncertainty resulting from the novel coronavirus global pandemic.  The Debtors, with the assistance of their professional advisors, have devoted significant time and energy to refine and adapt their business plan and go-forward strategy to address current and future market conditions. The Debtors have also engaged in negotiations with various stakeholders in an effort to formulate a value-maximizing path forward in resolution of these chapter 11 cases.

2.      After evaluating their strategic options, the Debtors determined to pursue a flexible, value-maximizing financial restructuring process set forth in the Restructuring Term Sheet (as defined below; such process, the "**Restructuring**").  To that end, the Debtors have negotiated at arm's length a Plan Support Agreement, dated as of September 4, 2020 (the "**PSA**"); a restructuring term sheet attached to the PSA (the "**Restructuring Term Sheet**"); and a $200 million debtor-in-possession loan facility to fund, among other things, the Restructuring (the "**DIP**

Facility") with a group of Consenting Creditors (as defined in the PSA) comprising certain unaffiliated holders of First Lien Debt Claims and Senior Unsecured Note Claims. The PSA and Restructuring Term Sheet reflect an overall agreement on an approach to a flexible, value-maximizing Restructuring in resolution of these chapter 11 cases that will permit the Debtors to obtain the short- and long-term financing necessary to conduct an orderly Sale Process, file and confirm a Plan, and emerge from chapter 11 with a healthy balance sheet and sufficient go-forward liquidity. In accordance with the PSA, the Debtors' joint chapter 11 plan of reorganization (the "**Plan**"), whether (i) a Sale Plan (as defined below) or (ii) a plan premised on either (a) a debt-for-equity exchange (an "**Exchange Plan**") or (b) the Credit Bid (as defined below) pursuant to an Acquisition Agreement (a "**Credit Bid Plan**"), will be consistent in all material respects with the Restructuring Term Sheet.

3.      The Debtors will effectuate the Restructuring by continuing their already robust and comprehensive marketing efforts (the "**Marketing Process**") as part of a formalized sale process (the "**Sale Process**") that is intended to generate the greatest level of interest in the Debtors' businesses. Through the Sale Process, the Debtors will seek to solicit one or more binding bids from third parties (each, a "**Third-Party Bid**") for the acquisition of either (i) the equity interests of the Reorganized Debtors (as defined below; such interests, the "**Reorganized Equity**" and such transaction, an "**Equity Sale**") or, alternatively or in combination therewith, (ii) up to all or substantially all of the Debtors' assets (the "**Assets**"; any such transaction, an "**Asset Sale**" and each of an Equity Sale and an Asset Sale, a "**Sale Transaction**"). In each case and as described in greater detail below, the Debtors may seek to consummate one or more Sale Transactions pursuant to a chapter 11 plan (the "**Sale Plan**") and either (i) an investment agreement (an "**Investment Agreement**") or (ii) an asset purchase agreement (an "**Asset Purchase Agreement**,"

and, together with an Investment Agreement, each an "**Acquisition Agreement**"), as applicable. Accordingly, any Sale Transaction will be subject to the approval of the Bankruptcy Court, which approval shall be sought in connection with the confirmation of the Plan at a sale and confirmation hearing (the "**Sale and Confirmation Hearing**").  The Debtors will not close any Sale Transaction if the Sale Plan is not confirmed by the Bankruptcy Court.

4.     As described in greater detail below, to ensure that each Third-Party Bid will yield at least a minimally acceptable amount of value for the Debtors' estates, a Reserve Price (as defined in the Bidding Procedures and provided by the Consenting Creditors) will be revealed to all known potential bidders prior to the time at which binding bids are due. Additionally, the First Lien Lenders shall have the right to credit bid, which for the avoidance of doubt may also include cash and/or other forms of consideration (such right, the "**Credit Bid Right**"; any such bid, a "**Credit Bid**") up to the full amount of the First Lien Debt Claims to acquire the Reorganized Equity or Assets, in whole or in part, through a new Delaware limited liability company organized by their Administrative Agent at the direction of the Consenting Creditors pursuant to section 363(k) of the Bankruptcy Code.  Moreover, as set forth in greater detail below, the Debtors shall have the unconditional right, at any time, and in accordance with their fiduciary duties, to terminate the Sale Process, including prior to the Binding Bid Deadline.  In addition, in the event that no Third-Party Bids constitute a Qualified Bid following the completion of the marketing process (or such earlier time as may be determined by the Debtors), or if one or more Third-Party Bids (taken together) exceeds the Reserve Price but (i) the Credit Bid is the highest or otherwise best bid at the Auction (if any) or (ii) such Third-Party Bids, prior to the hearing on confirmation of the Plan, are withdrawn or modified such that the Reserve Price or Credit Bid, as applicable, is not reasonably

likely to be exceeded on the effective date of the Plan, the Debtors have the unconditional right to terminate the Sale Process and instead seek to confirm a Credit Bid Plan or an Exchange Plan.

