1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 20-33163-H1-11
                              §
5   CEC ENTERTAINMENT, INC. AND  §      HOUSTON, TEXAS
    OFFICIAL COMMITTEE OF        §
6   UNSECURED CREDITORS,         §      TUESDAY,
                              §      SEPTEMBER 29, 2020
7              DEBTORS.     §      3:00 P.M. TO 4:03 P.M.

8
             MOTION HEARING VIA VIDEO CONFERENCE
9
            BEFORE THE HONORABLE MARVIN ISGUR
10            UNITED STATES BANKRUPTCY JUDGE

11

12     APPEARANCES:                    (SEE NEXT PAGE)

13     CASE MANAGER:                 TYLER LAWS

14     RECORDED VIA COURTSPEAK; NO LOG NOTES; AUDIO DISTORTED

15

16

17

18

19

20                 TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX 77478
                     281-277-5325
23              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

```
 1                    APPEARING BY VIDEO CONFERENCE:

 2

 3   FOR THE DEBTORS:              WEIL GOTSHAL & MANGES, LLP
                                   Matt Barr, Esq.
 4                                 787 Fifth Avenue
                                   New York, New York  10153
 5                                 212-310-8010

 6                                 WEIL GOTSHAL & MANGES, LLP
                                   Paul R. Genender, Esq.
 7                                 200 Crescent Court
                                   Suite 300
 8                                 Dallas, Texas  75201
                                   214-746-7877
 9   FOR LYNNWOOD PUBLIC
10   FACILITIES DISTRICT:          REED SMITH, LLP
                                   Michael P. Cooley, Esq.
11                                 2501 N Harwood
                                   Suite 1700
12                                 Dallas, Texas  75201
                                   469-680-4213
13

14   FOR CREDITORS COMMITTEE:      KELLEY DRYE & WARREN, LLP
                                   Jason R. Adams, Esq.
15                                 James S. Carr, Esq.
                                   101 Park Avenue
16                                 New York, New York  10178
                                   212-808-5056
17

18   FOR AD HC LENDER GROUP:       AKIN GUMP STRAUSS HAUER &
                                   FELD, LLP
19                                 Jason P. Rubin, Esq.
                                   One Bryant Park
20                                 Bank of America Tower
                                   New York, New York  10036
21                                 212-872-7489

22                                 KING SPALDING, LLP
                                   Arthur J. Steinberg, Esq.
23                                 1185 Avenue of the Americas
                                   34th Floor
24                                 New York, New York  10036
                                   212-556-2158
25
```

1                    <u>VIDEO APPEARANCES (CONTINUED)</u>:

2

3   FOR MEX-TEX, INC.:              REUBEN L. HANCOCK, PC
                                    Reuben L. Hancock, Esq.
4                                   7480 Golden Pond Place
                                    Suite 200
5                                   Amarillo, Texas  79121
                                    806-373-1713
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2

3   WITNESS:                    Direct   Cross   Redirect   Recross

4   JAMES HOWELL
       By Mr. Genender          13        .        45          .
5      By Mr. Cooley             .       23         .          .

6

7   EXHIBITS:                                    Offered    Received

8   DEBTORS' EXHIBITS
       No. 923:                                    15         16
9
    LYNNWOOD EXHIBITS
10     Nos. 922-7 through 922-9:                    12         12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HOUSTON, TEXAS; TUESDAY, SEPTEMBER 29, 2020; 3:00 P.M.

2                    (VIDEO CONFERENCE)

3          THE COURT:  All right.  Good afternoon.  We're

4    here in the CEC Chuck E. Cheese case.  It is Case No.

5    20-33163.

6          Appearances have been made electronically.

7          Let me start with a status report by Debtors'

8    counsel.  I've enabled pretty much everybody that's there

9    from that firm.  If someone wants to make the initial report

10   at the time, let's go ahead.

11         MR. BARR:  Thank you, Your Honor.  It's Matt Barr

12   from Weil Gotshal, on behalf of the Debtors.  And thank you

13   for your time today and for seeing us.

14         Your Honor, we have three Agenda items today on

15   the Agenda.  We have the proposed DIP financing, we have the

16   proposed bidding procedures and then we have a continuation

17   of the Debtors' Motion to abate certain rents.  And there's

18   one, the Lynnwood, No. 624, lease that will go forward with

19   respect to item No. 3 and Mr. Genender will deal with that

20   in a little bit.

21         Your Honor, with respect to items No. 1 and 2, we

22   learned a few hours ago some new facts that we believe we

23   need to discuss with the company, with the Board, with the

24   Creditors' Committee, with the lenders and other

25   stakeholders that we hope will streamline and shorten the

1  process and resolve a number of the outstanding objections

2  that still are in front of the Court.

3          As you may have seen from the pleadings that we

4  filed, there were significant reduction in the number of

5  issues, but we do believe that if we could have a one-week

6  adjournment for maybe next Tuesday or Wednesday at the

7  latest to come back in front of you, we're hopeful that

8  these facts will put us in a position to streamline the

9  cases.

10         We do have some milestones.  We understand that

11  the lenders would agree to extend the milestones and

12  continue to consent to the use of cash collateral during

13  this adjournment, but once Your Honor has a chance to look

14  at the calendar and maybe provide some times, we can have

15  the agent confirm that on the Record.

16         THE COURT:  All right.  I'm going to look up some

17  time for you and just what I have and then we'll see whether

18  the lender consents to the agreement of various deadlines

19  and milestones and whether any other party then objects to

20  the continuance.  So your request is for Tuesday or for

21  Wednesday.

22         MR. BARR:  Correct, Your Honor, and thank you.

23      (Pause in the proceedings.)

24         THE COURT:  Would 4:00 o'clock on Tuesday work for

25  your client, Mr. Barr?

1          MR. BARR:  I believe it would, Your Honor.  I know

2   we have some of them on the phone so if it doesn't, they

3   should do a thumbs down as opposed to not doing anything.

4          THE COURT:  So I have a request from the Debtor to

5   continue today's hearings with respect to the DIP and the

6   bid procedures until Tuesday, October 6th, at 4:00 o'clock.

7   I'd like to start by asking the lender group to press five

8   star.  We'll see if they have any objection.  We'll see if

9   any other party has any objection.  If not, we'll continue

10  the hearing.  Get those lines active.

11         Mr. Rubin, good afternoon.

12         MR. RUBIN:  Good afternoon, Your Honor.

13  Jason Rubin from Akin Gump Strauss Hauer and Feld, on behalf

14  of the Ad Hoc Lender Group, the DIP lenders and the

15  consenting creditors under the Plan Support Agreement.  I

16  can confirm that all those parties collectively will agree

17  to the milestones to accommodate the October 6th hearing.

