**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/13/2020

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **CEC ENTERTAINMENT, INC.,** *et al.*,[1] | § § | **Case No. 20-33163 (MI)** |
| | § § | **(Jointly Administered)** |
| **Debtors.** | § § | **Re: Docket No. 800** |

**ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING, (B) GRANT SENIOR SECURED
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND
(C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION SECURED PARTIES; AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated September 3 (the "**Motion**")[2] of CEC Entertainment, Inc.

("**CEC**") and its debtor affiliates, as debtors and debtors in possession (collectively, the

"**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**")

commenced on June 25, 2020 (the "**Petition Date**"), for entry of an order (this "**Order**")

pursuant to sections 105, 361, 362, 363, 364, 365, 503, 506 and 507 of title 11 of the United

States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 1075-1, 4002-1 and 9013-1 of

the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**")

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company (8656); and Texas PP Beverage, Inc. (6895). The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the applicable DIP Documents (as defined herein).

and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the

"**Complex Case Rules**") seeking, among other things,

(a)     authorization for CEC, in its capacity as borrower (the "**Borrower**"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "**Guarantors**"), on a joint and several basis, the Borrower's obligations in connection with a senior secured super-priority debtor in possession credit facility provided by the DIP Lenders (as defined herein) in an aggregate principal amount up to $200,000,000.00 (the "**DIP Facility**" and, the loans thereunder, the "**DIP Loans**"), pursuant to the terms and conditions of this Order and that certain *Senior Secured Superpriority Debtor-In-Possession Credit Agreement*, to be entered into among Queso Holdings Inc. ("**Queso**"), as holdings, the Borrower, the lenders party thereto (collectively, the "**DIP Lenders**") and UMB Bank, NA, as collateral agent and administrative agent under the DIP Credit Agreement (in such capacities, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Parties**") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**," together with all agreements, documents and instruments delivered or executed in connection therewith, the "**DIP Documents**"), which credit agreement shall be in substantially the form attached hereto as **Exhibit A**, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(b)     authorization for the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to, among other things, (i) pay fees, interest, and other amounts under the DIP Facility and (ii) to provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out (as defined herein) and payment of any Adequate Protection Obligations (as defined herein);

(c)     authorization for that certain letter of credit (the "**Prepetition Letter of Credit**") issued in the amount of $5,962,000.00 for the account of CEC and its subsidiaries for the benefit of ACE American Insurance Company (the "**Beneficiary**") by Credit Suisse AG, New York Branch (in such capacity, the "**L/C Issuer**"), as an issuing bank under the Prepetition Credit Agreement (as defined below) to be deemed cancelled solely with respect to, and only for the purposes of, the Prepetition Credit Agreement, and deemed contemporaneously reissued in its full amount (such reissued letter of credit the "**Carried Over Letter of Credit**") by the L/C Issuer with its maturity extended to the Maturity Date (as defined in the DIP Credit Agreement), without modification of any of its terms (including the term providing that it shall be automatically extended for a one year period upon the expiration date set forth therein absent notice of non-renewal at least sixty (60) days prior to such expiration), other than as set forth in Section 10(b) hereof

2

(for the avoidance of doubt, such deemed cancellation and deemed reissuance shall in no way affect the relative rights and obligations as solely between the L/C Issuer and the Beneficiary with respect to the Carried Over Letter of Credit and in fact, the Prepetition Letter of Credit shall become the Carried Over Letter of Credit such that the Prepetition Letter of Credit, as the Beneficiary currently holds it, shall remain in the Beneficiary's possession and shall remain in full force and effect pursuant to its terms);

(d)     the granting of adequate protection, to the extent of the Adequate Protection Obligations, to the Prepetition Secured Parties (each as defined herein) under that certain First Lien Credit Agreement, dated as of August 30, 2019, by and among Queso, as holdings, CEC, as borrower, the lenders party thereto (the "**Prepetition Lenders**"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Agent**" and, together with the Prepetition Lenders and other Secured Parties (as defined in the Prepetition Credit Agreement), the "**Prepetition Secured Parties**"; such First Lien Credit Agreement, the "**Prepetition Credit Agreement**," and together with the Subsidiary Guarantee Agreement, the Holdings Guarantee and Pledge Agreement and the Collateral Agreement (each as defined in the Prepetition Credit Agreement) and all other related loan documents, in each case as amended, modified, supplemented or restated from time to time, the "**Prepetition Loan Documents**");

(e)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses and other amounts payable under the DIP Documents or with respect to the Carried Over Letter of Credit as such become earned, due and payable, including, without limitation, the Put Option Premium (as defined in the DIP Credit Agreement), agency fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' advisors to the extent provided in, and in accordance with, this Order and the DIP Documents;

(f)     subject to the terms of this Order, the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out, on the terms and conditions set forth herein and in the DIP Documents;

(g)     the waiver of the Debtors' and the estates' rights to surcharge against the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, and the waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code (in each case, as of the Petition Date);

(h)     subject to the terms of this Order, authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described

herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(i)    the modification of the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Order; and

(j)    pursuant to Bankruptcy Rule 4001, that a hearing (the "**Hearing**") on the Motion be held before this Court to consider entry of this Order, among other things, (i) authorizing the Borrower, upon entry of this Order and as determined by the Debtors, to borrow from the DIP Lenders in accordance with the DIP Documents, including, in subsequent draws, the DIP Loans, in an aggregate amount not to exceed $200,000,000.00, (ii) authorizing the Carried Over Letter of Credit (including the deemed cancellation of the Prepetition Letter of Credit solely with respect to, and for the purposes of, the Prepetition Credit Agreement and the deemed reissuance of the Carried Over Letter of Credit with extended maturity); (iii) authorizing the Guarantors to guarantee the DIP Obligations, (iv) authorizing the use of Cash Collateral and (v) granting the adequate protection described in this Order;

and the Court having entered the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [ECF No. 114] (the "**Interim Cash Collateral Order**") and the *Stipulation And Order Modifying Interim Cash Collateral Order* [ECF No. 484]; and the Court having considered the Motion and the exhibits thereto, the *Declaration of Jon Walters in Support of Motion of Debtors for Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; and (III) Granting Related Relief* (the "**DIP Declaration**") the evidence submitted or proffered and the arguments of counsel made at the Hearing; and proper and sufficient notice of the Motion and the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Hearing to consider the relief requested in the Motion having been held before this Court on October 8, 2020 and concluded; and all objections, if any, to the relief requested in the

Motion and to the entry of this Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED:**

1.      **Disposition**.  The Motion is GRANTED on a final basis in accordance with the terms of this Order.  Any objections to the Motion that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      **Jurisdiction**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Bankruptcy Rule 7008 and Bankruptcy Local Rule 7008-1, the Debtors consent to entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      **Notice**.  The notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Bankruptcy Local Rules, and no further notice of the relief sought at the Hearing and the relief granted herein is necessary or required.

4.      **Stipulations as to Prepetition Secured Claims**.  Subject to the limitations of Paragraphs 21 and 24 of this Order, the Debtors admit, stipulate, and agree as follows:

(a)      As of the Petition Date, the Prepetition Secured Parties hold valid and enforceable prepetition claims against the Debtors in an aggregate amount equal to:  (a) $756.2 million in aggregate principal amount of term loans (inclusive of approximately $30.4 million of original

issue discount) (the "**Prepetition Term Loans**") plus (b) $113.96 million in aggregate principal amount of revolving loans (including obligations related to the Prepetition Letter of Credit) (the "**Prepetition Revolving Loans**") plus (c) accrued and unpaid interest and all unpaid fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), premiums (if any), reimbursement obligations, indemnification obligations, contingent obligations, and all other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Loan Documents) owing under or in connection with Prepetition Loan Documents whether arising prepetition or postpetition, including accrued and unpaid postpetition interest at the default rate (collectively, the "**Prepetition Secured Claims**").

(b)     The Prepetition Secured Claims constitute the legal, valid, binding, enforceable, and non-avoidable obligations of and claims against each Debtor, and the Prepetition Secured Claims, along with the first-priority liens upon and security interests in the Prepetition Collateral, are not and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination (whether equitable or otherwise), recovery, challenge, or claim pursuant to the Bankruptcy Code or any other applicable law, in each case, subject only to prior valid, perfected, unavoidable, and senior Permitted Liens (as used herein, such term shall have the meaning assigned thereto in the Prepetition Loan Documents), and the Debtors and their estates do not possess and shall not be entitled to assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, amount, and/or non-avoidability of the Prepetition Secured Claims. For the avoidance of doubt, all Obligations and all Prepetition Secured Claims in respect of the Prepetition Term Loans under the Prepetition Credit Agreement are *pari passu* with all

Obligations and all Prepetition Secured Claims in respect of the Prepetition Revolving Loans under the Prepetition Credit Agreement, respectively.

5.     **Stipulations as to Prepetition Loan Documents**.  Subject to the limitations of Paragraph 24 of this Order, the Debtors admit, stipulate, and agree that:

(a)     The Prepetition Secured Claims are evidenced by the Prepetition Loan Documents, which were executed and delivered to the Prepetition Agent by the Debtors prior to the Petition Date.

(b)     The Prepetition Loan Documents include the Prepetition Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, letters of credit, or other loan or security documents executed in connection therewith.  CEC is the Borrower under the Prepetition Credit Agreement, and its affiliated Debtors other than Queso (such Debtors together with CEC, the "**Principal Obligors**") are full-recourse guarantors of the obligations thereunder, pursuant to the Prepetition Credit Agreement and that certain Subsidiary Guarantee Agreement (First Lien), dated as of August 30, 2019, among the subsidiaries of CEC named therein, and the Prepetition Agent (the "**Subsidiary Guarantee Agreement**").  Queso, however, is a limited-recourse guarantor of such obligations, pursuant to the Prepetition Credit Agreement and that certain Holdings Guarantee and Pledge Agreement, dated as of August 30, 2019, between Queso and the Prepetition Agent (the "**Holdings Guarantee and Pledge Agreement**").

(c)     The Prepetition Loan Documents are genuine, valid, existing, legally enforceable, unavoidable, and admissible in these Chapter 11 Cases for all purposes.

6.    **Stipulations as to Prepetition Collateral**.   Subject to the limitations of Paragraph 24 of this Order, the Debtors and the Prepetition Secured Parties admit, stipulate, and agree that:

(a)    The Prepetition Secured Claims are secured by valid and perfected, first-priority liens on and security interests in (collectively, the "**Prepetition Liens**") substantially all of the Principal Obligors' cash and other assets (other than Excluded Property (as defined in the Prepetition Credit Agreement)) and Queso's equity interests in CEC, all to the extent set forth in the Prepetition Loan Documents (such assets collectively, the "**Prepetition Collateral**").

(b)    The Prepetition Secured Parties' liens on and security interests in the Prepetition Collateral were granted pursuant to, among other things, the Prepetition Loan Documents.

(c)    The Prepetition Secured Parties properly perfected their first-priority liens and security interests in and other liens on the Prepetition Collateral as evidenced by, among other things, the Prepetition Loan Documents and documents filed with the appropriate governmental offices.

(d)    Each of the Debtors is indebted and liable under the Prepetition Loan Documents and no payments or other transfers made by or on behalf of the Debtors to the Prepetition Secured Parties prior to the Petition Date are avoidable or recoverable from any of the Prepetition Secured Parties under any section of the Bankruptcy Code, any other federal, state, or other applicable law, or otherwise.

7.    **Stipulation as to the Prepetition Secured Parties' Interests in Cash**.   Subject to the limitations of Paragraph 24 of this Order, and to the extent provided for in section 363 of the Bankruptcy Code, the Debtors and the Prepetition Secured Parties admit, stipulate, and agree that (together with the stipulations set forth in Paragraphs 4, 5, 6 and 7 the "**Stipulations**") all

cash and cash equivalents of each Principal Obligor, wherever located, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Principal Obligors' possession, custody, or control (or persons in privity with any of the Principal Obligors), or which represent income, proceeds, products, rents, or profits of any of the Prepetition Collateral, including to the extent the Principal Obligors obtain an interest in such funds after the Petition Date, shall constitute the cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties (collectively, the "**Cash Collateral**").  The Prepetition Secured Parties have first-priority, perfected liens and security interests in the Cash Collateral pursuant to the applicable provisions of the Prepetition Loan Documents, sections 363(a) and 552(b) of the Bankruptcy Code, the Interim Cash Collateral Order and this Order.

8. **<u>Prepetition Secured Parties' Consent to Use Cash Collateral</u>**.

(a) The Prepetition Secured Parties have consented to the Principal Obligors' use of Cash Collateral solely on the terms of this Order, and any changes to the terms of the Principal Obligors' use of Cash Collateral shall require the consent of the Prepetition Agent (acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement) (the "**Required Prepetition Lenders**")).

(b) The Consenting Creditors (as defined in the Plan Support Agreement) advised by Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") and Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), which constitute the Required Prepetition Lenders, have agreed to the terms of this Order and have the power to direct (and, to the extent necessary, shall be deemed to have directed) the Prepetition Agent to consent to the entry of this Order.

9.       **Findings Regarding the DIP Facility and Use of Cash Collateral**.  Based on the record established and evidence presented at the Hearing, including the DIP Declaration, the proffers presented at the Hearing, and the representations of the parties, the Court makes the following findings:

(a)      Good cause has been shown for the entry of this Order.

(b)      As set forth in the DIP Declaration, the Debtors have a critical need to obtain the DIP Facility and to use the Cash Collateral in each case on a final basis, in order to, among other things, (i) permit the orderly continuation of their respective businesses, (ii) maintain business relationships with their vendors, suppliers, customers and other parties, (iii) make payroll, (iv) make Adequate Protection Payments (as defined below), (v) pay the costs of the administration of the Chapter 11 Cases and (vi) satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility and authorized use of Cash Collateral.  This Order shall constitute the final order with respect to the Debtors' emergency motion for authority to use cash collateral [Docket No. 61].

(c)      As set forth in the DIP Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are unable to obtain secured credit allowable

under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, the DIP Liens (as defined herein), in each case, under the terms and conditions set forth in this Order and the DIP Documents.

(d)     The terms of the DIP Facility, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents, obligations under and related to the Carried Over Letter of Credit, and all other Obligations (as defined in the DIP Credit Agreement) (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations and the DIP Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)      The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 2002, 4001(b)(2) and 4001(c)(2), 6003, 6004 and 9014 and Bankruptcy Local Rule 1075-1, 4002-1 and 9013-1.  For the reasons set forth in the Motion, the DIP Declaration, and the record presented to the Court at the Hearing, consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

10.      **Authorization of the DIP Facility, the DIP Documents and the Carried Over Letter of Credit**.

(a)      The Debtors are hereby expressly authorized and empowered to execute and deliver and, upon such execution and delivery, perform under (i) the DIP Documents, including the DIP Credit Agreement, which are hereby approved and incorporated herein by reference and (ii) the Carried Over Letter of Credit and any documents related thereto or necessary to extend the maturity date of the Carried Over Letter of Credit.

(b)      Upon entry of this Order, (i) the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guarantee, borrowings of up to an aggregate principal amount of $200,000,000.00 in DIP Loans (plus interest, fees, indemnities and other expenses and other amounts provided for in the DIP Credit Agreement), subject to and in accordance with this Order and the DIP Documents, (ii) the Prepetition Letter of Credit shall be deemed to be cancelled solely with respect to, and only for the purposes of, the Prepetition Credit Agreement and deemed contemporaneously reissued as the Carried Over Letter of Credit in its full undrawn amount and without modification of its terms (including, for the avoidance of doubt, with respect to pricing and any other economic terms) other than (x) the deemed issuance as the Carried Over

12

Letter of Credit, (y) the extension of the maturity date to the Maturity Date (as defined in the DIP Credit Agreement) (with an automatic extension for an additional year upon the expiration thereof absent notice of non-renewal at least sixty (60) days prior to such expiration) (for the avoidance of doubt, nothing in this Order (including the deemed cancellation of the Prepetition Letter of Credit and its deemed reissuance as the Carried Over Letter of Credit) shall in any way affect the relative rights and obligations as solely between the L/C Issuer and the Beneficiary with respect to the Carried Over Letter of Credit and in fact, the Prepetition Letter of Credit shall become the Carried Over Letter of Credit such that the Prepetition Letter of Credit, as the Beneficiary currently holds it, shall remain in the Beneficiary's possession and shall remain in full force and effect pursuant to its terms) and (z) the Carried Over Letter of Credit shall be secured by the DIP Liens and (iii) the Debtors are hereby authorized to take all actions in order to obtain and perform under the Carried Over Letter of Credit and the Guarantors are hereby authorized to guarantee the Borrower's obligations thereunder (including interest, fees, indemnities and other expenses and other amounts), subject to and in accordance with this Order.

(c)     Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreement and this Order and in accordance with the DIP Budget (subject to permitted variances), the DIP Documents and this Order.

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities and other amounts contemplated thereby or that may be reasonably required or

necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

      i.     the execution, delivery and performance of the DIP Documents to which it is a party, including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby;

     ii.     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agent and the Required DIP Lenders (as defined herein) may agree) in accordance with the DIP Documents, it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof, increase the aggregate commitments thereunder or increase the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

    iii.     the non-refundable and irrevocable payment to each of and/or on behalf of the DIP Lenders or the DIP Agent, as applicable, of any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents and any other amounts payable in connection with the DIP Facility, including without limitation (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders, including the Put Option Premium (as defined in the DIP Credit Agreement) and (y) all reasonable and documented fees, out of pocket expenses, and disbursements as may be due from time to time including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Akin Gump, as counsel, Houlihan Lokey, as financial advisor, to the DIP Lenders and the Consenting Creditors, Delaware corporate/franchise counsel, licensing and permitting counsel, and one foreign counsel in each applicable foreign jurisdiction (collectively, the "**DIP Consenting Creditor Advisors**"), (b) Perkins Coie LLP as counsel to the DIP Agent and (c) to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in each local jurisdiction, which such fees shall not be subject to approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee applications with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of Paragraph 36 of this Order;

      iv.    making any payments on account of the Adequate Protection Obligations provided for this Order; and

      v.    the performance of all other acts required under or in connection with the DIP Documents or this Order.

(e)    The DIP Credit Agreement, the other DIP Documents and the Carried Over Letter of Credit constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Order for all purposes during the Chapter 11 Cases and any subsequently converted Chapter 11 Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment, transfer or grant of security under the DIP Credit Agreement, the other DIP Documents, the Carried Over Letter of Credit or this Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)    The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations and to incur any DIP Obligations and DIP Liens in connection therewith.

11.    **Cash Management Compliance**.  The Debtors shall maintain their cash management arrangements in a manner consistent with the *Final Order (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System, and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) Waiving the Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* [ECF No. 410] (the "**Final**

**Cash Management Order**") and any subsequent amendments or modifications to the Final Cash Management Order.

12.     **Budget Covenants**.

(a)     Attached hereto as **Exhibit B** is a 13-week cash flow budget that sets forth the Debtors' projected cash receipts and cash disbursements on a weekly basis and is in form and substance reasonably acceptable to the Required Lenders (as defined in the DIP Credit Agreement) (the "**Required DIP Lenders**") (the budget, as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Order and the DIP Documents, the "**DIP Budget**").  On the fourth business day of each successive four-week period (as calculated from June 29, 2020), the Debtors shall deliver an updated DIP Budget to the Consenting Creditors (and shall concurrently provide to counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "**Committee**"), in each case substantially in the form attached hereto as **Exhibit B** with only such changes thereto as the Required DIP Lenders shall agree in accordance with the DIP Credit Agreement.  On the fourth business day of every week, the Debtors shall provide the Consenting Creditors, the DIP Lenders, the DIP Agent and the Committee, on a public and non-restricting basis, with a report (the "**Budget Variance Report**") of the aggregate variance between actual disbursements and projected disbursements as set forth in the DIP Budget for the prior rolling four-week period.

(b)     The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral (as defined herein) to make payments benefitted by the Carve-Out and otherwise in accordance with the specific purposes and amounts set forth in the DIP Budget, subject to the permitted variances as set forth in the DIP Documents.

(c)      The consent of the DIP Lenders to the DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the DIP Budget have been expended, other than funds necessary to satisfy the Carve-Out.

13.      **DIP Superpriority Claims**.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Agent and the DIP Lenders, against each of the Debtors' estates (the "**DIP Superpriority Claims**"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and the proceeds of any other claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "**Avoidance Actions**"), subordinate only to the Carve-Out. Except as set forth in, or permitted by, this Order, without the consent of the Required DIP

Lenders no other superpriority claims other than the Adequate Protection Superpriority Claims shall be granted or allowed in these Chapter 11 Cases.

14.     **DIP Liens**.   As security for the DIP Obligations, effective and automatically perfected upon the date of this Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (the "**DIP Liens**" and, all property identified in clauses (a) – (c) below, collectively, the "**DIP Collateral**"), which shall be subordinate only to the Carve-Out and the Permitted Liens (if any), to the extent specifically provided for herein, and otherwise subject to the terms of this Order and the DIP Documents.

(a)     Liens Priming the Prepetition Liens.   Subject to the terms of this Order, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the following:  the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, net operating losses and other tax attributes, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations,

18

vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than the outstanding capital stock of Queso), other equity or ownership interests, including equity interests in domestic and foreign subsidiaries and non-wholly-owned domestic and foreign subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Liens securing the Prepetition Secured Claims, subject and subordinate only to the Carve-Out, Permitted Liens (if any), and any Prior Liens (as defined below).

(b)     <u>Liens Junior to Permitted Liens and Prior Liens</u>.  Subject to the terms of this Order and to the extent set forth in the DIP Documents, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected security interests in and lien upon, all prepetition and postpetition property of the Debtors, whether now existing or acquired thereafter, that is subject to (x) valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the Prepetition Liens or (y) to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code that are senior to the Prepetition Liens (clauses (x) and (y) together, the "**Prior Liens**"), which security interest and lien in favor of the DIP Agent and the DIP Lenders shall be junior and subordinate only to such valid, perfected and unavoidable Permitted Liens (if any), Prior Liens (if any), and the Carve-Out.

(c)    <u>Liens on Unencumbered Assets</u>.  Subject to the terms of this Order and to the extent set forth in the DIP Documents, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether now existing or acquired thereafter, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, net operating losses and other tax attributes, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than the capital stock of Queso), other equity or ownership interests, including equity interests in domestic and foreign subsidiaries and non-wholly-owned domestic and foreign subsidiaries, money, investment property, causes of action (excluding Avoidance Actions but including the proceeds of Avoidance Actions) and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located; *provided*, that prior to seeking payment of the DIP Claims from the proceeds

of Avoidance Actions, the DIP Parties will first seek satisfaction of the DIP Obligations from all other DIP Collateral.

(d)     Notwithstanding the foregoing, the liens granted pursuant to this Order shall not attach to (i) the Debtors' leases and real property leaseholds, and shall attach solely to the proceeds of such leases and real property leaseholds or (ii) any Excluded Property (as defined in the DIP Credit Agreement) and the assets described in the foregoing clauses (i) and (ii) shall not constitute DIP Collateral.

15.     **Adequate Protection for the Prepetition Secured Parties**.   Subject to the Carve-Out and the terms of this Order, pursuant to sections 361, 363(c)(2), 363(e) and 364 of the Bankruptcy Code, and in consideration of the Stipulations and consents set forth herein, as adequate protection of their interests in the Cash Collateral and the other Prepetition Collateral to the extent that the imposition of the automatic stay, any use, sale, lease, depreciation, or disposition of Prepetition Collateral during these Chapter 11 Cases, or any grant of a lien on Prepetition Collateral permitted by this Order (including the DIP Liens and the Carve-Out (as defined below)) results in diminution in the value of the Prepetition Collateral (including the Cash Collateral) from and after the Petition Date, the Prepetition Secured Parties are hereby granted the following (such diminution in value, the "**Adequate Protection Obligations**"):

(a)     Adequate Protection Liens.  As security for the Adequate Protection Obligations, additional and replacement valid and perfected replacement security interests in and liens upon (the "**Adequate Protection Liens**") all of the DIP Collateral of the Debtors that are Principal Obligors, which Adequate Protection Liens shall be (i) junior and subject to the Carve-Out, (ii) junior and subject to the DIP Liens, any Permitted Liens, and any Prior Liens and (iii) senior to all other liens thereon.  Notwithstanding anything to the contrary herein, and without limiting

21

the Prepetition Secured Parties' consent to the terms of the Interim Cash Collateral Order and this Order, no lien granted by the Interim Cash Collateral Order or this Order shall be deemed to nonconsensually prime any prepetition lien of any party

(b)     Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of the Adequate Protection Obligations (the "**Adequate Protection Superpriority Claims**"), but junior to the Carve-Out and the DIP Superpriority Claims.  Subject and subordinate to the Carve-Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided*, that prior to seeking payment of the Adequate Protection Superpriority Claims from the proceeds of Avoidance Actions, the Prepetition Secured Parties will first seek satisfaction of the Adequate Protection Superpriority Claims from all other DIP Collateral.  The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required DIP Lenders, in each case as provided in the DIP Documents.

(c)      <u>Adequate Protection Payments</u>.   As further adequate protection, the Principal Obligors are authorized and directed to pay, in accordance with Paragraph 36 of this Order, all outstanding reasonable and documented fees and out-of-pocket expenses (the "**Adequate Protection Payments**"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to Paragraph 10(d)(iii) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Order, including, for the avoidance of doubt, of (i) the DIP Consenting Creditor Advisors (and with respect to Houlihan Lokey, in accordance with its draft engagement letter negotiated with Akin Gump and the Principal Obligors prepetition (the "**Houlihan Engagement Letter**"), including payment of a "Deferred Fee" (as defined in the Houlihan Engagement Letter) in the amount of $3,750,000 (with 50% of paid Monthly Fees (as defined in the Houlihan Engagement Letter) beginning with the sixth paid Monthly Fee to be credited dollar-for-dollar against the Deferred Fee) and potentially a "Discretionary Fee" (as defined in the Houlihan Engagement Letter) in the amount of up to $1,000,000 (but, with respect to the Discretionary Fee, subject to Court approval in connection with confirmation of the Plan, unless the Debtors, the Consenting Creditors and the Committee consent to such payment) and (ii) Davis Polk & Wardwell LLP, as counsel, and Rapp & Krock, PC, as local counsel to the Prepetition Agent.   Subject to Paragraph 36 of this Order, none of the Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.  Notwithstanding the foregoing, payment of the Adequate Protection Payments pursuant to this paragraph 15(c) shall be without prejudice to the rights of the Creditors'

Committee to seek to recharacterize as principal, and/or disgorge, Adequate Protection Payments to the extent it is determined by the Court that the Prepetition Secured Claims are undersecured and there has been no diminution in value of the Prepetition Collateral (as determined by the Court or as may be settled by the Debtors).

(d)    Accrual of Interest.  Subject to the provisions of section 506(b) of the Bankruptcy Code, the Prepetition Secured Claims shall accrue interest at the default rate provided for in the Prepetition Credit Agreement during the pendency of these Chapter 11 Cases.  Notwithstanding the foregoing, payment of interest, if any, pursuant to this paragraph 15(d) shall be without prejudice to the rights of the Creditors' Committee to seek to recharacterize as principal, and/or disgorge, such interest payments to the extent it is determined by the Court that the Prepetition Secured Claims are undersecured and there has been no diminution in value of the Prepetition Collateral (as determined by the Court or as may be settled by the Debtors).

(e)    Right to Request Additional Adequate Protection.  The grant of Adequate Protection under this Order is without prejudice to (i) the rights of the Prepetition Secured Parties to request different or additional adequate protection, including periodic cash payments in the event of a sustained material improvement in the operating performance of the Debtors, and (ii) other parties', including the Debtors', rights to object to any such request.

16.    **Automatic Perfection of DIP Liens and Adequate Protection Liens**.  This Order (and with respect to the Adequate Protection Liens, the Interim Cash Collateral Order) shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of the DIP Liens and the Adequate Protection Liens granted and created hereunder and the Interim Cash Collateral Order, as applicable, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted

hereunder, effective as of the date of this Order and the Interim Cash Collateral Order, as applicable, without the necessity of executing deposit account control agreements or creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the DIP Liens granted to the DIP Agent or Adequate Protection Liens granted to the Prepetition Secured Parties hereunder and the Interim Cash Collateral, as applicable.  For the avoidance of doubt, Paragraph 16 of the Interim Cash Collateral Order shall apply with respect to any Adequate Protection Liens granted thereunder.

17.    **Section 507(b) Reservation**.    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any diminution in value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties, that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral); *provided*, *however*, that any such additional section 507(b) claims shall be subject to the same relative priority as such party's Adequate Protection Obligations, as provided in this Order.

18.    **Carve-Out**.

