```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3                                )  CASE NO: 20-33163
                                 )
4    CEC Entertainment,          )  Houston, Texas
                                 )
5                                )  Thursday, October 8, 2020
              Debtors.           )
6                                )  3:43 p.m.- 6:02 p.m.
                                 )
7    ----------------------------)

8                              TRIAL

9            BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For The Official        JASON ADAMS
     Committee of            Kelley Drye & Warren LLP
13   Unsecured Creditors:    101 Park Avenue
                             New York, NY 10178
14
     For Kimco Realty        MICHELLE SHRIRO
15   Corporation, Site       Singer & Levick PC
     Centers Corporation     16200 Addison Road, Suite 140
16   and Various Other       Addison, Texas 75001
     Landlords:
17
     For Wilmington Trust,   JASON ANGELO
18   National Association,   MICHAEL COOLEY
     as Indenture Trustee:   Reed Smith LLP
19                           811 Main Street, Suite 1700
                             Houston, TX, 77002-6110
20
     For The Official        TODD A. ATKINSON
21   Committee of Unsecured  Womble Bond Dickinson (US) LLP
     Creditors:              811 Main St Suite 3130
22                           Houston, TX 77002

23   For Debtors:            MATT BARR
                             SCOTT BOWLING
24                           CLIFFORD CARLSON
                             PAUL GENENDER
25                           ALFREDO PEREZ
```

```
 1                               AMANDA PRUGH
                                LAUREL ROGLEN
 2                               Weil Gotshal
                                700 Louisiana Street, Suite 1700
 3                               Houston, TX 77002

 4    For Vestar California      DAVID BLAU
      XXII, LLC, RPT Realty,     Clark Hill PLC
 5    LP, and Brandon            909 Fannin St #2300
      Associates Southgate,      Houston, TX 77010
 6    LLC:

 7    For Credit Suisse AG,      HENRY FLORES
      Cayman Islands Branch,     Rapp & Krock PC
 8    as Agent:                  1980 Post Oak Blvd Suite 1200
                                Houston, TX 77056
 9
      For Brookfield Retail      IVAN GOLD
10    Properties; River Oaks     Allen Matkins Leck Gamble
      Properties, Ltd.; VR       Mallory & Natsis LLP
11    Partners I, L.P.;          6701 Fannin St
      Weingarten Realty          Houston, TX 77030
12    Investors:

13    For DIP lenders:           JASON RUBIN
                                Akin Gump Strauss Hauer & Feld
14                               1111 Louisiana St # 44
                                Houston, TX 77002
15
      Witnesses:                 JAMES HOWELL
16                               JONATHAN WALTERS
                                CHAD ERIC COBEN
17
      Court Reporter:            UNKNOWN
18
      Courtroom Deputy:          UNKNOWN
19
      Transcribed by:            Veritext Legal Solutions
20                               330 Old Country Road, Suite 300
                                Mineola, NY 11501
21                               Tel: 800-727-6396

22


23
      Proceedings recorded by electronic sound recording;
24    Transcript produced by transcription service.

25
```

```
1                           INDEX

2    DEBTOR'S WITNESSES      DIRECT    CROSS    REDIRECT    RECROSS

3    Jonathan Walters         22       26/30

4    Chad Eric Coben          32       38

5    James Howell             46       50

6

7    WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

8

9

10

11

12   DEBTOR'S EXHIBITS                            RECEIVED

13   1005-5, 1005-9, 1005-10 and 1005-14          20

14   1034-1                                       21

15

16

17   CREDITORS' EXHIBITS                          RECEIVED

18   46, 1-12, 14, 15 17 and 19                   22

19

20

21

22

23

24

25
```

1        HOUSTON, TEXAS; THURSDAY, OCTOBER 8, 2020; 3:43 P.M.

2                        (Call to Order)

3        THE COURT:  All right, we're here in the CEC

4   Entertainment, Inc. case, the Chuck E. Cheese case.  It's

5   20-33163.  If I can get whoever's going to take the lead for

6   a while to press five-star on your phone.

7        CLERK:  Judge, I believe it's going to be Mr.

8   Barr.

9        THE COURT:  All right.  For those of you that are

10  on Go To Meeting, it looks I'm going to need to restart

11  that.  I don't think this will knock you off, but if I do, I

12  apologize and you can just get right back on.

13       Mr. Barr, I have your -- you're on active at this

14  point, so why don't you tell me where we are on the motion

15  that we have?

16       MR. BARR:  Thank you, Your Honor.  Can you hear me

17  okay?

18       THE COURT:  I can hear you and I'll be able to see

19  you in just a second, I think, once I get the Go To Meeting

20  back running.

21       MR. BARR:  (indiscernible)

22       THE COURT:  Are you ready, Mr. Barr?

23       MR. BARR:  I am, Judge, thank you.  Your Honor,

24  thank you for hearing us today and for your patience from

25  chambers' accommodations (indiscernible) hearing from

1   Tuesday to today.  And what I thought I would do is start

2   with a brief update.  We do have three agenda items today.

3   We have a DIP motion filed as document (indiscernible) will

4   go forward, we have the bidding procedures motion at 834 you

5   may see from the agenda, we wanted to use at today's hearing

6   at the status conference to provide an update for Your Honor

7   as to the status rotations.  And then the UTT did file a

8   motion to seal that Docket 937.  It is our understanding

9   that has been resolved.  The Debtors are (indiscernible)

10  creditors can file an un-redacted version of the exhibits as

11  well as the motion to file the objection itself, and can use

12  all of the information during this hearing.  So, I believe

13  that motion can be withdrawn, but I'll let the committee

14  speak for themselves, as there is no need for

15  (indiscernible) that they had requested.

16          Your Honor, if I can start, what I would like to

17  do is provide an update before handing it over to Mr.

18  Genender for the evidence and Mr. Carlson for the DIP

19  arguments themselves.  Item Number 2, I mentioned, is the

20  (indiscernible) motion that we are seeking approval of

21  today.  You may recall that last week we gave you an update

22  of -- that we learned of new facts that may streamline the

23  cases and may cause us not to move forward.

24          The fact that we learned was that the reserve

25  price from the secured lenders with respect to a sale

1    process was $875 million with respect to the

2    (indiscernible).  The PJ team had the opportunity to go back

3    to the parties that had submitted letters of intent from

4    other parties that are interested in the process, and

5    discussed that with them to see if there was a bidder at

6    this point in time that wanted to move forward with their

7    (indiscernible) efforts; multiple bidders that we could put

8    together potentially with varied assets to see if there was

9    somebody who wanted to move forward at those levels.

10             And, unfortunately, standing here today, we do not

11    believe there is anyone who wants to move forward with that

12    particular price in mind.  So, what we would like to do and

13    what we talked to the parties about is moving to what we

14    call the plan without fail (indiscernible) under the plan

15    that's on file (indiscernible) statements (indiscernible)

16    procedures motion.  What that means is basically the debt

17    for equity plan no longer has to toggle to a sale being won

18    by a formal process.

19             However, what we would like to do, Your Honor, and

20    the reason why we're asking you to keep our (indiscernible)

21    procedure in abeyance at least until the next hearing is

22    modify our solicitation procedures motions, modify our

23    disclosure statement, and modify our plan to provide that if

24    there is a party that would like to come forward to the

25    Debtor's unsecured lenders from the other parties and talk

1    about a plan that eventually provides greater value to the

2    estate which is 175 million -- whether that's in cash or

3    it's in cash and securities or debt, then we would have to

4    talk to the term loan lenders about, and it would be part of

5    the process talking to the parties, that the Debtors and the

6    secured lenders are willing and open ears to do that.

7          So, what we're trying to do is almost have a

8    process within the plan process if somebody did want to come

9    forward, they are not discouraged or encouraged, but for the

10   company -- and from the company's perspective, we have our

11   debt to equity swaps (indiscernible) 75 if not

12   (indiscernible) come back to the valuation and we could move

13   forward in a streamlined clean process.  And that's why we

14   ask that the hearing be a status conference, and we hold

15   that in abeyance, Your Honor.

16          What I'd also add is (indiscernible) in abeyance

17   is any notice procedure with respect to (indiscernible) that

18   landlords and other contracted parties had to file under the

19   bidding procedures.  We received a number of pure objections

20   or letters.  What we would intend to do is to include now

21   inside (indiscernible) procedure is the (indiscernible)

22   motion (indiscernible) next week, a continuation of that

23   process where people can continue to raise the cure, and

24   then we'll seek approval of that cure process in connection

25   with that disclosure statement itself and then withdraw the

1    bidding procedures motion, which, in effect, would really

2    just withdraw this notice process that we put out.

3            So, to be clear, there was a deadline.  That

4    deadline would be extended and we'll again put it out on

5    notice for people to understand in connection with the

6    (indiscernible) process.

7            With all of that said, Your Honor, we also did

8    have an opportunity to talk to the unsecured creditors

9    committee and the ad hoc group of bondholders.  And where we

10   were hopeful was that we would be able to use this time to

11   see if we can get to a (indiscernible) resolution or at

12   least narrow issues in order for parties to get to a global

13   resolution.  And we did have a number of back and forth term

14   sheets or emails with the lenders, with the (indiscernible)

15   and with the ad hoc group.

16           Unfortunately, sitting here today, we're at an

17   impasse with respect to those.  We don't have an agreement

18   at this point in time with anybody.  We need to move forward

19   with our bid financial (indiscernible) with respect to

20   today's hearing and the testimony.  We're hoping that after

21   the hearing and in between the hearing and disclosure

22   statement, we'll be able to reengage with those parties and

23   start our discussions and negotiations again with them and

24   hopefully come back before you with a disclosure statement,

25   either consensual with all parties or maybe some of the

1   parties.

2            And our goal really is to continue to try to

3   streamline because we do think it's important that this

4   company is put on the track to (indiscernible) as quickly as

5   we possibly can.  I'm happy to answer any questions Your

6   Honor has, but that is the status update from where we stand

7   on the cases.

8            THE COURT:  I appreciate the update.  Just a very

9   minor question.  I assume you're not going to propose, since

10  you're talking about an extended deadline on the cure, that

11  anyone that already took the trouble to file a cure

12  objection will have to file a new one, right?  The existing

13  objections would remain?

14            MR. BARR:  They do not, Judge.  That's correct,

15  Your Honor.

16            THE COURT:  Why don't we hear from Mr. Adams, and

17  then from anyone else that wants to make any announcement as

18  to where things are?  Mr. Adams, if I can get you to press

19  five-star one time on your phone, please.

20            MR. ADAMS:  Good afternoon, Your Honor.  Can you

21  hear me clearly?

22            THE COURT:  I can.  Thank you, Mr. Adams.

23            MR. ADAMS:  And thank you.  For the record, Jason

24  R. Adams, Kelley Drye & Warren, on behalf of the committee

25  of unsecured creditors.  Your Honor, to deal with a

 1   procedural matter first, I would (indiscernible) with

 2   respect to the motion to seal, as Mr. Barr stated correctly.

 3   We (indiscernible) that out of an abundance of caution

 4   certain information in both the objection as well as the

 5   supporting declaration (indiscernible) information that had

 6   been provided under confidentiality restrictions

 7   (indiscernible) conversations with the Debtors on

 8   (indiscernible) issues over the last 24 hours of

 9   (indiscernible) I think it was streamlined for the hearing.

10   We will withdraw the motion to (indiscernible) file the

11   objection and the declaration so that it is (indiscernible)

12   status on the docket.  That is resolved.

13          On the status conference, Your Honor, with respect

14   to the bid procedures and the Debtor's motion -- and the

15   Debtor's motion to put in abeyance and ultimately withdraw,

16   I think the facts that presented themselves and echo and

17   kind of support (indiscernible) the procedures.  And so, you

18   know, the issue that we'll be (indiscernible) in terms of

19   value and whatnot (indiscernible) is to deal with them down

20   the road (indiscernible) the Debtors file their revised

21   certification (indiscernible) statement issue and there's no

22   objection to that.

