**IN THE UNITED STATED BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
12/14/2020

| | | |
|---|---|---|
| **IN RE:** | § | |
| **CEC ENTERTAINMENT, INC.,** *et al* | § | **CASE NO: 20-33163** |
| | § | |
| **PETER PIPER TEXAS, LLC** | § | **CASE NO: 20-33162** |
| | § | |
| **PETER PIPER, INC.** | § | **CASE NO: 20-33164** |
| | § | |
| **BHC ACQUISITION CORPORATION** | § | **CASE NO: 20-33165** |
| | § | |
| **CEC ENTERTAINMENT CONCEPTS, L.P.** | § | **CASE NO: 20-33166** |
| | § | |
| **CEC ENTERTAINMENT HOLDINGS, LLC** | § | **CASE NO: 20-33167** |
| | § | |
| **CEC ENTERTAINMENT INTERNATIONAL, LLC** | § | **CASE NO: 20-33168** |
| | § | |
| **CEC ENTERTAINMENT LEASING COMPANY** | § | **CASE NO: 20-33169** |
| | § | |
| **CEC LEASEHOLDER, LLC** | § | **CASE NO: 20-33170** |
| | § | |
| **CEC LEASEHOLDER #2, LLC** | § | **CASE NO: 20-33171** |
| | § | |
| **HOSPITALITY DISTRIBUTION INCORPORATED** | § | **CASE NO: 20-33172** |
| | § | |
| **PETER PIPER HOLDINGS, INC.** | § | **CASE NO: 20-33173** |
| | § | |
| **PETER PIPER MEXICO, LLC** | § | **CASE NO: 20-33174** |
| | § | |
| **QUESO HOLDINGS INC.** | § | **CASE NO: 20-33175** |
| | § | |
| **SB HOSPITALITY CORPORATION** | § | **CASE NO: 20-33176** |
| | § | |
| **SPT DISTRIBUTION COMPANY, INC.** | § | **CASE NO: 20-33177** |
| | § | |
| **TEXAS PP BEVERAGE, INC.,** | § | **CASE NO: 20-33178** |
| | § | **Jointly Administered Order** |
| **Debtors.** | § | |
| | § | **CHAPTER 11** |

1 / 29

## MEMORANDUM OPINION

CEC Entertainment, Inc. ("CEC") operates a nationwide chain of Chuck E. Cheese venues. Each Chuck E. Cheese venue aims to be "a place where a kid can be a kid," by offering a mixture of arcade games, entertainment, and dining in a safe sociable environment.  The COVID-19 pandemic has severely impacted CEC's ability to operate its venues.  Operations have been impacted by the need for safety and the requirements of government-imposed pandemic regulations.  After filing for chapter 11, CEC filed a Motion for Order Authorizing Debtors to Abate Rent Payments at Stores Affected by Government Regulations (the "Abatement Motion"). (ECF No. 487).  The Abatement Motion seeks "an order abating rent payments for stores closed or otherwise limited in operations as a result of any governmental order or restriction until such restriction or order has been lifted . . . ." (ECF No. 487 at 2).  Although multiple landlords initially objected to the motion, many have consensually resolved their objections.  This Memorandum Opinion addresses the objections of six lessors of CEC venues located in North Carolina, Washington, and California.  CEC is not entitled to an order involuntarily abating or reducing its rent obligations at those venues.

## BACKGROUND

CEC's chapter 11 case and the Abatement Motion both stem from the COVID-19 global pandemic and government regulations aimed at slowing viral spread.  The global pandemic caused unforeseen and economically devastating effects on businesses across countless sectors of the economy.  Discussing a retail business, Judge Huennekens described the pandemic's effects succinctly:

> No constituency in these cases predicted that the world would effectively grind to a halt.  But, so it did.  In the weeks and months that followed the Petition Date, this country has shuttered under mandatory stay-at-home orders and mandatory closures of 'nonessential' retail businesses, like the Debtors.  As of March 31, 2020,

'[a]t least 33 states, 89 counties, 29 cities, the District of Columbia, and Puerto Rico [had] issued 'stay at home' or 'shelter in place' orders' effectively closing the Debtors' stores.  With their stores shuttered, revenue dried up overnight.

*In re Pier 1 Imports, Inc.*, 615 B.R. 196, 198 (Bankr. E.D. Va. 2020).   While government regulations did not necessarily shutter the CEC venues at issue, state and local regulations curtailed CEC's ability to operate key aspects of its business.

Prior to the pandemic, CEC venues offered a combination of gaming, entertainment, and dining.  CEC venues are primarily geared towards entertaining groups of children.  (*See* ECF No. 821 at 24 ("Birthday parties average about ten kids.")).  James Howell, CEC's Chief Financial Officer, explained that "when you come to Chuck E. Cheese, you're looking for, again, food and fun. You're coming for the games, primarily, and you will eat the food while you are there."  (ECF No. 821 at 20).  Most CEC venues generate about 30% of their revenue from dining and 50% from entertainment.  (ECF No. 821 at 25).  The Court accepts Mr. Howell's testimony that the entertainment and dining aspects of CEC's business are inextricably linked.

When the global pandemic struck, state and local governments responded by enacting regulations aimed to limit social gathering.  Those regulations prohibited the operation of certain types of business and limited the operations of others.  The CEC venues at issue in this opinion are located in North Carolina, Washington, and California.  Each of those states enacted regulations that impact CEC's business in three primary ways.  First, the regulations prohibit the operation of gaming and arcade establishments.  Second, the regulations restrict the capacity of in person dining.  Third, the regulations prohibit large group gatherings.

North Carolina permits restaurants to offer carry out, as well as in person dining at 50% capacity.  (ECF No. 653 at 6).  Mass gatherings, defined as indoor gatherings with more than ten

people, are also prohibited.  (ECF No. 653 at 26).  Entertainment facilities, including arcades and gaming establishments, must remain closed.  (ECF No. 653 at 27-28).