5.     By way of this Motion, the Debtors are taking the first step in effectuating the Restructuring by seeking approval of the Debtors' proposed Bidding Procedures.  The Bidding Procedures establish a formal framework governing the Sale Process and were designed by the Debtors, with the assistance of their professional advisors, to be fair, open, and foster competitive bidding.  The Bidding Procedures are intended to generate the greatest level of interest in the Reorganized Equity and Assets, in whole or in part, and to facilitate a value-maximizing Sale Transaction in an appropriately timely and flexible manner. The Debtors propose to establish the following key dates and deadlines for the Sale Process:

| Key Event or Deadline | Date and Time |
|---|---|
| 1. Indication of Interest Deadline | **September 15, 2020, at 5:00 p.m. (prevailing Eastern Time**), subject to certain exceptions. |
| 2. Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order | **September 29, 2020** |
| 3. Deadline for Consenting Creditors to deliver Reserve Price to Debtors | **October 14, 2020** |
| 4. Deadline for Debtors to notify Potential Bidders of Reserve Price | **October 15, 2020** |
| 5. Binding Bid Deadline | **October 21, 2020 at 5:00 p.m. (prevailing Eastern Time)** |
| 6. Deadline for Debtors to notify applicable Third-Party Bidders of (i) status as Qualified Bidder and (ii) of selection of Baseline Bid | **October 23, 2020 at 5:00 p.m. (prevailing Eastern Time)** |
| 7. Auction (if any) to be held (i) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 or (ii) virtually pursuant to procedures to be announced to Qualified Bidders | **October 28, 2020, at 10:00 a.m. (prevailing Eastern Time)** |

|   | Key Event or Deadline | Date and Time |
|---|---|---|
| **8.** | Deadline to file notice of and identities of (i) Successful Bid(s) and Successful Bidder(s) and (ii) Back-Up Bid(s) and Back-Up Bidders | Promptly upon the conclusion of the Auction, but in any event no later than two (2) business days afterwards |

6.      The Debtors believe that approval of the proposed Bidding Procedures is necessary to facilitate a full and fair Sale Process.  Accordingly, the Debtors respectfully request that this Court approve the proposed Bidding Procedures.

### **Relief Requested**

7.      By this Motion, pursuant to sections 105, 365 and 1123 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9013, and 9014, and Local Rule 9013-1, the Debtors request the entry of an order (the "**Bidding Procedures Order**"), a proposed form of which is attached hereto as **Exhibit A**:

> a.      approving the procedures attached as **Exhibit 1** to the proposed Bidding Procedures Order (the "**Bidding Procedures**");
>
> b.      scheduling, as necessary, an auction (the "**Auction**") in connection with any Sale Transaction
>
> c.      approving procedures for identifying disputes over amounts necessary to cure defaults under executory contracts and unexpired leases in connection with the potential assumption or assumption and assignment of such agreements (the "**Cure Notice Procedures**"); and
>
> d.      granting related relief.

The Debtors do not hereby seek approval of a stalking horse bid, a termination fee, or the ability to use, sell, or lease property of the estate outside of the ordinary course of business.

## Background

8.      The Debtors, on June 24, 2020 (the "**Petition Date**"), commenced their chapter 11 cases by filing voluntary petitions in this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 13, 2020, the United States Trustee (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

9.      The Debtors, together with their non-debtor affiliates, are a leading family entertainment and dining company with a global network of dining, entertainment, and arcade centers that are operated and franchised under the names "Chuck E. Cheese" and "Peter Piper Pizza".  The venues deliver a kid-friendly atmosphere and feature an array of wholesome entertainment offerings including arcade-style and skill-oriented games, rides, live entertainment shows, and the opportunity for guests to win tickets and redeem prizes such as toys, plush dolls, and branded merchandise.

10.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of James Howell in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**").