18         THE COURT:  Thank you.  From 732-735-6471, who do

19  we have?

20       (No audible response.)

21         THE COURT:  732-735-6471.

22       (No audible response.)

23         THE COURT:  You may have your own line muted and

24  you'll need to unmute your own handset, if that's what's

25  going on.

1          MR. STEINBERG:  Your Honor, you're absolutely

2    correct and I apologize for that.  This is Arthur Steinberg

3    from King Spalding, on behalf of the Ad Hoc Noteholder

4    Group.  We have no problem with adjourning to that date and

5    that time.

6          THE COURT:  Mr. Steinberg, thank you.

7       (Pause in the proceedings.)

8          THE COURT:  From 806 area code, it is 373-6789.

9          MR. HANCOCK:  Yes.  Your Honor, this is

10   Reuben Hancock and we have no objection.

11         THE COURT:  Mr. Hancock, thank you.

12         Mr. Adams?

13         MR. ADAMS:  Your Honor, Jason Adams, Kelley Drye

14   and Warren, on behalf of the Committee.  Your Honor, we were

15   notified an hour ago about the requested adjournment of the

16   hearing for next Tuesday.  It's acceptable to the Committee

17   and we have no objection.

18         THE COURT:  Thank you, Mr. Adams.  Now let me just

19   open it to anyone that has any objection to continuing most

20   of the hearings.  I know people are prepared for today, but

21   typically these announcements are pretty meaningful when I

22   get them.  So if anyone objects, I need you to press five

23   star on your line.

24      (Pause in the proceedings.)

25         THE COURT:  All right.  There is no objection to

1    hearing on both the DIP Motion and on the bid procedures

2    Motion.  It's continued until October the 6th, at

3    4:00 o'clock.  No additional notice needs to be given.

4    Anyone that was interested in the hearing like me should

5    have been prepared for today and so they should be online I

6    think.  We'll see you on Tuesday on that.

7              MR. BARR:  Thank you, Your Honor.

8              THE COURT:  If people want to stay on the line

9    however for the other matter, which is the rent abatement

10   issue, you're free to stay on the line.  If you wish to hang

11   up, feel free to hang up.

12             So, Mr. Barr, how did you want to handle the rent

13   abatement Motion?  Do you want to go to Mr. Genender for

14   that or what was your pleasure on that?

15             MR. BARR:  Sure.  I would first like to apologize

16   for letting you know so late as we're sure that you did

17   prepare, but thank you very much for your --

18             THE COURT:  Mr. Barr, deals get made when deals

19   get made.  You needn't apologize for that.  I understand

20   that people -- people should have been here if they cared

21   about this.  I didn't see any reason to give more notice.

22   That's all that I really meant by that.

23             MR. BARR:  Understood.

24             THE COURT:  There's a complaint.  It's not

25   sometimes exact.

1       MR. BARR:  Thank you, Judge.  So Mr. Genender

2  should be on.

3       MR. GENENDER:  I am but --

4       THE COURT:  But I have a black screen for him for

5  some reason.

6       MR. GENENDER:  Well, I -- hang on.

7       Can you hear me okay, Judge?

8       THE COURT:  I can hear you fine and it's more

9  pleasurable to have the black screen so go ahead please,

10  Mr. Genender.

11       MR. GENENDER:  Judge, you're not alone in that

12  view.  I don't know why -- I can see myself, but I don't

13  know why I'm not able to see what -- if I can proceed?  What

14  we want to do, Judge, is we just have one venue, as Mr. Barr

15  indicated, and it's No. 624, Lynnwood in Washington state.

16  And we have reached agreements on the admissibility of

17  evidence with counsel for the landlord, Mr. Cooley from Reed

18  Smith.  And with the Court's permission, I'd like to read

19  for you what those agreements are through the stipulated

20  evidence and then proceed from there if that's okay.

21       THE COURT:  Well, first let me get Mr. Cooley's

22  line activated so hold on just a minute.

23       MR. GENENDER:  Thank you.

24       THE COURT:  Mr. Cooley, do we have you connected

25  up now?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1      MR. COOLEY:  Yes, Your Honor.  Good afternoon and

2 thank you.

3      THE COURT:  Good afternoon.  If there's anyone

4 else that wants their line activated during the hearing for

5 Mr. Cooley's client, you can press five star.  Otherwise,

6 we'll proceed just with the people who've already been

7 activated.

8      All right.  Mr. Genender, go ahead please.

9      MR. GENENDER:  Thank you, Your Honor.  I think I

10 may have figured out my camera here.

11      Is that better, Judge, can you see me now?

12      THE COURT:  I can't but I'm -- it's just fine.

13      MR. GENENDER:  Okay.  Your Honor, we have for the

14 Debtors' supplemental exhibit list, which is ECF 980, the

15 parties have agreed to stipulate to the admissibility of

16 Exhibits 15 through 19, 21, 23 and 25 through 28.

17      THE COURT:  Do you agree, Mr. Cooley?

18      MR. COOLEY:  I do, Your Honor.

19      THE COURT:  All right.  We're going to admit

20 980-15, 16, 17, 18, 19, 21, 23, 25, 26, 27 and 28.

21    (Debtors' Exhibit Nos. 980-15, 980-16, 980-17, 980-18,

22 980-19, 980-21, 980-23, 980-25, 980-26, 980-27 and 980-28

23 received in evidence.)

24      MR. GENENDER:  And, Your Honor, for the landlords'

25 exhibit list, which is No. 922, we have agreed to stipulate

1  to the admissibility of Exhibits 7, 8 and 9.

2          THE COURT:  Are you offering those, Mr. Cooley?

3          MR. COOLEY:  I am, Your Honor.  Thank you.

4          THE COURT:  922-7, 8 and 9 are admitted.

5      (Lynnwood's Exhibit Nos. 922-7, 922-8 and 922-9

6  received in evidence.)

7          THE COURT:  Additional exhibits may be offered

8  during the course of the proceeding.  We'll consider their

9  admissibility at the time that they are offered.

10          MR. GENENDER:  Great.  Thank you, Your Honor.

11  Just by way of housekeeping, Debtors' Exhibits 16 and 17 are

12  the transcripts, which are in evidence, the transcripts of

13  Mr. Howell's prior testimony on September 8th and 11th

14  respectively.  Given that those are in the evidentiary

15  Record, we're obviously not going to replow that ground.

16  And subject to that or with that said, Your Honor, we call

17  Jim Howell to the stand.

18          THE COURT:  All right.  Mr. Howell?

19      (Pause in the proceedings.)