(a)    Carve-Out.    As used in this Order, the "**Carve-Out**" shall mean, upon the Termination Date, the sum of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable

fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**"), whether such Allowed Professional Fees were incurred before or on the date of delivery by the Prepetition Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "**Pre-Trigger Date Fees**"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "**Trigger Date**"), to the extent incurred after the Trigger Date, the payment of Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,500,000.00 for Professional Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").  "**Carve-Out Trigger Notice**" shall mean written notice by the DIP Agent to the Debtors, their lead chapter 11 counsel, the U.S. Trustee, Akin Gump, and lead counsel for the Committee, delivered upon the occurrence of a Termination Date under this Order stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims provided under this Order, including the Prepetition Secured Claims, Prepetition Liens, Adequate Protections Claims, the Adequate Protection Liens, the DIP Superpriority Claims, and the DIP Liens.  Notwithstanding anything to the contrary contained in this Order and the Interim Cash Collateral Order, any Prepetition Loan Documents, the DIP Loan Documents, the security interests, liens and claims granted to the Prepetition Secured Parties

(including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and Adequate Protection Claims) under, pursuant to or in connection with this Order or the Interim Cash Collateral Order shall be subject to the payment in full in cash of the amounts due under the Carve-Out in accordance with the terms of this paragraph.

(b)     <u>Carve-Out Reserves</u>.  On the day on which a Carve-Out Trigger Notice is delivered (the "**Termination Declaration Date**"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the Required DIP Lenders in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve-Out Trigger Notice Reserve**") prior to the use of such reserve to pay any other claims.  On the Termination Declaration Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "**Post-Carve-Out Trigger Notice Reserve**" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "**Carve-Out Reserves**") prior to the use of such reserve to pay any other claims.  All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above in Paragraph 18 (a) (the "**Pre-Carve-Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of itself and the DIP Lenders.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set

forth in clause (iv) of the definition of Carve-Out set forth above (the "**Post-Carve-Out Amounts**"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of itself and the DIP Lenders. Notwithstanding anything to the contrary in the DIP Documents or this Order, if either of the Carve-Out Reserves are not funded in full in the amounts set forth in this Paragraph 18, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this Paragraph 18, prior to making any payments to the DIP Agent.  Notwithstanding anything to the contrary in the DIP Documents or this Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded following a reasonable period (which period shall be no less than two (2) business days) for each Professional Person to notify the Debtors of its expected amount of Allowed Professional Fees, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Order and the DIP Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not increase or reduce the DIP Obligations, or constitute additional DIP Loans (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve-Out Reserves) and (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order, the DIP Documents or in any Prepetition

Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Obligations and the Prepetition Secured Claims, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or the Prepetition Secured Claims.

(c)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. The foregoing shall in no way limit the rights for payment of the Allowed Professional Fees benefitted from the Carve-Out from the assets of the Debtors, including to the extent such assets are in the possession of the DIP Agent, DIP Lenders or Prepetition Secured Parties.

(e)    <u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled

to the protections granted under this Order, the DIP Documents, the Bankruptcy Code and applicable law.

(f)     Carve-Out Limits.  Notwithstanding anything in this Order to the contrary, except for and solely to the extent as set forth in Paragraph 21 below, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, or assertions of any defense or counterclaim, against any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens, mortgages, and security interests granted in connection with the DIP Documents or the Prepetition Credit Agreement, including, in each case, without limitation, for lender liability or pursuant to sections 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted herein to the DIP Lenders, the DIP Agent or the Prepetition Secured Parties; or (c) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement or realization upon any DIP Collateral or Prepetition Collateral in accordance with the DIP Documents and this Order other than to seek a determination that an Event of Default (as defined in the DIP Credit Agreement) has not occurred or is not continuing. Further, notwithstanding anything to the contrary in this Order, the failure of the Carve-Out Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out.  For the avoidance of doubt, nothing in this paragraph shall be construed to impair (x) the right of the Professional Persons to seek payment of any fees and expenses incurred in

connection with the foregoing as an administrative claim to the extent such fees and expenses are not payable from the Carve-Out or (y) the ability of any party to object to the allowance of fees, expenses, reimbursement or compensation of any Professional Persons on any other grounds.

19.      **Limited Modification of Automatic Stay**.   The automatic stay is hereby modified solely to the extent necessary to permit the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to commit all acts and take all actions necessary to implement this Order and all acts, actions, and transfers contemplated herein.

20.      **Ad Valorem Tax Liens**.   Notwithstanding any provision of this Order to the contrary, no liens granted by this Order shall prime or subordinate any statutory lien of any taxing authority in respect of ad valorem property taxes (to the extent such lien is valid, binding, senior, perfected, and unavoidable) held by any of the following taxing authorities:  County of Comal, Texas, The City of Waco *et al,* Texas, Bell County Tax Appraisal District, Texas, Bowie Central Appraisal District, Texas, The County of Brazos, Texas, The County of Denton, Texas, Midland Central Appraisal District, Texas, Taylor County Central Appraisal District, Texas, Tyler Independent School District, City of Weslaco, Weslaco Independent School District, Lubbock Central Appraisal District, Midland County, City of Garland, Garland Independent School District, Carrollton-Farmers Branch Independent School District, City of Grapevine, Grapevine-Colleyville Independent School District, Arlington Independent School District, Wichita County, Brazoria County Tax Office, Brazoria County Municipal Utility District #6, Fort Bend Independent School District, Fort Bend County Levee Improvement District #2, Pasadena Independent School District, Spring Independent School District, Alief Independent School District, City of Katy, Katy Management District, Humble Independent School District, Clear Creek Independent School District, Galena Park Independent School District, HC MUD

285, Maverick County Hospital District, Maverick County, Potter County Tax Office, Broward County, City of Allen, Allen ISD, Bexar County, Cameron County, Cypress-Fairbanks ISD, Dallas County, Fort Bend County, Grayson County,  City of Harlingen, Harlingen CISD, Harris County, Hidalgo County, Irving ISD, Jefferson County, Lewisville ISD, City of McAllen, McClennan County, Montgomery County, Northwest ISD, Nueces County, City of Richardson, Tarrant County and Victoria County; provided, however, that all parties' rights to object to  the priority, validity, amount and extent of the claims and liens asserted by any taxing authority are fully preserved.

21.     **Limitation on Use of DIP Facility Proceeds, DIP Collateral and Cash Collateral**.  Notwithstanding anything to the contrary set forth in the Interim Cash Collateral Order or this Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used:  (a) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, or other litigation (i) against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties seeking relief that would impair the rights and remedies of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under the Interim Cash Collateral Order, this Order, the DIP Documents or the Prepetition Loan Documents to the extent permitted or provided thereunder or hereunder, including, without limitation, for the payment of Allowed Professional Fees on account of any services rendered by Professional Persons retained by the Debtors or the Committee in connection with the assertion of or joinder in any such claim, counterclaim, action, proceeding, application, motion, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar

relief that would impair the ability of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein or seeking affirmative relief against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in respect of any of the foregoing matters; (ii) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Collateral, the Prepetition Secured Claims, the Prepetition Collateral or the Prepetition Liens on the Prepetition Collateral or (iii) for monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, that would impair the ability of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest in respect of the DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Claims to the extent permitted or provided hereunder; (b) for investigating, objecting to, or challenging (or preparing such investigation, objection, or challenge to) the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Claims, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for investigating, asserting, commencing or prosecuting (or preparing any such investigation, assertion, commencement, or prosecution of) any claims or causes of action (including, without limitation, any Avoidance Actions) related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Claims; and (d) for investigating, prosecuting an objection to, or contesting

in any manner (or preparing any of the foregoing to) the validity, extent, amount, perfection, priority or enforceability of any of the DIP Liens, the DIP Obligations, the Prepetition Liens, Prepetition Secured Claims or any other related rights or interests of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties; *provided*, that no more than $150,000.00 of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral (including Cash Collateral), in the aggregate, whether incurred prior to or subsequent to the entry of this Order, may be used by the Committee solely to investigate the foregoing matters (the "**Committee Investigation Matters**") with respect to the Prepetition Liens or the Prepetition Secured Claims within the Challenge Period (as defined herein) (the "**Challenge Budget**"); *provided, however,* for the avoidance of doubt, the foregoing Challenge Budget limitation shall not apply with respect to (i) the preparation or prosecution of the Committee's objection to the DIP Motion or Interim Cash Collateral Order, (ii) the preparation or prosecution of any objection to confirmation of a chapter 11 plan, or (iii) other actions undertaken by the Committee that are not directly related to the foregoing actions listed in clauses (a) through (d) above. The Committee may request that any fees and expenses of the Committee Professionals incurred in connection with the Committee Investigation Matters described in this Paragraph 21 in excess of the Challenge Budget be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, and the rights of each Prepetition Secured Party, DIP Party and all other parties in interest to object to such request are reserved. For the avoidance of doubt, this Paragraph 21 governs only the funding of the aforementioned actions that the Committee may determine to take and is not a prohibition on the Committee taking such actions.

22. **Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business**. Except as expressly permitted under the DIP Documents, the Debtors shall not use,

sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by section 363 of the Bankruptcy Code, without obtaining the prior written consent of the Required DIP Lenders.  Subject to the Carve-Out, the Permitted Liens (if any and as applicable), the Prior Liens (if any and as applicable), in the event of any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral (to the extent permitted by the DIP Documents and this Order), the Debtors are authorized and shall promptly pay, to the extent required by the DIP Documents and this Order, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of the DIP Documents, unless (in accordance with applicable DIP Documents and this Order) the Required DIP Lenders consent, in writing, to the funds being reinvested by the Debtors.  Subject to the Carve-Out, the Permitted Liens (if any and as applicable), and the Prior Liens (if any and as applicable), in the event of any casualty, condemnation or similar event with respect to property that constitutes DIP Collateral, to the extent required by the DIP Documents and this Order, the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the required amount of any insurance proceeds, condemnation award or similar payment (excluding any amounts on account of any D&O policies) to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Order and the DIP Documents, unless (in accordance with applicable DIP Documents, including this Order) the Required DIP Lenders consent, in writing, to the funds being reinvested by the Debtors.

23.     **Reservation of Rights of the DIP Agent, DIP Lenders and Prepetition Secured Parties**.  Except as otherwise expressly set forth in this Order, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise

impair, subject in all respects to the terms of the DIP Credit Agreement and the Prepetition Credit Agreement:  (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; (b) any of the rights of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, or (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code or any Court order, a chapter 11 plan or plans; and (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.  The delay in or failure of the DIP Agent, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Documents or the Prepetition Loan Documents, as applicable, shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition Secured Parties' rights and remedies.

24.     **Effect of Stipulations on Third Parties**.   The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in the Interim Cash Collateral Order and this Order shall be binding on the Debtors, their respective representatives, successors and assigns.  The acknowledgments, stipulations, admissions, waivers and releases contained in the Interim Cash Collateral Order and this Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Committee, or any chapter 7 or chapter 11 trustee

appointed or elected for any of the Debtors (a "**Trustee**"), unless (a) such party with requisite standing, has duly filed an adversary proceeding or contested matter (1) challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens or the Prepetition Secured Claims or (2) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Claims and Defenses**") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Claims by no later than (i) with respect to the Committee, through and including October 12, 2020; *provided*, *however*, that if the Committee files a motion seeking authority, derivatively or otherwise, to commence a challenge against the Prepetition Secured Parties on or prior to October 12, 2020, the deadline for the Committee to commence an action with respect to the claims specifically identified in such motion shall be tolled through the date that is three (3) business days after entry of a dispositive ruling on such motion; *provided further, however*, that, to the extent such motion is filed after September 30, 2020, the Committee shall be required to seek a hearing on such motion on an emergency basis, unless otherwise agreed by the Debtors and the Consenting Lenders; or (ii) with respect to other parties in interest, no later than September 12, 2020 (the time period established by the later of the foregoing clauses (i) and (ii), the "**Challenge Period**"); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter.  If no such adversary proceeding, contested matter or motion for standing, as applicable, is timely filed prior to the expiration of the Challenge Period, or the Court denies standing as set forth in the immediately preceding sentence, without further order of this Court:  (x) the Prepetition Secured Claims shall constitute allowed claims, not subject to any

Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in the Interim Cash Collateral Order and this Order not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (z) the Prepetition Secured Claims, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Parties shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in the Interim Cash Collateral Order and this Order shall nonetheless remain binding and preclusive on the Committee and any other party in these Chapter 11 Cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding or contested matter and (b) any Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever barred; *provided*, *that*, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable

order, such stipulation also shall be binding on the Debtors' estates and all parties in interest. Nothing in the Interim Cash Collateral Order or this Order vests or confers on any person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Loan Documents, the Prepetition Liens or the Prepetition Secured Claims.

25.     **Release**.  Subject to the rights and limitations set forth in Paragraphs 21 and 24 of this Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the Prepetition Secured Parties, the DIP Agent and DIP Lenders (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date

hereof solely with respect to or relating to the Prepetition Liens, the Prepetition Secured Claims, the DIP Liens, the DIP Superpriority Claims and the DIP Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the Prepetition Liens or Prepetition Secured Claims.

26.    **Insurance**.  At all times the Debtors shall maintain casualty and loss insurance coverage for the DIP Collateral and the Prepetition Collateral on substantially the same basis as maintained prior to the Petition Date.  As of the entry of the Interim Cash Collateral Order, the Prepetition Secured Parties were, and were deemed to be, and hereby shall be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the Prepetition Collateral or Adequate Protection Collateral (as defined in the Interim Cash Collateral Order).  Upon the entry of this Order, the DIP Agent shall be, and shall be deemed to be, and hereby shall be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

27.    **Section 552(b)**.  The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

28.    **Section 506(c)**.  The DIP Parties and the Prepetition Secured Parties are entitled to a waiver of section 506(c) of the Bankruptcy Code in light of the (i) DIP Parties' agreement to

provide the DIP Facility and that the DIP Liens and DIP Superpriority Claims shall be subject to the Carve-Out, (ii) the Prepetition Secured Parties' agreement that the Prepetition Liens and Prepetition Secured Claims, and any Adequate Protection Liens and Adequate Protection Superpriority Claims, shall be subject to the Carve-Out and subordinate to the DIP Liens and DIP Claims and (iii) the DIP Parties' and the Prepetition Secured Parties' agreement to the payment (in accordance with the DIP Budget and subject to the terms of this Order and the DIP Documents) of certain expenses of administration of these Chapter 11 Cases.  Except to the extent of the Carve-Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the interests of the DIP Lenders in the DIP Collateral or the Prepetition Secured Parties in any DIP Collateral and the Prepetition Collateral under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) and the Required Prepetition Lenders, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

29.    **No Marshaling**.  The DIP Agent and the Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral, the Prepetition Collateral in accordance with the provisions of this Order, the DIP Documents and the Prepetition Loan Documents.  Except as otherwise provided herein with respect to the proceeds of Avoidance Actions, the DIP Agent and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

30.    **Credit Bidding**.  Consistent with section 363(k) of the Bankruptcy Code and applicable law, (a) the DIP Agent, or any assignee or designee of the DIP Agent, acting at the

direction of the Required DIP Lenders and on behalf of the DIP Parties, shall have the right to credit bid up to the full amount of the DIP Loans in the sale of any of the Debtors' assets, including pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code, and (b) the Prepetition Agent (on behalf of or acting at the direction of, the Prepetition Secured Parties) shall have the right to credit bid up to the full amount of the Prepetition Secured Claims in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.  The DIP Agent and the Prepetition Agent (in accordance with the DIP Documents, the Prepetition Loan Documents and this Order, as applicable), shall have the absolute right to assign, sell or otherwise dispose of their respective rights to credit bid in connection with any credit bid by or on behalf of the DIP Parties or the Prepetition Secured Parties, as applicable, solely to any acquisition entity or joint venture formed in connection with such bid that remain under such parties' ownership and control.

31.     **Proofs of Claim**.  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or in any successor cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or successor cases to the contrary, the Prepetition Agent on behalf of itself and each of the Prepetition Secured Parties is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the

Chapter 11 Cases or successor cases for any claim allowed herein.  Any proof of claim filed by the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or successor cases shall not apply to any claim of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

32.     **Termination Events**.  The occurrence of any of the following shall constitute a "**Termination Event**":  (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement) to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders; (b) the Debtors' failure to comply in any material respect with any provision of this Order unless waived by the applicable lenders; or (c) the occurrence of the Maturity Date (as defined in each of the DIP Credit Agreement).

33.     **Remedies Following Termination Event**.

(a)     The Debtors shall immediately provide notice to counsel to the DIP Agent, the DIP Lenders and the Prepetition Agent (with a copy to counsel to the Committee), of the occurrence of any Termination Event, at which time (i.e., the time of the occurrence of the Termination Event) the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this Paragraph 33), the DIP Obligations shall become due and payable and any commitments under the DIP Facility shall terminate and to the extent outstanding, the Carried Over Letter of Credit shall be required to be cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer.  Upon the occurrence of a Termination Event and following the giving of not less than five (5) business

days' advance written notice (which may be by email) (the "**Notice Period**") by the DIP Agent (the **"Enforcement Notice"**), to counsel to the Debtors, the DIP Lenders, the Prepetition Agent, the U.S. Trustee and counsel to the Committee, subject to the terms of this Order and the DIP Credit Agreement, the DIP Parties may exercise any rights and remedies against the DIP Collateral available to them under this Order, the DIP Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility, and requiring the Carried Over Letter of Credit (to the extent outstanding) to be cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer, subject to the Carve-Out and Permitted Liens (if any).  During the Notice Period, the Debtors, the DIP Agent and the DIP Lenders consent to one or more hearings (each a "**Termination Event Hearing**") on an expedited basis at which the Court will determine (x) whether a Termination Event has occurred and is continuing, (y) whether the automatic stay should remain in effect and/or (z) the DIP Parties' rights and remedies in respect of any such Termination Event; *provided*, that if one or more hearings to consider any of the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of the conclusion of such hearing.  For the avoidance of doubt, the Committee may request a Termination Event Hearing on an expedited basis during the Notice Period.

(b)        Following the conclusion of the Notice Period (as may be extended as set forth above) and entry of an order by the Court adjudicating the Termination Event Hearing(s) in favor of the DIP Agent and the DIP Lenders and subject to any further order of the Court, the DIP Agent may be granted relief from the automatic stay to foreclose on, or otherwise realize on, its

DIP Liens on all or any portion of the DIP Collateral and/or to exercise other rights and remedies as ordered by the Court.  Provided, however, and notwithstanding the foregoing, the DIP Parties may not enter into any leased premises of the Debtors in connection with a Termination Event unless authorized (i) pursuant to a written agreement with the applicable landlord, (ii) by a pre-existing right held by the DIP Parties pursuant to applicable law, or (iii) by a court order on notice to the applicable landlord with an opportunity to respond.

(c)      Unless otherwise agreed in writing by the DIP Agent, no rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Order or the DIP Documents shall be limited, modified or impaired in any way by:  (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party other than the Prepetition Secured Parties.

34.      **No Waiver for Failure to Seek Relief**.  The failure or delay of the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties to exercise their respective rights and remedies under this Order, the DIP Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

35.      **Preservation of Rights Granted Under this Order**.

(a)      Unless and until the DIP Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facility are terminated and the Carried Over Letter of Credit (unless it has expired, terminated or been cancelled) has

been cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or made subject to other arrangements reasonably satisfactory to the L/C Issuer, the Prepetition Secured Parties shall, notwithstanding any rights such Prepetition Secured Parties may have under the Prepetition Loan Documents and applicable law:  (i) take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) be restricted from exercising any rights and remedies or taking any other actions in respect of the DIP Collateral to the extent provided by this Order, the DIP Documents and applicable law.

(b)     Subject to the Carve-Out, the Permitted Liens (if any), and the Prior Liens (if any), other than as set forth in this Order, the DIP Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the DIP Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(c)     Subject to the Carve-Out, the Permitted Liens (if any) and the DIP Liens, other than as set forth in this Order, the Adequate Protection Liens and the Prepetition Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the Adequate Protection Liens and the Prepetition Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(d)      In the event this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(e)      Subject to the Carve-Out, unless and until all DIP Obligations, Prepetition Secured Claims and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated and the Carried Over Letter of Credit (unless it has expired, terminated or been cancelled) has been cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or made subject to other arrangements reasonably satisfactory to the L/C Issuer, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (i) except as permitted under the DIP Documents or with the prior written consent of the Required DIP Lenders (x) any modification, stay, vacatur or amendment of this Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims and the Prepetition Secured Claims (or the liens and security interests securing such claims and obligations), or (z) any other

order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(f)     Notwithstanding any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to this Order, shall continue in full force and effect and shall maintain their priorities as provided in this Order and the DIP Documents until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(g)     Except as expressly provided in this Order or with the prior written consent of DIP Agent or the Prepetition Agent, as applicable, the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority

Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Parties granted by the provisions of this Order and the DIP Documents shall survive, shall maintain their priority as provided in this Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered or in any superseding chapter 7 cases under the Bankruptcy Code.

36.    **Expenses and Indemnification**.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with this Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, the Put Option Premium (and all payments and other amounts owed to the DIP Lenders), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 10(d)(iii) and 15(c) of this Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Order or the DIP Documents.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which shall constitute DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees and out-of-pocket expenses and disbursements of professionals to the extent provided for in Paragraph 10(d)(iii) and 15(c) of this Order following ten (10) calendar days following delivery to the Debtors, the U.S. Trustee and the Committee of an invoice as required by any applicable fee letter or engagement letter.  All such invoices shall be subject to review and objection by the Debtors, the U.S. Trustee, and the Committee within such 10 calendar day period.  If the Debtors, the U.S. Trustee, or the Committee objects to the reasonableness of such fees and expenses, then such objecting party shall file with the Court and serve upon such professional an objection (a "**Fee Objection**") limited to the issue of the reasonableness of the disputed fees and expenses which may be resolved consensually by such parties or by the Court.  If none of the Debtors, the U.S. Trustee, or the Committee so objects to the reasonableness of such fees and expenses within such time period, then all such objections shall be waived and the Debtors shall pay within three (3) business days the fees and expenses reflected on such invoice.  If the Debtors, the U.S. Trustee, or the Committee does so object, then the Debtors shall pay the undisputed portion of such invoice in accordance with the provisions above.

(c)     As set forth in the DIP Documents, the Debtors will, jointly and severally, indemnify the DIP Agent, the DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "**Indemnified Person**"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or

delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; *provided*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in any final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory for any special, indirect, consequential or punitive damages.

37.    **Limitation of Liability**.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Order, the DIP Documents or the Prepetition Loan Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties (in each case, solely in their capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall the Prepetition Secured Parties owe any fiduciary duty to any of the Debtors, their creditors or

estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in the Interim Cash Collateral Order, this Order or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

38.     **Chubb Reservation of Rights**. For the avoidance of doubt (i) this Order does not grant any party, including the DIP Parties, a security interest or lien on (x) the Carried Over Letter of Credit, issued by the L/C Issuer to ACE American Insurance Company (together with its U.S.-based affiliates and successors, "**Chubb**") or (y) to the extent the granting of a security interest thereon is prohibited by existing contractual obligations between the Debtors, on the one hand, and Chubb, on the other, that certain paid loss deposit fund in the current amount of $28,857.00 (the "**Chubb Paid Loss Deposit Fund**") remitted by the Debtors to Chubb in connection with the Debtors' insurance policies or self-insurance, (ii) this Order does not grant the Debtors any rights to use the Carried Over Letter of Credit (or the proceeds thereof) or the Chubb Paid Loss Deposit Fund (or the proceeds thereof) in a manner prohibited by any existing contracts or agreements between the Debtors, on the one hand, and Chubb, on the other, (iii) nothing, including the DIP Documents and/or this Order, alters or modifies the terms and conditions of any insurance policies or related agreements issued by Chubb and (iv) nothing in this Order grants Chubb any greater rights than it is otherwise entitled to under applicable non-bankruptcy law and under the insurance policies or related agreements issued by Chubb to the Debtors.

39.    **Rent Reserve Account**.  As soon as reasonably practicable following the Closing Date, the Debtors shall deposit $13 million in a segregated account (the "**Rent Reserve Account**"), the proceeds of which shall solely be used to pay post-petition claims of the Debtors' landlords as provided in the "Rent" line item of the DIP Budget for the week ending November 8, 2020, subject to adjustment or consensual reduction based upon agreements between the Debtors and the Debtors' landlords (the "**Catch-up Payments**"). Upon payment in full of the Catch-up Payments, any funds remaining in the Rent Reserve Account shall become available to the Debtors for use in any manner that is otherwise consistent with the DIP Order and DIP Documents.

40.    **Negotiations and Reporting**.  While this Order remains in effect, the Debtors will (a) negotiate in good faith with the Consenting Creditors including, without limitation, with respect to a Plan and (b) hold weekly confidential update calls with the Consenting Creditors' advisors and any Consenting Creditor willing to participate and agree that the information discussed on such calls is and shall remain confidential and not subject to any dissemination without the prior consent of the Debtors.

41.    **Survival of Order**.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (i) confirming any chapter 11 plan in any Debtor's chapter 11 case; (ii) converting any Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any Debtor's chapter 11 case; or (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court.

42.    **Immediate Effectiveness of Order**.  This Order, and the findings of fact and conclusions of law contained herein, shall be effective immediately upon signature by the Court, and may be relied upon by the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

43.     **Retention of Jurisdiction**.  The Court hereby expressly retains jurisdiction to enforce the terms of this Order and to adjudicate any and all disputes in connection herewith by motion and without necessity of an adversary proceeding.