23          And, finally, Your Honor, we do appreciate and

24   continue to appreciate this Court's willingness to have

25   hearings.  I think that there has been productive discussion

1    amongst the parties over the course of the last week.  As

2    Mr. Barr said, we can get there.  I don't think the hurdles

3    are necessarily insurmountable.  I think further discussion

4    with more time (indiscernible) we understand (indiscernible)

5    the Debtors (indiscernible) we're happy to do so.  And we in

6    no way see that as any sort of obstacle to further

7    discussions amongst the parties towards what we hope is a

8    consensual plan proffered for both the parties, all of the

9    creditors can support.

10            So, we are going to continue those efforts

11   notwithstanding the Debtor's (indiscernible) or with the DIP

12   hearing today, and we do hope that within the course of the

13   next few weeks we'll be able to come back in front of you,

14   Your Honor, with (indiscernible) resolutions on the

15   (indiscernible) so that we have a smooth end to that

16   bankruptcy.

17            THE COURT:  Mr. Adams, thank you.  Does anyone

18   else wish to make any sort of opening statement today before

19   we move on into the DIP motion?

20            MR. COOLEY:  Your Honor, this is Michael Cooley.

21            THE COURT:  Mr. Cooley, go ahead.

22            MR. COOLEY:  Good afternoon, Your Honor, this is

23   Michael Cooley from Reed Smith appearing either directly as

24   counsel or as local counsel for a lot of the landlords in

25   this case, including National Retail Properties, LP, which

1    is I think the largest landlord in the case by number of

2    properties.

3            I have one question for the Debtors by way of

4    clarification to the announcements that were just made.

5    I've understood everything that was said, and given the

6    circumstances with the (indiscernible) it sounds like what

7    they are proposing on a macro level makes sense.  My

8    question with respect to the cure notice that was sent out

9    and the proposed cure procedures that had accompanied it --

10   those cure procedures and cure notices have created some

11   confusion for landlords insofar as the notice identified

12   only the landlords for reasons where the Debtor's records

13   showed some dollar amount to be cured.  Where a landlord's

14   lease was proposed to be cured with an amount of zero

15   dollars, they're not listed, and so the landlords just had

16   to determine a negative implication -- then an objection

17   would be necessary.

18           Obviously, cure amounts will need to be determined

19   at an appropriate.  But given that it sounds like we are now

20   moving toward a claim process directly with a debt to equity

21   swap, I didn't hear a new deadline for when cure objections

22   would be required.  And it would be my suggestion, Your

23   Honor, that consistent with, I think, what is the typical

24   process for a plan of reorganization is that the cure

25   objections then be filed at some point in the days or weeks

1    prior to the confirmation hearing after the Debtor has filed

2    what it (indiscernible) will be its definitive or near

3    definitive schedule of (indiscernible) contracts, at which

4    point the landlords will have a very clear fix on what's

5    going to be assumed and what's going to be rejected in the

6    entirety and be able to make any informed objections that

7    need to be made without any kind of scramble, and without

8    any desk work as to the as-of date for any potential date of

9    assumption.  Thank you, Your Honor.

10            THE COURT:  Mr. Barr?  Mr. Barr, you're on and

11   should be active.  What happened to Mr. Barr?  Let's see...

12   I clicked something wrong, Mr. Barr.  I'll put you back on.

13   I didn't mean to cut you off.

14            MR. BARR:  Your Honor, can you hear me now?

15            THE COURT:  I can.  Thank you.

16            MR. BARR:  Thank you, Your Honor.  We're happy to

17   talk to Mr. Cooley about it and look at it over the next

18   couple of days as we modify the certification procedures and

19   think about it.  We'll try to come up with the most

20   appropriate procedure and put it in front of you in

21   connection with that next motion.  And if we can resolve it

22   with Mr. Cooley, great; if not, I'm sure we can raise the

23   issue with you.  But we'll talk to him before we file

24   anything new -- getting the new deadlines.

25            THE COURT:  Let me ask whether it would be helpful

1    to make a docket entry that says that the Court ordered that

2    the deadline for the filing of landlord cure objections will

3    be set by a future court order, making it clear that there

4    is --

5         MR. BARR:  (indiscernible)

6         THE COURT:  Mr. Cooley, does that largely resolve

7    your concern and let us put it off a little bit?

8         MR. COOLEY:  In the near term, Your Honor, it

9    does.  (indiscernible) helps for my landlord clients so that

10   we have something definite that we can look to.  Thank you.

11        THE COURT:  So, Mr. Oz, I want there to be an

12   entry that the Court orally ordered that the deadline for

13   the filing of cure statements or objections by landlords

14   will be established by future order of the Court.  And

15   that'll be the docket entry.  Mr. Gold, I think you had

16   something you wanted to add to this discussion?

17        MR. GOLD:  Thank you, Your Honor.  Ivan Gold of

18   Allen Matkins, also for a number of the Debtor's landlords.

19   I was going to be joining Mr. Cooley's comments that some

20   form of notice be provided that adjourned and suspended the

21   deadline -- so Your Honor was aware the Debtor had asked for

22   October 12th, which is next week.  So, something on the

23   docket sooner rather than later is quite helpful.

24        I would also remind the Court that this October

25   12th deadline that the Debtors (indiscernible) puts a

1    whopping 12 days after the planned bar date in which

2    landlords virtually have provided prepetition

3    (indiscernible) with a notice that (indiscernible) that Mr.

4    Cooley identified.  And that exercise is something we were

5    trying to avoid with our objections to the original plans

6    procedure.  That problem has self-corrected itself with Your

7    Honor's intervention, and we would urge that a new procedure

8    be added to the further motion or to the plan process that's

9    closer to the actual date of assumption so that Your Honor

10   is aware the (indiscernible) measures cure not as of the

11   petition date but as of the date of assumption.

12         So, I would say that the ordinary deadlines are

13   not particularly helpful, but I would thank Your Honor for

14   at least a (indiscernible) entry that we can point

15   counterparties to (indiscernible) with Debtor's October 12th

16   date pending from the Court.  Thank you for that.

17         THE COURT:  So, a couple things.  First of all,

18   that entry will be made tonight.  You won't have to worry

19   about it coming in later.  And, second, I've always thought

20   it was kind of a bad idea for the Debtors to create a

21   deadline because then they can't enforce it with a court

22   order.  So, the docket entry sort of goes to the procedure

23   that I prefer anyway, which is let's get an order because

24   otherwise the Debtors set a deadline and if someone doesn't

25   comply with it, I think they can usually just come in and

1    say, you know, so what?  They're not my boss.  So, I like

2    the order arrangement better anyway, and this allows us to

3    move to that.

4            So, Mr. Genender, I think we're now moving to you

5    for the DIP issues.  And let's run through what the current

6    DIP problems are.  I know that I have one DIP problem that

7    is of concern to me but you probably have reached deals on

8    some problems and are carrying others that are not resolved.

9    Is your line active right now, Mr. Genender?  I don't

10   remember, and I can look and see.  It's not active.  Hold

11   on.

12           Let's try that, Mr. Genender.  I think that I'll

13   be able to hear you now.

14           MR. GENENDER:  Good afternoon, Your Honor, Paul

15   Genender, Gotshal Manges, for the Debtors.  Can you hear me

16   okay?

17           THE COURT:  I can.  Thank you, Mr. Genender.

18           MR. GENENDER:  Your Honor, I'm happy to proceed

19   with the evidence.  If you have a question about the

20   (indiscernible) comment (indiscernible) Mr. Carlson to

21   perhaps (indiscernible) first.

22           THE COURT:  Well, this was contained in at least

23   one of the objections and it's a concern that I have, which

24   is this is a complicated case, like many cases we're seeing

25   right now with deep problems they are working hard to

 1   resolve.  And in the DIP order there's a provision that says

 2   that if you have a default, that the only thing we can

 3   determine is whether there has been a default.  And if there

 4   has been, that the lenders can seize all of your assets.

 5          It's been, I think, since the day I took the

 6   bench, policy of mine that the kind of call as to whether

 7   there has been a default or not or any factual call of that

 8   nature, I shouldn't bend the call because of the

 9   consequences of the call.  And so what I would -- what I

10   have concerns about is not that I need to make the call as

11   to whether there's been a default; if there has been, I need

12   to say, there's been a default.  But, instead, that there be

13   -- after that default hearing, a remedies hearing to

14   determine what the consequence of the default should be.

15   And I think that the order doesn't provide for any remedies

16   hearing unless y'all have amended that.

17          I don't know if that's something that we need to

18   get the DIP lenders on about, but it is of concern to me.

19   And it has become of greater concern just given the depths

20   of the country's issues with COVID and other matters that

21   just unexpected things are happening right now.

22          If it gives anyone comfort, I don't actually

23   remember any time where I had to go create my own remedy.

24   So, this isn't like, you know, there's some track record

25   that says, yeah, don't worry, the judge never gives a severe

```
1    remedy.  I've just not had the hearing.  But it makes me
2    nervous to do this today.  And so that's the question.  I
3    don't know if that's for Mr. Carlson, or if that's for you,
4    or if that's for the secured lender to tell me that that's
5    something they can address.  But I think that identifies the
6    problem I want to be sure I get through.
7              MR. GENENDER:  At first blush, Your Honor, I
8    understand the concern, Your Honor, at first blush -- I
9    don't think your mechanism would be of any issue to the
10   Debtors if the Debtors are okay, in effect, in starting that
11   later (indiscernible) default, it would become a motion of
12   default.  I would certainly prefer the language to speak to
13   (indiscernible) then.
14             THE COURT:  If I can lender's, DIP lender's
15   counsel to click five-star on your phone so that I can hear
16   what kind of an issue we have about this.  Mr. Rubin, good
17   afternoon.
18             MR. RUBIN:  Good afternoon, Your Honor.  Jason
19   Rubin from Akin Gump Strauss Hauer & Feld on behalf of the
20   DIP lenders and (indiscernible) group.  And, Your Honor, we
21   have made no objection to making the revisions that you
22   requested to remedy (indiscernible).
23             THE COURT:  All right.  I appreciate that
24   cooperation very much.  So, does that mean, Mr. Genender and
25   Mr. Carlson, that you want to move into an evidentiary
```

1    hearing at this point, or how do you want to go now?

2            MR. GENENDER:  Yes, Your Honor, if we could.

3            THE COURT:  All right, let's go ahead.

4            MR. GENENDER:  Great.  (indiscernible)

5    preliminary, as Mr. Adams said, we've reached a very

6    productive discussion group with the creditors committee in

7    terms of (indiscernible) matters.  And the Debtors intend to

8    call (indiscernible) during this hearing, we intend to call

9    Jon Walters from PJ&T, Chad Coben from FTI and Jim Howell

10   from the company, the company of DFO.  The parties have

11   reached agreement that the following of the Debtor's exhibit

12   (indiscernible) for this hearing and I'm on Exhibit

13   (indiscernible) EC 2005.  And it would be Exhibit 1005-5,

14   which is a DIP order, 1005-9, which is a declaration of John

15   Walters in support of the DIP motion, 1005-10, which is

16   (indiscernible) cash loan dated September 24, 2020, and

17   1005-14, which is the declaration of the Jim Howell

18   (indiscernible) the Debtor's Chapter 11 petition

19   (indiscernible).

20           (indiscernible) Mr. Adams to his exhibits but I

21   know for certain that (indiscernible)...

22           THE COURT:  Mr. Genender, Mr. Genender -- let me

23   interrupt you.  Something happened where once you got to

24   their exhibit list, your voice started being garbled.  So, I

25   heard -- let me just take it one step at a time anyway.  Is

1    there any objection to 1005-5, dash-9, dash-10, and dash-14?

2    I do have somebody else on the phone -- let me see who I've

3    got.  Mr. Carlson, did I get your line activated?

4            MR. CARLSON:  Your Honor, yes.  Can you hear me

5    okay?

6            THE COURT:  I can, Mr. Carlson.  I assume that you

7    don't have an objection.  You were just trying to get

8    online?

9            MR. CARLSON:  That's right.  And I was trying to

10   clarify your questions about termination provision.

11           THE COURT:  All right.  1005-5, 9, 10 and 14 are

12   admitted.

13       (Debtor's Exhibits 1005-5, 1005-9, 1005-10 and 1005-14

14   Entered Into Evidence)

15           THE COURT:  And then which of Mr. Adams' --

16           MR. ADAMS:  Your Honor?

17           THE COURT:  Yes?

18           MR. ADAMS:  Yes, Your Honor, Jason Adams again.

19   Your Honor, with respect to 1005-5, it seems like the

20   question (indiscernible) an older version of the DIP order,

21   and I believe (indiscernible) hearing.  So we want clarity

22   on which version of the order the Debtors were going to be

23   realizing today.