Mr. Howell testified that Washington state currently prohibits arcades as well.  (ECF No. 821 at 15).  Further, he testified that Washington limits in person dining to 60% capacity.  (ECF No. 821 at 15).

During most of this case, the California counties where the venues in question are located allowed indoor dining at 25% of a restaurant's maximum capacity.  (ECF No. 826 at 2).  Recently, even more severe restrictions were imposed across the state.  A regional stay at home order, effective December 7, 2020, now prevents in person dining in southern California.  Arcades remain prohibited.  (ECF No. 826 at 2).  Additionally, Los Angeles County passed an ordinance suspending evictions of lessees of commercial real property during the global pandemic.  However, lessees employing more than 500 employees are excepted from that ordinance.  (ECF No. 682 at 2).  No party disputes that CEC employs more than 500 individuals.  (*See* ECF No. 682 at 2).

CEC's business has faced "devastating financial impacts and continuing uncertainties in light of the COVID-19 global pandemic and resulting [g]overnment [r]egulations."  (ECF No. 826 at 2).  It is uncontested that no party foresaw the risk of a pandemic, and the related shutdown, when it entered into a lease.  (ECF No. 893 at 8).  The government regulations have entirely prevented CEC from operating the arcade portion of its business.  The CEC venues at issue have been limited to offering "take out" food services.

Certain regulations do allow CEC to offer in person dining up to certain capacities.  However, CEC reached a business decision that offering in person dining without arcade games would harm its business.  Mr. Howell stated that "[i]f we branch out at Chuck E. Cheese to eat, and [children] are sitting in the venue with games all around them, and [you] tell [children] they

cannot play the games, we believe that creates a bad experience for the child, a bad experience for either the parents or grandparents who brought that child, and we believe that would have [] long-term damage to our business." (ECF No. 821 at 20). Mr. Howell likened the experience to "taking your kids to the movie theater, buying them a big thing of popcorn, setting them down in the seat and then not show[ing] the movie." (ECF No. 821 at 31).

CEC and its affiliates filed petitions under chapter 11 of the Bankruptcy Code on June 24, 2020. (ECF No. 1). The Abatement Motion, filed on August 3, 2020, sought relief at 141 CEC venues located across twelve states. (ECF No. 487 at 2). Numerous lessors objected to the Abatement Motion; many objections have been consensually resolved; one has been overruled. This opinion resolves objections filed by six affected lessors.

CBL & Associates Management, Inc. ("CBL") filed an objection to the Abatement Motion. (ECF No. 653). CBL is the managing agent for a CEC venue located in Greensboro, North Carolina. CEC has offered carry out dining services at the Greensboro venue since the petition date. (ECF No. 653 at 6).

Hovde Family Investments, LLC also objected to the Abatement Motion. (ECF No. 601). Hovde Family Investments is the lessor of a CEC venue located in Spokane, Washington. (ECF No. 601 at 2). Lynnwood Public Facilities District ("Lynnwood") objected to the Abatement Motion as well. (ECF No. 674). Lynnwood is the lessor of a CEC venue in the Lynnwood Convention Center in Lynnwood, Washington. (ECF No. 674 at 1-2).

Granada Hills Partners, LLC filed its own objection to the Abatement Motion. (ECF No. 682). Granada Hills Partners is the lessor at a CEC venue located in Granada Hills, California. (ECF No. 682 at 2). Granada Hills is situated within Los Angeles County. CEC currently offers carry out dining services at the Granada Hills venue. (ECF No. 682 at 6). Portal Plaza LP objected

as well.  (ECF No. 669).  Portal Plaza is the lessor of a CEC venue located in Cupertino, California.  (ECF No. 902 at 1).  Finally, South Bay SPE, LLC objected.  (ECF No. 679).  South Bay SPE, LLC is the lessor of a CEC venue in National City, California.  (ECF No. 679 at 1).  National City is situated in San Diego County.

The Court held hearings on the Abatement Motion and the objections on September 8, September 11, September 29, 2020, and December 8, 2020, and took the matters under advisement.

## JURISDICTION

The district court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  This case was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a).  "[M]atters concerning the administration of the estate," and "other proceedings affecting the . . . adjustment of the debtor-creditor . . . relationship" are defined as core matters under 28 U.S.C. § 157(b)(2)(A) and § 157(b)(2)(O).

## DISCUSSION

CEC seeks rent abatement or reduction at six Chuck E. Cheese venues across three states.  In support of its position, CEC makes three arguments.  First, CEC argues that sections 365(d)(3) and 105(a) of the Bankruptcy Code give the Court equitable power to alter CEC's rent obligations.  Alternatively, CEC believes that the global pandemic and related government regulations are force majeure events which allow it to delay contractual performance under its leases.  Finally, if neither the Bankruptcy Code nor the force majeure clauses permit rent abatement, CEC argues that the doctrine of frustration of purpose relieves CEC's obligation to timely pay rent.

The Court cannot grant CEC's requested relief.  While the Bankruptcy Code allows the Court to delay performance of CEC's lease obligations, the Code expressly prohibits delays beyond sixty days after the order for relief.  That period has expired.  The Bankruptcy Code does

not provide the Court with authority to alter lease obligations beyond that sixty-day window.   Of course, if abatement was authorized under applicable non-bankruptcy law, the sixty-day limitation would not apply.   However, neither the leases nor state laws allow CEC to abate or reduce its rent obligations at these locations.   The Court will address each lease specifically, but generally each CEC lease prohibits CEC from delaying its rent obligations on account of a force majeure event. Frustration of purpose does not apply because the force majeure clauses supersede application of the doctrine under state law or because the purpose of each lease is not entirely frustrated.