## Jurisdiction

11.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Marketing Process

12.     Early in these chapter 11 cases, the Debtors, with the assistance of their professional advisors, launched the Marketing Process to generate interest in one or more Sale Transactions for the Debtors' Reorganized Equity and/or Assets, in whole or in part.   The Marketing Process is being led by the Debtors' investment banker, PJT Partners LP ("**PJT Partners**"), who has, among other things, developed comprehensive marketing materials and created a confidential electronic data room (the "**Data Room**") to permit potential third-party buyers to conduct due diligence.   To date, and over the past several weeks, PJT Partners has contacted 127 parties identified as potential third-party bidders, including both financial and strategic parties, 12 of which executed confidentiality agreements (each, a "**Confidentiality Agreement**") and have access to the Data Room.  The Debtors have clearly communicated to these potential third-party buyers that they must provide initial non-binding indications of interest (each, a "**Non-Binding Indication of Interest**") no later than **September 15, 2020 at 5:00 p.m. (prevailing Eastern Time**) (the "**Indication of Interest Deadline**") to continue in the Sale Process, so that the Debtors will be able to evaluate in a timely manner the level of serious interest in a bid process, an auction, and/or consummating one or more Sale Transactions.

13.     The Debtors now seek, by notice of this Motion, to expand the Marketing Process to all parties in interest in these chapter 11 cases and to incorporate the Marketing Process into the formalized Sale Process set forth in the Bidding Procedures.  In that regard, the Bidding

Procedures establish a straightforward process for additional interested third parties to become potential bidders (each, a "**Potential Bidder**") and gain access to the due diligence materials related to the Assets and the equity interests of the Debtors contained in the Data Room. Recognizing that the Indication of Interest Deadline will pass before the entry of the Bidding Procedures Order and to provide for a more expansive Marketing Process in these cases, the Bidding Procedures provide that any Potential Bidder that (i) was not contacted by the Debtors' advisors regarding the Sale Process prior to the filing of the Bidding Procedures Motion and (ii) requires more time to submit a Non-Binding Indication of Interest, may deliver one by **September 29, 2020 at 5:00 p.m.** (**prevailing Eastern Time**) after notifying certain of the Debtors' advisors by no later than **September 22, 2020 at 5:00 p.m.** (**prevailing Eastern Time**) of their intent to do so.  The Debtors believe that incorporating the Marketing Process into the formalized Sale Process set forth in the Bidding Procedures will increase interest in the Reorganized Equity and/or the Assets, in whole or in part, and thereby provide more opportunities for the Debtors to consummate a value-maximizing Sale Transaction for the benefit of their stakeholders.

### Need for a Timely Sale Process

14. The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable and will provide all Potential Bidders (including Potential Bidders, if any, that were not contacted by PJT Partners during the Marketing Process) with sufficient time and information to submit a Third-Party Bid for the Reorganized Equity or some or all of the Assets.  In formulating the Bidding Procedures and the time periods set forth therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to efficiently and expeditiously run a Sale Process.   The Debtors'

formulation of the time periods set forth Bidding Procedures was also informed by the fact that the Marketing Process has been underway since August 17, 2020 such that many Potential Bidders already have access to comprehensive information that is compiled in the Data Room. To the extent any other Potential Bidder may exist, such parties will have the opportunity to submit a Non-Binding Indication of Interest two weeks after the deadline for Potential Bidders that were previously contacted (but remain bound by the other Bidding Procedures deadlines). In light of the foregoing, the Debtors have determined that conducting a Sale Process in accordance with the time periods set forth in the Bidding Procedures is in the best interests of the Debtors' estates.

15.     In addition, the Debtors derive substantial benefits from the PSA and the Consenting Creditors' agreement to provide the DIP Facility, including—most importantly—a path to exit these chapter 11 cases and the financing to pursue such path. Both the PSA and the DIP Facility require the Debtors to pursue the Sale Process in accordance with certain agreed-upon milestones (the "**Milestones**") that the Debtors believe are reasonable. The Sale Process-related Milestones (among other Milestones set forth in the PSA and the DIP Facility) are:

   a.    by the date that is no later than September 11, 2020, the Debtors shall file the Bidding Procedures Motion;

   b.    by the date that is no later than September 23, 2020, the Debtors shall file the Plan and Disclosure Statement;

   c.    by the date that is no later September 29, 2020, the Debtors shall have obtained entry of the Bidding Procedures Order;

   d.    if the Plan Without Third-Party Sale Toggle (as defined in the Restructuring Term Sheet) has not occurred prior to such time, the Binding Bid Deadline shall be no later than October 21, 2020;

   e.    if the Plan Without Third-Party Sale Toggle has not occurred prior to such time, the Auction shall have occurred by no later than October 28, 2020;

   f.    by the date that is no later than November 6, 2020, the Debtors shall obtain entry of the Disclosure Statement Order, which shall be in a

form and substance reasonably acceptable to the Third-Party Successful Bidder(s), if any; *provided* that if the Plan Without Third-Party Sale Toggle has occurred prior to the Debtors filing the Plan and Disclosure Statement, the Debtors shall obtain entry of the Disclosure Statement Order by the date that is no later than forty (40) days after the filing of the Plan and Disclosure Statement.