20          THE COURT:  I believe I've got Mr. Howell's lines

21  activated.  I've also activated Mr. Carr's line.

22          Mr. Carr, did you have something you wanted to

23  address?

24          MR. CARR:  No, Your Honor, not at this time.

25          THE COURT:  Thank you.  I've going to go ahead and

1  leave your line active in case something comes up.  It looks

2  like I got a message that you had something you wanted --

3  that's fine.

4          Mr. Howell, would you raise your right hand

5  please, sir?

6      (Witness sworn.)

7          THE COURT:  Mr. Genender?

8          MR. GENENDER:  Thank you, Your Honor.

9              DIRECT EXAMINATION OF JAMES HOWELL

10 BY MR. GENENDER:

11 Q    Could you please state your full name for the Record?

12 A    James Andrew Howell.

13 Q    And, Mr. Howell, you testified on prior rent abatement

14 hearings on September 8th and September 11th?

15 A    Yes.

16 Q    And you're familiar with the testimony on those dates?

17 A    Yes, I am.

18 Q    And you also offered a declaration in support of the

19 rent abatement motion as well, which is Exhibit 15; are you

20 aware of that?

21 A    Yes.

22 Q    And you're familiar with that as well?

23 A    Yes.

24 Q    Have you -- do you have some familiarity with the lease

25 for location No. 624, which is Debtors' Exhibit 21?

1  A     Yes, some familiarity, yes.

2  Q     And are you familiar with Debtors' Exhibit 23, the

3  notice and pursuant to that lease dated August 3rd, 2020?

4  A     I am.

5  Q     I want you to turn, if you can, to Debtors' Exhibit 25.

6  A     Okay.

7  Q     And you'll see that's an email exchange between the

8  landlord counsel and me answering some questions that the

9  landlord counsel had?

10 A     Yes.

11 Q     Okay.  And do you agree with the accuracy of those

12 answers?

13 A     Yes.

14 Q     Okay.  What is the current status of Venue No. 624?

15 A     It is closed for all business.

16 Q     And why is it closed for all business?

17 A     I had mentioned in my earlier testimony that we had

18 pivoted to an off-premise for stores that could not fully

19 open.  This was one of the stores that did pivot to off-

20 premise, but the sales level were so low we changed -- we

21 weren't making enough money to cover the labor so we closed

22 the store completely.

23         THE COURT:  I need to interrupt you just for a

24 second.  I thought you had offered 980 sub exhibits, but I

25 must have heard that wrong because 980 doesn't have those.

1          MR. GENENDER:  Bear with me, Your Honor.

2          MR. SPEAKER:  Your Honor, I believe it's 923

3   unless there's been a change.

4          MR. GENENDER:  No, I think we did a supplemental.

5          THE COURT:  32 which was --

6          MR. SPEAKER:  You may be right.

7          MR. SPEAKER:  I think it's 980 is what we filed

8   today.

9          THE COURT:  980 has Exhibit 32 added, but the

10  other ones aren't there and that's why I want to be sure I

11  have it right.

12         MR. GENENDER:  Okay.  I understood that 980 had

13  all the exhibits and it added No. 32.  I don't have --

14         THE COURT:  To my defense, it has them all on a

15  list, but the exhibits themselves I don't think are there.

16         MR. GENENDER:  Okay.  Then let's go to our

17  original exhibit list, which is 923 as counsel said,

18  Your Honor.  The numbers that I gave you should key off of

19  our original exhibit list of September 25, which is ECF 923.

20  Apologize for any confusion, Your Honor.

21         THE COURT:  No problem.

22         Is that okay with you, Mr. Cooley?

23         MR. COOLEY:  Yes, Your Honor, it is.

24         THE COURT:  All right.  Then we'll -- let me now

25  clarify.  With the numbers you -- I want to be sure I've got

1  the right record.  923, Exhibit -- 923-25 is actually

2  Debtors' Exhibit 23, but I admitted them in a different

3  numbering system.  I want to go back and fix this and I'm

4  sorry to take everybody's time but I want a clean Record.

5          MR. GENENDER:  It's okay.  So, Judge --

6          THE COURT:  So out of 923, tell me what you're

7  actually offering.

8          MR. GENENDER:  I'm actually looking at the exhibit

9  numbers on the actual page, pages 2 through 5 of the actual

10 document 923.  Those exhibit numbers, Your Honor, is what

11 I'm going off, if that's okay with the Court.

12         THE COURT:  Okay.  Not what was -- that's fine

13 with me, if that's Mr. Cooley's understanding.

14         MR. COOLEY:  It is, Your Honor.  That's what I

15 understood the numbers to be that Mr. Genender was reciting

16 earlier.

17         THE COURT:  All right.  Then we are not admitting,

18 for example, 980-various numbers.

19    (Debtors' Exhibit Nos. 980-15, 980-16, 980-17, 980-18,

20 980-19, 980-21, 980-23, 980-25, 980-26, 980-27 and 980-28

21 withdrawn from evidence.)

22         THE COURT:  We're admitting the exhibit list off

23 of -- your exhibit list off of 923 and they are contained

24 and identified within 23.

25         (Debtors' Exhibit No. 923 received in evidence.)

1        MR. GENENDER:  Okay.

2        THE COURT:  So I've now got 923-27 with Exhibit 25

3   requested.

4        MR. GENENDER:  Okay.  Thank you, Your Honor.

5        THE COURT:  Okay.  It's showing up on the screen

6   now so.

7        MR. GENENDER:  Thank you, Your Honor.

8   BY MR. GENENDER:

9   Q    Mr. Howell, what impact has any government regulations

10  had on the company's decision to operate Venue 624 as it's

11  operating it now?

12  A    It severely curtailed our ability to run that venue as

13  we would have envisioned primarily because we offer both, as

14  I said earlier, food and fun and games.  You know, the games

15  are not allowed to be played in this venue.

16  Q    Thank you, sir.  By way of reference, Mr. Howell, let

17  me take a step back.

18        Aside from just Venue 624, when this Motion was --

19  when the abatement Motion was filed, I think your prior

20  testimony was there was about 140 venues subject to the

21  Motion; is that -- do you recall that?

22  A    There's 141 stores.

23  Q    Okay.  Looking at Debtors' Exhibit 26, which is 923-28,

24  Your Honor, can you turn to that page, Mr. Howell?

25  A    23.  Yes, sir.

1  Q    And is that the current store tracker that reflects the

2  locations that are currently subject to the abatement

3  Motion?

4  A    What I'm showing for the rent of the stores is 923-30,

5  Exhibit No. 28.

6            We're going off the bottom; is that right?

7  Q    Yes, sir.

8  A    Okay.  So, yeah, the bottom says No. 28.  Yes, that is

9  a list of the 56 remaining stores, yes.