44.     **Headings**.  All headings in this Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

Signed: October 13, 2020

_____
Marvin Isgur
United States Bankruptcy Judge

## Exhibit A

**DIP Credit Agreement**

**EXECUTION VERSION**

---

**SENIOR SECURED SUPERPRIORITY  DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of October 9, 2020

Among

QUESO HOLDINGS INC.,
as Holdings,

CEC ENTERTAINMENT, INC.,
as Borrower,

THE LENDERS PARTY HERETO,

UMB BANK, N.A.,
as Administrative Agent

---

## TABLE OF CONTENTS

**Page**

ARTICLE I Definitions ...........................................................................................................1

Section 1.01          Defined Terms ......................................................................1
Section 1.02          Terms Generally....................................................................37
Section 1.03          Effectuation of Transactions.................................................38
Section 1.04          Exchange Rates; Currency Equivalents .................................38
Section 1.05          Divisions ..............................................................................38
Section 1.06          [Reserved] ............................................................................38
Section 1.07          Timing of Payment or Performance......................................38
Section 1.08          Times of Day.........................................................................39
Section 1.09          [Reserved] ............................................................................39
Section 1.10          Election Date.........................................................................39

ARTICLE II The Credits ........................................................................................................39

Section 2.01          Commitments........................................................................39
Section 2.02          Loans and Borrowings ..........................................................40
Section 2.03          Requests for Borrowings.......................................................40
Section 2.04          [Reserved] ............................................................................41
Section 2.05          [Reserved] ............................................................................41
Section 2.06          Funding of Borrowings .........................................................41
Section 2.07          Interest Elections..................................................................42
Section 2.08          Termination and Reduction of Commitments........................43
Section 2.09          Repayment of Loans; Evidence of Debt ...............................44
Section 2.10          Repayment of Loans .............................................................44
Section 2.11          Prepayment of Loans ............................................................45
Section 2.12          Lender Payments...................................................................46
Section 2.13          Interest...................................................................................46
Section 2.14          Alternate Rate of Interest .....................................................47
Section 2.15          Increased Costs .....................................................................48
Section 2.16          Break Funding Payments ......................................................49
Section 2.17          Taxes.....................................................................................50
Section 2.18          Payments Generally; Pro Rata Treatment; Sharing of Set-offs ...............54
Section 2.19          Mitigation Obligations; Replacement of Lenders......................55
Section 2.20          Illegality ...............................................................................57
Section 2.21          Effect of Benchmark Transition Event ..................................57
Section 2.22          Defaulting Lender ..................................................................58

ARTICLE III Representations and Warranties........................................................................59

Section 3.01          Organization; Powers............................................................59
Section 3.02          Authorization ........................................................................59
Section 3.03          Enforceability........................................................................60

Section 3.04        Governmental Approvals ..................................................................60
Section 3.05        [Reserved] ........................................................................................60
Section 3.06        No Material Adverse Effect ..............................................................60
Section 3.07        Title to Properties; Possession Under Leases ..................................60
Section 3.08        Subsidiaries ......................................................................................61
Section 3.09        Litigation; Compliance with Laws ...................................................61
Section 3.10        Federal Reserve Regulations ...........................................................62
Section 3.11        Investment Company Act .................................................................62
Section 3.12        Use of Proceeds ...............................................................................62
Section 3.13        Tax Returns ......................................................................................62
Section 3.14        No Material Misstatements ...............................................................63
Section 3.15        Employee Benefit Plans ...................................................................63
Section 3.16        Environmental Matters......................................................................63
Section 3.17        Security Documents ..........................................................................64
Section 3.18        [Reserved] ........................................................................................65
Section 3.19        [Reserved] ........................................................................................65
Section 3.20        Labor Matters ...................................................................................65
Section 3.21        Insurance ..........................................................................................65
Section 3.22        No Default..........................................................................................66
Section 3.23        Intellectual Property; Licenses, Etc .................................................66
Section 3.24        [Reserved] ........................................................................................66
Section 3.25        USA PATRIOT Act; OFAC ..............................................................66
Section 3.26        Foreign Corrupt Practices Act .........................................................66
Section 3.27        Bankruptcy Matters ..........................................................................67

ARTICLE IV Conditions of Lending ...............................................................................67

Section 4.01        All Credit Events...............................................................................67
Section 4.02        First Credit Event .............................................................................68

ARTICLE V Affirmative Covenants .................................................................................71

Section 5.01        Existence; Business and Properties...................................................71
Section 5.02        Insurance ..........................................................................................71
Section 5.03        Taxes .................................................................................................73
Section 5.04        Financial Statements, Reports, etc ...................................................73
Section 5.05        Litigation and Other Notices............................................................75
Section 5.06        Compliance with Laws .....................................................................75
Section 5.07        Maintaining Records; Access to Properties and Inspections ...................76
Section 5.08        Use of Proceeds ...............................................................................76
Section 5.09        Compliance with Environmental Laws.............................................76
Section 5.10        Further Assurances; Additional Security .........................................76
Section 5.11        Rating................................................................................................79
Section 5.12        Post-Closing......................................................................................79
Section 5.13        Cash Management.............................................................................79
Section 5.14        Budget Covenant...............................................................................79
Section 5.15        Milestones ........................................................................................80

ARTICLE VI Negative Covenants ...........................................................................80

Section 6.01        Indebtedness.................................................................................80
Section 6.02        Liens.............................................................................................84
Section 6.03        Sale and Lease-Back Transactions.............................................87
Section 6.04        Investments, Loans and Advances..............................................87
Section 6.05        Mergers, Consolidations, Sales of Assets and Acquisitions......90
Section 6.06        Dividends and Distributions .......................................................92
Section 6.07        Transactions with Affiliates........................................................92
Section 6.08        Business of the Borrower and the Subsidiaries...........................94
Section 6.09        Limitation on Payments and Modifications of Indebtedness;
                    Modifications of Certificate of Incorporation, By-Laws and Certain
                    Other Agreements; etc .................................................................94
Section 6.10        Fiscal Year...................................................................................96
Section 6.11        Permitted Variance......................................................................96
Section 6.12        Payment of Prepetition Indebtedness..........................................96

ARTICLE VII Events of Default ..............................................................................97

Section 7.01        Events of Default ........................................................................97
Section 7.02        Treatment of Certain Payments ................................................103

ARTICLE VIII The Agents .....................................................................................103

Section 8.01        Appointment ..............................................................................103
Section 8.02        Delegation of Duties..................................................................104
Section 8.03        Exculpatory Provisions .............................................................104
Section 8.04        Reliance by Agents ...................................................................105
Section 8.05        Notice of Default........................................................................106
Section 8.06        Non-Reliance on Agents and Other Lenders ...........................106
Section 8.07        Indemnification ..........................................................................107
Section 8.08        Agent in Its Individual Capacity ...............................................107
Section 8.09        Successor Administrative Agent.................................................107
Section 8.10        [Reserved] ..................................................................................108
Section 8.11        Security Documents and Collateral Agent..................................108
Section 8.12        Right to Realize on Collateral and Enforce Guarantees ..........108
Section 8.13        Withholding Tax .........................................................................109
Section 8.14        Certain ERISA Matters ..............................................................110

ARTICLE IX Miscellaneous ...................................................................................111

Section 9.01        Notices; Communications..........................................................111
Section 9.02        Survival of Agreement................................................................113
Section 9.03        Binding Effect.............................................................................113
Section 9.04        Successors and Assigns...............................................................113
Section 9.05        Expenses; Indemnity..................................................................118
Section 9.06        Right of Set-off ..........................................................................120

Section 9.07      Applicable Law ...................................................................................120
Section 9.08      Waivers; Amendment .........................................................................121
Section 9.09      Interest Rate Limitation ......................................................................123
Section 9.10      Entire Agreement ...............................................................................123
Section 9.11      WAIVER OF JURY TRIAL ..............................................................124
Section 9.12      Severability .........................................................................................124
Section 9.13      Counterparts .......................................................................................124
Section 9.14      Headings .............................................................................................124
Section 9.15      Jurisdiction; Consent to Service of Process .......................................124
Section 9.16      Confidentiality ...................................................................................125
Section 9.17      Platform; Borrower Materials .............................................................126
Section 9.18      Release of Liens and Guarantees ........................................................126
Section 9.19      Judgment Currency .............................................................................128
Section 9.20      USA PATRIOT Act Notice ................................................................129
Section 9.21      [Reserved] ..........................................................................................129
Section 9.22      Agency of the Borrower for the Loan Parties .....................................129
Section 9.23      [Reserved] ..........................................................................................129
Section 9.24      Acknowledgment and Consent to Bail-In of Affected Financial
                  Institutions .........................................................................................129
Section 9.25      Acknowledgement Regarding Any Supported QFCs ...........................130
Section 9.26      Incorporation of DIP Order ................................................................131
Section 9.27      Parties Including Trustees; Bankruptcy Court Proceedings .................131
Section 9.28      Lender Consent to Credit Bid .............................................................132

Exhibits, Schedules and Annex

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Administrative Questionnaire |
| Exhibit C | [Reserved] |
| Exhibit D | Form of Borrowing Request |
| Exhibit E | Form of Interest Election Request |
| Exhibit F | Form of Mortgage |
| Exhibit G | [Reserved] |
| Exhibit H | [Reserved] |
| Exhibit I | [Reserved] |
| Exhibit J | Form of Non-Bank Tax Certificate |
| Exhibit K | Form of Intercompany Subordination Terms |

| | |
|---|---|
| Schedule 1.01 | Closing Date Mortgaged Properties |
| Schedule 1.01A | Landlord Promissory Note |
| Schedule 2.01 | Commitments |
| Schedule 3.01 | Organization and Good Standing |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.05 | Financial Statements |
| Schedule 3.07(c) | Notices of Condemnation |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.08(b) | Subscriptions |
| Schedule 3.13 | Taxes |
| Schedule 3.16 | Environmental Matters |
| Schedule 3.21 | Insurance |
| Schedule 3.23 | Intellectual Property |
| Schedule 3.27 | Initial Budget |
| Schedule 5.08 | Specified Accounts |
| Schedule 5.12 | Post-Closing Items |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02(a) | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.05 | Dispositions |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 9.01 | Notice Information |

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of October 9, 2020 (this "<u>Agreement</u>"), among QUESO HOLDINGS INC., a Delaware corporation ("<u>Holdings</u>"), CEC ENTERTAINMENT, INC., a Kansas corporation (the "<u>Company</u>" or the "<u>Borrower</u>"), the LENDERS party hereto from time to time, and UMB BANK, N.A., as Administrative Agent (in such capacity, the "<u>Administrative Agent</u>") for the Lenders.

WHEREAS, on June 24, 2020 (the "<u>Petition Date</u>"), Holdings, the Borrower and certain Subsidiaries of the Borrower (collectively, the "<u>Debtors</u>" and, each individually, a "<u>Debtor</u>") commenced cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") and the Debtors have retained possession of their assets and are authorized under the U.S. Bankruptcy Code to continue the operations of their businesses as debtors-in-possession; and

WHEREAS, the Debtors have requested the Lenders to extend post-petition credit in the form of the Loans hereunder in an aggregate principal amount of up to $200,000,000, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE I

*Definitions*

Section 1.01    <u>Defined Terms</u>.  Each capitalized term used in this Agreement but not defined in this Agreement shall have the meaning assigned thereto in the DIP Order. As used in this Agreement, the following terms shall have the meanings specified below:

"<u>ABR</u>" shall mean, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect for such day plus 0.50%, (b) the Prime Rate in effect on such day and (c) the Adjusted LIBO Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; <u>provided</u>, that for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate determined on such day at approximately 11:00 a.m. (London time) by reference to the ICE Benchmark Administration Interest Settlement Rates (or the successor thereto if the ICE Benchmark Administration is no longer making a LIBO Rate available) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the ICE Benchmark Administration (or the successor thereto if the ICE Benchmark Administration is no longer making a LIBO Rate available) as an authorized vendor for the purpose of displaying such rates). Any change in such rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans.

"ABR Loan" shall mean any Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"Acceptable Plan" shall mean a chapter 11 plan of reorganization in the Chapter 11 Cases of the Debtors that is in form and substance reasonably satisfactory to the Required Lenders.

"Additional Mortgage" shall have the meaning assigned to such term in Section 5.10(c).

"Adequate Protection Liens" shall have the meaning assigned to such term in the DIP Order.

"Adequate Protection Payments" shall have the meaning assigned to such term in the DIP Order.

"Adequate Protection Superpriority Claims" shall have the meaning assigned to such term in the DIP Order.

"Adjusted LIBO Rate" shall mean, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate in effect for such Interest Period divided by (b) one minus the Statutory Reserves applicable to such Eurocurrency Borrowing, if any; provided that the Adjusted LIBO Rate shall be no less than 1.00%.

"Administrative Agent" shall have the meaning assigned to such term in the introductory paragraph of this Agreement, together with its successors and assigns.

"Administrative Agent Fee Letter" shall mean that certain Proposal to Serve as Administrative Agent and Collateral Agent for CEC Entertainment, Inc., dated as of September 16, 2020 and countersigned by the Borrower on the date hereof, by and between the Borrower and the Administrative Agent.

"Administrative Agent Fees" shall have the meaning assigned to such term in Section 2.12(b).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit B or such other form supplied by the Administrative Agent.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

2

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement, as may be amended, restated, supplemented or otherwise modified from time to time.

"Agreement Currency" shall have the meaning assigned to such term in Section 9.19.

"Applicable Margin" shall mean for any day with respect to any Loan, 10.00% per annum in the case of any Eurocurrency Loan and 9.00% per annum in the case of any ABR Loan.

"Approved Budget" shall mean the Initial Budget for all purposes of this Agreement until superseded by an Updated Budget in accordance with, and to the extent permitted by, Section 5.14.

"Approved Fund" shall have the meaning assigned to such term in Section 9.04(b)(ii).

"Asset Sale" shall mean any loss, damage, destruction or condemnation of, or any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person of, any asset or assets of the Borrower or any Subsidiary.

"Assignee" shall have the meaning assigned to such term in Section 9.04(b)(i).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent and the Borrower (if required by Section 9.04), in the form of Exhibit A or such other form as shall be approved by the Administrative Agent and reasonably satisfactory to the Borrower.

"Availability Period" shall mean, with respect to Delayed Draw Commitments, the period from the first Business Day after the Closing Date until the earlier to occur of (x) the termination of any unfunded Delayed Draw Term Loan Commitments by the Borrower pursuant to Section 2.08(b) and (y) the Termination Date.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation administration or other insolvency proceedings).

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals of this Agreement.

"Benchmark Replacement" shall mean the sum of: (a) the alternate benchmark rate (which may include a SOFR-Based Rate) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1.0%, the Benchmark Replacement will be deemed to be 1.0% for the purposes of this Agreement.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar- denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Required Lenders decide, with the consent of the Borrower (not to be unreasonably withheld, conditioned or delayed), may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Required Lenders decide that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" shall mean the earlier to occur of the following events with respect to the LIBO Rate:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the LIBO Rate permanently or indefinitely ceases to provide the LIBO Rate; or

4

(2)       in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the LIBO Rate:

(1)       a public statement or publication of information by or on behalf of the administrator of the LIBO Rate announcing that such administrator has ceased or will cease to provide the LIBO Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate;

(2)       a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the LIBO Rate, a resolution authority with jurisdiction over the administrator for the LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Rate, which states that the administrator of the LIBO Rate has ceased or will cease to provide the LIBO Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate; or

(3)       a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate announcing that the LIBO Rate is no longer representative.

"Benchmark Transition Start Date" shall mean (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period" shall mean if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with the Section 2.21 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 2.21.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership of the Borrower as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. §1010.230.

"Benefit Plan" means any (a) "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) "plan" as defined in and subject to Section 4975 of the Code or (c) Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Bidding Procedures" shall mean the procedures governing the sale and marketing process for substantially all of the Debtors' assets, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"Bidding Procedures Motion" shall mean the motion seeking entry of an order approving the Bidding Procedures, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"Bidding Procedures Order" shall mean the order of the Bankruptcy Court approving the Bidding Procedures Motion, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" shall mean, as to any person, the board of directors or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning assigned to such term in the first recital of this Agreement.

"Borrower Materials" shall have the meaning assigned to such term in Section 9.17(a).

"Borrowing" shall mean a group of Loans of a single Type under a single Facility, and made on a single date and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" shall mean (a) in the case of Eurocurrency Loans, $1,000,000, and (b) in the case of ABR Loans, $1,000,000.

"Borrowing Multiple" shall mean (a) in the case of Eurocurrency Loans, $500,000 and (b)      in the case of ABR Loans, $250,000.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D or another form approved by the Administrative Agent.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or the Administrative Agent or Collateral Agent are authorized or required by law to remain closed; provided, that when used in connection with

a Eurocurrency Loan denominated in Dollars, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"Capitalized Lease Obligations" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease, a finance lease or other lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Carried Over Letter of Credit" shall mean the letter of credit issued for the account of CEC Entertainment, Inc. and its Subsidiaries by Credit Suisse AG, New York Branch (in such capacity, the "L/C Issuer") for the benefit of ACE American Insurance Company.

"Carve-Out" shall have the meaning set forth in the DIP Order.

"Cash Collateral Order" shall mean the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (ECF No. 114), as amended by the Stipulation and Order Modifying Interim Cash Collateral Order (ECF No. 484).

"Cash Management Order" shall mean the Final Order (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) Waiving the Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief entered by the Bankruptcy Court on July 23, 2020 [Docket No. 410], which shall be in form and substance reasonably satisfactory to Required Lenders.

"Cash Management Agreement" shall mean any agreement to provide to Holdings, the Borrower or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

A "Change in Control" shall be deemed to occur if:

(a)        (x) the Permitted Holders in the aggregate shall at any time cease to have, directly or indirectly, the power to vote or direct the voting of at least 35% of the Voting Stock of the Borrower or (y) any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such person, entity or "group" and its subsidiaries and any person or entity acting in its

capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders, shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of a percentage of the voting power of the outstanding Voting Stock of the Borrower that is greater than the percentage of such voting power of such Voting Stock in the aggregate, directly or indirectly, beneficially owned by the Permitted Holders; or

(b)     a "Change of Control" (as defined in (i) the Existing Senior Unsecured Notes Indenture, (ii) the Prepetition Credit Agreement or (iii) the definitive documentation governing any other Material Indebtedness) shall have occurred; or

(c)     Holdings shall fail to own, directly or indirectly, beneficially and of record, 100% of the issued and outstanding Equity Interests of the Borrower.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided, however, that notwithstanding anything herein to the contrary, (x) all requests, rules, guidelines or directives under or issued in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act, all interpretations and applications thereof and any compliance by a Lender with any request or directive relating thereto and (y) all requests, rules, guidelines or directives promulgated under or in connection with, all interpretations and applications of, or any compliance by a Lender with any request or directive relating to International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case under clauses (x) and (y) be deemed to be a "Change in Law" but only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy requirements similar to those described in clauses (a) and (b) of Section 2.15 generally on other borrowers of loans under United States of America cash flow term loan credit facilities.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals of this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean October 9, 2020, which is the date on which all conditions precedent set forth in Section 4.01 and Section 4.02 have been satisfied or waived in accordance with the terms of this Agreement.

"Closing Date Mortgaged Properties" shall have the meaning assigned to such term in the definition of "Mortgaged Properties".

"Code" shall mean the Internal Revenue Code of 1986, as amended.

8

"Co-Investors" shall mean each of (a) the Fund and the Fund Affiliates (excluding any of their portfolio companies) and (b) the Management Group.

"Consenting Creditor" shall have the meaning assigned to such term in the Plan Support Agreement.

"Collateral" shall have the meaning assigned to the term "DIP Collateral" in the DIP Order; provided that the Collateral shall not include Excluded Property.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Parties, together with its successors and permitted assigns in such capacity.

"Collateral Agreement" shall mean the Collateral Agreement, dated as of the Closing Date, as may be amended, restated, supplemented or otherwise modified from time to time, among Holdings, the Borrower, each Subsidiary Loan Party and the Collateral Agent.

"Collateral and Guarantee Requirement" shall mean the requirement that (in each case subject the DIP Order, Sections 5.10(d), (e) and (g) and Schedule 5.12):

(a)     the Obligations shall have been secured by a perfected security interest in the Collateral with the priority required by the Security Documents and the DIP Order (subject in all respects to the Carve-Out) through the provisions of the DIP Order, to the extent such security interest may be perfected by virtue of the DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(b)     on the Closing Date, the Collateral Agent shall have received (i) from Holdings, the Borrower, and each Subsidiary Loan Party, a counterpart of the Collateral Agreement and (ii) from each Subsidiary Loan Party and Holdings, a counterpart of Guarantee Agreement, in each case duly executed and delivered on behalf of such person;

(c)     on the Closing Date, (i)(x) all outstanding Equity Interests of the Borrower and all other outstanding Equity Interests, in each case, directly owned by the Loan Parties and (y) all Indebtedness owing to any Loan Party, in each case, that constitutes Collateral, shall have been pledged pursuant to the Collateral Agreement and (ii) the Collateral Agent shall have received certificates or other instruments (if any) representing such Equity Interests and any notes or other instruments required to be delivered pursuant to the applicable Security Documents, together with stock powers, note powers or other instruments of transfer with respect thereto endorsed in blank;

(d)     in the case of any person that becomes a Subsidiary Loan Party after the Closing Date, the Collateral Agent shall have received (i) a supplement to the Collateral Agreement and the Guarantee Agreement and (ii) supplements to the other Security Documents, if applicable, in the form specified therefor or otherwise reasonably acceptable to the Administrative Agent, in each case, duly executed and delivered on behalf of such Subsidiary Loan Party;

(e)     after the Closing Date, (x) all outstanding Equity Interests of any person that becomes a Subsidiary Loan Party after the Closing Date and (y) subject to Section 5.10(g), all Equity Interests directly acquired by a Loan Party after the Closing Date, in each case, that constitutes Collateral shall have been pledged pursuant to the Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(f)     except as otherwise contemplated by this Agreement or any Security Document, all documents and instruments, including Uniform Commercial Code financing statements, filings with the United States Copyright Office and the United States Patent and Trademark Office and all other actions reasonably requested by the Collateral Agent (including those required by applicable Requirements of Law) to be delivered, filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been delivered, filed, registered or recorded or delivered by the Company to the Collateral Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Security Document;

(g)     within (x) forty-five (45) days after receipt of a written request by the Required Lenders with respect to each Closing Date Mortgaged Property set forth on Schedule 1.01 (or on such later date as the Collateral Agent may agree in its reasonable discretion) and (y) within the time periods set forth in Section 5.10 with respect to Mortgaged Properties encumbered pursuant to said Section 5.10, the Collateral Agent shall have received (i) counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording or filing in all filing or recording offices that is deemed to be reasonably necessary or desirable by the Required Lenders in order to create a valid and enforceable Lien subject to no other Liens except as set forth in the DIP Order, at the time of recordation thereof, (ii) [reserved], (iii) with respect to each such Mortgaged Property, the Flood Documentation and (iv) such other documents as the Collateral Agent may reasonably request that are available to the Borrower without material expense with respect to any such Mortgage or Mortgaged Property;

(h)     within thirty (30) days after the Closing Date, the Borrower shall have executed and delivered, and used commercially reasonable efforts to cause the relevant depository bank to execute and deliver, a deposit account control agreement, in form and substance reasonably satisfactory to the Administrative Agent, that grants the Administrative Agent control (as defined in Article 9 of the Uniform Commercial Code) over the DIP Loan Proceeds Deposit Account (such control agreement, the "DIP Loan Proceeds DACA");

(i)     the Collateral Agent shall have received evidence of the insurance required by the terms of Section 5.02 hereof; and

(j)     after the Closing Date, the Collateral Agent shall have received (i) such other Security Documents as may be required to be delivered pursuant to Section 5.10 or

the Collateral Agreement, and (ii) upon reasonable request by the Collateral Agent, evidence of compliance with any other requirements of Section 5.10.

"Commitments" shall mean, with respect to any Lender, such Lender's Initial Term Loan Commitment and Delayed Draw Term Loan Commitment.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company" shall have the meaning assigned to such term in the first recital of this Agreement.

"Compounded SOFR" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent (in consultation with the Borrower) in accordance with:

(1)     the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:

(2)     if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Required Lenders determine in their reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Administrative Agent or Required Lenders decide that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for purposes of this Agreement, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"Confirmation/Sale Order" shall have the meaning assigned to such term in the Plan Support Agreement.

"Conduit Lender" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender; provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Sections 2.15, 2.16, 2.17 or 9.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit

made by such Conduit Lender unless the designation of such Conduit Lender is made with the prior written consent of the Borrower (not to be unreasonably withheld or delayed), which consent shall specify that it is being made pursuant to the proviso in the definition of "Conduit Lender" and provided that the designating Lender provides such information as the Borrower reasonably requests in order for the Borrower to determine whether to provide its consent or (b) be deemed to have any Commitment.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto. For the avoidance of doubt, neither the Borrower nor any Subsidiary will be deemed to Control a franchisee that is not a Subsidiary.

"Corresponding Tenor" with respect to a Benchmark Replacement shall mean a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the LIBO Rate.

"Credit Event" shall have the meaning assigned to such term in Article IV.

"Debtor" shall have the meaning assigned to such term in the recitals of this Agreement.

"Debtor Relief Laws" shall mean the U.S. Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Declining Lender" shall have the meaning assigned to such term in Section 2.10(c)(i).

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean, subject to Section 2.22, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or Administrative Agent in writing that it does not intend or expect to comply with its funding obligations hereunder or generally under other agreements in which it commits to extend credit, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit

12

of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (e) has become the subject of a Bail-In Action; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.22) upon delivery of written notice of such determination to the Borrower and each Lender.

"Delaware Divided LLC" shall mean any limited liability company which has been formed upon the consummation of a Delaware LLC Division.

"Delaware LLC Division" shall mean the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of any other Requirement of Law.

"Delayed Draw Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Delayed Draw Term Loans hereunder. The amount of each Lender's Delayed Draw Term Loan Commitment as of the Closing Date is set forth on Schedule 2.01. The aggregate amount of the Delayed Draw Term Loan Commitments as of the Closing Date is $100,000,000.

"Delayed Draw Term Loan Facility" shall mean the Delayed Draw Term Loan Commitments and the Delayed Draw Term Loans made hereunder.

"Delayed Draw Term Loans" shall have the meaning assigned to such term in Section 2.01(b).

"DIP Backstop Party" shall have the meaning assigned to such term in the Plan Support Agreement.

"DIP Loan Proceeds DACA" shall have the meaning assigned to such term in the definition of "Collateral and Guarantee Requirement".

"DIP Loan Proceeds Deposit Account" shall mean that certain segregated account of the Borrower held at JPMorgan Chase Bank, N.A., titled "CEC DIP Loan Proceeds Deposit Account".

"DIP Order" shall mean the final order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and

substance to the Required Lenders, in their sole discretion, and which order is in effect and not vacated or stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agents (at the direction of the Required Lenders in their sole discretion), which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guarantee) the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, provides for the superpriority of the Administrative Agent's and the Lenders' claims and authorizes the use of Cash Collateral.

"Discharge of DIP Obligations" shall means the date on which (a) all Commitments shall have been terminated, (b) the principal of and interest on each Loan, all Lender Payments and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash (other than in respect of (i) contingent indemnification and expense reimbursement claims not then due and (ii) obligations with respect to the Carried Over Letter of Credit) and (c) the Carried Over Letter of Credit shall have been cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer.

"Disclosure Statement" shall mean the related disclosure statement (and all exhibits thereto) with respect to the Acceptable Plan, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"Disclosure Statement Order" shall mean the order of the Bankruptcy Court approving the adequacy of the Disclosure Statement and authorizing solicitation of votes on the Acceptable Plan, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"Dispose" or "Disposed of" shall mean to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset (including to dispose of any property, business or asset to a Delaware Divided LLC pursuant to a Delaware LLC Division). The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" shall mean, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than the obligations in the respect of the Carried Over Letter of Credit, which shall be required to be cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer) that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the Maturity Date (provided, that only the

14

portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock). Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Borrower or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Equivalent" shall mean, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Borrower at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or other applicable date of determination) for the purchase of Dollars with such currency.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"Early Opt-in Election" shall mean the occurrence of:

(1)    a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.21 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(2)    the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Election Date" shall have the meaning assigned to such term in Section 1.10.

"EMU Legislation" shall mean the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, binding agreements, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the generation, use, transport, management, Release or threatened Release of, or exposure to, any Hazardous Material or to public or employee health and safety matters (to the extent relating to the environment or Hazardous Materials).

"Environmental Permits" shall have the meaning assigned to such term in Section 3.16.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Holdings, the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) with respect to any Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due

16

date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the incurrence by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (f) the receipt by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; or (j) the withdrawal of any of Holdings, the Borrower, a Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time

"Euro" shall mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Eurocurrency Borrowing" shall mean a Borrowing comprised of Eurocurrency Loans.

"Eurocurrency Loan" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Indebtedness" shall mean all Indebtedness not incurred in violation of Section 6.01.

"Excluded Property" shall have the meaning assigned to such term in Section 5.10(g).

"Excluded Securities" shall mean any of the following:

(a)     any Equity Interests or Indebtedness to the extent that the pledge thereof would be prohibited by any Requirement of Law;

17

(b)     [reserved];

(c)     any Equity Interests of any Subsidiary of, or other Equity Interests owned by, a Foreign Subsidiary;

(d)     [reserved]; and

(e)     any Margin Stock.

"Excluded Subsidiary" shall mean any of the following (except as otherwise provided in clause (b) of the definition of "Subsidiary Loan Party"):

(a)     [reserved],

(b)     [reserved],

(c)     each Domestic Subsidiary that is prohibited from Guaranteeing or granting Liens to secure the Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority to Guarantee or grant Liens to secure the Obligations (unless such consent, approval, license or authorization has been received),

(d)     each Domestic Subsidiary that is prohibited by any applicable contractual requirement from Guaranteeing or granting Liens to secure the Obligations on the Closing Date or at the time such Subsidiary becomes a Subsidiary not in violation of Section 6.09(c) (and for so long as such restriction or any replacement or renewal thereof is in effect),

(e)     [reserved],

(f)     any Foreign Subsidiary,

(g)     any Domestic Subsidiary (i) that is an FSHCO or (ii) that is a Subsidiary of a Foreign Subsidiary,

(h)     [reserved],

(i)     [reserved], and

(j)     with respect to any Swap Obligation, any Subsidiary that is not an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (i) Taxes imposed on or measured by its overall net income or branch profits (however denominated), and franchise (and similar) Taxes imposed on it, in each case by a jurisdiction (including any political subdivision thereof)

18

as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from this Agreement or any other Loan Documents or any transactions contemplated thereunder), (ii) in the case of a Lender, U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document that is required to be imposed on amounts payable to such Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 2.19(b) or 2.19(c)) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Loan Party with respect to such withholding Tax pursuant to Section 2.17, (iii) any withholding Tax imposed on any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document that is attributable to the Administrative Agent's, any Lender's or any other recipient's failure to comply with Section 2.17(d) or (e) or (iv) any Tax imposed under FATCA.

"Existing Senior Unsecured Note Documents" shall mean the Existing Senior Unsecured Notes Indenture and the other "Note Documents" under and as defined in the Existing Senior Unsecured Notes Indenture, as each such document may be amended, restated, supplemented or otherwise modified from time to time.

"Existing Senior Unsecured Notes" shall mean the Borrower's 8.000% Senior Unsecured Notes due 2022 outstanding on the Petition Date.

"Existing Senior Unsecured Notes Indenture" shall mean the Indenture dated as of February 19, 2014, among the Borrower, as issuer, the Subsidiary Loan Parties party thereto and Wilmington Trust, National Association, as indenture trustee, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"Facility" shall mean the respective facility and commitments utilized in making Loans and credit extensions hereunder, it being understood that, there are two Facilities hereunder (i.e., the Initial Term Loan Facility and the Delayed Draw Term Loan Facility).