24           MR. GENENDER?:  Your Honor, I think

25   (indiscernible) the (indiscernible) page.  And I think

1   (indiscernible) Exhibit 5-10.  So, (indiscernible) matter,

2   I'm happy to withdraw it.

3            THE COURT:  Then you want to use 1034-1 as the

4   correct proposed order, correct?

5            MR. GENENDER?:  Yes, yes.  It does need to be

6   (indiscernible).

7            THE COURT:  Mr. Adams?  Does that work for you,

8   Mr. Adams?

9            MR. ADAMS:  Yes, it does, Your Honor.  No

10  objection to that.

11           THE COURT:  All right.

12           MR. ADAMS:  And no objection to any of the other

13  orders.

14           THE COURT:  Then we're admitting 1005-5, 9, 10 and

15  14, and then 1034-1 as well, which will absolutely

16  substitute for 5 but it'll show us a history of what we

17  have.

18       (Debtor's Exhibit 1034-1 Entered Into Evidence)

19           THE COURT:  And, Mr. Adams, which of your exhibits

20  did you want to have admitted?

21           MR. ADAMS:  Your Honor, (indiscernible) 936, 1

22  through 12, 13 and 15, and then 17 and 19.  14 and 15, Your

23  Honor, are the (indiscernible) declaration.  I don't think

24  we've had the opportunity to upload the (indiscernible) un-

25  redacted versions.  I would just propose that we go with the

1   936, 14 and 15, and we clear that up after the hearing with

2   the un-redacted version.

3          THE COURT:  That's fine.  Is there any objection

4   to number 46, 1-12, 14, 15, 17 and 19?  All right, those are

5   admitted.

6          (Creditors' Exhibits 46, 1-12, 14, 15 17 and 19 Entered

7   Into Evidence)

8          THE COURT:  Mr. Genender, I think you have the

9   floor.

10          MR. GENENDER:  Thank you, Your Honor.  We'd like

11   to call Jon Walters from PJT for a little bit of live

12   testimony (indiscernible) the declaration, Your Honor.

13          THE COURT:  Thank you.  Mr. Walters, can I get you

14   to click on...  There you are.  Mr. Walters, is your phone

15   activated?  I'm not sure.  It is not yet, so let me get it

16   activated.  All right, Mr. Walters, can you raise your right

17   hand for us, please, sir?

18          MR. WALTERS:  Sure.

19          THE COURT:  Do you swear to tell the truth, the

20   whole truth and nothing but the truth?

21          MR. WALTERS:  I do.

22          THE COURT:  Thank you, Mr. Walters.  Mr. Genender?

23          MR. GENENDER:  Thank you, Your Honor.

24            DIRECT EXAMINATION OF JONATHAN WALTERS

25   BY MR. GENENDER:

1   Q    Mr. Walters, can you please state your name for the

2   record?

3   A    Jonathan Walters.

4   Q    (indiscernible) Mr. Walters?

5   A    PJT Partners.

6   Q    What's your position at PJT?

7   A    I'm a vice president in the Restructuring and Special

8   Situations Group.

9   Q    What did PJT (indiscernible) all these proceedings

10  generally?

11  A    We are the Debtor's investment banker.

12  Q    Mr. Walters, are you familiar with the Debtor's DIP

13  motion that we're here on today?

14  A    Yes.

15  Q    And (indiscernible) the declaration in support of that

16  motion?

17  A    I do.

18  Q    And you understand part of (indiscernible) before the

19  Court today?

20  A    I do.

21  Q    What specific role did you play in the Debtor's

22  negotiation in (indiscernible) interest in providing DIP

23  financing?

24  A    I led a marketing process to find the DIP and was

25  involved in the negotiations that culminated in this DIP

1    before the Court (indiscernible) first lien lenders.

2    Q    And who all did you approach in connection with that

3    marketing process?

4    A    I approached 14 third parties, including a number of

5    commercial banks, hedge funds and alternative lenders, many

6    of whom are very active in DIP lending.  I also approached

7    the unsecured noteholder group, the unsecured creditors

8    committee and the requisite personal banks.

9    Q    Did you receive any proposals in response to your

10   (indiscernible)?

11   A    We did.  We received two proposals.  One from the

12   (indiscernible) first lien lenders, and one from J&B

13   Capital, which involves a first lien lender.

14   Q    Do you have any understanding as to why

15   (indiscernible), Mr. Walters?

16   A    Yes.

17   Q    What's that?

18   A    The feedback that we received is that lenders did not

19   want to lend a DIP (indiscernible) to your bankers, and did

20   not want to pursue a private (indiscernible) on this list.

21   Q    Mr. Walters, (indiscernible) before the Court

22   negotiated (indiscernible) or as a package?

23   A    They're negotiated as a package.

24   Q    Based on your involvement, Mr. Walters, do you have a

25   view as to whether the (indiscernible) members

1   (indiscernible) to the Debtors under these circumstances?

2   A     I do.

3   Q     What is that view?

4   A     My view is that it gives the best proposal to the

5   Debtors.  It is -- it provides the financing that the

6   Debtors need to maximize value for all stakeholders.  And it

7   was negotiated at arm's length -- on an arm's length basis

8   through (indiscernible) negotiation -- that in terms of

9   reasonable and (indiscernible) market.

10  Q     Did you (indiscernible) formerly of the DIP?

11  A     Yes.

12  Q     And what did you conclude in that regard?

13  A     My conclusion was this is the only executable DIP that

14  we have.

15  Q     Do you have a view, Mr. Walters, if some debtors would

16  be able to (indiscernible) executable DIP (indiscernible)

17  similar term at a lower cost from an alternative lender as

18  opposed to (indiscernible)?

19  A     I do.

20  Q     And what is that view?

21  A     In my experience, I do not believe the Debtors could

22  obtain a better DIP that is executable.

23  Q     In your view (indiscernible) the Debtor?

24  A     Yes.

25  Q     And what would that be?

1    A    It is the best remaining option we have.  It provides,

2    as I said -- it provides the liquidity and the

3    (indiscernible) for liquidity that we need today to ensure

4    the Debtors can maintain ongoing operations, and that

5    provides value for all stakeholders.  So, it's very

6    important for the Debtors.  And (indiscernible) the terms

7    are, you know, reasonable and in line with market, in my

8    view.  And finally, this DIP also provides a path to a

9    (indiscernible) agreement and a potential transaction that

10   is supported by 87 percent of first lien claims to number

11   two (indiscernible) emerging from bankruptcy.

12   Q    Thank you, Mr. Walters.  Your Honor, pass.

13            THE COURT:  All right.  Are there any parties that

14   advocate approval of the Debtor's motion that have

15   additional questions for Mr. Walters?  All right.  Are there

16   any parties that oppose?  Mr. Adams?

17            MR. ADAMS:  Yes, Your Honor, thank you.  Just a

18   few questions.

19            CROSS-EXAMINATION OF JONATHAN WALTERS

20   BY MR. ADAMS:

21   Q    Mr. Walters, in your declaration you stated that

22   financially all of the Debtors' assets including their cash

23   are subject to the prepetition security interest and liens

24   in favor of the lenders, is that correct?

25   A    I believe so.

1    Q    Okay.  You later state in paragraph 29 of your

2    declaration (indiscernible) for the Debtors' provision of

3    the (indiscernible) first party security interest and

4    substantially all the Debtors' assets, including certain

5    unencumbered property (indiscernible) circumstances.  Is

6    that a correct statement on your declaration, to the best of

7    your knowledge?

8    A    To the best of my knowledge, yes.

9    Q    Okay.  What unencumbered property were you referring to

10   when you made that statement in your declaration?

11   A    There are a number of unencumbered (indiscernible) and

12   I was referring to the unencumbered assets as a whole.

13   Q    So, would it be fair to say that there's various

14   categories of excluded property under the prepetition credit

15   document that are not subject to the liens of the

16   prepetition lenders?

17   A    Correct.  Prepetition and (indiscernible) cash

18   collateral motion (indiscernible).

19   Q    Okay.  And did those assets include the Debtors' real

20   estate assets?

21   A    The asset included a very small number of properties.

22   There are, I believe, nine unencumbered properties.

23   Q    (indiscernible) their properties, correct?

24   A    Correct.

25   Q    Okay.  And to the best of your knowledge, did the

1     excluded property also include the Debtors' interest in

2     mutual properties?

3     A     Yes.

4     Q     Okay.  And now under the DIP credit agreement, the

5     lenders are going to be provided a lien in all of that real

6     property, correct?

7     A     Correct.

8     Q     Going back to paragraph 10 again of your declaration,

9     you say that the prepetition lender had a lien in the

10    Debtors' cash, correct?

11    A     Yes.

12    Q     And then again in paragraph 29 of your declaration, you

13    say that providing adequate protection to the prepetition

14    (indiscernible) party was necessary to allow the Debtors to

15    continue to use cash collateral, correct?

16    A     I believe I said that, yes.

17    Q     Okay.  That, of course, presupposes that the Debtors'

18    cash was subject to a valid lien of the lenders at the

19    petition date, correct?

20    A     I'm not sure if it supposes that actually.  I'm not

21    sure.

22    Q     Okay.  Are you aware that the Debtors, as of the

23    petition date, raised concerns about whether or not the

24    lenders actually had valid and perfected liens in the cash?

25    A     I recall there was some discussion around the cash

1    collateral (indiscernible).

2    Q    Okay.  Okay, (indiscernible) assuming that the DIP is

3    approved today, am I correct that $100 million will be

4    initially made available.

5    A    That's correct.

6    Q    Okay.  And when will that $100 million be funded?

7    A    It will be funded in the very near term.  As I recall,

8    there's one (indiscernible) cash he has.  But

9    (indiscernible) a number of days.

10   Q    Okay.  And are the Debtors authorized to use that cash

11   immediately?

12   A    Yes.  (indiscernible) the DIP and the cash collateral,

13   yes.

14   Q    Isn't there a limitation in the DIP agreement

15   (indiscernible) of the financing that says that the Debtor's

16   accounts must have less than $5 million in them

17   (indiscernible)?

18   A    That's correct.  As mentioned, that (indiscernible) are

19   withdrawn immediately, and we could use it when that

20   (indiscernible) occurs, correct.

21   Q    So, the Debtors are required, therefore, to utilize all

22   cash on hand now.  I'm told that (indiscernible) $5 million

23   of that before they can act (indiscernible) is that correct?

24   A    To my knowledge, yes.

25        MR. ADAMS:  Okay, thank you, Your Honor, I have no

1   further questions.

2            THE COURT:  All right, thank you, Mr. Adams.  Any

3   further questions for Mr. Walters?  Who had a question?  Go

4   ahead.

5            MR. GOLD:  Your Honor, Ivan Gold with Allen

6   Matkins.  Your Honor, just a few of what I believe will be a

7   few questions of Mr. Walters to follow up with Mr. Adams.

8                CROSS-EXAMINATION OF JONATHAN WALTERS

9   BY MR. GOLD:

10  Q    Good afternoon, Mr. Walters.  In your declaration, you

11  (indiscernible) the 14-week budget.  Do you recall that?

12  A    I believe that was attached to the DIP order, not my

13  declaration per se, but it was part of the filing of the

14  motion, correct.

15  Q    Are you familiar with that budget?

16  A    Yes.

17  Q    And (indiscernible) to be off the hook, as between Mr.

18  Coben, Mr. Potter and yourself, who was most familiar with

19  that budget?

20  A    Mr. Coben is rightly the most familiar.

21  Q    Is there an updated version of this budget, to your --

22  call it a public (indiscernible) version of this budget, to

23  your knowledge?

24  A    I believe there was a budget filed on September 1st,

25  and then a slow revised one on September 25th, both of which

1   are very similar.

2   Q    Beyond on September 25th, which was over two weeks ago,

3   is there anything further in terms of a budget that you're

4   aware of?

5   A    Not that I'm aware of.

6           MR. GOLD:  Thank you, Your Honor.  I'll save the

7   rest of my questions for Mr. Coben, since Mr. Walters has a

8   (indiscernible).  Thank you.