  *a.  Section 365(d)(3)*

  Section 365(d)(3) of the Bankruptcy Code commands that a debtor "timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."  11 U.S.C. § 365(d)(3).  That section goes on to state that "[t]he court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period."  *Id.*

  Under § 365(d)(3) a debtor-lessee of nonresidential real property must timely fulfill its obligations under the lease.  *Id.*; *see In re Circuit City Stores, Inc.*, 447 B.R. 475, 510 (Bankr. E.D. Va. 2009).   When cause is shown, the Court may extend the debtor's time for performance.  11 U.S.C. § 365(d)(3).  However, § 365(d)(3) expressly prohibits the Court from allowing extensions of more than sixty days after the order for relief.  *Id.*

  "The plain language of the statute is clear.   Section 365(d)(3) provides for timely performance of all obligations of the debtor from and after the order for relief."  *In re Appletree Mkts., Inc.*, 139 B.R. 417, 421 (Bankr. S.D. Tex. 1992).   Section 365(d)(3) "was added to the

Bankruptcy Code in order to relieve landlords from the burden of proving that the rent payments they sought to collect from debtors prior to rejection were 'actual and necessary' costs of preserving the bankruptcy estate." *In re Hitz Rest. Grp.*, 616 B.R. 374, 376 (Bankr. N.D. Ill. 2020) (quoting *In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125, 1128 (7th Cir. 1998)). "The legislative history reflects congressional concern that lessors of nonresidential real property had frequently been forced to extend credit to an estate during the time given for assumption or rejection of the lease." *Id.* (citing *In re Telesphere Comm'ns, Inc.*, 148 B.R. 525, 529 (Bankr. N.D. Ill. 1992)).  Other courts have described the legislative history as "display[ing] empathy for the plight of a lessor who, unlike most postpetition creditors is forced to extend credit to the bankruptcy estate for at least a limited period." *In re Brennick*, 178 B.R. 305, 307 (Bankr. D. Mass. 1995).

At least one court holds that § 365(d)(3) does not compel a debtor to timely pay rent in accordance with a lease.  *In re Pier 1*, 615 B.R. at 202.  In *Pier 1*, the Bankruptcy Court for the Eastern District of Virginia stated that, because § 365(d)(3) lacks a remedy to effect payment, "[i]f a debtor fails to perform its obligations . . . all a Lessor has is an administrative expense claim under [§] 365(d)(3), not a claim entitled to superpriority." *Id.* (quoting *In re Circuit City*, 447 B.R. at 511).  Because administrative claims must be paid on the effective date of a plan, "timely" performance under § 365(d)(3) means paying all accrued rent following plan confirmation. *Id.* Although landlords may ask for adequate protection if the value of their interest in real estate decreases, the *Pier 1* court determined that deferring rent did not diminish property value. *Id.* at 203.  The court supported its reading of § 365(d)(3) by noting that "COVID-19 presents a temporary, unforeseen, and unforeseeable glitch in the administration of the Debtors' Bankruptcy Cases." *Id.*

Both the text and the intent of § 365(d)(3) are clear: commercial real property lessees must continue to perform after filing for bankruptcy. Section 365(d)(3) requires that the debtor timely perform its lease obligations. The provision was added to the Bankruptcy Code to prevent commercial lessors from unwillingly extending credit to debtor-lessees during the pendency of a chapter 11 case. The Court disagrees with *Pier 1*, although perhaps on the margins. The command of § 365(d)(3) remains. The remedy for a violation of § 365(d)(3) is beyond the scope of this opinion.

Section 365(d)(3) unambiguously requires that debtors timely perform obligations under commercial leases. The Court cannot override that statutory mandate. *See Law v. Siegel*, 571 U.S. 415, 421 (2014); *In re Mirant Corp.*, 378 F.3d 511, 523 (5th Cir. 2004) ("A court's powers under § 105(a) are not unlimited as that section only 'authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code,' and does not permit those courts to 'act as roving commissions to do equity."). As such, the Bankruptcy Code does not permit this Court to equitably alter CEC's state law rent obligations. The Court's equitable powers will be tested at the remedy stage.

b. *Force Majeure*

The Bankruptcy Code requires CEC to timely perform its lease obligations. If either the leases or state law allow CEC to abate or reduce rent payments, then CEC's obligation to perform under § 365(d)(3) will reflect such abatement or reduction. CEC argues that the force majeure clauses in its leases excuse performance in this case. Because it believes the global pandemic and government regulations are force majeure events, CEC states that its performance obligations are suspended until the regulations are lifted. However, the applicable force majeure clauses do not apply to CEC's monetary obligations.

9 / 29

A force majeure clause is a "contractual clause that excuses performance of contractual obligations—either wholly or for the duration of the force majeure—upon the occurrence of a covered event which is beyond the control of either party to the contract." *In re Flying Cow Ranch HC, LLC*, 2018 WL 7500475, at *2 (Bankr. S.D. Fla. June 22, 2018). "Force majeure is a phrase coined primarily for the convenience of contracting parties wishing to describe the facts that create a contractual impossibility due to an 'Act of God.'" *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 n.5 (5th Cir. 1990) (citing 6 A. Corbin, *Corbin on Contracts,* § 1324 (1962)).

### *North Carolina Lease*

The force majeure clause of CEC's lease with CBL & Associates, for the Chuck E. Cheese venue located in Greensboro, North Carolina, does not allow CEC to withhold or abate rent during a force majeure. The lease states:

> Subject to the casualty and condemnation provisions of this Lease, if either party shall be prevented or delayed from punctually performing any obligations or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, unusual governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, or caused by the other party, then the time to perform such obligation or to satisfy such condition shall be extended on a day-for-day basis for the period of the delay caused by such event. The party claiming the benefit of this Section shall give notice to the other party in writing within ten (10) days of the incident specifying with particularity the nature thereof, the reason therefor, the date and time incurred and the reasonable length said incident will delay the fulfillment of obligation contained herein. ***This Section shall not apply to the inability to pay any sum of money due hereunder or the failure to perform any other obligation due to the lack of money or inability to raise capital or borrow for any purpose***.

(ECF No. 869 at 3 (emphasis added)).