g.  by the date that is no later than forty-five (45) days after entry of the Disclosure Statement Order, the Debtors shall obtain entry of the Confirmation/Sale Order, which, in addition to the other requirements of this Agreement, shall be in form and substance reasonably acceptable to the Third-Party Successful Bidder(s), if any; and

h.  by the date that is no later than twenty-one (21) days after entry of the Confirmation/Sale Order, the Debtors will cause the Plan to be substantially consummated (contemporaneously with the closing of the Sale, if applicable) (the "**Effective Date**").

Under the circumstances, the Debtors should be permitted to proceed in accordance with the Milestones because they permit ample time for Potential Bidders to fully participate while still providing for an efficient Sale Process and maintain and preserve the value of the DIP Facility and/or the PSA.

16.    To conduct the comprehensive and orderly Sale Process contemplated by the Bidding Procedures, the Debtors need access to the postpetition financing sought in connection with the DIP Motion.  Moreover, for the Debtors to derive the substantial benefits from the PSA and the DIP Facility and, in turn, maximize value for their stakeholders through the Sale Process, the Debtors need to adhere to the Milestones set forth in the PSA.   Accordingly, the Debtors request that the Court approve the relief requested herein in accordance with the time periods set forth in the Bidding Procedures to ensure the Debtors' compliance with the terms of the PSA, the Restructuring Term Sheet, and the DIP Facility.

**Bidding Procedures**

17.     The Debtors respectfully request entry of the Bidding Procedures Order and the Bidding Procedures.  The Bidding Procedures establish formal framework governing the Sale Process and were designed by the Debtors, with the assistance of their professional advisors, to be fair, open, and foster competitive bidding.  The Bidding Procedures are intended to generate the greatest level of interest in the Reorganized Equity or Assets, in whole or in part, and to facilitate a value-maximizing Sale Transaction in an appropriately timely and flexible manner consistent in all respects with the PSA, Restructuring Term Sheet, and DIP Facility.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify Third-Party Bids in excess of the Reserve Price that constitute the highest and best offer(s) for the Reorganized Equity or some or all of the Assets, as applicable, while concurrently providing the Debtors with the flexibility to pursue the confirmation of an alternative chapter 11 plan in accordance with their fiduciaries duties.

18.     The Debtors believe the proposed Bidding Procedures summarized below are fair and appropriate.  Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order, they are not restated in their entirety herein.  The Bidding Procedures provide, among other things, the following[2]:

> a.     the Debtors will implement a straight forward process pursuant to which interested third-parties may gain reasonable access to the Debtors' Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances each by becoming a Potential Bidder after (i) executing a Confidentiality Agreement, (ii) providing certain confirmatory financial information, and (iii) designating a Potential Bidder Contact Person;

> b.     the Debtors will solicit from each Potential Bidder a Non-Binding Indication of Interest with respect to the Reorganized Equity or

---

[2] Capitalized terms used in the subparts to this paragraph but not otherwise defined therein shall have the meaning ascribed to such terms in the Bidding Procedures.

some or all of the Assets, as applicable, by the Indication of Interest Deadline of **September 15, 2020, at 5:00 p.m. (prevailing Eastern Time)**, except where a Potential Bidder (i) was not contacted by the Debtors' advisors regarding the Sale Process prior to the filing of the Bidding Procedures Motion, (ii) requires more time to submit a Non-Binding Indication of Interest, and (iii) notifies one (1) of the PJT Partners' Designated Contact Persons by no later than **September 22, 2020 at 5:00 p.m. (prevailing Eastern Time)** of such matters, such Potential Bidder may deliver a Non-Binding Indication of Interest no later than **September 29, 2020 at 5:00 p.m. (prevailing Eastern Time)**;

c.       by no later than **October 14, 2020**, the Requisite Consenting Creditors will provide the Reserve Price to the Debtors, who will by the earlier of one (1) business day thereafter or **October 15, 2020** notify each Potential Bidder of such Reserve Price;

d.       the Debtors will solicit binding Third-Party Bids for the Reorganized Equity or some or all of the Assets, as applicable, by the Binding Bid Deadline of **October 21, 2020, at 5:00 p.m. (prevailing Eastern Time)**;

e.       in connection with any Sale Transaction, the First Lien Lenders shall have the right to Credit Bid up to the full amount of the First Lien Debt Claims to acquire the Reorganized Equity or Assets, in whole or in part, of the Debtors through a new Delaware limited liability company organized by their Administrative Agent at the direction of the Consenting Creditors;

f.       to be deemed a Qualified Bid, a Bid must be received by no later than the Binding Bid Deadline and must include, at a minimum:

(1)       a Proposed Acquisition Agreement for the acquisition of all, some, or any one of the Reorganized Equity or Assets, which complies in all material respects with the Restructuring Term Sheet;

(2)       a Purchase Price in excess of the Reserve Price, unless (x) the Third-Party Bid is for some portion of the Assets that is less than the whole, (y) there is one or more Third-Party Bid(s) for a different portion of the Assets that is less than the whole, and (z) the Debtors, in the exercise of their business judgement and in consultation with the Consultation Parties, reasonably believe that the Third-Party Bids, collectively, would exceed the Reserve Price, and (ii) an initial overbid, consisting of at least $10,000,000;

(3)      specify (i) the Reorganized Equity or Assets, in whole or in part, as applicable, sought to be acquired as well as (ii) which Assets, if any, are not sought to be acquired;

(4)      specify the form of consideration in (A) (i) all cash or (ii) non-cash components, and (B) cash consideration in excess of the Reserve Price;

(5)      an unconditional commitment that the Bid is binding, not subject to further diligence or financing, and irrevocable until said Bid is not deemed the Successful Bid or Back-Up Bid;

(6)      proof of financial and other information demonstrating the Potential Bidder's ability to consummate the applicable Sale Transaction and perform under any Contract (if applicable);

(7)      identify Proposed Assumed Contracts, which may be later amended;

(8)      a statement or evidence reflecting the Potential Bidder's (i) compliance with certain antitrust laws, (ii) ability to obtain regulatory and governmental approvals, and (iii) the Bid is reasonably likely to be consummated within a reasonable timeframe;

(9)      (A) disclose the identity of the Potential Bidder and each participant in its Bid and (B) (i) demonstrate corporate (or comparable organizational) authorization to submit the Bid, participate in the Auction, and close a Sale Transaction;

(10)     specify (i) whether the Potential Bidder seeks to hire some or all of the Debtors' employees and (ii) indicate the intended treatment of various Employee Obligations;

(11)     expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment;

(12)     disclose any connections to the (i) Debtors, (ii) any other known Potential Bidder, and/or (iii) any officer or director of the Debtors;

(13)     represent and warrant that the Potential Bidder (i) had the opportunity to conduct any and all due diligence prior to submitting its Bid, (ii) relied solely upon its own independent review, investigation, and/or inspection in making its Bid, (iii) has not engaged in collusion with

14

respect to its Bid, (iv) provided correct and truthful proof of financial ability to consummate any applicable Sale Transaction in a timely manner, and (v) agrees to be bound by the terms of the Bidding Procedures; and

(14)    include (i) a Deposit, unless otherwise agreed by the Debtors and Potential Bidder, to be deposited with the Escrow Agent pursuant to an escrow agreement, (ii) the contact information of the Potential Bidder Contact Person and any other specified persons, (iii) a covenant to cooperate with the Debtors and provide information for antitrust legal analysis, (iv) a detailed analysis of the value of any non-cash component of the Bid, if any, and documentation supporting such value, and (v) a statement as to whether the Bid is consistent with the terms of the Restructuring Term Sheet, and, if not, a detailed explanation of any inconsistency and the reason therefor.

g.    the Debtors, in consultation with the Consultation Parties, will review all timely Bids and notify each Qualified Bidder of its status as a Qualified Bidder by the Qualified Bid Deadline of **October 23, 2020, at 5:00 p.m. (prevailing Eastern Time)**;

h.    if the Debtors do not receive any Qualified Bids other than a Credit Bid, if any, they shall cancel the Auction and file a notice thereof by **October 23, 2020 at 5:00 p.m. (prevailing Eastern Time)** (i) with the Bankruptcy Court, and (ii) on the Claims Agent Website;

i.    in the event that there is an Auction:

(1)    it shall be held on **October 26, 2020, beginning at 10:00 a.m. (prevailing Eastern Time)** at (i) the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 or (ii) virtually pursuant to procedures to be announced to bidders;

(2)    only Qualified Bidders, including the Administrative Agent, may participate;