10  Q    Okay.  Thank you.  Turning now back specifically to

11  Venue 624, can you turn to Debtors' Exhibit 26, which is at

12  923-28?

13  A    Yes.  Okay.  I'm there.

14  Q    Okay.  Does that have -- and is that -- that's a two-

15  page document; is that right?

16  A    Yes.  The first page is Lynnwood and the second page I

17  believe is Paramus.

18  Q    Okay.  So we're only going to focus on the first page

19  since Paramus is not -- no longer set for hearing today.

20            As I asked you with the corresponding page for

21  other venues, can you walk the Court through what the first

22  page of Debtors' Exhibit No. 26 reflects?

23  A    Yes.  So this is a sale report that we use to break

24  down sales.  And I'll get reports daily that will show total

25  sales, but you also want to break it down into its

1  components and the two big components that we have are

2  revenue off food and beverage and what we call

3  "entertainment and merchandise."  So this breaks it down

4  into a little more granularity so you can see what was spent

5  on food versus beverage and then what was spent on gaming

6  versus merchandise.  And then we -- that's the rows.  And

7  then across the columns you'll see references like 2019 P3.

8  P3 would be March so that would be March 2019.  And if you

9  follow that all the way across, you have P8 of 2020, which

10 would be August of 2020.  So it's a comparative view of the

11 sales in this store.

12 Q    Great.  If you can turn to demonstrative Debtors'

13 Exhibit 27, which is at ECF 923-29?  And let me know when

14 you're there, Mr. Howell.

15 A    I'm there.

16 Q    Okay.

17         MR. GENENDER:  Thank you, Your Honor.

18         Again, Mr. Howell, this reflects Paramus,

19 New Jersey.  We can disregard that because that's not set

20 for hearing today.

21 BY MR. GENENDER:

22 Q    Can you walk the Court through what this demonstrative

23 shows on the first page for Lynnwood for the month depicted?

24 A    Sure.  So again each little box I guess, if you want to

25 call it that, is a different month and it's comparing 2019

1  sales volume to 2020 sales volume.  And then it's broken --

2  there are bars for each month.  The higher the bar, the

3  better it is.  The lower the bar obviously the lower the

4  revenue is.  And then we have an orange color and a red

5  color.  The red represents entertainment and merchandise and

6  the orange represents food and beverage revenue.

7  Q    Mr. Howell, with respect to April and May 2019 versus

8  2020, looking at the 2020 revenue, it shows a $1 figure and

9  a $2 figure, which is in -- these are in thousands; is that

10 right?  These are in --

11 A    That's right, yes.  Yeah.

12 Q    So for those months, would that Lynnwood store -- did

13 that -- how did that correspond to the time period when you

14 said this store was off-premises?

15 A    I believe that that would have been -- I'm looking at

16 it now.  I would say they may well have been off-premise at

17 that time, but were not doing very well.  But looking at

18 these numbers, I'd say we may -- we were probably trying to

19 peak out something from off-premise but there wasn't much

20 revenue.  It's very small.

21 Q    When you testified that the expense to run that venue

22 off-premise was more than the revenue generated, how if at

23 all does the revenue reflected on April and May 2020 on the

24 first page of demonstrative 27 support that?

25 A    Well, yeah.  And in both those cases, you would know

1    that you were spending more money than you were bringing in

2    and the primary reason would be labor, but you also have

3    other costs in the store.  But at any given time, we only

4    allow -- we don't allow less than two people to be in the

5    store, so two people have to be in the store at all times.

6    So it's pretty clear to me by looking at this that we would

7    be paying more than we were bringing in.

8    Q    Understood.  Mr. Howell, just a few more questions.

9              As it relates to this venue, if you -- if I had

10   asked you a year ago whether the pandemic -- the current

11   pandemic was something that you foresaw, what would you

12   answer be?

13   A    It would not have been something I could have foreseen.

14             MR. GENENDER:  I'll pass the witness, Your Honor.

15             THE COURT:  Thank you.  Mr. Cooley?

16             MR. COOLEY:  Yes, Your Honor.  Thank you.  And for

17   purposes of the exhibits, I have -- I also have them cued up

18   on my screen, but I'm happy to do what the Court prefers.

19   If the Court prefers to manage the documents for

20   consistency, I can work in that way as well.

21             THE COURT:  Not at all.  You're now the presenter.

22         (Pause in the proceedings.)

23             MR. COOLEY:  Okay.  Just a moment, Your Honor.

24   Let's see.  Your Honor, it's -- in order to become a

25   presenter, I'm being instructed to restart GoToMeeting.  I'm

1  going to just -- I think I'm going to disappear for just a

2  moment.  I'll be right back.  I apologize.

3              THE COURT:  That's fine.

4              Mr. Genender, I'm going to go ahead while he's

5  doing that and disconnect you from GoToMeeting and I think

6  when you come back in, your camera will probably work.

7              MR. GENENDER:  Thank you, Judge.

8          (Pause in the proceedings.)

9              MR. COOLEY:  Your Honor, I apologize, but could

10  you send me the presenter invitation if you will one more

11  time?

12              THE COURT:  Hold on.  This may take a second

13  because I've got to find you now here.  There it is.  All

14  right.  You should now be the presenter.  And I think we can

15  see Mr. Genender so.

16              MR. GENENDER:  I apologize for making myself

17  visible, Your Honor.

18              MR. COOLEY:  Do you have my screen, Your Honor?

19  You can see what should --

20              THE COURT:  I see 923-30.

21              MR. COOLEY:  Perfect.  It works.  I can't believe

22  it.  I think I'm ready to proceed.

23              THE COURT:  All right.  Go ahead.

24              MR. COOLEY:  Thank you, Your Honor.

25              Mr. Howell, good afternoon.  My name is

1  Michael Cooley and I represent Lynnwood Public Facilities

2  District, which is one of the Debtors' landlords.  I wanted

3  to start with just a couple of quick cleanup items at the

4  start based on some of the testimony you just gave.  And at

5  the moment, I'm looking at Debtors' Exhibit 28, which you

6  may refer to in your own exhibits or it should be on the

7  screen in front of you.

8                    CROSS-EXAMINATION OF JAMES HOWELL

9  BY MR. COOLEY:

10 Q    And I think I understand this is the list of remaining

11 landlords as to which the Debtors' still seeking abatement

12 of rent; is that correct?

13 A    Yes, sir.

14 Q    And for those landlords who are no longer on the list,

15 is that because the Debtors have reached deals with them or

16 because the applicable government regulations for those

17 landlords no longer impede the Debtors' ability to operate?