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any Treasury Regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on the Federal Reserve Bank of New York's Website), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such

day; provided that if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Federal Reserve Bank of New York's Website" shall mean the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

"Flood Documentation" shall mean, with respect to each Mortgaged Property located in the United States of America or any territory thereof, (i) a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination (to the extent a Mortgaged Property is located in a Special Flood Hazard Area, together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the Borrower and the applicable Loan Party relating thereto) and (ii) a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.02(c) hereof and the applicable provisions of the Security Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (B) name the Collateral Agent, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee, (C) identify the address of each property located in a Special Flood Hazard Area, the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (D) be otherwise in form and substance reasonably satisfactory to the Collateral Agent.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" shall mean any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"FSHCO" shall mean any Subsidiary that owns no material assets other than the Equity Interests of one or more Foreign Subsidiaries that are CFCs and/or of one or more FSHCOs.

"Fund" shall mean, collectively, investment funds managed by Affiliates of Apollo Global Management, LLC.

"Fund Affiliate" shall mean (i) each Affiliate of the Fund that is neither a "portfolio company" (which means a company actively engaged in providing goods or services to unaffiliated customers), whether or not controlled, nor a company controlled by a "portfolio company" and (ii) any individual who is a partner or employee of Apollo Management, L.P. or Apollo Management VIII, L.P.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section 1.02; provided, that any reference to the application of GAAP in Sections 3.13(b), 3.20, 5.03, 5.07 and 6.02(e) to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrower) shall mean generally accepted accounting principles in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"Guarantee Agreement" shall mean the Guarantee Agreement, dated as of the Closing Date, as may be amended, restated, supplemented or otherwise modified from time to time, among Holdings, each Subsidiary Loan Party and the Collateral Agent.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Guarantors" shall mean the Loan Parties other than the Borrower.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including, without limitation, explosive or radioactive substances or petroleum by products or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas or pesticides, fungicides, fertilizers or other agricultural chemicals, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of the Subsidiaries shall be a Hedging Agreement.

"Holdings" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount or deferred financing fees, the payment of interest or dividends in the form of additional Indebtedness or in the form of Equity Interests, as applicable, the accretion of original issue discount, deferred financing fees or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the currencies exchange rate of currencies.

"Indebtedness" of any person shall mean, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course of business), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Capitalized Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in

clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); provided, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses, and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out obligations until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (E) obligations in respect of Third Party Funds or (F) in the case of the Borrower and its Subsidiaries, (I) all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (II) intercompany liabilities in connection with the cash management, tax and accounting operations of the Borrower and the Subsidiaries. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"Indemnified Taxes" shall mean all Taxes imposed on or with respect to or measured by any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document other than (a) Excluded Taxes and (b) Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Ineligible Institution" shall mean (a) bona fide business competitors of the Borrower (in the good faith determination of the Borrower), as identified in writing by the Borrower to the Administrative Agent prior to the Closing Date (any such institution, a "Primary Ineligible Institution") and (b) any Affiliates of any Primary Ineligible Institution that are identified in writing by the Borrower to the Administrative Agent as such from time to time or are readily identifiable as such solely based on similarity of name; provided that in no event shall any Consenting Creditor party to the Plan Support Agreement as of September 25, 2020 or any Affiliate thereof be an Ineligible Institution.

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Initial Budget" shall have meaning assigned to such term in Section 4.02(l).

"Initial Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Initial Term Loans hereunder. The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is set forth on Schedule 2.01. The aggregate amount of the Initial Term Loan Commitments as of the Closing Date is $100,000,000.

"Initial Term Loan Facility" shall mean the Initial Term Loan Commitments and the Initial Term Loans made hereunder.

"Initial Term Loans" shall have the meaning assigned to such term in Section 2.01(a).

"Intellectual Property" shall have the meaning assigned to such term in the Collateral Agreement.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07 and substantially in the form of Exhibit E or another form approved by the Administrative Agent.

"Interest Payment Date" shall mean, (a) with respect to any Eurocurrency Loan, (i) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, (ii) in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and (iii) in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter.

"Interest Period" shall mean, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 2, 3 or 6 months thereafter, as the Borrower may elect; provided, however, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interpolated Rate" shall mean, in relation to any Eurocurrency Borrowing, the rate which results from interpolating on a linear basis between: (a) the rate appearing on Reuters Screen LIBOR01 Page (or otherwise on the Reuters screen) for the longest period (for which that rate is available) which is less than the Interest Period and (b) the rate appearing on Reuters Screen LIBOR01 Page (or otherwise on the Reuters screen) for the shortest period (for which that rate is available) which exceeds the Interest Period, each as of approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" shall have the meaning assigned to such term in Section 6.04.

"Judgment Currency" shall have the meaning assigned to such term in Section 9.19.

"Junior Liens" means Liens on the Collateral that are junior to the Liens thereon securing the Term Loans.

"L/C Issuer" shall have the meaning assigned to such term in the definition of "Carried Over Letter of Credit".

"Landlord Promissory Note" shall mean that certain Promissory Note set forth on Schedule 1.01A.

24

"Lender" shall mean each financial institution listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 9.04), as well as any person that becomes a "Lender" hereunder pursuant to Section 9.04.

"Lender Advisors" shall mean Akin Gump Strauss Hauer & Feld LLP, legal counsel to the Lenders, and Houlihan Lokey Capital, Inc., financial advisor to the Lenders.

"Lender Payments" shall mean the Put Option Premium and the Administrative Agent Fees.

"Lending Office" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"LIBO Rate" shall mean, with respect to any Eurocurrency Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the ICE Benchmark Administration Interest Settlement Rates (or the successor thereto if the ICE Benchmark Administration is no longer making such rates available) for Dollar deposits (as set forth by any service selected by the Administrative Agent that has been nominated by the ICE Benchmark Administration (or its successor) as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the Interpolated Rate.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"Loan Documents" shall mean (i) this Agreement, (ii) the Guarantee Agreement, (iii) the Security Documents, (iv) the DIP Order, (v) [reserved], (vi) any Note issued under Section 2.09(e), (vii) [reserved] and (viii) solely for the purposes of Sections 4.02 and 7.01 hereof, the Administrative Agent Fee Letter.

"Loan Parties" shall mean Holdings, the Borrower and the Subsidiary Loan Parties.

"Loans" or "Term Loans" shall mean, collectively, the Initial Term Loans and the Delayed Draw Term Loans (if any).

"Local Time" shall mean New York City time (daylight or standard, as applicable).

"Majority Lenders" of any Facility shall mean, at any time, Lenders under such Facility having Loans and unused Commitments representing more than 50% of the sum of all

Loans outstanding under such Facility and unused Commitments under such Facility at such time (subject to the last paragraph of Section 9.08(b)).

"Management Group" shall mean the group consisting of the directors, executive officers and other management personnel of the Borrower, Holdings or any Parent Entity, as the case may be, on the Closing Date together with (a) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Borrower, Holdings or any Parent Entity, as the case may be, was approved by a vote of a majority of the directors of the Borrower, Holdings or any Parent Entity, as the case may be, then still in office who were either directors on the Closing Date or whose election or nomination was previously so approved and (b) executive officers and other management personnel of the Borrower, Holdings or any Parent Entity, as the case may be, hired at a time when the directors on the Closing Date together with the directors so approved constituted a majority of the directors of the Borrower or Holdings, as the case may be.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse effect on the business, property, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder; provided that the impacts of COVID-19 on the business, property, operations or financial condition of the Borrower or any of its Subsidiaries that occurred and were disclosed to the Administrative Agent or otherwise publicly available on or prior to the Closing Date will be disregarded.

"Material Indebtedness" shall mean Indebtedness (other than Loans) of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $2,000,000; provided that in no event shall any Capitalized Lease Obligation existing on the Closing Date be considered Material Indebtedness.

"Maturity Date" shall mean the date that is 185 days after the Closing Date; provided, however, that if any condition precedent to the effective date of an Acceptable Plan (other than the receipt of one or more approvals from any Governmental Authority or the passage of any applicable waiting periods required by any Governmental Authority) has not been satisfied by the date that is 120 days after the Closing Date, the Maturity Date shall mean the date that is 120 days after the Closing Date.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Milestones" shall have the meaning assigned to such term in Section 5.15.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean the Owned Real Properties as of the Closing Date, each of which is identified on Schedule 1.01 (the "Closing Date Mortgaged Properties"), and each additional Owned Real Property encumbered by a Mortgage pursuant to Section 5.10.

"Mortgages" shall mean, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents (including amendments to any of the foregoing) delivered with respect to Mortgaged Properties, each substantially in the form of Exhibit F (with such changes as are reasonably consented to by the Collateral Agent to account for local law matters) or in such other form as is reasonably satisfactory to the Collateral Agent and the Borrower, in each case, as amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, Holdings or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"Net Proceeds" shall mean:

(a)     100% of the cash proceeds actually received by the Borrower or any Subsidiary Loan Party (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Asset Sale (other than Asset Sales pursuant to Sections 6.05(a)(i), (a)(ii), (a)(iv), (b), (c), (e), (f), (i), (j), (q) or (r)), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents) on such asset, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) Taxes paid or payable (in the good faith determination of the Borrower) as a result thereof and (iii) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (ii) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be cash proceeds of such Asset Sale occurring on the date of such reduction); provided, that (x) no net cash proceeds calculated in accordance with the foregoing from Dispositions pursuant to Section 6.05(a)(iii) shall constitute Net Proceeds until the aggregate amount of all such net cash proceeds shall exceed $1,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds), (y) no net cash proceeds calculated in accordance with the foregoing from Dispositions pursuant to Section 6.05(p) shall constitute Net Proceeds until the aggregate amount of all such net cash proceeds shall exceed $5,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds) and (z) no net cash proceeds calculated in accordance with the foregoing from all other Dispositions shall constitute Net Proceeds until the aggregate amount of all such net cash proceeds shall exceed $1,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds); and

(b)      100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any Subsidiary of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.19(c).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" shall have the meaning assigned to such term in Section 2.09(e).

"Obligations" shall mean (a) the due and punctual payment by the Borrower of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans made to the Borrower under this Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) [reserved] and (iii) all other monetary obligations of the Borrower owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment of all obligations of each other Loan Party under or pursuant to each of the Loan Documents and (c) the obligations in respect of the Carried Over Letter of Credit.

"OFAC" shall have the meaning provided in Section 3.25(b).

"Other Taxes" shall mean any and all present or future stamp or documentary Taxes or any other excise, transfer, sales, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, registration, delivery or enforcement of, consummation or administration of, from the receipt or perfection of security interest under, or otherwise with respect to, the Loan Documents (but excluding any Excluded Taxes).

"Owned Real Property" shall mean any parcel or parcels of Real Property located in the United States now or hereafter owned in fee by the Borrower or any Subsidiary Loan Party.

"Parent Entity" shall mean any direct or indirect parent of the Borrower.

"Participant" shall have the meaning assigned to such term in Section 9.04(d)(i).

"Participant Register" shall have the meaning assigned to such term in Section 9.04(d)(ii).

"<u>Participating Member State</u>" shall mean each state so described in any EMU Legislation.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"<u>Permitted Holder Group</u>" shall have the meaning assigned to such term in the definition of "Permitted Holders."

"<u>Permitted Holders</u>" shall mean (i) the Co-Investors, (ii) any person that, directly or indirectly, holds or acquires beneficial ownership of 100% on a fully diluted basis of the voting Equity Interests of the Borrower, and of which no other person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), other than any of the other Permitted Holders, beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests thereof, and any New Parent and its subsidiaries, (iii) any person who is acting solely as an underwriter in connection with a public or private offering of Equity Interests of the Borrower or any Parent Entity, acting in such capacity and (iv) any "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) the members of which include any of the other Permitted Holders and that, directly or indirectly, hold or acquire beneficial ownership of the voting Equity Interests of the Borrower (a "<u>Permitted Holder Group</u>"), so long as (1) no member of the Permitted Holder Group (other than Permitted Holders specified in clause (i), (ii) or (iii)) has the right to elect a number of directors that is greater than such member's proportional share of directors (with such member's proportional share of directors being determined based on the total number of directors on the applicable board of directors multiplied by the percentage of voting Equity Interests held or acquired by such member) and (2) no person or other "group" (other than the other Permitted Holders) beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests held by the Permitted Holder Group.

"<u>Permitted Investments</u>" shall mean:

(a)     direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years from the date of acquisition thereof;

(b)     time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c)     repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)     commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Borrower) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P 1 (or higher) according to Moody's, or A 1 (or higher) according to S&P (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(e)     securities with maturities of two years or less from the date of acquisition, issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(f)     shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)     money market funds that (i) comply with the criteria set forth in Rule 2a 7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000;

(h)     time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits in an aggregate face amount not in excess of 0.5% of the total assets of the Borrower and the Subsidiaries, on a consolidated basis, as of the end of the Borrower's most recently completed fiscal year; and

(j)     instruments equivalent to those referred to in clauses (a) through (i) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction.

"Permitted Liens" shall have the meaning assigned to such term in Section 6.02.

"person" or "Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Petition Date" shall have the meaning assigned to such term in the recitals of this Agreement.

"Plan" shall mean any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is (i) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, (ii) sponsored, maintained or contributed to (at the time of determination or at any time within the five years prior thereto) by Holdings, the Borrower, any Subsidiary or any ERISA Affiliate, and (iii) in respect of which Holdings, the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the U.S. Bankruptcy Code) of a chapter 11 plan of reorganization, which, for purposes of this Agreement, shall be no later than the effective date of a chapter 11 plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"Plan Support Agreement" shall mean the Amended and Restated Plan Support Agreement, dated as of September 25, 2020, by and among the Debtors and each "Consenting Creditor" party thereto, as amended, restated, supplemented or otherwise modified from time to time with the prior written consent of the Required Lenders.

"Platform" shall have the meaning assigned to such term in Section 9.17(a).

"Pledged Collateral" shall have the meaning assigned to such term in the Collateral Agreement.

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition Agents" shall mean the Prepetition Administrative Agent and the Prepetition Collateral Agent.

"Prepetition Credit Agreement" shall mean that certain First Lien Credit Agreement, dated as of August 30, 2019, by and among Holdings, CEC Entertainment, Inc., as borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and as collateral agent.

"Prepetition Administrative Agent" shall mean Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent under the Prepetition Credit Agreement.

"Prepetition Collateral" shall have the meaning assigned to such term in the DIP Order.

"Prepetition Collateral Agent" shall mean Credit Suisse AG, Cayman Islands Branch, in its capacity as collateral agent under the Prepetition Credit Agreement.

"Prepetition Indebtedness" shall mean all Indebtedness of the Loan Parties outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, other than Indebtedness under the Prepetition Credit Agreement.

"Prepetition Loan Documents" shall mean the "Loan Documents" as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Credit Agreement.

"primary obligor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Prime Rate" means, for any day, the prime lending rate published in T*he Wall Street Journal* for such day; provided that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates). Each change in the Prime Rate shall be effective on the date such change is effective.

"Pro Rata Share" shall have the meaning assigned to such term in Section 9.08(f).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company Compliance" shall mean compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith, the provisions of the Securities Act and the Exchange Act, and the rules of national securities exchange listed companies (in each case, as applicable to companies with equity or debt securities held by the public), including procuring directors' and officers' insurance, legal and other professional fees, and listing fees.

"Public Lender" shall have the meaning assigned to such term in Section 9.17(b).

"Put Option Premium" shall have the meaning assigned to such term Section 2.12(a).

"Qualified Equity Interests" shall mean any Equity Interest other than Disqualified Stock.

"Rate" shall have the meaning assigned to such term in the definition of the term "Type".

"Real Property" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"Register" shall have the meaning assigned to such term in Section 9.04(b)(iv).

32

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"Related Parties" shall mean, with respect to any specified person, such person's Controlled or Controlling Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Controlled or Controlling Affiliates.

"Related Sections" shall have the meaning assigned to such term in Section 6.04.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"Relevant Governmental Body" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders having (a) Loans outstanding and (b) unused Commitments that, taken together, represent more than 50% of the sum of (x) all Loans outstanding and (y) the total unused Commitments at such time; provided, that the Loans and unused Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time. For purposes of the foregoing, "Required Amount of Loans" means, at any time, the amount of Loans required to be held by Lenders in order for such Lenders to constitute "Required Lenders".

"Requirement of Law" shall mean, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such

person or any of its property or assets or to which such person or any of its property or assets is subject.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, or any other duly authorized employee or signatory of such person.

"Restricted Payments" shall have the meaning assigned to such term in Section 6.06. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as determined by the Borrower in good faith).

"S&P" shall mean S&P Global Ratings.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, the L/C Issuer and each sub-agent appointed pursuant to Section 8.02 by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the Mortgages, the Collateral Agreement, the DIP Order, the IP Security Agreements (as defined in the Collateral Agreement), and each of the security agreements, pledge agreements and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.10.

"Special Flood Hazard Area" shall have the meaning assigned to such term in Section 5.02(c).

"SOFR" shall mean, with respect to any day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"SOFR-Based Rate" means SOFR, Compounded SOFR, Term SOFR or any reference rate based on SOFR.

"Specified Accounts" means the accounts set forth on Schedule 5.08.

"Spot Rate" shall mean, with respect to any currency, the rate reasonably determined by the Borrower as the spot rate for the purchase by the Borrower of such currency at approximately 11:00 a.m., Local Time on the date three Business Days prior to the date as of which the foreign exchange computation is made or if such rate cannot be computed as of such

date such other date as the Borrower shall reasonably determine is appropriate under the circumstances.

"Statutory Reserves" shall mean the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurocurrency Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subagent" shall have the meaning assigned to such term in Section 8.02.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of the Borrower.

"Subsidiary Loan Party" shall mean (a) each Domestic Subsidiary of the Borrower that is not an Excluded Subsidiary and (b) any other Subsidiary of the Borrower that may be designated by the Borrower (by way of delivering to the Collateral Agent a supplement to the Collateral Agreement and a supplement to the Guarantee Agreement, in each case, duly executed by such Subsidiary) in its sole discretion from time to time to be a guarantor in respect of the Obligations and the obligations in respect of the Loan Documents, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section 5.10(d) as if it were newly acquired.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term SOFR" shall mean the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Termination Date" shall mean the earliest to occur of (i) the Maturity Date, (ii) the date on which the Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with this Agreement, by operation of law or otherwise, (iii) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (iv) the Plan Consummation Date.

"Third Party Funds" shall mean any accounts or funds, or any portion thereof, received by Borrower or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon Borrower or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"Transactions" shall mean, collectively, the transactions to occur pursuant to the Loan Documents, including (a) the execution, delivery and performance of the Loan Documents, the creation of the Liens pursuant to the Security Documents, and the initial borrowings hereunder and the use of proceeds thereof and (b) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

"Type" shall mean, when used in respect of any Loan or Borrowing, the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the ABR.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"U.S. Bankruptcy Code" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"U.S. Dollars", "Dollars" or "$" shall mean lawful money of the United States of America.

"U.S. Lender" shall mean any Lender other than a Foreign Lender.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107 56 (signed into law October 26, 2001)).

"Variance Report" shall have the meaning set forth in Section 5.14.

"Variance Test Period" shall have the meaning set forth in Section 5.14.

"Voting Stock" shall mean, with respect to any person, such person's Equity Interests having the right to vote for the election of directors of such person under ordinary circumstances.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person. Unless the context otherwise requires, "Wholly Owned Subsidiary" shall mean a Subsidiary of the Borrower that is a Wholly Owned Subsidiary of the Borrower.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" shall mean (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02   Terms Generally. The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and

Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

Section 1.03    Effectuation of Transactions. Each of the representations and warranties of the Borrower contained in this Agreement (and all corresponding definitions) are made after giving effect to the Transactions, unless the context otherwise requires.

Section 1.04    Exchange Rates; Currency Equivalents. (a) Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial ratios hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Borrower in accordance with this Agreement. No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VI or clause (f) or (j) of Section 7.01 being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.05    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws), (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

Section 1.06    [Reserved].

Section 1.07    Timing of Payment or Performance. Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.08    <u>Times of Day</u>. Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.09    [Reserved]

Section 1.10    <u>Election Date</u>. In connection with any commitment, definitive agreement or similar event relating to a Restricted Payment, Investment or Disposition, the Borrower or applicable Subsidiary may designate such Restricted Payment, Investment or Disposition as having occurred on the date of the commitment, definitive agreement or similar event relating thereto (such date, the "<u>Election Date</u>") if, after giving pro forma effect to such Restricted Payment, Investment or Disposition and all related transactions in connection therewith and any related pro forma adjustments, the Borrower or any of its Subsidiaries would have been permitted to make such Restricted Payment, Investment or Disposition on the relevant Election Date in compliance with this Agreement, and any related subsequent actual making of such Restricted Payment, Investment or Disposition will be deemed for all purposes under this Agreement to have been made on such Election Date, including, without limitation, for purposes of usage of any baskets hereunder and for purposes of determining whether there exists any Default or Event of Default (and all such calculations on and after such Election Date until the termination, expiration, passing, rescission, retraction or rescindment of such commitment, definitive agreement or similar event shall be made on a pro forma basis giving effect thereto and all related transactions in connection therewith).

ARTICLE II

*The Credits*

Section 2.01    <u>Commitments</u>. Subject to the terms and conditions set forth herein:

(a)    Each Lender agrees, severally and not jointly, to make term loans in Dollars to the Borrower on the Closing Date in an aggregate principal amount not to exceed its Initial Term Loan Commitment (collectively, the "<u>Initial Term Loans</u>"). Upon a Lender's funding of an Initial Term Loan on the Closing Date, such Lender's Initial Term Loan Commitment shall be permanently reduced to zero and shall terminate.  Amounts repaid or prepaid in respect of the Initial Term Loans may not be reborrowed.

(b)    Each Lender agrees, severally and not jointly, to make term loans in Dollars to the Borrower during the Availability Period from time to time in an aggregate principal amount not to exceed its Delayed Draw Term Loan Commitment (collectively, the "<u>Delayed Draw Term Loans</u>"); provided that (i) the Borrower may not request Delayed Draw Term Loans more than four (4) times during the Availability Period and (ii) the aggregate amount of Delayed Draw Term Loans requested on any such occasion may not exceed the lesser of (x) $50,000,000 and (y) the unfunded Delayed Draw Term Loan Commitments in effect at such time. Upon a Lender's funding of a Delayed Draw Term Loan, such Lender's Delayed Draw Term Loan Commitment shall be permanently reduced by the amount of such Delayed Draw Loan when made. Any remaining Delayed Draw Term Loan Commitment shall be

39

permanently reduced to zero and terminate at the end of the Availability Period. Amounts repaid or prepaid in respect of the Delayed Draw Term Loans may not be reborrowed.

Section 2.02   Loans and Borrowings. (a) Each Loan shall be made as part of a Borrowing consisting of Loans under the same Facility and of the same Type made by the Lenders ratably in accordance with their respective Commitments under the applicable Facility. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under Section 2.15 or 2.17 solely in respect of increased costs resulting from such exercise and existing at the time of such exercise.

(c)    Borrowings of more than one Type may be outstanding at the same time; provided, however, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than (i) 10 Eurocurrency Borrowings outstanding under the Initial Term Loan Facility at any time and (ii) 10 Eurocurrency Borrowings outstanding under the Delayed Draw Term Loan Facility at any time. Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(d)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03   Requests for Borrowings. To request a Borrowing, the Borrower shall notify the Administrative Agent in writing of such request electronically (a) in the case of a Eurocurrency Borrowing, not later than 12:00 noon, Local Time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 10:00 a.m. Local Time, on the Business Day of the proposed Borrowing (or, in each case, such shorter period as the Administrative Agent may agree); provided that to request a Borrowing on the Closing Date, the Borrower shall notify the Administrative Agent of such request electronically not later than 12:00 p.m., Local Time, three (3) Business Days prior to the Closing Date (or such later time as the Administrative Agent may agree). Each such electronic Borrowing Request shall be irrevocable (other than in the case of any notice given in respect of the Closing Date) and shall be confirmed promptly by hand delivery or electronic means to the Administrative Agent of a written Borrowing Request signed by the Borrower. Each such electronic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)    whether such Borrowing is to be a Borrowing of  Initial Term Loans or Delayed Draw Term Loans;

(ii)      the aggregate amount of the requested Borrowing;

(iii)     the date of such Borrowing, which shall be a Business Day;

(iv)     whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(v)     in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period".

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.  Subject to the terms and conditions of this Agreement, the Administrative Agent is hereby authorized and directed to pay over such funds (to the extent such funds are collected and available) to the Borrower, by effecting a wire transfer to the DIP Loan Proceeds Deposit Account, for the account of the Borrower, prior to 4:00 p.m., New York, New York time, on the date of the requested Loan.

Section 2.04   [Reserved].

Section 2.05   [Reserved].

Section 2.06   Funding of Borrowings. (a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to the DIP Loan Proceeds Deposit Account.

(b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with clause (a) of this Section 2.06 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the Federal Funds Effective Rate or (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to ABR Loans at such time. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative

41

Agent is hereby authorized and directed to promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.07    <u>Interest Elections</u>. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section 2.07, the Borrower shall electronically notify the Administrative Agent of such election, by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such electronic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or electronic means to the Administrative Agent of a written Interest Election Request signed by the Borrower.

(c)    Each electronic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)    if the resulting Borrowing is a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration. If less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall be in an integral multiple of the

Borrowing Multiple and not less than the Borrowing Minimum and satisfy the limitations specified in Sections 2.02(c) regarding the maximum number of Borrowings of the relevant Type.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written direction (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.08   <u>Termination and Reduction of Commitments</u>.   (a)   Unless previously terminated, the Delayed Draw Term Loan Commitments shall terminate at the end of the Availability Period. On the Closing Date (after giving effect to the funding of the Initial Term Loans to be made on such date), the  Initial Term Loan Commitments of each Lender as of the Closing Date will terminate.

(b)     The Borrower may at any time terminate, or from time to time reduce, the Delayed Draw Term Loan Commitments; <u>provided</u>, that each reduction of the Delayed Draw Term Loan Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 (or, if less, the remaining amount of the Delayed Draw Term Loan Commitments).

(c)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Delayed Draw Term Loan Commitments under paragraph (b) of this Section 2.08 at least three (3) Business Days prior to the effective date of such termination or reduction (or such shorter period acceptable to the Administrative Agent), specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable; <u>provided</u> that a notice of termination or reduction of the Delayed Draw Term Loan Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied (or waived by the Borrower in its sole discretion) and/or rescinded at any time by the Borrower if the Borrower determines in its sole discretion that any or all of such conditions will not be satisfied or waived. Any termination or reduction of the Commitments shall be permanent. Each reduction of the Delayed Draw Term Loan

Commitments shall be made ratably among the Lenders in accordance with their respective Delayed Draw Term Loan Commitments.

Section 2.09    Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.10.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain the Register in which it shall record (i) the amount of each Loan made hereunder, the Facility and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to clause (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note (a "Note"). In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent (acting at the direction of the Required Lenders) and reasonably acceptable to the Borrower. Thereafter, unless otherwise agreed to by the applicable Lender, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one (1) or more promissory notes in such form payable to the payee named therein (or, if requested by such payee, to such payee and its registered assigns).

Section 2.10    Repayment of Loans. (a) Subject to the other clauses of this Section 2.10, to the extent not previously paid, outstanding Loans shall be due and payable on the Termination Date, unless otherwise provided in the Acceptable Plan.

(b)    [Reserved].

(c)    Prepayment of the Loans from:

(i)    all Net Proceeds pursuant to Section 2.11(b) shall be allocated to the Loans in accordance with Section 2.10(d); provided, that any Lender, at its option, may elect to decline all, but not less than all, of any such prepayment of any Term Loan held by it if it shall give written notice to the Administrative Agent thereof by 5:00 p.m. Local Time at least three (3) Business Days prior to the date of such prepayment (any

such Lender, a "Declining Lender") and on the date of any such prepayment, any amounts that would otherwise have been applied to prepay Term Loans owing to Declining Lenders shall instead be retained by the Borrower for application for any purpose not prohibited by this Agreement; and

(ii)     any optional prepayments of the Term Loans pursuant to Section 2.11(a) shall be applied to the Loans on a pro rata basis across both Facilities.

(d)     Any mandatory prepayment of Loans pursuant to Section 2.11(b) shall be applied so that the aggregate amount of such prepayment is allocated among the Loans pro rata based on the aggregate principal amount of outstanding Loans across both Facilities. Prior to any prepayment of any Loan hereunder, the Borrower shall notify the Administrative Agent of such prepayment by telephone (confirmed by electronic means) not later than 2:00 p.m., Local Time, (i) in the case of an ABR Borrowing, at least one (1) Business Day before the scheduled date of such prepayment and (ii) in the case of a Eurocurrency Borrowing, at least three (3) Business Days before the scheduled date of such prepayment (or, in each case such shorter period acceptable to the Administrative Agent); provided, that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied (or waived by the Borrower in its sole discretion) and/or rescinded at any time by the Borrower if the Borrower determines in its sole discretion that any or all of such conditions will not be satisfied (or waived).  Each repayment of Loans shall be applied ratably to the Loans included in the repaid Borrowing. All repayments of Loans shall be accompanied by accrued interest on the amount repaid to the extent required by Section 2.13(d). Notwithstanding the foregoing or anything herein to the contrary, upon the consummation of the sale or transaction contemplated by the Bidding Procedures and/or the Confirmation/Sale Order, as applicable, 100% of the Net Proceeds of such sale or transaction shall be applied in accordance with the Bidding Procedures or the Confirmation/Sale Order, whichever controls at such time.