9           THE COURT:  Thank you.  Does anyone else have any

10  questions for Mr. Walters?  What kind of boat is that behind

11  you, Mr. Walters?

12          THE WITNESS:  I am embarrassed to say I don't

13  know.  My wife got that picture for me.  It's a turn of the

14  century (indiscernible).

15          THE COURT:  Oh, I couldn't see well enough to

16  understand that.  Okay.  When y'all are done, I'm going to

17  go and try to get my boat safe from this storm that's coming

18  our way.  So, that's where I'll be tonight and why that

19  attracted my attention.  Who's going to be your next

20  witness, Mr. Genender?

21          MR. GENENDER:  Your Honor, I propose that as a

22  segue from Mr. Walters, we can call John Coben, Your Honor.

23          THE COURT:  Mr. Coben, good afternoon.  If I could

24  get you to press five-star, please?  I apologize for these

25  long delays but somehow I think the internet between here

1    and my provider is running slowly and it just takes a minute

2    to register the five-star, so...

3              Mr. Coben, would you raise your hand, please, sir?

4    Do you swear to tell the truth, the whole truth and nothing

5    but the truth?

6              MR. COBEN:  Yes, I do.

7              THE COURT:  Thank you, Mr. Coben.  Let me be sure,

8    if somebody else (indiscernible) as well.  Mr. Genender, go

9    ahead, please.

10             MR. GENENDER:  Thank you, Your Honor.

11                  DIRECT EXAMINATION OF CHAD COBEN

12   BY Mr. GENENDER:

13   Q    Can you please state your name for the record, sir?

14   A    Chad Eric Coben.

15   Q    And, Mr. Coben, you have previously submitted a

16   declaration of Chase, correct?

17   A    Yes, sir, I have.

18   Q    And just for the record, it's in evidence for this

19   hearing at ETF936-7.  Are you aware of that?

20   A    Yes, I am.

21   Q    Okay.  Mr. Coben, what is your role in (indiscernible)?

22   A    I'm with FDI Consulting and FDI serves the financial

23   advisors (indiscernible).

24   Q    Thank you.  Are you familiar with 1005-10

25   (indiscernible) filed in the court (indiscernible) 25, 2020?

1    A    Yes, I am.

2    Q    And how are you familiar with that document?

3    A    It was involved in the development and (indiscernible)

4    supervision (indiscernible) forecast on a legal basis with

5    (indiscernible).

6    Q    Is this a current version of that (indiscernible)

7    forecast?

8    A    (indiscernible)

9    Q    Will you explain, Mr. Coben, at a high level why the

10   Debtors (indiscernible) cash collateral (indiscernible)...

11   A    I'm sorry, Mr. Genender.  I'm having a

12   (indiscernible)...  I didn't understand the question.

13   Q    I apologize.  I had my papers in front of my speaker.

14   Can you explain at a high level why the (indiscernible)

15   access to a $200 million (indiscernible) collateral?

16   A    Absolutely.  So, the Debtors are seeking access to a

17   $200 million facility in order to provide more working

18   capital to operate their business and to pay for using

19   expenses on the DIP including the adequate protection

20   obligations.

21   Q    And, Mr. Coben, why specifically do the Debtors need

22   $200 million as opposed to a lower amount?

23   A    It's really to protect against the unknown and the

24   financial risk that the business is subject to.  What I mean

25   by that is whether it's risk around the business, certainly

1    COVID has not gone away, and so the impact of COVID on the

2    business is uncertain.  It affects (indiscernible) to access

3    incremental liquidity in the event that the donation of the

4    (indiscernible) wanted and anticipated.  Those are the most

5    significant (indiscernible).

6    Q    Has there ever been a concern -- either a concern that

7    payments might become due (indiscernible)?

8    A    Certainly there's -- there is inconsistencies in the

9    frequency and the volume of payments.  So on a weekly basis,

10   whereas mortgages and certain payments, and some that can be

11   due every month (indiscernible) we have bread payments due,

12   and so that's a great cash outflow.  So, depending upon --

13   as the case goes on, having access to liquidity and working

14   capital is an important element to protect the Debtors'

15   assets.  Because when there's (indiscernible) in those

16   payments, we've got to have access to that (indiscernible).

17   Q    And, Mr. Coben, (indiscernible) protect the firm?

18            THE COURT:  You broke up there, Mr. Genender.  Can

19   you try that again?

20            MR. GENENDER:  Sure.  (indiscernible) technical

21   term, Your honor.  Forgive me, sometimes certain payments

22   are more due than others.  (indiscernible)

23   BY MR. GENENDER:

24   Q    Mr. Coben, why can't the Debtors just provide on a

25   (indiscernible)?

1    A    Well, the forecast calls for continued negative cash

2    flow from operations well into next year.  And obviously the

3    forecast in the (indiscernible) on the coverage is not

4    there.  But under management's current estimate, we believe

5    (indiscernible) make it a cash flow from operations

6    (indiscernible) overall, knowing the technical

7    (indiscernible).

8    Q    And, Mr. Coben, does the requested DIP before the

9    Court, does it provide emergent cost (indiscernible) case?

10   A    It would.  In (indiscernible) the DIP itself, we

11   contemplated the potential for needing to make certain cure

12   costs or (indiscernible) contracts or leases, and have

13   provided for other (indiscernible).

14   Q    Mr. Coben, without the DIP before the Court, do the

15   Debtors have to petition (indiscernible) cash collateral

16   alone?

17   A    No, they will not.

18   Q    And the Debtors -- I'm going to improvise --

19   (indiscernible) the Debtors' liquidity (indiscernible)?

20   A    Yes.  (indiscernible) I anticipate they send out

21   projections and the bills on stuff we've done, and the core

22   trajectory of the business in the current market

23   environment.  And they anticipate (indiscernible)

24   ...reorganization.

25   Q    Thank you, Mr. Coben.  Okay, you've (indiscernible)

1    1000-10 (indiscernible portion) ...after $100 million of the

2    debt is gone, correct?

3    A    Yes, sir, that's correct.

4    Q    And is it your view that notwithstanding the fact that

5    there's (indiscernible) the projection that the $200 million

6    (indiscernible) appropriate?

7    A    Could you repeat the second part of that question?

8    Q    Sure.  Notwithstanding their $58 million, according to

9    your projection on December 20th, after all the

10   (indiscernible) million dollars is withdrawn, is it still

11   your view that the $200 million debt is the appropriate

12   size?

13   A    Yes, it is.  If you were to look at the budget -- or

14   the forecast beyond these 13 weeks, where there's an

15   incremental draw projected in the last week of the year as a

16   result of the anticipation of the shareholder members'

17   payments and (indiscernible) emergence.

18   Q    Thank you, Mr. (indiscernible).  I'm sorry.  Go ahead

19   and finish you answer, I'm sorry.

20   A    No.  Yeah, there's material -- back rent payments due

21   and (indiscernible) debt due.  So there's equal amounts of

22   cash (indiscernible) that final week of the year and the

23   beginning of next year and the required (indiscernible).

24   Q    Thank you.

25         MR. GENENDER:  I'll pass the witness.  Thank you,

1  Your Honor.

2          THE COURT:  All right.  Thank you.  Mr. Coben,

3  what is the appropriate amount of cash on hand for a

4  business like this to have at a minimum level?  I assume

5  it's not zero, and so I'm trying to figure out whether --

6  even at the end of the year, is 58 million more than

7  adequate to run the business?  Is it about right -- what

8  does it take to run this business sufficiently?

9          THE WITNESS:  Sure, Your Honor.  The way we think

10  about it -- we think the $25 million as a minimum cash

11  number to have on hand.  And we think about that probably

12  just based on cash burn.  So, the statement that cash flow

13  is not (indiscernible) basis, about $10 million.  Then

14  there's non-operating cash flow (indiscernible) on top of

15  that.  And so we want to make sure that we have at least

16  more than a couple weeks of cash on hand for probably closer

17  to a month, and more cash on hand to protect the business.

18  We wouldn't want to find ourselves with two or three weeks

19  (indiscernible) so, that's why we want to ensure we've got

20  access to cash beyond that (indiscernible) mark.

21          THE COURT:  And with the 200 million, are you

22  confident that you'll have the 25 million through the date

23  of expected emergence?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.  Mr. Adams?

1            MR. ADAMS:  Your Honor, I know Mr. Gold was

2     chomping at the bit.  So I have no questions and I'll pass

3     it along.

4            THE COURT:  All right, thank you.  So I think, Mr.

5     Gold, you wanted to have at Mr. Coben.  Go for it.

6            MR. GOLD:  Thank you, Your Honor.

7            CROSS-EXAMINATION OF CHAD COBEN

8     BY MR. GOLD:

9     Q    Good afternoon, Mr. Coben.  This new 13-week updated

10    budget that appears at 1005-10 shows a draw the week of the

11    4th, is that correct?

12    A    Yes, sir.

13    Q    And that hasn't occurred yet, has it?

14    A    No, sir, it has not.

15    Q    Okay.  I want to talk about lumpiness -- your term

16    today, which will (indiscernible).  I'd like to talk about

17    the lumpiness of the redline in this budget.  The first week

18    of this budget shows a rent payment of approximately 1.9

19    million.  Then last week, we got about 8 million.  And then

20    the week of -- week 44, the week ending November 8th, we've

21    got 13.9 million, and then the week ending 11-29, we've got

22    9.2 million.  Do you see that?

23    A    Yes, sir, I do.

24    Q    Okay.  Every one of these numbers is different.  And

25    I'd like you to explain to me why they are different and

1    what assumptions underlie the differences between these four

2    different numbers.

3    A     Certainly.  So, in the forecast week one, that 1.9

4    million was related to outstanding uncashed checks

5    (indiscernible) cash coming from equity.  In the 10.4 -- in

6    the 10.4, that $8 million represents the company's view of

7    (indiscernible) makes sense, our approximation or our

8    tabulation of the leases to be paid for all of those

9    properties that were not subject to the rent abatement

10   (indiscernible) agreement.

11        So, 74 properties (indiscernible) sending direct

12   money, they had a team related to 20-30-40 percent payment

13   of rent (indiscernible) opened or closed.  And so what we

14   did in calculating that was to take, I believe it was, 40

15   percent of the rent for those 74 properties and add that to

16   the run rate rent.  So, that total amount is 8 million.

17        When you get to the 11-8 week, so the weekend of

18   11-8, that includes again the loan rate but it also includes

19   the catch-up payment for the (indiscernible).  So,

20   (indiscernible) we assumed 40 percent of the (indiscernible)

21   74 (indiscernible) 60 percent that remained unpaid.  The 74

22   then was for rent (indiscernible) in July, August, September

23   and October, which is (indiscernible) higher.

24   Q    Now, how did we get to 9.2 million on 11-29, which is

25   different from the 10.4 number?

1    A    Sure.  The 9.2 number is the run rate for all landlords

2    for the (indiscernible).

3    Q    So then is it fair to say that the 11-29 $9.2 million

4    (indiscernible) the current contract rate of rent under your

5    leases without any assumptions based on (indiscernible)

6    amounts or regulation outcomes?

7    A    It represents -- I'm not sure I'm going to answer the

8    question (indiscernible) it represents the rent that we have

9    owing, that we anticipate owing on that date, which

10   (indiscernible) to that 9.2, subject to further refinement

11   as a result of ongoing negotiations.

12   Q    It's the term anticipate that I'm struggling with.

13   Because in early findings in this case, both the motion to

14   approve cash collateral and the initial rent deferral motion

15   (indiscernible) whole instance is monthly rent accrual as

16   $10.5 million.  What is the difference between those figures

17   and the 9.2 (indiscernible)in the budget?

18   A    (indiscernible) we have in the budget is helping us

19   negotiate with landlords, and we've reached a consensual

20   resolution (indiscernible) landlords (indiscernible).  And

21   so what was originally 10.5 million in one rate rent is the

22   same thing applying to $9.2 million for the monthly rent --

23   I mean, for those landlords (indiscernible).

24   Q    Again, that $1.3 approximately million a month you

25   describe as the run rate reflects actual consensual deals

1   that are executed?  Or does it reflect anticipation or

2   projections of deals?