The force majeure clause specifically states that it does not apply to an "inability to pay any sum of money" or a failure to perform caused by a lack of money. *Id.* The final sentence of the force majeure clause precludes CEC's argument that the global pandemic and government

regulations excuse its rent obligation.  Rent is a "sum of money due" under the Greensboro lease. CEC seeks to delay its obligation to pay rent, however, the force majeure clause does not apply to an inability to pay rent.

North Carolina Executive Order No. 141 prohibits gatherings with more than ten people and prohibits the operation of arcades and gaming establishments.  (ECF No. 653 at 6, 26-28). Further, Executive Order No. 141 limits in person dining to 50% capacity.  (ECF No. 653 at 6). Executive Order No. 141 qualifies as an unusual government regulation because it significantly limits CEC's ability to do business in a way that the parties did not foresee.

CEC suggests that the force majeure clause could have been triggered by two events.  First, the global pandemic itself qualifies as an act of God under the lease.  Second, Executive Order No. 141 qualifies as an unusual governmental restriction or regulation.  The Court need not determine whether the pandemic itself or the relevant government regulations are force majeure events because the force majeure clause does not apply to the CEC's obligation to pay rent.

The force majeure clause also does not apply to an inability to pay rent or a failure to perform due to lack of funds.  That provision of the force majeure clause forecloses CEC's argument that the lease allows it to delay rent payments.  The force majeure clause does not excuse nonpayment of rent when CEC lacks funds or is unable to tender sums due under the lease.  That is exactly what CEC attempts to do today.  Executive Order No. 141 prevents CEC from operating its typical business and generating revenue.  Because the regulation limits its revenue, CEC seeks to use the force majeure clause to suspend rent payments.  CEC cannot claim the benefit of the force majeure clause under these circumstances because the clause expressly does not apply to situations where CEC seeks to avoid or delay rent.

*Washington Leases*

CEC also seeks rent abatement at two of its Washington venues, located in Spokane and Lynnwood. The force majeure clauses found in those leases are nearly identical to the Greensboro lease. Washington's pandemic regulations are also nearly identical to those found in North Carolina. For the same reasons as the Greensboro lease, neither force majeure clause authorizes the relief sought.

The force majeure clause of the Spokane lease states:

> Subject to the casualty and condemnation provisions of this Lease, if either party shall be prevented or delayed from punctually performing any obligations or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, unusual governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, or caused by the other party, then the time to perform such obligation or to satisfy such condition shall be extended on a day-for-day basis for the period of the delay caused by such event; provided, however, that the party claiming benefit of this Section shall, as a condition thereto, give notice to the other party in writing within ten (10) days of the incident specifying with particularity the nature thereof, the reason therefor, the date and time incurred and the reasonable length said incident will delay the fulfillment of obligation contained herein. Failure to give such notice within the specified time shall render such delay invalid in extending the time for performing the obligations hereunder. ***This Section shall not apply to the inability to pay any sum of money due hereunder or the failure to perform any other obligation due to the lack of money or inability to raise capital or borrow for any purpose.***

(ECF No. 846 at 3 (emphasis added)). Although worded differently, this force majeure clause mirrors the Greensboro clause. It applies when CEC is prevented or delayed from timely performing an obligation. Both acts of God and unusual governmental regulations are listed as events that may delay or prevent performance. Ten days written notice must be given and the time for performance is suspended for the period of the event. Most importantly, the force majeure clause does not apply when CEC has an inability to pay rent or fails to perform an obligation due

to a lack of funds.  The Spokane force majeure clause is substantively identical to the Greensboro

force majeure clause.

The Lynnwood lease includes a force majeure clause that reads as follows:

> The provisions of this Article 27 shall be applicable if there shall occur, on or after the date hereof, any strikes, lockouts or labor disputes, inability to obtain labor or materials or reasonable substitutes thereof or acts of God, governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, riot or insurrection, fire or other casualty or other events similar or dissimilar to those enumerated in this Article 27 beyond the reasonable control of the party obligated to perform.  If Landlord or Tenant, as a result of any of the abovementioned events, shall fail punctually to perform any term, covenant or condition on its part to be performed under this Lease, then such failure shall be excused and not be a breach of this Lease by the party in question, but only to the extent and for the time occasioned by such event.  ***Notwithstanding anything to the contrary herein contained, however, the provisions of this Article 27 shall not be applicable to Tenant's obligation to pay, when due and payable, the rents, charges or other sums reserved hereunder: and in addition, lack of funds and inability to procure financing shall not be deemed to be an event beyond the reasonable control of Tenant.***  In the event of any unavoidable delay as in this Article provided, and as a condition precedent of Tenant claiming or relying upon such delay, Tenant shall give notice of such unavoidable delay to Landlord within ten days after the occurrence of the same.

(ECF No. 674 at 2-3 (emphasis added)).  The phrasing of the Lynnwood force majeure clause

differs from the Spokane and Greensboro clauses, but the substance is nearly identical.  The lone

substantive difference is that force majeure events are not limited to 'unusual' government

restrictions or regulations.  Instead, any government restriction or regulation preventing or

delaying performance may constitute a force majeure event under the Lynnwood lease.  Most

importantly, the Lynnwood lease specifically states that the force majeure clause does not apply

to rent obligations.

Mr. Howell testified that Washington's pandemic regulations prohibit arcades and limit in

person dining to 60% of an establishment's capacity.  (ECF No. 821 at 15).  With the exception of

a more lenient capacity restriction (60% as opposed to 50%), those regulations limit CEC's

operations to the same extent as Executive Order No. 141 in North Carolina.

The force majeure clauses contained in the Spokane and Lynnwood leases, as well as the government regulations in Washington, are materially identical to the force majeure clause in the Greensboro lease and the North Carolina regulations.  For those reasons, the Court applies the same analysis to the Washington venues as the Greensboro venue.  CEC cannot abate or reduce rent at the Spokane or Lynnwood venues because the force majeure clauses do not apply to CEC's obligation to pay rent. *See Inn at Center, LLC v. City of Seattle*, 2004 WL 418021, at *5-6 (Wash. Ct. App. March 8, 2004) (finding force majeure provision that expressly excluded monetary obligations did not excuse payment obligation to city).