(3)    professionals of the Debtors, Consenting Creditors, and Creditors' Committee may attend and observe the Auction;

(4)    Qualified Bidders will be permitted to increase their bids by in increments of no less than the Minimum Overbid Amount of $10,000,000;

(5)     the Debtors, in consultation with the Consultation Parties, will be permitted to request best and final offers from Qualified Bidders;

(6)     Potential Bidders and their representatives may not communicate with one another;

(7)     all parties in attendance must keep the proceedings and results confidential;

(8)     the Debtors, in consultation with the Consultation Parties, (A) may identify as the Successful Bid(s) the highest or otherwise best Qualified Bid as either (i) one or more Third-Party Successful Bid(s) or (ii) a Successful Credit Bid, and (B) designate a Back-Up Bid and Back-Up Bidder; and

(9)     within two (2) calendar days after the conclusion of the Auction, the Debtors shall file a Notice of Auction Results (i) with the Bankruptcy Court and (ii) on the Claims Agent Website;

j.     the Debtors have the unconditional right at any time, and in accordance with their fiduciary duties, to terminate the Sale Process at any time, including (i) prior to the Binding Bid Deadline and (ii) in the event that no Third-Party Bids constitute a Qualified Bid following the completion of the marketing process (or such earlier time as may be determined by the Debtors), or if one or more Third-Party Bids (taken together) exceeds the Reserve Price but (x) the Credit Bid is the highest or otherwise best bid at the Auction (if any) or (y) such Third-Party Bids, prior to the hearing on confirmation of the Plan, are withdrawn or modified such that the Reserve Price or Credit Bid, as applicable, is not reasonably likely to be exceeded on the effective date of the Plan;

k.     if the Debtors terminate the Sale Process, they will provide a Termination Notice (i) to all known Potential Bidders by written communication to each respective Potential Bidder Contact Person; (ii) by filing a notice with the Bankruptcy Court; and (iii) by publishing a notice on the Claims Agent Website;

l.     any Sale Transaction between the Debtors and one or more Third-Party Successful Bidder(s) will be (i) consummated pursuant to a Sale Plan, consistent in all material respects with the Restructuring Term Sheet, and (ii) subject to the Bankruptcy Court's approval at a properly noticed Sale and Confirmation Hearing; and

m.     prior to the Sale and Confirmation Hearing, but in connection therewith, parties in interest will have an opportunity to object to the

16

Sale Plan, any Acquisition Agreement, and any Sale Transaction contemplated thereunder, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and Local Rules.

19.    The Debtors believe these Bidding Procedures are fair, appropriate, and will facilitate an open and transparent Sale Process by which the Debtors will seek to maximize the value of the Reorganized Equity or Assets, in whole or in part.  Therefore, the Debtors respectfully request that the Court enter the Bidding Procedures Order approving these Bidding Procedures in their entirety.

## Cure Notice Procedures

20.    A central part of the Restructuring is the Debtors' anticipated assumption (of, if applicable, assumption and assignment) of certain of their executory contracts and unexpired leases in connection with the Plan, whether a Sale Plan, Credit Bid Plan, or Exchange Plan.  Among other reasons, such agreements are critical components of the Debtors' business model and operations.  Accordingly, the Debtors and any potential buyer in the Sale Process have a pressing need for the implementation of an orderly and streamlined process by which the Debtors can identify and evaluate any liabilities associated with potential Cure Costs (as defined below).  Among other things, leaving asserted Cure Costs unknown throughout the Sale Process is likely to create substantial uncertainty regarding the Debtors' liabilities and result in a lower likelihood of success in the Sale Process.  Accordingly, the Debtors propose that the Cure Notice Procedures set forth below should be implemented.  However, given the centrality of these procedures to the Restructuring, irrespective of whether the Sale Process results in the consummation of any Sale Transaction or is terminated in accordance with the Debtors' fiduciary duties, the Debtors expressly intend for these Cure Notice Procedures to be severable in their entirety from the Sale Process established by the Bidding Procedures such that they will survive the termination (if any) of the Sale Process.  Moreover, although the Cure Notice Procedures are intended to help the

17

Debtors understand their asserted Cure Costs, they are intended to help the Debtors and any potential buyer understand Cure Costs under <u>all</u> executory contracts and unexpired leases and will not limit the Debtors' ability to assume, assume and assign, or reject executory contracts or unexpired leases under the Plan.  Actual assumption, rejection, or assumption and assignment will not occur until Plan confirmation.  As set forth in the Bidding Procedures Order, the Debtors propose the following Cure Notice Procedures:

a.  By no later than **<u>September 23, 2020</u>**, the Debtors will file a notice (the "**Cure Notice**") identifying (a) each executory contract and unexpired lease (and the relevant Counterparty (as defined below) thereto) having a known non-zero Cure Cost and (b) the amount the Debtors believe is necessary to cure all monetary defaults under such agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**").