18 A    I believe it would be because deals are -- have been

19 worked or maybe are in negotiations.

20 Q    Very good.  Thank you.  And then next I'm going to turn

21 just briefly to the other document you were just looking at.

22 This is Debtors' Exhibit demonstrative I should say 27 on

23 the screen.

24           Do you recall you were just talking about this

25 document a moment ago?

1  A    Yes.

2  Q    And as you described, this shows the year-over-year

3  decline in monthly revenue over the last several months at

4  the Lynnwood facility; did I read that correctly?

5  A    Yes.

6  Q    As you sit here today, do the Debtors expect the 2021

7  revenue at this location also to be zero?

8  A    No.  I think we expect at some point the -- you know,

9  COVID will maybe turn the corner and regulations will be

10 lifted and we'll be able to operate these stores as we

11 intended.

12 Q    So the current expectation is that this financial

13 performance shown on this chart is a temporary situation

14 that the Debtors expect to resolve as the government

15 regulations are lifted.

16 A    Yes.

17 Q    Thank you.  Okay.  In your prior testimony on

18 September 8th and September 11th, you had testified that the

19 relief that the Debtors sought in the Motion is in part due

20 to the pandemic; do you recall that testimony?

21 A    Yes.

22 Q    But just to be clear because this is an important

23 distinction, am I correct that it is actually the government

24 regulations that have been imposed on certain venues and not

25 the pandemic per se that the Debtors claim is the actual

 1  source of the impairment to their business operations?

 2  A    I am not sure how to explain --

 3          MR. GENENDER:  Your Honor, I'm going to interpose

 4  an objection to the extent that calls for a legal

 5  conclusion.

 6          THE COURT:  Overruled.  You can answer the

 7  question.

 8          THE WITNESS:  Yeah.  I just -- I don't know how to

 9  separate the two.  To me, it's a little bit like chicken or

10  the egg.

11          MR. COOLEY:  Okay.  Well, let's take just a moment

12  because I do want to be clear on this and I'm going to ask

13  you to take a look for a moment at the rent abatement Motion

14  which is -- it's in this -- it's in the Debtors' exhibit

15  list.  It was filed on the Docket at docket entry 487.

16  BY MR. COOLEY:

17  Q    Are you familiar with the original Motion that is the

18  subject of today's hearing?

19  A    Yes.

20  Q    Okay.  And I think you actually mentioned this earlier.

21  In that Motion, the Debtors originally sought rent abatement

22  relief for 141 stores located in 12 states; is that right?

23  A    I know it was 141 stores.  I don't recall how many

24  states.

25  Q    Okay.  If I direct your attention on the screen -- and

1   this is the Debtors' Motion marked at the top docket entry

2   487, which is the original Motion, it is docket entry 923-11

3   on the exhibit list, the highlighted text in paragraph 2 of

4   the Motion says:

5       "As of this motion, there are 141 stores in 12 states

6       affected by government shelter-in-place mandates."

7           Does that refresh your memory as to the number of

8   affected states implicated by this Motion?

9   A    Yes.

10  Q    Okay.

11  A    Yeah.

12  Q    And the number is 12?

13  A    Yes.

14  Q    Very good.  Thank you.  But at least at the start of

15  the bankruptcy case, the Debtors currently operate over 500

16  venues in 47 states; is that correct?

17  A    At the beginning of the year, we had about 515

18  Chuck E. Cheese stores and then we also have around 40

19  Peter Piper stores as well.

20  Q    Located in how many states across the country?

21  A    Mostly I want to say there's probably only three or

22  four states that we're not in.

23  Q    And is it fair to say that the Corona Virus in some

24  form or another exists in every state in the country at this

25  time?

1  A     That seems reasonable.

2  Q     Okay.  And there are just 12 states in which there are

3  government regulations in place that have prevented the

4  Debtors' operations to the extent necessary to prompt this

5  Motion; is that right?

6  A     Yeah.  I think every store has been negatively impacted

7  in some way by COVID and some sort of regulation.  I think

8  in these 12 states, I think the difference was that there's

9  a very, you know, solid sort of shelter-in-place mandate as

10 opposed to other regulations or interpretations.

11 Q     Nonetheless, am I correct that in the Order that was

12 proposed by the Debtors should the Court grant the requested

13 relief, the Order proposed for the Court to say that the

14 Debtors not be required to pay rent at the enumerated stores

15 based on the extent and duration of the closure and

16 limitations imposed by the government regulations.

17        Are you familiar with the Order that was entered

18 or that was proposed?

19 A     Yes.

20 Q     And to put a fine point on it, the Order did not

21 propose that the rent abatement continue until such time as

22 the pandemic subsides; is that a fair statement?

23 A     You know, honestly I think that's a fair statement, but

24 I don't recall exactly.

25 Q     That's fair.  Let me put in front of you then.  This is

1  the proposed form of Order, which was accompanied to the

2  Motion as entry 487-2 and is part of the Debtors' compendium

3  of documents and I'll direct your attention to the first

4  decretal paragraph that the Debtors requested.  I

5  highlighted it on the screen.

6          Do you see that?

7  A    I do.

8  Q    And in it, the proposed Order the Debtors submitted

9  asked the Court to order that the Debtors are not required

10 to pay rent at stores subject to government regulations

11 based on the extended duration of the closures and

12 limitations imposed by such government regulations including

13 the stores identified from the date such government

14 regulations went into effect until such government

15 regulations have been lifted; do you see that?

16 A    I do.

17 Q    And does that refresh your recollection as to whether

18 the specific relief the Debtors requested was tied to the

19 timing of government regulations as opposed to the status of

20 the pandemic generally?

21 A    Yes.

22 Q    Thank you.  And it was, in fact, tied to the government

23 regulations as laid out in the proposed Order; is that

24 correct?

25 A    That appears to be that way, yes.

1  Q     Thank you.  Now the Debtors have not offered any

2  epidemiological studies that the virus or its impact on the

3  various states in support of the Motion; am I correct about

4  that?

5  A     Yeah.  Not that I recall we've done anything like that.

6  Q     And in any event, the Debtors are not seeking relief in

7  all of the states where they operate, are they?

8  A     No, I'm not sure I agree with that.  I think we are

9  looking for relief from all of our landlords.  That's been

10 our intent from the beginning, all of our stores.

11 Q     Let me rephrase it.

12 A     Nearly all of our stores are impacted.

13 Q     That was a poorly-phrased question.  In the rent

14 abatement Motion, the Debtors are not seeking relief from

15 rent at all of their venues across the country.