Section 2.11   Prepayment of Loans. (a) The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty (but subject to Section 2.16), in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding, subject to prior notice in accordance with Section 2.10(d).

(b)     The Borrower shall apply all Net Proceeds promptly upon receipt thereof to prepay Loans in accordance with clauses (c) and (d) of Section 2.10.

(c)     [Reserved].

(d)     Notwithstanding any other provisions of this Section 2.11 to the contrary, (i) to the extent that any Net Proceeds of any Asset Sale by a Foreign Subsidiary would otherwise be required to be applied pursuant to Section 2.11(b) but is prohibited, restricted or delayed by applicable local law from being repatriated to the United States of America, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(b) but may be retained by the applicable Foreign Subsidiary so

45

long, but only so long, as the applicable local law will not permit repatriation to the United States of America, and once such repatriation of any of such affected Net Proceeds is permitted under the applicable local law, such repatriation will be effected and such repatriated Net Proceeds will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(b), to the extent provided therein and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of such Net Proceeds that would otherwise be required to be applied pursuant to Section 2.11(b) would have a material adverse tax consequence with respect to such Net Proceeds, the Net Proceeds so affected may be retained by the applicable Foreign Subsidiary for so long as, but only for so long as, as such material adverse tax consequences exist (the Borrower hereby agreeing to cause the applicable Subsidiary to promptly use commercially reasonable efforts to take all actions within the reasonable control of the Borrower that are reasonably required to eliminate such tax consequences).

Section 2.12   Lender Payments.

(a)     The Borrower shall pay to each of the DIP Backstop Parties on the Closing Date a nonrefundable put option premium (the "Put Option Premium") payable in cash in an amount equal to 5.0% of the aggregate principal amount of the Commitments of such DIP Backstop Party as in effect on the Closing Date immediately prior to funding Initial Term Loans.The Borrower agrees to pay to the Administrative Agent, for the account of the Administrative Agent, the "Administration Fee" as set forth in the Administrative Agent Fee Letter, as may be amended, restated, supplemented or otherwise modified from time to time, at the times specified therein (the "Administrative Agent Fees").

(c)     [Reserved].

(d)     All Lender Payments shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, none of the Lender Payments shall be refundable under any circumstances.

Section 2.13   Interest. (a) The Loans comprising each ABR Borrowing shall bear interest at the ABR plus the Applicable Margin.

(b)     The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)     Notwithstanding the foregoing, if any principal of or interest on any Loan or any Lender Payments or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding clauses of this Section 2.13 or (ii) in the case of any other overdue amount, 2.00% plus the rate applicable to ABR Loans as provided in clause (a) of this Section 2.13; provided, that this clause (c) shall not apply to any Event of Default that has been waived by the Lenders pursuant to Section 9.08.

46

(d)     Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date for such Loan, and on the Termination Date; provided, that (A) interest accrued pursuant to clause (c) of this Section 2.13 shall be payable on demand, (B) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (C) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed on ABR shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14    Alternate Rate of Interest. If prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Required Lenders notify the Administrative Agent (with a copy to Borrower) that the Required Lenders have determined, that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or electronic means as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing, and (ii) if any Borrowing Request requests a Eurocurrency Borrowing, such Borrowing shall be made as an ABR Borrowing.

If at any time the Administrative Agent and the Borrower determine (which determination shall be conclusive absent manifest error), or the Required Lenders notify the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined, that (i) the circumstance set forth in Section 2.14(a) above has arisen and such circumstance is unlikely to be temporary, (ii) the circumstance set forth in Section 2.14(a) has not arisen but the supervisor for the administrator of the LIBO Rate, or the administrator of the LIBO Rate, or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Rate shall no longer be published or used for determining interest rates for loans, or (iii) the circumstance set forth in Section 2.14(a) have not arisen but syndicated loans currently being executed, or that include language similar to

47

that contained in this Section 2.14, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, then (A) if the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower reasonably determine that there exists a then prevailing market convention for determining a reference rate of interest for syndicated loans in the U.S. as the successor to interest rates based on the LIBO Rate, the Administrative Agent and the Borrower shall enter into an amendment to this Agreement to reflect such alternate rate of interest (including any mathematical or other adjustments to the benchmark (if any) incorporated therein) and such other related changes to this Agreement as may be applicable, or (B) if the Administrative Agent and the Borrower are unable to reasonably determine that a then prevailing market convention for determining a rate of interest for syndicated loans in the U.S. as the successor to interest rates based on the LIBO Rate does exist, the Administrative Agent and the Borrower shall enter into an amendment to this Agreement to reflect an alternate rate of interest (including any mathematical or other adjustments to the benchmark (if any) incorporated therein) and such other related changes to this Agreement as may be applicable, in each case that are acceptable to the Borrower and the Administrative Agent (and any such amendment described in clauses (A) or (B) above shall, notwithstanding anything to the contrary in Section 9.08, become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent notice that such Required Lenders do not accept such amendment).

Section 2.15   <u>Increased Costs</u>. (a) If any Change in Law shall:

(i)   impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)   subject any Lender to any Tax with respect to any Loan Document (other than (i) Taxes indemnifiable under Section 2.17 or (ii) Excluded Taxes); or

(iii)   impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurocurrency Loans made by such Lender ;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)   If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender  to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration

48

such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in clause (a) or (b) of this Section 2.15 shall be delivered to the Borrower and shall be conclusive absent manifest error; provided, that any such certificate claiming amounts described in clause (x) or (y) of the definition of "Change in Law" shall, in addition, state the basis upon which such amount has been calculated and certify that such Lender's demand for payment of such costs hereunder, and such method of allocation is not inconsistent with its treatment of other borrowers which, as a credit matter, are similarly situated to the Borrower and which are subject to similar provisions. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender shall notify the Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16   Break Funding Payments. In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow (other than due to the default of the relevant Lender), convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurocurrency Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender (it being understood that the deemed amount shall not exceed the actual amount) to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in Dollars of a comparable amount and period from other banks in the Eurocurrency market. A certificate of any Lender setting forth any

49

amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 2.17    Taxes. (a) Any and all payments made by or on behalf of a Loan Party under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided, that if a Loan Party, the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirement of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with applicable Requirement of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Loan Party shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.17) the Administrative Agent or any Lender, as applicable, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. Whenever any Indemnified Taxes or Other Taxes are payable by a Loan Party, as promptly as possible thereafter, such Loan Party shall send to the Administrative Agent for its own account or for the account of a Lender, as the case may be, a certified copy of an official receipt (or other evidence acceptable to the Administrative Agent or such Lender, acting reasonably) received by the Loan Party showing payment thereof. Without duplication, after any payment of Taxes by any Loan Party or the Administrative Agent to a Governmental Authority as provided in this Section 2.17, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Requirements of Law to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(b)    The Borrower shall timely pay any Other Taxes in accordance with the applicable Requirements of Law.

(c)    The Loan Parties shall jointly and severally indemnify and hold harmless the Administrative Agent and each Lender within fifteen (15) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent or such Lender, as applicable, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)      Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to withholding of Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, any such withholding of Taxes in respect of any payments to be made to such Lender by any Loan Party pursuant to any Loan Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)      Without limiting the generality of Section 2.17(d), each Foreign Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i)      deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Foreign Lender is due hereunder, two (2) copies of (A) in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," United States Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, (or any applicable successor form) (together with a certificate (substantially in the form of Exhibit J hereto, such certificate, the "Non-Bank Tax Certificate") certifying that such Foreign Lender is not a bank for purposes of Section 881(c) of the Code, is not a "10-percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower and is not a CFC related to the Borrower (within the meaning of Section 864(d)(4) of the Code), and that the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States of America), (B) Internal Revenue Service Form W-8BEN, W-8BEN-E, as applicable, (or any applicable successor form), or Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Foreign Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) Internal Revenue Service Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (A) and (B) above, provided that if the Foreign Lender is a partnership, and one (1) or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Foreign Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

51

(ii)      deliver to the Borrower and the Administrative Agent two (2) further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

Any Foreign Lender that becomes legally ineligible to update any form or certification previously delivered shall promptly notify the Borrower and the Administrative Agent in writing of such Foreign Lender's inability to do so.

Each person that shall become a Participant pursuant to Section 9.04 or a Lender pursuant to Section 9.04 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to Section 2.17(d) or this Section 2.17(e); provided that a Participant shall furnish all such required forms and statements to the person from which the related participation shall have been purchased.

In addition, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Administrative Agent pursuant to Section 8.09 on which payment by the Borrower is due hereunder, as applicable, two (2) copies of a properly completed and executed Internal Revenue Service Form W-9 certifying its exemption from U.S. federal backup withholding or such other properly completed and executed documentation prescribed by applicable law certifying its entitlement to an available exemption from applicable U.S. federal withholding taxes in respect of any payments to be made to such Agent by any Loan Party pursuant to any Loan Document including, as applicable, an Internal Revenue Service Form W-8IMY certifying that the Agent is a U.S. branch and intends to be treated as a U.S. person for purposes of withholding under Chapter 3 of the Code pursuant to Section 1.1441-1(b)(2)(iv) of the Treasury Regulations, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, two (2) further copies of such documentation.

(f)      If any Lender or the Administrative Agent, as applicable, determines, in its sole discretion, that it has received a refund of an Indemnified Tax or Other Tax for which a payment has been made by a Loan Party pursuant to this Agreement or any other Loan Document, which refund in the good faith judgment of such Lender or the Administrative Agent, as the case may be, is attributable to such payment made by such Loan Party, then the Lender or the Administrative Agent, as the case may be, shall reimburse the Loan Party for such amount (net of all reasonable out-of-pocket expenses of such Lender or the Administrative Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender or Administrative Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the Indemnified Tax or Other Tax giving rise to such refund had not been imposed in the first instance; provided that the Loan

Party, upon the request of the Lender or the Administrative Agent agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority. In such event, such Lender or the Administrative Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or the Administrative Agent may delete any information therein that it deems confidential). A Lender or the Administrative Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim. Neither any Lender nor the Administrative Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party in connection with this clause (f) or any other provision of this Section 2.17.

(g)     If the Borrower determines that a reasonable basis exists for contesting an Indemnified Tax or Other Tax for which a Loan Party has paid additional amounts or indemnification payments, each affected Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax. The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such person in connection with any request made by the Borrower pursuant to this Section 2.17(g). Nothing in this Section 2.17(g) shall obligate any Lender or Agent to take any action that such person, in its sole judgment, determines may result in a material detriment to such person.

(h)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent two (2) Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from United States federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(i)     If a payment made to any Lender or any Agent under this Agreement or any other Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely

53

for purposes of this Section 2.17(i), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(j)     The agreements in this Section 2.17 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable under any Loan Document.

For purposes of this Section 2.17, the terms "applicable law" and "applicable Requirement of Law" include FATCA.

Section 2.18   Payments Generally; Pro Rata Treatment; Sharing of Set-offs. (a) Unless otherwise specified herein, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds; provided that, if any applicable order of the Bankruptcy Court prohibits any such payment by the time specified herein, the Borrower shall make each such payment as soon as permitted, or not prohibited, by such order (it being understood that the failure to make any payment as required hereunder within any applicable grace period shall constitute a Default or Event of Default, as applicable). Each such payment shall be made without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.05 shall be made directly to the persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. Except as otherwise expressly provided herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments made under the Loan Documents shall be made in Dollars. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     Subject to Section 7.02, if at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (ii) second, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on, any of its Loans resulting

in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender entitled to receive the same proportion of such payment, then the Lender receiving such greater proportion shall purchase participations in the Loans of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders entitled thereto ratably in accordance with the principal amount of each such Lender's respective Loans and accrued interest thereon; provided, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders jointly and severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06 or Section 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19    Mitigation Obligations; Replacement of Lenders. (a) If    any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event that gives rise to the operation of Section 2.20, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17 or mitigate the applicability of Section 2.20, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Borrower hereby agrees to pay all

reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)        If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.20, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or (iii) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require any such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, to the extent consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent, in each case, shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15, payments required to be made pursuant to Section 2.17 or a notice given under Section 2.20, such assignment will result in a reduction in such compensation or payments. Nothing in this Section 2.19 shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender. No action by or consent of the removed Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment the Borrower, Administrative Agent, such removed Lender and the replacement Lender shall otherwise comply with Section 9.04, provided, that if such removed Lender does not comply with Section 9.04 within one (1) Business Day after the Borrower's request, compliance with Section 9.04 shall not be required to effect such assignment.

(c)        If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.08 requires the consent of all Lenders or all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) at its sole expense (including with respect to the processing and recordation fee referred to in Section 9.04(b)(ii)(B)) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to (and any such Non-Consenting Lender agrees that it shall, upon the Borrower's request) assign its Loans and its Commitments (or, at the Borrower's option, the Loans and Commitments under the Facility that is the subject of the proposed amendment, waiver, discharge or termination) hereunder to one (1) or more assignees reasonably acceptable to the Administrative Agent (unless such assignee is a Lender, an Affiliate of a Lender or an Approved Fund); provided, that: (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon and (c) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or

termination. No action by or consent of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 9.04; provided, that if such Non-Consenting Lender does not comply with Section 9.04 within one (1) Business Day after the Borrower's request, compliance with Section 9.04 shall not be required to effect such assignment.

Section 2.20    Illegality. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date  that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurocurrency Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency Borrowings shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), convert all Eurocurrency Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so converted.

Section 2.21    Effect of Benchmark Transition Event.

(a)    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment.  No replacement of the Adjusted LIBO Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date. In connection with the implementation of a Benchmark Replacement, the Administrative Agent (at the direction of the Required Lenders), with the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.The Administrative Agent, upon the written notice and direction of the Required Lenders, will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark

Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Required Lenders (in each case, with the consent of the Borrower (not to be unreasonably withheld, conditioned or delayed)) pursuant to this Section 2.21, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.21.Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period, the component of the ABR based upon the Adjusted LIBO Rate will not be used in any determination of the ABR.Defaulting Lender. (a) *Defaulting Lender Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

> (i)     *Waivers and Amendments*. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Required Lenders".

> (ii)     *Defaulting Lender Waterfall*. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, following an Event of Default or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.22 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     *Defaulting Lender Cure*. If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with their Commitments in respect of the applicable Facility whereupon such Lender will cease to be a Defaulting Lender; provided that, no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III

### *Representations and Warranties*

On the Closing Date and the date of each other Credit Event, the Borrower represents and warrants to each of the Lenders that:

Section 3.01   Organization; Powers. Except as set forth on Schedule 3.01, each of Holdings, the Borrower and each of the Subsidiaries (a) is a partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States of America) under the laws of the jurisdiction of its organization, (b) subject to any restriction arising on account of Holding's, the Borrower's or any Subsidiary's status as a "debtor" under the U.S. Bankruptcy Code, has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, and (d) subject to the entry of the DIP Order and the terms thereof, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder.

Section 3.02   Authorization. Subject to the entry of the DIP Order and the terms thereof, the execution, delivery and performance by the Borrower and each of the Subsidiary Loan Parties and, in the case of Section 3.02(a) and 3.02(b)(i)(B), Holdings, of each of the Loan Documents to which it is a party and the borrowings hereunder (a) have been duly authorized by all corporate, stockholder, partnership or limited liability company action required to be obtained by Holdings, the Borrower and such Subsidiary Loan Parties and (b) will not (i) violate (A) any provision of law, statute, rule or regulation applicable to Holdings, the Borrower or any such Subsidiary Loan Party, (B) the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreements) or by-laws of Holdings, the Borrower, or any such Subsidiary Loan Party, (C) any applicable order of any court or any rule, regulation or order of any Governmental Authority applicable to the

Borrower or any such Subsidiary Loan Party or (D) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which the Borrower or any such Subsidiary Loan Party is a party or by which any of them or any of their property is or may be bound, (ii) result in a breach of or constitute (alone or with due notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i) or (ii) of this Section 3.02(b), would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to (x) any property or assets now owned or hereafter acquired by the Borrower or any such Subsidiary Loan Party, other than the Liens created by the Loan Documents and Permitted Liens, or (y) any Equity Interests of the Borrower now owned or hereafter acquired by Holdings, other than Liens created by the Loan Documents or Liens permitted by Article VIA.

Section 3.03   <u>Enforceability</u>. Subject to the entry of the DIP Order and the terms thereof, this Agreement has been duly executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by the Borrower and each Subsidiary Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against the Borrower and each such Subsidiary Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing and (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries that are not Loan Parties.

Section 3.04   <u>Governmental Approvals</u>. No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required for the execution, delivery or performance of each Loan Document to which the Borrower or any Subsidiary Loan Party is a party, except for (a) such as have been made or obtained and are in full force and effect, (b) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect, (c) filings or other actions listed on <u>Schedule 3.04</u> and any other filings or registrations required by the Security Documents and (d) the entry of the DIP Order.

Section 3.05   [<u>Reserved</u>].

Section 3.06   <u>No Material Adverse Effect</u>. Except for the Chapter 11 Cases, since the Petition Date, there has been no event or circumstance that, individually or in the aggregate with other events or circumstances, has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.07   <u>Title to Properties; Possession Under Leases</u>. (a) Each of the Borrower and the Subsidiaries has valid title in fee simple or equivalent to, or valid leasehold interests in, or easements or other limited property interests in, all its Real Properties (including all Mortgaged Properties) and has valid title to its personal property and assets, in each case,

60

except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All such properties and assets are free and clear of Liens, other than Permitted Liens. The Equity Interests of the Borrower owned by Holdings are free and clear of Liens, other than Liens permitted by Article VIA.

(b)     [Reserved].

(c)     As of the Closing Date, none of the Borrower and the Subsidiaries has received any written notice of any pending or contemplated condemnation proceeding affecting any material portion of the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date, except as set forth on Schedule 3.07(c).

(d)     As of the Closing Date, none of the Borrower and its Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, except as permitted under Section 6.02 or 6.05 or as would not reasonably be expected to have a Material Adverse Effect.

(e)     Schedule 1.01 lists each Owned Real Property as of the Closing Date.

Section 3.08     Subsidiaries. (a) Schedule 3.08(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each subsidiary of the Borrower and, as to each such subsidiary, the percentage of each class of Equity Interests owned by the Borrower or by any such subsidiary.

(b)     As of the Closing Date, after giving effect to the Transactions, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors (or entities controlled by directors) and shares held by directors (or entities controlled by directors)) relating to any Equity Interests of the Borrower or any of the Subsidiaries, except as set forth on Schedule 3.08(b).

Section 3.09     Litigation; Compliance with Laws. Except for the Chapter 11 Cases,  (a) there are no actions, suits or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against the Borrower or any of the Subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, except (in the case of this clause (ii) only) for any action, suit or proceeding at law or in equity or by or on behalf of any Governmental Authority or in arbitration which has been disclosed in any of the Company's public filings with the Securities and Exchange Commission prior to the Closing Date or which arises out of the same facts and circumstances, and alleges substantially the same complaints and damages, as any action, suit or proceeding so disclosed and in which there has been no material adverse change since the date of such disclosure.

(b)     None of the Borrower, the Subsidiaries and their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are the subject of Section 3.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10     <u>Federal Reserve Regulations</u>. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board.

Section 3.11     <u>Investment Company Act</u>. None of Holdings , the Borrower and the Subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 3.12     <u>Use of Proceeds</u>. The Debtors shall use the proceeds of the Loans to (i) pay fees, interest and other amounts payable under this Agreement and (ii) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out and payment of any Adequate Protection Obligations, in each case of clauses (i) and (ii), in accordance with, and subject to, the DIP Order and the Approved Budget (subject to any Permitted Variance).

Section 3.13     <u>Tax Returns</u>. Except as set forth on <u>Schedule 3.13</u>:

(a)     Except (i) pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and each of the Subsidiaries has filed or caused to be filed all federal, state, local and non-U.S. Tax returns required to have been filed by it (including in its capacity as withholding agent) and each such Tax return is true and correct;

(b)     Except (i) pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and each of the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due), except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which Holdings, the Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP; and

(c)     Other than as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect, as of the Closing Date, with respect to Holdings, the Borrower and each of the Subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

Section 3.14   <u>No Material Misstatements</u>. (a) All written factual information (other than projections, forward looking information and information of a general economic nature or general industry nature) (the "<u>Information</u>") concerning the Borrower, the Subsidiaries, the Transactions and any other transactions contemplated hereby or otherwise prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates provided thereto).

(b)      All projections and other forward looking information and information of a general economic nature prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (including each Updated Budget, Variance Report and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that such projections are as to future events and are not to be viewed as facts, such projections are subject to significant uncertainties and contingencies and that actual results during the period or periods covered by any such projections may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized), as of the date such projections and information were furnished to the Lenders.

(c)      As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 3.15   <u>Employee Benefit Plans</u>. Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) no Reportable Event has occurred during the past five years as to which the Borrower, any of its Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (ii) no ERISA Event has occurred or is reasonably expected to occur; and (iii) none of the Borrower, the Subsidiaries or any of their ERISA Affiliates has received any written notification that any Multiemployer Plan is in endangered or critical status within the meaning of Title I of ERISA or has been terminated within the meaning of Title IV of ERISA.

Section 3.16   <u>Environmental Matters</u>. Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, request for information, order, complaint or penalty has been received by the Borrower or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Borrower's knowledge, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Borrower or any of its Subsidiaries, (ii) each of the Borrower and its Subsidiaries has all environmental permits, licenses and other approvals necessary for its operations to comply with all Environmental Laws ("<u>Environmental Permits</u>") and is, and in the prior eighteen (18) month

63

period, has been, in compliance with the terms of such Environmental Permits and with all other Environmental Laws, (iii) except as set forth on Schedule 3.16, no Hazardous Material is located at, on or under any property currently or, to the Borrower's knowledge, formerly owned, operated or leased by the Borrower or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws or Environmental Permits, and no Hazardous Material has been generated, used, treated, stored, handled, disposed of or controlled, transported or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws or Environmental Permits, (iv) there are no agreements in which the Borrower or any of its Subsidiaries has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other person arising under or relating to Environmental Laws, which in any such case has not been made available to the Administrative Agent prior to the Closing Date, and (v) there has been no material written environmental assessment or audit conducted (other than customary assessments not revealing anything that would reasonably be expected to result in a Material Adverse Effect), by or on behalf of the Borrower or any of the Subsidiaries of any property currently or, to the Borrower's knowledge, formerly owned or leased by the Borrower or any of the Subsidiaries that has not been made available to the Administrative Agent prior to the Closing Date.

Section 3.17   Security Documents. (a) Subject to the entry of the DIP Order, the Collateral Agreement, together with the DIP Order, creates in favor of the Collateral Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest in and Liens on the Collateral described therein and proceeds thereof, which security interest and Lien shall be valid and perfected as of the Closing Date by entry of the DIP Order with respect to each Loan Party and which shall constitute a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing all the Obligations, other than as set forth in the DIP Order. The Collateral Agent and Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted by or pursuant to the Collateral Agreement, any other Loan Document or the DIP Order.

(b)       Pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the U.S. Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the U.S. Bankruptcy Code,

64

and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof other than as set forth in the DIP Order.

(c)     Subject to the entry of the DIP Order, the Mortgages, if any, executed and delivered on the Closing Date are, and the Mortgages executed and delivered after the Closing Date pursuant to Section 5.10 shall be, together with the DIP Order, effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) legal, valid and enforceable Liens on all of the Loan Parties' rights, titles and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed or recorded in the proper real estate filing or recording offices, all relevant mortgage taxes and recording charges are duly paid and the DIP Order has been entered, the Collateral Agent (for the benefit of the Secured Parties) shall have valid Liens with record notice to third parties on, and security interests in, all rights, titles and interests of the Loan Parties in such Mortgaged Property and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, in each case prior and superior in right to the Lien of any other person, other than as set forth in the DIP Order.

(d)     Notwithstanding anything herein (including this Section 3.17) or in any other Loan Document to the contrary, no Borrower or any other Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign law.

Section 3.18     [Reserved].

Section 3.19     [Reserved].

Section 3.20     Labor Matters. Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or threatened against the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from the Borrower or any of the Subsidiaries or for which any claim may be made against the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP. Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Borrower or any of the Subsidiaries (or any predecessor) is a party or by which the Borrower or any of the Subsidiaries (or any predecessor) is bound.

Section 3.21     Insurance. Schedule 3.21 sets forth a true, complete and correct description, in all material respects, of all material insurance (excluding any title insurance) maintained by or on behalf of the Borrower or the Subsidiaries as of the Closing Date. As of such date, such insurance is in full force and effect.

Section 3.22   <u>No Default</u>. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 3.23   <u>Intellectual Property; Licenses, Etc</u>. Except as would not reasonably be expected to have a Material Adverse Effect or as set forth in <u>Schedule 3.23</u>, (a) the Borrower and each of its Subsidiaries owns, or possesses the right to use, all Intellectual Property that is used or held for use in or is otherwise reasonably necessary for the present conduct of their respective businesses, (b) to the knowledge of the Borrower, the Borrower and its Subsidiaries are not interfering with, infringing upon, misappropriating or otherwise violating Intellectual Property of any person, and (c) (i) no claim or litigation regarding any of the Intellectual Property owned by the Borrower and its Subsidiaries is pending or, to the knowledge of the Borrower, threatened and (ii) to the knowledge of the Borrower, no claim or litigation regarding any other Intellectual Property described in the foregoing clauses (a) and (b) is pending or threatened.

Section 3.24   [Reserved].

Section 3.25   <u>USA PATRIOT Act; OFAC</u>.

(a)   The Borrower and each Subsidiary Loan Party is in compliance in all material respects with the material provisions of the USA PATRIOT Act, and, (i) on or prior to the Closing Date, the Borrower has provided to the Administrative Agent all information related to the Loan Parties (including names, addresses and tax identification numbers (if applicable)) reasonably requested in writing by the Administrative Agent not less than ten (10) Business Days prior to the Closing Date and mutually agreed to be required under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by the Administrative Agent or any Lender and (ii) at least five (5) Business Days prior to the Closing Date, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, any Lender or Agent that has requested, in a written notice to the Borrower not less than ten (10) Business Days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower, shall have received such Beneficial Ownership Certification.

(b)   None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of the Borrower or any of the Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>"). The Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any person, for the purpose of financing activities or business of or with any person, or in any country, that, at the time of such financing, is the subject of any U.S. sanctions administered by OFAC.

Section 3.26   <u>Foreign Corrupt Practices Act</u>. Holdings, the Borrower and its Subsidiaries, and, to the knowledge of the Borrower or any of its Subsidiaries, their directors, officers, agents and employees, are in compliance with the U.S. Foreign Corrupt Practices Act of 1977 and all similar laws of the jurisdictions in which the Borrower or any of its Subsidiaries

66

conduct their business and to which they are lawfully subject, in each case, in all material respects. No part of the proceeds of the Loans made hereunder will be used to make any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

Section 3.27    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given. Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)    Upon the entry of the DIP Order and to the extent provided therein, the Obligations are secured by a valid and perfected first-priority Lien on all of the Collateral, subject, as to priority only, to the Carve-Out and as otherwise set forth in the DIP Order.

(c)    The DIP Order is in full force and effect has not been reversed, stayed, modified or amended in an adverse manner without the Required Lenders' consent.

(d)    A true and complete copy of the initial budget, as agreed to with the Required Lenders as of the Closing Date, is attached as Schedule 3.27 hereto (the "Initial Budget").

ARTICLE IV

*Conditions of Lending*

The occurrence of the Closing Date and the obligations of the Lenders to extend Loans (each Borrowing (but for the avoidance of doubt, excluding any continuation or conversion of any Existing Borrowing), a "Credit Event") are subject to the satisfaction (or waiver in accordance with Section 9.08) of the following conditions:

Section 4.01    All Credit Events. On the Closing Date and the date of each Credit Event:

(a)    The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(b)    The representations and warranties set forth in the Loan Documents shall be true and correct in all material respects as of such date, as applicable, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(c)    As of such date, no Event of Default or Default shall have occurred and be continuing.

(d)    The extension of credit pursuant to the applicable Credit Event shall not violate, to the Borrower's knowledge, any material requirement of law applicable to the

Borrower or its Subsidiaries and shall not, to the Borrower's knowledge, have been enjoined, temporarily, preliminarily, or permanently by any applicable court or governmental authority having jurisdiction over the Borrower or its Subsidiaries.