3   A    Actually, (indiscernible).

4   Q    And -- thank you.  With respect to -- are you familiar

5   with the concept of sub-rent?

6   A    Sub-rent?

7   Q    Yes, sir.

8   A    I'm not sure if I am.

9   Q    I'll briefly define sub-rent as the prorated post-

10   petition portion of rent occurring in the first month of the

11   case.  Are you familiar with that concept?

12   A    Yes.

13   Q    Is sub-rent provided for anywhere in this docket?

14   A    Yes.

15   Q    Where in the 13 weeks will I find sub-rent?

16   A    Are you referring to -- when you define sub-rent, I

17   want to make sure that I understand.  This is post-petition

18   rent?

19   Q    Correct.

20   A    It's paid for in those rent payments along the way.

21   For any amounts owing that remain unpaid and are consensual

22   -- we've accounted for that and provided for

23   (indiscernible).

24   Q    You qualified your statement by (indiscernible) or

25   agree.  So I'm representing did the Debtor file on June

1   25th?  And whether or not an agreement is reached, is any

2   rent for the June 25 through June 30 period (indiscernible)

3   is that provided for anywhere in this (indiscernible)?

4   A    Yes.

5   Q    As to all landlords or only those landlords in which

6   you already reached a consensual agreement?

7   A    I'll say I believe for all landlords.

8   Q    Is that part of the November catch-up payment, as you

9   described it?

10  A    Yes, it could be -- it could be.  It is certainly a

11  part of it.  There may be other periods in which

12  (indiscernible).

13  Q    Why are some landlords being treated differently than

14  others as to timing?

15  A    I'm not certain that they are.

16  Q    (indiscernible)

17  A    Those that are related to the -- (indiscernible)

18  abatement motion, they're all being caught up.  And I

19  believe that all others will be caught up by that time, if

20  they're not already caught up.

21  Q    Now, you -- let me ask you a question about the first

22  week of the budget.  You have 1.9 and you refer to that as

23  uncashed checks, is that correct?

24  A    That's correct.

25  Q    Did you make any late payment of rent for the month of

1    September?

2    A    Not to my knowledge.

3    Q    There are pipelines that (indiscernible) in Fort Worth

4    that are (indiscernible) store 595 got a check for September

5    rent that's dated September 28th.  (indiscernible)

6              MR. GENENDER:  Objection.  Your Honor, assumes

7    facts not in evidence.

8              THE COURT:  Sustained.

9              MR. GOLD:  It's cross, Your Honor.

10             THE COURT:  It may be cross but you can't state

11   the fact.  You can ask him a question.

12             MR. GOLD:  Okay.

13   BY MR. GOLD:

14   Q    And, again, are you aware of any late payments of

15   September rent?

16             MR. GENENDER:  Objection.

17   A    (indiscernible) income.

18             THE COURT:  I didn't hear the objection.

19             MR. GENENDER:  (indiscernible) it's okay, Judge.

20   He didn't say (indiscernible)

21             THE COURT:  That's fine.  Let's move ahead.

22   BY MR. GOLD:

23   Q    Just to qualify your earlier testimony, Mr. Coben, the

24   cure costs required to resume (indiscernible) on or about

25   the time of emergence would be off the page, so to speak, in

1   that you are looking forward beyond 12-20 of where you're

2   projecting those payments will be made, is that correct?

3   A    That's correct.

4   Q    And those payments would be made on the subsequent

5   draws on the availability under the DIP credit facility that

6   is before the Court today?

7   A    I'm sorry?  Could you restate the question?

8   Q    The source of that would be the subsequent draws on the

9   DIP facility that is before the Court today?

10  A    That and the cash on hand, yes.

11  Q    Have you done a projection of the cure cost?

12  A    Not preliminarily.

13  Q    In the roughest estimated terms, what would that number

14  look like?

15  A    It's on the (indiscernible) of $13 million.

16  Q    13 million?  (indiscernible) roughly one and a half

17  times your rent run for a month?

18  A    Roughly.

19  Q    How close are you to the $5 million (indiscernible)

20  that you described in your direct testimony?

21  A    I'm sorry, could you...  (indiscernible) that I

22  testified to?

23       MR. GENENDER:  I'm going to object, Your Honor.

24  That was Mr. Walters' testimony.

25  MR. GOLD:  I'll restate it.

1    BY MR GOLD:

2    Q    Mr. Walters testified that the draw on the expenditure

3    -- you can draw but you can't spend until you get to $5

4    million in cash.  Do you recall that testimony?

5    A    I do.

6    Q    Is that complicit with your understanding of the

7    proposed (indiscernible)?

8    A    Yes, sir, it is.

9    Q    How close are you to the (indiscernible) trigger as we

10   sit here today?

11   A    We have approximately $47 million in cash on hand

12   today.

13   Q    Okay.

14   A    As of the end of last week.

15   Q    Okay.  As of the end of last week is fine.

16           MR. GOLD:  Your Honor, that's all I have.

17           THE COURT:  Thank you.  Any further questions for

18   Mr. Coben by any party?  All right, Mr. Howell, would you

19   raise your hand, please, sir?  Do you swear to tell the

20   truth, the whole truth and nothing but the truth?

21           R. HOWELL:  I do.

22           THE COURT:  Thank you, Mr. Howell.

23           MR. HOWELL:  Can you hear me?

24           THE COURT:  I can, thank you.  Mr. Genender?

25           MR. GENENDER:  Thank you, Your Honor.

1          DIRECT EXAMINATION OF JAMES HOWELL

2     BY MR. GENENDER:

3     Q     Can you please state your full name for the record,

4     sir?

5     A     James Avery Howell.

6     Q     And, Mr. Howell, you have provided a declaration in

7     connection with this case, correct?

8     A     I have.

9     Q     And it is already admitted into evidence as Exhibit

10    1005-14, is that right?

11    A     Yes.

12    Q     Okay.  Mr. Howell, as the Debtor's CFO, are you

13    familiar generally with the Debtor's assets as of the

14    petition date in this case?

15    A     Yes.

16    Q     Relatedly, are you familiar with liens that were

17    attached to the Debtor's assets as of that date?

18    A     Yes.

19    Q     How did you gain that familiarity, sir?

20    A     I participated in due diligence and discussions on that

21    issue.

22    Q     Mr. Howell, how much of the Debtor's assets were

23    encumbered by liens as of the petition date, sir?

24    A     Substantially all assets are encumbered.

25    Q     Mr. Howell, based on your familiarity with the Debtor's

1    assets, any diligence you participated in, do you have an

2    understanding as to the value of any unencumbered assets?

3    A    Yes.

4    Q    What is that understanding?

5    A    There's very little value attached to unencumbered

6    assets.

7    Q    What forms the basis of that understanding that there's

8    very little in -- associated with the unencumbered assets,

9    Mr. Howell?

10   A    Certainly the nature of those assets, you know,

11   categorically, (indiscernible) value at low-value real

12   property that we've tended to sell before and have been

13   unable to.  We've got (indiscernible).  We have liquor

14   licenses that are un-transferrable.  And then we have a few

15   (indiscernible) licenses, and then there's 35 percent equity

16   in CDC Canada.

17   Q    Mr. Howell, if the unencumbered assets that you just

18   went through were worth a material amount, would that be a

19   good thing for the Debtors?

20   A    Yes.

21   Q    If they were worth a material amount, would the Debtors

22   have you then fund their operations?

23   A    Yes.  I (indiscernible)...

24         THE COURT:  Sorry.  Hold on.  We have an

25   objection.

1          MAN 1:  Objection, Your Honor.  Speculation.

2          THE COURT:  Sustained.

3    BY MR. GENENDER:

4    Q    Mr. Howell, I want to ask you about -- I want to turn

5    to the second (indiscernible) I want to ask you about, is

6    referenced in your declaration, which is Exhibit 14 -- 1005-

7    14.  Do you recall mentioning a potential preference claim

8    in paragraph 18 of that declaration?

9    A    Yes, I do.

10   Q    What events or transactions formed the basis of that

11   potential claim referenced in your prior testimony?

12   A    Well, as I understand it, when we moved on our line of

13   credit and the first draw was 105 million, and we received

14   that cash, because of the size of the cash, we moved it into

15   a money market account that we had used regularly when we

16   had cash, and then by doing so it created an issue for us.

17   Q    And do you recall when that occurred, Mr. Howell --

18   that movement of the money?

19   A    Yeah, we drew -- we drew it out about May -- March

20   18th, as I recall.

21   Q    And why did... Move to strike.  Okay.  Why did the --

22   what was the reason for moving the money from one bank to

23   another?

24   A    We typically moved money around accounts to maximize

25   the return it would get from the odd weekend generating

1    interest income in certain accounts, or (indiscernible) in

2    other accounts.  And so that was something that we did in

3    the normal course of business and, again, because of the

4    size of this, we ended up moving it into a J.P.  Morgan

5    money market account.

6    Q    Do you have any understanding as to why that movement

7    of money from one account to the other may have been

8    significant at the timing with the (indiscernible)?

9    A    Yes.  As I understand it, there was an issue with, you

10   know, (indiscernible) cash and if there was a preference

11   claim.  And I think we filed when we did to preserve the

12   (indiscernible) and work on negotiating with the creditors.

13   Q    And what was the result, to your understanding, of the

14   negotiations?

15   A    We (indiscernible) the claim and gained permission to

16   use the cash collateral.

17   Q    Thank you, Mr. Howell.

18            MR. GENENDER:  Pass the witness, Your Honor.

19            THE COURT:  Thank you.  Why don't we take a 10-

20   minute break and we'll come back at 5:15 or we'll come back

21   at 5:12 and finish the hearing.

22            (Recess)

23            THE COURT:  All right, Mr. Adams, let's move

24   ahead.

25            MR. ADAMS:  Thank you, Your Honor.

1    (indiscernible) my cross-examination.

2         CROSS-EXAMINATION OF JAMES HOWELL

3    BY MR. ADAMS:

4    Q    Mr. Howell, in your direct testimony, you indicated

5    today that there's really little value in the unencumbered

6    assets.  Is that correct?

7    A    Yes.

8    Q    Okay.  And of that -- those unencumbered assets, you

9    identified some parcels of (indiscernible) property,

10   correct?

11   A    Yes.

12   Q    Do you have an appraisal today that shows the value of

13   that (indiscernible) property?

14   A    I think there's an appraiser in profits, I have not

15   seen a (indiscernible) report.

16   Q    Okay.  So as you said here today you don't actually

17   have a value for those nine parcels of their property, do

18   you?

19   A    I have a value in my head but do I have a piece of

20   paper that says what they are, no.

21   Q    Okay.  You did not mention the debtors who resold

22   interest, is it your understanding that the retail ventures

23   are also excluded collateral under the (indiscernible)

24   agreement?

25   A    I'm not sure.

1   Q    Okay.  You mentioned the position of the equity

2   interest and certain subsidiaries, that is for CEC Canada,

3   is that correct?

4   A    That's correct.

5   Q    And what is the value of the assets of that -- from

6   your understanding if that's CEC Canada?

7   A    It'd be -- there's a couple ways you can look at it, I

8   guess.  One is Canada, in and of itself, owes a very large,

9   payable to CECE of about $17 million dollars last I checked.

10  So that would imply that their liabilities exceed their

11  assets.  Having said that, there is business there of about

12  10 stores right now that are operating.  I will tell you

13  that those 10 stores are some of our worst performing stores

14  right now.  In fact, in our bottom 10 stores they are

15  probably -- six of them are probably in that bottom 10.

16  Q    So I'm sorry, I'll repeat the question.  What is the

17  value of the assets of CEC Canada?

18  A    I don't have it -- I don't necessarily have that number

19  right now.

20  Q    Okay.  At the end of your testimony you were talking

21  about the preference out of (indiscernible) you mentioned in

22  paragraph 18 that your debtor agents remained

23  (indiscernible) and you stated that you settled that claim,

24  is that correct?

25  A    Yes, I said yes.

1    Q    Okay, (indiscernible) did the debtors file the motion

2    to the approval of that settlement the first time?

3    A    I don't know the technical explanation of it, all I

4    know is that I was allowed to use the cash and I've been

5    using that cash since then.

6    Q    Okay.  Your Honor, no further questions for Mr. Howell,

7    thank you.