*California Leases*

Three CEC venues in California are also at issue.  The venues are located in Cupertino, Granada Hills, and National City.  At the hearing on September 11, 2020, the Court found that "[t]he force majeure clause in the Cupertino lease plainly does not apply to this situation."  (Tr. at 76:15-17 (Sept. 11, 2020)).  In light of the Court's prior ruling, this section only discusses the Granada Hills and National City leases.

The Granada Hills lease does not contain a typical force majeure clause.  Instead, that lease contains what the parties refer to as an anti-force majeure clause.  The clause reads as follows:

> This Lease and the obligations of either party hereunder shall not be affected or impaired because either party is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reasons of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of either party.

(ECF No. 870 at 2).  Unlike the other leases, the anti-force majeure clause in the Granada Hills lease expressly requires a party to perform all obligations, even in the face of "acts of God, or any other cause beyond the reasonable control of either party." *Id.*  If the global pandemic is an act of God, CEC cannot excuse performance of its rent obligations based on the pandemic's occurrence.

Likewise, if the government regulations in California are a "cause beyond the reasonable control of either party," the anti-force majeure clause prohibits CEC from delaying performance. On the other hand, even if the pandemic or government regulations are not "acts of God, or any other cause beyond the reasonable control of either party," the Granada Hills lease contains no provision otherwise allowing CEC to abate or reduce rent. The Granada Hills lease does not entitle CEC to abate or reduce rent.

Granada Hills Partners, LLC, the lessor of the Granada Hills lease, also argues that applicable government regulations do not grant CEC the relief it seeks. Specifically, Granada Hills Partners cite Los Angeles Emergency Ordinance No. 186585. (ECF No. 682 at 3). That ordinance protects tenants from eviction during the pandemic. Granada Hills Partners correctly points out that Emergency Ordinance No. 186585 does not protect CEC because the Ordinance expressly does not apply to commercial tenants with more than 500 employees. (ECF No. 682 at 3). However, CEC does not seek rent abatement because Emergency Ordinance No. 186585 prohibits eviction, CEC seeks rent abatement based on the government regulations that hinder its ability to operate its business. Much like North Carolina and Washington, those regulations prohibit indoor dining and the operation of arcades. (ECF No. 821 at 14-15). Emergency Ordinance No. 186585 is immaterial to the resolution of the Abatement Motion.

The force majeure provision of the National City lease reads as follows:

> If either party hereto shall be delayed or prevented from the performance of any act required hereunder by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive governmental laws or regulations or other cause without fault and beyond the control of the party obligat [sic] (*financial inability excepted*), performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; *provided, however, nothing in this Article 33 contained shall excuse Tenant from the prompt payment of any rental or other charge required of Tenant hereunder except as may be expressly provided elsewhere in this lease.*

(ECF No. 679 at 23 (emphasis added)).

CEC's argument under the National City lease fails for the same reason as the North Carolina and Washington leases. The provision expressly provides that a force majeure event cannot excuse prompt payment of rental charges. (ECF No. 679 at 23).

   c.  *Frustration of Purpose*

CEC also argues that the frustration of purpose doctrine excuses its obligation to timely pay rent. North Carolina, Washington, and California each recognize frustration of purpose as a defense to contractual performance. *See Brenner v. Little Red Sch. House, Ltd.*, 274 S.E.2d 206, 209 (N.C. 1981) ("Under [the doctrine] performance remains possible, but is excused whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance."); *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 637 P.2d 647, 650 (Wash. 1981) (en banc) ("The doctrine of commercial frustration may be summarized as follows: Where the possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears."); *Lloyd v. Murphy*, 153 P.2d 47, 50 (Cal. 1944) ("[A]n unanticipated circumstance, the risk of which should not be fairly thrown on the promisor, has made performance vitally different from what was reasonably to be expected.").

The doctrine excuses a party's nonperformance when circumstances beyond the parties' control frustrate the purpose of the deal. Generally, the remedy is rescission of the contract. Unlike the force majeure clauses at issue, frustration relates to the purpose of a contract, as opposed to a party's actual inability to perform. Despite that distinction, all three states allow parties to

16 / 29

specifically delegate the risk of frustration. The leases at issue delegate the risk to CEC, preventing application of the frustration doctrine. The purposes of the leases are set out in provisions describing CEC's permitted uses of the premises. The risk that governmental regulations may disrupt CEC's permitted uses is allocated by the force majeure provisions.

The lessors argue that the force majeure and anti-force majeure provisions supplant the frustration of purpose doctrine under applicable state law. CEC argues that the question of whether a force majeure provision precludes a frustration of purpose defense depends on whether the parties specifically contemplated the scenario leading to frustration. (*See* ECF No. 893 at 4). Because the leases did not specifically contemplate a global pandemic, CEC argues that frustration of purpose may apply. (ECF No. 893 at 4 ("The Leases themselves and the evidence developed at the September 8 Hearing and the September 11 Hearing, confirm that the parties did not specifically contemplate and contract for the payment of rent despite the COVID-19 pandemic and Government Regulations.")). In CEC's view, only contractual provisions dealing explicitly with pandemics could preclude frustration defenses.

The Court will discuss frustration of purpose law state by state momentarily, however, at the outset CEC's argument is flawed. The frustration of purpose doctrine and force majeure provisions are legal mechanisms that aim to account for unforeseeable events that impact contractual performance. CEC acknowledges that parties may abrogate the doctrine of frustration of purpose by specifically allocating risk in a contract. However, CEC believes that because the leases do not specifically contemplate a pandemic, the force majeure clauses do not supersede frustration. In CEC's mind, a doctrine whose application is predicated on the occurrence of *unforeseen* events can only be abrogated if the parties foresee and contract around the specific event. That is impossible.