b.  Upon the filing of the Cure Notice, the Debtors will serve the Cure Notice on each of the non-Debtor counterparties (each, a "**Counterparty**") listed on the Cure Notice by first-class mail.  The Cure Notice will state that the Debtors are evaluating whether to seek (but are not required to seek) the assumption of executory contracts and unexpired leases in connection with the Plan, which may involve one or more Sale Transaction(s), and include (i) identification of each executory contract and unexpired lease of the Debtors having a non-zero Cure Cost and (ii) the deadline for objecting (a "**Cure Objection**") to the amount of the proposed Cure Costs related to each listed executory contract or unexpired lease, which deadline will be **<u>October 12, 2020 at 5:00 p.m.</u> (prevailing Eastern Time)** (such deadline, the "**Cure Objection Deadline**").

c.  Each Cure Objection must be filed with the Bankruptcy Court and served on the following parties so as to be received no later than the applicable Cure Objection Deadline: (i) the Debtors c/o CEC Entertainment, Inc., <u>Attn</u>: Rodolfo Rodríguez Jr., Esq. (rrodriguez@cecentertainment.com); (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, <u>Attn</u>: Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Scott R. Bowling, Esq. (matt.barr@weil.com, alfredo.perez@weil.com, and scott.bowling@weil.com); (iii) the Office of the United States Trustee for the Southern District of Texas, <u>Attn</u>: Hector Duran and Stephen Statham (hector.duran@usdoj.gov, stephen.statham@usdoj.com); and (iv) attorneys for the Official Committee of Unsecured Creditors, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New

18

York 10178 (<u>Attn</u>:  Jason Adams, Esq. (jadams@kelleydrye.com), and Lauren Schlussel, Esq. (lschlussel@kelleydrye.com), and Womble Bond Dickinson (US) LLP, 811 Main Street, Suite 3130, Houston, Texas 77002 (<u>Attn</u>:  Matthew Ward, Esq. (matthew.ward@wbd-us.com), and Todd Atkinson, Esq. (todd.atkinson@wbd-us.com)), and (v) counsel to the Consenting Creditors,  Akin Gump Strauss Hauer & Feld LLP, (<u>Attn</u>:  Jason P. Rubin, Esq. (jrubin@akingump.com), Daniel Fisher (dfisher@akingump.com), and Phillip Dublin (pdublin@akingump.com).

d. If no objections are received with respect to an executory contract or unexpired lease, then the Cure Cost set forth in the Cure Notice for such agreement will be binding upon the Counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by the applicable Debtor in connection with the assumption and assignment of such agreement. In addition, all Counterparties to the executory contracts or unexpired leases that fail to file an objection before the Cure Objection Deadline will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to such agreements, and the Debtors and any applicable Successful Bidder(s) (if any) will be entitled to rely solely upon the Cure Cost set forth in the Cure Notice; (ii) deemed to have consented to the assumption by the Debtors; and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) that any additional amounts are due or other defaults exist, that conditions to assumption must be satisfied or that there is any other objection or defense to the assumption of the applicable agreements.  For the avoidance of doubt, these Cure Notice Procedures will not prohibit Counterparties from later objecting to assumption or assumption and assignment of an executory contract or unexpired lease based on an asserted lack of adequate assurance of future performance under such agreement.

e. Prior to confirmation of a Plan, the Debtors will determine whether to assume, reject, or assume and assign their executory contracts and unexpired leases taking into account, among other things, the Cure Notice and any Cure Objections that may be filed.  These Cure Notice Procedures do not require or govern assumption, rejection, or assumption and assignment other than with respect to the matters addressed herein.

21.     The Debtors request that any party failing to file a Cure Objection be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code.

22.     The Debtors believe that the Cure Notice Procedures are fair, reasonable, and necessary for them effectuate a successful Restructuring and maximize value in the Sale Process, and that notice of the Cure Notice Procedures by way of notice of this Motion is sufficient for all purposes.   Therefore, the Debtors respectfully request that the Court enter the Bidding Procedures Order approving the Cure Notice Procedures.