16 A     Yes.

17 Q     All right.  Incidentally, do you happen to know if the

18 12 states that were identified in the Motion are the states

19 with the highest number -- total number of reported cases of

20 COVID-19?

21 A     No, I don't know that it's the answer to that.  I'm

22 generally aware where cases are at, but I'm not tracking it

23 to that level.

24 Q     Okay.  Am I correct though that the Debtors are not

25 seeking relief under this Motion as to venues based in

1  Florida or Texas, correct?

2  A    Yeah, I don't recall Florida or Texas being involved,

3  yes, that's correct.

4  Q    And are you aware whether those are two of the states

5  with the largest number of COVID cases in the country right

6  now?

7          MR. GENENDER:  Your Honor, I'm going to object on

8  the grounds of relevance as to the pending Motion as to one

9  location.

10          MR. COOLEY:  Your Honor, I believe it's relevant

11  because it goes to establishing precisely what is the force

12  majeure event that the Debtors are pointing to, whether it

13  is government regulations or the pandemic as a generalized

14  concept.

15          THE COURT:  I'm going to overrule the objection.

16          Go ahead, you can answer if you have an answer.

17          THE WITNESS:  I'm sorry, could you repeat the

18  question again?

19  BY MR. COOLEY:

20  Q    I think my question was whether you were aware whether

21  Florida and Texas were among the states with the largest

22  number of COVID cases in the United States at this time?

23  A    I'm not aware of any ranking of cases.  I would like

24  though logically they're two big states so they'd have a lot

25  of people in them so from a numbers perspective, yeah, they

1  could have a lot.

2  Q    But nevertheless in the rent abatement Motion, Texas

3  and Florida are not two of the states in which the Debtors

4  are seeking rent abatement relief, correct?

5  A    I believe that's right.

6  Q    And am I correct that that is at least in part because

7  in both of those states, the Debtors are permitted to

8  operate their arcade and entertainment venues?

9  A    Yes.  I think that's an important part of the decision

10 around opening a store, yes.

11 Q    Thank you.  Finally the rent abatement Motion refers to

12 two Washington governor's proclamations, Proclamation No.

13 20-13 and Proclamation No. 20-25.7.

14        Are you aware that those were cited as the

15 relevant Washington state proclamations in the rent

16 abatement Motion?

17 A    You know, I've looked at the Washington state

18 proclamations.  If it was those numbers, I'll take your word

19 on that.  I'm familiar with some of the materials that are

20 out there.

21 Q    Am I correct those that neither of those proclamations

22 was on the Debtors' exhibit list for today?

23 A    I don't recall if I saw a proclamation.  I think we had

24 some information off the web.

25 Q    Very good.  Thank you.  Now I'll turn your attention to

1  the Lynnwood lease itself and that is Debtors' Exhibit 21

2  and what I put up in front of you should be the first page

3  of the lease.

4           Do you recognize -- have you had a chance to

5  review the Debtors' exhibits before the hearing?

6  A    Yes.

7  Q    And I'll show you.  There's the exhibit number at the

8  bottom.

9           And is this a true and correct copy of the lease,

10 the current lease for the Lynnwood property from the

11 Debtors' books and records?

12 A    I believe so, yes.

13 Q    Okay.  And I'll note that there are some handwritten

14 notes on the front.

15          Were you the person who put those handwritten

16 notes there or are those just something that has accumulated

17 to the document over time?

18 A    It looks to me like it's accumulated over time.  It's

19 not mine.

20 Q    Very good.  Okay.  Very good.  And the date of the

21 lease is 1986 so this is an older lease I suppose.

22          Am I correct that you yourself did not negotiate

23 this lease?

24 A    I did not.

25 Q    Okay.  Nevertheless, the Debtors or CEC Entertainment

1   is currently the tenant party under this lease agreement; is

2   that correct?

3   A    Correct.

4   Q    Okay.  And by becoming a party to the lease, the

5   Debtors, CEC Entertainment, agreed to be bound by its terms?

6   A    Yes.

7   Q    Do you know the current expiration date of the term of

8   this lease?

9   A    I believe the last extension is 2023, the last date of

10  extension to operate.

11  Q    And that's the final extension?

12  A    That's what I -- yeah, I believe that's right.

13  Q    Okay.  Very good.  Thank you.  I'm now going to turn

14  your attention to Article 27 of the lease and again I'll try

15  and make this a little bit larger for the -- for your

16  benefit there.  The Debtors' exhibit number at the bottom.

17  And this is Article 27 of the lease, which is titled

18  "Unavoidable Delays."

19          Have you had occasion to look at this provision

20  before today?

21  A    Yes.

22  Q    Okay.  And since this is one of the articles, one of

23  the terms of the lease, am I correct that the Debtor would

24  have agreed to the terms of this provision along with the

25  rest of the lease document?

1  A    Yes.

2  Q    Thank you.  The provision begins, "The provisions of

3  this Article 27 shall be applicable if there shall occur";

4  do you see that line?

5  A    I do.

6  Q    Okay.  And what follows then is a list starting with

7  strikes, lockouts or labor disputes.  It continues on.

8        And at the end of the fourth line within the list,

9  it says, "Governmental restrictions, regulations or

10  controls"; do you see that?

11  A    I do.

12  Q    Okay.  So would you agree with me then that at the time

13  this lease was drafted, somebody must have foreseen the

14  possibility that there could be a need to address the

15  possibility of governmental restrictions in this provision?

16  A    Yes, I think that's a reasonable conclusion, yes.

17  Q    Okay.  The list continues on and it ends a few more

18  lines down with the inclusion of the phrase "Or other events

19  similar or dissimilar to those enumerated"; do you see that

20  text there?

21  A    Yes.

22  Q    Very good.  Thank you.  And again that's part of what

23  the landlord and tenant agreed to under the terms of this

24  lease.

25  A    Yes.

1  Q    The next sentence then tells us what happens and it

2  begins two more lines down:

3       "If landlord or tenant, as a result of any of the

4       above-mentioned events, shall fail punctually to

5       perform any term, covenant or condition on its part to

6       be performed under this lease, then such failure shall

7       be excused and not be a breach of this lease by the

8       party in question but only to the extent and for the

9       time occasioned by such events."

10      Did I read that correctly?

11 A    Yes.

12 Q    And again that's what the landlord and tenant would

13 have agreed to under this lease.

14 A    Yes.

15 Q    Very good.  Turning to the third sentence and this is

16 the important part.  The next sentence reads:

17      "Notwithstanding anything to the contrary herein

18      however" -- excuse me.  "Notwithstanding anything to

19      the contrary herein contained however, the provisions

20      of this Article 27 shall not be applicable to tenant's

21      obligation to pay when due and payable the rents,

22      charges or other sums reserved hereunder."