(e)     The Bankruptcy Court shall have entered the DIP Order, which shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any adverse respect without the prior written consent of the Required Lenders.

(f)     The Plan Support Agreement shall be in full force and effect and shall not have been amended or modified without the prior written consent of the Requisite Consenting Creditors (as defined in the Plan Support Agreement) in accordance with the terms thereof.

(g)     No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Required Lenders.

(h)     [Reserved].

(i)     [Reserved].

(j)     With respect to each Borrowing of Delayed Draw Term Loans, the Debtors shall have less than $50,000,000 of cash on hand immediately prior to giving effect to such Borrowing and the Administrative Agent shall have received a certificate from a Responsible Officer of the Borrower certifying thereto (which certification may be included in the applicable Borrowing Request);

provided, that, it is agreed that if the Plan Support Agreement is properly terminated by the Borrower in accordance with Section 8(b)(i), (v) or (vii) thereof as determined by a court of competent jurisdiction in a final, non-appealable judgment, (i) the condition set forth in Section 4.01(f) shall not be a condition to any Credit Event occurring on or after such termination and (ii) this Agreement shall be deemed to be amended, effective as of the effectiveness of such termination, to delete Section 4.01(f).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in paragraphs (b) through (j) of this Section 4.01 upon which the Administrative Agent may conclusively rely upon.

Section 4.02   First Credit Event. On or prior to the Closing Date:

(a)     The Administrative Agent (or its counsel) shall have received from each of Holdings, the Borrower and the Lenders (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include delivery of a signed signature page of this Agreement by facsimile or other means of electronic transmission (e.g., "pdf")) that such party has signed a counterpart of this Agreement.

(b)     [Reserved].

(c)     The Administrative Agent shall have received a certificate of the Secretary or Assistant Secretary or similar officer of each Loan Party dated the Closing Date and certifying:

(i)     a copy of the certificate or articles of incorporation, certificate of limited partnership, certificate of formation or other equivalent constituent and governing documents, including all amendments thereto, of such Loan Party, (1) in the case of a corporation, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, or (2) otherwise certified by the Secretary or Assistant Secretary of such Loan Party or other person duly authorized by the constituent documents of such Loan Party,

(ii)     a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of such Loan Party as of a recent date from such Secretary of State (or other similar official),

(iii)     that attached thereto is a true and complete copy of the by-laws (or partnership agreement, limited liability company agreement or other equivalent constituent and governing documents) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (iv) below,

(iv)     that attached thereto is a true and complete copy of resolutions (or equivalent documentation) duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member) authorizing the execution, delivery and performance of the Loan Documents dated as of the Closing Date to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions (or equivalent documentation) have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(v)     as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party, and

(vi)     as to the absence of any pending proceeding for the dissolution or liquidation of such Loan Party or, to the knowledge of such person, threatening the existence of such Loan Party.

(d)     The Administrative Agent and the Lenders shall have received the results of a search of the Uniform Commercial Code (or equivalent), tax and judgment, United States Patent and Trademark Office and United States Copyright Office filings made with respect to the Loan Parties in the jurisdictions in which UCC financing statements and such other filing should be made to evidence or perfect security interests in the Collateral and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) that the Liens indicated by such financing statements (or similar documents) are Permitted Liens or have been,

or will be simultaneously or substantially concurrently with the closing under this Agreement, released (or arrangements reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) for such release shall have been made).

(e)     The Borrower shall have used best efforts to obtain from Moody's and S&P (i) "indicative" ratings for the Term Loans and (ii) "indicative" corporate credit ratings and corporate family ratings in respect of the Borrower (it being understood that, in each case, the Borrower shall not be required to obtain a specific rating).

(f)     [Reserved].

(g)     [Reserved].

(h)     The Borrower shall have paid all fees and out-of-pocket costs and expenses of (i) the Administrative Agent (including the reasonable and documented fees and expenses of Perkins Coie LLP, counsel to the Administrative Agent) and (ii) the Lenders (including the reasonable and documented fees and expenses of the Lender Advisors), in each case, that have been invoiced at least one (1) Business Day prior to the Closing Date.

(i)     Except as set forth in <u>Schedule 5.12</u> (which, for the avoidance of doubt, shall override the applicable clauses of the definition of "Collateral and Guarantee Requirement" for the purposes of this Section 4.02) and subject to the grace periods and post-closing periods set forth in such definition, the Collateral and Guarantee Requirement shall be satisfied (or waived) as of the Closing Date; <u>provided</u> that, it is agreed that, to the extent any possessory collateral was delivered to the Prepetition Administrative Agent under the Prepetition Credit Agreement, such possessory collateral shall be deemed to have been delivered to the Administrative Agent under this Agreement for the purposes of this clause (i) and the Collateral and Guarantee Requirement;

(j)     The Administrative Agent shall have received all documentation and other information required by Section 3.25(a), to the extent such information has been requested not less than ten (10) Business Days prior to the Closing Date.

(k)     The Borrower shall have delivered to the Administrative Agent a certificate dated as of the Closing Date, to the effect set forth in Section 4.01(b).

(l)     The Lenders and the Administrative Agent shall have received the Initial Budget.

For purposes of determining compliance with the conditions specified in this Section 4.02, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the Closing Date specifying its objection thereto and, in the case of a Borrowing, such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of the initial Borrowing.

ARTICLE V

*Affirmative Covenants*

The Borrower covenants and agrees with each Lender that, until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, the Borrower will, and will cause each of the Subsidiaries to:

Section 5.01   Existence; Business and Properties. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of the Borrower, where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and except as otherwise permitted under Section 6.05, and except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by the Borrower or a Wholly Owned Subsidiary of the Borrower in such liquidation or dissolution; provided, that Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Loan Parties and Domestic Subsidiaries may not be liquidated into Foreign Subsidiaries (except in each case as permitted under Section 6.05).

(b)   Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew and keep in full force and effect the permits, franchises, authorizations, Intellectual Property, licenses and rights with respect thereto necessary to the normal conduct of its business, and (ii) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as permitted by this Agreement); provided that, in no event shall this Section 5.01(b) prohibit the Borrower or any Subsidiary from rejecting or abandoning or seeking rent abatement or other modifications under any lease in accordance with the U.S. Bankruptcy Code and any order of the Bankruptcy Court.

Section 5.02   Insurance. (a) Maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations, cause the Collateral Agent to be listed as a co-loss payee on property and casualty policies with respect to Mortgaged Property located in the United States of America and as an additional insured on liability policies. Notwithstanding the foregoing, the Borrower and the Subsidiaries may self-insure with respect to such risks with respect to which companies of established reputation engaged in the same general line of business in the same general area usually self-insure.

(b)   Except as the Collateral Agent may agree in its reasonable discretion, cause all such property and casualty insurance policies with respect to the Mortgaged Property located in the United States of America to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably

71

satisfactory to the Collateral Agent, deliver a certificate of an insurance broker to the Collateral Agent; cause each such policy covered by this clause (b) to provide that it shall not be cancelled or not renewed upon less than 30 days' prior written notice thereof by the insurer to the Collateral Agent; deliver to the Collateral Agent, prior to or concurrently with the cancellation or nonrenewal of any such policy of insurance covered by this clause (b), a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Collateral Agent), or insurance certificate with respect thereto, together with evidence satisfactory to the Collateral Agent of payment of the premium therefor, in each case of the foregoing, to the extent customarily maintained, purchased or provided to, or at the request of, lenders by similarly situated companies in connection with credit facilities of this nature.

(c)     If any building comprising part of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "Special Flood Hazard Area") with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Collateral Agent evidence of such compliance in form and substance reasonably acceptable to the Collateral Agent.

(d)     In connection with the covenants set forth in this Section 5.02, it is understood and agreed that:

(i)     the Administrative Agent, the Collateral Agent, the Lenders and their respective agents or employees shall not be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 5.02, it being understood that (A) the Loan Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Collateral Agent, the Lenders, or their agents or employees. If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then each of Holdings and the Borrower, on behalf of itself and behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of their Subsidiaries to waive, its right of recovery, if any, against the Administrative Agent, the Collateral Agent, the Lenders, and their agents and employees;

(ii)     the designation of any form, type or amount of insurance coverage by the Collateral Agent (including acting in the capacity as the Collateral Agent) under this Section 5.02 shall in no event be deemed a representation, warranty or advice by the Collateral Agent or the Lenders that such insurance is adequate for the purposes of the business of Holdings, the Borrower and the Subsidiaries or the protection of their properties; and

(iii)   the amount and type of insurance that the Borrower and its Subsidiaries has in effect as of the Closing Date satisfies for all purposes the requirements of this Section 5.02.

Section 5.03   <u>Taxes</u>. Subject to the U.S. Bankruptcy Code, the terms of the DIP Order and any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the U.S. Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payment), pay its obligations in respect of all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.04   <u>Financial Statements, Reports, etc</u>. Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a)   within 90 days after the end of the fiscal year of each fiscal year (commencing with the fiscal year ending December 30, 2020), a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be accompanied by customary management's discussion and analysis and audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of annual reports on Form 10-K (or any successor or comparable form) of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(a) to the extent such annual reports include the information specified herein);

(b)   within 45 days after the end of each of the first three fiscal quarters of each fiscal year (commencing with the fiscal quarter ending September 30, 2020), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail, which consolidated balance sheet and related statements of operations and cash flows shall be accompanied by customary management's discussion and analysis and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis and, except (i) as set forth in any notes or schedules attached thereto and (ii) with respect to the

application of ASC 350-20-25 and ASC 360-10-35, in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery by the Borrower of quarterly reports on Form 10-Q (or any successor or comparable form) of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(b) to the extent such quarterly reports include the information specified herein);

(c)   (x) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower certifying that no Event of Default or Default has occurred since the date of the last certificate delivered pursuant to this Section 5.04(c) or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (y) concurrently with any delivery of financial statements under clause (a) above, if the accounting firm is not restricted from providing such a certificate by its policies office, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations);

(d)   promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials filed by Holdings  , the Borrower or any of the Subsidiaries with the SEC, or after an initial public offering, distributed to its stockholders generally, as applicable; provided, however, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this clause (d) shall be deemed delivered for purposes of this Agreement when posted to the website of the Borrower (or Holdings or any Parent Entity referred to in Section 5.04(h)) or the website of the SEC and written notice of such posting has been delivered to the Administrative Agent;

(e)   [reserved];

(f)   [reserved];

(g)   promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender);

(h)   in the event that Holdings or any Parent Entity reports on a consolidated basis, such consolidated reporting at Holdings or such Parent Entity's level in a manner consistent with that described in clauses (a) and (b) of this Section 5.04 for the Borrower will satisfy the requirements of such paragraphs;

(i)   promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation;

(j)        no later than ten (10) Business Days after the delivery of the financial statements required pursuant to clauses (a) and (b) of this This Section 5.04, commencing with the financial statements for the first full fiscal period ending after the Closing Date, the Borrower shall hold a customary conference call for Lenders; and

(k)        deliver to the Administrative Agent and the Lender Advisors copies of all monthly reports, projections, or other written information with respect to each of the Loan Parties' business or financial condition or prospects (as well as all pleadings, motions, applications and judicial information) filed by or on behalf of the Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, as applicable; provided, however, that such reports, projections, or other written information required to be delivered pursuant to this clause (k) shall be deemed delivered to the Administrative Agent and the Lender Advisors for purposes of this Agreement when such reports, projections or other written information is filed with the Bankruptcy Court.

The Borrower hereby acknowledges and agrees that all financial statements and reports furnished pursuant to paragraphs (a), (b) and (d) above and/or Section 5.14 are hereby deemed to be Borrower Materials suitable for distribution, and to be made available, to Public Lenders as contemplated by Section 9.17 and may be treated by the Administrative Agent and the Lenders as if the same had been marked "PUBLIC" in accordance with such paragraph (unless the Borrower otherwise notifies the Administrative Agent in writing on or prior to delivery thereof).

Section 5.05    Litigation and Other Notices. Furnish to the Administrative Agent (which will promptly thereafter furnish to the Lenders) written notice of the following promptly after any Responsible Officer of Holdings or the Borrower obtains actual knowledge thereof:

(a)        any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)        the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, the Borrower or any of the Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(c)        any other development specific to Holdings, the Borrower or any of the Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)        the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to have a Material Adverse Effect.

Section 5.06    Compliance with Laws. Comply with all laws, rules, regulations and orders of any Governmental Authority (including any order of the Bankruptcy Court)

applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided, that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.09, or to laws related to Taxes, which are the subject of Section 5.03.

Section 5.07   <u>Maintaining Records; Access to Properties and Inspections</u>. Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties of Holdings , the Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to Holdings   or the Borrower, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to Holdings   or the Borrower to discuss the affairs, finances and condition of Holdings , the Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Borrower has the opportunity to participate in any such discussions with such accountants), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract.

Section 5.08   <u>Use of Proceeds</u>. All proceeds of the Loans shall be deposited into the DIP Loan Proceeds Deposit Account, and all amounts therein shall be invested at all times in cash and Permitted Investments.  Withdrawals from the DIP Loan Proceeds Deposit Account shall only be used for the permitted purposes described under Section 3.12. Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the DIP Loan Proceeds Deposit Account or the proceeds thereof held therein or credited thereto be (a) in the case of the Loans funded on the Closing Date, be withdrawn or used for any purpose (including for the permitted purposes described under Section 3.12) by the Loan Parties until the first date following the Closing Date on which the aggregate amount of cash or Cash Equivalents contained in the Specified Accounts is less than $5,000,000, on and after which date the proceeds of the Loans funded on the Closing Date may be withdrawn and used by the Loan Parties at any time for any of the permitted purposes described under Section 3.12, or (b) used to pay any Prepetition Indebtedness or other Prepetition Obligations or for any other purpose except as permitted under the DIP Order or as set forth in the Approved Budget.

Section 5.09   <u>Compliance with Environmental Laws</u>. Comply,  and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.09, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10   <u>Further Assurances; Additional Security</u>.

(a)      Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that the Collateral Agent may

reasonably request (including, without limitation, those required by applicable law), to satisfy the Collateral and Guarantee Requirement and to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties and provide to the Collateral Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Collateral Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any asset (other than Real Property) that has an individual fair market value (as determined in good faith by the Borrower) in an amount greater than $1,000,000 is acquired by the Borrower or any Subsidiary Loan Party after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than (x) assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof and (y) assets constituting Excluded Property), the Borrower or such Subsidiary Loan Party, as applicable, will (i) notify the Collateral Agent of such acquisition or ownership and (ii) subject to the terms of the DIP Order, cause such asset to be subjected to a Lien securing the Obligations by, and take, and cause the Subsidiary Loan Parties to take, such actions as shall be reasonably requested by the Collateral Agent to grant and perfect such Liens, including actions described in clause (a) of this Section 5.10, all at the expense of the Loan Parties, subject to clause (g) below.

(c)     Subject to the terms of the DIP Order, (i) grant and cause each of the Subsidiary Loan Parties to grant to the Collateral Agent security interests in, and Mortgages on, any Owned Real Property of the Borrower or such Subsidiary Loan Parties, as applicable, that are not Mortgaged Property as of the Closing Date, to the extent acquired after the Closing Date, within 30 days after such acquisition (or such later date as the Collateral Agent may agree in its reasonable discretion) pursuant to documentation substantially in the form of Exhibit F (with such changes as are reasonably consented to by the Collateral Agent to account for local law matters) or in such other form as is reasonably satisfactory to the Collateral Agent and the Borrower (each, an "Additional Mortgage"), which security interest and Mortgage shall constitute valid and enforceable Liens subject to no other Liens other than as set forth in the DIP Order, (ii) record or file, and cause each such Subsidiary to record or file, the Additional Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) required to be granted pursuant to the Additional Mortgages and pay, and cause each such Subsidiary to pay, in full, all Taxes, fees and other charges required to be paid in connection with such recording or filing, in each case subject to clause (g) below, and (iii) deliver to the Collateral Agent an updated Schedule 1.01 reflecting such additional Mortgaged Properties. Unless otherwise waived by the Collateral Agent, with respect to each such Additional Mortgage, the Borrower shall cause the requirements set forth in clause (g) of the definition of "Collateral and Guarantee Requirement" to be satisfied with respect to such Owned Real Property.

(d)     If any additional direct or indirect Subsidiary of the Borrower is formed or acquired after the Closing Date and if such Subsidiary is a Subsidiary Loan Party, within fifteen (15) Business Days after the date such Subsidiary is formed or acquired (or such longer period as the Collateral Agent may agree in its reasonable discretion), notify the Collateral Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such

77

Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party, subject to clause (g) below.

(e)     If any additional Foreign Subsidiary of the Borrower is formed or acquired after the Closing Date and if such Subsidiary is a "first tier" Foreign Subsidiary of a Loan Party, within 15 Business Days after the date such Foreign Subsidiary is formed or acquired (or such longer period as the Collateral Agent may agree in its reasonable discretion), notify the Collateral Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to any Equity Interest in such Foreign Subsidiary owned by or on behalf of any Loan Party, subject to clause (g) below.

(f)     Furnish to the Collateral Agent prompt written notice of any change (A) in any Loan Party's corporate or organization name, (B) in any Loan Party's identity or organizational structure, (C) in any Loan Party's organizational identification number, (D) in any Loan Party's jurisdiction of organization or (E) in the location of the chief executive office of any Loan Party that is not a registered organization; provided, that the Borrower shall not effect or permit any such change unless all filings have been made, or will have been made within fifteen (15) days following such change (or such longer period as the Collateral Agent may agree in its reasonable discretion), under the Uniform Commercial Code that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral in which a security interest may be perfected by such filing, for the benefit of the Secured Parties.

(g)     The Collateral and Guarantee Requirement and the other provisions of this Section 5.10 and the other Loan Documents with respect to Collateral need not be satisfied with respect to any of the following (collectively, the "Excluded Property"): (i) pledges and security interests prohibited by applicable law, rule, regulation or contractual obligation (in each case, except to the extent such prohibition is unenforceable after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code) or which could require governmental (including regulatory) consent, approval, license or authorization to the pledged (unless such consent, approval, license or authorization has been received); (ii) any lease, license or other agreement to the extent that a grant of the security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto (other than the Borrower or any Guarantor) after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code; (iii) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (iv) any "intent-to-use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. §1051, unless and until an Amendment to Allege Use or a Statement of Use under Section 1(c) or 1(d) of the Lanham Act has been filed; (v) any Excluded Securities; (vi) any Third Party Funds; and (vii) any equipment or other asset that is subject to a Lien permitted by Section 6.02 or is otherwise subject to a purchase money debt or a Capitalized Lease Obligation, in each case, as permitted by Section 6.01 and in existence on the Closing Date, if the contract or other agreement providing for such debt or Capitalized Lease Obligation prohibits or requires the consent of any person as a condition to the creation of any security interest on such equipment or asset and, in each case,

such prohibition or requirement is permitted hereunder; <u>provided</u> that (x) the Borrower may in its sole discretion elect to exclude any property from the definition of "Excluded Property" and (y) the definition of "Excluded Property" shall not include proceeds of any asset that otherwise constitutes Excluded Property, unless such proceeds independently would be "Excluded Property" pursuant to clauses (i) through (vii) above. Notwithstanding anything to the contrary, (A) the Collateral Agent may grant extensions or time (including extensions beyond the Closing Date) for the taking of any actions in relation to the perfection of security interest in the assets of the Loan Parties where it reasonably determines, in consultation with the Borrower, that such actions cannot be completed without undue effort or expense by the time or times at which this Agreement would otherwise require, (B) no control agreement or control, lockbox or similar arrangement shall be required with respect to any deposit accounts, securities accounts or commodities accounts, other than the DIP Loan Proceeds Deposit Account, (C) no landlord, mortgagee or bailee waivers shall be required, (D) no foreign-law governed security documents or perfection under foreign law shall be required, (E) no notice shall be required to be sent to account debtors or other contractual third parties, (F) Liens required to be granted from time to time pursuant to, or any other requirements of, the Collateral and Guarantee Requirement and the Security Documents shall be subject to the exceptions and limitations set forth in the Security Documents, (G) to the extent any Mortgaged Property is located in a jurisdiction with mortgage recording or similar tax, the amount secured by the Security Document with respect to such Mortgaged Property shall be limited to the fair market value of such Mortgaged Property as determined in good faith by the Borrower (subject to any applicable laws in the relevant jurisdiction or such lesser amount agreed to by the Collateral Agent and (H) no actions, notices or filings (other than the filing of a UCC-1) shall be required to perfect the liens on motor vehicles and other assets subject to a certificate of title or letter-of-credit rights.

Section 5.11 <u>Rating</u>. Exercise best efforts to obtain, as soon as practicable after the Closing Date and in any event within fourteen (14) days after the Closing Date, and maintain (a) public ratings (but not to obtain a specific rating) from Moody's and S&P for the Term Loans and (b) public corporate credit ratings and corporate family ratings (but, in each case, not to obtain a specific rating) from Moody's and S&P in respect of the Borrower.

Section 5.12 <u>Post-Closing</u>. Take all necessary actions to satisfy the items described on <u>Schedule 5.12</u> within the applicable period of time specified in such Schedule (or such longer period as the Administrative Agent (acting at the direction of the Required Lenders) may agree in its reasonable discretion).

Section 5.13 <u>Cash Management</u>. Maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

Section 5.14 <u>Budget Covenant</u>. Provide:

(a)     on the fourth Business Day of each successive four-week period (as calculated from June 29, 2020), to the Administrative Agent and each Lender, on a public and non-restricting basis, a budget in a form consistent with the then-Approved Budget covering the subsequent 13-week period (an "<u>Updated Budget</u>"), which Updated Budget shall become the Approved Budget unless the Required Lenders notify the Debtors in writing (which may be by

electronic mail through any of the Lender Advisors) that such Updated Budget is not reasonably acceptable; and

(b)      on the fourth Business Day of every week, to the Administrative Agent and each Lender, on a public and non-restricting basis, a report (the "Variance Report") of the aggregate variance between actual disbursements and projected disbursements as set forth for the Approved Budget for the prior rolling four-week period (such period, a "Variance Test Period").

Section 5.15   Milestones. Comply with following milestones (collectively, the "Milestones"):

(a)      by the date that is no later than October 9, 2020 the Debtors shall obtain entry of the DIP Order;

(b)      by the date that is no later than November 6, 2020, the Debtors shall obtain entry of the Disclosure Statement Order, which Disclosure Statement Order shall include the approval of procedures with respect to indications of interest for potential transaction structures with third-parties in form and substance reasonably acceptable to the Required DIP Lenders;

(c)      by the date that is no later than forty-five (45) days after entry of the Disclosure Statement Order, the Debtors shall obtain entry of the Confirmation/Sale Order, which shall be in form and substance reasonably acceptable to the Third-Party Successful Bidder(s), if any; and

(d)      by the date that is no later than twenty-one (21) days after entry of the Confirmation/Sale Order, the Debtors will cause the Plan to be substantially consummated (contemporaneously with the closing of the Sale, if applicable).

Each capitalized term used in this Section 5.15 that is not defined in this Agreement shall have the meaning assigned thereto in the Plan Support Agreement.

ARTICLE VI

*Negative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that, until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, each of Holdings and the Borrower shall not, and shall not permit any of the Subsidiaries to:

Section 6.01   Indebtedness. Incur, create, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness outstanding on the Closing Date that is set forth on Schedule 6.01;

(b)      Indebtedness created hereunder and under the other Loan Documents;

80

(c)    Indebtedness of the Borrower or any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes and in the ordinary course of business;

(d)    Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(e)    Indebtedness of the Borrower to Holdings or any Subsidiary and of any Subsidiary to Holdings, the Borrower or any other Subsidiary; provided, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties incurred pursuant to this Section 6.01(e) shall be (x) subject to Section 6.04 and (y) incurred only in the ordinary course of business and (ii) Indebtedness owed by any Loan Party to any Subsidiary that is not a Loan Party incurred pursuant to this Section 6.01(e) shall be (x) subordinated to the Obligations under this Agreement on subordination terms described in the intercompany note substantially in the form of Exhibit K hereto or on other subordination terms reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower and (y) incurred only in the ordinary course of business;

(f)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practices;

(g)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred in the ordinary course of business;

(h)    Adequate Protection Claims;

(i)    [reserved];

(j)    Indebtedness owing under the Landlord Promissory Note, in an aggregate principal amount outstanding not to exceed $2,000,000;

(k)    other Indebtedness of the Borrower or any Subsidiary, in an aggregate principal amount not to exceed $1,000,000;

(l)    [reserved];

(m)    Guarantees (i) by Holdings, the Borrower or any Subsidiary Loan Party of any Indebtedness of the Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement, (ii) [reserved], (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party and (iv) by the Borrower

81

of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business so long as such Indebtedness is permitted to be incurred under Section 6.01(t) to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)); provided, that Guarantees by the Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to the Obligations to at least the same extent as such underlying Indebtedness is subordinated;

(n)     Indebtedness arising from agreements of the Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with any Investment not prohibited by this Agreement or the disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(o)     Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business or consistent with past practice or industry practices;

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     Indebtedness of Subsidiaries that are not Subsidiary Loan Parties in an aggregate principal amount outstanding not to exceed $1,000,000;

(u)     Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money or any Hedging Agreements;

(v)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) or any Subsidiary incurred in the ordinary course of business;

(w)     [reserved];

(x)     obligations in respect of Cash Management Agreements;

(y)     [reserved]

(z)     [reserved];

(aa)     Guarantees of Indebtedness under customer financing lines of credit entered into in the ordinary course of business;

(bb)     [reserved];

(cc)     [reserved];

(dd)     [reserved];

(ee)     [reserved];

(ff)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(gg)     (x) Indebtedness supported by a letter of credit under the Prepetition Credit Agreement and (y) the Carried Over Letter of Credit and Indebtedness supported by the Carried Over Letter of Credit (and Guarantees pursuant to the Guaranty Agreement thereof) in an aggregate principal amount outstanding pursuant to this clause (gg) not to exceed $5,962,000;

(hh)     Indebtedness outstanding on the Petition Date in respect of (i) the Existing Senior Unsecured Notes and (ii) the Prepetition Credit Agreement;

(ii)     [reserved]; and

(jj)     all premium (if any, including tender premiums) expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (ii) above or refinancings thereof.

For purposes of determining compliance with this Section 6.01 or Section 6.02, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums),

accrued interest, defeasance costs and other costs and expenses incurred in connection with such refinancing.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

Further, for purposes of determining compliance with this Section 6.01, Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (jj) but may be permitted in part under any combination thereof.

Section 6.02   Liens. Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Borrower or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "Permitted Liens"):

(a)   Liens on property or assets of the Borrower and the Subsidiaries existing on the Closing Date that are set forth on Schedule 6.02(a);

(b)   any Lien created under the Loan Documents (including Liens created under the Security Documents securing obligations in respect of the Carried Over Letter of Credit) or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(c)   Adequate Protection Liens;

(d)   Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in compliance with Section 5.03;

(e)   Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)   (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(g)   deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory

84

obligations, surety and appeal or similar bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(h)     zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary;

(i)     subject to the DIP Order, Liens securing the Prepetition Obligations;

(j)     [reserved];

(k)     Liens securing judgments that do not constitute an Event of Default;

(l)     Liens disclosed by the title insurance policies delivered on or subsequent to the Closing Date pursuant to the terms hereof and any replacement, extension or renewal or any such Lien; provided, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal and any accessions and additions thereto or proceeds and products thereof and related property; provided, further, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(m)     any interest or title of a lessor or sublessor under any leases or subleases entered into by the Borrower or any Subsidiary in the ordinary course of business;

(n)     Liens that are contractual rights of set-off (and related pledges) (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Subsidiary, including with respect to credit card charge-backs and similar obligations, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Borrower or any Subsidiary in the ordinary course of business;

(o)     Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes, (iv) in respect of Third Party Funds or (v) in favor of credit card companies pursuant to agreements therewith;

85

(p)     Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations and completion guarantees permitted under Section 6.01(f) or (o) and covering the property (or the documents of title in respect of such property) financed by such letters of credit, bankers' acceptances or similar obligations and completion guarantees and the proceeds and products thereof;

(q)     leases or subleases, licenses or sublicenses (including with respect to Intellectual Property) granted to others in the ordinary course of business not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)     [reserved];

(t)     Liens with respect to property or assets of any Subsidiary that is not a Loan Party securing obligations of a Subsidiary that is not a Loan Party permitted under Section 6.01;

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases or other obligations not constituting Indebtedness;

(y)     [reserved];

(z)     Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

(aa)     [reserved];

(bb)     Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(cc)     in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(dd)     Liens securing Indebtedness or other obligations (i) of the Borrower or a Subsidiary in favor of the Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not a Loan Party in favor of any Subsidiary that is not a Loan Party;

(ee)     [reserved];

(ff)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance

issued or created for the account of the Borrower or any Subsidiary in the ordinary course of business; provided, that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit, bank guarantee or bankers' acceptance to the extent permitted under Section 6.01;

(gg)    Liens securing the Landlord Promissory Note; provided that such Liens shall only cover the property (or the documents of title in respect of such property) financed by such Landlord Promissory Note;

(hh)    [reserved];

(ii)    other Liens with respect to property or assets of the Borrower or any Subsidiary securing obligations in an aggregate principal amount outstanding not to exceed $1,000,000; and

(jj)    Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Borrower or any of the Subsidiaries in the ordinary course of business.