8         THE COURT:  Thank you.  Does anyone else have any

9    questions for Mr. Howell?  All right, any follow ups?  Mr.

10   Genender?  We didn't get you, Mr. Genender, hold on.  All

11   right, Mr. Genender, any further questions?

12        MR. GENENDER:  No, Your Honor, thank you.

13        THE COURT:  Thank you.  Any further evidence by

14   the debtor?

15        MR. GENENDER:  No, Your Honor, the debtors rest on

16   the evidentiary record for the Court.

17        THE COURT:  Any further evidence by any supporter

18   of the motion?  Any evidence by any opponent to the motion?

19        MR. ADAMS:  Yes, Your Honor.  Jason Adams again

20   for the committee.  Your Honor, we do have the testimony of

21   Andrea Gonzalez and Albert (indiscernible) Marcel, which

22   would potentially (indiscernible) objection, we feel the

23   unsealed document per the agreement with the debtors party

24   to the hearing, we would proffer that the declaration and

25   the direct testimony and Mr. (indiscernible) would have a

1    (indiscernible) and cross examination.

2              THE COURT:  Thank you.  What's the CF number on

3    that just so that I've got it in front of me?

4              MR. ADAMS:  (indiscernible) Your Honor, that is CF

5    number -- if I can find the right document, I apologize Your

6    Honor.

7              THE COURT:  I think it's part of 946 but I'm not

8    sure.

9              MR. ADAMS:  Yeah -- yes it is, Your Honor, and I'm

10   not -- I've been jumbled from (indiscernible) -- 936-14 is

11   the redacted version, which probably for purposes of today

12   will be the proper one.  I don't think we have now submitted

13   the unredacted version per the (indiscernible) issue

14   (indiscernible).

15             THE COURT:  Didn't you submit one under seal

16   though?

17             MR. ADAMS:  We did, Your Honor.  The unredacted of

18   this one is 936-15, I think that may -- I'm not sure that's

19   going to show up as just a blank because we've only

20   submitted for purposes of the courts.

21             THE COURT:  Right, but didn't when you file your

22   actual objection?

23             MR. ADAMS:  We did, Your Honor, and I'm going to

24   have to find the document on that.

25             THE COURT:  I think it's 936-1, let me just be

1  sure.  And that's unredacted I think.

2        MR. ADAMS:  I believe you're correct, Your Honor.

3  Thank you.

4        THE COURT:  Yeah, I just didn't have the

5  (indiscernible) right.  Okay.

6        MR. ADAMS:  No, I appreciate it.

7        THE COURT:  All right.  Ms. Gonzalez, I don't see

8  her on the screen.  Can you turn your camera on please, Ms.

9  Gonzalez?  Well, let me see if we have her on the phone.

10  Ms. Gonzalez, if you could press five star one time on your

11  phone, please.  Ms. Gonzalez, good afternoon.  Do we have

12  you in Chicago?

13        MR. GONZALEZ:  Yes, hi.  (indiscernible)

14        THE COURT:  Katherine, did you want to connect up

15  your camera or are you going to try and testify just by

16  phone?

17        MS. ANDERSON SANCHEZ:  Right now I'm getting an

18  error that my camera is not connected on the -- won't

19  connect (indiscernible).

20        THE COURT:  We can either take a minute and get

21  that fixed or we can proceed without looking at you, I'll

22  leave that up to Mr. Adams to see how he wants to do that.

23        MR. ADAMS:  Your Honor, I have no issues with Ms.

24  Gonzalez not being on camera although I'm sure if

25  (indiscernible) she here today (indiscernible) process of

1   (indiscernible) as long as no other parties have an

2   objection I think we can both proceed with the call.

3   MR. GENENDER:  Your Honor, it's Paul Genender.  We don't

4   have an objection to that, and Katie -- well, Your Honor, I

5   don't have any questions for her.

6        THE COURT:  Okay.  Did you have any supplemental

7   questions, Mr. Adams?

8        MR. ADAMS:  I did not, Your Honor.

9        THE COURT:  Then let me just take a moment and

10  read the substantive part of this for a moment.  Just to be

11  sure I'm reading this right, Ms. Gonzalez, I would add

12  Exhibit 1, negative balance of -- or negative burn of 29

13  million to the forecast burn of 97 million and get 123 -- or

14  I'm sorry, 126 million of burn from June 28th through 12/31.

15  I just want to be sure I'm reading it right.  Is that

16  correct?  Or through 12/20, excuse me.

17       MR. GONZALEZ:   So there's a total burn, so the

18  (indiscernible phrase) any cash for (indiscernible) the week

19  ending September 27th, which is the 38.6 million reference

20  on page four.

21       THE COURT:  I'm looking at Exhibits 1 and 2 and

22  trying to figure out the total cash burn from June 28th

23  through December 20th.  And would that be the sum of 97

24  million and 29 million?

25       MR. GONZALEZ:   That's that (indiscernible) but

1    also it would be cash burn for that period in totality,

2    correct.

3            THE COURT:  I missed the last couple words.  You

4    said it'd be the cash burn for that period and then I didn't

5    hear what you said.

6            MR. GONZALEZ:   Yeah, if you added together the

7    29.3 (indiscernible) plus the 97.6 time for the two, that

8    would be the total cash burn.  For June, the weekend of June

9    28th through December 20th.

10           THE COURT:  Okay, thank you.  All right, any

11   further evidence on -- Mr. Adams?

12           MR. ADAMS:   No, Your Honor.

13           THE COURT:  Any other party have any evidence?

14   All right.  Having heard the evidence, is there now

15   opposition to approval of the DIP, and if so can I get

16   closing arguments as to why we should not approve the DIP?

17           MR. ADAMS:  Yes, Your Honor.  Again, Jason Adams.

18   (indiscernible) Your Honor, what we (indiscernible) is to

19   say is that we are not opposing the debt.  As we have said

20   since the outset and our permission through the outset,

21   financing is critical in this case given the situation at

22   hand.  And the issue we have today is not (indiscernible)

23   with the handful of protections that are provided, we will

24   get financing to sell.

25                We do believe in the facts of the circumstances of

1    this case, one, standing back ability (indiscernible) in

2    order to preserve some very important estate rights, Your

3    Honor.  The debt had entered chapter and what we believe is

4    meeting a value that otherwise wouldn't have been available

5    to satisfy unsecured creditor claims in this case.

6            We heard the testimony today that there is

7    emphatically a group and a bucket of uncovered assets.  And

8    there's no value at this point.  But we do know, Your Honor,

9    that we have a plan that at this point provides no value for

10   us as their creditors.

11           We also know, Your Honor, that the debtors entered

12   Chapter 11 with a significant amount of cash, roughly $90

13   million, which the debtors themselves asserted the

14   (indiscernible) were subject to potential challenge.  And we

15   believe that those challenges are legitimate.

16           And so the situation that we find ourselves in,

17   Your Honor, is one where the debtors have been utilizing

18   that potentially unencumbered cash now for nearly three

19   months.  Without the parties (indiscernible) financing.  The

20   members are now seeking means in substantially all the asset

21   of the debtors including the previously unencumbered value -

22   - the previously unencumbered assets which would include any

23   unencumbered cash that was left over as of today.

24           At the same time we're seeking to get the value of

25   those assets under their liens.  We're also asking Your

1    Honor to approve waivers of explicit provisions of the

2    bankruptcy code there to protect these (indiscernible)

3    protects the creditors, including the 506(c) waiver, Your

4    Honor, and the 552(b) (indiscernible) of the case exception.

5         And we believe, Your Honor, given the facts and

6    circumstances of this case, given the existence of the

7    unencumbered asset as of (indiscernible), given the

8    substantial use of cash to fund operations which have

9    undoubtedly benefited all stakeholders including the

10   lenders, that the call back of those protections under the

11   proposed DIP order is appropriate.

12        We're not asking, Your Honor, for you to surcharge

13   collateral today.  All we are asking is to preserve that

14   right, at least, Your Honor, from (indiscernible) the

15   condition date through the date when the debtors actually

16   accessed the debt (indiscernible).

17        We think that that properly preserves the estate's

18   rights and the rights of the unsecured creditors.  Your

19   Honor, that is the core of the objection, this was the

20   primary issue.  We (indiscernible) that there were a number

21   of more minor issues that we raised in our objection, some

22   of which have been resolved through modifications of the DIP

23   order and we appreciate both the debtors and the lenders

24   trying to bridge the gap and your help with those issues.

25        Your Honor raised one of our issues that we raised

1    in our DIP objection at the outset and that has been

2    resolved as well.  The only other issues that we would

3    raise, Your Honor, that require (indiscernible) we did raise

4    a number of adequate protection issues and concerns.  Those

5    were improving a discretionary fee to protect

6    (indiscernible) lenders' financial advisor, the revised DIP

7    order now makes that subject to Your Honor's signed

8    approval.

9            We can actually get confirmation of the plans so

10   we appreciated that change.  The DIP order's also been

11   revised to provide for the right to seek recharacterization

12   of the (indiscernible), the lenders and the terms of the

13   under secured so we appreciate those concerns.

14           We would additionally raise two additional

15   concerns that were in our objection that I believe remain

16   live, Your Honor.  One, the correct -- the credited rights

17   in paragraph 30 of the DIP order, which references section

18   363K, does not necessarily make it subject to 363K, and we

19   would oppose, Your Honor, that because the rights of the

20   lenders shouldn't be as provided in section 363K, and

21   (indiscernible) to a credit situation in this case which I'm

22   not sure we're going to, we (indiscernible) that that moves

23   at that (indiscernible).

24           And lastly, Your Honor, paragraph 21 of the DIP

25   order and remediation of the (indiscernible) of the cash,

1   Your Honor, it is a multi-page provision due to

2   (indiscernible) that can and can't be done with the cash,

3   specifically with what the committee can do.

4        So we would ask for that, and we submitted in the

5   (indiscernible) fact, Your Honor.  We understand the

6   lenders' desire not to have us use cash to sue them and we

7   get that, we're not going to do that.  The committee would

8   rather use that cash as a backup.

9        Your Honor, the committee has to have the right

10  obviously to appeal in this case the (indiscernible)

11  provisions adverse to the lenders, and that provision is

12  extremely broad and prevents potentially the lenders from

13  doing so.  Your Honor, that includes credit cards --

14        THE COURT:  Show me how it prevents you from doing

15  that.  That -- let me open it up so that I can see that

16  paragraph.

17        MR. ADAMS:  Absolutely, Your Honor.

18        THE COURT:  Should open in a minute.

19        MR. ADAMS:  Your Honor, I would look at paragraph

20  of subsection A, which I (indiscernible) the treatment of

21  that, Your Honor.  The investigation -- that you investigate

22  (indiscernible) provided hearing initiate, prosecute,

23  (indiscernible) during (indiscernible) initiation or

24  (indiscernible) reach an end point (indiscernible) actions,

25  suit, arbitration, proceeding, application, motion,

1    objection, prevents or any other litigation of any type.

2    Your Honor, that conceivably includes any action to

3    (indiscernible) this case.

4         THE COURT:  I don't see this as prohibiting you

5    from doing it, and that's my concern.  It prohibits the

6    debtors from using cash to pay you with, but it doesn't

7    prohibit you from taking any action, I think, and those are

8    -- it -- maybe that's equally distasteful but I do think

9    they're different and I'm trying to see if there's actually

10   a prohibition against you doing it or if you're going to get

11   an admin claim and take the risk of confirmation if you do

12   it.

13        MR. ADAMS:  It's a fair point, Your Honor, that it

14   is an absolute (indiscernible).  But certainly if we don't

15   have access to funding to do it certainly (indiscernible)

16   maybe (indiscernible) cases we'd be prepared to do pending

17   what (indiscernible) committee, includes any potential

18   action in this case, very significant limitation on the tax

19   attorney committee.

20        THE COURT:  All right.  I've got a couple other

21   people that -- I'm sorry, I didn't mean to interrupt.  Are

22   you done and now you want me to move somewhere else or do

23   you have more that you want to say?