17 / 29

Besides its argument that the leases do not contemplate a pandemic, CEC argues that the global pandemic and related government regulations entirely frustrate the purpose of its leases. CEC claims that the principal purpose of each lease was to operate a family entertainment center. (ECF No. 805 at 7). Each CEC location is designed to offer traditional restaurant services along with gaming and entertainment in "an integrated and experiential" environment. (ECF No. 805 at 7). Without the ability to operate the gaming and entertainment aspects, CEC believes its ability to run its business is fully frustrated. The Court now looks to each state's frustration of purpose law to decide whether the doctrine excuses performance under any lease.

### North Carolina

In North Carolina, "[c]hanged conditions supervening during the term of a contract sometimes operate as a defense excusing further performance on the ground that there was an implied condition in the contract that such a subsequent development should excuse performance or be a defense . . . ." *Faulconer v. Wysong & Miles Co.*, 574 S.E.2d 688, 691 (N.C. Ct. App. 2002). The frustration of purpose doctrine applies when a supervening event causes a failure of consideration or causes "practically total destruction of the expected value of performance." *S. Coll. St., LLC v. Charlotte Sch. Of Law, LLC*, 2018 WL 3830008, at *4 (N.C. Super. Ct. Aug. 10, 2018) (citing *WRI/Raleigh, L.P. v. Shaikh*, 644 S.E.2d 245, 248 (N.C. Ct. App. 2007)); *see also Sechrest v. Forest Furniture Co.*, 141 S.E.2d 292 (N.C. 1965) (finding no frustration of contract to build furniture after promisor's furniture factory burned down). North Carolina courts recognize that the purpose of the doctrine is to give "relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." *Faulconer*, 574 S.E.2d at 691. The doctrine is unavailable when the frustrating event was reasonably foreseeable. *Shaikh*, 644 S.E.2d at 248.

"[I]f the parties have contracted in reference to the allocation of the risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations." *Brenner*, 274 S.E.2d at 209.

In *Charlotte School of Law*, a for-profit law school argued that frustration of purpose excused rent payments under a lease.  2018 WL 3830008, at *1.  Charlotte School of Law ("CSL") leased office space to use as classrooms.  *Id.*  The lease permitted CSL to use the premises for an "[e]ducational institution, as well as for general office space . . . and other legally permitted uses." *Id.* at *2.  Use for purposes other than an educational institution or general office space required the lessor's consent, which the lessor could not unreasonably withhold.  *Id.*

After the University of North Carolina Board of Governors revoked CSL's license to conduct post-secondary degree activities, the school shut down and ceased paying rent.  *Id.*  When the lessor filed suit, CSL argued that frustration of purpose applied because it was no longer legally allowed to operate a law school on the premises.  *Id.* at 3.

The trial court found that frustration did not excuse the school's nonpayment.  CSL argued that the ability to operate a law school was an implied condition of the lease.  When CSL lost that ability, the changed circumstance caused a failure of consideration and destroyed the value of the lease.  *Id.* at 4.  The court disagreed.

First, the court noted that the lease expressly permitted uses other than an educational institution, including use as a general office space and use for other lawful purposes.  *Id.*  Because the lease allowed the space to be used for purposes besides an educational institution, CSL could not claim that "there [was] an implied condition in the lease that CSL be able to operate a law school on the premises and that CSL's inability to do so should excuse performance."  *Id.*

Next, the court noted that the lease contained a force majeure clause which, by its express terms, could not excuse CSL's obligation to pay rent.  *Id.* at *5.  The carve out in the force majeure clause indicated the parties' intent that nonpayment of rent would be a breach of the lease, notwithstanding CSL's failure to maintain a license.  *Id.*

Finally, the court also noted that CSL failed to show that revocation of its license caused a failure of consideration or total destruction of its expected value because CSL could have utilized the premises for other purposes or sublet the premises.  *Id.*  ("CSL could have used the premises for general office operations, or could have sought Plaintiff's approval to use the Premises for another legally permitted use or to assign its interest in the Lease or sublease the Premises. Therefore, the frustration of purpose doctrine does not excuse CSL's payment obligations under the Lease . . . .").

CEC argues that both the global pandemic itself and pandemic-related government regulations are frustrating events.  However, the force majeure clause of the Greensboro lease supersedes the frustration of purpose doctrine because the parties specifically allocated the risk of unusual governmental regulation.  The force majeure clause contemplates unusual government regulations and how they may alter the parties' performance obligations.  The parties specifically agreed that unusual government regulations shall not relieve CEC's obligation to pay rent.  As in *Charlotte School of Law*, the exception of payment obligations from the force majeure clause precludes CEC's reliance on frustration due to the alleged occurrence of a force majeure event. 2018 WL 3830008, at *5.

The Court also must recognize that the Abatement Motion only makes sense if the leases are to be assumed.  North Carolina requires a near "total destruction of the expected value of performance" before frustration can apply.  *Id.* at *4.  CEC could have rejected the leases at the

outset of its bankruptcy case if it believed the leases were valueless.  If CEC intends to close the relevant venues, there would arguably have been a "permanent" or "total" loss of the value of the lease.

In the context of the pandemic, CEC choose to retain its leasehold rights for use after the pandemic and its associated governmental regulations subside.  This suggests that CEC believes that any destruction of value is limited to the period where the government regulations are in effect.  The destruction is temporary, not total.  This Court has located no case in which such a temporary reduction in the value of the lease was adequate for the Court to determine that there had been a frustration of purpose.

Moreover, there is no evidence that CEC considered other uses for the leased premises.  The principal obstacle alleged by CEC is that it cannot operate a Chuck E. Cheese restaurant at the venue.  Although it might not be consistent with CEC's long term best interests or business plan, nothing in the lease precludes CEC from opening another style of pizza restaurant or other potential uses of the facility, without gaming.

### _Washington_

CEC is not entitled to abatement or reduction under frustration of purpose in Washington because the Spokane and Lynnwood leases allocate the risk of harmful government regulations.  The Supreme Court of Washington defines commercial frustration as follows:

> Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.