**Relief Requested Should Be Granted**

**A.      Bidding Procedures**

23.     For the reasons set forth below, the Debtors believe the Bid Procedures are reasonable and appropriate and should be approved as proposed.   Section 1123(a)(5)(D) of the Bankruptcy Code permits the sale of all or some of a debtor's assets pursuant to a plan.   Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."   In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

24.     To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and their constructs may serve to "encourage bidding and [] maximize the value of the debtor's assets").

25.     The Debtors believe that the Bidding Procedures are appropriately tailored to ensure that the bidding process is fair and reasonable and will maximize value for their estates and stakeholders.  The Bidding Procedures are designed to maximize the value received for the Reorganized Equity or Assets, in whole or part, by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing Third-Party Bids. Moreover, by requiring that Third-Party Bids exceed the Reserve Price to constitute Qualified Bids, the Bidding Procedures ensure that the Sale Process will yield at least a minimally acceptable value for the Debtors' estates and their stakeholders.

26.     The Bidding Procedures also provide interested third-party buyers with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  This is in part because interested Potential Bidders already have access to the Data Room and the Bidding Procedures provide for a streamlined process for any other interested third-party buyers to gain access.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with the Consultation Committee, the highest or otherwise best

offer(s) for the Reorganized Equity or the Assets, in whole or in part, as applicable.  In particular, by permitting bids for either the Reorganized Equity or, alternatively or in combination therewith, the Assets, in whole or in part, the Debtors' proposed Sale Process seeks to provide the best opportunity for Third-Party Bids to exceed the Reserve Price.  Finally, by providing the Debtors with the right to terminate the Sale Process in accordance with their fiduciary duties, the Bidding Procedures ensure that the Debtors can swiftly seek to confirm an alternative chapter 11 plan if the Sale Process will not yield value in excess of the Reserve Price.

**B.      Cure Notice Procedures**

27.      The Debtors also respectfully request that the Court approve the Cure Notice Procedures set forth in the Bidding Procedures Order.   Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.

28.      As stated above, the Debtors and any potential third-party buyer must be aware of asserted Cure Costs and assertions that the Debtors cannot provide adequate assurance of future performance in order for the Sale Process to reasonably maximize value.  Counterparties, by receiving notice of this Motion, will have four weeks' notice of the Cure Objection Deadline and over three weeks' notice of known Cure Costs.  By contrast, in a plan confirmation context, such parties would ordinarily have only a fraction of that time to review a cure notice and object to cure amounts or adequate assurance.  Moreover, the Cure Objection Deadline falls after the claims bar date in these chapter 11 cases, and in the event of assignment and assumption of an executory contract or unexpired lease to a third-party under a Plan, the applicable Counterparty

22

retains the right to object such assumption and assignment based on an alleged failure to provide adequate assurance.  Accordingly, Counterparties will have sufficient notice of the Cure Objection Deadline and Cure Costs and ample opportunity to file Cure Objections.  The Cure Notice Procedures should be approved.

<u>**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**</u>

29.     To implement the foregoing successfully, the Debtors request that, to the extent that Bankruptcy Rule 6004 may be applicable to the relief requested by this Motion, the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

<u>**Emergency Relief Is Appropriate**</u>

30.     As stated above, emergency relief is appropriate in the context of this Motion so that the Debtors may comply with the milestones under the Plan Support Agreement and the DIP Facility.  Moreover, because the Cure Notice Procedures are designed to provide ample notice of Cure Costs and the Cure Objection Deadline, Counterparties are not prejudiced by emergency relief.

<u>**Notice**</u>

31.     Notice of this Motion will be provided to any party that has requested notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

<u>**No Previous Request**</u>

32.     No previous request for the relief sought in herein has been made by the Debtors to this or any other court.

Dated:  September 11, 2020
       Houston, Texas

                    Respectfully submitted,

                     */s/  Alfredo R. Pérez*

                    WEIL, GOTSHAL & MANGES LLP
                    Alfredo R. Pérez (15776275)
                    Clifford Carlson (24090024)
                    700 Louisiana Street, Suite 1700
                    Houston, Texas  77002
                    Telephone: (713) 546-5000
                    Facsimile:  (713) 224-9511
                    Email:  Alfredo.Perez@weil.com
                              Clifford.Carlson@weil.com

                    -and-

                    WEIL, GOTSHAL & MANGES LLP
                    Matthew S. Barr (admitted *pro hac vice*)
                    Ryan Preston Dahl (admitted *pro hac vice*)
                    Scott Bowling (admitted *pro hac vice*)
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007

                    *Attorneys for Debtors*
                    *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on September 11, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

           _/s/ Alfredo R. Pérez_
           Alfredo R. Pérez