23      And it continues.

24      Did I read that correctly?

25 A    Yes.

1  Q     And again that's what the landlord and tenant would

2  have agreed to under the terms of this lease.

3  A     Yes.

4  Q     Thank you.  Now the Debtors filed a supplemental reply

5  brief in support of the Motion last night that responded in

6  part to the supplemental brief that Lynnwood filed; are you

7  aware of that?

8  A     I'm not sure what you're referring to.

9  Q     Okay.  I will represent to you that the Debtors filed a

10 reply brief last night that referred in particular to

11 section 18.1 of this lease as contemplating the abatement of

12 rent and so I'd like to take a brief look at that provision.

13 And this is 18.01 on page 26 of Debtors' Exhibit 21.

14        And this provision is titled "Damage and

15 Destruction," and it reads beginning at the first line, "If

16 the premises or any part thereof shall be partially damaged

17 by fire or other casualty" do you see that?

18 A     Yes.

19 Q     And then it continues down and there is language in the

20 middle that says that:

21        "If the damage is not the result of the willful or

22        negligent acts or omission of tenant or tenant's agent,

23        the minimum rent shall be abated to the extent the

24        premises shall be rendered untenantable."

25        And then it continues on.

1          Do you see that?

2     A    No, because I was having trouble following you there.

3     Q    I'm sorry.  Let me -- there we go.

4     A    Gotcha.  Okay.

5     Q    Very good.

6     A    Yeah.  Yes.

7     Q    And just to be clear -- and I think I know the answer

8     to this or I'd be very surprised -- am I correct that the

9     Debtors are not claiming that any portion of the Lynnwood

10    venue has been damaged by fire or other casualty?

11    A    No, we're not.

12    Q    Okay.  Thank you.  Next I'd like to take just a brief

13    look at the letter that was referred to in prior testimony.

14    This is Debtors' Exhibit 23.  This is a letter dated

15    August 3rd from CEC Entertainment to Lynnwood PFD, Public

16    Facilities District.

17          Do you recognize this letter --

18    A    Yes.

19    Q    -- or the form I should say?  Okay.

20    A    Yes.

21    Q    And is this is a letter that was sent -- to your

22    knowledge, this was a letter that was sent to Lynnwood

23    Public Facilities District on or about August 3rd pertaining

24    to the store?

25    A    Yes.

1  Q    And am I correct, is this the only such notice that the

2  Debtors sent to Lynnwood Public Facilities District

3  concerning the impact to their store's operations from the

4  Washington government regulations?

5  A    I don't know if it's the only letter or not at this

6  moment.

7  Q    As you sit here today, are you aware of any other?

8  A    I'm aware when we -- when the pandemic -- early in the

9  pandemic, I'm aware that we instructed our people and helped

10  our advisors to reach out to all of our landlords so I

11  suspect it is possible that another notification could have

12  been sent to Lynnwood PDF or even a phone call, but we were

13  reaching out to landlords at that time.

14  Q    But none of those letters are included on the Debtors'

15  exhibit list here today; is that correct?

16  A    That appears to be correct, yes.

17  Q    Okay.  Now I think you mentioned this previously, but

18  when did the Debtors actually cease regular indoor dining at

19  the Lynnwood venue?

20  A    I want to say that time frame was sort of mid-March,

21  early to mid-March.

22  Q    And so this letter would have been dated roughly four

23  and a half months later?

24  A    Yeah, roughly.

25  Q    Do you happen to know or do you happen to recall

1  whether Article 27, the force majeure provision of the

2  Lynnwood lease, had a timing requirement for the time within

3  which notice was required to be given for a party to take

4  advantage of that provision?

5  A    No.  I think that question --

6  Q    I'd be happy to put it up on the screen.

7  A    Yeah.  And that -- yeah.  Okay.  This is considered the

8  force majeure because I -- as I was going through the lease,

9  I was looking for that term and never found it so.

10 Q    This is the provision and if you -- I'll draw your

11 attention to the final sentence and just ask you looking at

12 the highlighted text in the final sentence of Article 27,

13 does that refresh your recollection as to whether there is a

14 time period within which notice is required to be given to

15 take advantage of this provision?

16 A    Yes.

17 Q    And that period is 10 days?

18 A    That's what it says, yes, sir.

19 Q    Thank you.  In the prior hearings and again today, you

20 testified that even a year ago it would not have been

21 foreseeable to you that Chuck E. Cheese would find itself in

22 a situation like we have today with a global pandemic and

23 its business affected the way it has; do you recall that

24 testimony?

25 A    Yes.

1  Q    And is it fair to say also that it would not have been

2  foreseeable to you personally a year ago that the Debtor

3  would have found itself subjected to the government

4  regulations it has in the 12 states identified in the

5  abatement Motion?

6  A    Yes.

7  Q    But as we've discussed previously, given the presence

8  of the -- excuse me -- given inclusion of governmental

9  restrictions, regulations or controls and the enumerated

10  acts in Article 27, is it fair to say that it was

11  foreseeable to at least somebody who was involved in the

12  original drafting of this lease?

13         MR. GENENDER:  Your Honor, I'm going to object.

14  Calls for a legal conclusion and lack of foundation.

15         THE COURT:  Sustained.

16         MR. COOLEY:  I'll withdraw the question.

17  BY MR. COOLEY:

18  Q    Mr. Howell, you testified already this venue has been

19  closed to indoor dining since March 16th; is that right?

20  A    Around that day, yes, sir.

21  Q    And it remained open for takeout thereafter until

22  approximately when?

23  A    As I -- if I look at the numbers, they would have

24  probably stayed opened through May and then we would have

25  closed it probably -- looking at the numbers, we probably

1  would have shut them down somewhere toward the end of May.

2  And then for June, July and August, they would have been

3  fully closed.

4  Q    And would -- I think you testified to this already, but

5  the decision to fully close the store in or about May of

6  this year was prompted by the fact that this store was just

7  not generating enough sales even to cover its basic costs

8  like labor.

9  A    That's correct.

10 Q    And today the store is closed in its entirety.

11 A    Yes.

12 Q    So would it be fair to say then that the Debtors do not

13 currently believe that it would be profitable for them to

14 open the store at this time for indoor dining or outdoor

15 dining?

16 A    I'm going to --

17         MR. GENENDER:  Objection.  Proposed by the state.

18         MR. COOLEY:  Let me ask it different way.  That

19 was a little bit awkward.

20 BY MR. COOLEY:

21 Q    In light of the -- let me state it differently.  For so

22 long as the current Washington state restrictions remain in

23 place as they currently stand, am I correct that the Debtors

24 have concluded that it would not be profitable to open the

25 Lynnwood venue for outdoor dining?

1  A    Yes.

2  Q    And am I correct that the Debtors has similarly

3  concluded it would not be profitable to open for indoor

4  dining with the arcade closed and dark?