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

Further, for purposes of determining compliance with this Section 6.02, Liens need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 6.01(a) through (jj) but may be permitted in part under any combination thereof.

Section 6.03    Sale and Lease-Back Transactions. Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04    Investments, Loans and Advances. (i) Purchase or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person and made in the ordinary course of business or consistent with industry practices, (iii) contribute assets to any other person (other than to the extent such contribution constitutes a Disposition subject to Section 6.05) or (iv) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person (each of the foregoing, an "Investment"), except:

(a)    [reserved];

(b)      (i) Investments by the Borrower or any Subsidiary in the Equity Interests of the Borrower or any Subsidiary; (ii) intercompany loans from the Borrower or any Subsidiary to the Borrower or any Subsidiary; and (iii) Guarantees by the Borrower or any Subsidiary of Indebtedness otherwise permitted hereunder of the Borrower or any Subsidiary; provided, that as at any date of determination, the aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any subsequent change in value) of (A) Investments made after the Closing Date by the Loan Parties pursuant to subclause (i) in Subsidiaries that are not Subsidiary Loan Parties, plus (B) net outstanding intercompany loans made after the Closing Date by the Loan Parties to Subsidiaries that are not Subsidiary Loan Parties pursuant to subclause (ii), plus (C) outstanding Guarantees by the Loan Parties of Indebtedness after the Closing Date of Subsidiaries that are not Subsidiary Loan Parties pursuant to subclause (iii), together with any Investments pursuant to Section 6.04(u), shall not exceed $1,000,000 plus (Y) an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in respect of any such Investment;

(c)      Permitted Investments and Investments that were Permitted Investments when made;

(d)      [reserved];

(e)      loans and advances to, or Guarantees or Indebtedness of, officers, directors, employees or consultants of the Borrower or any Subsidiary in respect of the payment of payroll and operating expenses in the ordinary course of business;

(f)      accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)      [reserved];

(h)      Investments existing on, or contractually committed as of, the Closing Date and set forth on Schedule 6.04;

(i)      Investments resulting from pledges and deposits under Sections 6.02(f), (g), (o), (r) and (ii);

(j)      Investments by the Borrower or any Subsidiary in an aggregate amount (valued at the time of the making thereof and without giving effect to any subsequent changes in value) not to exceed $1,000,000;

(k)      [reserved];

(l)      [reserved];

(m)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by the Borrower or a Subsidiary as a result of a foreclosure by the Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(n)     [reserved];

(o)     acquisitions by the Borrower of obligations of one or more officers or other employees of Holdings, any Parent Entity, the Borrower or its Subsidiaries in connection with such officer's or employee's acquisition of Equity Interests of Holdings or any Parent Entity, so long as no cash is actually advanced by the Borrower or any of the Subsidiaries to such officers or employees in connection with the acquisition of any such obligations;

(p)     Guarantees by the Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by the Borrower or any Subsidiary in the ordinary course of business;

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(u)     Investments in Subsidiaries that are not Loan Parties after giving effect to the applicable Investments, in an aggregate outstanding amount (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof) not to exceed, together with any Investments in Subsidiaries that are not Loan Parties pursuant to Section 6.04(b), $1,000,000 in the aggregate;

(v)     Guarantees permitted under Section 6.01 (except to the extent such Guarantee is expressly subject to this Section 6.04);

(w)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrower or such Subsidiary;

(x)     [reserved];

(y)     [reserved];

(z)     maintenance capital expenditures in the form of purchasing or otherwise acquiring, in one transaction or a series of related transactions, (i) all or substantially all of the

property and assets or business of any Person or (ii) assets constituting a business unit, line of business or division of any Person, in each case, to the extent permitted by, and not to exceed the amount set forth in, the Approved Budget (subject to the Permitted Variance); and

(aa)    to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business.

Any Investment in any person other than the Borrower or a Subsidiary Loan Party that is otherwise permitted by this Section 6.04 may be made through intermediate Investments in Subsidiaries that are not Loan Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above. The amount of any Investment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as determined by the Borrower in good faith) valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

The amount of any Investment made other than in the form of cash or cash equivalents shall be the fair market value thereof, which shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such Investment or as of the date of the definitive agreement with respect to such Investment, and without giving effect to any subsequent change in value.

Section 6.05   <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), effect any Delaware LLC Division or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all of the assets of any other person or division or line of business of a person, except that this Section 6.05 shall not prohibit:

(a)    (i) the purchase and Disposition of inventory in the ordinary course of business by the Borrower or any Subsidiary or the conversion of accounts receivable to notes receivable, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Borrower or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Borrower), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other property by the Borrower or any Subsidiary in the ordinary course of business or determined in good faith by the Borrower to be no longer used or useful or necessary in the operation of the business of the Borrower or any Subsidiary or (iv) the Disposition of Permitted Investments in the ordinary course of business;

(b)    the Disposition of equipment set forth in <u>Schedule 6.05</u>;

(c)    Dispositions to the Borrower or a Subsidiary (upon voluntary liquidation or otherwise); <u>provided</u>, that any Dispositions by a Loan Party must be to another Loan Party;

(d)    [reserved];

(e)     Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)     Dispositions of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)     other Dispositions of assets (x) for an aggregate consideration for all such Dispositions made in reliance on this clause (g)(x) of less than $250,000 or (y) that are approved in writing in advance by the Required Lenders; provided, that the Net Proceeds thereof, if any, are applied in accordance with Section 2.11(b) to the extent required thereby;

(h)     [reserved];

(i)     leases, assignments, licenses or subleases or sublicenses of any real or personal property in the ordinary course of business;

(j)     Dispositions constituting the rejection or abandonment of any lease in accordance with the U.S. Bankruptcy Code and any order of the Bankruptcy Court;

(k)     [reserved];

(l)     [reserved];

(m)     [reserved];

(n)     [reserved];

(o)     [reserved];

(p)     Dispositions of games and other equipment to Subsidiaries and franchisees in a manner consistent with past practice; provided that any Disposition in reliance on this clause (p) to franchisees shall be at cost and for cash consideration;

(q)     Dispositions of food, beverages and other goods held for sale or consumed in the ordinary course of operation of the dining and entertainment center business; and

(r)     any termination, non-renewal, expiration, amendment or other modification of franchise agreements or development agreements with franchisees of the Borrower or any Subsidiary.

For purposes of this Agreement, the fair market value of any assets acquired, leased, exchanged, Disposed of, sold, conveyed or transferred by the Borrower or any Subsidiary shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such acquisition, lease, exchange, Disposition, sale, conveyance or transfer, as applicable, or as of the date of the definitive agreement with respect to such acquisition, lease, exchange, Disposition, sale, conveyance or transfer, as applicable.

Section 6.06   <u>Dividends and Distributions</u>. Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of the Borrower's or Holdings' Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares) (all of the foregoing, "<u>Restricted Payments</u>"); <u>provided</u>, <u>however</u>, that:

(a)      Restricted Payments may be made to the Borrower or any Wholly Owned Subsidiary of the Borrower (or, in the case of non-Wholly Owned Subsidiaries, to the Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests of such Subsidiary on a pro rata basis (or more favorable basis from the perspective of the Borrower or such Subsidiary) based on their relative ownership interests); and

(b)      Restricted Payments may be made to (i) Holdings in respect of overhead, legal, accounting and other professional fees and expenses of Holdings, (ii) [reserved], (iii) Holdings to pay franchise and similar taxes and other fees and expenses in connection with the maintenance of its existence and its ownership of the Borrower, (iv) payments permitted by Section 6.07(b) (other than Section 6.07(b)(vii)), (v) Holdings in an amount not to exceed the amount of any U.S. federal, state, local or foreign taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate taxpayer or a stand-alone corporate group, and (vi) pay customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of Holdings in order to permit Holdings to make such payments; <u>provided</u>, that in the case of subclauses (i) and (iii), the amount of such Restricted Payments shall not exceed the portion of any amounts referred to in such subclauses (i) and (iii) that are allocable to the Borrower and its Subsidiaries (which shall be 100% at any time that Holdings owns no material assets other than the Equity Interests in the Borrower and assets incidental to such equity ownership).

Notwithstanding anything herein to the contrary, no Restricted Payment shall be made to any Fund or Fund Affiliate.

The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof, which shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such Restricted Payment or as of the date of the definitive agreement with respect to such Restricted Payment.

Section 6.07   <u>Transactions with Affiliates</u>. (a) Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Borrower, Holdings, and the Subsidiaries or any person that becomes a Subsidiary as a result of such transaction) in a transaction (or series of related transactions), unless such transaction is   upon terms that are substantially no less

favorable to the Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, as determined by the Board of Directors of the Borrower or such Subsidiary in good faith.

(b)    The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)    [reserved],

(ii)    [reserved],

(iii)    [reserved],

(iv)    the payment of fees, reasonable out-of-pocket costs and indemnities and employment and severance arrangements provided to, or on behalf of or for the benefit of, directors, officers, consultants and employees of Holdings, the Borrower and the Subsidiaries in the ordinary course of business,

(v)    any transactions, agreements and arrangements in existence on the Closing Date and set forth on Schedule 6.07,

(vi)    (A) any employment agreements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii)    Restricted Payments permitted under Section 6.06, including payments to Holdings (and any Parent Entity), and Investments permitted under Section 6.04,

(viii)    [reserved],

(ix)    [reserved],

(x)    transactions for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business,

(xi)    [reserved],

(xii)    [reserved],

(xiii)    [reserved],

(xiv)    [reserved],

(xv)    [reserved],

(xvi)   [reserved],

(xvii)  [reserved],

(xviii) [reserved],

(xix)   [reserved],

(xx)    [reserved],

(xxi)   [reserved], and

(xxii)  transactions permitted by, and complying with, the provisions of Section 6.05.

Section 6.08   <u>Business of the Borrower and the Subsidiaries</u>. Notwithstanding any other provisions hereof, engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date.

Section 6.09   <u>Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.</u> (a) Amend or modify in any manner materially adverse to the Lenders when taken as a whole (as determined in good faith by the Borrower), or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders when taken as a whole (as determined in good faith by the Borrower)), the articles or certificate of incorporation, by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of the Borrower or any of the Subsidiary Loan Parties.

(b)

(i)    Make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of or interest on any Indebtedness (other than the Loans), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any such Indebtedness, except for payments made in compliance with the DIP Order or the Approved Budget (including any Permitted Variance), including Adequate Protection Payments permitted by Section 6.12, payments in respect of leases made in compliance with the Approved Budget (including any Permitted Variance) and payments in respect of the Landlord Promissory Note made in compliance with the Approved Budget (including any Permitted Variance).

(ii)   Amend or modify, or permit the amendment or modification of, any provision of any Material Indebtedness, or any agreement, document or instrument evidencing or relating thereto, other than amendments or modifications that are not materially adverse to Lenders when taken as a whole (as determined in good faith by the Borrower) and that do not affect the subordination or payment provisions thereof (if any)

in a manner adverse to the Lenders when taken as a whole (as determined in good faith by the Borrower.

(c)      Permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to the Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Borrower or such Subsidiary that is a Loan Party pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)      restrictions imposed by applicable law;

(B)      contractual encumbrances or restrictions in effect on the Closing Date and set forth on Schedule 6.01;

(C)      [reserved];

(D)      [reserved];

(E)      [reserved];

(F)      any restrictions imposed by any agreement relating to Indebtedness incurred pursuant to or permitted by Section 6.01 in respect thereof;

(G)      customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(H)      customary provisions restricting subletting or assignment (including any change of control deemed an assignment) of any lease governing a leasehold interest;

(I)      customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(J)      customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(K)      customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(L)      customary net worth provisions imposed by suppliers, customers or landlords of Real Property under contracts entered into in the ordinary

course of business or consistent with past practice or industry norm or customary restrictions on cash or other deposits or net worth arising in connection with any Liens permitted under Section 6.02 so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations under the Loan Documents;

        (M)    [reserved];

        (N)    [reserved];

        (O)    customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto; and

        (P)    restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business.

Section 6.10   <u>Fiscal Year</u>. In the case of the Borrower, permit any change to its fiscal year without prior notice to the Administrative Agent, in which case, the Borrower and the Administrative Agent may, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.11   <u>Permitted Variance</u>. Subject to the Permitted Variance (as defined below), permit actual disbursements (other than on account of professional fees) for any Variance Test Period to exceed disbursements (other than on account of professional fees) projected in the Approved Budget for such Variance Test Period. As used herein, "<u>Permitted Variance</u>" means the amount of aggregate disbursements (other than on account of professional fees) made or accrued during any applicable Variance Test Period that exceeds the aggregate sum of projected disbursements (other than on account of professional fees) for such Variance Test Period by not more than 15%.

Section 6.12   <u>Payment of Prepetition Indebtedness</u>. None of Holdings, the Borrower or any of its Subsidiaries shall make any payments of principal of or interest on, or otherwise make any payment in respect of, or provide consideration to, any Prepetition Indebtedness, except for the Adequate Protection Payments or other payments made in compliance with the DIP Order or the Approved Budget (including any Permitted Variance), including payments in respect of leases made in compliance with the Approved Budget (including any Permitted Variance).

ARTICLE VIA

*Holdings Negative Covenants*

Holdings hereby covenants and agrees with each Lender that, from and after the Closing Date and until the Discharge of DIP Obligations has occured, unless the Required Lenders shall otherwise consent in writing, (a) Holdings will not create, incur, assume or permit to exist any Lien other than (i) Liens created under the Loan Documents and (ii) Liens not

96

prohibited by Section 6.02 on any of the Equity Interests issued by the Borrower held by Holdings and (b) Holdings shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence.

ARTICLE VII

*Events of Default*

Section 7.01   <u>Events of Default</u>. In the case of the happening of any of the following events (each, an "<u>Event of Default</u>"):

(a)     any representation or warranty made or deemed made by the Borrower or any Subsidiary Loan Party herein or in any other Loan Document or any certificate or document (including any Variance Report) delivered pursuant hereto or thereto shall prove to have been false or misleading in any material respect when so made or deemed made;

(b)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise, and such default shall continue unremedied for a period of two Business Days;

(c)     default shall be made in the payment of any interest on any Loan or in the payment of any Lender Payment or any other amount (other than an amount referred to in clause (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)     default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in, Section 5.01(a), 5.05(a), 5.08, Section 5.14 or Section 5.15 or in Article VI;

(e)     default shall be made in the due observance or performance by Holdings of Article VIA or by the Borrower or any of the Subsidiary Loan Parties of any covenant, condition or agreement contained in any Loan Document, including the DIP Order (other than those specified in any other clause of this Section 7.01), and such default shall continue unremedied for a period of ten (10) Business Days after notice thereof from the Administrative Agent to the Borrower;

(f)     (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; or (ii) the Borrower or any of the Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; <u>provided</u>, <u>further</u>, this clause (f) shall not apply to any Prepetition Indebtedness to the extent the holders thereof are stayed from exercising remedies in connection therewith has a result of the Chapter 11 Cases;

(g)     there shall have occurred a Change in Control;

(h)      [reserved];

(i)      any Subsidiary organized under the laws of Canada shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner (to the extent that contest may be made in the applicable jurisdiction), any proceeding or the filing of any petition seeking (x) relief in respect of such Subsidiary, or of a substantial part of the property or assets thereof, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (y) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Subsidiary or for a substantial part of the property or assets thereof or (z) the winding-up or liquidation of such subsidiary (except in a transaction permitted hereunder), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for itself or for a substantial part of its property, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)      the failure by the Borrower or any Loan Party to pay one or more final post-petition judgments aggregating in excess of $2,000,000 (to the extent not covered by insurance), which post-petition judgments are not discharged or effectively waived or stayed for a period of 45 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or any Subsidiary to enforce any such judgment;

(k)      (i) an ERISA Event shall have occurred, (ii) the PBGC shall institute proceedings (including giving notice of intent thereof) to terminate any Plan or Plans, (iii) the Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in endangered or critical status within the meaning of Title I of ERISA or is being terminated within the meaning of Title IV of ERISA, or (iv) the Borrower or any Subsidiary shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect; or

(l)      (i) any Loan Document shall for any reason be asserted in writing by Holdings, the Borrower or any Subsidiary Loan Party not to be a legal, valid and binding obligation of any party thereto (other than in accordance with its terms), (ii) any security interest or Lien purported to be created by the DIP Order or any Security Document in a material portion of the Collateral shall cease to be, or shall be asserted in writing by the Borrower or any other Loan Party not to be (other than, in each case, in accordance with its terms), a valid and perfected security interest (perfected as or having the priority required by this Agreement, the DIP Order and the relevant Security Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent that any such loss of perfection or priority results from the limitations of foreign laws, rules and regulations as they apply to pledges of Equity Interests in Foreign Subsidiaries or the

application thereof, or from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Agreement or to file Uniform Commercial Code continuation statements or take the actions described on <u>Schedule 3.04</u> and except to the extent that such loss is covered by a lender's title insurance policy and the Collateral Agent shall be reasonably satisfied with the credit of such insurer, or (iii) a material portion of the Guarantees pursuant to the Security Documents by Holdings  or the Subsidiary Loan Parties guaranteeing the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdings or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations (other than in accordance with the terms thereof);

(m)     [reserved];

(n)     [reserved];

(o)     the entry of an order by the Bankruptcy Court appointing, the filing of an application by any Debtor or any Debtor consenting to or supporting an application by any other Person, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under Section 1104 of the U.S. Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) of the U.S. Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors or with the power to conduct an investigation of (or compel discovery from) the Agents or Lenders or against the Prepetition Agents or Prepetition Lenders under the Prepetition Loan Documents;

(p)     other than pursuant to the Confirmation/Sale Order, the consummation of a sale of all or substantially all of the Debtors' assets pursuant to a sale under Section 363 of the U.S. Bankruptcy Code, a confirmed plan of reorganization in the Chapter 11 Cases or otherwise or any Loan Party shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking any of the foregoing, in each case, without the prior written consent of the Required Lenders;

(q)     [reserved];

(r)     [reserved];

(s)     the creation or incurrence by the Debtors of any claim that is senior to or *pari passu* with the Adequate Protection Claims without the prior written consent of the Required Lenders;

(t)     the Debtors filing or supporting any motion, pleading, applications or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition Liens or the Prepetition Secured Claims or asserting or supporting any other cause of action against and/or with respect to any of the Prepetition Liens, the Prepetition Secured Claims or any of the Prepetition Secured Parties;

(u)      the conversion of any Chapter 11 Case of a Debtor from one under chapter 11 to one under chapter 7 of the U.S. Bankruptcy Code or any Debtor shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking the conversion of any Chapter 11 Case of a Debtor under Section 1112 of the U.S. Bankruptcy Code or otherwise;

(v)      the payment of or granting adequate protection (except for Adequate Protection Payments) that rank senior to or pari passu with the Adequate Protection Payments with respect to any Prepetition Indebtedness (other than as set forth in the DIP Order or any Approved Budget);

(w)      the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Order, the Cash Collateral Order, the DIP Liens and the Collateral;

(x)      (i) the entry by the Bankruptcy Court of any order terminating the Debtors' exclusive periods to file a plan of reorganization or liquidation and solicit acceptances thereon under Section 1121 of the U.S. Bankruptcy Code or (ii) the expiration of any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation;

(y)      the dismissal of any Chapter 11 Case which does not contain a provision for Discharge of DIP Obligations, or if any Debtor shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case which does not contain a provision for the Discharge of DIP Obligations;

(z)      [reserved];

(aa)      the entry by the Bankruptcy Court of an order granting relief from or modifying the automatic stay of Section 362 of the U.S. Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral which has a value in excess of $1,000,000, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority which has a value in excess of $1,000,000;

(bb)      the bringing of a motion, taking of any action in any Chapter 11 Case, or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the U.S. Bankruptcy Code not otherwise permitted pursuant to this Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations (other than the Obligations with respect to the Carried Over Letter of Credit, which shall be required to be cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer) substantially concurrently with the incurrence thereof or (ii) except as provided in the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the U.S. Bankruptcy Code without the prior written consent of the Required Lenders;

(cc)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is pari passu or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under this Agreement or the DIP Order;

(dd)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order or the Cash Management Order, in each case, without the prior written consent of the Required Lenders;

(ee)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under this Agreement or the other Loan Documents;

(ff)     the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures, the Approved Budget, the DIP Order or as otherwise permitted under this Agreement or acceptable to the Required Lenders;

(gg)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case  (other than pursuant to the DIP Order), granting any Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and Lenders, without the consent in writing of the Required Lenders;

(hh)     the filing of a motion by any Debtor requesting, or the entry of any order by the Bankruptcy Court granting, any superpriority claim which is senior or *pari passu* with the Lenders' claims or with the claims of the Prepetition Lenders under the Prepetition Loan Documents;

(ii)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding the Administrative Agent or the Prepetition Administrative Agent to have the right to or be permitted to "credit bid";

(jj)     any attempt by any Loan Party to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Indebtedness; and

(kk)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(ll)      the filing by any Loan Party of any chapter 11 plan of reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure, that is not an Acceptable Plan without the prior written consent of the Required Lenders;

(mm)   (i) the filing by any of the Debtors of any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Obligations or the Obligations, and/or the liens securing the Prepetition Obligations or the Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Obligations, the Obligations, the liens securing the Prepetition Obligations, the lien securing the Obligations, the Prepetition Agents or the Administrative Agent (or if any Debtor files a pleading supporting any such motion, application or adversary proceeding commenced by any third party) or (ii) the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any Consenting Lender, the Prepetition Agents or the Administrative Agent with respect to any of the foregoing claims, causes of action or proceedings, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding;

(nn)     [reserved]; and

(oo)     an order in the Chapter 11 Cases shall be entered (i) other than with respect to de minimis amounts, charging any of the Collateral under Section 506(c) of the U.S. Bankruptcy Code against the Administrative Agent and the Secured Parties or (ii) limiting the extension under Section 552(b) of the U.S. Bankruptcy Code of the Liens of the Prepetition Administrative Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

then, and in every such event, and at any time thereafter during the continuance of such event, but subject to the terms and conditions of the DIP Order, the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times and upon written notice thereof by the Administrative Agent (which such notice shall be made to the Debtors, the Committee and the United States Trustee for the Southern District of Texas and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "Termination Declaration Date"): (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Lender Payments and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding and (iii) declare a restriction or termination of the Loan Parties' ability to use Cash Collateral.

In addition, five (5) Business Days following the Termination Declaration Date (such five (5) Business Day period, the "Remedies Notice Period"), absent the Debtors curing all such existing Events of Default during such Remedies Notice Period, the Agents, subject to other applicable conditions set forth in the DIP Order, may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations in accordance with Section 7.02, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law and the DIP Order. During the Remedies Notice Period, the Debtors and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred.

Section 7.02   Treatment of Certain Payments. Any amount received by the Administrative Agent or the Collateral Agent from any Loan Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement, in each case that is continuing, shall be applied: (i) first, ratably, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent or the Collateral Agent from the Borrower, (ii) second, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (iii) third, towards payment of other Obligations (or, in the case of the Obligations in respect of the Carried Over Letter of Credit, towards the cash collateralization thereof at a rate of 105% of the face amount thereof, unless such Obligations in respect of the Carried Over Letter of Credit shall have been backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer) then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of such Obligations then due to such parties and (iv) last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

ARTICLE VIII

*The Agents*

Section 8.01   Appointment. (a) Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, including as the Collateral Agent for such Lender and the other Secured Parties under the Security Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than the United States of America, each of the Lenders hereby grants to the Administrative Agent any required powers of attorney to execute any Security Document governed by the laws of such jurisdiction on such Lender's behalf. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions,

103

responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

(b) In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent (and any Subagents appointed by the Collateral Agent pursuant to Section 8.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights or remedies thereunder at the direction of the Collateral Agent) shall be entitled to the benefits of this Article VIII (including, without limitation, Section 8.07) as though the Collateral Agent (and any such Subagents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

Section 8.02    Delegation of Duties. The Administrative Agent and the Collateral Agent may execute any of their respective duties under this Agreement and the other Loan Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care. Each Agent may also from time to time, when it deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "Subagent") with respect to all or any part of the Collateral; provided, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent or the Collateral Agent. Should any instrument in writing from the Borrower or any other Loan Party be required by any Subagent so appointed by an Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges, indemnities and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by such Agent. If any Subagent, or successor thereto, shall become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Subagent. No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Subagent that it selects with reasonable care.

Section 8.03    Exculpatory Provisions. None of the Agents, or their respective Affiliates or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by any Agent under or in connection with,

this Agreement or any other Loan Document (including the accuracy of any mathematical calculations or other facts stated therein) or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party. No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (b) no Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity. The Agents shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to the Administrative Agent by the Borrower, or a Lender. No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. None of the provisions of this Agreement shall require any Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it. Anything in this Agreement to the contrary notwithstanding, in no event shall any Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Neither Agent shall have any responsibility for preparing, recording, filing, re-recording, or re-filing any financing statement, perfection statement, continuation statement or other instrument in any public office or for otherwise ensuring the perfection or maintenance of any security interest granted pursuant to this Agreement or any Security Document.

Section 8.04   Reliance by Agents. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) or conversation believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance

with any condition hereunder to any Credit Event, that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received notice to the contrary from such Lender prior to such Credit Event. Each Agent may consult with legal counsel (including counsel to Holdings or the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. Each Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with such Agent. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

Section 8.05   <u>Notice of Default</u>. Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all or other Lenders); <u>provided</u>, that unless and until the Administrative Agent shall have received such directions and indemnity satisfactory to it from the Required Lenders, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06   <u>Non-Reliance on Agents and Other Lenders</u>. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, operations, property, financial and other condition and creditworthiness of, the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and

the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

Section 8.07   <u>Indemnification</u>. The Lenders agree to indemnify, defend and hold harmless each Agent (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), in the amount of its pro rata share (based on its aggregate, outstanding Loans and unused Commitments hereunder), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (whether brought by any Lender, Holdings, the Borrower or any third party) of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent (including, without limitation, the enforcement of the terms of this Agreement and the indemnifications provided herein) in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u>, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The failure of any Lender to reimburse any Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent for such other Lender's ratable share of such amount. The agreements in this Section 8.7 shall survive the payment of the Loans and all other amounts payable hereunder and the removal or resignation of any Agent.

Section 8.08   <u>Agent in Its Individual Capacity</u>. Each Agent and its affiliates may make loans to, accept deposits from, and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

Section 8.09   <u>Successor Administrative Agent</u>. The Administrative Agent may resign as Administrative Agent and Collateral Agent upon ten (10) days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent and Collateral Agent under this Agreement and the other Loan Documents, then the Borrower shall have the right, subject to the reasonable consent of the Required Lenders (so long as no Event of Default under Section 7.01(b), (c) or (i) shall have occurred and be continuing, in which case the

Required Lenders shall have the right), to appoint a successor which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent and Collateral Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective (except in the case of the Collateral Agent holding collateral security on behalf of such Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed), and the Lenders shall assume and perform all of the duties of the Administrative Agent and Collateral Agent hereunder until such time, if any, as the Borrower (or the Required Lenders) appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 8.09 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

Section 8.10    [Reserved].

Section 8.11    Security Documents and Collateral Agent . The Lenders and the other Secured Parties authorize the Collateral Agent to release any Collateral or Guarantors in accordance with Section 9.18 or if approved, authorized or ratified in accordance with Section 9.08.

The Lenders and the other Secured Parties hereby authorize the Administrative Agent and the Collateral Agent to release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document that is or becomes Excluded Property, and the Administrative Agent and the Collateral Agent shall do so upon request of the Borrower; provided, that prior to any such request, the Borrower shall have in each case, delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying that such property is or has become Excluded Property.

Section 8.12    Right to Realize on Collateral and Enforce Guarantees. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, (i) the Administrative Agent (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent and any Subagents allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any

custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

Section 8.13   <u>Withholding Tax</u>. To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Loan Party and without limiting the obligation of any applicable Loan Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, fines, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 8.13.

Section 8.14   <u>Certain ERISA Matters</u>. (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, , the Commitments or this Agreement,

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with

110

the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

Section 8.15   <u>No Discretion on the Part of any Agent</u>.  Neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents; provided, the such Agent shall be entitled to refrain from any act or the taking of any action hereunder or under any of the Loan Documents or from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions from the Required Lenders, and if such Agent deems necessary, satisfactory indemnity, and shall not be liable for any such delay in acting.  Neither Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to this Agreement, any Security Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy or insolvency law. For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in its discretion", "selected by", "requested by" any Agent, and phrases of similar import, authorize and permit such Agent to approve, disapprove, determine, act or decline to act in its discretion.