24        MR. ADAMS:  No, Your Honor, that concludes my

25   statements.

```
 1            THE COURT:  All right.  I've got a couple other

 2    people that wish to speak.  Ms. Roglen?

 3            MS. ROGLEN:  Thank you, Your Honor.  Laurel Roglen

 4    of Ballard Spahr on behalf of (indiscernible) of the

 5    debtors' landlord.  I have (indiscernible) and on DIP

 6    objection, which was filed at docket number 930, and would

 7    represent a total of 35 of the debtors' locations.

 8            With respect to the debtor submission, we have

 9    unresolved concerns with respect to the sufficiency of the

10    budget and its ability to provide the necessary, adequate

11    protection to landlords with respect to the debtors'

12    (indiscernible) rent obligation, sub-rent, and even

13    (indiscernible) in these cases.

14            What (indiscernible) seek immediate approval of

15    the waiver of the debtors' ability to surcharge.  The other

16    -- beyond what's required by the debtors' (indiscernible)

17    fail to address these concerns.  Simply stating that the

18    evidence will show the debtors have sufficient liquidity to

19    cover their operating and (indiscernible) expense and other

20    (indiscernible) ability, that (indiscernible) the debtors

21    have failed to do so.

22            The revised order that was signed shortly before

23    the hearing does not appear to include an updated DIP

24    budget, so while we were initially looking at the DIP budget

25    filed with the motion, (indiscernible) Exhibit 10 which
```

1  we've been moving today provides a recurrent (indiscernible)

2  cash (indiscernible) with updated lower rent numbers.

3        Now the landlord can only review this budget and

4  cash flow through the lens of everything that has transpired

5  to date in these cases, beginning with an emergency night

6  before a motion on (indiscernible) resulting in an interim

7  rent deferral order, and later a final rent deferral order

8  which order was followed mere hours later by a motion to

9  abate rent at 141 locations across (indiscernible)

10  jurisdiction.

11        This resulted in the standstill and partial

12  payment settlement for the majority of landlords while the

13  debtor continued to leverage nonpayment and the

14  renegotiation.  Then the debtor filed an aversion to motion

15  for a funding order, which I believe discussed

16  (indiscernible) payment outside of this jurisdiction would

17  require all landlords to file claims for (indiscernible)

18  rejected.

19        As the debtor (indiscernible) that needed its

20  relief, the Court fashioned a process that required all

21  landlord pre petition claims to be filed by October 1st

22  otherwise they can't (indiscernible) in these cases.  Now

23  we've already addressed several deficiencies in the debtors

24  proposed (indiscernible) process in connection with the DIP

25  procedure.

```
 1              That doesn't change the fact that the debtors did
 2      file an emergency (indiscernible) motion which
 3      (indiscernible) only provided for the marketing and auction
 4      phase of the plan after the investment process.
 5      Unilaterally set another deadline, a (indiscernible)
 6      objection deadline from them for October 12th, only 11 days
 7      after the bar date, and might be more than two months before
 8      any possible confirmation of a transaction in connection
 9      with the plan.
10              And of course that is if (indiscernible) is even
11      included on the supported (indiscernible) at all.  So that
12      the debtors, without approval of this court, simply omitted
13      any recourse for which they believe (indiscernible).  Which
14      now will hopefully be corrected in a subsequent, court
15      approved process.
16              But taken together, these actions show a
17      consistent and intentional strategy to delay, defer, and
18      deny landlords the payment of the rent obligation.  This
19      leaves the landlord rightfully skeptical of the sufficiency
20      of the amounts included in the rent line of the
21      (indiscernible) budget.
22              This is especially critical because if there is
23      any (indiscernible) termination of that after we get them
24      fully funded, which could get (indiscernible) this week, all
25      free cash the debtors may have had, which was approximately
```

1    $90 million, (indiscernible) out of these cases, will be
2    gone and everything belongs to the lenders.
3            This would leave the debtor with no ability to pay
4    the rent obligation, and under this order, the lender would
5    have already received the benefit of a 506(c) waiver where
6    the lenders' collateral could not be surcharged to pay the
7    (indiscernible) of these cases.
8            I think it's fair, because right (indiscernible)
9    Mr. Coben (indiscernible) says it's unclear as to where in
10   the budget June 7th would be found and in what amount it is
11   budgeted, so there's been no showing as to the sufficiency
12   of the budget paying sub rents for all landlords.
13           Here, the debtors are required by the terms of
14   this DIP to essentially (indiscernible) their cash on hand
15   before being able to realize the DIP draw.  It is abundantly
16   clear that if the sub rent is not in the budget it cannot
17   and will not be paid.
18           Mr. Coben did testify as to the sufficiency of the
19   budget to pay the partial October rent, November rent in
20   full, and all rent deferred from (indiscernible) standstill
21   from July, August, September, and October rent, in that
22   November cash out payment.
23           And the landlords are certainly happy here that
24   the debtors (indiscernible) fund will be sufficient to pay
25   our history of rent claims and alter (indiscernible) paid in

1    full.  But as the Court noted earlier in this hearing,

2    during this time unexpected things are happening.  We are

3    already here on October 8th, and the debtors propose to make

4    the substantial administrative catch-up rent payment for the

5    week ending November 8th, just one month away.

6            Until that time and that payment is made, the

7    landlords take a substantial risk and burden of any

8    administrative solvency in these cases.  Given we are only

9    talking about one month until that (indiscernible) catch-up

10   payment, the landlords assert that it would be most prudent

11   to simply delay the grant of the 506(c) surcharge and

12   preserve that potential avenue of recourse for the debtors

13   and this Court until after that catch-up payment is made and

14   the landlords can be current for the (indiscernible)

15   administrative rent.

16           If that waiver brings it today, there is no

17   recourse, and a critical potential remedy is taken out of

18   (indiscernible) payment.  A 506(c) waiver today leaves

19   little adequate protection as to that significant

20   administrative obligation coming due the third week of

21   November, and no adequate protection whatsoever for the

22   payment of (indiscernible).

23           For these reasons, we respectfully request that

24   the Court delay the approval of the 506(c) waiver for the

25   benefit of the lenders until such adequate protection can be

1    provided or the November payment is made, and the debtor can

2    provide for the administrative solvency of these cases.

3    Thank you, Your Honor.

4          THE COURT:  Thank you.  Mr. Warren.

5          MR WARREN:  Good afternoon, Your Honor.  Matt

6    Warren of King and Spalding on behalf of the ad hoc debt

7    holders.  We filed an objection to docket number 948, Your

8    Honor.  Your Honor, I'll just press on one point, I won't

9    make all the arguments (indiscernible) made very well.

10          But (indiscernible) condition of being this case,

11    and we do have a serious concern only about the 506(c)

12    waiver that (indiscernible) with the DIP.  And while we

13    recognize the 506(c), 502(d) waivers are a common thing for

14    DIP financial orders, this is a rather unique circumstance

15    where you (indiscernible) a group that paid that filed with

16    significantly potential unencumbered cash.

17          During those (indiscernible) the term lenders have

18    decided that you are (indiscernible) reserve right of $875

19    million and in fact they filed plans along those lines which

20    includes a death trap that provides (indiscernible) for the

21    noteholders to have a strike right, many, many hundreds of

22    millions of dollars above (indiscernible) recovery on all

23    (indiscernible) debt and all the money debt.

24          But I think the desire of the (indiscernible) is

25    very clear, but per the DIP order (indiscernible) now in the

1  case that they've burned all the unencumbered cash or they

2  will before they fund the DIP, now there's a plan to

3  (indiscernible) get to the plan that they propose.

4          And I think there's (indiscernible) which is

5  correct, that the 506(c) waiver (indiscernible) right away

6  which should be preserved to prevent those negotiations that

7  (indiscernible) hearing (indiscernible).  And with

8  (indiscernible) revolution for the plan, or that -- or be

9  addressed (indiscernible) at that time.

10          But I don't think it's appropriate in this order,

11  Your Honor, given the very unique circumstances of this

12  case, the (indiscernible) away that this stage can certainly

13  fund the DIP to effectually convert the ownership to

14  (indiscernible) and relieve the (indiscernible) plan.

15          THE COURT:  Thank you.  Any other party oppose

16  approval of the DIP?  All right, let me hear a response.

17  Cooley: Your Honor?

18          THE COURT:  Yes, Mr. Cooley?  Mr. Cooley I think

19  you turned your own phone off right after you started.  No?

20          MR. GOLD:  This is Mr. Gold, Your Honor,

21  (indiscernible).

22          THE COURT:  Oh I'm sorry, that was Mr. Gold.  I

23  thought it was Mr. Cooley.  Go ahead, Mr. Gold, and then

24  we'll turn on -- I'll turn on Mr. Cooley's line in the mean

25  time.  Go ahead, Mr. Gold.

1          MR. GOLD:  Mr. Cooley is indeed my local counsel,

2     Your Honor, so perhaps it's (indiscernible).  I'd like to

3     start by joining the (indiscernible) comments.  I believe

4     (indiscernible) say that the landlord can take opposition.

5     But I'd like to return to Your Honor's own comments to start

6     the hearing.

7          What happens when there's a termination of debt?

8     You referred to the great uncertainty in this case of the

9     need where, should something unexpected happen, your hands

10    should not be tied on the (indiscernible) remedies.

11         What we're asking in terms of what you might call

12    a (indiscernible) or a temporary restriction of the

13    506(c)/552 waivers that are contained in paragraphs 27 and

14    28 of the proposed order is exactly what Your Honor

15    (indiscernible).

16         This case in unquestionably a (indiscernible)

17    benefit of the six (indiscernible) lenders that wasn't

18    (indiscernible) before, certainly as the (indiscernible)

19    pointed out, the (indiscernible) and profusion with the debt

20    for equity plan makes it crystal clear.

21         You would not be the first judge to carve out

22    adequate protection for landlords under the guise of pay the

23    (indiscernible) or pay to play.  We cited for example the

24    Sports Authority case on -- four years ago, very small debt,

25    did exactly the same thing.

1          Obviously different circumstances, but here

2     they're actually looking at more uncertainty than she was in

3     2015.  It's important that you retain the possibility to

4     stay nimble for whatever circumstances may be confronted,

5     forcing the landlords that had a rate to have close to

6     efficient rent paid and to carry that into November, to put

7     that at risk should there be an unexpected termination then

8     after all the unencumbered cash has been spent, basically

9     would be to give the lender a get out of jail free card.

10         And we believe that that's certainly inappropriate

11    and sheds too much risk of administrative insolvency into a

12    subgroup of administrative creditors.  So we would join in

13    those comments.  We would absolutely condition the

14    506(c)/552 waivers on the catch-up payment that is scheduled

15    for mid November and that better balances with respect to

16    interests and risks with the various stakeholders

17    (indiscernible).  Thank you, Your Honor.

18         THE COURT:  Thank you.  Any other parties opposed?

19         CLERK:  Your Honor, Mr. Cooley from Reed Smith.

20    COOLEY: Thank you, Your Honor, just briefly again, Michael

21    Cooley on behalf of National Retail Properties LP and

22    (indiscernible) of the landlords.  I join in the comments of

23    my colleagues Ms. Roglen and Mr. Gold and their comments

24    make my comments a residual argument, briefer.

25         As Mr. Gold said today the announcement on the

1    (indiscernible) for an extension of the DIP procedures

2    really does bring the landlords' concerns right into the

3    forefront in making this case a unique situation where it is

4    appropriate for the Court to depart from what is commonly

5    seen as preliminary course these days regarding the 506(c)

6    waiver.

7           It's more unusual to see a case run for the

8    benefit of a lender, but it is ultimately not appropriate

9    for the landlords to be compelled to boost the value they

10   ultimately accrue to them or to bear the risk of debtor

11   loss, might be a (indiscernible) to that value or that

12   upside by allowing even for the possibility that the estate

13   might find itself at some point unable to satisfy

14   (indiscernible) rent obligations.

15          I would agree with the strategy the debtors have

16   taken on the issue of resource, how prosecuting

17   (indiscernible) objections as the Court is aware, but we all

18   (indiscernible).  But the debtor cannot simultaneously

19   (indiscernible) the rents that they have to defer and delay

20   the payment post petition rent notwithstanding 365D3 while

21   on the other hand given that the right to surcharge

22   (indiscernible) lender should the DIL eventually come

23   (indiscernible) into the case without enough money left in

24   their wallet to cover the tab.