_Weyerhaeuser Real Estate Co._, 637 P.2d at 650.  "Commercial frustration 'is limited to cases of extreme hardship where the event was not foreseeable and counterperformance is nearly or totally

destroyed.'" *Metro. Park Dist. of Tacoma v. Griffith*, 723 P.2d 1093, 1102-03 (Wash. 1986) (citing *Thornton v. Interstate Sec. Co.*, 666 P.2d 370 (Wash. Ct. App. 1983)).

"[F]oreseeability is merely a relevant factor in determining whether nonoccurrence of the frustrating event was a basic assumption of the frustrated party in entering the transaction." *Wash. State Hop Prods, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 773 P.2d 70, 76 (Wash. 1989) (en banc). If a basic assumption is found, foreseeability becomes irrelevant. *Id.*

Washington is often regarded as having a "quite liberal application of the frustration doctrine." 17 Wash. Prac., Real Estate § 6.91 (2d ed. 2020). Although liberally applied in Washington, "the doctrine of frustration does not apply if the contract between the parties disclosed an allocation of that risk to one party or the other." *Scott v. Petett*, 816 P.2d 1229, 1236 (Wash. App. 1991).

The remedy in Washington when frustration applies is that a party is "discharged from performing its duties." *Griffith*, 723 P.2d at 1102. Discharge of a party's duties equates to rescission of the contract. *See Goschie Farms, Inc.*, 773 P.2d at 75 ("Rescission based upon slight frustration would be inappropriate.").

Frustration of purpose does not relieve CEC of its obligations under the Spokane or Lynnwood lease because both leases allocate the risk when government regulations impact performance. As in the Greensboro lease, the force majeure clauses in the Washington leases acknowledge that government regulations might impact a party's ability to perform. While the parties could not have foreseen that a global pandemic would *cause* government regulations, the parties expressly recognized that government regulations could delay or prevent contractual performance. The force majeure clauses generally excuse performance in those situations, thus allocating the risk to the nonperforming party. However, payment of rent is excepted from the

force majeure clauses, which demonstrates that the parties assigned the risk of paying rent during a force majeure event to CEC.  Washington does not allow a party to assert frustration when the lease allocates the risk of frustration.  *Scott*, 816 P.2d at 1229.

Even if frustration applied, the remedy in Washington is rescission of the leases.  *Goschie Farms, Inc*., 773 P.2d at 75.  CEC would not be entitled to reduce its rent obligations or postpone the payment of rent.  Nor could the Court equitably grant that relief.  CEC would be faced with the decision of whether to perform its obligations at the Spokane and Lynnwood venues or terminate those leases.

The force majeure clauses in the Spokane and Lynnwood leases supersede Washington's commercial frustration defense.  Those clauses do not relieve CEC of the obligation to timely pay rent.  Even if CEC could assert the doctrine of frustration, the sole remedy would be rescission of the Spokane and Lynnwood leases.

<u>California</u>

To establish frustration of purpose in California, a party must show that (1) the principal purpose in entering the contract was substantially frustrated, (2) the frustrated party is not at fault, and (3) the non-occurrence of the frustrating event was a basic assumption when the contract was entered.  *Cutter Labs, Inc. v. Twining*, 221 Cal. App. 2d 302, 314-15 (Cal. Dist. Ct. App. 1963); *Dorn v. Goetz*, 193 P.2d 121 (Cal. Dist. Ct. App. 1948); *see Peoplesoft U.S.A., Inc. v. Softeck, Inc.*, 227 F. Supp. 2d 1116, 1119 (N.D. Cal. 2002).  "The question in cases involving frustration is whether the equities of the case, considered in the light of sound public policy, require placing the risk of a disruption or complete destruction of the contract equilibrium on defendant or plaintiff under the circumstances of a given case."  *Lloyd v. Murphy*, 153 P.2d 47, 53-54 (Cal. 1944).

"It is settled that if the parties have contracted with reference (to the frustrating event) or have contemplated the risks arising from it, they may not invoke the doctrine of frustration to escape their obligations." *Glenn R. Sewell Sheet Metal, Inc. v. Loverde*, 451 P.2d 721, 727 (Cal. 1969). A party may be excused from performance "[w]hen it is prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, *unless the parties have expressly agreed to the contrary*." Cal. Civ. Code § 1511(2) (emphasis added).

California also recognizes the doctrine of impossibility. "[I]mpossibility as excuse for nonperformance of a contract is not only strict impossibility but includes impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved." *Autry v. Republic Prods, Inc.*, 180 P.2d 888, 891 (Cal. 1947). "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." *Mineral Park Land Co. v. Howard*, 156 P.2d 458, 460 (Cal. 1916).

Performance under either the three California leases is not made impracticable based on unreasonable cost. The cost is the rent, and nothing about the pandemic or government regulations increase the cost of rent at any venue. Impossibility does not apply to the California leases because the government regulations have no impact on CEC's cost of performance or actual ability to perform.

The Cupertino and National City leases supersede frustration of purpose under California law. Both of those leases excuse most nonperformance caused by government regulations, but expressly require rent payments notwithstanding frustrating regulations. The Court ruled at an earlier hearing that the force majeure clause of the Cupertino lease does not permit abatement of rent in this case. The force majeure clause of the Cupertino lease reads as follows:

> Subject to the casualty and condemnation provisions of this Lease, if ether party shall be prevented or delayed from punctually performing any obligations or satisfying any condition under this Lease by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, unusual governmental restriction, regulation, or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, or cause by the other party, then the time to perform such obligation to satisfy such condition shall be extended on a day-for-day basis for the period of the delay caused by such event; provided, however, that the party claiming the benefit of this Section shall, as a condition thereto, give notice to the other party in writing within ten (10) days of the incident specifying with particularity the nature thereof, the reason therefor, the date and time incurred and the reasonable length said incident will delay the fulfillment of obligation contained herein.  Failure to give such notice within the specified time shall render such delay invalid in extending the time for performing the obligations hereunder.  ***This Section shall not apply to the . . . inability to pay any sum of money due hereunder or the failure to perform any other obligation due to the lack of money or inability to raise capital or borrow for any purpose . . . .***