5  A    Yes.

6  Q    And so am I correct then that someone at Chuck E.

7  Cheese, whether that was you or a group of people, conducted

8  the necessary analysis and arrived at the business decision

9  that it would not profitable to open under those

10 circumstances?

11 A    Yes.  It would have been group decision, in a group,

12 yes.

13 Q    Okay.  And so based on that business judgment then, the

14 Debtor would have made the decision to fully close the

15 Lynnwood store until the government regulations permit the

16 arcade to be operated together with indoor dining; is that

17 correct?

18 A    I think -- yeah, I'd say that was accurate.

19 Q    As you sit here today, is it fair to say that the

20 Debtors do not want to reject this lease, not yet anyway?

21         MR. GENENDER:  Objection, Your Honor.  Relevance.

22         MR. COOLEY:  The Debtors -- Your Honor, the

23 Debtors have claimed that the purpose of the lease has been

24 frustrated and I'm wondering whether it has been utterly

25 frustrated or only temporarily so.

1          THE COURT:  And how is that relevant to the

2   Motion?

3          MR. COOLEY:  Because, Your Honor, the Debtors

4   under the Motion have asserted the right to be relieved of

5   the rent obligation based upon the frustration of purpose

6   doctrine.  As we have briefed in our papers, we believe that

7   the frustration purpose defense requires the complete rather

8   than temporary destruction of the purpose of the parties'

9   agreement.  And so my -- the purpose of my question is to

10  explore to what extent the Debtors believe that the

11  impairment they're currently suffering is a permanent one or

12  a temporary one.

13         THE COURT:  I'll overrule the objection.  Go ahead

14  you can answer.

15         THE WITNESS:  We would love to continue to operate

16  this store.  We have no intention of rejecting it at this

17  time.

18  BY MR. COOLEY:

19  Q    And based on what you've said already, am I correct

20  that that is because to some extent the Debtor remains

21  hopeful that at some point it can return to normal

22  operations at this location?

23  A    Yes.

24  Q    Has the Debtor done any forecasting of its own on when

25  it thinks it may be able to or when it thinks it might

1  ultimately be able to return to something like normal

2  operations?

3  A    For this particular store or more broadly?

4  Q    Fair question.  For this particular store.

5  A    No.  I think that this particular store it really comes

6  down to when we -- when you think the governmental

7  regulations will be lifted and when they'll move into say

8  the next stage and so to get the -- to get in the game,

9  though, you've got to move to phase four.  And to be honest,

10  I just don't have the crystal ball to know when that's going

11  to happen.

12      So our approach would be continue to watch the progress

13  that's being made in Snohomish County.  And once we're able

14  to do -- to open it at some level, we'd do it as fast as we

15  could.

16  Q    And at least as you sit here today, the Debtors remain

17  hopeful for that possibility.

18  A    We do.

19  Q    Thank you.

20          MR. COOLEY:  Your Honor, nothing further.  I pass

21  the witness.

22          THE COURT:  Thank you.  Mr. Genender?

23          MR. GENENDER:  Very briefly, Your Honor.

24              REDIRECT EXAMINATION OF JAMES HOWELL

25  BY MR. GENENDER:

1  Q    Mr. Howell, do Exhibits -- Debtors' Exhibits 18 and 19

2  reflect the current governmental regulations in effect that

3  affect Venue 624?

4  A    Yes.  I read these and then I went online as well to

5  clarify a few things.

6  Q    And as a matter of fact, Exhibit 18 has said that the

7  summary of change is updated September 21, just last week,

8  right?

9  A    Yeah, very recent.

10 Q    So obviously that document didn't exist as of

11 August 3rd when the abatement Motion was filed, correct?

12 A    That would seem reasonable, yes.

13         MR. GENENDER:  That's all the questions I have,

14 Your Honor.

15         THE COURT:  All right.  Thank you.  I assume no

16 follow-up; is that correct?

17         MR. COOLEY:  No follow-ups, Your Honor.

18    (Witness steps down.)

19         THE COURT:  Thank you.  Any further evidence by

20 the Debtors?

21         MR. GENENDER:  Your Honor, that concludes the

22 Debtors' evidence.  And as part of our agreement, Mr. Cooley

23 indicated he would not be calling a witness in exchange for

24 our stipulation as to his exhibits.

25         THE COURT:  Mr. Cooley?

1          MR. COOLEY:  That is correct, Your Honor.  And I

2   believe we've already covered the admission of Lynnwood

3   Exhibits 7, 8 and 9 and so I have nothing further to offer

4   in the way of evidence.  Thank you.

5          THE COURT:  Thank you.  Do you all want to do any

6   sort of closing arguments or do you just want me to take

7   this under advisement on the Record that we have?

8          MR. GENENDER:  Your Honor, as much as I would like

9   to argue it, I don't think I would be saying anything that

10   wouldn't be in prior statements or any of our briefing.

11          THE COURT:  Mr. Cooley, are you in the same boat?

12          MR. COOLEY:  I am, Your Honor.  I feel satisfied

13   that we had the opportunity to lay out or arguments in some

14   detail in supplement brief and I'll be glad to rest on

15   those.

16          THE COURT:  Thank you.  I'll take it under

17   advisement immediately and we'll try to get you all a

18   decision out.  Thank you.

19          Is there anything else that we ought to be doing?

20          I need a yellow sheet, Mr. Laws.  If you will send

21   one out today?

22          Is there anything else that we need to do in order

23   to get on with this case or just see you all next week?

24          Mr. Genender?

25          MR. GENENDER:  Your Honor, not on this Motion.  I

1    defer to Mr. Barr if he has anything he wants to share on

2    the case in general.

3            MR. BARR:  Unless Your Honor has any questions for

4    me --

5            THE COURT:  Do you want me to switch?  He's doing

6    his best not to share things.

7            MR. GENENDER:  Understood.  I meant as a --

8    understood, Your Honor.

9            THE COURT:  All right.  We're in adjournment until

10   the morning.  Thank you all.

11       (The parties thank the Court.)

12       (Hearing adjourned at 4:03 p.m.)

13                        * * * * *

14           *I certify that the foregoing is a correct*

15   *transcript to the best of my ability due to the condition of*

16   *the electronic sound recording of the proceedings vid video*

17   *conferencing in the above-entitled matter.*

18   */S/ MARY D. HENRY*

19   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

20   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

21   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

22   *JTT TRANSCRIPT #62794*

23   *DATE FILED:  OCTOBER 7, 2020*

24

25