Section 8.16   <u>Force Majeure</u>.  In no event shall any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that such Agent shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

ARTICLE IX

*Miscellaneous*

Section 9.01   <u>Notices; Communications</u>. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.01(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or other electronic means as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to any Loan Party or the Administrative Agent to the address, telecopier number, electronic mail address or telephone number specified for such person on <u>Schedule 9.01</u>; and

(ii)      if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

111

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by them, provided that approval of such procedures may be limited to particular notices or communications. The Borrower and Lenders, as applicable, agree to assume all risks arising out of the use of using electronic methods to submit communications to the Administrative Agent, including without limitation the risk of Administrative Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties; provided that the foregoing shall not be construed as an assumption of any risk for the Administrative Agent's gross negligence, bad faith or willful misconduct.

(c)     Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in Section 9.01(b) above shall be effective as provided in such Section 9.01(b).

(d)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

(e)     Documents required to be delivered pursuant to Section 5.04 and/or Section 5.14 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in Section 9.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 9.01, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender entitled to access thereto and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided, that the Borrower shall notify the Administrative Agent (by electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Except for such certificates required by Section 5.04(c), the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

(f)     Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Administrative Agent, the Collateral Agent and the Lenders in the manner prescribed by the U.S. Bankruptcy Code any pleading or notice required to be given to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the U.S. Bankruptcy Code.

Section 9.02    Survival of Agreement. All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders shall survive the making by the Lenders of the Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until the Discharge of DIP Obligations has occurred. Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.15, 2.16, 2.17 and 9.05) shall survive the Discharge of the DIP Obligations.

Section 9.03    Binding Effect. This Agreement shall become effective when it shall have been executed by Holdings, the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Borrower, the Administrative Agent, and each Lender and their respective permitted successors and assigns.

Section 9.04    Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 9.04), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.  Any assignment that violates or does not comply with this Section 9.04 shall be *void ab initio*.

(b)        (i) Subject to the conditions set forth in subclause (ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)        the Borrower, which consent, with respect to the assignment of a Loan, will be deemed to have been given if the Borrower has not responded within ten (10) Business Days after the delivery of any request for such consent; provided, that no consent of the Borrower shall be required for (i) an assignment of a Loan to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below), (ii) in the case of assignments during the primary syndication of the Commitments and Loans to persons identified to and agreed by the Borrower in writing prior to the Closing Date, (iii) an assignment of a Loan if an Event of Default under Section 7.01(b), (c) or (i) has

occurred and is continuing, to any other person or (iv) an assignment to any DIP Backstop Party or Affiliate thereof within fourteen (14) days after the Closing Date; and

(B)     the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 or an integral multiple of $1,000,000 in excess thereof, unless each of the Borrower and the Administrative Agent otherwise consent; provided, that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds (with simultaneous assignments to or by two (2) or more Related Funds shall be treated as one assignment), if any;

(B)     the parties to each assignment shall (1) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (2) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, in each case together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the reasonable discretion of the Administrative Agent and shall not be payable for any assignment to a DIP Backstop Party or Affiliate thereof within fourteen (14) days after the Closing Date);

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and any tax forms required to be delivered pursuant to Section 2.17; and

(D)     the Assignee shall not be the Borrower or any of the Borrower's Affiliates or Subsidiaries.

For the purposes of this Section 9.04, "Approved Fund" means any person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender. Notwithstanding the foregoing or anything to the contrary herein, no Lender shall be permitted to assign or transfer any portion of its rights and obligations under this Agreement to (A) any Ineligible Institution, (B) any Defaulting Lender or any of its Subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this clause (B), or (C) a natural person. Notwithstanding the foregoing, each

Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any assignment made to an Ineligible Institution. Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default under Section 7.01(b), (c) or (i) has occurred and is continuing.

(iii)     Subject to acceptance and recording thereof pursuant to subclause (v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.05 (subject to the limitations and requirements of those Sections)); provided, that an Assignee shall not be entitled to receive any greater payment pursuant to Section 2.17 than the applicable Assignor would have been entitled to receive had no such assignment occurred. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section 9.04 (except to the extent such participation is not permitted by such clause (d) of this Section 9.04, in which case such assignment or transfer shall be null and void).

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and interest amounts of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register").

(v)     The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, and any Lender, at any reasonable time and from time to time upon reasonable prior notice; provided, that no Lender shall, in such capacity, have access to, or be otherwise permitted to review any information in the Register other than information with respect to such Lender.

(vi)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder),

the processing and recordation fee referred to in clause (b) of this Section 9.04, if applicable, and any written consent to such assignment required by clause (b) of this Section 9.04 and any applicable tax forms, the Administrative Agent shall accept such Assignment and Acceptance and promptly record the information contained therein in the Register. No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this subclause (v).

(c)      [Reserved].

(d)      (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations in Loans and Commitments to one or more banks or other entities other than (I) any Ineligible Institution (to the extent that the list of Ineligible Institutions has been available to the Lender selling the participation), (II) the Borrower or any of the Borrower's Affiliates or Subsidiaries or (III) any Defaulting Lender or any of its Subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this clause (III) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided, that (x) such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that both (1) requires the consent of each Lender directly affected thereby pursuant to clauses (i), (ii), (iii) or (vi) of the first proviso to Section 9.08(b) and (2) directly adversely affects such Participant (but, for the avoidance of doubt, not any waiver of any Default or Event of Default) and (y) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant. Subject to clause (d)(iii) of this Section 9.04, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the limitations and requirements of those Sections and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender; provided, that such Participant shall be subject to Section 2.18(c) as though it were a Lender. Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Participant or potential Participant is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any participation made to an Ineligible Institution.

(ii)      Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts and interest amounts

116

of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and each party hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. Without limitation of the requirements of this Section 9.04(d), no Lender shall have any obligation to disclose all or any portion of a Participant Register to any person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other Obligations under any Loan Document), except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other Obligation is in registered form for U.S. federal income tax purposes or is otherwise required by applicable law. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, which consent shall state that it is being given pursuant to this Section 9.04(d)(iii); provided, that each potential Participant shall provide such information as is reasonably requested by the Borrower in order for the Borrower to determine whether to provide its consent.

(e)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank and in the case of any Lender that is an Approved Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender, including to any trustee for, or any other representative of, such holders, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(f)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in clause (e) above.

(g)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent. Each of Holdings, the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto and each Loan Party for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(h)     [Reserved].

(i)     [Reserved].

(j)     [Reserved].

(k)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any other Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans; provided that notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Section 9.05   Expenses; Indemnity.  (a) Subject to the DIP Order, the Borrower agrees to pay, whether accrued or incurred prior to, on, or after the Petition Date, (i) all reasonable and documented out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent, the Collateral Agent, and the Lenders in connection with the preparation of this Agreement and the other Loan Documents, or by the Administrative Agent or the Collateral Agent in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof, including the reasonable fees, charges and disbursements of the Lender Advisors and counsel for the Administrative Agent and the Collateral Agent, and, if necessary, the reasonable fees, charges and disbursements of one local counsel per jurisdiction, and (ii) all reasonable and documented out-of-pocket fees and expenses (including Other Taxes) incurred by the Agents, or any Lender in connection with the enforcement of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made hereunder, including the fees, charges and disbursements of the Lender Advisors, and, if necessary, a single local counsel in each appropriate jurisdiction for all such persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where such person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel with the Borrower's prior written consent (not to be unreasonably withheld), of another firm of counsel for such affected person).

(b)     Subject to the DIP Order, the Borrower agrees to indemnify, defend and hold harmless the Administrative Agent, the Collateral Agent, each Lender and each of their respective Affiliates, successors and assignors, and each of their respective directors, officers, employees, agents, trustees, advisors and members (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless (whether brought by the Borrower,

118

the Agents, any Lender, or any other third party) from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements (including, without limitation, any costs or expenses incurred in enforcing the terms of this Agreement, including the indemnifications provided herein) (excluding the allocated costs of in house counsel and limited to not more than one counsel for all such Indemnitees, taken as a whole, and, if necessary, a single local counsel in each appropriate jurisdiction for all such Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel with the Borrower's prior written consent (not to be unreasonably withheld), of another firm of counsel for such affected Indemnitee)), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans, (iii) any violation of or liability under Environmental Laws by or relating to the Borrower or any Subsidiary, (iv) any actual or alleged presence, Release or threatened Release of or exposure to Hazardous Materials at, under, on, from or to any property owned, leased or operated by the Borrower or any Subsidiary or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrower or any of their subsidiaries or Affiliates; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties, (y) arose from a material breach of such Indemnitee's or any of its Related Parties' obligations under any Loan Document (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (z) arose from any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and is brought by an Indemnitee against another Indemnitee (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against any Agent in its capacity as such). None of the Indemnitees (or any of their respective affiliates) shall be responsible or liable to the Fund, Holdings, the Borrower or any of their respective subsidiaries, Affiliates or stockholders or any other person or entity for any special, indirect, consequential or punitive damages, which may be alleged as a result of the Facilities or the Transactions. The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender. All amounts due under this Section 9.05 shall be payable within fifteen (15) days after written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)     Except as expressly provided in Section 9.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 9.05 shall not apply to any Taxes (other than Taxes that represent losses, claims,

damages, liabilities and related expenses resulting from a non-Tax claim), which shall be governed exclusively by Section 2.17 and, to the extent set forth therein, Section 2.15.

(d)     To the fullest extent permitted by applicable law, Holdings and the Borrower shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     The agreements in this Section 9.05 shall survive the resignation of the Administrative Agent or the Collateral Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.

Section 9.06     Right of Set-off. If an Event of Default shall have occurred and be continuing, subject to the DIP Order, each Lender  is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of Holdings, the Borrower or any Subsidiary against any of and all the obligations of Holdings   or the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

Section 9.07     Applicable Law. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW AND, TO THE EXTENT APPLICABLE, THE U.S. BANKRUPTCY CODE.

Section 9.08 <u>Waivers; Amendment</u>. (a) No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on Holdings, the Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders (or of Section 4.01 after the Closing Date, the Lenders having (a) Delayed Draw Term Loans outstanding and (b) unused Delayed Draw Term Loan Commitments that, taken together, represent more than 50% of the sum of (x) all Delayed Draw Term Loans outstanding and (y) the total unused Delayed Draw Term Loan Commitments at such time; <u>provided</u>, that the Delayed Draw Term Loans and unused Delayed Draw Term Loan Commitments of any Defaulting Lender shall be disregarded), and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each Loan Party party thereto and the Administrative Agent and consented to by the Required Lenders; <u>provided</u>, <u>however</u>, that no such agreement shall:

(i)     decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan without the prior written consent of each Lender directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification); <u>provided</u>, that any amendment to (x) the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (i) and (y) the proviso to the definition of "Maturity Date" shall not constitute an extension of the final maturity of any Loan under this clause (i),

(ii)     increase or extend the Commitment of any Lender, or decrease any Lender Payments owed to any Lender without the prior written consent of such Lender (which, notwithstanding the foregoing, such consent of such Lender shall be the only consent required hereunder to make such modification); <u>provided</u>, that (x) waivers or modifications of conditions precedent, covenants, Defaults or Events of Default, mandatory prepayments or of a mandatory reduction in the aggregate Commitments shall not constitute an increase or extension of the Commitments of any Lender for purposes of this clause (ii) and (y) any amendment to the proviso in the definition of "Maturity Date" shall not constitute an extension of any Commitment of any Lender under this clause (ii),

121

(iii)    extend any date on which payment of interest on any Loan or any Lender Payment is due, without the prior written consent of each Lender directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification); provided that, any amendment to the proviso in the definition of "Maturity Date" shall not constitute an extension of any date on which any payment is due for the purposes of this clause (iii),

(iv)    amend the provisions of Section 7.02 in a manner that would by its terms alter the pro rata application of payments required thereby, without the prior written consent of each Lender adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification),

(v)    amend or modify the provisions of this Section 9.08 or the definition of the terms "Required Lenders," "Majority Lenders," or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby, in each case except, for the avoidance of doubt, as otherwise provided in Section 9.08(d) and (e) (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans and Commitments are included on the Closing Date),

(vi)    release all or substantially all of the Collateral or all or substantially all of the applicable Loan Parties from their respective Guarantees under the Guarantee Agreement, unless, in the case of a Subsidiary Loan Party, all or substantially all the Equity Interests of such Subsidiary Loan Party is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender other than a Defaulting Lender;

(vii)    effect any waiver, amendment or modification that by its terms adversely affects the rights in respect of payments or collateral of Lenders participating in any Facility differently from those of Lenders participating in another Facility, without the consent of the Majority Lenders participating in the adversely affected Facility except, for the avoidance of doubt, as otherwise provided in Section 9.08(e) (it being agreed that the Required Lenders may waive, in whole or in part, any prepayment or Commitment reduction required by Section 2.11 so long as the application of any prepayment or Commitment reduction still required to be made is not changed);

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement, as applicable. Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08 and any consent by any Lender pursuant to this Section 9.08 shall bind any Assignee of such Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have the right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be affected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c)     Without the consent of any Lender, the Loan Parties and the Administrative Agent and/or Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Loan Document.

(d)     [Reserved].

(e)     Notwithstanding the foregoing, (A) technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent (but without the consent of any Lender) to the extent necessary to cure any ambiguity, omission, defect or inconsistency and (B) this Agreement may be amended to implement any Benchmark Replacement or any Benchmark Replacement Conforming Changes or otherwise effectuate the terms of Section 2.21.

Section 9.09   Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate; provided, that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

Section 9.10   Entire Agreement. This Agreement, the other Loan Documents and the agreements regarding certain Lender Payments referred to herein constitute the entire contract between the parties relative to the subject matter hereof. Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than

the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12 <u>Severability</u>. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, including in electronic .pdf format, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03. Delivery of an executed counterpart to this Agreement by facsimile transmission (or other electronic transmission pursuant to procedures approved by the Administrative Agent) shall be as effective as delivery of a manually signed original. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Agreement, any other Loan Document or any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.14 <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15 <u>Jurisdiction; Consent to Service of Process</u>. (a) The Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in

contract or in tort or otherwise, against the Administrative Agent, the Collateral Agent, any Lender, or any Affiliate of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in the Bankruptcy Court or, if applicable, such New York State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(b)        Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court or any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement or any other Loan Document to serve process in any other manner permitted by law.

Section 9.16   Confidentiality. Each of the Lenders and each of the Agents agrees that it shall maintain in confidence any information relating to Holdings, any Parent Entity, the Borrower and any Subsidiary furnished to it by or on behalf of Holdings, any Parent Entity, the Borrower or any Subsidiary (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender or such Agent without violating this Section 9.16 or (c) was available to such Lender or such Agent from a third party having, to such person's knowledge, no obligations of confidentiality to Holdings, any Parent Entity, the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know and any numbering, administration or settlement service providers or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), except: (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (B) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities,

including the National Association of Insurance Commissioners or the Financial Industry Regulatory Authority, Inc., (C) to its parent companies, Affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), (D) in order to enforce its rights under any Loan Document in a legal proceeding, (E) to any pledgee under Section 9.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), (F) [reserved], (G) to CUSIP Service Bureau, Inc., and (H) to the Bankruptcy Court in connection with the approval of the Transactions contemplated hereby; <u>provided</u> that in the case of clause (E), no information may be provide to any Ineligible Institution.

Section 9.17   <u>Platform; Borrower Materials</u>. The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information (or, if Holdings is not at the time a public reporting company, material information of a type that would not reasonably be expected to be publicly available if Holdings was a public reporting company) with respect to Holdings, the Borrower or its Subsidiaries or any of their respective securities) (each, a "<u>Public Lender</u>"). The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as solely containing information that is either (A) publically available information or (B) not material (although it may be sensitive and proprietary) with respect to Holdings, the Borrower or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (<u>provided</u>, <u>however</u>, that such Borrower Materials shall be treated as set forth in Section 9.16, to the extent such Borrower Materials constitute information subject to the terms thereof), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

Section 9.18   <u>Release of Liens and Guarantees</u>.

(a)      The Lenders and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released: (i) in full upon the occurrence of the Discharge of DIP Obligations as set forth in Section 9.18(d) below; (ii) upon the Disposition of such Collateral by any Loan Party to a person that is not (and is not required to become) a Loan Party in a transaction not prohibited by this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent that such Collateral comprises property leased to a Loan Party, upon termination or expiration of such lease (and the Collateral Agent may rely conclusively on a certificate to that

126

effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 9.08), (v) to the extent that the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with the Guarantee Agreement or clause (b) below (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (vi) as provided in Section 8.11 (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), and (vii) as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents. Any such release (other than pursuant to clause (i) above) shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.

(b)     In addition, the Lenders and the other Secured Parties hereby irrevocably agree that the Guarantors shall be automatically released from the Guarantees upon consummation of any transaction not prohibited hereunder resulting in such Subsidiary ceasing to constitute a Subsidiary Loan Party or otherwise becoming an Excluded Subsidiary (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry).

(c)     The Lenders and the other Secured Parties hereby authorize the Administrative Agent and the Collateral Agent (each acting at the direction of the Required Lenders), as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this Section 9.18 and to return to Holdings or the Borrower all possessory collateral (including share certificates (if any)) held by it in respect of any Collateral so released, all without the further consent or joinder of any Lender or any other Secured Party. Any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Guarantor shall no longer be deemed to be made. In connection with any release hereunder, the Administrative Agent and the Collateral Agent shall promptly (and the Secured Parties hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Loan Document in respect of such Subsidiary, property or asset; provided, that the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower containing such certifications as the Administrative Agent shall reasonably request and any such release shall be without recourse to or warranty by the Administrative Agent or Collateral Agent.

(d)     Notwithstanding anything to the contrary contained herein or any other Loan Document, upon the occurrence of the Discharge of DIP Obligations, all Liens granted to the Collateral Agent by the Loan Parties on any Collateral and all obligations of the Borrower and the other Loan Parties under any Loan Documents (other than such obligations that expressly

survive the Discharge of DIP Obligations pursuant to the terms hereof) shall, in each case, be automatically released and, upon request of the Borrower, the Administrative Agent and/or the Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to evidence the release its security interest in all Collateral (including returning to Holdings or the Borrower all possessory collateral (including all share certificates (if any)) held by it in respect of any Collateral), and to evidence the release of all obligations under any Loan Document (other than such obligations that expressly survive the Discharge of DIP Obligations pursuant to the terms hereof), whether or not on the date of such release there may be any (i) obligations in respect of the Carried Over Letter of Credit, which shall be required to be cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer, or (ii) contingent indemnification obligations or expense reimburse claims not then due; <u>provided</u>, that the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower containing such certifications as the Administrative Agent shall reasonably request. Any such release of obligations shall be deemed subject to the provision that such obligations shall be reinstated if after such release any portion of any payment in respect of the obligations guaranteed thereby shall be rescinded, avoided, or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made. The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or the Collateral Agent (and their respective representatives) in connection with taking such actions to release security interest in all Collateral and all obligations under the Loan Documents as contemplated by this Section 9.18(d).

(e)     Subject to the last sentence of this clause (e), the Obligations under the Carried Over Letter of Credit shall be secured and guaranteed pursuant to the Security Documents until the Carried Over Letter of Credit has expired or been terminated, cancelled, cash collateralized at a rate of 105% of the face amount thereof, backstopped on terms reasonably satisfactory to the L/C Issuer or otherwise subject to arrangements reasonably satisfactory to the L/C Issuer. The L/C Issuer shall not have any voting rights under any Loan Document solely as a result of the existence of the contingent obligations owed to it under the Carried Over Letter of Credit but shall vote on account of any unreimbursed drawings in respect of the Carried Over Letter of Credit, as if the L/C Issuer had made loans to the Borrower hereunder in the amount of such unreimbursed drawing. No release of Collateral or Guarantors effected in the manner permitted by this Agreement shall require the consent of the L/C Issuer, so long as such release is not disproportionately adverse to the interests of the L/C Issuer (in comparison to the other Secured Parties hereunder), and any such release will be effective with respect to the Obligations with respect to the Carried Over Letter of Credit to the same extent as it is to the other Obligations hereunder.

Section 9.19     <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with

such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other person who may be entitled thereto under applicable law).

Section 9.20   USA PATRIOT Act Notice. Each Lender that is subject to the USA PATRIOT Act and the Beneficial Ownership Regulation and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 9.21   [Reserved].

Section 9.22   Agency of the Borrower for the Loan Parties. Each of the other Loan Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Loan Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

Section 9.23   [Reserved]

Section 9.24   Acknowledgment and Consent to Bail-In of Affected Financial Institutions. Solely to the extent any Lender that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.25     <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that

130

rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 9.25, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 9.26     Incorporation of DIP Order. Each of the Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders agrees that any reference contained herein to the DIP Order shall include all terms, conditions and provisions of such DIP Order and that the DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement (or any other Loan Document) and the terms of the DIP Order, the terms of the DIP Order shall govern.

Section 9.27     Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the U.S. Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Secured Parties and their respective permitted assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Loan Parties, the Agents and

Secured Parties with respect to the transactions contemplated hereby and no Person (other than the Indemnitees) shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 9.28    <u>Lender Consent to Credit Bid</u>. Each Lender hereby irrevocably (x) authorizes and directs the Collateral Agent to, in a manner determined by the Required Lenders and subject to the Collateral Agent's rights and protections (including requesting direction and indemnity), credit bid all or any portion of the Obligations in connection with any "credit bid" and (y) in connection with any credit bit, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Required Lenders determine in order to consummate such credit bid (and each such Lender shall execute and deliver such documents as the Collateral Agent reasonably requests to evidence such assignment and delegation). As used herein, "Qualified Purchaser" means a Person (i) designated by the Required Lenders as a "Qualified Purchaser" in connection with any such credit bid, (ii) whose stock is owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such credit bid) and (iii) whose actions are controlled by the Required Lenders.

[Signature Pages Follow]

**<u>Exhibit B</u>**

**DIP Budget**



Strictly confidential
Professional Eyes Only

# Updated Budget: 13-Week Forecast

**Shown below are the first 13 weeks of the Updated Budget, and the forecast shows the Company receiving $100.0M of DIP proceeds the week ending 10/4. The DIP Hearing is scheduled for 9/29**

- This forecast will be delivered to the Lenders and Committee Advisors, and disbursements in Forecast Weeks 1 – 4 will be tested as a part of the Rolling 4-Week Disbursement Test

| Period Week<br>Forecast Week<br>Week Ending | Wk 38<br>Fcst 1<br>9/27 | Wk 39<br>Fcst 2<br>10/4 | Wk 40<br>Fcst 3<br>10/11 | Wk 41<br>Fcst 4<br>10/18 | Wk 42<br>Fcst 5<br>10/25 | Wk 43<br>Fcst 6<br>11/1 | Wk 44<br>Fcst 7<br>11/8 | Wk 45<br>Fcst 8<br>11/15 | Wk 46<br>Fcst 9<br>11/22 | Wk 47<br>Fcst 10<br>11/29 | Wk 48<br>Fcst 11<br>12/6 | Wk 49<br>Fcst 12<br>12/13 | Wk 50<br>Fcst 13<br>12/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location Receipts | $ 3,903 | $ 3,907 | $ 3,907 | $ 3,907 | $ 3,907 | $ 3,936 | $ 3,936 | $ 3,936 | $ 3,936 | $ 4,547 | $ 4,547 | $ 4,547 | $ 4,547 |
| Other Receipts | 580 | 594 | 594 | 594 | 594 | 4,145 | 598 | 1,066 | 598 | 680 | 680 | 1,057 | 680 |
| **Total Collections** | **4,482** | **4,501** | **4,501** | **4,501** | **4,501** | **8,080** | **4,533** | **5,002** | **4,533** | **5,227** | **5,227** | **5,605** | **5,227** |
| Payroll and Benefits | (2,896) | (2,759) | (2,645) | (2,631) | (3,074) | (2,505) | (2,562) | (2,476) | (2,912) | (2,476) | (3,149) | (2,555) | (3,499) |
| Cost of Sales | (815) | (856) | (982) | (998) | (987) | (1,089) | (841) | (968) | (961) | (983) | (870) | (886) | (825) |
| Utilities | (2,049) | (798) | (762) | (725) | (623) | (635) | (745) | (548) | (544) | (425) | (629) | (681) | (532) |
| Rent | (1,932) | (8,023) | - | - | - | - | (13,952) | - | - | (9,214) | - | - | - |
| Advertising | (256) | (944) | (518) | (2,043) | (808) | (616) | (24) | (2,486) | (105) | (49) | (200) | (145) | (5) |
| Insurance, Legal, & Licensing | (153) | (919) | (187) | (426) | (280) | (910) | (129) | (57) | (158) | (133) | (765) | (182) | (57) |
| IT Payments | (18) | (386) | (209) | (24) | (138) | (101) | (204) | (12) | (1,624) | (74) | (204) | (1) | (60) |
| Capital Expenditures | (150) | (400) | (264) | (250) | (250) | (250) | (250) | (250) | (275) | (275) | (275) | (275) | (275) |
| Taxes | (401) | (204) | (68) | (225) | (1,149) | (200) | - | (250) | (1,365) | (17) | (506) | (220) | (1,453) |
| Other Operating Expenses and Payments | (597) | (597) | (599) | (558) | (583) | (586) | (586) | (586) | (586) | (637) | (637) | (637) | (637) |
| Critical Vendors, PACA / PASA, Lien Holders, & 503(b)(9) | - | (8) | (2,556) | (2,556) | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **(9,266)** | **(15,896)** | **(8,789)** | **(10,436)** | **(7,893)** | **(6,891)** | **(19,294)** | **(7,633)** | **(8,530)** | **(14,283)** | **(7,235)** | **(5,582)** | **(7,343)** |
| **Operating Cash Flow** | **$ (4,783)** | **$ (11,395)** | **$ (4,289)** | **$ (5,935)** | **$ (3,392)** | **$ 1,189** | **$ (14,761)** | **$ (2,631)** | **$ (3,997)** | **$ (9,056)** | **$ (2,008)** | **$ 23** | **$ (2,116)** |
| Total Debt Service | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (1,734) | (578) | (3,580) | (1,008) | - | (2,715) | (3,936) | - | - | - | (6,261) | - | - |
| DIP Fees and Related Expenses | (761) | (10,250) | - | - | - | - | - | - | - | - | - | - | - |
| Contract Assumption Cure Costs & 9019 Settlements | (1,971) | (1,499) | (50) | (25) | (25) | (25) | - | - | - | - | - | - | - |
| Other Emergence Costs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Non-Operating Receipts / (Disbursements)** | **(4,466)** | **(12,327)** | **(3,630)** | **(1,033)** | **(25)** | **(2,740)** | **(3,936)** | **-** | **-** | **-** | **(6,261)** | **-** | **-** |
| **Total Net Cash Flow** | **$ (9,250)** | **$ (23,722)** | **$ (7,918)** | **$ (6,968)** | **$ (3,417)** | **$ (1,551)** | **$ (18,696)** | **$ (2,631)** | **$ (3,997)** | **$ (9,056)** | **$ (8,269)** | **$ 23** | **$ (2,116)** |
| Beginning Cash | 57,054 | 47,804 | 124,083 | 116,164 | 109,196 | 105,780 | 104,229 | 85,532 | 82,901 | 78,904 | 69,848 | 61,579 | 61,602 |
| Net Cash Flow | (9,250) | (23,722) | (7,918) | (6,968) | (3,417) | (1,551) | (18,696) | (2,631) | (3,997) | (9,056) | (8,269) | 23 | (2,116) |
| DIP Revolver Borrowing / (Repayment) | - | 100,000 | - | - | - | - | - | - | - | - | - | - | - |
| New Money Borrowing / (Repayment) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash** | **$ 47,804** | **$ 124,083** | **$ 116,164** | **$ 109,196** | **$ 105,780** | **$ 104,229** | **$ 85,532** | **$ 82,901** | **$ 78,904** | **$ 69,848** | **$ 61,579** | **$ 61,602** | **$ 59,486** |
| (-) Restricted Cash - Utility Deposits | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) | (950) |
| **Adjusted Ending Cash** | **$ 46,854** | **$ 123,133** | **$ 115,214** | **$ 108,246** | **$ 104,830** | **$ 103,279** | **$ 84,582** | **$ 81,951** | **$ 77,954** | **$ 68,898** | **$ 60,629** | **$ 60,652** | **$ 58,536** |



**Note**: Ending cash balances exclude $3.1M of Queso Holdings
**Note**: Forecast assumptions are continually updated and subject to material change
**Note**: A $3.5M income tax refund is reflected in other receipts in Week 39
**Note**: $s in thousands

15