25          In the end, if the Court ultimately requires the

1   payment of all accrued post petition rent, whether it's

2   under 365d3 or a plain confirmation, there is no

3   (indiscernible) in this case where an 11th hour revelation

4   would surprise, that the cash no longer exists.  And so for

5   these reasons, Your Honor, I join in the objections made and

6   ask the Court to approve the debt condition and the

7   (indiscernible) sustaining those objections objections.

8   Thank you.

9           THE COURT:  Thank you.  Any other opponents?  All

10  right.   Let me see, I have one more person that has pressed

11  five star.  No, that was Mr. Gold I think and I've already

12  got him.  From 302-740-2009, who do we have on the line?

13  MENDEL: Your Honor, thank you, this is Jake Mendel of Reed

14  Smith on behalf of (indiscernible) Trust and (indiscernible)

15  the (indiscernible) trustee for the (indiscernible).  May I

16  (indiscernible) briefly?

17          THE COURT:  Yes, sir.

18  MENDEL: Your Honor, we -- not much to say other than we

19  concur with the committee and the ad hoc group and we join

20  in filing our own objection in the objection of the DIP

21  motion and we just wanted -- so we don't agree that the

22  (indiscernible) assets, which is the sole -- probably the

23  sole (indiscernible) property available for distribution

24  (indiscernible) should be encumbered.

25          We also think that the 506 waiver and

1   (indiscernible) given that -- (indiscernible) didn't know

2   that (indiscernible) due to (indiscernible) often happens

3   (indiscernible), that's all we have.  We (indiscernible)

4   again in this argument.  Thank you.

5          THE COURT:  Thank you.  Any other opponents?  All

6   right.  Probably makes the most sense to go to Mr. Rubin but

7   if the debtor wants to address issues first that's fine.

8   Mr. Rubin, why don't you - - I'm sorry, go ahead.  Mr.

9   Carlson, go ahead.

10  CARLSON: So Your Honor, the objections really come down to

11  objection to specific terms, they want me to cut a deal

12  negotiated heavily by the debtors.  We (indiscernible) and

13  Mr. Walters helped the (indiscernible) process, reached out

14  to several different parties including the committee and the

15  (indiscernible) crew and ultimately negotiated a deal that

16  included these protections here, subject to (indiscernible)

17  surcharge.

18          And you know, I've seen (indiscernible) --

19  negotiations were done in the package and the 506(c)

20  surcharge (indiscernible) other protections were provided in

21  exchange for the DIP lenders offering to provide the $200

22  million in financing and the use of (indiscernible) cash in

23  these cases.

24          And so you know, given that background and sort of

25  what the debtors -- the debtors are seeking approval that

1    (indiscernible) we thought it was a fair deal and we fought

2    hard for it, and to the (indiscernible) request of the Court

3    for that and an order within (indiscernible).

4              THE COURT:  Mr. Carlson, if we were to order the

5    debtors to establish a $13 million catch-up reserve next

6    week, is that consistent with what your rights are under the

7    DIP order?

8    CARLSON: If we are permitted to do a $13 million reserve for

9    catch-up payments?

10             THE COURT:  Right, if I ordered it -- when this

11   money gets funded, that you take 13 million and you put it

12   into a reserve next week so that you then have it for the

13   November rent catch-up payment, does that in any way violate

14   any of your obligations under this DIP order?

15   CARLSON: It may violate -- well, taking a look at it, it may

16   violate communications on (indiscernible) that, in paragraph

17   21 that provide limitations on use of (indiscernible).  It

18   would not be necessarily consistent with our budget in that

19   paragraph.  But I think that is (indiscernible) the DIP

20   order probably would not allow for that.

21             THE COURT:  So Mr. Rubin, let me ask you a couple

22   questions.  I'm not sure that it would violate the terms but

23   I'm not sure it wouldn't if I were to order that the debtors

24   go ahead and establish a $13 million reserve for those

25   catch-up payments.  That would eliminate a lot of the

1    landlords' concerns over giving the 506(c) waiver up front.

2    Which is something that they're raising pretty hard.  And I

3    don't know that it hurts your clients at all to do that.

4              And then the second question that I have for you

5    about a change in the order -- and I am worried despite the

6    fact that I said to Mr. Adams that doesn't prohibit you from

7    doing things, it just prohibits you from getting paid for

8    it.  It would seem to me that the committee has to get

9    funded by the debtors, and that if they're doing their job

10   that doesn't include a challenge to your lien position or a

11   suit against you all up until the point of default.

12             That that language can largely be eliminated just

13   by adding language at the beginning of it that says prior to

14   the event of a default they can be -- or after an event of

15   default they can't be paid for these things and they can

16   never be paid for suing you.  I don't see much injury to

17   your client because we all know that the professional fees

18   have to get paid in the case.

19             And it is a bit distasteful to do it -- I don't

20   know that it's wrong, I don't know that I shouldn't approve

21   it and I'm not -- trying not to dictate to you, but just

22   kind of raising those two questions for you as maybe

23   reasonable actions to take at this point.  What's your

24   reaction?

25             MR. RUBIN:  Sure, Your Honor.  Jason Rubin from

1    Akin Gump.  I'm on behalf of the DIP lenders.  I will take

2    your questions in order.  First question, Your Honor, is if

3    the Court were to request or order that the debtors need to

4    provide a $13 million reserve for rent in order for the DIP

5    lenders to be given the 506(c) waiver, I do believe that is

6    something we could agree to.

7            We do believe that testimony that was presented to

8    the Court today clearly demonstrated by the $200 million,

9    should be more than sufficient to pay operating expenses

10   while (indiscernible) expense claims and all (indiscernible)

11   landlord claim and all the (indiscernible) fees throughout

12   the case.  But if Your Honor confirmed and would like to see

13   a reserve established in order to grant the 506(c) waiver, I

14   believe that is something we would be okay with.

15           Your second one Your Honor, there is no intention

16   of the DIP lenders or the pre petition secure parties to

17   restrict the ability of the committee to do what committees

18   need to do to represent their constituents.  As Your Honor

19   noted, there are certainly a lot of words on that page but

20   the limitation that -- as you summarized it is probably

21   accurate, as you said (indiscernible) our clients in a

22   general sense.

23           We added language at the committee's request to

24   the DIP order in paragraph 21, we did -- that may clear that

25   -- per their prosecution and preparation of their objections

1   to the DIP motion were not intended to be covered by the

2   restriction on investigation matters.  That's here in the

3   red line in paragraph 21.

4          Similarly, Your Honor, you know, prosecution

5   (indiscernible) objection, again, we would not expect the

6   (indiscernible) subject to the committee investigation but

7   if that's set forth in paragraph 21, so potentially Your

8   Honor, you know, we could work on the language.  That was

9   not the intention and I can represent that.

10          And then lastly, myriad language at the end of

11   paragraph 21 that does make (indiscernible) that in the

12   extent there are expenses incurred that (indiscernible)

13   challenge (indiscernible), this is not prejudicing the right

14   of the committee to have those expenses paid under our

15   (indiscernible) bankruptcy code.

16          THE COURT:  Yeah, I just -- and I appreciate that

17   language.  I want to be sure that there isn't -- and I'm not

18   suggesting your clients were doing this.  I want Mr. Adams

19   not to feel that level of leverage on your clients' part.

20   And I appreciate the fact that your client would be willing

21   to make those two changes.

22          I think that the evidence is pretty overwhelming

23   that this DIP ought to be approved.  And although I have

24   additional objections to those that have been resolved by

25   agreement I think, by three principle agreements, I find

1   that this DIP is necessary and in the best interest of the

2   estate.

3            The fact that the DIP wasn't taken down in the

4   beginning and that the debtors have used their money to

5   operate with seems entirely appropriate to me.  The fact is

6   that on the 13 week budget which no one contests, next week

7   the debtor will drop below its $25 million optimum cash

8   reserves if the DIP isn't funded immediately.  And we will

9   jeopardize this business and jeopardize the jobs and

10  jeopardize any more point of recovery for the various

11  creditors in the case.

12           The lenders can't be charged for the

13  administrative expenses in the case.  They can't be charged

14  for the losses of the debtor that are the routine losses

15  that aren't directly related to their collateral.  And the

16  fact is, this estate's going to lose in cash flow over $100

17  million during the course of this bankruptcy case.

18           Are we funding too large of a DIP?  No way.  We

19  are in wholly uncharted territory for the United States and

20  maybe for the world in terms of what's going on.  We know

21  the money is needed next week in some amount, and the fact

22  that the forecasts don't show that all $200 million will be

23  used doesn't mean that this debtor from a stability point of

24  view doesn't need additional money.  It needs pretty much as

25  much as it can get in order to assure its stability and

1    ability to emerge as a going concern business.

2              I find that the DIP should be approved and it

3    should be approved in full with the three changes that we

4    have talked about.  So just to run through those and then

5    we'll get an order uploaded that does that, number one is

6    there will be a remedies provision added.  Number two is

7    that there will be, out of the first $100 million of

8    funding, $13 million set aside out of which the debtors may

9    pay all of their catch-up payments in order to bring the

10   landlords current.

11             That does not excuse the debtors from any

12   additional obligation to bring them current.  It doesn't set

13   an amount -- if that turns out to be in excess of what is

14   needed, the debtors can then put it into their regular bank

15   account.  But that reserve will be inviolate until those

16   amounts are paid.

17             And then the third change is I just want cleaner

18   language to be sure that the UCC can do its job without fear

19   of leverage.  And I think those have all been agreed to by

20   the lenders.  I should say for the record that I think my

21   role is either to approve or not approve the DIP.  I can't

22   approve it and impose additional conditions.  And so these

23   three conditions that I am now requiring are done because

24   the lender has agreed to it.

25             As to whether I would have approved this without

1    the lenders' agreement to those things is a different

2    question.  But my choice is either approve or don't approve,

3    it isn't approve and then print something on it because the

4    lenders have volunteered in terms of advancing additional

5    money.

6            They've done this voluntarily at this -- as

7    voluntarily as they can be when asked a question like I

8    asked.  They've still done it voluntarily and solved the

9    problems. So I'm going to approve it.  Mr. Carlson, can you

10   -- I think this needs to be done tomorrow.  Can you work on

11   this -- I hate to do this to you overnight during the storm

12   if it comes in, and get an order uploaded tomorrow that I'll

13   be able to sign tomorrow?

14           MR. CARLSON:  Not a problem (indiscernible).

15           THE COURT:  All right.  I want the landlords to

16   tell me -- one landlord lawyer that Mr. Carlson can consult

17   with.  I want Mr. Adams signing off with it and then one of

18   the landlord lawyers.  Can you all designate one person that

19   can consult with the rest of you all so that Mr. Carlson's

20   not having to deal with six people all with identical

21   interests?

22           THE COURT:  Let's volunteer Ms. Roglen, Your

23   Honor.

24           MR. RUBIN: That's fine with me, Your Honor.

25           THE COURT:  Ms. Roglen?

1            MS. ROGLEN: That's fine for me as well, thanks.

2            THE COURT:  Yeah, I'll have them confer with you.

3    I do think this resolves your objection as I understand it

4    as well, and I hope that -- it's not what you asked for but

5    I think it's actually better than what you asked for.  So.

6    Hopefully you all can agree.

7            MS. ROGLEN:  I think it's a very (indiscernible)

8    Your Honor.

9            MR. ADAMS:  Yes, Your Honor, thank you.

10           THE COURT:  All right.  Is there anything else

11   that we need to get done tonight?  Okay, thank you.  I know

12   it's been a long day for you all and I know I started a

13   little bit late just from other hearings, so.  I appreciate

14   your courtesies towards me.  We will go ahead and adjourn

15   for the night.  I'll get an order in tomorrow.

16   CARLSON: Thank you, Your Honor.

17           THE COURT:  Mr. Carlson, if you will contact Ms.

18   Stowe the minute that gets filed, I'll need to get that done

19   tomorrow and I want to do it right away on an emergency

20   basis.

21           CARLSON: We'll do that, thanks, Your Honor.

22           THE COURT:  Thank you all.  Good night, everyone.

23           MR. RUBIN:  Thank you, Your Honor.

24

25       (Proceedings adjourned at 6:02 p.m.)

```
1                           CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 16, 2020
```