(ECF No. 902 at 3 (emphasis added)).  This provision is substantively identical to the force majeure clauses found in the Greensboro and Spokane leases.  For the same reasons as those leases, the force majeure clause of the Cupertino lease supersedes frustration of purpose.  *Loverde*, 451 P.2d at 727.  Identical reasoning applies to supersede frustration under the National City lease.  *Id.*

The Granada Hills lease also supersedes the frustration of purpose doctrine.  Unlike the other leases at issue, the Granada Hills lease contains an anti-force majeure clause.  Further, the anti-force majeure clause makes no reference to governmental regulations.  Instead, the anti-force majeure clause states that a party is not excused from performance if that party's performance was prevented or delayed "by reasons of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of either party."  (ECF No. 870 at 2).

While the anti-force majeure clause does not specifically mention government regulations, the clause expresses the parties' intent that unforeseen circumstances will not excuse performance under the Granada Hills lease.  The government regulation preventing CEC from fully operating

at the Granada Hills venue is a "cause beyond the reasonable control of either party." (*See* ECF No. 870 at 2). The frustration of purpose doctrine does not excuse nonperformance when "the parties have expressly agreed to the contrary." Cal. Civ. Code § 1511(2). The anti-force majeure clause of the Granada Hills lease demonstrates the parties' express agreement that frustrating events do not excuse performance.

Even if the leases did not supersede the doctrine, the purpose of each lease has not been totally frustrated, only restricted. In *Lloyd v. Murphy*, the lessee rented space "for the sole purpose of conducting . . . the business of displaying and selling new automobiles (including the servicing and repairing thereof and of selling petroleum products of a major oil company) and for no other purpose whatsoever without the written consent of the lessor except to make an occasional sale of a used automobile." 153 P.2d at 48-49. During World War II, the federal government restricted the sale of new automobiles. *Id.* at 49. Due to the government restrictions, the lessor orally waived the lease's restriction on use and offered to reduce the rent if the lessee could not operate profitably. *Id.* Nevertheless, the lessee vacated the premises. *Id.* The lessor filed suit and the lessee asserted that frustration of purpose excused its obligations under the lease. *Id.*

The California Supreme Court recognized that frustration can excuse lease obligations when "[p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration." *Id.* at 50. However, application of the doctrine is limited to cases of "extreme hardship," where the frustrating event was not reasonably foreseeable and the value of counterperformance is nearly totally destroyed. *Id.* "Frustration is no defense if . . . counterperformance remains valuable." *Id.* As such, " laws or other governmental acts that make performance unprofitable," do not frustrate a lease. *Id.* at 51.

The value of the lease at issue was not destroyed because "[t]he sale of automobiles was not made impossible or illegal but merely restricted and if governmental regulation does not entirely prohibit the business to be carried on in the leased premises but only limits or restricts it, thereby making it less profitable and more difficult to continue, the lease is not terminated or the lessee excused from further performance." *Id.*  Because the value was not destroyed, frustration was inappropriate.  The Supreme Court noted that a contrary result would undermine the certainty of contracts and encourage litigation whenever government regulations negatively impact profitability. *Id.* at 52.

Like in *Lloyd*, the governmental restrictions here restrict, rather than destroy, the purpose of CEC's California leases.  The Cupertino lease permits CEC to use the premises for any lawful retail or restaurant purpose, so long as the use does not conflict with other tenants of the shopping center where the venue is located.  (ECF No. 902 at 3).  Although the government regulations currently limit CEC's ability to operate its primary business, the Cupertino lease allows CEC to operate any number of different businesses on the premises.  This demonstrates that operation of a Chuck E. Cheese venue was not the parties' primary purpose when entering the lease.  Further, the governmental regulations do not prevent CEC from using the premises in accordance with the lease.

Like the Cupertino lease, the Granada Hills lease permits a wide array of alternative uses for the premises.  The Granada Hills lease states that "[t]enant shall use the Premises for . . . Pizza restaurant; electronic games and animated computer controlled electronically amplified shows and related uses . . . and shall not use or permit the Premises to be used for any other purpose without prior written consent of Landlord, which shall not be unreasonably withheld."  (ECF No. 802-1 at 2).

27 / 29

That provision allows CEC to use the premises for other purposes, so long as CEC obtains the landlord's consent. Because the landlord cannot unreasonably withhold consent, the primary purpose of the lease is not limited to operating Chuck E. Cheese venue. Instead, CEC is free to pursue profitable alternative uses of the Granada Hills premises. Restriction of the purpose of the lease, rather than near total destruction, does not lead to frustration. *Id.*

Finally, the National City lease allows CEC to use the premises as "a pizza restaurant and family entertainment center, including computer controlled, amplified, animated shows, electronic games, and related items." (ECF No. 679 at 15). The government regulations presently prohibit CEC's use of the venue as a family entertainment center, however, the regulations merely restrict its use as a pizza restaurant. For the majority of this bankruptcy case, CEC has been legally permitted to operate the dining portion of the National City venue, albeit at reduced capacity. CEC voluntarily determined against doing so. This restriction, and CEC's business decision to prioritize its own long term business interests over near term profits, does not totally destroy the value of the lease in accordance with *Lloyd*.

For the reasons stated above, CEC is not entitled to reduction or abatement of its rent obligations. The Court is sympathetic to the hardship which CEC has endured as a result of the global pandemic. However, neither the Bankruptcy Code, the force majeure clauses of the leases, nor the doctrine of frustration afford CEC the relief requested.

## CONCLUSION

The Abatement Motion is denied as to the objecting lessors.  A separate order will be entered.


SIGNED 12/14/2020

_____
Marvin Isgur
United States Bankruptcy Judge